```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Norfolk Division

 3    - - - - - - - - - - - - - - - - - -
                                         )
 4    CENTRIPETAL NETWORKS, INC.,        )
                                         )
 5           Plaintiff,                  )       CIVIL ACTION NO.
                                         )            2:18cv94
 6                                       )
      v.                                 )
 7                                       )
      CISCO SYSTEMS, INC.,               )
 8                                       )
             Defendant.                  )
 9    - - - - - - - - - - - - - - - - - -

10

11                    TRANSCRIPT OF PROCEEDINGS
                            (Motions Hearing)
12
                          Norfolk, Virginia
13
                        September 11, 2019
14

15    BEFORE:  THE HONORABLE HENRY COKE MORGAN, JR.
               United States District Judge
16

17

18    APPEARANCES:

19            KAUFMAN & CANOLES, P.C.
              By:  Stephen E. Noona
20                    - and -
              KRAMER LEVIN NAFTALIS & FRANKEL LLP
21            By:  Paul J. Andre
                   Counsel for the Plaintiff
22
              TROUTMAN SANDERS LLP
23            By:  Dabney J. Carr, IV
                      - and -
24            DUANE MORRIS LLP
              By:  Matthew C. Gaudet
25                 Counsel for the Defendant
```

```
 1              (Proceedings commenced at 2:13 p.m.)
 2              THE CLERK:  Civil action 2:18cv94.  Plaintiff
 3    Centripetal Networks, Inc. vs. Cisco Systems, Inc.
 4              For the plaintiff, Mr. Andre, Mr. Noona, are you
 5    ready to proceed?
 6              MR. NOONA:  We are.
 7              THE CLERK:  For the defendant, Mr. Gaudet, Mr. Carr,
 8    are you ready to proceed?
 9              MR. CARR:  We are.
10              THE COURT:  We're here on the plaintiff's motion to
11    lift the say.
12              MR. NOONA:  Good morning.  Stephen Noona, Your
13    Honor, on behalf of the plaintiff.  I have with me Mr. Paul
14    Andre.  You may remember him from the trial we had earlier
15    last year.  He's going to take the lead on this argument.
16              THE COURT:  All right.
17              MR. ANDRE:  Good afternoon, Your Honor.  May it
18    please the Court?  I have some slides I'd like to hand up, if
19    that's okay.  Three copies enough?
20              May I proceed, Your Honor?
21              THE COURT:  You may.
22              MR. ANDRE:  Your Honor, we filed this motion to lift
23    the stay because circumstances have changed, since the stay
24    was instituted, that we think warrant lifting the stay and
25    getting this case going and setting it for trial.
```

1            Just to remind the Court of where this case -- the

2     disposition of it, if you turn to slide 2 on the set I have

3     given you here, you will see -- the page number is on the

4     bottom right-hand corner.  You will see that we filed this

5     case February 13, 2018.  So the case has been pending already

6     over a year and a half.  We filed 11 patents in the case.

7            What I want to draw the Court's attention to is that

8     in three of these patent families -- that dictates eight of

9     the patents.  If you look at the first and second one, that's

10    a rule swapping patent family.  The next three are the

11    filtering network data transfer patent family.  And then the

12    methods and systems for protecting a secured network are the

13    other three.  So eight of the 11 patents have family patents

14    that were set out there.

15            Why this is important is because when the dust

16    settles from all the IPRs, one of these patents from each one

17    of those families did not go through IPR.  So we're going to

18    go to trial on at least one of those at the very least.

19            THE COURT:  Do you mean one of each group?

20            MR. ANDRE:  Yes, at least one of each group that are

21    not in IPR, that a claim is not in IPR.

22            THE COURT:  Okay.

23            MR. ANDRE:  So that's the reason, when you go to the

24    next slide, slide 3, you'll see the patents with no claims in

25    IPR, and you'll see the patent with some claims in and some

1    claims out, and then you'll see the patents with claims --

2    all the asserted claims are in IPR.  If you look at that

3    grouping of the five patents with claims not in IPR, that's

4    141 claims.  As you look at the previous slide, you see that

5    all the families are going to go to trial.

