IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| **CENTRIPETAL NETWORKS, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:18cv00094-MSD-LRL |
| | ) |
| **CISCO SYSTEMS, INC.** | ) |
| | ) |
| Defendant. | ) |

## CISCO SYSTEMS, INC.'S OPPOSITION TO PLAINTIFF CENTRIPETAL NETWORKS, INC.'S MOTION TO COMPEL CERTAIN DOCUMENTS AND DISCOVERY RESPONSES

The Motion to Compel ("Motion") filed by Plaintiff Centripetal Networks, Inc. requests documents and information that fall into two categories: (i) documents and information that Defendant Cisco Systems, Inc. ("Cisco") has already produced (or is already in the process of producing); and (ii) documents and information that Plaintiff attempts to identify by referencing the very infringement contentions that this Court already ruled are unintelligible. *See* Transcript of Proceedings (Motion Hearing) November 26, 2019 ("Hearing Tr."), at 19:5-20.

On the first category, Cisco has already produced documents more than sufficient to show how Cisco's products operate, including Cisco's crown jewels: the relevant source code. This is described in detail below (even with citations to Bates numbers) in response to each issue Plaintiff raised. Plaintiff, however, appears to have spent little time actually reviewing the production or the source code, nor asking Cisco's witnesses questions regarding that code. Indeed, despite telling the Court that "we'd like time to review their code" (Hearing Tr. at 22:5-7), the revised contentions that Plaintiff served Tuesday night do not contain a single citation to a line of source code. Similarly, Plaintiff's requests for damages-related documents

DM2\10759104.1

(*i.e.*, Cisco's agreements with its cloud providers and documents showing every product ever purchased by a customer that also purchased an accused combination of products) should be denied as overly broad, unduly burdensome, and not proportional to the needs of the case.

On the second category – and this is the most significant point relating to this Motion – the revised infringement contentions that Plaintiff served on Tuesday, December 10 (at 5:00 pm) are in violation of the Court's rulings at the hearing (which were confirmed by the written Order on December 11). To the extent there are areas of discovery that remain at issue, it is because Plaintiff tied them to its original, deficient infringement contentions. Plaintiff's revised contentions take that a step further, ignoring the Court's instructions.

## I.    Background

Plaintiff's Motion necessarily relies on the infringement contentions in this case, as those contentions define the scope of discovery. To the extent there were disconnects between the parties about the scope of discovery, it is because Plaintiff's contentions were deficient and Plaintiff refused Cisco's repeated requests for additional specificity during the course of the parties' meet-and-confers. To put this Motion into context, and to understand what can properly be at issue now, Cisco will therefore describe the new contentions – and Plaintiff's failure to comply with the Court's Order – before turning to the specific issues raised in Plaintiff's Motion.

### A.    Plaintiff's Failure To Comply With The Court's Order

Despite the specific directive from the Court, Plaintiff did <u>not</u> provide a list of the specific product(s) or combination(s) of products Plaintiff is accusing for each patent. There can be no mistaking the requirement, as Plaintiff's counsel explicitly acknowledged it to the Court. Hearing Tr. at 20:24-25 (Mr. Hannah: "Give them a list of the product[s]. I understand."). Instead, Plaintiff's supplemental contentions state that "The infringing products are set forth in Appendix 1, with a separate chart for each accused product or combination of products." Ex. 1

2

(Centripetal's Supplemental Response to Cisco's Interrogatory No. 1, at 8-9).  But Appendix A has no list either.  Instead, Appendix A is 321 pages worth of charts.  Each chart purportedly identifies <u>in the header of the chart</u> what product or combination is at issue for that chart.  Cisco attaches that Appendix A hereto as Ex. 2.  Had Plaintiff complied with the Court's Order to provide a list, Cisco could just attach the list of each specific product or combination of products for each patent.  Instead, Cisco (and the Court) must work through 321 pages just to try to understand what products are being accused.

