IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

CENTRIPETAL NETWORKS, INC.,　　)
　　　　　　　　　　　　　　　　　)
　　　　　**Plaintiff,**　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　　　**Case No. 2:18-cv-94**
　　　　　　　　　　　　　　　　　)
CISCO SYSTEMS, INC.　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　**Defendant.**　　　　　　　)

## OPINION & ORDER

These matters come to the Court on eight (8) disputed terms found in the asserted claims in this patent case. On February 6, 2020, this Court held a <u>Markman</u> hearing to construe the disputed claim terms. The Court heard arguments of counsel and reviewed the record and ruled from the bench as to six (6) terms and took two (2) terms under advisement. The parties submitted additional briefing on the one (1) term under advisement and resolved their dispute as to the other term under advisement. The Court is prepared to rule on those remaining two (2) terms. The Court hereby issues this Opinion and Order memorialize and explain its claim construction rulings.

## I. BACKGROUND

### A.　FACTUAL BACKGROUND

In 2014, Cisco Systems, Inc. ("Defendant") partnered with ThreatGRID, an entity which included threat intelligence technology which Centripetal Networks, Inc. ("Plaintiff") used in its technology. Doc. 29 ❡ 66. Defendant acquired ThreatGRID later that year. <u>Id.</u> Plaintiff alleges that Defendant gained "increased exposure" to Plaintiff's technology through this acquisition. <u>Id.</u>

Plaintiff alleges that Defendant requested a meeting with Plaintiff through a third-party. <u>Id.</u> ❡ 67. Defendant allegedly asked for a demonstration of Plaintiff's technology at a partner

1

conference, and Plaintiff did so. Id. Plaintiff argues that Defendant willfully and unlawfully sold products that incorporate Plaintiff's threat detection computer technology. Id. ¶¶ 66-71.

## B.   PROCEDURAL HISTORY

This case began on February 13, 2018, when Plaintiff filed its original complaint accusing Defendant of direct, indirect, and willful patent infringement. Doc. 1. On March 29, 2018, Plaintiff filed an amended complaint, adding allegations of infringement of an additional patent. Doc. 29. The March 29 amended complaint is the operative complaint in this case.

On April 13, 2018, Defendant moved to dismiss Plaintiff's allegations of indirect and willful infringement. Doc. 37.[1]

On September 19, 2018, Defendant moved to stay the case pending inter partes review ("IPR") by the United States Patent and Trademark Office ("PTO"). The Court granted the stay on February 25, 2019. Doc. 58. On June 10, 2019, Plaintiff moved to life the stay, due to several decision by the PTO in the IPR. Doc. 59. The Court held a hearing on September 11, 2019, and granted the motion to lift the stay IN PART. Doc. 68. The Court lifted the stay as to the patents which were not subject to IPR. Id. Trial on the claims and defenses pertaining to the patents that are not under IPR is scheduled to commence on April 7, 2020. The case remains stayed as to those patents still undergoing IPR. Id.

The parties indicated that a Markman hearing was necessary, Doc. 176 at 1, and the Court convened to hear arguments on the disputed claim terms on February 6, 2020. Doc. 74 ¶ 11.

---

[1] Before the Court was scheduled to hear arguments on that motion, Defendant withdrew its motion to dismiss.

## II. CLAIMS ASSERTED

### A.  U.S. PATENT NO. 9,137,205 ("THE '205 PATENT")

The '205 Patent generally pertains to "methods and systems for protecting a secured network." '205 Patent at 1. Specifically, it discloses a proactive method of defeating cyber attacks before the attack is successfully launched. Id. at 1:15-24, 10:47-58. Claims 63 and 77 in the '205 Patent are asserted in this case.

### B.  U.S. PATENT NO. 9,203,806 ("THE '806 PATENT")

The '806 Patent generally pertains to methods for computer systems to change rule sets. '806 Patent at 4:60-65-65. The '806 Patent's methods are intended to facilitate changing between rule sets, as modern rule sets grow in size and complexity. Claims 9 and 17 in the '806 Patent are asserted in this case.

### C.  U.S. PATENT NO. 9,560,176 ("THE '176 PATENT")

The '176 Patent relates to methods for detecting packets sent between network devices. '176 Patent col. 1 ll. 16-18. The patent discusses the use of log entries corresponding to certain packets, and a packet correlator uses the logs to correlate the packets. '176 Patent col 3 ll. 23-31, col. 8 ll. 46-48. Using the logs, the system can make rules to identify packets. Id. at col. 13 ll. 14-33. Claims 11 and 21 in the '176 Patent are asserted in this case.

