**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **CENTRIPETAL NETWORKS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:18cv00094-MSD-LRL** |
| | ) | |
| **CISCO SYSTEMS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT CISCO SYSTEMS, INC.'S MEMORANDUM IN SUPPORT OF MOTIONS IN LIMINE

## <u>TABLE OF CONTENTS</u>

**Page**

1.      Motion in Limine No. 1: Centripetal may not introduce evidence or argument regarding its prior litigation with Keysight/Ixia and may not reference or rely upon the Binding Term Sheet entered into with Keysight/Ixia mid-trial to justify its reasonable royalty analysis in this case. ..........................................................................1

2.      Motion in Limine No. 2:  Centripetal may not introduce evidence or argument disclosing Cisco's stock value, market value, total sales, sales by segment, past annual revenue, past annual revenue from the sales of the accused product(s), estimated future annual revenue, sales figures for sales outside of the U.S., overall capital expenditures, or price paid to acquire various companies. Similarly, Centripetal may not argue through a demonstrative or otherwise that the royalty rate it seeks is only a "fraction," "small percentage," etc., of any Cisco's overall revenues. ..................................................................................................................6

3.      Motion in Limine No. 3: Centripetal may not introduce evidence or argument regarding information obtained from LeadLander and may not reference or rely upon information from LeadLander to suggest that Cisco or any employee of Cisco visited Centripetal's website for purposes of copying Centripetal's technology or patents. ..............................................................................................10

4.      Motion in Limine No. 4: The parties shall be precluded from raising any argument, evidence, testimony, insinuation, reference, or assertion that the court has the power to dismiss frivolous suits and/or frivolous counterclaims. ........................14

5.      Motion in Limine No. 5: Exclude Duplicative Expert Testimony, the Cumulative Effect of Which Will Tend to Confuse and Mislead the Jury. ...........................................15

6.      Motion in Limine No. 6:  The Court should preclude the parties from presenting evidence or argument regarding the petition for, or outcome of, inter partes review (IPR) proceedings, including any decisions to institute or not institute review. The parties are not precluded from presenting evidence or argument regarding statements made by the parties to the Patent Trial and Appeal Board (PTAB) in IPR proceedings to the extent the statements are admissible under the Federal Rules of Evidence. The parties shall refer to any such statements as statements "made to the Patent Office," without identifying the existence of IPR proceedings. ........17

7.      Motion in Limine No. 7:  The Court should preclude Centripetal from offering any testimony, argument, or opinions that it is ████████████ ████████ or that other third parties allegedly infringe its patents. ....................18

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Acantha LLC v. DePuy Orthopaedics Inc.*, 2018 U.S. Dist. LEXIS 89854 (E.D.
  Wis. May 30, 2018) ........................................................................................17

*BMC Software, Inc. v. ServiceNow, Inc.*, No. 2:14-cv-903-JRG, 2016 WL 379620
  (E.D. Tex. Feb. 1, 2016) ...................................................................................7

*Centripetal Networks, Inc. v. Keysight Techns., Inc. and Ixia*, 2:17-cv-383-HCM-
  LRL, Dkt. 1 (E.D. Va. July 20, 2017)........................................................ 1-2, 5, 18

*ContentGuard Holdings v. Amazon.com*, Nos. 2:13-cv-01112-JRG, 2:14-cv-
  00061-JRG, 2015 WL 11089490 (E.D. Tex. Sep. 3, 2015).....................................8

*Fenner Investments, Ltd. V. Hewlett-Packard Co.*, 6:08-cv-273, 2010 WL
  1727916 (E.D. Tex. Apr. 28, 2010) ...................................................................5

*Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*, Case No. 2:16-cv-00052-JRG-RSP,
  Dkt. No. 440 (E.D. Tex. Sept. 29, 2017) .............................................................7

*Implicit, LLC v. Trend Micro, Inc.*, 6:16-cv-00080-JRG, Dkt. No. 253 (E.D. Tex.)......................8

*Kaufman v. Microsoft Corp.*, 2020 U.S. Dist. LEXIS 14292 (S.D. N.Y. Jan. 22,
  2020) ..........................................................................................................18

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012) .........................1, 6

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) ...................................................7

*Pioneer Hi-Bred Int'l, Inc. v. Ottawa Plant Food, Inc.*, 219 F.R.D. 135 (N.D.
  Iowa 2003) ....................................................................................................4

*Prism Technologies LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360 (Fed. Cir. 2017) ................. 3-4

*Prisua Eng'g Corp. v. Samsung Elecs. Co., 2018 U.S. Dist. LEXIS 221548 at \*6*
  (S.D. Fla. Feb. 13, 2018)..................................................................................17

*Promethean Insulation Tech. v. Sealed Air Corp.*, No. 2:13-cv-1113, 2015 WL
  11027036 (E.D. Tex. Aug. 14, 2015) ..................................................................8

*Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*, 2019 U.S. Dist.
  LEXIS 27282 (D. Del. Jan. 2, 2019)...................................................................18

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011)...........................................6

**State Cases**

*Shallow v. Follwell*, 554 S.W.3d 878 (Mo. 2018) ..........................................................................17

**Rules**

Fed. R. Civ. P. §16 ..........................................................................................................16

Fed. R. Evid. §401 ................................................................................................ 8-9, 14, 17

