**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | | |
|---|---|---|
| **CENTRIPETAL NETWORKS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:18cv00094-HCM-LRL** |
| | ) | |
| **CISCO SYSTEMS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT CISCO SYSTEMS, INC.'S
MEMORANDUM IN SUPPORT OF MOTION TO BIFURCATE**

# TABLE OF CONTENTS

**Page**

I.     FACTUAL AND PROCEDURAL BACKGROUND............................................................3

    A.     The Liability Phase (Phase 1) ................................................................ 3

        1.     Accused Patents and Products ..................................................... 3

        2.     Liability Experts.......................................................................... 6

    B.     The Damages Phase (Phase 2) .............................................................. 7

II.    ARGUMENT .........................................................................................................10

    A.     Legal Standard .................................................................................... 10

    B.     Bifurcation of Liability and Damages Phases is Necessary and Appropriate to Avoid Prejudice and Economize the Jury's Time ........................ 12

        1.     Bifurcation Will Minimize Juror Confusion............................... 12

        2.     Bifurcation Will Promote Judicial and Party Economy............................. 14

        3.     Bifurcation Will Avoid Prejudice ............................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, Civil Action No. 2:07cv415, 2008 WL 11379925 (E.D. Va. Sept. 22, 2008) ........................................................................12

*Audio MPEG, Inc. v. Dell Inc.*, 254 F. Supp. 3d 798 (E.D. Va. 2017) ........................................10

*BASF Plant Science, LP v. Commonwealth Scientific and Industrial Research Organisation*, Civil Action No. 2:17cv503 (E.D. Va.)................................................... 1, 10-12

*British Telecommc'ns PLC v. Google*, C.A. No. 11-1249-LPS, 2013 WL 3814329 (D. Del. July 22, 2013)................................................................................................. 13-14

*Cherdak v. Stride Rite Corp.*, 396 F. Supp. 2d 602 (D. Md. 2005) ...............................................12

*Dutch Branch of Streamserve Development AB v. Exstream Software, LLC*, Civ. No. 08-343-SLR, 2009 WL 2705932 (D. Del. Aug. 26, 2009) ...............................................11

*Enzo Life Scis., Inc. v. Digene Corp.*, No. Civ. A. 02-212-JJF, 2003 WL 21402512 (D. Del. 2003) ........................................................................................................10

*In re GPAC Inc.*, 57 F.3d 1573 (Fed. Cir. 1995) ...........................................................................16

*In re Innotron Diagnostics*, 800 F.2d 1077 (Fed. Cir. 1986)........................................................10

*Mesh Comm, LLC v. E.ON US, LLC*, Civil Action No. 3:09-cv-641-S, 2011 WL 11563901 (W.D. Ky. May 10, 2011) ............................................................................... 11-12

*Princeton Biochemicals Inc. v. Beckman Instruments Inc.*, 180 F.R.D. 254 (D.N.J. 1997) ........................................................................................................................14

*Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305 (Fed. Cir. 2013)....................................10

*Shepard v. Int'l Business Machines Corp.*, 45 F.R.D. 536 (S.D.N.Y. 1968) ................................14

*Shum v. Intel Corp.*, 499 F.3d 1272 (Fed. Cir. 2007) ...................................................................10

*Swofford v. B&W, Inc.*, 34 F.R.D. 15 (S.D. Tex. 1963), *aff'd*, 336 F.2d 406 (5th Cir. 1964) ....................................................................................................................12

*Unwired Planet, LLC v. Google Inc.*, No. 3:12-cv-00504-MMD-VPC, 2014 WL 7012499 (D. Nev. Dec. 12, 2014)................................................................................. 13-14

*Westvaco Corp. v. Int'l Paper Co.*, Civ. A. No. 3:90CV00601, 1991 WL 398677 (E.D. Va. May 7, 1991)...........................................................................................................12

**Other Authorities**

9 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2388 (1971)..................................11

Fed. R. Civ. P. 42(b) ..............................................................................................................1, 10

Defendant Cisco Systems, Inc. ("Cisco") respectfully requests that, pursuant to Federal Rule of Civil Procedure 42(b), the Court bifurcate the issues of liability and damages for separate trials to the same jury, such that a damages trial would be conducted, if necessary, immediately after the verdict on the liability issues. This is the same process the Court used in the recent *BASF* case. *See BASF Plant Science, LP v. Commonwealth Scientific and Industrial Research Organisation*, 2:17cv503 (E.D. Va.), Dkt. 809 (Jury Trial – Day 9), at 1820-21.

