FILED

APR 2 7 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| CENTRIPETAL NETWORKS, INC., )<br>)<br>    Plaintiff )<br>)<br>    v. )<br>)<br>CISCO SYSTEMS, INC., )<br>)<br>    Defendant )<br>_____ ) | CIVIL ACTION NO. 2:18-cv-00094-HCM-LRL |

**PROPOSED JOINT PRETRIAL ORDER**

Plaintiff Centripetal Networks, Inc. ("Centripetal") and Defendant Cisco Systems, Inc.

("Cisco") submit the following proposed Final Pretrial Order pursuant to the Court's Order at Dkt.

No. 297, Federal Rules of Civil Procedure, and Local Rules of this Court. The parties have

stipulated as to various matters identified herein and having identified exhibits, witnesses, factual

contentions and triable issues:

It is hereby ORDERED as follows:

**I.    STIPULATION OF UNDISPUTED FACTS**

The parties agree that the following facts are stipulated as undisputed for purposes of this

litigation. The parties' statement of stipulation of undisputed facts will become a part of the

evidentiary record in the case:

1.    This Court has jurisdiction over the parties and all claims and defenses in this

action and is a proper venue.

2.    Centripetal is a corporation duly organized and existing under the laws of the

State of Delaware, with its principal place of business in Herndon, Virginia.

3.    Defendant Cisco is a California Corporation with its principal place of business at 170 West Tasman Drive, San Jose, California 95134.

4.    On February 13, 2018, Centripetal filed the Complaint asserting Cisco's infringement of U.S. Patent No. 9,686,193 ("the '193 Patent"); U.S. Patent No. 9,560,176 ("the '176 Patent"); U.S. Patent No. 9,560,077 ("the '077 Patent"); U.S. Patent No. 9,413,722 ("the '722 Patent"); U.S. Patent No. 9,203,806 ("the '806 Patent"); U.S. Patent No. 9,160,713 ("the '713 Patent"); U.S. Patent No. 9,124,552 ("the '552 Patent"); U.S. Patent No. 9,565,213 ("the '213 Patent"); U.S. Patent No. 9,137,205 ("the '205 Patent"); and U.S. Patent No. 9,674,148 ("the '148 Patent").

5.    On March 29, 2018, Centripetal filed the Amended Complaint to add an assertion of infringement of U.S. Patent No. 9,917,856 ("the '856 Patent").

6.    Cisco filed a number of petitions for *inter partes* review ("IPR") of some of the patents asserted against it and filed for a Motion to Stay Pending Resolution of IPR Proceedings and the Court granted the stay on February 25, 2019.  (Dkt. No. 58).

7.    On September 18, 2019, the Court issued an order, lifting the stay in part with respect to patents and claims not currently subject to IPR proceedings.  (Dkt. No. 68).

8.    Centripetal is asserting that Cisco infringes Claims 63 and 77 of the '205 Patent, Claims 9 and 17 of the '806 Patent, Claims 11 and 21 of the '176 Patent, Claims 18 and 19 of the '193 Patent and Claims 24 and 25 of the '856 Patent (the "Asserted Claims").

9.    On September 15, 2015, the U.S. Patent and Trademark Office ("PTO") issued the '205 Patent entitled "Methods and Systems for Protecting A Secured Network."

10.    The application for the '205 Patent was filed on October 22, 2012, as Application No. 13/657,010.

11.     The '205 Patent expires on October 22, 2032.

12.     On December 1, 2015, the PTO issued the '806 Patent entitled "Rule Swapping in A Packet Network."

13.     The application for the '806 Patent was filed on January 11, 2013, as Application No. 13/739,178.

14.     The '806 Patent expires on December 10, 2033.

15.     On January 31, 2017, the PTO issued the '176 Patent entitled "Correlating Packets in Communications Networks."

16.     The application for the '176 Patent was filed on May 15, 2015 as Application No. 14/714,207.

17.     The '176 Patent expires on February 10, 2035.

18.     On June 20, 2017, the PTO issued the '193 Patent entitled "Filtering Network Data Transfers."

19.     The application for the '193 Patent was filed on February 18, 2015 as Application No. 14/625,486.

20.     The '193 Patent expires on March 12, 2033.

21.     On March 13, 2018, the PTO issued the '856 Patent entitled "Rule-Based Network-Threat Detections for Encrypted Communications."

22.     The application for '856 Patent was filed on December 23, 2015, as Application No. 14/757,638.

23.     The '856 Patent expires on December 23, 2035.

24.     Centripetal asserts it is the owner of the '205, '806, '193, '176 and '856 Patents ("Asserted Patents").

25.     After Centripetal filed its Complaint, Cisco filed petitions for IPR of all of the claims of nine of the 11 patents-in-suit, including the Asserted Claims of the '205 Patent, '176 Patent, and '193 Patent.

26.     Cisco did not file petitions for IPR regarding the '806 Patent and '856 Patent.

27.     The U.S. Patent Trial & Appeal Board ("PTAB") denied institution of IPR of the Asserted Claims over the prior art asserted by Cisco in its Petitions.

28.     The PTAB denied Cisco's Requests for Rehearing of Petitions for IPR of the Asserted Claims of the '205 Patent, '176 Patent, and '193 Patent.

29.     Of the claims not at issue for the upcoming bench trial, the PTAB granted institution of IPR of all of the claims of U.S. Patent Nos. 9,124,552 (the "'552 Patent"), 9,160,713 (the "'713 Patent"), 9,565,213 (the "'213 Patent"), 9,674,148 (the "'148 Patent"), 9,560,077 (the "'077 Patent"), and 9,413,722 (the "'722 Patent") and granted institution of IPR of claims of the '205 Patent that are not the subject of the upcoming bench trial.

30.     The PTAB has, thus far, invalidated all of the claims of the '552 Patent, '713 Patent, '213 Patent, '148 Patent, and '077 Patent, invalidated the unasserted claims of the '205 Patent, and is scheduled to issue a decision regarding all of the claims of the '722 Patent no later than May 20, 2020. Centripetal has appealed or will be appealing the PTAB decisions regarding the '552 Patent, '713 Patent, '213 Patent, '148 Patent, '077 Patent, and unasserted claims of the '205 Patent.