6         So if you go to slide 4, you'll see what's being

7    accused of infringing the 141 claims not in IPR, which are

8    four product lines, and those exact same four product lines

9    are accused of the claims that are in IPR.

10        So the point that I'm trying to make is that,

11   regardless of what happens in the IPRs, we're going to go to

12   trial on the same products; it will be the same discovery;

13   the same damages; the same witnesses; the same experts --

14   everything that's going to go forward with the 141 claims

15   that are not in IPR.

16        And to give you an idea of when these IPRs are going

17   to conclude, if you go to slide 5, you'll see these are the

18   final written decisions when all the IPRs will be done.  They

19   start ending, the first set, the final written decisions will

20   come out in January of next year, which is in a few months.

21   And then there's two more in March, one in April, and one in

22   May.  So by May 20th at the latest, we're going to know the

23   status of all the IPRs.

24        THE COURT:  All right.

25        MR. ANDRE:  So what I've done on the last slide here

1    is to give a possible case schedule, just to give Your Honor

2    an idea what we're thinking about.  And you will see that if

3    you look at the proposed schedule, we could schedule a trial

4    a year from today, or September 7th, and get all the

5    discovery in, get the *Markman* hearing in, expert reports,

6    everything in, and by the time we're done with all of that,

7    all the IPRs will be done.

8         So we can do the discovery we're going to do

9    regardless.  We can start it now.  We're going to do it on

10   the same products, the same patents.  When it comes to claim

11   construction, the Court will have the benefit of knowing

12   where the IPRs stand at that time.  So there's absolutely no

13   reason to stay the case.

14        It does not simplify matters at all at this point.

15   When Your Honor stayed the case originally, there were a lot

16   of IPRs still outstanding.  We weren't sure how it was going

17   to suss out.  Some were instituted; some were not.  And as I

18   said, as it shaped out, when we got the final determination,

19   that's when we filed the motion to lift the stay because we

20   realized that the scope of discovery is not going to change

21   at all, and nothing in the case will change regardless.

22        If you told us right now and said, Mr. Andre, you

23   have to go to trial on the five patents and 141 claims that

24   are not in IPR, we could do that also.  We do could that in

25   the spring.  We could just take off and get that going very

```
 1    quickly.  We could bifurcate out the two cases.  If Your
 2    Honor had one single trial, then we could do that a year from
 3    today.
 4           THE COURT:  Well, the Court is not going to try 141
 5    claims in one trial.
 6           MR. ANDRE:  Well, we're going to have to do a claim
 7    election, obviously, and we're going to have to simplify.  We
 8    understand how the Court is set up.  With 141 claims, just to
 9    give you an idea of the scope of the number of claims not in
10    IPR at this point, we will do -- if you look at the proposed
11    schedule, we have a final election of claims scheduled here,
12    a hypothetical one here, in May.  And that's when you can go
13    through and say these are the claims that are going to go
14    trial.
15           At that point, we would have the benefit of knowing
16    what patents are ones that went through IPR and that came out
17    of IPR.  We think almost all the claims will come out of IPR.
18    We will have 300-and-some-odd claims to choose from, but
19    we'll have to determine which claims we want to go forward
20    with at that point.
21           With the 141 claims, if you were to say we're going
22    to bifurcate and have two trials, then what we would do is
23    we'd make an election much earlier out of the 141 claims.
24    There is -- the urgency behind --
25           THE COURT:  I can't recall whether any discovery
```

1    took place in the case before it was stayed.

2            MR. ANDRE:  Not much, Your Honor.  I don't think any

3    at all.

4            THE COURT:  The case started with Judge Davis --

5            MR. ANDRE:  Yes.

6            THE COURT:  -- and was transferred to me --

7            MR. ANDRE:  That's correct.

8            THE COURT:  -- because I tried the other case.

9            MR. ANDRE:  That's correct.

10            THE COURT:  All right.

11            MR. ANDRE:  So the reason this is --

12            THE COURT:  Why do we have this staggered schedule

13    of various claims being decided on an IPR?