Even worse, after working though those 321 pages, the identity of the specific accused products or combinations of products remains a mystery. Cisco specifically identified six items at the hearing: routers, switches, firewalls, Stealthwatch, Cognitive Threat Analytics (CTA), and Encrypted Traffic Analytics (ETA).  *Id.* at 6:1-10:1.  <u>None</u> of the charts identify CTA or ETA as an accused product in the header of the chart, but then some of the charts still reference CTA and/or ETA in connection with various claim elements.  As to Stealthwatch, some of the charts identify Stealthwatch in the header (and also in the body of the chart), but other charts do not identify Stealthwatch in the header yet nonetheless reference Stealthwatch in the body of the chart.  The infringement contentions thus remain a moving target, and this deficiency is directly tied to the problem with Centripetal's Motion.  Perhaps the best example is that despite not identifying ETA or CTA in the header of any chart, the very first product that Plaintiff seeks discovery on in its Motion is ETA, and another product at issue in this Motion is CTA.

Plaintiff cannot (again) feign ignorance on this.  Stealthwatch, CTA, and ETA were the last three of the six items that Cisco specifically discussed at the hearing, as follows:

> This is the fourth product that they identify. It's called Stealthwatch. Stealthwatch is sort of like a traffic cop. . . .

3

> Now, there are two other things that they try to get a little bit more specific, and that's, if we go to the next slide here, something called Cognitive Threat Analytics, or CTA. . . . Cognitive Threat Analytics can be used with Stealthwatch. It can be used with all sorts of other products.
>
> So the next one -- and this is the last one that I'll talk about, Your Honor -- is something called Encrypted Traffic Analytics, or ETA. What ETA is, number 6 here on the chart . . .

*Id.* at 8-9.  Cisco was clear that the point of its motion was to compel Plaintiff to disclose whether or not these things are actually required in any given infringement allegation:

> This is important: Encrypted Traffic Analytics, ETA, didn't come -- we didn't do it until 2017. So this is after the patent. So you could say, **is this what the case is about? Is this it? Is this the thing that they're actually suing us about, that it was ETA? We just want to know the answer to that question. Is ETA required** -- I suspect they're not going to say "yes" because it's really small. Very few people use it. Four of these patents have nothing to do with encryption, and the one that does doesn't deal with this. **But at this point, we're just trying to understand what they're accusing.**

*Id.* at 9:16-10:1.  Then, in discussing the original contentions, Cisco made clear that although Stealthwatch, CTA ad ETA can work together (and ETA is an option available for some versions of Stealthwatch), they are different products that must be separately accused:

> And it says -- the next sentence, which begins towards the end of that second line, says, "As one example, Stealthwatch, including its Cognitive Threat Analytics and Encrypted Traffic Analytics, perform analysis to detect exfiltration. So there they've put three products together, but it's just an example, and they didn't tell us if Encrypted Traffic Analytics is always required for their theory, if it's just an option and it's not required, or what.

*Id.* at 14:13-21.  For example, Stealthwatch does not necessarily use ETA (ETA is a new option that relatively few customers enable), and so merely accusing Stealthwatch does not disclose whether Plaintiff is accusing ETA – and that was the point of the motion.  Likewise, CTA can operate even without Stealthwatch. The Court granted Cisco's motion in full, ruling that "You're going to have to do it just the way they ask, counsel." *Id.* at 18:9-10.

Yet no chart identifies ETA or CTA as an accused product in the header (and again, there is no list of accused products and combinations of products). Instead, exactly like the unintelligible contentions that Plaintiff served previously, Plaintiff buries references to ETA, CTA, and other things *within* the body of its charts, hiding whether these products are always required according to Plaintiff, or are only an alternative – thus refusing to answer the specific question Cisco posed at the hearing.