### D.  U.S. PATENT NO. 9,686,193 ("THE '193 PATENT")

The '193 Patent discloses a method for determining whether data packets match given criteria and acting on that determination. '193 Patent at 1, col. 1 ll. 58-59, col. 8 ll. 45-52. This is intended to meet the common problem of cyber security systems' inability to scale to a large volume threat. '193 Patent col. 1 ll. 28-47. Claims 18 and 19 in the '193 Patent are asserted in this case.

## E.  U.S. PATENT NO. 9,917,856 ("THE '856 PATENT")

The '856 Patent generally relates to a packet-filtering system that receives traffic and applies program rules to detect hidden, encrypted communications. E.g., '856 Patent at col 24 ll. 8-17.  Claims 24 and 25 in the '856 Patent are asserted in this case.

## III.  LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

## A.  GENERAL PRINCIPLES

The purpose of a Markman hearing is to assist the Court in construing the meaning of the patent(s) at issue. Markman v. Westview Instruments, Inc., 517 U.S. 370, 371 (1996); Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).  Patents consist of "claims," and the construction of those claims "is a question of law, to be determined by the court." Markman, 517 U.S. at 371; Markman, 52 F.3d at 970–71.  A court need only construe, however, claims "that are in controversy, and only to the extent necessary to resolve the controversy." Vivid Techs., Inc. v. Am. Science Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) (citations omitted).  To be clear, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy." NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1311 (Fed. Cir. 2005) (citing U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

Claim construction begins with the words of the claims. Vitronics Corp. v. Conceptrome, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves . . . .").  Words in a claim are generally given their ordinary meaning as understood by a person of ordinary skill in the art (a "POSITA"). Id.  This "person of ordinary skill in the art is deemed to read the claim term not only in the particular claim in which the disputed term appears but also in

the context of the entire patent, including the specification." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "In some cases, . . . the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than application of the widely accepted meaning of commonly understood words." Id. at 1314. Often, however, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claims language to mean." Id.

Further, the claims themselves can provide substantial guidance as to the meaning of particular claim terms. Id. First, "the context in which a term is used within a claim can be highly instructive." Id. In addition, other claims of the patent in question, both asserted and not asserted, can also be useful because claim terms are "normally used consistently throughout the patent" and therefore "can often illuminate the meaning of the same term in other claims." Id.

The claims should not be read alone, however, but rather should be considered within the context of the specification of which they are a part. Markman, 52 F.3d at 978. As the Federal Circuit stated in Vitronics and restated in Phillips, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Phillips, 415 F.3d at 1315. The Court, however, must not read in limitations from the specification without clear intent to do so. Thorner v. Sony Comp. Entmt. Am. LLC, 669 F.3d 1362, 1366 (Fed. Cir. 2012). Furthermore, a patentee is free to be his or her own

lexicographer, and thus if the patentee defines a term in the specification differently than its ordinary meaning, the patentee's definition controls. Phillips, 415 F.3d at 1316.

In addition to consulting the specification, a court may also consider the patent's prosecution history, if in evidence, because it provides information regarding how the United States Patent and Trademark Office and the inventor understood the patent. See id. at 1317. It also enables the Court to determine if the inventor limited the invention during the course of prosecution. Id. "[W]here an applicant whose claim is rejected on reference to a prior patent ... voluntarily restricts himself by an amendment of his claim to a specific structure, having thus narrowed his claim in order to obtain a patent, he may not by construction ... give the claim the larger scope which it might have had without the amendments." I.T.S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 444 (1926). Thus, consulting prior art reference in the prosecution history is permissible. Vitronics, 90 F.3d at 1583.

These elements of the patent itself—the claims, the specification, and its prosecution history—constitute intrinsic evidence of claim construction. In addition to such intrinsic evidence, a court may consider extrinsic evidence to determine the meaning of disputed claims. Phillips, 415 F.3d at 1317. Such extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317 (citing Markman, 52 F.3d at 980). However, the Court should not rely on extrinsic evidence when the intrinsic evidence removes all ambiguity. Vitronics, 90 F.3d at 1583.

Such extrinsic evidence generally is held as less reliable than the intrinsic evidence and "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of intrinsic evidence." Id. at 1317–18. With respect to expert evidence, for example,

6

"[c]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court . . . [and] a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." Id. at 1318.