Fed. R. Evid. §402 .................................................................................................. 1, 8-9, 14

Fed. R. Evid. §403 ...................................................................................................*Passim*

Fed. R. Evid. §403 ...................................................................................................*Passim*

Fed. R. Evid. §702 ......................................................................................................16, 19

1. **Motion in Limine No. 1: Centripetal may not introduce evidence or argument regarding its prior litigation with Keysight/Ixia and may not reference or rely upon the Binding Term Sheet entered into with Keysight/Ixia mid-trial to justify its reasonable royalty analysis in this case.**

Pursuant to Federal Rule of Evidence 402 and 403, Defendant Cisco Systems, Inc. ("Cisco") respectfully requests that the Court preclude any documentary evidence and/or testimony regarding or any reference to Centripetal's prior litigation with Keysight and specifically exclude any mention of the Binding Term Sheet that Centripetal entered with Keysight/Ixia during the middle of trial.  This is not in any way an arms-length patent license negotiated between a willing licensor and willing licensee, but instead is the classic settlement of a dispute mid-trial.  Nonetheless, Centripetal intends for this settlement agreement to be the lynchpin of its damages case against Cisco.  Put simply, the Centripetal-Keysight Term Sheet "appears to be the least reliable" evidence of the value of the patents-in-suit "by a wide margin" and, therefore, it should not be permitted into evidence pursuant to Federal Rule of Evidence 403.  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012).  Moreover, any discussion of the Keysight litigation and the related settlement and Term Sheet risks substantial prejudice to Cisco because jurors may believe such settlement bolsters Centripetal's infringement case against Cisco (*i.e.* that Centripetal's patents must be "good patents"; otherwise, Keysight would not have settled and paid $25 + million dollars).

As this Court will recall, Centripetal brought suit against Keysight and Ixia in 2017, alleging that various Keysight/Ixia products willfully infringed six of Centripetal's patents.[1]  The

---

[1] *See* Complaint for Patent Infringement, *Centripetal Networks, Inc. v. Keysight Techns., Inc. and Ixia*, 2:17-cv-383-HCM-LRL, Dkt. 1 (E.D. Va. July 20, 2017) (alleging willful infringement of U.S. Patent Nos. 9,264,370; 9,137,205; 9,560,077; and 9,413,722); Amended Complaint for Patent Infringement, 2:17-cv-383-HCM-LRL, Dkt. 192 (E.D. Va. June 13, 2018) (adding additional willfulness facts and infringement allegations as to U.S. Patent Nos. 9,565,213; 9,917,856).

case proceeded to trial before this Court on October 2, 2018, and settled over the weekend after

the first week of trial following several key trial developments, including, *e.g.*, (1) testimony

from a Keysight witness effectively admitting he had copied Centripetal's product in developing

the accused product (*see* Transcript of Proceedings, *Centripetal Networks, Inc. v. Keysight*

*Technologies, Inc.* (Case No. EDVA-2-17-cv-00383) (hereafter "Keysight Trial Transcript"), at

Dkt. No. 602 at 379:19-24; 386:4-13); (2) several statements by the Court (outside the jury's

presence) affirming the "copying" story (*see* Dkt. No. 602 (Keysight Trial Transcript), at 386:4-

13, 390:13-23); and (3) Keysight's lead lawyer having been hospitalized over that same

weekend.  *See* Dkt. No. 612 (Keysight Trial Transcript), at 839:15-840:4.



As negotiated over that first trial weekend, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮      *See* Ex. 1 (Binding Term Sheet).  In return.▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮      and the litigation between the parties was only dismissed without

prejudice.  *Id*.

The admissibility of license agreements in patent cases is discretionary and highly fact

specific, with the key determinative factor being whether the facts and circumstances that led to

the license agreement (and the terms thereof) are truly comparable to the outcome of the so

called "hypothetical negotiation."  *See Prism Technologies LLC v. Sprint Spectrum L.P.*, 849

F.3d 1360, 1368-69 (Fed. Cir. 2017) ("This court has recognized that, depending on the

circumstances, a license agreement entered into in settling an earlier patent suit sometimes is

admissible in a later patent suit involving the value of the patented technology, and sometimes is

not.") (collecting cases).  Here, the circumstances surrounding the execution of the Binding Term

Sheet demonstrate that the Rule 403 balance dramatically tips in favor of exclusion.  The Federal

Circuit has identified various factors that would lead a court to find "a settlement of an earlier

suit too high as evidence on the valuation question presented in a later suit."  *Id.* at 1369.  These

factors include:

> An earlier settlement may cover technology either not the same as or not
> comparable to the patented technology at issue in the later suit, or may cover the
> patented technology plus other technologies. The earlier suit may have included a
> risk of enhanced damages, a factor in the settling parties' assessment of risk that
> would push settlement value above the value of the technology. And, of course,
> the litigation costs still to come at the time of settlement may loom large in
> parties' decisions to settle. *See Rude v. Westcott*, 130 U.S. 152, 164, 9 S.Ct. 463,
> 32 L.Ed. 888 (1889) ("Many considerations other than the value of the
> improvements patented may induce the payment in such cases. The avoidance of
> the risk and expense of litigation will always be a potential motive for a
> settlement."); *LaserDynamics*, 694 F.3d at 78 (discussing "desire to avoid further
> litigation under the circumstances," including "the numerous harsh sanctions
> imposed" on the settling defendant in the earlier suit).