Bifurcation is necessary here for two reasons.

<u>First</u>, both the liability case and the damages case are exceptionally complex. Bifurcation will ensure the orderly presentation of evidence, minimize juror confusion, and ensure appropriate management of the Court's and the parties' time and resources. Specifically, the liability case in this trial (on infringement, willfulness, and validity) involves five patents. Each patent has a different specification, and Centripetal considers these patents to be in different "groups". *See* Dkt. 68, Order at 5 ("Furthermore, at oral argument. Plaintiff's counsel asserted that at least one Asserted Patent in each asserted patent group encompasses a claim or claims which are not undergoing IPR."). Centripetal's infringement allegations target at least nine different Cisco product families, plus a subset of specifically accused functionality found within those products (such as the Encrypted Traffic Analytics and the Cognitive Threat Analytics products within the "Stealthwatch" product family, and the Threat Intelligence Director option to the "Firepower Management Center" product). Across these five patents and nine separate product families, Centripetal targets at least 13 different *combinations* of products. As a result, the parties will call **<u>eleven</u>** technical expert witnesses between them in the liability case alone, in addition to likely calling at least a dozen fact witnesses.

The damages case is equally complex.  Centripetal has identified 4 experts for damages alone, with one expert opining on a reasonable royalty; one expert opining on "licensing"; one expert estimating the costs to develop just one of the accused combinations; and one expert providing predicate opinions for such cost estimates.  Additionally, one of Centripetal's technical experts from the liability case has offered an opinion on "apportionment" for damages issues.  In response, Cisco's damages expert properly conducted a separate damages analysis for each patent because the five asserted patents are in different groups, none has the same specification, and most are directed at different Cisco product combinations.  Thus, the question of what precise damages analysis is relevant (*i.e.*, which patent(s) and which accused product combination(s) will actually be the subject of a damages award) depends on the specific patent(s) and product combination(s) for which the jury finds liability (both infringement and validity).  Presenting hypothetical damages cases that could cover every possible liability scenario before the jury decides liability is inefficient and highly confusing.  In contrast, after the jury renders the liability verdict, it will be clear exactly what (if any) damages case should be presented.

In sum, Centripetal's myriad of infringement allegations makes bifurcation the appropriate trial management procedure.  The jury will have its hands full with the liability issues alone in the first phase.  Then, the jury's verdict in the first phase will determine whether a damages phase is needed, and if so, on which patent(s) and product combination(s), and would immediately be heard by the same jury.

Second, bifurcation will minimize the potential for unfair prejudice to Cisco's liability defenses that will result from Centripetal's introduction of the core piece of evidence it is using for its damages case:  Centripetal's mid-trial settlement agreement with Keysight.[1]  If Centripetal

---

[1] The exclusion of this settlement agreement with Keysight is the subject of a motion *in limine.*

is allowed to use that settlement agreement to prove damages -- and if damages are not bifurcated and, instead, Centripetal is allowed to discuss Keysight's settlement agreement while the jury is still considering liability against Cisco -- then Cisco's liability defenses would be unfairly prejudiced.  The fact that a different defendant chose to compromise and settle its claims mid-trial with Centripetal for ███ (rather than continuing with trial to see what that jury would make of Centripetal's ████ claim in that case) is irrelevant to the liability issues in this case, but will invariably color the jury's view of the infringement and invalidity allegations against Cisco.  Even if the Court permits the agreement for purposes of damages, its prejudicial effect far outweighs any possible relevance to liability, and so bifurcation will also ensure that the jury decides the liability issues on the merits.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

The details of the liability issues and the damages issues – *i.e.*, the proposed "Liability Phase" and "Damages Phase" – are described below.

### A.       The Liability Phase (Phase 1)

#### 1.       Accused Patents and Products

The liability phase, which will include validity, infringement and willfulness, will be complex in and of itself.  None of the five asserted patents has the same specification, and thus none covers the same subject matter.  Making matters more complicated still, Centripetal alleges that the five patents are infringed by at least thirteen different combinations of Cisco products.