## II.     GENERAL STIPULATIONS

### A. Trial Phases

The parties have agreed on the order that trial will follow, as set forth below:

(1)     Centripetal's Case-in-Chief on Infringement, Willfulness and Damages;

(2)     Defendants' Rebuttal on Infringement, Willfulness and Damages, and Defendants' Case-in-Chief on Invalidity;

(3)     Centripetal's Rebuttal on Invalidity

### B. Exhibits

#### 1.     Exhibit Lists

The parties have segregated the documents, summaries and other exhibits that may be offered into evidence at trial into exhibit lists. A joint Exhibit List, including documents identified by both parties and not objected to, is attached as **Exhibit A**; Centripetal's Exhibit List and Defendants' objections thereto are attached as **Exhibit B**; Defendants' Exhibit List and Centripetal's objections thereto are attached as **Exhibit C**. The parties reserve the right to object to any additional documents sought to be added to the Exhibit Lists and further reserve the right to object to any additional documents added to the Exhibit Lists under the Federal Rules of Evidence, the Federal Rules of Civil Procedure, or any other appropriate basis.

#### 2.  **Efforts to Resolve Objections**

The parties have been working diligently to resolve or narrow all objections lodged as to their respective exhibits. The parties have successfully resolved many objections and will continue their efforts to resolve the objections to each other's proposed exhibits.

#### 3.  **Exhibits to Which No Objections Have Been Made**

The parties agree that the documents, summaries and other exhibits listed on their Exhibit Lists to which no objection has been specified may be introduced into evidence, without the necessity of further proof of admissibility through a witness, subject to foundational requirements, provided that a witness offers testimony about the exhibit at trial, either live or by deposition. This

5

is without prejudice to motions *in limine* and *Daubert* motions concerning certain of these documents and related testimony.

### 4.  Cross Examination and Impeachment Exhibits

The Exhibit Lists set forth the parties' exhibits for their respective cases-in-chief; the lists do not include potential cross examination or impeachment exhibits that may or may not be introduced into evidence.  The Exhibits Lists also include documents relied upon by experts in rendering opinions which may or may not be introduced into evidence.  The parties reserve the right to offer exhibits for purposes of impeachment that are not included in the Exhibit Lists.

### 5.  Authenticity Stipulations For Exhibits

The Parties stipulate to the authenticity of each document that on its face appears to be generated by a party (plaintiff or defendant), including documents generated by its employees during the course of their employment for a party, and produced in this case by that party.  Notwithstanding this stipulation, each party preserves its right to object to the document on any ground other than authenticity.

### C. Procedures Regarding Witnesses and Exhibits

The parties are required to disclose the expected order in which the witnesses will be called, and use good faith in identifying non-demonstrative exhibits that are intended to be used in the direct testimony of each witness or as part of opening statements.  Each party must identify to opposing counsel the identity of any live witnesses to be called at trial (and the order in which they will be called) by no later than 6:30 p.m.[1] three (3) calendar days before the trial day on which that witness is expected to testify (e.g., witnesses to be called on Tuesday must be disclosed by 6:30 p.m. the preceding Saturday).

---

[1] All times identified herein are Eastern Time.

Except for when a fact witness is testifying during trial, fact witnesses are not permitted to witness or have access to the trial proceedings in any manner until after that fact witness has completed all testimony that witness will provide at trial.  The only exception is the parties' client representative, who will be allowed to witness and have access to the trial proceedings, even if testifying in the case.   Expert witnesses may have access to the trial proceedings while other witnesses are testifying.

Any exhibits to be used on direct examination with any live witness must be identified by no later than 7 p.m. two (2) calendar days before the start of the trial day on which that exhibit will be offered (e.g., the exhibit(s) for witnesses to be called on Tuesday must be disclosed by 7 p.m. the preceding Sunday).  Objections to exhibits disclosed by a party must be provided by 8 p.m. two (2) calendar days before the start of the trial day on which that exhibit will be offered (e.g., objections to exhibits for witnesses to be called on Tuesday must be provided by 8 p.m. the preceding Sunday).  The parties will each designate one or more counsel who shall meet and confer regarding any such objections by 8:30 p.m. on the day when the objections are provided.  The notice provisions above shall not apply to illustrative exhibits created in the virtual courtroom during testimony or to the enlargement, highlighting, ballooning, excerpting, etc. of trial exhibits, demonstratives, or testimony, so long as the underlying exhibit is pre-admitted or the party has identified the exhibit or deposition testimony according to the agreed schedule.

The parties will cooperate in seeking to have the Court resolve any objections they are unable to resolve among themselves prior to the proposed testimony.  Each party will deliver exhibits to the Court that it anticipates using on direct examination by 9 a.m. ET the day of the direct examination in the form of a witness binder.  Each party will deliver exhibits to the Court

that it anticipates using on cross-examination by 9 a.m. ET the day of the cross-examination, and to opposing counsel by e-mail prior to commencing cross-examination.

Any document that on its face appears to have been authored or prepared by an employee, officer, or agent of a party, or was produced from the files of a party, shall be deemed *prima facie* authentic under F.R.E. 901 and 902, subject to the right of the party against whom such a document is offered to introduce evidence to the contrary. The parties reserve the right to add additional deposition designations to establish the foundation and authenticity of an exhibit to the extent the admissibility of a particular document is challenged.

Legible or better quality copies may be offered and received in evidence in lieu of originals thereof, subject to all foundational requirements and other objections which might be made to the admissibility of such originals, and subject to the right of the party against whom they are offered to inspect an original upon request. The Parties may use electronic, native versions of exhibits that are spreadsheets or slide presentations to the extent such documents were produced during discovery or otherwise agreed to by both parties.

**D. Procedures Regarding Deposition Testimony and Discovery Response Designations**

The parties are required to provide opposing counsel the identity of any deposition designations or designations of discovery responses and a list of any exhibits to be introduced along with those designations according to the schedule set forth above for disclosure of witnesses/exhibits. Objections and counter-designations to any such designations disclosed by a party will be provided according to the schedule set forth above for objections to exhibits. For deposition testimony, the party introducing the deposition testimony shall be responsible for editing the deposition testimony to include the testimony and any counter-designation testimony,

Case 2:18-cv-00094-HCM-LRL   Document 411   Filed 04/27/20   Page 9 of 38 PageID# 17056

and remove any attorney objections, and provide a final version of the deposition testimony excerpts (testimony clip report) to the other party by 6:30 p.m. the day before the testimony is to be submitted, read or played to the Court. The parties will each designate one or more counsel who will meet and confer regarding any objections, including objections to any applicable counter-designations[2], by 8:30 p.m. the same day that such objections are disclosed.