14            MR. ANDRE:  It's because Cisco filed IPRs at

15    different times.  That's governed by statute.  And the

16    written decisions come out --

17            THE COURT:  How many different filings did they

18    make?

19            MR. ANDRE:  They filed 14 IPRs.

20            THE COURT:  I know, but all at the same time or at

21    different times?

22            MR. ANDRE:  No, at all different times, staggered

23    out over time.  So that's part of the tactic of trying to

24    stall this case out.  They filed these over several months,

25    and then after they filed the last one and the first ones

1   started coming through, that's when they moved the Court to

2   stay it.  So we have 14 IPRs that are outstanding.  Some have

3   been instituted.

4         THE COURT:  Well, what decision date do we have on

5   the first group that they asked for?

6         MR. ANDRE:  Some were instituted; some were not.

7         THE COURT:  In other words, there's this schedule of

8   when they're going to decide them, and you said that they

9   staggered the filings.

10        MR. ANDRE:  Yes.

11        THE COURT:  They filed a few at a time.

12        MR. ANDRE:  Yes.

13        THE COURT:  Where is that?

14        MR. ANDRE:  Slide 5 is the timeline.

15        THE COURT:  All right.  Now, January 24th, is that

16   the first?  Did they file them five different times, and

17   that's why we have five different dates that they're

18   concluding?

19        MR. ANDRE:  That's correct, Your Honor.  Actually,

20   it was more than five different times.  Just those are the

21   ones instituted.  They filed the first set on July 12th.

22   Then they filed some on July 20th, July 27th, August 3rd,

23   August 10th, August 21st, September 17th, and September 18th.

24         So they filed them from that staggered time period.

25   And then the Patent Office has statutory time periods they

1    have to decide certain things by.  It's all based on three

2    months or six months, et cetera, one year.  So this is -- the

3    final written decisions can come out earlier than this

4    schedule, but by statute, this is the last day for the final

5    written decisions to come out.  Sometimes the Patent Office

6    will come out earlier with a decision, but that's when they

7    have to by statute.

8              THE COURT:  All right.

9              MR. ANDRE:  So when we got the final disposition of

10   what was going to be instituted and go through IPR and which

11   was not and we did the math and we looked at the scope of

12   discovery and we realized nothing was going to change, we

13   filed this motion, and there is a sense of urgency because of

14   the prejudice to Centripetal.