As an example, for the '193 Patent, Plaintiff served four charts: one for "Catalyst" (which is a Cisco switch); one for "ASR" (which is a Cisco router); one for "ISR" (which is another Cisco router); and one for "ASA with Firepower Management Center" (an ASA is a Cisco firewall, accused with an additional product called Firepower Management Center or "FMC"). So, it would appear that Plaintiff is not accusing – either alone or in any combination – ETA, CTA, Stealthwatch, or anything else. Yet on the second page of each chart – for example – there is a claim element for which the second paragraph references "Stealthwatch (including CTA and ETA)" to satisfy the element. This is exactly the type of language that Cisco highlighted at the hearing, as quoted above. Thus, in each new '193 chart that purports to accuse a single product, Plaintiff slips in allegations relying on <u>three of the six</u> products Cisco identified at the hearing (Stealthwatch, CTA and ETA) – even though none is identified in the header as an accused product. Plaintiff does so in exactly the same way that Cisco identified at the hearing, thus camouflaging whether any of these are required, are in the alternative, or are purely options. And again, there is no list we can check, because Plaintiff did not comply with that part of the Court's Order.

As another example, for the '806 Patent, Plaintiff served a chart for "Catalyst with Cisco's Digital Network Architecture (DNA)". But on the second page (in the first paragraph for

5

the "receive" element), Plaintiff references "a server such as, e.g., Stealthwatch (including CTA), Identity Services Engine, and DNA Center". In other words, in a chart that is purportedly only accusing "Catalyst with Cisco's Digital Network Architecture (DNA)," Plaintiff uses an "e.g." to reference Stealthwatch (a product it identifies in the headers of charts on other patents but not this one), CTA (which Plaintiff never identifies in the header for any chart), Identity Services Engine (which Plaintiff identifies in the header for charts on the '856 Patent but not this one), and DNA Center.

In sum, as to three of the six key products that Cisco said it could not tell if they were optional or required – ETA, CTA, and Stealthwatch – Plaintiff has done the same thing it did last time. Likewise, other charts reference other products (*e.g.*, Threat Grid) or internal organizations (*e.g.*, Talos) raised in Plaintiff's motion even though they are not referenced in the header of any chart. There is no standalone list Cisco can examine, and products such as "ETA, CTA, and Talos" do not appear in the headers of any charts, and yet references are randomly sprinkled throughout. Among other remedies, the Court should strike (for purposes of discovery and expert reports) any reference to ETA or CTA, because they are not identified in any list (or even in any header) as accused products. The Court should likewise strike any product not explicitly listed in the "header" of each chart, and the Court certainly should not order additional discovery on anything (such as ETA and CTA) that Plaintiff did not identity as part of an accused combination, despite the Court giving Plaintiff a ***second*** opportunity to do so. Plaintiff's Motion is an attempt to change the subject from its deficient infringement contentions, and yet the Motion inevitably returns to those very deficiencies.

**B.     Background On Discovery To Date**

Plaintiff served its first 166 requests for production on October 2, to which Cisco timely responded on October 22. In those requests, Plaintiff identified the "Accused Instrumentalities"

6

by referencing its (deficient) infringements contentions, i.e., the same contentions the Court found were "designed to obfuscate." Hearing Tr. at 21:20-22. Because of the lack of clarity, Cisco repeatedly asked Plaintiff to provide additional detail regarding what, exactly, it was seeking. Plaintiff demurred, time and time again. Nevertheless, Cisco acted diligently to identify, collect, and produce documents. Plaintiff, however, continues to complain that it does not have enough, and even goes so far as to complain that Cisco has not produced documents in response to requests for production that are not even due until today (*see* Mot. Ex. 6 (RFP Nos. 184-196)) or are due on December 17 (*see* Mot. Ex. 7 (RFP Nos. 197-205)). But, as shown below, Cisco has continually made diligent and timely production of not only its source code and key technical documents, but also additional documents collected from shared repositories and relevant custodians. As part of the discovery process, Cisco has repeatedly asked Plaintiff to specify exactly what it is looking for, and then has made every effort to accommodate any such specific request. Put simply, Plaintiff's complaints are meritless and a clear attempt to divert attention from its deficient contentions.

**II.     Each of Plaintiff's Specific Complaints Fails**

Each of the issues raised in Plaintiff's Motion is addressed below.