With respect to general usage dictionaries, the Federal Circuit noted that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used . . . in claim construction," and further noted that "a dictionary definition has the value of being an unbiased source 'accessible to the public in advance of litigation.'" Id. at 1322 (citing Vitronics, 90 F.3d at 1585). However, the Federal Circuit cautions that (1) "'a general-usage dictionary cannot overcome art-specific evidence of the meaning' of a claim term;" that (2) "the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent;" and that (3) "[t]here is no guarantee that a term is used in the same way in a treatise as it would be by the patentee." Phillips, 415 F.3d 1322 (quoting Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n, 366 F.3d 1311, 1321 (Fed. Cir. 2004)).[2] Indeed, "different dictionary definitions may contain somewhat different sets of definitions for the same words. A claim should not rise or fall based upon the preferences of a particular dictionary editor . . . uninformed by the specification, to rely on one dictionary rather than another." Id.

---

[2] In Phillips, the Federal Circuit thus expressly discounted the approach taken in Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F. 3d 1193 (Fed. Cir. 2002), in which the court placed greater emphasis on dictionary definitions of claim terms. Phillips, 415 F.3d at 1319–24 ("Although the concern expressed by the court in Texas Digital was valid, the methodology it adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history."). The Federal Circuit reaffirmed the approach in Vitronics, Markman, and Innova as the proper approach for district courts to follow in claim construction, but acknowledged that there was "no magic formula" for claim construction, and that a court is not "barred from considering any particular sources . . . as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." Phillips, 415 F.3d at 1324.

## B. CANONS OF CLAIM CONSTRUCTION

The Federal Circuit has recognized certain guideposts, or "canons of construction," to assist a district court in determining the meaning of disputed claim terms and phrases. These are merely guideposts, however, and are not immutable rules:[3]

1. Doctrine of Claim Differentiation: Ordinarily, each claim in a patent has a different scope. See, e.g., Versa Corp. v. Ag-Bag Int't Ltd., 392 F.3d 1325, 1330 (Fed. Cir. 2004). Ordinarily, a dependent claim has a narrower scope than the claim from which it depends. See, e.g., Phillips, 415 F.3d at 1315. Ordinarily, an independent claim has a broader scope than a claim that depends from it. See, e.g., Free Motion Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1351 (Fed. Cir. 2005).

2. Ordinarily, claims are not limited to the preferred embodiment disclosed in the specification. See, e.g., Phillips, 415 F.3d at 1323.

3. Ordinarily, different words in a patent have different meanings. See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1119–20 (Fed. Cir. 2004).

4. Ordinarily, the same word in a patent has the same meaning. See, e.g., Phillips, 415 F.3d at 1314.

5. Ordinarily, the meaning should align with the purpose of the patented invention. See, e.g., Innovad Inc. v. Microsoft Corp., 260 F.3d 1326, 1332–33 (Fed. Cir. 2001).

6. Ordinarily, general descriptive terms are given their full meaning. See, e.g., Innova/Pure Water, Inc., 381 F.3d at 1118.

7. If possible, claims should be construed so as to preserve their validity. See, e.g., Energizer Holdings, Inc. v. Int'l Trade Comm'n, 435 F.3d 1366, 1370–71 (Fed. Cir. 2006).

8. Ordinarily, absent broadening language, numerical ranges are construed exactly as written. See, e.g., Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377, 1381 (Fed. Cir. 2000).

9. Ordinarily, absent recitation of order, steps of a method are not construed to have a particular order. See, e.g., Combined Sys., Inc. v. Def. Tech. Corp. of Am., 350 F.3d 1207, 1211–12 (Fed. Cir. 2003).

---

[3] This list is derived from the one provided in the FEDERAL JUDICIAL CENTER, PATENT LAW AND PRACTICE § 5.I.A.3.d (5th ed. 2006).

8

10. Absent highly persuasive evidentiary support, a construction should literally read on the preferred embodiment. See, e.g., Cytologix Corp. v. Ventana Med. Sys., Inc., 424 F.3d 1168, 1175 (Fed. Cir. 2005).