*Id.* at 1369-70.  These factors and more are at play here and demonstrate the lack of

comparability between the Keysight Term Sheet and the hypothetical negotiation in this case.

First, despite Centripetal suing Keysight on six patents and Cisco on five patents, there

are only two patents in common (the '205 and '856 Patents), and even then, the only overlapping

patent claims being asserted are from the '856 Patent.  Second, in Centripetal/Keysight, the

parties were direct competitors in the Threat Intelligence Gateway ("TIG") market, the key

market for Centripetal's products, whereas Centripetal witnesses have acknowledged that

Centripetal does not consider Cisco to be a competitor in that market and that Centripetal does

3

not offer products that would otherwise compete with Cisco's basic networking technology such as the accused routers and switches.  Ex. 2, (Christopher Gibbs Dep.), at 42:17-44:6.  Third, Keysight witnesses at the Centripetal trial effectively admitted copying Centripetal's technology – a fact the Court noted out of the presence of the jury.  *See* Dkt. No. 602 (Keysight Trial Transcript), at 379:19-24; 386:4-13.  This even led to Centripetal arguing that as a result of such copying, Keysight has saved as much as $1 billion in development cost.  *See* Dkt. No. 608 (Keysight Trial Transcript) at 678:25-680:15.  Such copying evidence undoubtedly increased the risk of a finding of willful infringement and thus enhanced damages.  *See Prism Technologies LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1368-69 (Fed. Cir. 2017) ("The earlier suit may have included a risk of enhanced damages, a factor in the settling parties' assessment of risk that would push settlement value above the value of the technology.").   No such evidence exists in this case.  Fourth, the mid-trial settlement occurred against the backdrop of Keysight's lead lawyer being hospitalized during trial.  These settlement factors are far removed from the mid-2017 hypothetical negotiation where Centripetal and Cisco are a willing licensor and licensee sitting at a negotiating table.  Indeed, a Term Sheet executed mid-trial, with a past damages figure representing over ███ of accused revenues and a ██████████████████ ████████████████████████████, looks nothing like the license Cisco would have considered let alone negotiated at the hypothetical negotiation for the five patents-in-suit.

Finally, admitting the Centripetal-Keysight Term Sheet would "invite a 'mini-trial' on similarities and differences" between the products and circumstances at issue here and those at issue in Keysight/Ixia, as well as the differences in the parties' respective market positions.  *Pioneer Hi-Bred Int'l, Inc. v. Ottawa Plant Food, Inc.*, 219 F.R.D. 135, 145 (N.D. Iowa 2003).  For example, if the Keysight Term Sheet were admitted, the parties necessarily would be forced

to discuss the differences between the products accused of infringement here and the accused Keysight/Ixia products.  The parties would also need to discuss the differences in the scope of the claims asserted in the *Keysight* matter and those asserted here.  Cisco would also have to distinguish itself from Keysight/Ixia, a relative newcomer in the network security space, as compared to Cisco, which has been offering computer networking technology since it was founded in the 1980s.  For these reasons, courts have concluded that "parties are prejudiced by being forced to litigate the 'similarities and differences in the facts regarding the 'same' claims against other defendants to determine what, if any, light the [settlement agreement] sheds on the value of the claim against [this defendant]." *Fenner Investments, Ltd. V. Hewlett-Packard Co.*, 6:08-cv-273, 2010 WL 1727916 (E.D. Tex. Apr. 28, 2010) (quoting *Pioneer Hi-Bred Int'l*, 219 F.R.D. at 144-45)).

A five-patent case involving nearly a dozen combinations of products and assertions of infringement and invalidity is already confusing enough without the added complexity of introducing evidence regarding the mid-trial settlement of a prior litigation involving different parties in different circumstances, different patents, and different products that compete in a different market.  "Such a diversion would cause unfair prejudice, confuse the issues, and waste time." *Fenner*, 2010 WL 1727916, at *3 (citing *Insight Tech. Inc. v. SureFire LLC*, No. 4-cv-74, 2009 WL 3242554, at *1 (D.N.H. Oct. 8, 2009).  In short, the Binding Term Sheet is

> well outside the limited scope of circumstances under which we deemed the settlement agreement in *ResQNet* admissible and probative.  The probative value of the [Keysight/Ixia] settlement agreement is dubious in that it has very little relation to the demonstrated economic demand of the patented technology, and its probative value is greatly outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury.  Fed. R. Evid. 403.

*LaserDynamics*, 694 F.3d at 78. Accordingly, the Term Sheet and evidence or testimony about or reference to the Centripetal/Keysight litigation should be excluded because its probative value is far outweighed by its confusion of the issues and prejudice to Cisco.

**2.      Motion in Limine No. 2:  Centripetal may not introduce evidence or argument disclosing Cisco's stock value, market value, total sales, sales by segment, past annual revenue, past annual revenue from the sales of the accused product(s), estimated future annual revenue, sales figures for sales outside of the U.S., overall capital expenditures, or price paid to acquire various companies. Similarly, Centripetal may not argue through a demonstrative or otherwise that the royalty rate it seeks is only a "fraction," "small percentage," etc., of any Cisco's overall revenues.**

The Court should preclude Centripetal from offering any argument or evidence about, or otherwise making any reference to, Cisco's total revenues, total cash flow, total profits, stock value, market value, total sales, sales by segment, past annual revenue, annual revenue, estimated future annual revenue, sales figures for sales outside of the U.S., or overall capital expenditures. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d. 51, 67-68 (Fed. Cir. 2012).