To get a sense of the liability issues, the following chart identifies the asserted patents, the accused product combinations for each of the asserted patents, and the parties' technical experts as to infringement and invalidity on each patent.

| Patent | Accused Combinations (according to Centripetal)[2] | Centripetal's Infringement Expert | Cisco's Non-Infringement Expert | Cisco's Invalidity Expert | Centripetal's Validity Expert |
|---|---|---|---|---|---|
| '856 Patent | (1) Catalyst[3] + Stealthwatch + ISE (2) ASR + Stealthwatch + ISE (3) ISR + Stealthwatch + ISE | Cole | Schmidt | Schmidt | Jaeger |

[2] Many of these combinations are under-inclusive.  For example, Centripetal's infringement allegations on the '856 Patent regarding Stealthwatch actually require the use of Encrypted Traffic Analytics with Stealthwatch, but Encrypted Traffic Analytics is an optional, add-on feature of Stealthwatch.  Likewise, Centripetal's allegations on the '176 Patent regarding Stealthwatch actually require the use of Cognitive Threat Analytics with Stealthwatch, which is also an optional, add-on feature of Stealthwatch.  Moreover, the parties contest whether or not Centripetal's expert (Dr. Mitzenmacher) is actually relying on functionality found in Stealthwatch and Identity Services Engine to prove infringement of the '193 Patent.

[3] To show the complexity of these combinations, consider the combination of "Catalyst + Stealthwatch + Identity Services Engine" for the '856 Patent.  This is just one of the three combinations for a single patent.  To flesh this out, Centripetal's expert on infringement of the '856 Patent, Dr. Cole, defines "Catalyst" to mean "Cisco's Catalyst 9000 series switches, and specifically Catalyst 9300 series, Catalyst 9400 series, Catalyst 9500 series, and Catalyst 9800 series wireless controller, the switches which run software IOS-XE 16.5 and subsequent releases, and the controller that runs IOS-XE 16.10 and subsequent releases."  Dr. Cole defines "Stealthwatch" to mean "Cisco's Stealthwatch Enterprise, capable of working with Cisco's Encrypted Traffic Analytics ("ETA") and/or Cisco's Cognitive Threat Analytics ("CTA") and CTA's Global Risk Map, all of which are components of Stealthwatch."  And "ISE" refers to "Cisco's Identity Services Engine."  As complicated and confusing as this is already, this just a single combination (of "Catalyst + Stealthwatch + ISE") for a single patent (the '856 Patent).  The next two combinations for the '856 Patent ("ASR + Stealthwatch + ISE" and "ISR + Stealthwatch + ISE") are no better, as Dr. Cole defines "ASR" to mean "Cisco's Aggregation Services Router 1000 series routers, all of which run software IOS-XE 16.5 and subsequent releases" and "ISR" to mean "Cisco's Integration Services Router 1000 and 4000 series routers, all of which run software IOS-XE 16.5 and subsequent releases."  Thus, to prove infringement, Plaintiff must map each of the 7-9 claim limitations of the asserted claims of the '856 Patent—which each comprise over 37 lines in the patent—to each of these three accused combinations.

Case 2:18-cv-00094-HCM-LRL   Document 249   Filed 03/03/20   Page 9 of 22 PageID# 9226

| Patent | Accused Combinations (according to Centripetal)[4] | Centripetal's Infringement Expert | Cisco's Non-Infringement Expert | Cisco's Invalidity Expert | Centripetal's Validity Expert |
|---|---|---|---|---|---|
| **'176 Patent** | (1) Catalyst + Stealthwatch (2) ASR + Stealthwatch (3) ISR + Stealthwatch | Cole | Almeroth | Almeroth | Jaeger |
| **'205 Patent** | (1) Catalyst + DNA (2) ASR + DNA (3) ISR + DNA (4) ASA/ Firepower + FMC | Mitzenmacher | Jeffay | Jeffay | Orso |
| **'806 Patent** | (1) Catalyst + DNA (2) ASR + DNA (3) ISR + DNA (4) ASA/ Firepower + FMC | Mitzenmacher | Reddy | Reddy | Orso |
| **'193 Patent** | (1) Catalyst (2) ASR (3) ISR | Mitzenmacher | Crovella | Crovella | Orso |

[4] Many of these combinations are under-inclusive. For example, Centripetal's infringement allegations on the '856 Patent regarding Stealthwatch actually require the use of Encrypted Traffic Analytics with Stealthwatch, but Encrypted Traffic Analytics is an optional, add-on feature of Stealthwatch. Likewise, Centripetal's allegations on the '176 Patent regarding Stealthwatch actually require the use of Cognitive Threat Analytics with Stealthwatch, which is also an optional, add-on feature of Stealthwatch. Moreover, the parties contest whether or not Centripetal's expert (Dr. Mitzenmacher) is actually relying on functionality found in Stealthwatch and Identity Services Engine to prove infringement of the '193 Patent.