The parties will cooperate in seeking to have the Court resolve any objections they are unable to resolve among themselves prior to the proposed testimony or presentation of a discovery response. Each side is to provide the discovery response or deposition testimony excerpts of the specific portions of the deposition video(s) to be played or read, to opposing counsel and to the Court at the time each such designation is presented to Court.

The parties agree that any counter-designations, to which the other party did not object or to which the Court overruled the objection, will be included in the designation of discovery responses or testimony clip report of deposition designations, and that passages of testimony from a deposition will be presented chronologically. The parties further agree to withdraw any objections or attorney colloquy contained with the deposition designations by both sides to the extent possible. For allocating time between the parties for witnesses presented by deposition, witnesses presented by video or read testimony will be divided by the actual time for designations and counter-designations by each party. For witnesses presented by read testimony, the allocation of trial time will be determined by the ratio of deposition testimony lines designated by each party to the total number of lines read by that witness. No time will be allocated to the parties for deposition testimony submitted to the Court as an exhibit only, with no video or read testimony. Deposition summaries will be offered at trial as appropriate pursuant to Local Rule 30(G). All

---

[2] The parties agreed not to serve objections to counter-designations as part of this pretrial order, and to raise necessary objections to such counter-designations at the time of trial.

testimony clip reports for deposition testimony provided to the Court will be admitted as a trial exhibit.  The parties' current deposition designations, objections, and counter-designations are attached as **Exhibit D** (Centripetal) and **Exhibit E** (Defendant).  The parties' discovery responses designations, objections, and counter-designations are attached as **Exhibit F** (Centripetal) and **Exhibit G** (Defendant).

## III.   <u>WITNESSES</u>

The parties agree that for current employees of a party, any such witness that such party expects to call in their case-in-chief will appear live by video.  For those non-employee witnesses who will be called in a party's case-in-chief via deposition, the parties agree that any counter-designated testimony will be presented to the Court together with the designated deposition testimony, subject to the resolution of any objections to the designated or counter-designated testimony, as discussed above.  The parties also agree that a party who wishes to call an employee of the other party as part of its case-in-chief can do so by deposition, regardless of the availability of that witness to testify live.

The parties agree that all fact and expert witnesses will provide any trial testimony from a location remote from their lawyers or staff working on this matter.  A remote location means a home, building or office different from any home, building or office where lawyers or staff working on this matter are present.  Furthermore, while providing testimony at trial, no witness shall access any form of communication other than the Zoom video or audio feed provided by the Court.  Once sworn, no witness shall communicate with anyone else regarding the substance of the witness's testimony (absent express permission of the Court) until such time as the witness is excused by the Court from further participation in the trial.  The agreement reflected in the foregoing sentence does not apply to fact witnesses or Dr. Medvidovic, Dr. Striegel, and Dr. Almeroth should they be called to testify on more than one occasion during the trial.  For such

witnesses, the parties agree that they will not communicate or speak with the witness once he begins testimony on the subject matter for which they are in the middle of testimony, as delineated by the Court.  Once the witness has completed such testimony and leaves the stand, that witness can speak with counsel before taking the stand to testify at a later time during the trial.

### A. Centripetal's Witnesses

Centripetal expects to call the following witnesses at trial:

| Witness Name |
| --- |
| Dr. Eric Cole |
| Mr. Chris Gibbs |
| Dr. Michael Goodrich |
| Mr. Lance Gunderson |
| Dr. Trent Jaegar |
| Mr. James Malackowski |
| Dr. Alessandro Orso |
| Dr. Nenad Medvidovic |
| Dr. Michael Mitzenmacher |
| Dr. Sean Moore |
| Mr. Jonathan Rogers |
| Mr. Steven Rogers |
| Dr. Aaron Striegel |
| Dr. Ricardo Valerdi |

Centripetal may call the following witnesses at trial:

| Witness Name |
| --- |
| Sandeep Agrawal |
| David Ahn |
| Gregory Akers |
| Sunil Amin |

| |
|---|
| Kerry Armistead |
| Michael Auger |
| Paul Barkworth |
| Steven Boyles |
| Petr Cernohorsky |
| Haig Colter |
| Patrick Crowley |
| Douglas DiSabello |
| Peter Geremia |
| Jaroslav Gergic |
| Christopher Gibbs |
| Robert Gourley |
| Anthony Grieco |
| Robert Hamilton |
| Bret Hartman |
| Martin Hughes |
| Peter Jones |
| Timothy Keanini |
| Danny Llewallyn |
| Pierre Mallett, III |
| David McGrew |
| Ken O'Reilly |
| Jess Parnell |
| Prasad Parthasarathi |
| Manas Pati |
| Robert T. Perry |
| Saravanan Radhakrishnan |
| Pavan Reddy |
| Justin Rogers |
| Michael Sheck |
| David Scruggs |

| |
|---|
| Hari Shankar |
| Karthik Subramanian |
| Rajagopal Venkatraman |
| Andy Vogel |
| Matt Watchinski |

**B. Cisco's Witnesses**

Cisco expects to call the following witnesses at trial:

| **Witness Name** |
|---|
| Kevin Almeroth, Ph.D. |
| Stephen Becker, Ph.D. |
| Mark Crovella, Ph.D. |
| Kevin Jeffay, Ph.D. |
| Narasimha Reddy, Ph.D. |
| Douglas Schmidt, Ph.D. |

Cisco may call the following witnesses at trial:

| **Witness  Name** |
|---|
| Sandeep Argrawal |
| Gregory Akers |
| Sunil Amin |
| Kerri Armistead |
| Michael Auger |
| Steven Boyles |
| Matthew Brannigan |
| Petr Cernohorsky |

| **Witness  Name** |
|:---:|
| Patrick Crowley |
| Matthew Donnan |
| Jaroslav Gergic |
| Anthony Grieco |
| Robert Hamilton |
| Bret Hartman |
| Martin Hughes |
| Peter Jones |
| Timothy Keanini |
| Danny Llewallyn |
| David McGrew |
| Ken O'Reilly |
| Chris O'Rourke |
| Prasad Parthasarathi |
| Manas Pati |
| Saravanan Radhakrishnan |
| Pavan Reddy |
| Michael Scheck |
| David Scruggs |
| Hari Shankar |
| Karthik Subramanian |
| Rajagopal Venkatraman |
| Andy Vogel |

| **Witness  Name** |
|---|
| Matthew Watchinski |
| David Ahn |
| Paul Barkworth |
| Haig Colter |
| Douglas DiSabello |
| Peter Geremia |
| Christopher Gibbs |
| Robert Gourley |
| Pierre Mallett |
| Sean Moore, Ph.D. |
| Jess Parnell |
| Jonathan Rogers |
| Justin Rogers |
| Steven Rogers |
| Scott Beer |
| Kyle Petsch (Upland Software) |
| Steven Johnson (Ingate Systems, Inc.) |