15             THE COURT:  Well, the last group was filed on

16   September 18th, did you say?

17             MR. ANDRE:  I believe that's correct, Your Honor.

18             THE COURT:  Of last year?

19             MR. ANDRE:  Of 2018.

20             THE COURT:  And the first group was filed?

21             MR. ANDRE:  On July 12th.

22             THE COURT:  Okay.

23             MR. ANDRE:  And as I say, the reason for the urgency

24   here is because what we're seeing in the marketplace is Cisco

25   is obviously a much larger player, and they can kill us in

1    the marketing department and sales force and whatnot.
2    They're competing against us directly, but what's more
3    troublesome is now Cisco's competitors, their bigger
4    competitors, the other big global behemoths are seeing Cisco
5    do this, and they're trying to copy Cisco because they have
6    to compete against them.
7         So now we're not only competing against Cisco, but
8    we're also competing against other big players as well.
9    They're starting to come in to copy what Cisco is doing
10   because they have competing products.
11        THE COURT:  Well, that's what happens in these
12   software cases.  They have a shelf life.
13        MR. ANDRE:  So everyone is jumping in now.  We're
14   sitting here on the sideline with the case stayed, not able
15   to enforce our patents, and that's the reason for the
16   urgency.
17        THE COURT:  Okay.
18        MR. ANDRE:  As far as the timing goes, I think this
19   is the right time because, like I said, given this proposed
20   schedule, that discovery is going to happen regardless.  It's
21   either now or six months from now.  It's going to happen.  It
22   doesn't change the scope of anything that is going to happen
23   in the case.
24        If Your Honor has any questions?
25        THE COURT:  No.

```
1              MR. ANDRE:  I'll turn it over to my colleague.
2              MR. CARR:  Good afternoon, Your Honor.  I'm Dabney
3       Carr with Troutman Sanders in Richmond, and Matt Gaudet with
4       Duane Morris from Atlanta is going to argue the motion today.
5              THE COURT:  All right.
6              MR. GAUDET:  Good afternoon, Your Honor.  I've got a
7       chart, if I might hand it up, Your Honor.
8              And, Your Honor, the main point that I want to make
9       throughout the argument and with the chart are that the only
10      things that have changed since you entered the stay add
11      further support for the stay.  So what this chart is is a
12      chart of all 11 patents that are asserted in this case.
13             Now, we only sought IPRs on nine of them.  That's
14      always been true.  So the bottom two patents in white, there
15      were never IPRs filed on that, and that was always the case.
16             So the first six patents in this chart are IPRs that
17      were instituted on all claims.  So almost better than anybody
18      could have predicted.
19             The next patent, this '205 patent, where we've got
20      two different colors, a lighter red and then a lighter
21      yellow, that patent was instituted -- there are 96 claims in
22      that patent, and a little more than half were instituted.
23      But let me pause on that because there are three claims in
24      that patent that, from what we can tell, are the most
25      important.
```

1          Claim 1 was the claim they actually talked about in

2     their complaint, where they went through it.   Then, Your

3     Honor, in the Keysight trial, they had to choose two claims.

4     They chose claim 17 and claim 33.   All of those were

5     instituted.   So from what we can tell, everything that really

6     mattered in that patent got instituted.

7          What changed, I guess, is that they avoided

8     institution on just two patents, and that's the one that's

9     got the yellow line going all the way across, the '193 and

10    the '176.   That's it.   And that's over a 70 percent hit rate

11    for us, which is much better than even we would have

12    predicted based on the statistics.

13          And, Your Honor, with respect to the question of the

14    timing of the filings, these patents are huge.   Some of them

15    have 96 claims, where you have to file four IPRs just to take

16    care of a single patent.   And so it was a four-month period

17    over which we got 14 of these massive filings complete with

18    expert declarations on file.   We would have done it quicker

19    if we could have, but it just rolled out that way.

20          But the punch line over on the right of this chart,

21    the far right in the red, I bolded the dates of the deadlines

22    for the decisions.   And the last date is May the 20th.   So we

23    filed this motion to stay a year ago.   We've only got eight

24    months left.   And eight months from now, we're going to have

25    the answer on all of these IPRs.

1            Also, in terms of the simplification of the issues,

2      I again want to talk a little bit about the Keysight trial

3      because I think this will really make the point.

4            There are five patents that were at issue in the

5      Keysight case that are also at issue here.  One of those

6      patents is a patent that we didn't file an IPR on.  So that's

7      never been an issue.

8            For the other four patents, every one of the claims

9      that they went to the jury in Keysight on are currently under

10     review in the IPR.  That's the kind of difference that this

11     scenario would have had a profound impact on the issues that

12     actually have to be tried, and we expect the same thing will

13     happen here, Your Honor.

14           The point that Mr. Andre made about grouping these

15     patents into related families and saying at least one of each

16     survived, let me say, for what it's worth, that was not

17     anywhere in the motion papers.  That's a new argument that he

18     made today.  So I'm giving you my immediate reaction to that,

19     which is if these patents were all the same, you wouldn't

20     have different results in the IPRs.

21           Of course, what matters for fact discovery are the

22     specifics of the claims and what exactly is the thing that's

23     so inventive in this given claim that differentiated it.  And

24     so the list of products that Mr. Andre had -- Cisco routers,

25     Cisco switches, Cisco's firewalls -- that's almost everything

1    that Cisco does, and that's not a way to figure out the scope

2    of fact discovery.  That would be trillions of documents.