**A.     Cisco's Document Production Has Been Fully Compliant**

**1.     Product Requirements Documents and Functional Specifications for ETA**

Again, Plaintiff's revised contentions do not identify ETA in any list of accused products or specific combinations (because no such list exists), nor in the header of any of the charts. The fact that ETA is nonetheless the first item on which Plaintiff seeks more discovery in this Motion demonstrates the extent to which Plaintiff has simply ignored the Court's rulings.

As Cisco explained, ETA is an option available on Stealthwatch Enterprise for customers that choose to enable it, and it enables certain Cisco routers and switches (i.e., basic networking equipment) to export two additional data fields about the data flows traversing an enterprise's network. Even though Plaintiff did not identify ETA as an accused product, Cisco collected and produced the entirety of the ETA source code. In addition, Cisco produced all documents identified in various shared document repositories (including Cisco's technical document repository), the Engineering Wikis and Confluence sites, as well as documents collected from relevant individual custodians.

The problem appears to be that Plaintiff is performing only a cursory review of Cisco's production. Cisco has produced the ETA System Requirements Document (Cisco-Centripetal_00048142), which is the "requirements document" for ETA. Cisco has also produced the Stealthwatch products requirements documents (e.g., Cisco-Centripetal_00012554, Cisco-Centripetal_00012977 (which relates to the incorporation of ETA in Stealthwatch); and Cisco-Centripetal_00013648). Cisco has also produced the specifications related to the development of ETA, which are cited below. Yet Plaintiff's Motion describes the production as if this did not occur.

### 2. Recent Versions of Functional Specifications for ETTA

Plaintiff appears to be confused. ETTA was the early, non-productized version of ETA. Plaintiff has not even identified ETA as an accused product, much less an earlier version (ETTA) that was never sold. Nevertheless, to the extent they exist, Cisco has produced functional specifications for ETTA. *See, e.g.*, Cisco-Centripetal_00001217 (aptly entitled "ETTA Software Functional Specification"); Cisco-Centripetal_0062942 (entitled "Enhanced Telemetry Basted Threat Analytics Software Functional Specification"); Cisco-

8

Centripetal_0062942 (entitled "ETTA Information Elements for Threat Defense").  There are no "recent" versions.

### 3. Stealthwatch Functional Specifications and Stealthwatch Product Requirement Documents Dated After 2017

Plaintiff has had the entirety of the Stealthwatch code (both Enterprise and Cloud) since November 8.  Plaintiff even told the Court it needed time to review the code before revising its contentions, and yet spent less than two hours questioning Cisco's 30(b)(6) representative on Stealthwatch Enterprise source code.   Cisco also has produced a large volume of technical documents regarding Stealthwatch.

By way of background, Stealthwatch was developed by Lancope in the early 2000s.  Cisco acquired Lancope in December 2015 (although Lancope's Stealthwatch product—now known as Stealthwatch Enterprise—had been available to Cisco's customers for many years prior as part of a partnership between the two companies).  Cisco's 30(b)(6) witnesses have testified that the Stealthwatch Enterprise product has not changed its overall functionality since before Cisco acquired Lancope.  Cisco has already produced the technical materials provided by Lancope as part of the due diligence related to the acquisition.  In addition, Cisco has produced archived technical documents from prior to the acquisition, including the documents referenced by Mr. Amin during his deposition (Mot. at 7).   Further, Cisco has produced all documents identified in various Cisco shared document repositories (including Cisco's technical document repository) and the entirety of the Stealthwatch Engineering Confluence site.  Notably, in recent years, the Engineering team switched to the Confluence site to house this type of technical information in the form of web pages as opposed to formal documents.  Cisco produced the entire Confluence site—so, by definition, the information Centripetal is seeking has been produced.