## IV. AGREED CONSTRUCTIONS

The parties agree to the following constructions:[4]

| TERM | AGREED CONSTRUCTION | PATENT |
|---|---|---|
| packet security gateway | a gateway computer configured to receive packets and perform a packet transformation function on the packets | '205 |
| security policy management server | a server configured to communicate a dynamic security policy to a packet gateway | '205 |
| network-threat indicators | indicators of packets associated with network threats, such as network addresses, ports, domain names, uniform resource locators (URLs), or the like | '856 |
| rule | a condition or set of conditions that when satisfied cause a specific function to occur | '176 |
| log entries | notations of identifying information for packets | '176 |

---

[4] Prior to the Markman hearing, the parties advised the Court that the following, previously-disputed terms require no construction: (1) "preprocess the first rule set and second rule set" for claims 9 and 17 of the '806 Patent; (2) "one or more packet filtering rules" for claims 18 and 19 of the '193 Patent; (3) "determined packets", "filtered packets", and "a determination" for claims 24 and 25 of the '856 Patent. Accordingly, the Court **FINDS** that **NO CONSTRUCTION** is necessary, pursuant to the agreement of the parties.

Additionally, as discussed infra, the parties agreed, after the Markman hearing but before the Court issued a ruling, that the term, "responsive to correlating" should have its plain and ordinary meaning. Accordingly, that term will be given its plain and ordinary meaning as well.

# V. DISPUTED CONSTRUCTIONS

## A.   DISPUTES COMMON TO ALL ASSERTED PATENTS

### i. "Packet"

| Disputed Term | Plaintiff's Construction | Defendant's Construction | Court's Construction |
|---|---|---|---|
| packet(s) | "a link layer (L2) or network layer (L3) packet" | Plain and ordinary meaning | Plain and ordinary meaning, which will require reference to the context of the specific claim at issue |

The dispute with regard to the term, "packet(s)," is whether the term should be given its plain and ordinary meaning in the specific context of each claim, or if the Court should construe the term to only refer to packets operating on "Layer 2" or "Layer 3." At oral arguments, counsel represented that a "packet" in this context is akin to a virtual box of information. Some of the inventions at issue contain seven (7) layers in which information is processed or acted upon. The parties dispute whether "packet(s)" in this context can only refer to "box(es)" of information on Layer 2 or Layer 3.

Plaintiff argues that the Court should construe "packet" to mean "a link layer (L2) or network layer (L3) packet," because a POSITA would understand that to be the meaning of the term. Plaintiff argued that after Layer 3 the "box" is opened and ceases to be a "packet."

Defendant argues that the term "packet" should be given its plain and ordinary meaning, in the context of the particular claim. Defendant argues that in some patents the "L3" or "L2" construction proposed by Plaintiff is too narrow and too broad in other patents. Defendant gives an example that in the '193 patent, "packet" could refer to data units on any of the seven layers. Further, in the '205 patent, claims 62 and 77 only reference packets on the L3 layer. Thus, Defendant argues that the term packet should be read in context of the claim in which it appears.

The Court **FINDS** that the term should be given its **plain and ordinary meaning, which will require reference to the context of the specific claim at issue**. Neither party has proposed a construction of the term, "packet," beyond construing it to include reference to the particular layer at which a packet is used. Accordingly, the Court need not construe the term "packet(s)" beyond whether the term only refers to packets that operate on Layer 2 or Layer 3.

As to construing the term to include reference to the particular layer(s) at which a packet is used, the Court **FINDS** that such a construction requires reference to the particular claims in which the term appears. Although Plaintiff argues that "packets" are only relevant to Layer 2 and 3 in the asserted patents, the patents themselves contemplate "packets" at other layers. E.g., '193 Patent col. 2 ll. 36-44 (referencing an "HTTP packet").[5] Accordingly, whether "packet" refers to any particular layer or layers **should be resolved with reference to the context of the particular claim at issue**.

### ii. Whether the Computer-Readable Media Claim Preambles are Limiting

Many of the asserted claims contain preambles. The parties initially disputed whether the preambles of the computer-readable media claims limit the scope of their respective claims. However, at the claim construction hearing, the parties appeared to agree that the claim preambles limit the scope of the claims in the sense that the preambles identify the patented article. For reasons stated on the bench and herein, the Court agrees and **FINDS** that the "computer-readable media" preambles limit the scope of their respective claims.