Total Revenues:  Mr. Gunderson, Centripetal's damages expert, provides in bullet point fashion a "summation of the reported Cisco Accused Products Invoice Gross Revenue amount, which corresponds to total gross product revenue" and then proceeds to identify figures that range from ███████ to ███████ in overall product revenues.  See Ex. 3 (Gunderson Report), p. 88; *see also id.* at 140 ("Further demonstrating commercial success and popularity of the Cisco Accused Products, from June 2017 to December 2017, the worldwide Cisco Accused Product Invoice Gross Revenue totaled approximately ███████ (**Schedule 6**).").  Mr. Gunderson does not offer an "entire market value" opinion anywhere in his report and these figures represent the entire market value of the components that make up the product combinations and, thus, are irrelevant and will only tend to skew the damages horizon in the jury's mind.  *See, e.g., Uniloc USA, Inc. v. Microsoft Corp.*,  632 F.3d 1292, 1320 (Fed. Cir.

6

2011) ("The disclosure that a company has made $19 billion in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.").  Centripetal must "structure its damages presentation in such a way that the jury will not be able to calculate [Cisco's] total revenues … ." *BMC Software, Inc. v. ServiceNow, Inc.*, No. 2:14-cv-903-JRG, 2016 WL 379620, at *3 (E.D. Tex. Feb. 1, 2016).

<u>Worldwide Revenues:</u>  Centripetal's primary damages model is predicated on using Cisco's worldwide revenues, but Centripetal has not come forward with any evidence that it is entitled to damages for sales outside of the United States for each of the products included within the accused combinations, let alone the entire accused systems.  The use of worldwide revenues wildly skews the damages horizon.  For example, Centripetal's Mr. Gunderson opines that Centripetal is entitled to a royalty of ███████████ to ███████████ using Cisco's *worldwide sales revenues*, but approximately half that amount if only U.S. revenues are taken into account: ███████████ to approximately ███████████ Ex. 3 (Gunderson Report), at 9 n. 11.  The Court should exclude, as irrelevant and highly prejudicial, Cisco's worldwide product revenue figures.  *See*, *e.g.*, *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) ("It is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country.").

<u>"Small Fraction":</u>  Similarly, the Court should not permit Centripetal to argue, through a demonstrative or otherwise, that the royalty rate it seeks is only a fraction, small percentage, etc., of Cisco's overall revenue, or otherwise compare the proposed royalty rate to any revenue other than Centripetal's damages expert's estimation of Cisco's apportioned revenue for the accused products.  *Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*, Case No. 2:16-cv-00052-JRG-RSP, Dkt.

No. 440, at 11 (E.D. Tex. Sept. 29, 2017); *Implicit, LLC v. Trend Micro, Inc.*, 6:16-cv-00080-JRG, Dkt. No. 253, at 6 (E.D. Tex.) (ordering that "Neither party may reference Trend's size, profits, or total value without obtaining leave from the Court.").

    <u>Cisco's Overall Market Capitalization:</u>  Likewise, the Court should preclude Centripetal under FRE 401, 402, and/or 403 from introducing other large irrelevant and prejudicial financial figures, such as Cisco's market capitalization or capital expenditures, that would only confuse the jury and skew the damages horizon. For example, Centripetal's expert James Malackowski opines that "Cisco's market capitalization exceeded $200 billion" as of January 2020.  Ex. 4 (Malackwoski Report), at 8.  This information is irrelevant and it would be improper to provide such figures to the jury.  *See ContentGuard Holdings v. Amazon.com*, Nos. 2:13-cv-01112-JRG, 2:14-cv-00061-JRG, 2015 WL 11089490, at *5 (E.D. Tex. Sep. 3, 2015) ("ContentGuard is precluded from introducing any evidence or argument regarding Samsung'[s] size, market capitalization, or revenues and profits not derived from the accused products or services."); *Promethean Insulation Tech. v. Sealed Air Corp.*, No. 2:13-cv-1113, 2015 WL 11027036, at *3-6 (E.D. Tex. Aug. 14, 2015) (excluding "testimony (including expert opinion), evidence, or argument regarding the total sales data, total revenues, size, or financial worth of Defendants or their affiliates … , including comparing that information to corresponding information from Plaintiff … except as to revenue from accused products.").