Mapping each of the various aspects of the various product combinations to each claim element in five patents from different "groups" is an extraordinary undertaking. Even then, the complexity of the accused products is more extensive than what appears in the summary chart. For example, for the '806 Patent, Centripetal's identification of "DNA" in the three combinations pulls in numerous other products, according to the report from its expert, Dr. Mitzenmacher. Dr. Mitzenmacher's report defined "DNA Center Appliance" to also include Cisco's Identity Services Engine (ISE), plus Cisco's Stealthwatch Enterprise service, which he opines is capable of working with Cisco's Encrypted Traffic Analytics ("ETA") and/or Cisco's Cognitive Threat Analytics ("CTA"). Mitzenmacher Report ¶ 17. In other words, Centripetal's accusation of the sole item "DNA" actually packs in four other items (ISE, Stealthwatch, ETA, and CTA).

### 2.    Liability Experts

For the liability case, Centripetal intends to call six experts, and Cisco intends to call five experts (for a total of 11 experts testifying on liability issues alone). The role of each of these experts is explained below.

To put on its infringement case, Centripetal will likely first call Dr. Medvidovic (who will provide a "technology tutorial" on the five patents-in-suit and the world of network security), followed by Drs. Cole and Mitzenmacher, with Dr. Cole opining on infringement of two patents, and Dr. Mitzenmacher opining on the other three. In rebuttal, Cisco will present expert testimony from five experts, one for each patent-in-suit: Drs. Schmidt, Almeroth, Jeffay, Reddy, and Crovella. Each of Cisco's five experts will handle both non-infringement and invalidity for a given patent. Then, Centripetal will counter these invalidity opinions with three additional experts—Drs. Orso and Jaeger will address the details of the invalidity analysis, and Dr. Striegel will opine on secondary considerations of non-obviousness.

6

In sum, during the liability phase of the trial, 11 experts are expected to testify, and will deal with 13 different product combinations across 5 patents that do not share any common specifications.  In addition, the parties are likely call a dozen fact witnesses, or more.

### B.      The Damages Phase (Phase 2)

There are three significant issues with Centripetal's damages case:  (1) the sheer number of experts it will involve; (2) the complexity of the number of combinations that will need to be presented, depending on the outcome of the liability phase (as discussed above) on what Centripetal claims are five unrelated patents; and (3) Centripetal's current intent to base its entire damages model on the terms of the Centripetal/Keysight settlement reached during a different trial, over which this Court presided. Each issue is addressed below

First, the damages phase will involve 6 experts, only one of which will overlap with the liability phase.  More specifically (assuming Centripetal's experts survive Cisco's *Daubert* challenges), Centripetal is set to call five damages-related experts:  (1) Mr. Lance Gunderson, who will opine on a reasonable royalty (with his current damages number being on the high end of ▓▓▓▓▓▓▓▓▓▓▓▓▓ (2) Dr. Striegel, who will offer opinions on apportionment (on which Mr. Gunderson will rely); (3) Mr. Malackowski, who will opine on licensing issues, which again are relied upon by Mr. Gunderson; (4) Dr. Valerdi, who will provide estimated costs to develop just one of the accused combinations; and (5) Dr. Goodrich, who will provide predicate opinions for Dr. Valerdi's analysis.  Cisco will call one expert witness, Dr. Becker, in rebuttal.

Second, because Centripetal asserts patents against many different product combinations, its resulting damages case necessarily depends on which patents (if any) the jury actually finds to have been infringed and valid.  The particular damages analysis will necessarily depend on what

claims of which patents (if any) the jury decides are infringed by Cisco, and what product combination (if any) the jury decides are infringed by those specific patent claims.