## IV.  **FACTUAL CONTENTIONS**

The parties agree that their submission on April 29, 2020 of their respective Proposed

Findings of Fact and Conclusions of Law pursuant to the Court's March 12, 2020 Minute Entry

sets forth a complete listing of the factual contentions and governing law for this bench trial.  The

absence of a factual contention on this list shall not constitute waiver and shall not preclude the

admission of relevant evidence at trial. The factual contentions of the parties (in addition to the Stipulated Facts identified in Section I, above) are as follows:

### A. Centripetal's Factual Contentions

1. Centripetal is a start-up company that was founded in 2009 by Steven Rogers.

2. Since its founding, Centripetal has been involved in the research and development of award-winning computer network security technologies.

3. The '205 Patent was conceived by October 11, 2010 and constructively reduced to practice on October 22, 2012.

4. The '806 Patent was conceived by November 1, 2011 and constructively reduced to practice on January 11, 2013.

5. The '193 Patent was conceived by January 16, 2012, and constructively reduced to practice on March 12, 2013.

6. Starting in late 2014, Centripetal began selling a line of patented products and services known as RuleGATE and CleanINTERNET, which it developed.

7. Centripetal's products and Asserted Patents are the result of Centripetal's extensive research and development in the field of network analysis and cyber security.

8. Centripetal's products and services work inline and out-of-band.

9. Centripetal has marked its products with the Asserted Patents since immediately after they issued.

10. Centripetal's customers include banks, small and large enterprise customers, and government agencies including the U.S. Department of Homeland Security.

11. Between 2015 and 2017, Centripetal and Cisco had several in-person and telephone meetings where Centripetal discussed confidential information about its patents, business,

16

products, and provided live demonstrations of its products to Cisco, including at the Cisco LIVE conference in July 2016. During this period of time, Cisco visited Centripetal's website hundreds of times, viewing pages regarding Centripetal's business and products.

12. Centripetal and Cisco entered into a mutual non-disclosure agreement on January 26, 2016 where each company agreed to maintain the confidentiality of information of the disclosing party and use such information solely for purposes of evaluating a potential partnership between the two companies. After the parties entered into the non-disclosure agreement, Centripetal disclosed highly sensitive confidential and proprietary information about its patented technology to Cisco.

13. Cisco is a company in the industry that is not known to create innovative technology. Instead, Cisco either acquires technology or copies it from an innovator.

14. Centripetal was led to believe by Cisco that Cisco was going to acquire or license Centripetal's patented technology. For this reason, Centripetal disclosed its confidential and proprietary technology under an NDA.

15. Cisco, instead of acquiring or licensing the technology, decided to copy Centripetal's patented technology.

16. In this case, Centripetal asserts that Cisco infringes its patents by the use, manufacture, sale, offer for sale, and/or importation of three primary categories of products – certain Switches branded as Catalyst ("Catalyst Switches")[3], certain Routers branded as Aggregation Services

---

[3] Cisco's switches are Catalyst 9000 series switches, and specifically Catalyst 9300 series, Catalyst 9400 series, Catalyst 9500 series, and Catalyst 9800 series wireless controller, the switches which run software IOS-XE 16.5 and subsequent releases, and the controller that runs IOS-XE 16.10 and subsequent releases.

Router ("ASR") or Integration Services Router ("ISR") (collectively "Routers")[4] and Cisco's NextGen Firewalls called Adaptive Security Appliance and Firepower (collectively "ASA/Firepower").[5]

17. At least one of these three categories of products are accused with other separate Cisco products and/or services for all the asserted patents except the '193 Patent. These other separate products and services are Cisco's Stealthwatch Enterprise ("Stealthwatch"),[6] Identity Services Engine ("ISE"), Digital Network Architecture ("DNA")[7] and Firepower Management Center ("FMC").[8]

18. Centripetal asserts that (i) Catalyst Switches and (ii) Routers infringe, literally and under the doctrine of equivalents, Claims 18 and 19 of the '193 Patent. Centripetal also asserts that Cisco induces infringement of these claims.

19. Centripetal asserts that (i) Catalyst Switches with DNA, (ii) Routers with DNA and (iii) ASA/Firepower with FMC infringe, literally and under the doctrine of equivalents, Claims 63 and 77 of the '205 Patent and Claims 9 and 17 of the '806 Patent. Centripetal also asserts that Cisco induces infringement of these claims.

---

[4] Cisco's Routers are ASR 1000 series routers, ISR 1000 and 4000 series routers, which run software IOS-XE 16.5 and subsequent releases.

[5] Cisco's ASA 5500 series with Firepower services that runs ASA software version 9.4 and subsequent releases, and Cisco's Firepower appliance series 1000, 2100, 4100 and 9300, which run Firepower Threat Defense or "FTD" software version 6.0 and subsequent releases.

[6] The accused Stealthwatch is capable of working with Cisco's Encrypted Traffic Analytics ("ETA") and/or Cognitive Threat Analytics ("CTA") and CTA's Global Risk Map, all of which are components of Stealthwatch.

[7] DNA includes Cisco's DNA Center Appliance and/or DNA services, both of which use SD-Access software.

[8] The accused FMC supports Cisco's Firepower Services software and FMC software version 6.0 and subsequent releases, and hosts Cisco Threat Intelligence Director ("TID").

20. Centripetal asserts that (i) Catalyst with Stealthwatch and ISE and (ii) Routers with Stealthwatch and ISE infringe, literally and under the doctrine of equivalents, Claims 24 and 25 of the '856 Patent.  Centripetal also asserts that Cisco induces infringement of these claims.

21. Centripetal asserts that (i) Catalyst with Stealthwatch and (ii) Routers with Stealthwatch infringe, literally and under the doctrine of equivalents, Claims 11 and 21 of the '176 Patent.  Centripetal also asserts that Cisco induces infringement of these claims.

22. The date of first infringement of the Asserted Claims for the '193 Patent is June 20, 2017.

23. The date of first infringement of the Asserted Claims for the '176 Patent is August 18, 2017.

24. The date of first infringement of the Asserted Claims for the '205 Patent and the '806 Patent for Cisco's ASA/Firepower products with Firepower Management Center is October 23, 2017.