3         Fact discovery is based on the specific patents that

4    are actually in the case, and we're only eight months away

5    from knowing the answer to that.

6         The other point I want to address, Your Honor, is

7    the competitor -- the prejudice issue that Mr. Andre raised.

8    To be honest, I have no idea what he is talking about.  There

9    is no evidence of any sort of anyone in the marketplace doing

10   what he just described when he said people are copying Cisco.

11   And there's nothing.  There is no declaration.  There's not

12   proof that Cisco and Centripetal are even competitors.

13        They easily could have put in a declaration

14   identifying what products compete, customers that a sale was

15   lost to, the sales channels.  There is nothing of the sort.

16   It was previously just lawyer argument when they were saying

17   that we were competitors.  And they don't even plead that in

18   the complaint.  The complaint does not even allege we're

19   competitors.

20        But the idea that -- at Cisco, a lot of the things

21   they're accusing, Cisco has been doing for years.  The idea

22   that somebody is copying something that's relevant to this

23   patent because of Cisco, that is completely unsubstantiated,

24   and certainly nothing has changed.  It's not a basis for Your

25   Honor to change the ruling.

1              Your Honor, unless there are other questions, that's

2    everything I have.

3              THE COURT:  All right.

4              MR. ANDRE:  Just very briefly, Your Honor.  They're

5    proposing continuing the stay until May of 2020, after May 20

6    of 2020.  If we were to be aggressive with the trial schedule

7    after that, we're not going to trial until, presumably, early

8    2021.  That means this case will be pending for three years.

9              Now, I can promise you an argument that we're going

10   to hear in May of 2020 -- I think we're going to be very

11   successful in these IPRs and the claims will be confirmed

12   valid.  But the question we're going to hear is Mr. Gaudet is

13   going to come up and say, yeah, but we're going to appeal

14   these IPRs decisions to the Federal Circuit.  Let's wait

15   another year and a half or two years, however long it takes

16   for the Federal Circuit.

17             There comes a time when the stay is so unfairly

18   prejudicial to one side, that it's time to lift it.

19             Here is an instance where -- he gave you a chart

20   that talked about institution decisions.  You see five of

21   them denied on the institution of the patents, and the

22   different patents, different claims, and two were not even

23   filed against.

24             So if you just look at what was denied on

25   institution and what claims are not in institution, like I

1    said, that's 141 claims.  We can't try 141 claims.  We can go

2    to trial on those five by themselves.  IPRs don't clarify

3    anything for those.

4              We can tee that up very soon, and we can get

5    discovery up and running, but for judicial economy, it makes

6    more sense to kind of push it out a little further and do it

7    all at one time after the IPRs.

8              We're happy to do it either way because, contrary to

9    what Mr. Gaudet says, we are going to have the same discovery

10   on those 141 claims just as we would on the 176 claims that

11   are in IPR, regardless of which ones comes out and which ones

12   we elect.  It's going to be the same scope of discovery.  It

13   will be the same everything; damages, experts.  Everything is

14   going to be exactly the same.

15             So right now, a delay is for delay purposes only,

16   which I understand Cisco wants another eight months, and

17   after that, they'll want another year and a half, two years.

18   As long as they can get it delayed, it's good for them

19   because, like you said, these things have a shelf life.

20   These new patents are coming out, but it does have a shelf

21   life, and there comes a point where a small company like

22   Centripetal will bleed out eventually.

23             And one of the things that was apparent from the

24   last trial is Centripetal is a real company.  They have a

25   sales force, a development force.  They're out there in the

1    market trying to make a go of it.  Mr. Rogers, sitting back

2    there, his father found that company.  He's one of the vice

3    presidents.  He'll tell you the sales they lose to Cisco and

4    why they're at a competitive disadvantage.

5            But for the purposes of this motion, what's key is

6    there's no simplification.  We're going to do a trial on the

7    same products.  Patent claims are substantially similar,

8    regardless of what happens at IPR, so why not get this going

9    now and save the prejudice to the small company so they don't

10   have to go out of business eventually.