### 4. Firepower Management Center/Threat Intelligence Director

Plaintiff is seeking discovery on aspects of the Firepower Management Center ("FMC") that Plaintiff did not even accuse until it served its revised infringement contentions yesterday. Even then, Cisco has produced ample discovery on FMC (including the FMC source code, which is contained within the previously produced ASA source code), and Cisco (having received the new contentions 24 hours ago) is now reviewing whether there is additional relevant technical documentation in view of the revised contentions.

By way of background, FMC serves to provide enterprise operators a single, unified console to manage any number of devices, including as relevant here, Cisco's ASA with FirePOWER services. This product (or prior iterations of it) has been on sale for over a decade. Plaintiff's original contentions made cursory reference to the FMC, but basically limited its assertions that Version 6.0 of the FMC was relevant because it "manages network devices." *See*, *e.g.*, Ex. 3 ('205 Chart, at 4). Moreover, those charts explicitly referred to documents related to version 6.0, which version ***did not*** include what Plaintiff now targets, *i.e.*, the Threat Intelligence Director. *See id.*, at 6. Despite these limited references, in an effort to avoid a discovery dispute, and to ensure that there could be no claim that Plaintiff did not have the relevant source code, Cisco produced the entirety of the FMC code (both current and prior art versions) in November. Cisco also produced various documentation on the FMC and each of its releases. Now, after having the opportunity to review Plaintiff's revised infringement contentions (served yesterday at 5:00 pm), it is clear that Plaintiff has abandoned its generic claims regarding the FMC and version 6.0 and instead has decided to target FMC version 6.2.2 (and the Threat Intelligence Director) because that version was introduced in September 2018 (and thus--Plaintiff is likely hoping--this allows them to claim infringement without specifically accusing prior art). Cisco is actively working to identify any additional technical documents that

show the functionality of the FMC -- both prior to and after the introduction of the Threat Intelligence Director. But again, Plaintiff already has everything it needs, insofar as it has the source code, which Cisco's witnesses have repeatedly confirmed is the most relevant and reliable source of information.

### 5. Hitless ACL Updates, ACL Label-Sharing, and Transactional Commit Modeling

Cisco has not refused to produce relevant technical documents. Cisco has made available the relevant source code, and its witnesses have been prepared to provide testimony regarding any aspects of these features that Plaintiff has questions about. Cisco has also produced other technical documents showing how these features operate and function in its routers, switches, and firewalls, and has produced the relevant technical specifications, many of which pre-date the patents-in-suit. *See, e.g.*, Cisco-Centripetal_00008406 (Transactional Commit Model Software Functional and Design Specification"); Cisco-Centripetal_00007123 (Transactional Commit Wiki); Cisco-Centripetal_00011540 (NG3K ACL Threading Software Design Specification); Cisco-Centripetal_00010897 (ALC Software Design Specification); Cisco-Centripetal_00000119 (NG3K Security Access Control Lists Software Functional Specification). The fact that there are not hundreds of documents related to these features should not be surprising, given that they are minor features in products with thousands of other features and functions. Again, Plaintiff has asked very few questions about source code to Cisco's witnesses, either corporate or individual – even though the source code and the witnesses who know that code are the best way to understand a software product. For example, Centripetal took the deposition today of Hari Shankar, who was Cisco's technical and source code designee as to the accused ASA products, which include the accused Transactional Commit Modeling feature.

11

Plaintiff did not ask Mr. Shankar *any questions* regarding this feature, or *any questions* regarding the relevant source code.

### B. Cisco's Response to Interrogatory No. 5 Is Fully Compliant

Yet again, Plaintiff is complaining about an issue of its own making. Interrogatory No. 5 requested code names using the groups of products that Plaintiff originally identified as infringing in the contentions that the Court ruled are indecipherable, *i.e.*, the "Accused Catalyst Products and Services," the "Accused Router Products and Services," the "Accused ASA Products and Services," and the "Accused Stealthwatch Products and Services." Cisco did its best to respond along those lines. Plaintiff then complained that that identification did not go far enough and demanded that Cisco further break down its response to identify "which codenames applied to which version" of these products. Plaintiff claims that this information is relevant to "an understanding of what changes were made" over time. Mot. at 8.