"Generally, the preamble does not limit the claims." Allen Engineering Corp. v. Bartell Indust., Inc., 299 F.3d 1336, 1346 (Fed. Cir. 2002). However, "when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the

---

[5] At the Markman hearing, counsel represented that Layer 7 contains "HTTP packets."

invention so defined, and not some other, is the one the patent protects." Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 620 (Fed. Cir. 1995) (emphasis in original) (collecting cases). "In those . . . cases where the preamble to the claim or count was expressly or by necessary implication given the effect of a limitation, the introductory phrase was deemed essential to point out the invention defined by the claim or count." Id. at 620-21 (quoting Kropa v. Robie, 187 F.2d 150, 152 (C.C.P.A. 1951)). It is often said that to determine whether a preamble limits a claim, courts should look to whether the preamble is needed to "give life, meaning, and vitality to the claims or counts." E.g., Bell Communications, 55 F.3d at 621 (quoting Kropa, 187 F.2d at 152). In cases involving computer-readable media claims, such as those implicated here, other courts have held that similar preambles are limiting. E.g., United States Auto. Ass'n v. Wells Fargo Bank, N.A., No. 2:18-cv-00245, 2019 U.S. Dist. LEXIS 99285, at *21 (E.D. Tex. June 13, 2019) ("Without reference to the preamble it is not clear whether the claim covers the medium holding the instructions for the processor or performance of the functions irrespective of a processor.").

Claim 77 of the '205 Patent is illustrative; it is quoted below, and the preamble is in bold.

**One or more non-transitory computer-readable media having instructions stored thereon, that when executed, cause each packet security gateway of one or more packet security gateways associated with a security policy management server to:**

receive, from the security policy management server, a dynamic security policy comprising at least one rule specifying a set of network addresses and a Session Initiation Protocol (SIP) Uniform Resource Identifier (URI);

receive packets associated with a network protected by the packet security gateway;

perform, on the packets, on a packet by packet basis, at least one packet transformation function of multiple packet transformation functions specified by the dynamic security policy;

encapsulate at least one packet of the packets that falls within the set of network addresses and matches the SIP URI with a header containing a network address that is different from

12

a destination network address specified by the at least one packet and that corresponds to a network device configured to copy information contained in the at least one packet and to forward the at least one packet to the destination network address; and

route, based on the header, the at least one packet to the network address that is different from the destination network address.

'205 Patent cl. 77. Without the preamble, one would not be able to determine what "new and useful process, machine, manufacture, or composition of matter" is claimed by the invention. See 35 U.S.C. § 101; see also 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention."). The preamble states what is patented; the balance of the claim states what its patented function is. Thus, the drafter used both the claim preamble and the body of the claim to define to scope of the patented invention.

Accordingly, the Court **CONSTRUES** the computer-readable media preambles to be **LIMITING**, consistent with its analysis and the parties' agreement.

**B.    CLAIM-SPECIFIC DISPUTES**

*i.  "configured to"*

| Disputed Term | Plaintiff's Construction | Defendant's Construction | Court's Construction |
|---|---|---|---|
| configured to | Plain and ordinary meaning – capable of performing a function | Plain and ordinary meaning, which requires being actually configured, not merely being capable of being configured | Plain and ordinary meaning, which requires being actually configured, not merely being capable of being configured. |

This term appears in asserted claim 63 of the '205 patent. The parties AGREE that "configured to" should be given its plain and ordinary meaning. The parties DISAGREE on whether this requires that the configured device be capable of performing a function (as Plaintiff

13

argues) or if the device must be actually configured (as Defendant argues). The Court **FINDS** that this term be given its **plain and ordinary meaning, which requires that the device be <u>actually configured</u> to do the function**.

> Claim 63 of the '205 Patent reads:
>
> system, comprising:
> . . .
> one or more packet security gateways associated with the security policy management server, wherein each packet security gateway of the one or more packet security gateways comprises computer hardware and logic **configured to** cause the packet security gateway to:
> . . .
> encapsulate at least one packet of the packets that falls within the set of network addresses and matches the SIP URI with a header containing a network address that is different from a destination network address specified by the at least one packet and that corresponds to a network device **configured to** copy information contained in the at least one packet . . .

'205 Patent, cl. 63.

Plaintiff argues that the plain and ordinary meaning merely requires that the applicable system be capable of performing the given function. Plaintiff argues that the term is only located in system claims, not method claims; therefore, the term should be read as not requiring a step.

Defendant argues that other courts have consistently held that "configured to" does not mean "capable of." Defendant further argues that the claim language does not use a future-tense verb or the phrase "capable of." Accordingly, Defendant argues that the term should require the system to actually be configured.