    <u>Annual Growth Rate of Cisco's Infrastructure/Security Product Categories:</u>  Looking to Cisco's annual report, Mr. Malackowski provides a chart setting forth the annual revenue of Cisco's "Security" product category since 2014 and compares that to the revenue for Cisco's other three product categories. Ex. 4 (Malackowski Report), at 43.  This information is on its face highly prejudicial, as it once again provides Cisco's annual revenues, which is untethered to

the accused products.  The Court should exclude it on this basis alone.  The Court should also

exclude it because it will only confuse the jury.  Mr. Malackowski opines that the ███████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ *Id.*  Mr. Malackowski

has done nothing to tie such growth rates to the alleged value of the patents-in-suit, nor has any

Centripetal technical expert even attempted to do so.  These "opinions" are again both not

relevant pursuant to FRE 401/402 and unfairly prejudicial and risk confusing the issues and

misleading the jury under FRE 403.  While Cisco's "Security" product category includes some

of the accused products (such as the ASAs and FMCs), it also includes dozens of other, non-

accused products.  Thus, the revenue comparison does not make sense on its face, nor does it

support the proposition for which it is relied upon.  But it also, once again, demonstrates

Centripetal's improper attempt to introduce Cisco's total product revenues and revenues and

growth rates for a wide array of products that are not at issue and which have not been accused.

Acquisition Price:  Both Mr. Gunderson and Mr. Malackowski further provide figures

regarding what Cisco paid to acquire certain companies, including Sourcefire ($2.7 billion) and

Lancope ($452 million).  *See*, *e.g.*, Ex. 3, (Gunderson Report), at 61 ("Cisco's purchase price for

Sourcefire was reported to be $2.7 billion."), *id.* at 62 ("Cisco paid approximately $452 million

to acquire Lancope"); Ex. 4 (Malackowski Report), at 7-8.  What Cisco paid to acquire these

companies is completely irrelevant to any issue in dispute and is not a proper consideration for a

reasonable royalty here, as neither Mr. Gunderson nor Mr. Malackowski, or any other

Centripetal expert, makes any effort to tie the acquisition of these companies to infringement or

value of the patents-in-suit.  Indeed, Mr. Gunderson and Mr. Malackowski reference these

figures simply due to their large price tags, which would only serve to unduly prejudice Cisco and confuse the jury.  Fed. R. Evid. 403.

3.      **Motion in Limine No. 3: Centripetal may not introduce evidence or argument regarding information obtained from LeadLander and may not reference or rely upon information from LeadLander to suggest that Cisco or any employee of Cisco visited Centripetal's website for purposes of copying Centripetal's technology or patents.**

Pursuant to Federal Rules of Evidence 402 and 403, Defendant Cisco Systems, Inc. ("Cisco") respectfully requests that the Court preclude testimony regarding information provided by LeadLander ("LeadLander Reports") as purported evidence that Cisco visited Centripetal's website or that such unsubstantiated visits to Centripetal's website constitute proof that Cisco copied Centripetal's products or patents.  Centripetal intends to use the LeadLander Reports to make the argument that Cisco employees regularly visited Centripetal's website and did so in order to copy Centripetal's technology.  There are two unsubstantiated leaps in logic in this argument that make the probative value of the LeadLander Reports far outweighed by the dangers of misleading the jury and undue prejudice to Cisco.

First, the evidentiary record is clear that Centripetal's effort to connect the Cisco "visits" from the LeadLander Reports to Cisco or employees of Cisco cannot be substantiated in light of the deposition testimony of LeadLander.  In particular, LeadLander's corporate representative confirmed that (1) LeadLander's software cannot accurately identify who visits a website or where the visits originate, and (2) the purported Cisco "visits" reflected in the LeadLander Reports may actually be visits by Cisco's customers using Cisco equipment, as confirmed by technical documents produced in this case.  Ex. 5 (Kyle Petsch Dep.), at 8:19-9:6; 12:15-22; 14:19-24; 20:1-17; 27:15-28:9.

Second, there is not a shred of evidence in the LeadLander Reports that supports Centripetal's argument that the unidentified individuals who visited Centripetal's website did so

to copy or steal Centripetal's technology, as opposed to the multitude of reasons driving the general public to visit a company's public website. The LeadLander Reports and the information derived from them are inaccurate and misleading, especially for the purpose for which Centripetal seeks to proffer them, and they should be excluded in their entirety under FRE 402 and 403.

By way of background, LeadLander's software is a sales tool that operates by tracking the IP addresses of visits to websites. The purpose of LeadLander's service is to help companies "land leads" with potential customers, not to serve as evidence in proving how many times a specific individual or company visited a website. *Id*. at *Id*. at 9:11-19. To use LeadLander's services, LeadLander's customers, such as Centripetal, place LeadLander tracking code on their webpages. *Id*. at 11:9-12:3. When a page containing LeadLander code loads, an IP address is sent to LeadLander. *Id.* LeadLander then looks up the IP address in either its internal database or on a subscription-based IP registry to try to determine the individual or company to which the IP address is registered. *Id.* LeadLander delivers various reports to its customers, such as the "LeadLander Weekly Report" which is a summary of purported visits to a customer's website. *Id.* at 23:7-24:7.