 Third, Centripetal's main damages expert, Mr. Lance Gunderson, opines that Cisco should pay an ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████[5]

 The primary component of Mr. Gunderson's analysis is the two-page "Confidential Binding Term Sheet" entered into between Centripetal and Keysight in the middle of their separate trial in 2018, which obviously did not involve Cisco.  What is more, Centripetal's case against Keysight involved six patents, but only two of those patents are even at issue in this case -- and of those two overlapping patents, *only one* has asserted claims that overlap with the claims asserted in this case.  Keysight agreed to pay ██████████████████████████ Keysight also agreed ████████████████████████████████████████████████ ████████████████████████████████████████ Based on this arrangement with Keysight (involving many different patents and vastly different products), Mr. Gunderson opines that Centripetal and Cisco would have agreed to royalty rates of ██████ on the revenues received by Cisco on each product included within an accused combination of products.

---

[5] Mr. Gunderson does not present a patent-by-patent damages analysis, but instead insists that "[i]f one or more of the asserted patents or claims are found to be invalid or not infringed, my opinion regarding the appropriate royalty rate in this case for the patents still at issue would remain the same for the reasons stated herein."  Ex. 1 (Gunderson Report) p. 8, n. 8.  Mr. Gunderson, however, does not actually explain why this would be the case, given the differences in accused product combinations and that the limited footprint of each alleged inventions does not actually overlap.

The Keysight term sheet (a mid-trial settlement reached the weekend Keysight's lead trial counsel was hospitalized) is irrelevant to any liability issue in this case, and is highly prejudicial for the jury to hear about at any point, but certainly during the liability phase of the case (as set forth more fully in Cisco's motion *in limine* regarding the same). As a mid-trial settlement, it should not be used as a relevant data point for purposes of establishing damages in any case. It is particularly irrelevant here, given that (1) Centripetal alleged that Keysight infringed six patents, with only *one* containing any overlapping claims asserted in this case, (2) Cisco's accused products are completely different than what Centripetal accused in Keysight—*i.e.*, Centripetal accused Keysight's Network Packet Brokers and Threat Intelligence Gateways, not the routers, switches, firewalls, off-line, and network management systems accused here, and (3) the facts and circumstances between Cisco and Centripetal are completely different than those between Keysight and Centripetal. On the last point, Centripetal's current Vice President of sales identified ███████████████████████████████████████████████████████ ████████████████████████████████████ and testified that he ████████████████████████████ ████████████████████████████████████

---

[6] Chris Gibbs (Centripetal's current Vice President of Sales) testified in his deposition that ████████████████████████████████████████ Centripetal's core product is called RuleGate, which Centripetal refers to as a "threat intelligence gateway." Ex. 2 (Christopher Gibbs Dep. Tr.), at 19:5-6 ("RuleGATE is a threat intelligence gateway.") Mr. Gibbs confirmed in his deposition that ██████████████████████████████████████████████████████████ *Id.* at 42:21-25. He then identified secondary competitors as companies called ████████████████████ *Id.* at 43:9-44:1. He then confirmed that, even as of today, ██████████████████████████ *Id.* at 44:5-6.

## II.    ARGUMENT

### A.    Legal Standard

Under Federal Rule of Civil Procedure 42(b), "to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues." Fed. R. Civ. P. 42(b). Federal Circuit law governs whether to bifurcate a patent trial. *Audio MPEG, Inc. v. Dell Inc.*, 254 F. Supp. 3d 798, 803 (E.D. Va. 2017) (Davis, J.) (citing *In re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed. Cir. 1986)). The Court "has broad discretion with regard to trial management" and its "decision to bifurcate a trial is reviewed for an abuse of discretion," which would normally only occur if a party's right to a trial by jury is violated. *Shum v. Intel Corp.*, 499 F.3d 1272, 1276 (Fed. Cir. 2007); *see also Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1319 (Fed. Cir. 2013) ("Finally, we wish to make clear that district courts, in their discretion, may bifurcate willfulness and damages issues from liability issues in any given case.").