25. The date of first infringement of the Asserted Claims for the '205 and '806 Patent for Cisco's Catalyst Switches and Routers with Cisco's Digital Network Architecture is January 26, 2018.

26. The date of first infringement of the Asserted Claims for the '856 Patent is March 13, 2018. Cisco's infringement of the Asserted Patents has and continues to be willful and deliberate.

27. The date of the hypothetical negotiation for the Asserted Patents is on or around June 20, 2017.

28. Cisco's infringement of Centripetal's patents has been willful, because Cisco's conduct rose to the level of egregious and bad-faith behavior required for willful infringement.

29. As a result of Cisco's infringement of the Asserted Patents, Cisco has been able to attract a number of customers and received revenues.

30. At no point in time did Cisco redesign Cisco's Accused Products in an attempt to avoid infringement of the Asserted Patents.

31. Cisco's accused products ASA/Firepower competes with Centripetal's RuleGATE and CleanINTERNET products and services.

32. There is an absence of available and acceptable non-infringing alternatives.

33. Cisco fails to identify any purported products or non-patent references that qualify as prior art to the Asserted Patents.

34. Cisco has not identified any prior art that anticipates or renders obvious Centripetal's Asserted Patents.

35. The alleged prior art asserted by Cisco is cumulative of prior art that was considered by the Patent Office during the original prosecution of the Asserted Patents and/or Cisco's Petitions for IPR that were denied by the PTAB.

36. Cisco used the best prior art in an attempt to invalidate the claims of the Asserted Patents for three of the patents asserted in this case.  The three judges at the PTAB determined that Cisco's best prior art did not rise to the level of instituting an IPR on the asserted claims, even though the standard to institute an IPR is much lower than the clear and convincing standard required before a district court.

37. For two of the Asserted Patents, Cisco was not able locate prior art to even prepare a good faith petition seeking institution of an IPR before the PTAB.

38. Centripetal cannot fairly compete in the security industry against a company of Cisco's size that is using its patented technologies.

39. Centripetal has suffered damages as a result of Cisco's infringement of the Asserted Patents and is entitled to an award of damages adequate to compensate it for Cisco's infringement.

40. Centripetal is also entitled to a finding that this case is exceptional and an award of enhanced damages for past and continued willful conduct, as well as an award of interest, costs, attorneys' fees and any other relief the Court deems equitable and just.

41. Cisco will continue its infringement of the Asserted Patents unless enjoined by this Court.

42. If Cisco's infringement is not enjoined by this Court, Centripetal will suffer significant and irreparable harm as a result of Cisco's continuing infringement post-trial and continued willful infringement, particularly if Cisco is permitted to continue to compete with Centripetal using Centripetal's patented technology.

43. Centripetal's ability to grow its sales and market share as a smaller business has been hampered by Cisco's intentional use and sale of Centripetal's patented technologies.

44. The absence of an injunction would deeply impact Centripetal's business, but the issuance of one would have significantly less relative impact on Cisco's business.

45. The public would not be harmed by an injunction, because Centripetal could continue to fill the public's need for the patented inventions by scaling up its business under its current agreement with Dell regarding its platform to deliver the technologies to Cisco's customers.

**B. Defendant's Factual Contentions**

1.    Cisco was founded in 1984.

2.    Cisco has sold network equipment for decades, including routers, switches, firewalls, and security equipment.

3.      Cisco is a leader in network security.  Cisco had already published many textbooks on cyber security before Centripetal was founded.

4.      Cisco's yearly research and development expenditures have exceeded $5 billion per year for the last 10 years, and these efforts have resulted in Cisco being the owner of over 15,000 U.S. patents, with over 800 U.S. patents in the network security space that are prior art to the patents-in-suit.

5.      As part of its efforts to support emerging companies and emerging technologies, Cisco regularly invests in start-up companies, having invested in over 400 start-up companies over the last 20 years, and with such investments exceeding $2 billion in total.

6.      Cisco is a key supplier of network equipment to the United States Government, including cyber security equipment used by the Department of Defense.

7.      Cisco acquired a company called SourceFire in 2013.  SourceFire was founded in 2001, and it was the pioneer of "inline" network security systems, in which a device called a "gateway" uses rules (referred to as "Snort" rules) to filter each packet of incoming network traffic.

8.      SourceFire's pioneering "inline" technology filters traffic that attempts to enter a protected network through the gateway by applying approximately 10,000-20,000 "rules" to the packets at the gateway.

9.      Centripetal's technology is also fundamentally about inspecting packets – on a packet-by-packet basis -- at a gateway.  Centripetal's technology is "inline" in that it filters the actual network packets, or a copy of those packets, at the same speed that the packets are arriving at the network.  Although these general ideas were pioneered by SourceFire over a decade before Centripetal was founded, Centripetal invented ways to filter packets at a gateway using

22

approximately *5 million rules*, as opposed to just 10,000-20,000 rules (which is typical in the industry).

10.     Over the last five years, Centripetal intentionally hired multiple employees away from SourceFire, including Centripetal's current VP of Sales.

11.     For its part, SourceFire's "inline" products still use approximately 10,000-20,000 rules, not the 5 million rules that characterize Centripetal's technology.

12.     Centripetal's technology – embodied in its RuleGate product – has not met acceptance in the marketplace because of the perceived downsides in blocking packets using approximately *5 million rules* in an "inline" packet filtering system, including the heightened chance of false positives, slow performance, and cost.

13.     Centripetal's technology also has not succeeded in the marketplace because it offers a niche product (*i.e.*, RuleGate), as opposed to a complete security solution that customers in this space are looking for.

14.     Apart from "inline" packet-filtering systems, Cisco has developed other, different security products that monitor network traffic that has already entered into a protected network. This category of products is referred to as "out-of-band" products (instead of "inline" products), and Cisco's accused out-of-band products are all based on a technology called NetFlow.

15.     Cisco invented NetFlow in 1996.  NetFlow is a description of overall traffic flows between devices (as opposed to looking at each individual packet, as an inline gateway would). Cisco supported its NetFlow technology becoming an industry standard in 2004.

16.     Cisco's NetFlow-based out-of-band products include StealthWatch.  StealthWatch was developed by a company called Lancope prior to 2004, StealthWatch was packaged and sold with Cisco products at least as early as 2012, and then Cisco acquired Lancope in 2015.