11           THE COURT:  Okay.

12           MR. ANDRE:  Thank you, Your Honor.

13           (Pause in the proceeding.)

14           THE COURT:  The Court is going to lift the stay.  I

15   will set the trial for the cases which are not in IPR for

16   March 9th, and you can work back from there to fix your dates

17   for the final pretrial conference.  I'm going to lift the

18   stay effective October the 3rd, and I want counsel to submit

19   a proposed pretrial schedule by that date.

20           Well, wait a minute.  Make it October 2nd, and we'll

21   schedule a scheduling conference for October 3rd.

22           Counsel keep saying we only have to wait eight

23   months.  Well, unless the Court sets the trial for May,

24   that's not true.  We'd have to wait more than eight months

25   just to get the case scheduled, not to mention the pretrial.

1    That would mean the case is, what, two years and four months

2    old by the time they're going to finish that schedule of

3    decisions.

4            Whether the defendant filed these requests in a

5    staggered fashion on purpose or not, the result of filing

6    them in such fashion is that it delays the whole procedure.

7    This Court normally resolves patent cases within a year of

8    when they're filed.

9            The case has already been pending for a year and a

10   half.  If we hear it in March, that means it's been pending

11   for 25 months.  And of course, we can't finish cases the year

12   when they're submitted for review with the Patent Office.

13   That makes it impossible, but particularly this form of

14   patent -- that is, computer programs -- has a shelf life, a

15   very short shelf life.  And I always tell the attorneys who

16   are fighting over these cases, that by the time they finish

17   litigating it, it may well be obsolete, and that's the

18   problem I'm facing here.

19           Obviously, security in this area is very much at the

20   forefront of what people are seeking to develop at this time.

21   So this area is bound to be extremely competitive, thus

22   making the shelf life of the patents that much less.  And I

23   don't agree that you can necessarily resolve the plaintiff's

24   problems by money damages.  When you're trying to enter a

25   field so competitive as this, when you're delayed from being

 1    able to do it by alleged infringement, that's going to hamper

 2    the efforts for a new entity trying to enter the field, which

 3    is apparently what the plaintiff is; they are relatively new

 4    in the field.

 5          It's a very important field.  And it's certainly the

 6    policy of this Court to encourage people to enter this field

 7    because it's a very important field.  It has to do with the

 8    security of this country.  So the Court should do everything

 9    it can do to encourage people to enter this field and to

10    resolve disputes of this nature in as timely a manner as

11    possible.

12          So I always say to people involved in this kind of

13    litigation that both of you might be losing money by spending

14    your money on litigation instead of trying to resolve your

15    dispute so that both companies can go in the direction which

16    they should because you may find out, by the time you finish

17    this case, and if somebody appeals it, by the time the appeal

18    is heard, you may be holding an empty bag.

19          So I always encourage parties in this kind of

20    litigation to try to resolve their differences as soon as

21    possible.  And the fact that it's under review, it's

22    questionable what effect that's going to have on the final

23    outcome when there's so many patents in the same family that

24    are not under review.

25          So it's not as if the plaintiff is going to be

1   driven out of business by this, although, as a practical

2   matter, I suppose it could be, but if there are patents that

3   are not in dispute -- or not under review -- I shouldn't say

4   "not in dispute" because I guess they are in dispute -- I

5   think the parties would be well advised to work on.

6           I mean, look at the work.  I mean, you've got all of

7   these reviews which take a lot of work, and then you've got

8   all of these claims to try.  I mean, it's going to be a

9   monumental task just to try the claims that are not in

10  dispute.  We're certainly not going to try 141 claims at one

11  time.  So there will be plenty of claims for us to try in

12  March.

13          And apparently, these claims can survive

14  independently, or if they couldn't survive independently,

15  then you would think that they would be reviewed along with

16  the others since the five I'm looking at -- they asked them

17  to review it, and they turned them down.