Plaintiff's complaints are meritless. As an initial matter, Cisco worked diligently to identify internal codenames for those products that it understood were accused of infringement, despite Plaintiff's deficient contentions. Indeed, the correspondence attached to Plaintiff's motion shows that Cisco specifically asked Plaintiff if it had "a specific question about a specific product." Mot. Ex. 5, at 1. Rather than respond, Plaintiff filed this Motion. Likewise, Plaintiff could have asked Cisco witnesses about changes made to the products over time. The problem is that Plaintiff does not like the facts; Cisco's witnesses have been clear that much of the functionality that is accused of infringement is nearly identical in substance, if not fully identical, to functionality that Cisco (or its acquired companies, such as Lancope) were offering since well before Plaintiff filed for its patents. The Court should deny Plaintiff's request for further supplementation.

12

  C. **Plaintiff Has Repeatedly Failed to Identify What Information It Wants, Besides All Sales Of Any Product Sold To Any Customer That Has Also Purchased a Cisco Router, Switch, or Firewall**

Plaintiff requests that Cisco be required to provide "those revenues generated from sales of other products and services sold to the same customers that also purchased the Accused Products and Services." Mot. at 12. Yet again, that request is based on the definition of "Accused Products and Services" in Plaintiff's deficient infringement contentions. A request based on that definition is both indecipherable (as the Court already ruled), and breathtakingly overbroad. It has no basis in law; indeed, none of the cases cited by Plaintiff stand for such a broad proposition. For example, in the *DirectPacket* case, in the motion itself, information regarding convoyed sales was not even requested. *See generally* 2:18-cv-331-AWA-LRL (Dkt. 68). And it is not clear from the resulting order what was meant by "convoyed" sales.

  Moreover, Plaintiff's assertion of what revenue information is relevant is a constantly moving target. This is because Plaintiff's meaningless contentions made the focus of this case a moving target. For example, the Motion contends that "Cisco's website identifies the accused Cognitive Threat Analytics ('CTA') is available with the following solutions: AMP for Endpoints and AMP for Web Security," and thus, presumably, Plaintiff seeks at least this revenue information as a convoyed sale. Mot, at 11. But again, Plaintiff has not accused CTA of infringement – there is no list of accused products the Court can reference that identifies CTA, and CTA is not in the header of any of the charts that Plaintiff served. Trying to make sense of Plaintiff's charts, it is possible that Plaintiff has accused the sale/use of a specific set of routers and switches, when (perhaps) used in combination with Stealthwatch and when the customer has enabled the sending of information to CTA, and has further enabled the collection of the additional ETA telemetry data fields. Had Plaintiff complied with the Court's Order, the answer

to that question would be clear.  Second, AMP for Endpoints and AMP for Web Security are completely separate licenses that are not even available on, for example, the Catalyst switches.

Despite Plaintiff's overbroad requests, Cisco has indeed agreed to provide revenue information for bundled products.  For example, Cisco sells enterprise license agreements, which bundle a number of Cisco's security products, including Stealthwatch, into a complete package.  Similarly, Cisco markets and sells a bundle called DNA Premiere (formerly known as Cisco One), which contains Stealthwatch.  For internal revenue allocation purposes, only a small portion of these total bundles are allocated to Stealthwatch.  Nevertheless, Cisco has agreed to produce not only the revenue that is allocated to the Stealthwatch business unit, but it has also agreed to produce the overall bundle revenue.  This despite the fact that Cisco has also produced documentation showing that less than 1% of the DNA Premiere customers have actually activated Stealthwatch functionality.