This Court has previously rejected proposed constructions of "configured" to mean "capable of." E.g., Swimways Corp. v. Zuru, Inc., Case No. 2:13-cv-334, 2014 U.S. Dist. LEXIS 98092, at *17-20 (E.D. Va. July 18, 2014). As this Court recognized, "a construction that an appendage is merely 'capable' of propelling a figure through liquid fails to adequately convey that the appendage is actually 'configured to' propel the figure through the liquid." Id. at *18. Other

district courts have taken similar approaches. E.g., Solocron Media, LLC v. Verizon Communs. Inc., 2:13-CV-01059, 2015 U.S. Dist. LEXIS 26681, *35-36 (E.D. Tex., Mar. 5, 2015) (construing configured to as having its "plain meaning, which the Court understands to require not merely being capable of being configured but rather being actually configured."); Sipco, LLC v. Abb, Inc., No. 6:11-CV-0048, 2012 U.S. Dist. LEXIS 106659, *29-33 (E.D. Tex. July 30, 2012) (same). This construction is consistent with the claim language and patent specification. Accordingly, the Court **CONSTURES** "configured to" as having its plain and ordinary meaning, which requires actual configuration.

*ii. Dynamic Security Policy*

| Disputed Term | Plaintiff's Construction | Defendant's Construction | Court's Construction |
|---|---|---|---|
| dynamic security policy | A non-static set of one or more rules, messages, instructions, files, or data structures associated with one or more packets | Any rule, message, instruction, file, data structure, or the like that specifies criteria corresponding to one or more packets and identifies a packet transformation function to be performed on packets corresponding to the specified criteria | A changeable set of one or more rules, messages, instructions, files, or data structures, or any combination thereof, associated with one or more packets. |

This term appears in claims 63 and 77 of the '205 Patent. Having reviewed the evidence and considered the arguments of counsel, the Court **FINDS** that the appropriate construction of "dynamic security policy" is: **"a changeable set of one or more rules, messages, instructions, files, or data structures, or any combination thereof, associated with one or more packets."**

Plaintiff devotes much of its argument to emphasize that this term should be construed as being "non-static," i.e., dynamic. Doc. 155 at 10-11. Plaintiff cites the '205 specification where,

at several points, the specification refers to the capability of the security policy to change. Plaintiff also argues that its construction is consistent with the Court's Keysight Markman Order which construed "packet-transformation function specified by the plurality of dynamic security policies" as "function specified by the dynamic security policy where the dynamic security policy is subject to change." Id.

Defendant argues that the patentee acted as its own lexicographer. Doc. 158 at 6. Defendant takes its proposed construction directly from the patent specification, which states "As used herein, a dynamic security policy includes [Defendant's construction]." Doc. 158 at 7.

The Court has already construed a similar term, "packet-transformation functions specified by the plurality of dynamic security policies," as "function specified by the dynamic security policy where the dynamic security policy is subject to change." Centripetal Systems Inc. v. Keysight Technologies, 2:17-cv-383, Doc. 484, at 21 (E.D. Va. Sept. 17, 2018).[6] Accordingly, the Court has already held that a "dynamic security policy" in the context of these patents is "changeable."

The Court notes that a "dynamic security policy," as defined by the '205 Patent, may include more subject matter than is proposed by Defendant's construction. As the specification reads:

> As used herein, a dynamic security policy includes any rule, message, instruction, file, data structure, or the like that specifies criteria corresponding to one or more packets and identifies a packet transformation function to be performed on packets corresponding to the specified criteria. [As Defendant argues.] Optionally, a dynamic security policy may further specify one or more additional parameters as described herein.

'205 Patent col. 4 ll. 43-49 (emphasis added). Upon review of the claims and specification, and considering the arguments of counsel, the Court **FINDS** that Plaintiff's proposed construction is

---

[6] The "Keysight case" was a patent case involving the same Plaintiff and similar patents and technology. The Keysight case was resolved by settlement of the parties during the jury trial.

the most appropriate. However, the Court makes the following modifications. The Court will use the term, "**changeable**," instead of "non-static" to facilitate the jury's comprehension of this term. The Court will also add "**or any combination thereof**" after the word, "structure," to reflect that a dynamic security policy may include multiple rules, messages, etc. E.g., '205 Patent col. 5 ll. 61-61 ("dynamic security policy . . . may include one or more rules. . . ."); id. at col. 6 l. 56 ("dynamic security policy . . . may include rules.").