However, as LeadLander's corporate representative acknowledged – "with an IP address, [LeadLander is] unable to know exactly who [visitors] are" or "where they're coming from." *Id.* at 8:19-9:6. This is because IP addresses are inherently unreliable for purposes of identifying an individual or company associated with an IP address. That is particularly true when attempting to associate an IP address with a company like Cisco, the largest supplier of computer networking equipment in the world. Indeed, the evidence in this case shows that a Cisco IP address is assigned to Cisco ***customers*** using certain cloud-based proxy servers sold by Cisco,

such as Cisco's Web Security Appliance ("WSA") and Cloud Web Security ("CWS") product. *See, e.g.,* Ex. 6 (Cisco Data Sheet stating, "When a customer's web traffic is redirected to a CWS cloud proxy the destination web server will see the customer's traffic as originating from the CWS proxy's egress IP address.").   A proxy server acts as an intermediary, with its own IP address.   Accordingly, the LeadLander Reports incorrectly associate IP addresses with Cisco when the individual or company actually visiting the website is a Cisco customer.  Ex. 5 (Petsch Dep.), at 20: 1–17.  This is confirmed by LeadLander itself:

> **Q**:  So the fact that the LeadLander Report identifies an IP address as belonging to Cisco does not mean that an individual working at Cisco actually visited Centripetal's website, correct?
>
> **A**: Yes.

Id. at 27:22-28:2.

Despite LeadLander's admission that it cannot accurately identify visitors to websites based on IP addresses and documents showing that use of certain Cisco products will result in Cisco IP addresses being assigned to Cisco's customers, Centripetal plans to use information provided by LeadLander to support its allegation that Cisco copied Centripetal's patented technology.  Specifically, in response to Cisco's interrogatory seeking Centripetal's legal and factual basis for its allegation of copying, Centripetal points to the number of times Cisco allegedly visited Centripetal's webpage.  In particular, Centripetal alleges:



*See* Ex. 7, Centripetal's Amended Supplemental Response to Cisco's First Set of Interrogatories (No. 8).  These allegations are based entirely on reports from LeadLander.  *Id*. (citing LeadLander Reports bearing Bates numbers CENTRIPETAL-CSCO 099422 - 099445); *see also* Ex. 8 (exemplary LeadLander Reports).  However, LeadLander acknowledged the inherent shortcomings of its own software and repeatedly confirmed that LeadLander cannot reliably identify an individual or company that visited a website.  Ex. 5 (Petsch Dep.), at p. 8:19-9:6; 12:15-22; 14:19-15:5; 31:6-10; 27:22-28:2; 28:5-9; 31:6-9.  Indeed, LeadLander confirmed that if a visit to Centripetal's website involved the use of a proxy server, the LeadLander software would identify the IP address of the proxy server, not that of the actual visitor.  *Id*. at 15:19-16:14; 18:9-14.  As just one example, a LeadLander Report Centripetal relies on states that

██████████████████████████████████████████████████

██████████████████████████████████████████████████  *Id.* at 28:12-31:3, Ex. 9 (LeadLander Report).  Counsel for Cisco looked up this IP address on "WhatIsMyIPAddress.com" and found that the hostname was "Egress601.**cws**.sco.cisco.com." (emphasis added) and that the ISP was "Scan Safe."  *Id.* at 32:4-33:24; Ex. 10 (WhatIsMyIPAddress.com).   As indicated in the hostname itself, this IP address was hosted by a Cisco CWS, as opposed to being internal to Cisco, the company.  *Id.*  Therefore, any allegation or suggestion that this entry reflected a visit by a Cisco employee is erroneous, demonstrating the fallacy of using the LeadLander Reports to prove Cisco visits to Centripetal's website.

Furthermore, there is no evidence that can be gleaned from the LeadLander Reports that supports Centripetal's argument that the unidentified individuals who visited Centripetal's website did so to copy or steal Centripetal's technology.  There are a multitude of reasons why people may visit a company's public website.  Yet, Centripetal plans to use the LeadLander

Reports to establish that Cisco not only visited Centripetal's website, but also must have done so for the nefarious purpose of copying Centripetal technology.  Such suppositions conveyed to the jury in the context of supposedly accurate technical reports are misleading and highly prejudicial to Cisco, particularly given that Centripetal intends to use the uncorroborated website "visits" as purported evidence that Cisco actually copied Centripetal's technology.  The probative value of this kind of speculative "evidence" is zero, while the intended prejudicial impact on Cisco is extreme.  Accordingly, the Court should preclude testimony regarding information provided by LeadLander as purported evidence that Cisco visited Centripetal's website or that Cisco copied Centripetal's patented technology as a result of unsubstantiated website visits.

4.    **Motion in Limine No. 4: The parties shall be precluded from raising any argument, evidence, testimony, insinuation, reference, or assertion that the court has the power to dismiss frivolous suits and/or frivolous counterclaims.**

The Court should preclude the parties from raising any argument, evidence, testimony, insinuation, reference, or assertion that the court has the power to dismiss frivolous suits and/or specific claims and implying or explicitly stating that the claims are not frivolous because they are being presented to the jury.  This exclusion is necessary to prevent juror confusion and waste time under FRE 403 and because the facts underlying such an argument are irrelevant under FRE 402.  For example, an assertion by Centripetal that its claims necessarily have merit because, if they did not, the Court would have dismissed them already, would require Cisco to engage in a multipronged rebuttal describing the standards governing motions to dismiss, motions for summary judgment, and the like. This type of evidence and argument is irrelevant, would only lengthen the trial, and waste time.  Accordingly, the Court should exclude such argument and testimony pursuant to FRE 401, 402, and 403.

5.     **Motion in Limine No. 5: Exclude Duplicative Expert Testimony, the Cumulative Effect of Which Will Tend to Confuse and Mislead the Jury**

Centripetal presents several, cumulative and overlapping expert opinions regarding the patents-in-suit, the technology and products at issue, and its purported damages.