This Court exercised that broad discretion in the recent patent case of *BASF Plant Science*, deciding at the final pretrial conference to bifurcate liability and damages issues in order to make the issues more understandable for a jury and avoid prejudice. Indeed, "[i]n the context of patent cases, experienced judges use bifurcation and trifurcation both to simplify the issues in patent cases and to maintain manageability of the volume and complexity of the evidence presented to a jury." *Audio MPEG*, 254 F. Supp. 3d at 803 (quoting *Enzo Life Scis., Inc. v. Digene Corp.*, No. Civ. A. 02-212-JJF, 2003 WL 21402512, at *5 (D. Del. 2003)). "In deciding whether one trial or separate trials will best serve the convenience of the parties and the court, avoid prejudice, and minimize expense and delay, the major consideration is directed toward the choice most likely to result in a just final disposition of the litigation." *In re Innotron*

10

*Diagnostics*, 800 F.2d at 1084 (citing 9 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2388 (1971)).

Some courts have found that some form of bifurcation of damages issues from liability "is appropriate, if not necessary, in all but exceptional patent cases." *Dutch Branch of Streamserve Development AB v. Exstream Software, LLC*, Civ. No. 08-343-SLR, 2009 WL 2705932, *1 (D. Del. Aug. 26, 2009). *See also Mesh Comm, LLC v. E.ON US, LLC*, Civil Action No. 3:09-cv-641-S, 2011 WL 11563901 (W.D. Ky. May 10, 2011) ("Bifurcation of complex patent trials appears to be a growing phenomenon.") (collecting cases). Several reasons have been given for bifurcation of liability and damages phases:

- "the burden imposed on a jury in a patent trial is extraordinary … juries are tasked with resolving complex technical issues regarding infringement and invalidity, many times with respect to multiple patents and/or multiple prior art references. Absent bifurcation, jurors then are expected to understand the commercial complexities of the relevant market (or, even more impenetrable, the commercial complexities of the hypothetical market) in order to determine the economic consequences of their liability decisions"; and

- "[B]ifurcation promotes the just and efficient resolution of what damages, if any, should to [*sic*] awarded."

*Id.*

These same concerns appear to have led the Court to bifurcate liability and damages in the recent matter of *BASF Plant Science*. In that case there was significant discussion between the parties and the Court as to the proper order of proof. Ultimately, the Court determined that "the remedy would be bifurcated from the trial on liability. We can stay with the same jury, and depending upon the result of the trial on liability, we'll know what issues can be presented to the jury on damages." *BASF Plant Science*, 2:17cv503 (E.D. Va.), Dkt. 684 (Tr. of Final Pretrial Conference), at 8.

Other courts in this District likewise bifurcated liability issues from damages issues, where both presented complex issues. *See Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, Civil Action No. 2:07cv415, 2008 WL 11379925 (E.D. Va. Sept. 22, 2008) ("The parties are correct in their assertion that separate trials are frequently ordered in in patent cases.") (citing *Cherdak v. Stride Rite Corp.*, 396 F. Supp. 2d 602, 604 (D. Md. 2005), *Westvaco Corp. v. Int'l Paper Co.*, Civ. A. No. 3:90CV00601, 1991 WL 398677, *18  (E.D. Va. May 7, 1991);  *Swofford v. B&W, Inc.*, 34 F.R.D. 15, 20 (S.D. Tex. 1963), *aff'd*, 336 F.2d 406 (5th Cir. 1964) ("The trial of the damages question in such a suit is often difficult and expensive, while being easily severed from the trial of the questions of validity and infringement of the patent.").   Indeed, "in the absence of a distinct and persuasive showing of prejudice" by Centripetal, bifurcation in a complex patent case is a "very potent tool."  *Mesh Comm*, 2011 WL 11563901, *4.

To be sure, the decision to bifurcate remains purely within the discretion of the Court.  As explained below, the reasons to bifurcate liability from damages (through phases to the same jury) are compelling here.

### B.    Bifurcation of Liability and Damages Phases is Necessary and Appropriate to Avoid Prejudice and Economize the Jury's Time

Bifurcation -- using the same process as the Court employed in the *BASF* case -- will promote judicial economy, avoid unnecessary juror confusion, and present no prejudice to Centripetal, while avoiding potentially substantial prejudice to Cisco to defend itself on the merits.

### 1.    Bifurcation Will Minimize Juror Confusion

Given the complex technologies at issue, separating liability from damages will promote juror comprehension.  As set forth above, the five patents-in-suit are from different patent groups and do not share the same specifications.  Centripetal accuses thirteen different combinations of

12

products, involving at least nine unique product groups.  Keeping all of these allegations straight is difficult even for the lawyers working on this case; it will be exceptionally challenging for a lay juror.  Accordingly, the Court should endeavor to manage the trial to minimize any unnecessary combinations as evidence is presented to the jury.