17.     StealthWatch uses NetFlow to detect malware that has entered the protected network by detecting anomalous traffic patterns.

18.     Centripetal's founder, Steven Rogers, admitted that Centripetal's technology has nothing to do with NetFlow, yet Centripetal accuses Cisco's NetFlow-based out-of-band products of infringing its patents.

19.     As part of Cisco's potential investments in startup companies, Cisco has a group of employees whose job is to evaluate such potential investments, and it is regularly solicited to make such investments.

20.     Centripetal repeatedly solicited Cisco to make such an investment, and had several videoconference meetings with members of Cisco's investment team.

21.     Cisco – like dozens of other major network security companies that Centripetal solicited for investment at the same time – decided against investing in Centripetal because Cisco believed that the idea of blocking packets at a gateway using *5 million rules* would not be successful in the marketplace – a conclusion that has proven correct.

22.     While Centripetal generally alleges that Cisco "copied" something from Centripetal based on these meetings, Centripetal cannot identify anything specific that they disclosed to Cisco, much less something specific it disclosed to Cisco that it alleges Cisco now uses in the accused products.

23.     Cisco's engineers (and its predecessors' engineers) independently developed all of the accused products, whether at Cisco or at predecessor companies, with no reference to Centripetal, and certainly without the benefit of any confidential information from Centripetal. This is apparent in the facts that (1) none of the accused "inline" products have anything like the core functionality of Centripetal's technology, *i.e.*, filtering packets using 5 million rules; and (2)

the accused out-of-band products all use NetFlow, which has nothing to with Centripetal's technology.

24.     The evidence shows that the Centripetal viewed Cisco as a role model for a company who had great technology and did things the right way.  This is shown by the number of outreaches to Cisco, the hiring of employees from Sourcefire and/or Cisco, and the copying of Cisco product features when developing its RuleGate product .

25.     In developing Centripetal's RuleGate product, Centripetal repeatedly copied from Cisco's and SourceFire's descriptions of their own products, confirmed in both Centripetal documents and the testimony of Centripetal's employees.

26.     The accused products do not infringe Claims 11 and 21 of the '176 Patent for multiple reasons because they lack multiple limitations of the claims.

27.     The functionality that Centripetal accuses in the accused products was present in the prior versions of those products sold by Lancope and Cisco prior to the effective filing date of the '176 patent.

28.     The accused products do not infringe Claims 63 and 77 of the '205 Patent for multiple reasons because they lack multiple limitations of the claims.

29.     The functionality that Centripetal accuses in the accused products was present in the prior versions of those products sold under the "Sourcefire" brand more long prior to the filing of the '205 Patent.

30.     In addition to invalidating the unasserted claims of the '205 Patent in IPRs, the USPTO recently determined that there was a substantial new question as to whether the Asserted Claims of the '205 Patent were valid, and thus agreed to re-examine them.

31.     The accused products do not infringe Claims 18 and 19 of the '193 Patent for multiple reasons because they lack multiple limitations of the claims.

32.     Substantively similar functionality that Centripetal accuses of infringement in the accused combination of accused Stealthwatch, ISE, and router and switch products was present in prior versions of combinations of those products described, used, and/or sold by Lancope and Cisco prior to the filing of the '193 Patent.  The particular combination of packet-filtering rules that Centripetal accuses of infringement in the accused products was present in prior art products sold under the "Sourcefire" brand long prior to the filing of the '193 Patent.

33.     The accused products do not infringe Claims 9 and 17 of the '806 Patent for multiple reasons because they lack multiple limitations of the claims.

34.     The functionality that Centripetal accuses in the accused products was also present in the prior versions of those products sold by Cisco long prior to the filing of the '806 Patent.

35.     The accused products do not infringe Claims 24 and 25 of the '856 Patent for multiple reasons because they lack multiple limitations of the claims.

36.     Substantively similar functionality that Centripetal accuses of infringement in the accused combination of accused products was present in prior versions of combinations of those products described, used, and/or sold by Lancope and Cisco prior to the filing of the '856 patent..

37.     Cisco and Centripetal do not compete in the marketplace.  Centripetal's VP of Sales had never even heard of ETA or CTA, and cannot recall a single competitive sales situation involving StealthWatch.

26

38.     To the extent the Court determines that one or more of the Asserted Claims is valid and infringed, the reasonable royalty should be determined based upon the incremental benefit that the patented invention adds to the specific system(s) that is found to infringe.

39.     To the extent the Court determines that one or more of the Asserted Claims is valid and infringed, Centripetal is still not entitled to an injunction, as it will not suffer irreparable harm, but instead any injury can be remedied through monetary damages.  Moreover, the public would be harmed because the accused products are used by the United States Government.  For its part, Centripetal does not itself make products such as routers, switches, or firewalls.

## V.      **TRIABLE ISSUES**

### A.      **The Triable Issues as Contended by Centripetal**

1.     Whether Cisco directly infringes Claims 63 and 77 of the '205 Patent.

2.     Whether Cisco induces the infringement of Claims 63 and 77 of the '205 Patent.

3.     Whether Cisco directly infringes Claims 18 and 19 of the '193 Patent.

4.     Whether Cisco induces the infringement of Claims 18 and 19 of the '193 Patent.

5.     Whether Cisco directly infringes Claims 9 and 17 of the '806 Patent.

6.     Whether Cisco induces the infringement of Claims 9 and 17 of the '806 Patent.

7.     Whether Cisco directly infringes Claims 11 and 21 of the '176 Patent.

8.     Whether Cisco induces the infringement of Claims 11 and 21 of the '176 Patent.

9.     Whether Cisco directly infringes Claims 24 and 25 of the '856 Patent.

10.     Whether Cisco induces the infringement of Claims 24 and 25 of the '856 Patent.

11.     Whether Cisco's infringement has and continues to be willful.

12.     Whether Centripetal has suffered damages in an amount to be determined at trial as a direct and proximate cause of Cisco's direct and/or indirect infringement.

13.     What award of damages through trial should be awarded to Centripetal to compensate it for Defendants' direct and/or indirect infringement.[9]

14.     Whether the Court should enjoin Cisco's infringement from the entry of judgment through the expiration of the Asserted Patents.

15.     Whether Centripetal has suffered irreparable harm as a result of Cisco's infringement.

16.     Whether the balance of hardships weighs in favor of granting an injunction on Cisco's Accused Products.

17.     Whether the public interest weighs in favor of granting an injunction.

18.     Whether Cisco's alleged prior art Ingate was known or used by others in the United States before the invention date of the '205 Patent, under 35 U.S.C. § 102(a) (pre-AIA).