18          So I think that the parties need to proceed full

19  speed ahead.  So submit a proposed pretrial schedule to the

20  Court.  And I think that you need to move up the election

21  date as to what claims you're going to try because that will

22  have the ability to get it to a manageable number, and

23  hopefully, it will eliminate some of the duplication between

24  what's before the Patent Office and what isn't.  And you can

25  separate those out that have the least relationship with the

1    ones that are under review.

2           So I want to see an early date for election, and of

3    course, the earlier the date for election is, the earlier the

4    date for the defendant's defenses related to the claims in

5    dispute.

6           All right.  Any questions?

7           MR. ANDRE:  No.  Thank you, Your Honor.  Appreciate

8    it.

9           MR. GAUDET:  Your Honor, two quick matters.  Well,

10   one quick matter, one question.

11          There's also pending a motion to dismiss -- I just

12   wanted to bring that to the Court's attention -- on the

13   willfulness claims and the indirect infringement allegations.

14          THE COURT:  Well, they didn't allege willfulness in

15   the complaint.  Or you said they didn't?

16          MR. GAUDET:  They did.

17          THE COURT:  Oh, they did?  I thought you said they

18   didn't.

19          MR. GAUDET:  No.  They alleged willfulness -- they

20   didn't allege that we were competitors.  They alleged that we

21   somehow knew about the patents, not that we were competitors.

22   They did allege willfulness, and that's the basis of the

23   motion, is that they didn't allege anything that would get

24   you to willfulness.  But that's pending.

25          The other thing I just wanted to raise with the

1    Court -- well, obviously, Cisco's position was to maintain

2    the stay.  We lost that.  We understand that.

3            Very much picking up on Your Honor's point that we

4    need to find a way to bring the whole dispute to a head,

5    Cisco's preference, if we're going to lift the stay, would be

6    to find a way to have one proceeding and one trial.  And so

7    if we could move the trial back another -- understood.

8    Understood.

9            It was going to be an effort to just do this all in

10   parallel, and if things drop out, they drop out.  That way,

11   we have a single trial.

12           THE COURT:  Well, usually, if you try this number of

13   claims, it ends up resolving the disputes between the

14   parties.  But if we have to have a separate hearing on some

15   of the patents, that's what we'll do.  But this case has been

16   delayed long enough, and the Court explained to you why it

17   feels that the delay is not in the best interest of public

18   policy as well as the litigants and this Court's standing

19   procedures to resolve cases as quickly as we can.

20           And there are a number of reasons for that, not only

21   the shelf life of the patent, but the cost to the parties.

22   The longer the case is pending, the more it costs both

23   parties.  So I think it would be premature for me to order a

24   settlement conference at this point, but that doesn't keep

25   the parties from talking.  And I will order a settlement

1    conference at some point if the case is not voluntarily

2    resolved.

3            MR. GAUDET:  And, Your Honor, last question.  Is the

4    stay lifted with respect to the entire case or only the --

5    the trial is only on the patents that are not in IPR.  Is the

6    stay -- entire stay lifted so the entire case is open?

7            THE COURT:  No.  Only for the patents that are not

8    in dispute.  The first decision is going to be on

9    January 24th.  I mean, the parties may say that, well, they

10   can try those on March 9th, but I'm not going to force

11   anybody to do it because it may not be feasible.  So I'm not

12   going to force somebody to trial on something that's either

13   still under review or will be under review until that short

14   of time before trial.

15           MR. GAUDET:  Thank you, Your Honor.

16           THE COURT:  But the Court's order will be effective

17   October 2nd, which is the date that I want the parties to

18   submit an agreed proposed schedule, just working back from

19   the trial date, which is the way we do it here.

20           I know in Alexandria they don't do it that way, but

21   here, we set the trial date and then we work backwards.  And

22   Richmond has its own way of doing it.  Maybe each judge has

23   its own way of doing things.  But what we do is pick a date

24   and then work backwards.

25           (Off the record at 2:52 p.m.)

Carol L. Naughton, Official Court Reporter

1                           CERTIFICATION

2

3        I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6

7              _____/s/_____

8                          Carol L. Naughton

9                          September 18, 2019

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25