Finally, Plaintiff has wholly failed to engage in a proper meet and confer on this issue.  Plaintiff first brought up the issue on November 20.  On November 24, Cisco responded and asked for clarification regarding Plaintiff's position and the scope of its ask.  Mot. Ex. 2, at 1.  Plaintiff did not respond.  Following the Thanksgiving holiday, Cisco again asked for clarification.  *See* Mot. Ex. 5, at 2 ("We are attempting to reach a compromise … .  As it stands, you have not otherwise articulated with any reasonable limitation what information you would like from us and so it is impossible for us to consider the scope of your request.").  Plaintiff again did not respond to this reasonable request for clarification and a narrowing of this overly broad and burdensome request.  Plaintiff perhaps decided that because it was not going to comply with the Court's Order in its infringement contentions, it needed to change the subject by filing a motion to compel, regardless of whether there had been a meaningful  meet-and-confer.

### D. Plaintiff's Request for All Service Contracts with Cloud Providers Is Unreasonable

Cisco has already produced information regarding the costs associated with the products. Plaintiff, however, appears to want even finer granularity, and goes so far as to demand the production of the actual agreements that Cisco has entered into with its third-party cloud providers, such as Amazon Web Services ("AWS"). According to Plaintiff, these figures are relevant because "the Accused Products and Services … are largely software and cloud based." The only cloud-based products that Plaintiff has identified anywhere in its charts are (1) Stealthwatch Cloud and (2) Cognitive (also known as CTA) – but CTA is not even identified as an accused product. Cisco's agreements with, *e.g.*, AWS, are not relevant to any issue in dispute, and certainly do not relate to any "cost-savings" given that Plaintiff has not identified what these costs would be compared to. For example, Plaintiff does not make any allegation that its own products allow for the use of cloud technology, or even that the patents-in-suit have anything to do with the use of cloud technology (as opposed to on-premise appliances). It seems as this request is nothing more than a "make work" that has no place in a case with this short of a discovery period.

## III. Conclusion

Plaintiff's Motion should be denied in its entirety; CTA and ETA should be struck from the case; and the Court should Order briefing on further remedies for Plaintiff's violation of the Court's Order regarding Plaintiff's infringement contentions.

Dated: December 11, 2019

Respectfully submitted,

CISCO SYSTEMS, INC.

By /s/ Dabney J. Carr, IV

Dabney J. Carr, IV, VSB No. 28679
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com

**DUANE MORRIS LLP**
Louis N. Jameson (admitted pro hac vice)
Matthew C. Gaudet (pro hac vice pending)
John R. Gibson, VSB No. 72968
Jennifer H. Forte (admitted pro hac vice)
1075 Peachtree Street, N.E., Suite 2000
Atlanta, Georgia 30309-3929
Telephone: (404) 253-6900
Facsimile: (404) 253-6901
wjameson@duanemorris.com
jrgibson@duanemorris.com
jhforte@duanemorris.com

Joseph A. Powers (admitted pro hac vice)
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Facsimile: (215) 689-3797
japowers@duanemorris.com

John M. Baird, VSB No. 77827
Christopher J. Tyson, VSB No. 81553
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
Telephone: (202) 776 7851
Facsimile: (202) 478 2620
jmbaird@duanemorrris.com
cjtyson@duanemorris.com

Nicole E. Grigg (formerly Johnson)
(admitted *pro hac vice*)
2475 Hanover Street
Palo Alto, CA 94304-1194
Telephone: (650) 847-4176
Facsimile: (650) 618-2713
NEGrigg@duanemorris.com

*Counsel for Defendant Cisco Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of December, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Kevin M. O'Donnell
Jeffery T. Martin, Jr.
HENRY & O'DONNELL, P.C.
300 N. Washington Street – Suite 204
Alexandria, VA 22314
kmo@henrylaw.com
jtm@henrylaw.com

Stephen Edward Noona
VSB No. 25367
KAUFMAN & CANOLES, P.C.
150 W. Main St., Suite 2100
Norfolk, VA 23510
senoona@kaufcan.com

Paul J. Andre
Lisa Kobialka
James Hannah
Hannah Lee
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
hlee@kramerlevin.com

/s/ Dabney J. Carr, IV
Dabney J. Carr, IV (VSB No. 28679)
**TROUTMAN SANDERS** LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com

*Counsel for Defendant Cisco Systems, Inc.*