*iii.  Correlate, Based on the Plurality of Log Entries*

| Disputed Term | Plaintiff's Construction | Defendant's Construction | Court's Construction |
|---|---|---|---|
| **5. correlate, based on the plurality of log entries** | packet correlator may compare data in one or more log entries with data in one or more other log entries | correlate by comparing log entries that do not already include information about linked connections | packet correlator may compare data in one or more log entries with data in one or more other log entries |

This term appears in claims 11 and 21 of the '176 Patent. The term "correlate" was previously construed by this Court as "packet correlator may compare data in one or more log entries with data in one or more other log entries to identify the host," as Plaintiff argues. Keysight, 2:17-cv-383 at 27-28. Thus, the Court **FINDS** that the appropriate construction is "**packet correlator may compare data in one or more log entries with data in one or more other log entries.**"

Defendant argues that this term should be construed to include log entries that do not use correlation using information that pertains to previously linked connections. Defendant argues that Plaintiff should be precluded from attempting to include previously linked connections, because of statements Plaintiff allegedly made to the PTO during IPR. Specifically, Defendant argues that Plaintiff distinguished prior art by arguing in IPR:

In fact, because Rajan's trace log already "identifies the end-to-end network traffic activity between a client and server even though the network traffic traverses a plurality of transport layer connections," there would never be any utility in using the trace logs for correlating packets. . . . More specifically, Rajan teaches that a trace manager first identifies linked incoming and outgoing connections and then stores information "on the linked connections in the trace log."

Doc. 158 at 12.

Plaintiff argues that it has not "clearly" disavowed the use of already linked connections in IPR. Plaintiff argues that the PTO found that the prior art referenced here (Rajan) is not actually prior art to Plaintiff's patents.

The Court is not persuaded that prosecution disclaimer[7] is appropriate here. "For prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." Avid Tech., Inc. v. Hamonic, Inc., 812 F.3d 1040, 1045 (Fed. Cir. 2016) (quoting Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325-26 (Fed. Cir. 2003)). Indeed, this is a high burden. Id. The Rajan invention correlates information first, then generates log entries. As Plaintiff argued in IPR, if one tried to use Rajan's process in its invention, "the necessary information to create those trace logs would remain unavailable." Doc. 158-6 at 13. The PTO found, "because Rajan's trace log is created on the same 'intermediary device' that receives and transmits the packets being traced, Rajan does not teach using its trace logs to perform any correlation of the received and transmitted packets envisioned by Ivershen." Doc. 158-6 at 9. Additionally, the Court has construed a similar

---

[7] Although prosecution history estoppel is a doctrine of infringement, prosecution disclaimer, a related doctrine, applies in the claim construction context. Prosecution history estoppel prevents a patentee from re-capturing what it surrendered in prosecution through a doctrine of equivalents infringement theory. Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 733-34 (2002). However, prosecution disclaimer prevents a patentee from re-capturing that which it surrendered in prosecution through claim construction. Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323 (Fed. Cir. 2003).

term in the prior <u>Keysight</u> litigation. <u>Keysight</u>, 2:17-cv-383 at 27-28. Accordingly, the language which Defendant calls disavowal is neither clear nor unmistakable.

Further, there is no language in the claims or specification to support limiting the scope of the claims as Defendant requests. Without a clear and unmistakable disavowal of territory covered by the plain meaning of the patent's claims, the Court will not limit the scope of the claim as requested by Plaintiff. Accordingly, the Court **FINDS** that the appropriate construction is **"packet correlator may compare data in one or more log entries with data in one or more other log entries."**

### iv. Responsive to Correlating

At the <u>Markman</u> hearing, the Court took this term **UNDER ADVISEMENT**. The Court ordered further briefing to be filed by the close of business on Tuesday, February 11, 2020. The parties advised the Court that they agreed that this term should have its plain and ordinary meaning. Accordingly, the Court will give the term "responsive to correlating" its **PLAIN AND ORDINARY MEANING.**

### v. Generate, Based on the Correlating, One or More Rules

| Disputed Term | Plaintiff's Construction | Defendant's Construction | Court's Construction |
|---|---|---|---|
| generate, based on the correlating, one or more rules | Plain and Ordinary Meaning – no construction necessary | Generate one or more rules based on the correlating, not based on user defined filters or rules | Plain and ordinary meaning. |

At the <u>Markman</u> hearing, the Court took this term **UNDER ADVISEMENT** and ordered additional briefing. The parties filed their supplemental briefing on February 11, 2020. Doc. 192, 193. Having reviewed the opening, rebuttal, and supplemental briefs and considering the evidence

in the record and arguments of counsel, the Court **FINDS** that this term should have its **plain and ordinary meaning**.