Specifically, on issues of liability, Centripetal has proffered the expert opinions of:

1.  Dr. Nenad Medvidovic "Regarding Technology Tutorial and Technology" of each of the patents-in-suit (Ex. 11);

2.  Dr. Aaron Striegel, who provides "Patent Summaries" (Ex. 12);

3.  Dr. Mitzenmacher, who has entire sections of his report on infringement of the titled "Overview of Centripetal and Asserted Patents" and "Overview of Accused Products and Technologies" in his infringement report on the '205, '806, and '193 Patents (Ex. 13);

4.  Dr. Cole, who has entire sections on "Overview of Centripetal," "Centripetal Patents", and "Cisco's Accused Products and Components" in his infringement report on the '856 and '176 Patents (Ex. 14);

5.  Dr. Jaeger, who has an "Analysis of Background Technologies" and the "State of the Art" in his report on the validity of the '856 and '176 Patents (Ex. 15);

6.  Dr. Orso, who has a section titled "Background of Centripetal Patents and the State of the Art" in his report on the validity of the '205, '806, and '193 Patents (Ex. 16); and

7.  Dr. Malackowski, who is not even a technical expert and yet purports to "summarize the patents-in-suit," by simply quoting verbatim from the patents' specification (Ex. 4, at pp. 9-14).

Cisco recognizes the need for a technical expert to teach the patented technology of the asserted claims to the jury, but the Court should preclude Centripetal from multiple experts treading the same ground, and, in effect, "vouching" for the quality of the patents through repetition.

Centripetal's damages case is no less cumulative.  Setting aside for the time being the opinions of Dr. Goodrich and Dr. Valerdi, who are not proffered as damages experts and yet whose only relevance could be to support Centripetal's damages claims, Centripetal has provided expert opinions from both Mr. Lance Gunderson, and Mr. Malackowski, upon whom Mr. Gunderson

relies for portions of his affirmative opinions.  Mr. Gunderson is the only Centripetal witness that opines as to a reasonable royalty in this matter and thus Dr. Becker (Cisco's damages expert) provided opinions in rebuttal (and in doing so, rebutted Mr. Malackowski to the extent his opinions were relied upon by Mr. Gunderson).  Mr. Malackowski's Reply report, however, appears to be an attempt to usurp Mr. Gunderson's role as Centripetal's lead damages expert insofar as he has provided opinions rebutting the entirety of Dr. Becker's Report.  For example, Mr. Malackowski provided no opinions in his opening report regarding what products properly comprise the royalty base or what a proper apportionment would be, now opines that Dr. Becker improperly excluded certain products and that Dr. Becker's apportionment opinions are "invalid."  These are essentially the same rebuttal opinions that Mr. Gunderson, Centripetal's true damages expert, as set forth in reply.

The Court should strike this duplicative testimony from each of Centripetal's liability and damages experts, the cumulative effect of which is overly prejudicial to Cisco.  Federal Rule of evidence 403 specifically permits the court to exclude evidence it its "probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Similarly, Rule 16 of the Federal Rules of Civil Procedure provides that the Court may take action to avoid "unnecessary proof and cumulative evidence," including "limiting the use of testimony under Federal Rule of Evidence 702 … ."

Here, each of the grounds for exclusion under Rule 403 exist and, therefore, the Court should exercise its discretion to ensure that Centripetal does not present to the jury a multitude of overlapping experts, each of which has been tasked to provide opinions on essentially the same subject matter.  Indeed, it appears that Centripetal's goal is to force upon Cisco a game of expert-

testimony whack-a-mole:  knock down one expert, and two more will pop up to regurgitate the exact same attorney-driven opinions.  This will only have the effect of needlessly prolonging the trial.  Moreover, the sheer number of experts that Centripetal has identified to provide the same opinions on the same issues could tend to lead a jury to decide the issues in dispute on a basis other than the merits.  *See*, *e.g.*, *Shallow v. Follwell*, 554 S.W.3d 878, 885 (Mo. 2018) ("Excessive expert witnesses can create the risk the trier of fact will resolve differences in expert witness opinions by the number of experts called instead of giving due consideration to the quality and credibility of each expert opinion.").   This case should be decided on the merits, not based upon which side hired more experts to provide the same opinions.

6.     **Motion in Limine No. 6:  The Court should preclude the parties from presenting evidence or argument regarding the petition for, or outcome of, inter partes review (IPR) proceedings, including any decisions to institute or not institute review. The parties are not precluded from presenting evidence or argument regarding statements made by the parties to the Patent Trial and Appeal Board (PTAB) in IPR proceedings to the extent the statements are admissible under the Federal Rules of Evidence. The parties shall refer to any such statements as statements "made to the Patent Office," without identifying the existence of IPR proceedings.**

Cisco has filed several petitions for Inter Partes Review of Centripetal's patents.  Some of those petitions have been instituted and some have not.  The Patent Trial and Appeal Board (PTAB) has issued final written decisions relating to several petitions that have been instituted finding that multiple claims of Centripetal's patents are invalid.  *See e.g.*, Centripetal's Notice Regarding Status of Inter Partes Review Proceedings dated February 3, 2020 [ECF No. 178].

Numerous district courts have recognized that the fact of filing IPR petitions, whether the PTAB has instituted proceedings based on IPR petitions, and the result of IPR proceedings are inadmissible under Federal Rules of Evidence 401 and 403.  *See e.g., Acantha LLC v. DePuy Orthopaedics Inc.*, 2018 U.S. Dist. LEXIS 89854 at *7-*8 (E.D. Wis. May 30, 2018) (citing cases); *Prisua Eng'g Corp. v. Samsung Elecs. Co.*, 2018 U.S. Dist. LEXIS 221548 at *6 (S.D.

Fla. Feb. 13, 2018).  In fact, in its suit against Keysight, Centripetal moved to exclude evidence

of Cisco's IPR petitions.  *See* Centripetal's Mem. in Sup. of Motions In Limine Nos. 1-7 (ECF

No. 400) at 13-16, *Centripetal Networks, Inc. v. Keysight Techs.*, No. 2:17CV00383 (HCM-

LRL).  Relevant testimonial and documentary evidence from IPR proceedings, however, is

admissible, as long as no reference is made to the proceedings.  *See e.g.*, *Kaufman v. Microsoft*

*Corp.*, 2020 U.S. Dist. LEXIS 14292 at *1-*2 (S.D. N.Y. Jan. 22, 2020); S*iemens Mobility Inc.*

*v. Westinghouse Air Brake Techs. Corp.*, 2019 U.S. Dist. LEXIS 27282 at *2 (D. Del. Jan. 2,

2019).  Accordingly, Cisco requests that the Court exclude evidence of or argument regarding

the IPR proceedings, except to the extent that statements or evidence from those proceedings is

otherwise admissible.  In that event, Cisco requests that the parties be limited to referring to such

statements as statements "made to the Patent Office" without identifying the existence of the IPR

proceedings.

7.     **Motion in Limine No. 7:  The Court should preclude Centripetal from offering any testimony, argument, or opinions that it is ███████████████████████████████ ████████ or that other third parties allegedly infringe its patents.**

One of Centripetal's numerous damages experts, Mr. Malackowski, based on nothing

more than "discussions with [Centripetal's] Jonathan Rogers," asserts that ████████████████

████████████████████████████ Ex. 4 (Malackowski Report), at 40.  According to

Mr. Malackowski, ████████████████████████████████████████████████████

████████████████████████████████████████ *Id.*  This, Mr.

Malackowski opines, ████████████████████████████████████████ This, of

course, first assumes that Cisco has been found to infringe a valid patent, that other cybersecurity

providers have copied (with no evidence at all) Cisco's products, and that the products they have

copied are the ones that infringe.  The Court should exclude these "opinions", and the unfounded

and unsupported statements of Jonathan Rogers upon which it is based, as irrelevant, highly

prejudicial and likely to inflame and confuse the jury.  Indeed, during his deposition, Mr. Rogers

confirmed that ███████████████████████████████████████████████████████ let

alone the patents-in-suit.  Ex. 17 (Jonathan Rogers Dep.), at 218:21-219:1.  Moreover, neither

Mr. Malackowski nor Mr. Rogers is qualified to render an expert opinion on infringement (and,

indeed, neither does) and, therefore, the Court should further exclude these opinions and

testimony pursuant to FRE 702.

There is absolutely no evidence in the record to justify the implied assertion that ███

███████████████████████████████ Mr. Malackowski himself

never explicitly states as such, but rather simply opines that ███████████████████

████████████████████████████████████████████

███████████████ Ex. 4 (Malackowski Report), at 42; *see also id.* at 42-

43 (same re ██████  The fact that Cisco has numerous competitors has no bearing on whether

any companies are infringing any of Centripetal's patents, let alone any of the asserted claims of

the patents-in-suit.  And, to be sure, none of Centripetal's other experts have opined that any

███████████ or █████product infringes any Centripetal patent.

Dated: Feburary 27, 2020                                    CISCO SYSTEMS, INC.


                                                                    By /s/ *Dabney J. Carr, IV*
                                                                          Of Counsel

Dabney J. Carr, IV, VSB No. 28679
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com

**DUANE MORRIS LLP**
Louis N. Jameson (admitted pro hac vice)
Matthew C. Gaudet (pro hac vice pending)
John R. Gibson, VSB No. 72968
Jennifer H. Forte (admitted pro hac vice)
1075 Peachtree Street, N.E., Suite 2000
Atlanta, Georgia 30309-3929
Telephone: (404) 253-6900
Facsimile: (404) 253-6901
wjameson@duanemorris.com
jrgibson@duanemorris.com
jhforte@duanemorris.com

Joseph A. Powers (admitted pro hac vice)
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Facsimile: (215) 689-3797
japowers@duanemorris.com

John M. Baird, VSB No. 77827
Christopher J. Tyson, VSB No. 81553
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
Telephone: (202) 776 7851
Facsimile: (202) 478 2620
jmbaird@duanemorrris.com
cjtyson@duanemorris.com

Nicole E. Grigg (formerly Johnson) (admitted *pro hac vice*)
2475 Hanover Street
Palo Alto, CA 94304-1194
Telephone: (650) 847-4176
Facsimile: (650) 618-2713
NEGrigg@duanemorris.com

*Counsel for Defendant Cisco Systems, Inc.*