The Court has noted that this case involves complex technologies and confusing product terminology.  *See*, *e.g.*, Dkt. 125, 11-26-2019 Hearing Tr., at 19 ("[H]ow can you expect anybody to look at this chart you've prepared and understand anything … [I]t just looks like it's written in a foreign language.  … Product infringes claim so-and-so and so-and-so in combination infringes claim so-and-so.  That's the way it has to be set up.  Otherwise, the Court can't understand it . . . much less a jury."); Dkt. 137, 12-12-2019 Hearing Tr., at 3 ("[O]n page 2 of the new Exhibit 2, it refers to Catalyst, which is the accused products, uses threat information received from Stealthwatch including CTA and ETA.  Now, how is the Court supposed to understand what that means?  Maybe it means something to the defendant, but it means nothing to the Court.  Is Stealthwatch a product, a system, or a group of products?  What's CTA and ETA?  … This doesn't make any sense.").

In light of this complexity, bifurcation will allow the jury to focus on understanding the complex web of products that Centripetal chose to accuse in this case, and not also juggle competing, hypothetical damages scenarios.  "Bifurcation will allow a jury to focus exclusively on liability, and potentially dispose of asserted claims at the infringement stage."  *Unwired Planet, LLC v. Google Inc.*, No. 3:12-cv-00504-MMD-VPC, 2014 WL 7012499 (D. Nev. Dec. 12, 2014).  Accordingly, "[s]eparately resolving liability will … ease juror confusion in determining damages…  for the surviving claims."  *Unwired Planet*, 2014 WL 7012499, at *2; *see also British Telecommc'ns PLC v. Google*, C.A. No. 11-1249-LPS, 2013 WL 3814329, *2

(D. Del. July 22, 2013) ("[I]t would be extremely difficult for a single jury to determine infringement and validity and concurrently craft a damages award that is consistent with whatever portion of the fifty or so accused products the jury finds to infringe particular valid patent claims."); *Princeton Biochemicals Inc. v. Beckman Instruments Inc.*, 180 F.R.D. 254, 256 (D.N.J. 1997) ("Federal precedent suggests that the entire damages phase of patent litigation could be severed from issues of liability, upon a finding that the damages issue are complicated and extensive evidence would be necessary on these issues.").

## 2.      Bifurcation Will Promote Judicial and Party Economy

"There is no doubt that separate trial of the issues of validity and infringement will provide a more rapid trial. The issue of damages is often more complex than the issues of validity and infringement." *Shepard v. Int'l Business Machines Corp.*, 45 F.R.D. 536 (S.D.N.Y. 1968).

Centripetal's intended damages evidence will be complex.  As noted above, Centripetal appears intent on presenting five different expert witnesses to support its damages case: Mr. Gunderson (who relies on Mr. Malackwoski and Dr. Striegel), and Dr. Valerdi (who relies on Dr. Goodrich).  All of this will be unnecessary if the jury determines that the patents are either not infringed or are invalid.  Thus, bifurcation "presents the possibility of preservation of judicial (and party) resources, particularly if the jury finds certain claims to be not infringed or invalid, or finds that certain accused products do not infringe any valid claims." *British Telecommc'ns PLC v. Google*, C.A. No. 11-1249-LPS, 2013 WL 3814329, *2 (D. Del. July 22, 2013).  Even if there is some overlap in the factual testimony, "[i]n light of this case's complexity, … this possibility of overlap does not outweigh the judicial resources that would be conserved if the damages and willfulness inquiries are narrowed through a separate liability trial." *Unwired Planet*, 2014 WL 7012499, at *2.

14

If damages are tried along with liability, both sides' damages experts will have to articulate their respective views of damages for each patent, while taking into consideration how they dealt with each product combination.  The sheer complexity of this exercise will likely be daunting enough, even in a damages-only phase of the case if one or more patents is found valid and infringed. But it is simply asking too much of jurors to assimilate all this information (much of which could be wholly unnecessary) and to keep track of possible damages theories on a per patent/product combination basis while also trying to meaningfully evaluate liability issues.

### 3.       Bifurcation Will Avoid Prejudice

The issue of the Keysight Term Sheet also plays a central role in Cisco's request for bifurcation.  As noted above, Centripetal's damages position is staked on the argument that Keysight took a license to its portfolio at certain rates, and that those rates now should form the baseline for what Cisco should have to pay for allegedly infringing the patents-in-suit.  As fully set forth in Cisco's pending motion *in limine*, Cisco believes this term sheet has no place in this trial and should be excluded as a classic non-comparable settlement that was reached in the middle of trial, as a result of incredibly unique facts and circumstances between two competitors.

But the prejudice to Cisco of Centripetal being allowed to publish, discuss and argue the impact of the Centripetal/Keysight settlement during the liability phase of the case cannot be overstated.  The question of whether Cisco infringes any patent has nothing to do with anything that happened in Centripetal/Keysight trial or with the settlement that those parties reached.  Nor does a mid-trial, portfolio-wide settlement and license constitute the type of "secondary indicia of non-obviousness" that could justify admitting such a prejudicial agreement on the question of patent validity.  Specifically, in order to rely on the fact that a patent claim was licensed by others -- as evidence of "secondary indicia" that the patent is not obvious -- there must be a "nexus" between the license agreement and the *specific* subject matter of the particular claim at

15

issue, *i.e.*, evidence that the license was entered "out of recognition and acceptance of the subject matter claimed" in a specific patent. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). In addition, the fact that an agreement was to settle litigation (as is the case here, given that it was entered mid-trial) greatly diminishes any probative value. *Id.* at 1580. By definition, then, a mid-trial settlement agreement that broadly covers a portfolio of at least 23 patents (only one of which even has overlapping claims with the asserted claims here) cannot provide the type of "nexus" required to have any probative value, and certainly is not probative enough to overcome the certain prejudice that will result from the admission of such a settlement agreement. This lack of probative value was exactly the same conclusion that the PTAB reached in rejecting this very settlement agreement when the PTAB invalidated other patents in Centripetal's portfolio through IPRs. *See, e.g.*, Ex. 3, IPR2018-01436, Final Written Decision, at p. 62 ("Accordingly, we find that Patent Owner has not provided sufficient evidence to establish the requisite nexus between the Keysight license and the '552 patent.")

Of course, every experienced litigator has witnessed the prejudice to a liability defense when a Court has allowed a prior settlement into evidence – and this is precisely why Centripetal's lawyers want to do it. The risk of a lay juror taking the fact of a prior settlement as evidence that Centripetal's unrelated case against Cisco must be good – even though Keysight involved completely different products and four completely different patents (and only a single patent that had overlapping asserted claims with this case) – is simply unfair to Cisco, and moves the case away from being decided on the merits. Even if the Court denies the currently pending motion *in limine*, and thus allows the mid-trial term sheet with Keysight to be presented to the jury, that term sheet should be permitted into evidence only after the jury has determined the

issue of liability, and no reference to the Keysight trial or settlement should be made during the

liability phase.

Dated: March 3, 2020                              CISCO SYSTEMS, INC.


                                                  By /s/ *Dabney J. Carr, IV*
                                                       Of Counsel

Dabney J. Carr, IV, VSB No. 28679
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com

**DUANE MORRIS LLP**
Louis N. Jameson (admitted pro hac vice)
Matthew C. Gaudet (pro hac vice pending)
John R. Gibson, VSB No. 72968
Jennifer H. Forte (admitted pro hac vice)
1075 Peachtree Street, N.E., Suite 2000
Atlanta, Georgia 30309-3929
Telephone: (404) 253-6900
Facsimile: (404) 253-6901
wjameson@duanemorris.com
jrgibson@duanemorris.com
jhforte@duanemorris.com

Joseph A. Powers (admitted pro hac vice)
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Facsimile: (215) 689-3797
japowers@duanemorris.com

John M. Baird, VSB No. 77827
Christopher J. Tyson, VSB No. 81553
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
Telephone: (202) 776 7851
Facsimile: (202) 478 2620
jmbaird@duanemorrris.com
cjtyson@duanemorris.com

Nicole E. Grigg (formerly Johnson) (admitted *pro hac vice*)
2475 Hanover Street
Palo Alto, CA 94304-1194
Telephone: (650) 847-4176
Facsimile: (650) 618-2713
NEGrigg@duanemorris.com

*Counsel for Defendant Cisco Systems, Inc.*