19.     Whether Cisco's alleged prior art Ingate was in public use or on sale in the United States before October 22, 2011, under 35 U.S.C. § 102(b) (pre-AIA).

20.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art Ingate was a printed publication before October 22, 2011, under 35 U.S.C. § 102(b) (pre-AIA).

---

[9] Centripetal reserves its right to request an accounting of sales and revenue information for any award for past damages, including pre-judgment and post-judgment interest.

21.     Whether Cisco's alleged prior art ASA 5500 and alleged prior art Sourcefire 3D were known or used by others in the United States prior art to the '205 Patent, under 35 U.S.C. § 102(a) (pre-AIA).

22.     Whether Cisco's alleged prior art ASA 5500 and alleged prior art Sourcefire 3D were in public use or on sale in the United States before October 22, 2011, under 35 U.S.C. § 102(b) (pre-AIA).

23.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art ASA 5500 and alleged prior art Sourcefire 3D was a printed publication before October 22, 2011, under 35 U.S.C. § 102(b) (pre-AIA).

24.     Whether Cisco's alleged prior art Hitless ACL was known or used by others in the United States before the invention date of the '806 Patent, under 35 U.S.C. § 102(a) (pre-AIA).

25.     Whether Cisco's alleged prior art Hitless ACL was in public use or on sale in the United States before January 11, 2012, under 35 U.S.C. § 102(b) (pre-AIA).

26.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art Hitless ACL was a printed publication before January 11, 2012, under 35 U.S.C. § 102(b) (pre-AIA).

27.     Whether Cisco's alleged prior art ASA CX was known or used by others in the United States before the invention date of the '193 Patent, under 35 U.S.C. § 102(a) (pre-AIA).

28.     Whether Cisco's alleged prior art ASA CX was in public use or on sale in the United States before March 12, 2012, under 35 U.S.C. § 102(b) (pre-AIA).

29.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art ASA CX was a printed publication before March 12, 2012, under 35 U.S.C. § 102(b) (pre-AIA).

30.     Whether Cisco's alleged prior art Sourcefire 3D was known or used by others in the United States before the invention date of the '193 Patent, under 35 U.S.C. § 102(a) (pre-AIA).

31.     Whether Cisco's alleged prior art Sourcefire 3D was in public use or on sale in the United States before March 12, 2012, under 35 U.S.C. § 102(b) (pre-AIA).

32.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art Sourcefire 3D was a printed publication before March 12, 2012, under 35 U.S.C. § 102(b) (pre-AIA).

33.     Whether Cisco's alleged prior art Cyber Threat Defense was known or used by others in the United States before the invention date of the '193 Patent, under 35 U.S.C. § 102(a) (pre-AIA).

34.     Whether Cisco's alleged prior art Cyber Threat Defense was in public use or on sale in the United States before March 12, 2012, under 35 U.S.C. § 102(b) (pre-AIA).

35.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art Cyber Threat Defense was a printed publication before March 12, 2012, under 35 U.S.C. § 102(b) (pre-AIA).

36.     Whether Cisco's alleged prior art Stealthwatch system and alleged prior art Cognitive system were in public use, on sale, or otherwise available to the public before February 10, 2015 under 35 U.S.C. § 102(a)(1) (AIA).

37.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art Stealthwatch system and alleged prior art Cognitive system was a printed publication before February 10, 2015 under 35 U.S.C. § 102(a)(1) (AIA).

38.     Whether Cisco's alleged prior art ASA CX was in public use, on sale, or otherwise available to the public before December 23, 2015 under 35 U.S.C. § 102(a)(1) (AIA).

39.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art ASA CX was a printed publication before December 23, 2015 under 35 U.S.C. § 102(a)(1) (AIA).

40.     Whether Cisco's alleged prior art Stealthwatch system was in public use, on sale, or otherwise available to the public before December 23, 2015 under 35 U.S.C. § 102(a)(1) (AIA).

41.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art Stealthwatch system was a printed publication before December 23, 2015 under 35 U.S.C. § 102(a)(1) (AIA).

42.     Whether Cisco's alleged SourceFire SSL Appliance System is prior art to the '856 Patent under 35 U.S.C. § 102(a)(1) (AIA).

43.     Whether Cisco's alleged prior art SourceFire SSL Appliance System was in public use, on sale, or otherwise available to the public before December 23, 2015 under 35 U.S.C. § 102(a)(1) (AIA).

44.     Whether the non-patent reference(s) Cisco relied on for its alleged prior art SourceFire SSL Appliance System was a printed publication before December 23, 2015 under 35 U.S.C. § 102(a)(1) (AIA).

**B.     The Triable Issues as Contended by Defendant**

6.     Whether Cisco directly infringes Claims 63 and 77 of the '205 Patent.

7.     Whether Cisco directly infringes Claims 18 and 19 of the '193 Patent.

8.     Whether Cisco directly infringes Claims 9 and 17 of the '806 Patent.

9.     Whether Cisco directly infringes Claims 11 and 21 of the '176 Patent.

10.     Whether Cisco directly infringes Claims 24 and 25 of the '856 Patent.

11.     Whether the asserted claims of the '205 Patent are invalid under 35 U.S.C. § 102 based on anticipation by the prior art.

12.     Whether the asserted claims of the '205 Patent are invalid under 35 U.S.C. § 103 based on obviousness in view of the prior art.

13.     Whether the asserted claims of the '193 Patent are invalid under 35 U.S.C. § 102 based on anticipation by the prior art.

14.     Whether the asserted claims of the '193 Patent are invalid under 35 U.S.C. § 103 based on obviousness in view of the prior art.

15.     Whether the asserted claims of the '806 Patent are invalid under 35 U.S.C. § 102 based on anticipation by the prior art.

16.     Whether the asserted claims of the '806 Patent are invalid under 35 U.S.C. § 103 based on obviousness in view of the prior art.

17.     Whether the asserted claims of the '806 Patent are invalid under 35 U.S.C. § 112 based on a lack of written description support for the claim scope asserted for infringement purposes by Centripetal.

18.     Whether the asserted claims of the '176 Patent are invalid under 35 U.S.C. § 102 based on anticipation by the prior art.

19.     Whether the asserted claims of the '176 Patent are invalid under 35 U.S.C. § 103 based on obviousness in view of the prior art.

20.     Whether the asserted claims of the '176 Patent are invalid under 35 U.S.C. § 112 based on a lack of written description support for the claim scope asserted for infringement purposes by Centripetal.

21.     Whether the asserted claims of the '856 Patent are invalid under 35 U.S.C. § 102 based on anticipation by the prior art.

22.     Whether the asserted claims of the '856 Patent are invalid under 35 U.S.C. § 103 based on obviousness in view of the prior art.

23.     Whether the asserted claims of the '856 Patent are invalid under 35 U.S.C. § 112 based on a lack of written description support for the claim scope asserted for infringement purposes by Centripetal.

24.     If Defendant is found to infringe a valid claim of any of the Asserted Patents, whether such infringement is willful.

25.     If Defendant is found to infringe a valid claim of any of the Asserted Patents, whether, and to what extent, Centripetal is entitled to damages.

26.     If Defendant is found to infringe a valid claim of any of the Asserted Patents, whether, and to what extent, Centripetal is entitled to injunctive relief.

## VI.     MISCELLANEOUS

### A.     Centripetal's Outstanding Issues

#### 1.     Centripetal's Motion for Summary Judgment (Dkt. No.  287)

#### 2.     Centripetal's Pending Motions *in Limine* (Dkt. No. 213)

The following Motions *in Limine* ("MIL") are pending before the Court:

MIL No. 1: Preclude Defendant Cisco From Presenting Evidence or Argument that It Does Not Infringe the Asserted Patents Because They Are Purportedly Invalid.

MIL No. 4: Preclusion of testimony, evidence and expert opinions Defendant did not timely disclose or make available during discovery, including several of the witnesses in Cisco's witness list.

MIL No. 6: Preclude testimony or evidence regarding invalidity allegations or combination of prior art that Defendant did not disclose in its invalidity interrogatory responses.

**B.    Cisco's Outstanding Issues**

**1.    Cisco's Pending *Daubert* Motions**

The following *Daubert* motions are pending before the Court:

Dkt. No. 229:  Motion to Exclude the Opinions of Mr. Lance Gunderson;

Dkt. No. 236: Motion to Exclude the Testimony of Centripetal's Experts Regarding Alleged Prior Knowledge and Alleged Copying of Centripetal's Technology, Products and Patents;

Dkt. No.  242: Motion to Exclude the Opinions of Drs. Michael T. Goodrich and Ricardo Valerdi;

Dkt. No. 270:  Motion to Exclude the Apportionment-Related Opinions of Dr. Aaron Striegel and the Related Royalty Base Opinions of Mr. Lance Gunderson.

**2.    Cisco's Pending Motions *in Limine***

The following Motions *in Limine* ("MIL") are pending before the Court (Dkt. No. 208):

MIL No. 1: Centripetal may not introduce evidence or argument regarding its prior litigation with  Keysight/Ixia and may not reference or rely upon the Binding Term Sheet entered into with Keysight/Ixia mid-trial to justify its reasonable royalty analysis in this case.

MIL No. 3: Centripetal may not introduce evidence or argument regarding information obtained from LeadLander and may not reference or rely upon information from LeadLander to suggest that Cisco or any employee of Cisco visited Centripetal's website for the purpose of copying Centripetal's technology or patents.

MIL No. 7: The Court should preclude Centripetal from offering any testimony, argument, or opinions that it is "facing what appears to be copycats of Cisco" or that other third parties allegedly infringe its patents.

        **3.**     **Cisco's Pending Motion for Summary Judgment (Dkt. No. 255)**

        **4.**     **Cisco's Pending Motion Opposing Trial Entirely by Videoconference (Dkt. No. 387)**

This Joint Pre-Trial Order is hereby approved this 24 day of April, 2020.

                                        /s/
                                Henry Coke Morgan, Jr.
                                Senior United States District Judge

Entered _____
                  Henry Coke Morgan, Jr.
                  Senior United States District Judge
                  United States District Judge

**WE ASK FOR THIS:**

Dated:  April 21, 2020

Respectfully submitted,

*/s/Stephen E. Noona*
Stephen Edward Noona
Virginia State Bar No. 25367
**KAUFMAN & CANOLES, P.C.**
150 W Main St., Suite 2100
Norfolk, VA 23510
Telephone:  (757) 624-3239
Facsimile:  (888) 360-9092
senoona@kaufcan.com

Paul J. Andre (*pro hac vice*)
Lisa Kobialka (*pro hac vice*)
James Hannah (*pro hac vice*)
Hannah Lee (*pro hac vice*)
**KRAMER LEVIN NAFTALIS
& FRANKEL LLP**
990 Marsh Road
Menlo Park, CA 94025
Telephone:  (650) 752-1700
Facsimile:  (650) 752-1800
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
hlee@kramerlevin.com

**ATTORNEYS FOR PLAINTIFF
CENTRIPETAL NETWORKS, INC.**

*/s/Dabney J. Carr, IV*

Dabney J. Carr, IV, VSB No. 28679
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com

Neil H. MacBride, VSB No. 79883
**DAVIS POLK & WARDWELL LLP**
901 15th Street, NW
Washington, DC  20005
Telephone:  (202) 962-7000
Facsimile:  (202) 962-7111
neil.macbride@davispolk.com

Louis N. Jameson (*pro hac vice*)
Matthew C. Gaudet (*pro hac vice*)
John R. Gibson, VSB No. 72968
Jennifer H. Forte (*pro hac vice*)
**DUANE MORRIS, LLP**
1075 Peachtree Street, N.E., Suite 2000
Atlanta, GA 30309-3929
Telephone: (404) 253-6900
Facsimile: (404) 253-6901
wjameson@duanemorris.com
mcgaudet@duanemorris.com
jrgibson@duanemorris.com
jhforte@duanemorris.com

Joseph A. Powers (*pro hac vice*)
**DUANE MORRIS, LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Facsimile: (215) 689-3797
japowers@duanemorris.com

John M. Baird, VSB No. 77827
Christopher J. Tyson, VSB No. 81553
**DUANE MORRIS, LLP**
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
Telephone: (202) 776 7851
Facsimile: (202) 478 2620
cjtyson@duanemorris.com

Nicole E. Grigg (formerly Johnson)
(*pro hac vice*)
**DUANE MORRIS, LLP**
2475 Hanover Street
Palo Alto, CA 94304-1194
Telephone:  (650) 847-4150
Facsimile:  (650) 618-2713
NEGrigg@duanemorris.com

**ATTORNEYS FOR DEFENDANT
CISCO SYSTEMS, INC.**