The dispute over this term is whether Plaintiff disavowed the use of "user defined filters or rules" during the original prosecution. Defendant argues that in original prosecution, Plaintiff sought to distinguish its invention from prior art, referred to as Pleshek, by arguing that Pleshek "did not generate 'based on the correlating' because the automated rule generation of Pleshek was based on 'user defined filters.'" Doc. 158 at 17.

Plaintiff argues that it did not clearly disavow the use of user-defined rules. Plaintiff argues that it distinguished itself from Pleshek by arguing that Pleshek does not "generate, based on the correlating." Plaintiff argues that it argued against the same "specific implementation" in Pleshek. Doc. 161 at 21-22.

As discussed supra at 18, 18 n.6, "For prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." Avid Tech., Inc., 812 F.3d at 1045. The specific portion of the record that composes the alleged disavowal is:

> However, the Office Action [rejecting claims due to Pleshek] is incorrect. In paragraph [0065], Pleshek states that "the tool optimizer 102 automatically generates the filter rules 110 based upon these user defined filters 108." Similarly, Pleshek paragraph [0142] states "ASE converts overlapping user-defined filters into filter rules useable with single-forwarding-action per packet switching ICs." Thus, even assuming, arguendo, that the filter rules in Pleshek are similar to the "one or more rules configured to identify packets received from the host located in the first network," Pleshek fails to teach or suggest "generating . . . based on the correlating, one or more rules configured to identify packets received from the host located in the first network," as recited in amended claim 1.

Doc. 159-4 at 13-14. Although Plaintiff refers to "user defined rules," Plaintiff ultimately distinguishes its invention by stating that "Pleshek fails to teach or suggest "generating . . . based on the correlating, one or more rules configured to identify packets received from the host located

in the first network, as recited in amended claim 1." Id. (internal quotations omitted). Thus, it is not clear and unmistakable that Plaintiff sought to distinguish its invention based on the use of user defined rules. Accordingly, importing such a limitation is inappropriate. Therefore, the Court **FINDS** that the **plain and ordinary meaning** is the correct construction.

*vi. Proxy System*

| Disputed Term | Plaintiff's Construction | Defendant's Construction | Court's Construction |
|---|---|---|---|
| proxy system | a proxy system which intervenes to prevent threats in communications between devices | system that intermediates a communication session between network devices to prevent threats in communications between such devices | a proxy system which intervenes to prevent threats in communications between devices |

This Court has already construed "proxy system" as "a proxy system which intervenes to prevent threats in communications between devices." Keysight, 2:17-cv-383, Doc. 484, at 33-34. Defendant argues that this construction merely clarifies what a proxy system does, not what it is.

Proxy system is a straightforward term that a POSITA would understand and the Court **FINDS** that no further construction is necessary beyond its Keysight construction. The Court's previous construction clarifies the term insofar as a lay person may be confused. Accordingly, the Court will apply its previous construction and insofar as Defendant asks the Court to define proxy system, the Court should give the term its plain and ordinary meaning.

## VI. CONCLUSION

Accordingly, having considered the arguments of counsel and the record evidence, the Court **CONSTRUES** the disputed terms as follows:

| Term | Court's Construction |
|------|---------------------|
| Packets | Plain and ordinary meaning in the context of the claim in which the term appears. |
| Preambles | Limiting. |
| Configured to | Plain and ordinary meaning which requires that the action actually do the function automatically. |
| Dynamic security policy | a changeable set of one or more rules, messages, instructions, files, or data structures, or any combination thereof, associated with one or more packets. |
| Correlate, based on a plurality of log entries | Packet correlator may compare data in one or more log entries with data in one or more other log entries. |
| Responsive to correlating | Plain and ordinary meaning. |
| Generate, based on the correlating, one or more rules. | Plain and ordinary meaning. |
| Proxy system | A proxy system which intervenes to prevent threats in communications between devices. |

The Clerk is **REQUESTED** to deliver a copy of this Opinion and Order to counsel of record.

It is **SO ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

Norfolk, Virginia

February 20, 2020

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE