```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Norfolk Division

 3     - - - - - - - - - - - - - - - - - - -

 4                                       )
       CENTRIPETAL NETWORKS, INC.,       )
 5                                       )
                Plaintiff,               )     CIVIL ACTION NO.
 6                                       )         2:18cv94
       v.                                )
 7                                       )
       CISCO SYSTEMS, INC.,              )
 8                                       )
                Defendant.               )
 9     - - - - - - - - - - - - - - - - - - -

10

11        TRANSCRIPT OF VIDEOCONFERENCE BENCH TRIAL PROCEEDINGS

12                        Norfolk, Virginia

13                         May 7, 2020

14                          Volume 2B
                           Pages 250-324
15

16     BEFORE:  THE HONORABLE HENRY COKE MORGAN, JR.
                United States District Judge
17


18
       APPEARANCES:
19

20             KRAMER LEVIN NAFTALIS & FRANKEL LLP
               By:  Paul J. Andre
21                  Counsel for the Plaintiff

22             DAVIS POLK & WARDWELL LLP
               By:  Neil H. MacBride
23                     - and -
               DUANE MORRIS LLP
24             By:  Matthew C. Gaudet
                    Counsel for the Defendant
25
```

Carol L. Naughton, Official Court Reporter

1                            I N D E X

2    PLAINTIFF'S
     WITNESSES                                          PAGE
3
     STEVEN ROGERS
4         Direct Examination (Resumed) By Mr. Andre      252
          Cross-Examination By Mr. MacBride              264
5         Redirect Examination By Mr. Andre              298
     SEAN MOORE, Ph.D.
6         Direct Examination By Mr. Andre                301

7

8                          E X H I B I T S

9    PLAINTIFF'S TRIAL EXHIBITS
10   NO.                                                 PAGE

11    PTX-547                                            259
      PTX-1219                                           306
12    PTX-957
      PTX-1112                                           319
13

14   JOINT TRIAL EXHIBITS
     NO.                                                 PAGE
15
      JTX-1                                              316
16

17

18

19

20

21

22

23

24

25

─────────Rogers, S. - Direct─────────

```
 1              (Proceedings resumed at 2:08 p.m.)
 2              THE COURT:  All right, Mr. Andre.  You may resume
 3     your examination of Mr. Rogers.
 4              MR. ANDRE:  Thank you, Your Honor.
 5                     DIRECT EXAMINATION (Resumed)
 6     BY MR. ANDRE:
 7     Q.  Mr. Rogers, when we left off, we were on PTX-231, and I
 8     just had highlighted the second bullet point, talking about
 9     threat intelligence.
10              Could you explain to the Court what is threat
11     intelligence and how does Centripetal use it?
12     A.  Well, threat intelligence is the knowledge of who the bad
13     guys are, where they're coming from, what infrastructure they
14     use, what servers they might attack you from, what locations
15     they might want to send information that they've stolen from
16     your network to.
17              So it's a pretty big area.  There's lots of
18     companies now who develop this threat intelligence, find out
19     these things, and publish their list.
20     Q.  And it's safe to say on this document you have over 90
21     integrated threat intelligence providers.  Who are some of
22     those providers?
23     A.  Well, Jonathan in our company manages those providers,
24     but the typical one would be IBM or web route companies like
25     that.
```

————Rogers, S. - Direct————

1   Q.  So you pay these companies for this information?

2   A.  Yes, and we also have other providers.  We have -- there

3   are groups that do this.  The U.S. government provides threat

4   feeds.  Industry organizations from a group of banks provide

5   a threat feed for threat intelligence actors who might attack

6   banks and financial institutions, yes.

7           THE COURT:  I'm back to where we were at the

8   beginning audio-wise.  I don't know what you did, Mr. Rogers,

9   but I could hear you a lot better before than I can now.  I

10  don't know what the reason is.

11          THE WITNESS:  Okay.  I'm going to turn up my audio.

12          THE COURT:  Okay.

13          THE WITNESS:  Hopefully, that will be better for

14  you.  And I will also attempt to speak up.

15          THE COURT:  Well, I can hear you fine now.

16          THE WITNESS:  Okay, good.

17          THE COURT:  All right.  You may continue, Mr. Andre.

18          MR. ANDRE:  Thank you, Your Honor.

19  BY MR. ANDRE:

20  Q.  So is threat intelligence -- is that an important aspect

21  of how Centripetal's technology works?

22  A.  Yes.  The threat intelligence is what we use to make the

23  discrimination as to whether you should allow or not allow or

24  who is bad, is impinging on your network.

25  Q.  And you can take down that document.

——————Rogers, S. - Direct——————

1           How is Centripetal's technology different or better
2      than what was out there in 2009, when you first got into this
3      business?
4      A.   Well, in 2009, again, the whole idea was to look at
5      "what."  So the -- you would look at signatures, things like
6      that, of files that were already traversing your network.
7      Q.   Does Centripetal patent its inventions in this space?
8      A.   Yes.
9      Q.   And why do you do that?
10     A.   Well, because in order to make our product successful and
11     to protect the interests of our venture capital investors and
12     others, we had to file for protection of our ideas;
13     otherwise, they could just be copied.
14     Q.   And you mentioned your venture capital investors.  Have
15     you received significant investment in your company?
16     A.   Yes.
17     Q.   You mentioned that when you started the company, you
18     started by yourself in the basement.  How many employees do
19     you have now?
20     A.   We've got between 50 and 100.
21     Q.   And have you received any awards for your technology and
22     your products in the market?
23     A.   Yes, we have.
24     Q.   We have a slide here.  Could you describe just a couple
25     of these awards?

—————Rogers, S. - Direct—————

1   A.   Sure.   For instance, Gartner has an award for new

2   emerging companies called the "Cool Vendor."   Gartner

3   typically only follows large, established companies, but they

4   gave us a Cool Vendor Award in 2017.   They only do that once

5   in your lifetime, and they'll do it for maybe four or five

6   companies a year, three companies a year, that kind of thing.

7           We also received a Signet 16.   Signet is an

8   organization that has a board composed of CSOs from major

9   companies and government agencies, and they get together and

10  look at the new technologies, and they awarded us a Signet 16

11  Innovators Award.

12          We were a FinXTech Labs Award.   That's a group of

13  banks in New York City.   And we've also been noted by many

14  others.   I can keep going, if you'd like.

15  Q.   That's unnecessary.   Let's talk about some of your

16  customers.

17          Who are some of the customers, just a representative

18  customer that you've been able to place your products with?

19  A.   Well, our customers include a range of customers who are

20  the very largest representative customers that are out there,

21  all the way down to very small ones.

22          So we have customers like the Department of Homeland

23  Security, who is an early adopter of our technology, Home

24  Shopping Network, QVC, the NASDAQ bought our systems.   So

25  customers like that are at the top end.

Carol L. Naughton, Official Court Reporter

—————————Rogers, S. - Direct—————————

```
 1            But on the bottom end, we have small companies.
 2    Brethren Mutual is an insurance company that does 100 million
 3    a year in revenue.  New England Die Company is a small
 4    defense contractor but very critical in what they do.  And so
 5    we can protect the smallest to the largest and do it cost
 6    effectively for them.
 7    Q.  You can take that slide down.
 8            Now, in 2015, do you recall a meeting you had with
 9    Pavan Reddy of Cisco?
10    A.  Yes, I sure do.
11    Q.  First of all, who is Pavan Reddy?
12    A.  Well, Pavan Reddy worked out of Research Triangle Park,
13    and he was responsible for putting together special solutions
14    for Cisco customers who needed to go beyond what products
15    Cisco had.
16    Q.  And could you describe your first encounter with
17    Mr. Reddy?
18    A.  Yes.  I'll never forget it.  He called me when I was on
19    the train in New Jersey, going -- coming from visiting a
20    customer, and I had to get off the train at a train stop and
21    do the call, walking up and down the train platform.
22            Do you want me to go into any more detail about the
23    call?
24    Q.  Yes, please.
25    A.  Okay, sorry.  So anyhow, what I did was just describe to
```

Rogers, S. - Direct

1  him what we did, how it worked, how effective it was, why it

2  was so effective, that kind of thing, and Pavan told me that

3  he thought that it would fit into the types of solutions they

4  needed for customers that were -- you know, that needed

5  something that went beyond the offerings that Cisco had at

6  the time.

7  Q.  And did you have follow-up meetings with Mr. Reddy or his

8  representatives in 2015?

9  A.  Yes, we did.  We ended up having a demo for them.  We

10 showed them our whole system and all the pieces and explained

11 to him why it was effective.  We did that for not just him

12 but for other members of his team, as well.

13 Q.  And do you recall in 2016 after -- you meeting with the

14 corporate development team at Cisco?

15 A.  That's correct.

16 Q.  And did you sign a nondisclosure agreement before you had

17 those meetings?

18 A.  Yes, we did.

19 Q.  Now in the meetings with Mr. Reddy in 2015, there was no

20 nondisclosure agreement.  Is that correct?

21 A.  That's correct.

22 Q.  And did you only show him at that point mostly

23 public-facing information, nonconfidential?

24         MR. MacBRIDE:  Objection, Your Honor; leading.

25         MR. ANDRE:  Wait.  There's an objection, Mr. Rogers.

258

                           ─────Rogers, S. - Direct─────

 1    I'm sorry.

 2            THE COURT:  Yeah, I heard.

 3            It was a leading question.  I think you can rephrase

 4    the question.

 5            MR. ANDRE:  Sure.

 6    BY MR. ANDRE:

 7    Q.  Did you have a nondisclosure agreement in place when you

 8    had your meetings with Mr. Reddy?

 9    A.  No, we did not.

10    Q.  And did you disclose any confidential information to

11    Mr. Reddy in 2015?

12    A.  No.

13    Q.  Do you recall when you did get a nondisclosure agreement

14    in place with Cisco?

15            MR. MacBRIDE:  Objection.

16            THE WITNESS:  It was -- am I allowed to answer?

17            THE COURT:  Overruled.  Go ahead.

18            THE WITNESS:  Okay.  So it would have been early in

19    2016.

20    BY MR. ANDRE:

21    Q.  And was there a meeting -- do you recall a meeting with

22    Cisco in 2016, after you signed the nondisclosure agreement?

23    A.  Yes.  We had a Webex meeting with people at Cisco from --

24    they gathered together people from all over their cyber

25    security product line, all over the world.

———Rogers, S. - Direct———

1    Q.  And what does it mean to you at Centripetal when you sign

2    a nondisclosure agreement?

3    A.  It means that they will not disclose the things that we

4    discuss beyond the meeting, beyond the participants.

5    Q.  I want to show you what's been marked as PTX-547.

6           Do you recognize the document that's on the screen,

7    Mr. Rogers?

8    A.  Yes, I do.

9    Q.  And what is this document?

10   A.  I believe it's the presentation that we provided to

11   Cisco.

12   Q.  Who led the discussion for Centripetal in this meeting

13   with Cisco?

14   A.  Jonathan did, Jonathan Rogers.

15   Q.  And is he related to you?

16   A.  Yes.  He's my son.

17   Q.  And if you turn --

18          MR. ANDRE:  Your Honor, I'd like to move Exhibit

19   PTX-547 into evidence.

20          THE COURT:  PTX-547 will be admitted.

21          MR. ANDRE:  Thank you, Your Honor.

22          (Plaintiff's Exhibit PTX-547 received in evidence.)

23   BY MR. ANDRE:

24   Q.  If you turn to Page 6 of this document, there's a slide

25   entitled "Threat Intelligence."  Do you see that?

Rogers, S. - Direct

1   A.  Yes, I do.

2   Q.  Did you inform the people at Cisco how Centripetal uses

3   threat intelligence in its solutions?

4   A.  Yes, we did.

5   Q.  And if you turn to the next page, Page 7, there's a slide

6   there that says, "Speed and Scale."

7         The first bullet point says, "Centripetal's patented

8   filter algorithms eliminate the speed and scalability

9   problem."  Do you see that?

10  A.  I do.

11  Q.  Did you tell the people at Cisco about your patented

12  filter algorithms?

13  A.  Well, I didn't.  Jonathan did, of course.

14        Yes, we did.  We talked about the filter algorithms

15  and all of the other pieces that required speed and scale of

16  the solution.

17  Q.  And you mentioned that your solutions were patented?

18  A.  Yes, of course.

19  Q.  You can take that slide down.

20        Mr. Rogers --

21        THE COURT:  Well, it talks about how many documents

22  you can pass through your system, which seems to be one of

23  the issues, and it says, "1/0 of 30 million packets per

24  second."  What does that mean?

25        MR. ANDRE:  Could you put the document back up?

—————Rogers, S. - Direct—————

1   Thank you.

2          THE WITNESS:  So when you're operating at a very

3   high network speed -- some of our customers operate all the

4   way up to 100 gigabits now, or certainly beyond 10 gigabits

5   of full line grade.  That's bits per second that flow through

6   the interface, and that's because they have so many customers

7   who are coming at their system with such a volume of traffic.

8   Okay.  That ends up being broken up into packets, and that's

9   a lot of packets per second.

10          And so 30 million packets per second, each packet

11  having, maybe, 1,000 bits or more, 10,000 bits, that's the

12  speed at which we had to be able to handle these packets,

13  send them through the system, and not delay the packet.

14  Because if you delay the packet, then you'll slow down the

15  experience, and people won't want to come to your web page

16  anymore.

17          THE COURT:  Well, you say that's the speed at which

18  we did it.

19          THE WITNESS:  Yes.

20          THE COURT:  Which you're saying is 30 million

21  packets per second?

22          THE WITNESS:  Yes.

23          THE COURT:  All right.  Now, is that considered

24  average or fast or slow?

25          THE WITNESS:  It's super fast for what we were

———Rogers, S. - Direct———

1    doing, because we had to take each packet and examine it and

2    find and compare it against millions of threat indicators,

3    and we had to make each of those comparisons and then be

4    finished with that in time for the next packet to come.

5            If you can't do it within a single packet time, then

6    you'll end up having a queue develop, which will then

7    eventually result in packet loss.

8            THE COURT:  A queue?  You mean a line, like waiting

9    in line?  Is that what you mean?

10           THE WITNESS:  That's right.  It would be like

11   waiting in line, but the line is only so long, so if you

12   don't take people out of the line fast enough, the line will

13   overflow, and they'll have to send people away.

14           THE COURT:  Well, the number of packets that go

15   through your system for various customers, does that vary

16   with the size of the customer or --

17           THE WITNESS:  Yeah, that's right; it typically does.

18   I would find that for ranging all the way from a small

19   business, it might be 100 megabits per second, all the way up

20   to our largest customers, some of which are now going faster

21   than the 30 million packets per second.

22           THE COURT:  So you can speed up the system if there

23   are more packets to deal with?  Is that what you're saying?

24           THE WITNESS:  That's right.  We're working on that

25   all the time.  We've got one in the lab that goes 10 times

Rogers, S. - Direct

1    faster than our fastest that we have today.
2              THE COURT:  All right.
3    BY MR. ANDRE:
4    Q.  And the first part of that line says, "I/O."  What does
5    that stand for?
6    A.  Input/output.  It means that the packet goes both
7    directions.  You have to look at both sides, because you
8    could be receiving packets from a bad threat actor, or you
9    could be sending packets to a bad threat actor.  It goes both
10   ways.  You have to look at both at the same time.
11   Q.  You're examining packets going in and out of the system?
12   A.  That's correct.
13   Q.  And you could do that back at the time of this meeting at
14   30 million packets per second?
15   A.  Yes, and we regularly gave demos of that capability, just
16   so there would be no doubt.
17   Q.  When it says, "filter against 5 million complex IOCs" --
18   first of all, what is an IOC?
19   A.  Well, in the trade we call it an indicator of compromise.
20   So if your network has traffic going out of it, let's say,
21   and that traffic is going to a place in Romania that we know
22   is hosted by criminals, cyber criminals, that's an indicator
23   that you've been compromised.
24              So that's the lingo that we use in the industry to
25   talk about these things.

—————Rogers, S. - Cross—————

1   Q.  Thank you.  You can take that document down.

2       And all this information you discussed with Cisco in

3   the February 2016 meeting?

4   A.  Yes.

5   Q.  Mr. Rogers, how has having to compete against your own

6   technology in the marketplace affected your business?

7   A.  Well, it's impossible to compete against your own

8   technology if you have, you know, a large incumbent, a

9   competitor.  That competitor has already sold into virtually

10  every customer you would go to.

11      You tell them about your wonderful new technology

12  that can help them, and, you know, they'll talk to their

13  incumbent and say, "What do you think about this?"  The

14  incumbent just says, "Well, we do the same thing.  And that

15  other company is pretty small, too, and so it's a risk for

16  you," and it kills your business.  It's devastating to your

17  business.  It makes it really hard.

18  Q.  Thank you, Mr. Rogers.

19          MR. ANDRE:  Your Honor, I have no further questions.

20          THE COURT:  All right.  Does defendant wish to

21  cross-examine?

22                    CROSS-EXAMINATION

23  BY MR. MacBRIDE:

24  Q.  Good afternoon.  Neil MacBride, for Cisco Systems.

25          MR. MacBRIDE:  Can the Court and counsel and the

--------Rogers, S. - Cross--------

1    witness hear me?

2              THE COURT:  Not very well.

3              THE WITNESS:  I can.

4              MR. MacBRIDE:  Your Honor, I'll keep my voice up.

5    Is that better?

6              THE COURT:  Yes.

7              MR. ANDRE:  And, Your Honor, this is Mr. Andre.  Can

8    we ask that the defendants e-mail the cross-examination

9    exhibits, if there are any, at this point?

10             MR. MacBRIDE:  Yes, Mr. Andre.  Thank you for

11   sending yours over this morning.  They came a bit late, but

12   we'll send ours right now.  In fact, they may have already

13   been sent.

14             MR. ANDRE:  Thank you.

15             MR. MacBRIDE:  Confirming they've been sent.

16             THE COURT:  You're going to send it to me, as well?

17             MR. MacBRIDE:  Your Honor, I believe it should have

18   been in your binder, delivered this morning.  It's a two-page

19   document.

20             (There was a pause in the proceedings.)

21             THE CLERK:  Do you know where the summary documents

22   are for Cisco?  Centripetal brought the summaries over this

23   morning, but the Judge had asked for a summary for each

24   witness.  That's what he's looking for at the moment.

25             THE COURT:  I've got all the exhibits, but I don't

—Rogers, S. - Cross—

1    have the summary of the outline of the areas of

2    cross-examination, is what I don't have.  I guess the

3    document that was just e-mailed to Mr. Andre -- I don't have

4    it.

5            Have we got it?  Have you got it?

6            THE CLERK:  No, sir, I don't have it.

7            MR. NOONA:  I don't see it, either.  This is Steve

8    Noona.

9            MR. MacBRIDE:  Your Honor, my understanding is that

10   we e-mailed it to Ms. Stacie Countess, at the court, this

11   morning.

12           THE CLERK:  She's not available at the moment, so,

13   Mr. Noona, can you forward that to me, please?

14           MR. NOONA:  Mr. Noona here.  I don't have of it.

15   I'm looking for it right now myself.

16           THE CLERK:  If someone can forward it to me, instead

17   of -- Ms. Countess is off today.

18           MR. MacBRIDE:  Mr. Carr, our local counsel, I can

19   have him send it over again right now.

20           THE CLERK:  Thank you.

21           MR. MacBRIDE:  My apologies that it has not arrived.

22           (There was a pause in the proceedings.)

23           MR. MacBRIDE:  Ms. Baxter, we're forwarding that

24   document to you now.

25           THE CLERK:  Thank you.  I'll let you know as soon as

---

───Rogers, S. - Cross───

 1    I get it.

 2           MR. MacBRIDE:  My apologies, Your Honor and

 3    Ms. Baxter, for the inconvenience.

 4           THE COURT:  I don't know -- Stacie has the day off.

 5    I don't know if she has it or not, but I don't have it in my

 6    book.  That's all I know.

 7           You can go ahead and proceed, Mr. MacBride.

 8           MR. MacBRIDE:  All right, Your Honor, I will

 9    proceed.  And, again, my apologies to the Court and

10    Ms. Baxter.  Hopefully, opposing counsel has received the

11    document at this point.

12    BY MR. MacBRIDE:

13    Q.  Good afternoon, Mr. Rogers.

14    A.  Good afternoon.

15    Q.  Mr. Rogers, we've not met before, at least to my

16    recollection, so it's nice to meet you.  I'll be asking you

17    some questions this afternoon, and I just want to make sure,

18    again, that you can hear me okay.

19    A.   Just fine.

20    Q.  Great.  So if at any point you can't -- I've got spring

21    allergies, so if for any reason you can't hear me, just ask

22    me, and I'll be happy to speak up or reask my question.

23           So, Mr. Rogers, if I may, I'd like to start by

24    clarifying a couple of things that your lawyer, Mr. Andre,

25    asked you on direct examination.

---

———Rogers, S. - Cross———

1          And, in particular, I wanted to ask you about

2   RuleGATE, Centripetal's product, and how it was introduced to

3   the market when it -- in recent years.  And I just want to

4   make sure I'm correct that the way your company described

5   RuleGATE to the market was in terms of "Packet filters

6   located at network security boundaries need to be able to

7   enforce highly dynamic security policies with millions of

8   rules but without impacting network performance and user

9   quality of experience."

10          Is that how RuleGATE was described to the community?

11   A.  Yeah, that's part of it.

12   Q.  And to clarify, did you also tell the market that

13   RuleGATE packet filters from Centripetal networks meet these

14   performance specifications, the ones I just alluded to?

15   A.  Well, there's a time continuum here, so we did

16   different -- we had initial capabilities, and then we added

17   to those capabilities, and then we added to those

18   capabilities, and so on, across a period of time.

19          So what time are you talking about here?  Why don't

20   we turn to Plaintiff's Exhibit 1591, which was a document

21   your lawyer, Mr. Andre, previously asked you about.  If we

22   could turn to Page 2 of this document --

23          MR. MacBRIDE:  Your Honor, again, this is

24   Plaintiff's Exhibit 1591, previously moved into evidence.

25          THE COURT:  This is one of the plaintiff's exhibits?

─────Rogers, S. - Cross─────

 1        MR. MacBRIDE:  That's correct, Your Honor, and I'm

 2   on the second page, Page 2, of a five-page document, and the

 3   Bates number ending in 228.

 4        THE COURT:  Okay.

 5   BY MR. MacBRIDE:

 6   Q.  And so I will ask Mr. Simon to go to the first paragraph

 7   entitled "Summary," and, starting about midway down, if you

 8   could, please, highlight, Mr. Simon, the sentence starting

 9   "Packet filters..." and if you could highlight that sentence

10   and the next sentence at this point, please.

11        Mr. Rogers, again, am I correct that you

12   described -- your company described to the industry --

13   RuleGATE this way?

14   A.  Let's see.  First of all, we talk about what a solution

15   would look at, so that's the sentence on packet filters.

16        And then we spoke about -- in the second sentence,

17   we said that the RuleGATE packet filter would meet that

18   performance specification.

19   Q.  Right.  So this is how you described your technology to

20   the industry.

21   A.  Well, it's a basic piece of the whole system, yes.  It's

22   how we would describe this piece of it.

23   Q.  Well, isn't it true, Mr. Rogers, that after you describe

24   packet filters in these two sentences, the next thing you

25   told the market is that your product RuleGATE is "readily

Rogers, S. - Cross

1  combined with conventional defenses to accelerate existing

2  cyber security infrastructure"?

3  A.  What's your question?

4  Q.  Do you agree that when you put out this document to

5  industry, you described your product RuleGATE as being

6  "readily combined with conventional defenses," conventional

7  cyber security defenses, "to accelerate existing cyber

8  security infrastructure"?

9  A.  Yeah, because the existing infrastructure wasn't getting

10 the job done, and so we designed our system in such a way

11 that you could leave the existing infrastructure in place and

12 just add what we did.

13 Q.  So you told industry that your product could be combined

14 with security that was already being done, conventional

15 security, correct?

16 A.  Well, most of the customers didn't want to take anything

17 out, so, yes, we would leave what you got there and put this

18 new system in, along with the things you already had.

19 Q.  And, Mr. Rogers, when you put this information out to

20 industry, your company gave some examples of conventional

21 cyber defenses, right?

22 A.  We may have.  I don't know.

23 Q.  Well, if I could direct your attention to the first

24 sentence and ask Mr. Simon to highlight that at the top

25 there.

‾‾‾‾‾‾‾Rogers, S. - Cross‾‾‾‾‾‾‾

1  A.  Yes, of course.  Okay.  I see what you're saying.

2  Q.  All right.  So Centripetal recognized, for example, that

3  it was totally conventional to have things like network

4  firewalls, correct?

5  A.  Yes.

6  Q.  And you agree you told potential customers that it was

7  conventional for clients to use -- to have cyber defenses in

8  their routers, correct?

9  A.  Some do.  Some had boards that would plug into their

10  routers that would be firewalls, sure.

11  Q.  Right.  And Centripetal -- you didn't invent any of these

12  conventional cyber defenses, correct?

13  A.  Invent the defenses that were failing?  No, we didn't

14  invent those.

15  Q.  And Centripetal didn't invent packet filtering, either,

16  correct?

17  A.  The idea of packet filtering we did not invent, but we

18  did invent the filtering systems that we created.

19  Q.  Packet filtering was around long before Centripetal was

20  founded, true?

21  A.  Well, it depends on what you mean by packet filtering.

22  What were you filtering on, what types of things?  Were you

23  just looking to see if there was an address that you could

24  move a packet through a router on or not?

25          Packet filtering covers a huge range of possible

———Rogers, S. - Cross———

1   things you might do, most of which have nothing to do with

2   cyber security.

3   Q.  Centripetal did not invent the concept of packet

4   filtering in cyber security, true?

5   A.  Let's see.  No, I'm not -- I don't agree with that.  It

6   depends on what kind.  You can't just make such a broad

7   statement in filtering.

8   Q.  Is it true, Mr. Rogers, that this presentation very

9   clearly told potential customers that your product RuleGATE

10  could be combined with conventional defenses, conventional

11  security defenses, cyber security?

12  A.  It did not have to remove -- we wanted to make the point

13  that it didn't have to remove what they already had.

14          Many of the banks and others that we were talking to

15  at the time had these things in.  They were required to have

16  a firewall, a web proxy, and an IPS.  They were required to

17  have it.  So we couldn't go in and say, "Well, you know, if

18  you put our system in, you don't need these things."  So we

19  worked in conjunction with them.

20  Q.  Mr. Rogers, let me try and put it to you this way:

21          The lines that you see in the exhibit that are

22  highlighted that I've asked you about, those are all still

23  correct, right?  You're not backing away from any of those

24  statements?

25  A.  No.  We've made those statements.  I'm not backing away

—Rogers, S. - Cross—

1    from them.

2    Q.  All right.  Let's shift gears, Mr. Rogers.

3           You told your counsel that you're the CEO and

4    founder of Centripetal Networks?

5    A.  Yes.

6    Q.  You founded the company?

7    A.  Yes.

8    Q.  And would you agree that as the CEO, you have the

9    ultimate responsibility for any actions your company takes?

10   A.  I do, you know, but I have a team, and I'm a good

11   delegator.  I don't make every decision.  So I don't do that.

12   Q.  And, in fact, you delegated the responsibility of

13   managing this lawsuit against Cisco to your son, Jonathan

14   Rogers; is that right?

15   A.  I did.

16   Q.  And your view, your recollection, is that Jonathan is the

17   one who came up with the idea for this lawsuit, correct?

18          THE COURT:  The idea of what?  I didn't get that.

19   The lawsuit?

20          MR. MacBRIDE:  Your Honor, I asked Mr. Rogers

21   whether he agreed that his view was that his son Jonathan is

22   the individual who probably came up with the idea to sue

23   Cisco.

24          THE WITNESS:  I think we all realized that if there

25   was copying going on of our technology, we would need to

---Rogers, S. - Cross---

1    enforce that in some way.  So I don't know whose idea it was.

2    BY MR. MacBRIDE:

3    Q.  Do you recall testifying at your deposition, Mr. Rogers,

4    that it was probably Jonathan who came up with that idea?

5    A.  Well, yeah, probably, but I can't say for sure.  It was a

6    discussion that was ongoing among the team members, so...

7    Q.  Mr. Rogers, let's shift gears a little bit and talk about

8    NetFlow, a concept that's already been introduced to the

9    Court.

10           And just to clarify, you agree that Centripetal has

11   never developed a security product based on NetFlow, correct?

12   A.  Not really, no.  We built a product that could integrate

13   with NetFlow, if you wanted it to, but, no, I don't think we

14   specifically went out there and said, "Let's integrate with

15   NetFlow."

16   Q.  My question is:  You agree that Centripetal -- I'm not

17   asking about integration.

18           My question is:  Your company never invented a

19   security product based on NetFlow; is that right?

20   A.  NetFlow preexisted our product.

21   Q.  Let me try again.

22           Do you agree -- do you remember testifying in

23   December, at which time you said your company had never

24   developed a security product based on NetFlow?  Do you agree?

25   A.  No, I don't agree, because NetFlow is just a protocol,

──────Rogers, S. - Cross──────

 1  and so there's no reason why we couldn't absorb that protocol

 2  and use it if it was useful to do so, so I don't agree.

 3  Q.  I believe you may have testified differently in the past,

 4  Mr. Rogers.  If we could please turn to your December 2019

 5  deposition, at Page 216.

 6       MR. MacBRIDE:  Your Honor, this should be in your

 7  binder of your cross-examination materials.

 8       THE COURT:  Okay.  I have a deposition that was

 9  taken on December 18th --

10       MR. MacBRIDE:  Correct.

11       THE COURT:  -- is what it says on mine.

12       MR. MacBRIDE:  Yes, that's correct, Your Honor.  It

13  is Mr. Rogers' deposition from December 18, 2019.

14       THE COURT:  What page?

15       MR. MacBRIDE:  Page 216, and lines 13 to 18.

16       THE COURT:  Wait a minute.  Page what, now?

17       THE CLERK:  216.

18       THE COURT:  What?

19       THE CLERK:  216.

20       THE COURT:  Well, okay.  The Court's rule is that

21  you read the question and the answer.  We don't allow anybody

22  to paraphrase what he said.  We just allow whatever question

23  and answer that you think is inconsistent with his testimony,

24  you just read it.

25       So we're on line 13 of Page 216?

Rogers, S. - Cross

```
 1            MR. MacBRIDE:  That's correct, Your Honor.
 2    BY THE CLERK:
 3    Q.  And, Mr. Rogers, this deposition was previously provided
 4    to your counsel.
 5            THE COURT:  I've got it.  I'm looking at it.
 6            MR. MacBRIDE:  Thank you.
 7    BY MR. MacBRIDE:
 8    Q.  So, Mr. Rogers, on December 18, 2019, I'm reading from
 9    the deposition:
10            "QUESTION:  To your knowledge, has Centripetal ever
11    done any development work in developing a security product
12    that's based on NetFlow?
13            "ANSWER:  No.  We felt that threat intelligence
14    would be a much better way to address cyber concerns.  It's a
15    different market."
16            Sir, were you asked that question, and did you give
17    that answer at your deposition?
18    A.  Well, I'm sure I did give it at my deposition.  Thank you
19    for putting this up for me.
20            So what is your question?
21    Q.  You've answered it.
22            And, Mr. Rogers, isn't it a fact that instead of
23    using NetFlow, your company's product RuleGATE, instead,
24    applies threat indicators to review packets?  True?
25    A.  That's correct.
```

Carol L. Naughton, Official Court Reporter

─────Rogers, S. - Cross─────

1   Q.  In fact, Centripetal's product applies millions of threat

2   indicators to those packets at wire speed; is that right?

3   A.  That's right.

4   Q.  And by "wire speed" you mean the technology that applies

5   these millions of indicators to packets so fast, in real

6   time, that a person sitting at their computer doesn't detect

7   any delay; is that correct?

8   A.  That's correct.

9   Q.  But that's not what Cisco does, in your understanding.

10  Don't you agree that, even today, Cisco's equipment cannot

11  apply millions of threat indicators at speed?

12  A.  Well, our patents cover lots of different things besides

13  just the filtering algorithm.  To be effective at what we do,

14  to be really effective, you have to do it at wire speed, but

15  that doesn't mean that you don't get some benefit from

16  copying us and doing it even at a lower speed.

17  Q.  Mr. Rogers, I think you answered a different question, so

18  let me try again.

19          Do you recall testifying, sir, that, even today,

20  Cisco's equipment cannot apply millions of threat indicators

21  at wire speed?

22  A.  I haven't analyzed Cisco's equipment, so I don't know.

23  Q.  I believe you may have testified differently in the past,

24  Mr. Rogers.  If we could turn to Page 94 of your deposition.

25          MR. MacBRIDE:  Your Honor, this is the same exhibit,

Rogers, S. - Cross

1  of course, at Page 94 and at pages -- excuse me, at lines 8

2  through 13.

3          Your Honor, have you found the passage?  May I

4  proceed, Your Honor?

5          THE COURT:  Yes.

6          MR. MacBRIDE:  Thank you.

7  BY MR. MacBRIDE:

8  Q.  Mr. Rogers, again, for the record, I'm reading from your

9  December 18, 2019 deposition.  You were asked the following

10  question:

11          "QUESTION:  To your knowledge, Cisco's equipment

12  isn't performing at this level, correct?

13          "ANSWER:  Not making any sort of decisions on threat

14  intelligence, can a Cisco router run at a hundred gigabytes?

15  Yeah, of course, but they can't make the security decisions

16  at that speed."

17          Mr. Rogers, were you asked that question, and did

18  you give that answer at your deposition?

19  A.  I believe I was, yes.  I think that's different than the

20  question you just asked me, but yes.

21  Q.  Mr. Rogers, let's move now and talk a little bit about

22  your company's patents.

23          In your view, isn't it correct that all of your

24  company's patents concern the techniques that allow

25  Centripetal to apply these millions of threat indicators at

```
                          ─Rogers, S. - Cross─
```

1   wire speed?

2   A.  Is that a question?

3   Q.  Have you agreed that all of your patents involve this --

4   ultimately involve this technique that allows you to apply

5   millions of threat indicators at speed?

6           THE COURT:  At what?

7           THE WITNESS:  All of the patents have to work

8   together.  Your Honor, did you want to ask me something?

9           THE COURT:  I heard the word "speed," but it just

10  sounded like he said, "at speed," it didn't say what the

11  speed was, or at least I didn't hear it.

12          MR. GAUDET:  Sure.  Let me ask again.

13  BY MR. MacBRIDE:

14  Q.  Mr. Rogers, do you remember testifying previously that

15  all of Centripetal's patents concerned the technique that

16  allows the application of millions of threat indicators at

17  wire speed?

18  A.  I probably did testify to that, because our system needed

19  to operate at the speed to be maximally effective, but that

20  doesn't mean that it has no effectiveness if it operated at a

21  lower speed.

22  Q.  Again, my question was you agree that all of your patents

23  involve the concept of applying millions of threat indicators

24  at wire speed, correct?

25  A.  No, absolutely not.  I don't agree with that.

—Rogers, S. - Cross—

1  Q.  You don't -- you didn't previously testify that all of

2  your patents involved this concept?

3  A.  All of -- the entire system that's put together, using

4  all of the patented technologies, are all designed to run at

5  that speed, but it doesn't mean they have to.  A patent on

6  correlation doesn't have to be relative to the speed of the

7  correlation.

8  Q.  Mr. Rogers, I believe you testified different previously,

9  and so I would ask that Page 100 of your deposition --

10         THE COURT:  It's up to the jury to decide if he

11 testified differently.

12         MR. MacBRIDE:  Understood, Your Honor.

13         THE COURT:  And I'm the jury.

14         MR. MacBRIDE:  Yes, Your Honor.  I was simply laying

15 a predicate to impeach, knowing the Court's rules.

16 BY MR. MacBRIDE:

17 Q.  So I'm at Page 100 of your December 18th, 2019

18 deposition, lines 5 to 17.

19         And, Mr. Rogers, I'm going to read the question and

20 answer from your transcript that you were asked.

21         Question by Mr. -- I'm sorry.  My question was:

22         "Which patents went to the original idea that was

23 the genesis of the Centripetal advanced packet filtering

24 algorithm techniques that led to the millions of rules of

25 performance level?"

—————Rogers, S. - Cross—————

1           There was an objection by your lawyer.

2           "ANSWER:  My answer is all of them.  If you wanted

3    to, you could probably look at the oldest ones and start with

4    the oldest ones, moving forward.  The oldest ones gave us

5    something, and then there were more improvements, and more

6    improvements, and so on, all the way through."

7           Mr. Rogers, my question is:  Were you asked that

8    question, and did you give that answer in your deposition?

9           MR. ANDRE:  Your Honor, this is Mr. Andre.

10   Objection.  This is not impeachment.  It's a completely

11   different question that he's asked here at trial.

12          MR. MacBRIDE:  No, it's not, Your Honor.  Excuse me.

13          THE COURT:  I think he's answered -- I mean, did you

14   say that, Mr. Rogers?

15          THE WITNESS:  Did I say what's in the transcript?

16          THE COURT:  Yes.

17          THE WITNESS:  Sure.

18          THE COURT:  Okay.  He's answered the question.

19          THE WITNESS:  I don't think what's in the transcript

20   is what he's asking me, though.

21          THE COURT:  Well, you're entitled to explain your

22   answer.

23          THE WITNESS:  I'm happy to.  So --

24          THE COURT:  Well, you don't -- I mean, I think you

25   just did.

—Rogers, S. - Cross—

1           THE WITNESS:  Okay.  All right.

2           THE COURT:  As I said, I'm the jury, so the Court

3    will decide the extent to which, if any, the prior testimony

4    is inconsistent with the testimony today.

5           MR. MacBRIDE:  Thank you, Your Honor.  May I

6    proceed?

7           THE COURT:  Yes.

8           MR. MacBRIDE:  Thank you.

9    BY MR. MacBRIDE:

10   Q.  Mr. Rogers, is it your understanding as a technologist --

11   would you agree that Centripetal's first three patents were

12   the ones that's enabled your company to get this speed

13   breakthrough we've been discussing?

14   A.  No.  They enabled us to start on that path, but they were

15   not all that we needed to bring it to market as a product

16   that worked.

17          So you're probably a little confused about how

18   technology works, I'm sensing, but it takes lots of pieces,

19   and the first piece that works in a lab doesn't necessarily

20   mean that it's all ready to be in a product.  So we're a

21   service.

22   Q.  Mr. Rogers, let's go back to your deposition, to

23   Page 101, at line 2, lines 2 to 18.

24          Mr. Rogers, I'll read this portion from the

25   transcript:

———Rogers, S. - Cross———

 1          "QUESTION:  I'm not asking you, Mr. Rogers, whether
 2   elements of your patents are used in your APF.  I'm talking
 3   about achieving the five million indicators of compromise and
 4   being able to apply that at the full line rate without any
 5   latency."
 6          Your lawyer objected.  The question continues:
 7          "And so with respect to that ability, do you have
 8   any understanding as to which of your patents are directed to
 9   the core packet filtering techniques that allow you to
10   achieve that level?"
11          Mr. Andre objects.
12          "ANSWER:  Speaking of the technology, the first
13   three enabled us to get the speed breakthrough.  There was a
14   lot more that had to be added, but that got us there."
15          Mr. Rogers, were you asked this question, and did
16   you give this response in your deposition?
17   A.  Yes, I was asked this question, and I gave this response.
18          Are you saying that I have to have memorized my
19   previous testimony?  Because I don't think there's anything
20   inconsistent in my answers to you and this testimony.
21   There's nothing inconsistent.  So what are you saying?
22          THE COURT:  Well, that's for the Court to decide,
23   Mr. Rogers.
24          THE WITNESS:  Oh, I'm sorry.
25          THE COURT:  I mean, you can explain your answer, but

———Rogers, S. - Cross———

1   just saying that it's not inconsistent is not an explanation,

2   that's an argument.

3           THE WITNESS:  Okay.  I would like to explain my

4   answer, then.

5           THE COURT:  All right.  You can explain it.

6           THE WITNESS:  Okay.  So we had to get over a hurdle

7   of basic speed.  The first three patents did enable us to get

8   over that hurdle.  The other patents were not directed at

9   high speed.  They just had to be implemented in such a way

10  that they could be high speed and that they wouldn't slow

11  down the rest of the system.  I think that's totally

12  consistent.  I think so.

13          THE COURT:  All right.  You may proceed,

14  Mr. MacBride.

15          MR. MacBRIDE:  Thank you, Your Honor.

16  BY MR. MacBRIDE:

17  Q.  Mr. Rogers, the first three patents that we've just

18  discussed, those are not asserted against Cisco in this case,

19  correct?

20  A.  I don't know.

21  Q.  Do you remember testifying previously in your deposition

22  that these three patents, your first three, are not ones that

23  Cisco is accused with?

24          THE COURT:  Not ones that what?

25          MR. MacBRIDE:  Your Honor, I'm happy to ask the

—Rogers, S. - Cross—

1  question again, if you didn't hear it.

2          THE COURT:  I didn't hear the end of it.

3          MR. MacBRIDE:  Yes.  I'll keep my voice up, Your

4  Honor.

5          My question to Mr. Rogers was whether he agreed that

6  his first three patents, the ones we've been discussing, that

7  those three patents have not been asserted in this case

8  against Cisco.

9          THE WITNESS:  I believe they are not, to the best of

10  my recollection.

11  BY MR. MacBRIDE:

12  Q.  Isn't it right, Mr. Rogers, that your company acquired

13  the first of those three patents from a company called Great

14  Wall?

15  A.  That's incorrect.

16  Q.  Well, let me ask it this way:  Isn't it correct that the

17  three patents, the first three patents, were acquired or

18  licensed from a company called Great Wall and Wake Forest

19  University?  That's where those three patents came from?

20  A.  Yes.  That was two separate transactions.

21  Q.  Switching gears just a bit, Mr. Rogers, you founded

22  Centripetal in 2009, right?

23  A.  Yes.

24  Q.  And your company sold your first RuleGATE product in

25  December of 2014 or thereabouts; is that right?

—Rogers, S. - Cross—

1  A.  That's correct.

2  Q.  And before that first sale for RuleGATE was in

3  development, isn't it true that you, sir, visited the Cisco

4  website to look at what Cisco was doing in the security

5  space?

6  A.  I honestly don't recall, but it's not impossible.

7  Q.  So you agree that you probably visited the Cisco website

8  during this time?

9  A.  Probably.

10  Q.  And, Mr. Rogers, I assume you have no reservation about

11  going to Cisco's public website, correct?

12  A.  It's public information, so...

13  Q.  Right.  You wouldn't expect a company, Cisco or any

14  company, to put confidential information on their public

15  website, true?

16  A.  That's correct.

17  Q.  And Centripetal doesn't put confidential information on

18  its website, correct?

19  A.  That's correct.

20  Q.  And during RuleGATE's development during this 2009 to

21  2014 period, you did not regard Cisco as a competitor, true?

22  A.  Say that again.  Ask that question again.

23  Q.  At the time that RuleGATE was under development leading

24  up to 2014, you did not regard Cisco as a competitor,

25  correct?

———Rogers, S. - Cross———

1    A.  That's correct.

2    Q.  And that's because Cisco was not in Centripetal's area of

3    expertise, correct?

4    A.  Well, I don't know what Cisco was doing.  Were they in --

5    I mean, that's a very vague question.

6    Q.  Do you remember testifying in your deposition that you

7    did not think Cisco was a competitor because they didn't

8    share your company's area of expertise?

9    A.  I could have said that, yes.

10            THE COURT:  Let's always use the question and answer

11   and not -- but he's already answered the question, so we'll

12   move on.

13            MR. MacBRIDE:  Very good, Your Honor.  We'll switch

14   gears again.

15   BY MR. MacBRIDE:

16   Q.  Mr. Rogers, you've heard of a company called Threat Grid,

17   correct?

18   A.  Yes.

19   Q.  And Centripetal purchased a subscription to Threat Grid's

20   threat intelligence information, correct?

21   A.  No, I don't think that's correct.

22   Q.  You don't remember testifying that you purchased their

23   feed?

24   A.  I think, as it turns out, I didn't -- we didn't purchase

25   their feed.  So I might have thought that we did, but we

—————Rogers, S. - Cross—————

1    didn't.

2    Q.  Do you remember testifying in your deposition under oath

3    that you --

4              THE COURT:  We're not going to do it that way,

5    Mr. MacBride.  You're going to have to read the question and

6    the answer.  I tried to get that message over a minute ago.

7              MR. MacBRIDE:  Thank you, Your Honor.

8    BY MR. MacBRIDE:

9    Q.  Mr. Rogers, if we could go back to Page 114 of your

10   deposition, and we're at line 14 to 21.

11             Mr. Rogers, I'm going to read this into the record:

12             "QUESTION:  What was the nature of the relationship

13   between Threat Grid and Centripetal?"

14             Mr. Andre objects.

15             "ANSWER:  What was the nature?

16             "QUESTION:  What was the nature of the relationship?

17             "ANSWER:  We purchased their feed.  We utilized

18   their feed.  It's a subscription of some kind."

19             Did you give that answer, sir?

20   A.  Yes, I did.

21   Q.  And so as part of this subscription, your company would

22   have sent -- excuse me.

23             As part of this subscription, Threat Grid would have

24   sent its threat intelligence to Centripetal, correct?

25   A.  So let me explain my previous comment.

—Rogers, S. - Cross—

1              So I thought we had purchased it -- I did not handle

2     that part of it -- but what happened was we had a partnership

3     with Threat Grid, where they had customers that might like to

4     protect themselves using our system, and we would use their

5     Threat Grid data feed, and then Threat Grid could gain a

6     customer by selling their Threat Grid data feed directly to

7     that customer.  And I think that happened several times.

8              So that explains what was going on there.  We

9     actually didn't license from Threat Grid.

10    Q.  So were you --

11    A.  That's my explanation.

12    Q.  Excuse me for interrupting.

13             Mr. Rogers, just to make sure I'm clear on your

14    testimony today, are you saying that Threat Grid did not send

15    its threat intelligence to your company?

16    A.  We did receive Threat Grid intelligence at our company,

17    as far as I remember.

18    Q.  But your company didn't, in turn, send any of its

19    confidential information to Threat Grid, correct?

20    A.  No, we did not --

21    Q.  And you're aware that --

22    A.  -- as far as I'm aware.

23    Q.  Excuse me.

24             And you're aware that Threat Grid is now part of

25    Cisco; is that right?

—————Rogers, S. - Cross—————

1    A.   Yes.

2    Q.   Let's talk about another company, Mr. Rogers.  Are you

3    familiar with a company called Sourcefire?

4    A.   Yes.

5    Q.   And Sourcefire existed before Centripetal; is that right?

6    A.   That's correct.

7    Q.   And Sourcefire produced a product called intrusion

8    detection system.  Is that right?

9    A.   That's right.

10   Q.   And Sourcefire's system was widely known in the industry

11   at the time, applying packet filtering rules, going back to

12   the early 2000s; is that right?

13           MR. ANDRE:  Objection, Your Honor; lack of

14   foundation.

15           THE COURT:  Overruled.

16   BY MR. MacBRIDE:

17   Q.   Mr. Rogers, I can ask it again, if you need to be

18   reminded of the question.

19   A.   What was the question, again?

20   Q.   Sure.  Do you agree that the Sourcefire system was widely

21   known in the industry as applying packet filtering rules,

22   going back to the 2000s?

23   A.   No.

24   Q.   Do you agree that Sourcefire's intrusion detection system

25   is what's known as an inline system?

Rogers, S. - Cross

1   A.  I don't know what you mean by that.

2   Q.  Are you familiar with the term "inline," Mr. Rogers?

3   A.  Yes, I am, but I don't know what you mean by that.

4   Q.  Let me try again.

5          Are you aware that Sourcefire's intrusion detection

6   system, also known as IDS -- are you aware that that product

7   of Sourcefire was what is known as an inline system?

8   A.  Explain to me what you mean by "inline."  "Inline" can

9   have many different meanings.  So I can't answer your

10  question until you define your terms.

11  Q.  So you're not familiar with concepts of inline and out of

12  bounds?

13  A.  I think you're not familiar with those terms, so please

14  explain.

15  Q.  I'll move on.

16         Mr. Rogers, do you agree with me that Centripetal

17  did not invent Sourcefire's intrusion detection system?

18  A.  That's correct.

19  Q.  And in 2012, isn't it true that you thought that

20  Sourcefire's intrusion detection system was completely

21  different than Centripetal's products?

22  A.  That, I don't know the answer to.  I think so, yes.

23  Q.  Do you remember saying at your deposition that they were

24  completely different products back in 2012?

25         THE COURT:  Where did he say it?

Carol L. Naughton, Official Court Reporter

—————————Rogers, S. - Cross—————————

1          MR. MacBRIDE:  Your Honor, we can turn to

2    Mr. Rogers's deposition at Page 235, lines 2 through 14.

3    BY MR. MacBRIDE:

4    Q.  And that section is now displayed on the screen,

5    Mr. Rogers.  I'll read this for the record:

6          "QUESTION:" --

7          THE COURT:  What page are we on here?

8          MR. MacBRIDE:  I apologize, Your Honor.  We're at

9    Page 235 of Mr. Rogers' December deposition, Page 235,

10   line 2, toward the top of that page.

11         THE COURT:  Okay.

12   BY MR. MacBRIDE:

13   Q.  Mr. Rogers, "QUESTION:  If I understand your testimony

14   correctly, in 2012 you viewed the Centripetal product to be

15   superior to the Sourcefire intrusion detection system."

16         Mr. Andre objects.

17         "ANSWER:  In 2012 we thought they were completely

18   different products for different purposes.  The only thing

19   that caught my eye was that Sourcefire was saying, oh, we

20   stop 97 percent of attacks, which we did not believe at all.

21   I think that's been proven not to be true.  If it were true,

22   we wouldn't have the cyber security problems we have today."

23         Mr. Rogers, were you asked that question, and did

24   you give that answer?

25   A.  Yes.

───────Rogers, S. - Cross───────

1            MR. ANDRE:  Objection, Your Honor.  The previous

2    question is about the intrusion detection system, and this is

3    about the intrusion prevention system, two completely

4    different technologies.

5            THE WITNESS:  That's true.

6            THE COURT:  Well, I'm lost on that.  I didn't pick

7    up that distinction.

8            MR. ANDRE:  Yes.  Your Honor, Mr. MacBride was

9    talking about Sourcefire's intrusion detection system, and

10   this was a question about Sourcefire's intrusion prevention

11   system, and they are two different technologies.

12           MR. MacBRIDE:  I'm happy to reask the question.

13   BY MR. MacBRIDE:

14   Q.  Mr. Rogers, in 2012 is it true that you thought

15   Sourcefire's intrusion prevention system was completely

16   different than your products?

17   A.  That's a different question than you referred to in the

18   last question.

19           THE COURT:  Well, answer the one on the floor.

20           THE WITNESS:  Yes, sir.  So, please, ask me that

21   question again.

22   BY MR. MacBRIDE:

23   Q.  Certainly.  My question is:  In 2012 isn't it true that

24   you thought that Sourcefire's intrusion prevention system was

25   completely different than Centripetal's products and served

—————Rogers, S. - Cross—————

1    completely different purposes?

2    A.  Yes.

3    Q.  Mr. Rogers, a couple questions about Centripetal's

4    investors.  You spoke about this with Mr. Andre.

5           You're familiar with a financial institution called

6    Oppenheimer, correct?

7    A.  Yes.

8    Q.  And your company retained Oppenheimer in 2015 or '16,

9    correct?

10   A.  I believe so.

11   Q.  And you asked Oppenheimer to find sources of capital for

12   your company, true?

13   A.  Yes.

14   Q.  Oppenheimer then reached out to about 148 companies on

15   your behalf to seek capital; is that right?

16   A.  No, I don't think so.

17   Q.  Well, you're aware that Cisco was one of the companies,

18   one of the many companies, that Oppenheimer reached out to on

19   your behalf, correct?

20   A.  No, you say "many."  I didn't say "many."

21   Q.  Are you aware that Oppenheimer reached out to a number of

22   companies?

23   A.  Yes, it was more than one.

24   Q.  Was it more than ten?

25   A.  I don't know.  I'm not sure.

—————————————Rogers, S. - Cross—————————————

1    Q.   Could have been more than ten, true?

2    A.   It could have been, of course.

3    Q.   And are you aware that in response to Oppenheimer's

4    outreach to Cisco for funding, Cisco declined to provide any

5    funding to your company?

6    A.   Yes.

7    Q.   And do you agree that of all the companies that

8    Oppenheimer reached out to, only one made an offer to your

9    company?

10   A.   I believe that's correct.

11   Q.   And that company --

12   A.   I didn't manage that, so you should ask Jonathan that

13   question.  He was dealing with the day-to-day on that.

14   Q.   Do you recall that the one company was named Fortress?

15   A.   I remember Fortress, yes.

16   Q.   And you agree that the offer from the -- the sole offer

17   from Fortress was for debt funding; is that right?

18   A.   The details of it are complex, so you should ask

19   Jonathan.  I think there were elements of debt, but there

20   might have been some other elements of equity, as well, so

21   you should ask him.

22   Q.   You agree, Mr. Rogers, that Fortress ultimately did not

23   end up funding Centripetal, right?

24   A.   No, we did receive a term sheet from them, but we did

25   not -- we decided to go in a different direction.

—Rogers, S. - Cross—

1   Q.  You didn't close, right?

2   A.  We did not close, no.  We didn't -- we decided we didn't

3   want to close.

4   Q.  Now, Mr. Rogers, on direct exam Mr. Andre asked you about

5   Plaintiff's Exhibit -- excuse me.  I'll get to that in a

6   minute.

7         You testified to Mr. Andre a few minutes ago that

8   you participated in this February 16 Webex meeting between

9   Centripetal and Cisco.  Do you remember that testimony?

10  A.  What testimony was that?

11  Q.  Do you remember the questions Mr. Andre asked you about a

12  February '16 -- February 2016 meeting between Centripetal and

13  Cisco, a Webex meeting?

14  A.  I remember he asked about it, yes.

15  Q.  And do you remember you told him that you were certain

16  that Centripetal talked about its patents at that meeting?

17  A.  Yes.

18  Q.  I think your words were, "Of course we did."

19  A.  Yes.

20  Q.  Mr. Rogers, if we could turn to your deposition, to

21  Page 178, lines 6 through 21 -- Page 178 of your December

22  deposition, lines 6 through 21.

23        I'll read this exchange for the record.

24        THE COURT:  I can read it.

25        THE WITNESS:  Okay.

Carol L. Naughton, Official Court Reporter

─────Rogers, S. - Cross─────

1              (There was a pause in the proceedings.)

2              THE COURT:  Okay.

3              MR. MacBRIDE:  Your Honor, may I confirm with the

4    witness that he was asked these questions, or I can move on?

5              THE COURT:  No, I mean, you can ask him if you asked

6    him those questions and he gave you those answers, if you

7    wish.

8    BY MR. MacBRIDE:

9    Q.  Were you asked these questions, and did you give these

10   answers?

11   A.  Yes.

12   Q.  Mr. Rogers, you also testified on direct about a

13   presentation that was used at that meeting.  It's Plaintiff's

14   Exhibit 547.  It's been introduced into evidence.

15             And Mr. Andre asked you some questions about this

16   presentation.  I believe he asked you about Page 6 and

17   Page 7, and you provided some testimony about what was

18   discussed.

19             Isn't it true, sir, that you're not positive whether

20   this document was even used in that Cisco presentation?

21   A.  What do you mean I'm not positive?  It looks like it.  I

22   don't have a perfect memory, but to the best of my knowledge,

23   it is the document.

24   Q.  Well, let's -- I just want to understand.  Are you

25   positive, or are you not sure?

```
                        ─Rogers, S. - Redirect─
```

1   A.  To the limits of my memory, I'm positive.

2   Q.  Do you remember testifying differently before?

3   A.  No.

4   Q.  If we could go to Page 176 of your deposition, at

5   lines 16 to 23.

6           MR. MacBRIDE:  Your Honor, I can read it, or I'm not

7   sure if the Court is just reading it to yourself.  I'm happy

8   to proceed however you would like.

9           THE COURT:  All right.  Did you give those answers

10  to the questions?

11          THE WITNESS:  Are you asking me?

12          THE COURT:  Yes.

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.

15          MR. MacBRIDE:  Mr. Rogers, thank you very much for

16  your time.

17          Nothing further, Your Honor.

18          THE COURT:  Any redirect?

19          MR. ANDRE:  Just one question.  This is Paul Andre.

20                      REDIRECT EXAMINATION

21  BY MR. ANDRE:

22  Q.  Mr. Rogers, could you explain to the Court the concept

23  you were talking about earlier regarding the speed that the

24  RuleGATE, or your product, handles and how that relates to

25  the patents, the Centripetal patents, that are in this case?

---
Rogers, S. - Redirect
---

1  A.  Sure.  So the ability to be able to filter at high speed

2  is not the only thing.  There are other capabilities that are

3  required.  We have to be able to correlate so that we can

4  identify who inside the network is talking to the remote bad

5  guy.

6        Because if you don't know that, then the defending

7  team can't do anything about it.  They don't know what

8  computer is infected.  We have to be able to handle

9  exfiltrations at the same time you have infiltrations.  We

10  have to be able to swap the policies rapidly with new updates

11  to the threat intelligence, all these things.

12        And so these things, while they're not specific to

13  the filtering capability, they all have to run at speed.

14  That's why I said that they would all have to be fast to be

15  able to be effective as the filtering is effective.

16        Does that answer your question?

17  Q.  It does.  Thank you.

18        MR. ANDRE:  I have no further questions, Your Honor.

19        THE COURT:  All right.  I think there's something in

20  the rules that counsel agreed upon -- there was some

21  discussion about recalling witnesses.

22        Is there any reason why either side would want to

23  recall Mr. Rogers?

24        MR. ANDRE:  Your Honor, Centripetal does not intend

25  to call Mr. Rogers and will excuse him at this time.

––––––Rogers, S. - Redirect––––––

1      THE COURT:  How about the defendant?

2      MR. MacBRIDE:  No, Your Honor, no further need for

3  Mr. Rogers' time.  Thank you.

4      THE COURT:  All right.  Mr. Rogers, you are excused

5  as a witness.  Of course, I'm not sure if you were designated

6  the corporate representative or if your son was, but...

7      THE WITNESS:  Your Honor, it was my son who was

8  designated.

9      THE COURT:  Well, if you're not going to be recalled

10  as a witness, then it would be just like if we were all in

11  the courtroom.  You can observe the proceedings by video, if

12  you choose to do so, but you cannot discuss your testimony

13  with other witnesses.

14      Do you understand what I mean by that?

15      THE WITNESS:  Yes, sir.

16      THE COURT:  Okay.

17      (Witness excused.)

18      THE COURT:  Mr. Andre, have you got your next

19  witness?

20      MR. ANDRE:  I do, Your Honor.  We have Dr. Sean

21  Moore, the Chief Technology Officer of Centripetal.  I don't

22  know if he's in the waiting room or not.  Hopefully, he is.

23  Actually, he may be with -- hang on a second.  They're

24  putting him on right now.

25      THE COURT:  Okay.  His name shows up as Jonathan

Moore, S. - Direct

1   Rogers on the display, but it's --

2           MR. ANDRE:  There it is.  They changed the name.

3           THE COURT:  All right.  I have it.

4           THE CLERK:  Dr. Moore, raise your right hand,

5   please.

6           (Witness sworn.)

7           MR. GAUDET:  Your Honor, before we begin with the

8   examination -- this is Matt Gaudet, on behalf of Cisco.  I

9   will be doing the cross-examination of Dr. Moore, just so you

10  know we've changed on the Cisco side.

11          THE COURT:  All right.

12          MR. ANDRE:  May I proceed, Your Honor?

13          THE COURT:  You may.

14          MR. ANDRE:  Thank you.

15          SEAN MOORE, Ph.D., called by the Plaintiff, having

16  been first duly sworn, was examined and testified as follows:

17                      DIRECT EXAMINATION

18  BY MR. ANDRE:

19  Q.  Good afternoon, Dr. Moore.

20  A.  Good afternoon.

21  Q.  Where do you currently work?

22  A.  I work at Centripetal Networks.

23  Q.  And what is your position at Centripetal?

24  A.  I'm the Chief Technology Officer, and I'm also the Vice

25  President of Research.

Moore, S. - Direct

1  Q.  What is your responsibility as the Chief Technology

2  Officer and the Vice President of Research?

3  A.  Well, generally, it's to create, research, and develop

4  new technologies for protecting networks against cyber

5  attacks.

6  Q.  Before we start talking about Centripetal, let's get into

7  your background a little bit.

8        Could you describe for the Court your education?

9  A.  Sure.  As shown on the slide here, in 1983, I received a

10 Bachelor's degree in electrical engineering from Tulane

11 University.

12       In 1990, I received a Master's degree in mathematics

13 from the University of New Orleans.

14       And in 1993 and '94, I received a Master's and Ph.D.

15 degree in computer science from Dartmouth College.

16 Q.  And your jobs are listed below that.  Can you tell us

17 what you did for BBN Technologies, and what kind of company

18 is that?

19 A.  Sure.  So BBN Technologies is a -- I describe them as an

20 R&D research services contractor for the government and for

21 the Department of Defense.

22       Just to make something concrete about that, so BBN,

23 in conjunction with DARPA, actually invented the Internet and

24 the base TCP/IP protocols back in the late '60s and early

25 '70s.

Moore, S. - Direct

1   Q.  And what was your job title there?  What kind of work did

2   you do for them?

3   A.  So I was the lead scientist.  I was also the Director of

4   the Advanced Systems Department, and I was also a business

5   development director for the entire company.

6          THE COURT:  Did you say -- what did you say BBN

7   invented?

8          THE WITNESS:  BBN invented the Internet, in

9   conjunction with DARPA, which is the Department of Defense

10  Advanced Research Projects Agency.  Now, that happened before

11  I showed up there.  That was in the late 1960s and early

12  1970s.

13         THE COURT:  Well, there appear to have been

14  competing claims as to who invented the Internet, but you

15  believe that BBN did.

16         MR. ANDRE:  Did Vice President Gore work at BBN?

17         MR. GAUDET:  I was going to object that he was

18  impersonating the Vice President.

19         THE WITNESS:  Okay.  I want to be clear.  Although I

20  worked at BBN Technologies, I did not invent the Internet.

21         THE COURT:  All right.

22         THE WITNESS:  I'm just trying to characterize the

23  type of work that they did and the type of environment that

24  was BBN.  It was very creative, especially in the area of

25  network technologies.

Moore, S. - Direct

1          THE COURT:  All right.  You may proceed.

2          MR. ANDRE:  Thank you, Your Honor.

3    BY MR. ANDRE:

4    Q.  When you left BBN Technologies, what is Cetacean, and

5    what did you do there?

6    A.  Cetacean Networks was a start-up company that was

7    developing internet routers that were designed to optimally

8    transport voice over IP, or telephone calls, and video

9    conferences over the Internet.  And that was around the 2000

10   time frame, so that was quite disruptive, advanced technology

11   for the time, and I was the chief scientist at Cetacean

12   Networks.

13   Q.  We noticed Mr. Steven Rogers, who was testifying before

14   you, had Cetacean on his background, as well.

15          Did you guys work together?

16   A.  Yes.  So Steven was the CEO and founder of Cetacean.  He

17   hired me in 2001.

18          Yeah, we did work together.  We were a great team.

19   You know, Steven has great visionary ideas, and, you know, I

20   like to think that I have the ability to design -- do the

21   math and the computer science and the algorithms to carry out

22   those ideas.

23   Q.  After Cetacean, I see you went to Avaya.  How did you get

24   to Avaya?

25   A.  So Avaya acquired Cetacean Networks.  Avaya is -- or at

Moore, S. - Direct

1   the time was the world's leading enterprise
2   telecommunications manufacturer, and I was brought in as the
3   chief architect and chief scientist.
4   Q.  After that, you went to Centripetal Networks?
5   A.  Yes.
6   Q.  And let's talk about Centripetal.  How long have you been
7   working at Centripetal?
8   A.  I started there in April 2010, so just over ten years.
9   Q.  And how many employees did Centripetal have when you
10  started?
11  A.  I was the third employee.  Steven Rogers, the founder and
12  CEO, was there, as well as Neel Price, the Vice President of
13  Sales.
14  Q.  And what made you want to join Centripetal?
15  A.  Well, there are several factors.  So I had been at Avaya
16  for several years and -- how would I put it?
17         I really just felt like I needed to take my shot at
18  changing the world, and that wasn't going to happen at Avaya.
19  I knew Steven.  You know, I worked with Steven ten years
20  before, and I knew Steven had a new company going, wanted to
21  do some exciting stuff.
22         So I contacted Steven.  We stayed in touch over the
23  years, but I contacted him.  We talked about what he wanted
24  to do.  He wanted to solve the Internet cyber security
25  problem once and for all, and that was something I wanted to

——————Moore, S. - Direct——————

1    do, too.  And I knew, you know, if anybody, Steven and I

2    could pull this off, so I decided to leave Avaya and join up

3    with Centripetal.

4    Q.  What was the vision of the company at the time you joined

5    Centripetal?

6    A.  Well, the vision was big.  As I just said a moment ago,

7    we wanted to take our shot at solving the Internet cyber

8    security problems once and for all.

9    Q.  Let me show you what's been marked as PTX-1219.

10   A.  Okay.

11   Q.  And you may not be able to see here, but if you go to the

12   second page, could you describe what this document is?

13   A.  Well, this appears to be one of the web pages on our --

14   on the Centripetal website.  I don't know if it's current,

15   but it's, you know, the "About Centripetal" page.

16          MR. ANDRE:  Your Honor, we'd like to move

17   Exhibit PTX-1219 into evidence.

18          MR. GAUDET:  No objection.

19          THE COURT:  That exhibit will be admitted.

20          (Plaintiff's Exhibit PTX-1219 received in evidence.)

21   BY MR. ANDRE:

22   Q.  If you go to the second page of this document, in the

23   first full paragraph -- can we pull that up?  The page before

24   that.  I'm sorry.  There you go.  It says, "The problem we

25   solve."

————Moore, S. - Direct————

1         There's a sentence that states, "By distributing and
2    applying cyber threat intelligence, it should be possible to
3    actively prevent most cyber attacks."  Do you see that?
4    A.  Yes, I do.
5    Q.  What do you mean by that?
6    A.  Well, so I said earlier, and I think it says in the first
7    sentence on the page, cyber security -- we wanted to solve
8    the Internet cyber security problem once and for all.  We
9    knew we needed to use a completely different approach than
10   what had been done before, and we were aware that there was
11   what is called cyber threat intelligence.  And what that is
12   is it's intelligence, data reports, about cyber criminals on
13   the Internet and which computers do they control, who are the
14   cyber criminals, and what types of attacks are they launching
15   from the computers that they control.
16        So that's what cyber intelligence is.  Our idea was,
17   well, why don't we take the cyber threat intelligence, which
18   is interesting by itself, but let's somehow transform this so
19   that we can apply it to live internet traffic and see if we
20   can secure the Internet this way, by essentially shutting
21   down the cyber criminal communications and their attacks.
22        THE COURT:  We don't know -- I don't see any date on
23   this document.  It's from the plaintiff's website.  I don't
24   know if there's any way we can determine the date.  I don't
25   see a date on the document.

Moore, S. - Direct

 1            MR. ANDRE:  Your Honor, at the very last page -- or,
 2    I guess, the third page there's a 2017 date.
 3            But is there another date on this?
 4            (There was a pause in the proceedings.)
 5            MR. ANDRE:  There appears to be a 2018 date on it.
 6            THE COURT:  Where is that?
 7            MR. ANDRE:  Is it the last page?
 8            Yeah, there's a copyright on the very last page,
 9    Your Honor, 2018.
10            THE COURT:  Oh, okay.  2018.  All right.
11            You may continue.
12            MR. ANDRE:  Thank you, Your Honor.
13    BY MR. ANDRE:
14    Q.  So have you ever heard of the term "operationalizing
15    cyber threat intelligence"?
16    A.  Yes.
17    Q.  What does that mean?
18    A.  Well, first, let me say I believe we coined the term
19    "operationalized threat intelligence," and we invented
20    operational cyber threat intelligence technology, and I'll
21    probably refer to it as operationalized CTI, just because the
22    whole sentence is a mouthful.
23            So what is operationalized CTI?  As I said earlier,
24    we were discussing cyber threat intelligence, and we'd get --
25    we'll get cyber threat intelligence from CTI providers, and

————Moore, S. - Direct————

1    we call this raw cyber threat intelligence.  And, as I said

2    earlier, you know, by itself, this raw CTI is good stuff; it

3    tells us about cyber criminals, what they're doing, where

4    they are.  Great, but we can't take it in that raw form and

5    apply it to live internet traffic to defend networks.

6          So what we do is we go through this transformation

7    process where we take the raw cyber threat intelligence, and

8    we call it operationalizing cyber threat intelligence.  We're

9    transforming it into computer logic and algorithms that we

10   can then apply directly to the live internet traffic to stop

11   cyber attacks as they're occurring or before they even occur,

12   before they cause any damage.

13   Q.  If we go to the next paragraph in PTX-1219, Pages 2 and

14   3, could you describe what you're discussing in that

15   paragraph?

16   A.  Okay.  So, yeah, as I described it, it seems

17   straightforward, you know, to take cyber threat intelligence,

18   operationalize it, and, therefore, stop cyber attacks.  But

19   that step of transforming the raw CTI to operationalized CTI

20   is very difficult.  We had to develop new mathematics, new

21   computer science, new algorithms, and develop new

22   technologies that could apply this operationalized CTI to

23   live internet traffic.  This is a very difficult thing to do,

24   but we did it.

25   Q.  Did it take you a long time?

——Moore, S. - Direct——

1    A.  Well, yes, and I like to say we're still doing it.  And,

2    you know, that has to do with how we're continually evolving,

3    improving our products, and that's in response to -- you

4    know, there's -- cyber attacks are always evolving and

5    changing themselves, and they're growing rapidly, as is the

6    associated cyber threat intelligence.  It's also evolving

7    right along with it.

8              Our internet infrastructure changes, so, you know,

9    in 2010, Internet -- you know, let's just say 1- to

10   10-gigabits-per-second links were just coming into play, and

11   now it's 100-gigabits-per-second links.  So things are

12   faster.  We've got Clouds now, we've got other infrastructure

13   changes, and we have to adapt our technology.

14             And I'll also say, you know, another major component

15   of why we need to continually create new technologies is

16   encryption.  You know, back in 2010, when we started the

17   company, you know, encryption was in use, but it was

18   generally in use for legitimate traffic for financial

19   transactions.

20             And then about that time frame, you know, cyber

21   criminals started using encrypted traffic.  And then by, I'd

22   say, the 2015-2016 time frame, there was a big push to just

23   encrypt everything on the Internet.  And that's pretty much

24   where we are today, but we have to continually evolve our

25   products, our operationalized CTI technologies, to adapt to

Moore, S. - Direct

1  encryption.

2  Q.  Go to the next paragraph of this document, PTX-1219.  You

3  talk about how Centripetal intended to solve the problem that

4  you were just discussing.  Can you describe how, one,

5  RuleGATE was revolutionary new technology?

6  A.  Sure.  So RuleGATE is our platform upon which, you know,

7  we build all our operationalized CTI technologies.  It's

8  revolutionary, if for any reason -- you know, operationalized

9  CTI technologies did not exist before we invented them.

10 Nobody could take raw cyber threat intelligence and apply it

11 to live Internet traffic to stop cyber attacks.

12       So the RuleGATE network appliance is the platform

13 upon which we build and deploy these operationalized CTI

14 technologies.

15 Q.  Let me show you another document we've marked as PTX-957.

16       Dr. Moore, could you tell us what this document is?

17 A.  This is a white paper that I wrote in the 2013 time

18 frame, I believe, on threat surface reduction.

19 Q.  And what is a white paper?

20 A.  Well, generally, in the technology industry, you'll write

21 white papers to communicate new technology concepts and their

22 benefits, but you'll do it in a way that you're not using,

23 like mathematics or, you know, implementation details of the

24 technology.  It's like a technology marketing document.

25 Q.  And on the cover, at the bottom, there's a date of

———Moore, S. - Direct———

1   April 30, 2015.  Is that when you updated or published on the

2   website?

3   A.  I don't really know what that date refers to.

4   Q.  Okay.  Fair enough.

5          I want to turn your attention to a figure in this

6   white paper, figure 3 -- figure 1, on Page 3.

7          Could you describe for the Court what these round

8   discs with red and black lines are and how that relates to

9   reducing the threat -- the surface reduction?

10  A.  Okay.  Sure.  So, again, the white paper is kind of a

11  threat surface reduction, and this white paper was written to

12  say, well, you know, we know we need something new to solve

13  the Internet cyber security problem.  We have a -- we've

14  invented a new defense methodology that we call threat

15  surface reduction.  So these discs are a way of visualizing

16  what that is, so let me try to describe it briefly.

17         So each of these discs -- the center of the disc

18  represents your computers, your networks, that you want to

19  protect from cyber criminals, cyber threats.  Now, the

20  perimeter of these discs represent all the Internet computers

21  that are out there.  There's billions of computers, desktops,

22  mobile phones, et cetera.  And the radius of these discs

23  represent communications between all the Internet computers

24  and your computer, your network, at the center of the disc.

25         So what the disc on the left represents is what we

─────Moore, S. - Direct─────

 1   call the threat surface.  Cyber criminal computers that can

 2   communicate with your computer at the center, that

 3   communication is represented by red lines.  These are bad.

 4   Cyber criminal, red, bad.  They're attacking or they can

 5   attack your computer.  The white lines represent -- well,

 6   these are legitimate computers that can communicate with

 7   yours.

 8           And so it's the idea of -- you know, so the disc on

 9   the left, the red lines, red you think of this is your threat

10   surface, and what we want to do as a defense methodology is,

11   well, let's eliminate those red lines.  Let's, you know,

12   block communications between cyber criminal computers and our

13   computer networks at the middle of the disc.

14           So as we transition from left to right, let's say

15   here, we're reducing the threat surface.  We're turning those

16   red lines into black, and once we have all the red lines

17   turned to black, we totally reduce the threat surface of the

18   Internet, and we are protected from cyber criminals, because

19   they can't communicate -- their computers can't communicate

20   with ours.

21   Q.  Thank you.

22           MR. ANDRE:  And, Your Honor, I'd like to move this

23   document, PTX-957, into evidence.

24           MR. GAUDET:  All right.  Your Honor, we do have an

25   objection.  It's a foundation objection that I suspect

—————Moore, S. - Direct—————

1    Mr. Andre will be able to clear up.

2          It's that the witness testified that he thought he

3    wrote this in 2013, or wrote a document in 2013, and this

4    document indicates it was written on April 30, 2015, on the

5    bottom right of the first page.  And so perhaps if Mr. Andre

6    just clarifies that, we would withdraw the objection.

7          THE COURT:  Well, the witness said he didn't know

8    what that date meant.  As long as that date is subsequent to

9    the date that he said he prepared it, I don't see that

10   there's a problem.  So I think the foundation is properly

11   laid.

12         But I do have a question, and that is in the

13   diagram, you show all of these entrances from the outside to

14   the computer to be blocked.  I suppose -- well, I don't mean

15   to say, "be blocked."  They have security applied to them.

16   So that's what it means.  It doesn't mean that you're

17   blocking all of these pathways, it means that you're applying

18   your RuleGATE security to all of these lines, radius lines,

19   inside the circle.  Is that right?

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.

22         (Plaintiff's Exhibit PTX-957 received in evidence.)

23   BY MR. ANDRE:

24   Q.  Thank you, Dr. Moore.

25         Now, you're an inventor on all the patents in this

Moore, S. - Direct

1   case, correct?

2   A.   Yes.

3   Q.   Are patents important to Centripetal?

4   A.   Yes, they're very important.

5   Q.   And why is that?

6   A.   Well, you know, we've made tremendous investments --

7   time, energy, money, promotional investments -- in this

8   technology, and we want to protect ourselves from somebody

9   else copying or stealing the technologies.

10  Q.   What's the process that you use at Centripetal to come up

11  with these inventions and then go through the patent process?

12  A.   Sure.  Well, you know, this was this idea of

13  operationalizing cyber threat intelligence.  It was a new

14  idea, and so there's always new cyber attacks, new things we

15  need to defend against, and so we're always coming up with

16  new ideas and coming up with, you know, ideas about, well,

17  how are we going to develop technologies that will do this?

18  And once we figure that out, the ideas and how we might

19  realize them, then we file for patents.

20          And then subsequent to that, we develop the

21  technologies and get them into our products.

22  Q.   What were the kinds of problems that you were trying to

23  solve with the technology described in these patents?

24  A.   You know, I'll just say generally it's, how do we, you

25  know, operationalize cyber threat intelligence to stop cyber

Moore, S. - Direct

1   attacks, in all their many forms, that are continually

2   evolving all the time?

3   Q.  And the technology you describe in your patents, do you

4   put those into the Centripetal products?

5   A.  Yes.

6   Q.  Let me show you what's been marked as JTX-1, the '205

7   patent.

8           MR. ANDRE:  And, Your Honor, I would like to move

9   JTX-1 into evidence.

10          MR. GAUDET:  No objection.

11          THE COURT:  I'm sorry.  What are you asking to

12  introduce?

13          MR. ANDRE:  This is Joint Trial Exhibit Number 1,

14  the '205 patent.  I'd like to move it into evidence.

15          MR. GAUDET:  No objection, Your Honor.

16          THE COURT:  All right.

17          (Joint Trial Exhibit JTX-1 received in evidence.)

18          THE COURT:  I have a question for Dr. Moore.  The

19  purpose, I think I understood you to say, for all of these

20  patents, is to operationalize, which I assume you mean make a

21  functioning part of your product --

22          THE WITNESS:  Yes.

23          THE COURT:  -- threat intelligence that you acquire.

24          THE WITNESS:  Yes.

25          THE COURT:  Does that mean that you acquire this

─────────Moore, S. - Direct─────────

1    threat intelligence from sources other than your own systems?

2            THE WITNESS:  Yes, it does.  So --

3            THE COURT:  Well, where do you get this threat

4    intelligence from?

5            THE WITNESS:  Yes, Your Honor.  So there's actually

6    a thriving ecosystem of companies that are generally called

7    CTI providers, cyber threat intelligence providers.  These

8    are independent organizations that go out, watch what's going

9    on on the Internet, watch what the cyber criminals are doing,

10   and they create this cyber threat intelligence, they support;

11   you know, who are the cyber criminals, what computers do they

12   control, and what types of attacks are they doing?  And they

13   publish this information by subscription.

14           So our organization, our products, we subscribe to

15   the CTI from many of the CTI providers.  I think we have

16   business relationships with on the order of a hundred of

17   these CTI providers.  And they all provide different types of

18   cyber threat intelligence, and so we get all of our cyber

19   threat intelligence from these, you know, approximately

20   hundred CTI provider organizations.

21           THE COURT:  Are they international in scope?

22           THE WITNESS:  Yes.

23           THE COURT:  Uh-huh.  All right.  You may proceed,

24   Mr. Andre.

25           MR. ANDRE:  Thank you, Your Honor.

―Moore, S. - Direct―

1   BY MR. ANDRE:

2   Q.  Dr. Moore, we're looking at the front page of the '205

3   patent, and, first of all, are you an inventor of this

4   patent?

5   A.  Yes.

6   Q.  Now, if I were to tell you -- ask you questions about

7   interpreting the claims of these patents and giving me a

8   legal interpretation, could you do so?

9   A.  I cannot.  I'm not a patent lawyer.  I'm not qualified to

10  do that.

11  Q.  If I asked you about the technology, about these patents,

12  could you give me that answer?

13  A.  Yes.

14  Q.  All right.  Let's talk about the technology, then, of the

15  '205 patent.

16          What problems were you trying to solve with the '205

17  patent?  And just describe generally what the patent is

18  about, from a technology point of view.

19  A.  Sure.  I characterize this as our network protection

20  system technology that enforces these operationalized CTI

21  policies on wide network traffic.

22          So it enforces CTI policies.  These are dynamic

23  security policies applied to live network traffic to stop

24  cyber attacks.

25  Q.  And I'm going to show you a document we marked as

Moore, S. - Direct

1   PTX-1112 and ask you have you seen this document?

2   A.  Yes, I have.

3   Q.  And what is this document?

4          THE COURT:  Where?

5          MR. ANDRE:  I'm sorry.  This is PTX-1112, Your

6   Honor.  1112.

7          THE COURT:  Okay, PTX-1112.  Okay.

8          You may proceed.

9          MR. ANDRE:  Thank you.

10  BY MR. ANDRE:

11  Q.  Dr. Moore, what is this document?

12  A.  Well, this document -- first, let me say this document

13  was given to me by Steven Rogers shortly after I joined the

14  company in April 2010, and what this is is a program

15  description published by the Office of Naval Research,

16  announcing that they've got a program scoped out for doing

17  research, funded research, into solving the computer network

18  defense problem.

19          MR. ANDRE:  Your Honor, I would like to move

20  PTX-1112 into evidence.

21          MR. GAUDET:  No objection.

22          THE COURT:  That exhibit will be admitted.

23          (Plaintiff's Exhibit PTX-1112 received in evidence.)

24  BY MR. ANDRE:

25  Q.  If we go down to Section 6 of the document on the first

———Moore, S. - Direct———

1   page, entitled "Research Opportunity Description," could you

2   describe what the Office of Naval Research was looking for?

3   A.   Yes.   So call it the -- the title of the whole program is

4   called "Computer Network Defense," and what the Office of

5   Naval Research -- I'll refer to it as ONR -- says in the

6   first sentence, they're looking for innovative research

7   proposals for new technologies that support proactive cyber

8   network defense.

9        So, you know, they're saying -- well, I think in

10  later sections they talk about what problem they really need

11  to solve, but they need to protect the Department of the Navy

12  networks, and they're looking for people to research new

13  technologies to do that.

14  Q.   And how did this document influence your motivation to

15  come up with the technology that was in the '205 patent?

16  A.   Well, what got our attention right away was the wording

17  in that first sentence that says, "We need proactive cyber

18  network defense."

19       Now at this point we already thought of the idea of

20  operationalizing cyber threat intelligence, and one reason we

21  loved that idea was we felt it was the first way ever that

22  could be used to proactively defend networks.   So when Steven

23  saw this program announcement and gave it to me, we keyed in

24  on the wording -- "Oh, they're looking for proactive cyber

25  network defense solutions.   We think we know how to do that."

321

Moore, S. - Direct

1  Q.  And what's the difference between proactive defense and

2  reactive defense?

3  A.  Okay.  So reactive defense -- well, let me start with

4  saying what's proactive defense.

5       Well, the basic idea of proactive defense is we need

6  to be able to stop cyber attacks before they even occur,

7  before they can cause any damage, which may sound like, how

8  is that possible?  Well, it is possible if you operationalize

9  cyber threat intelligence.

10       Now, that's opposed to at the time the existing

11  state-of-the-art were what were called reactive defenses,

12  which is really not a defense at all.  It's after-the-fact

13  forensics on looking at historical data, trying to figure out

14  if you were even attacked, and if you do look at historical

15  data and say, oh, we think we got attacked at a certain time

16  in the past, you react to that by coming up with possible

17  defense measures in the future.

18       But it's reactive.  It doesn't stop the attacks at

19  all before they occur.  The damage has already happened, and

20  you're just reacting to an attack that already occurred in

21  order to defend.  What you want, of course, is proactive,

22  which stops these attacks before they even occur, before they

23  cause any damage, and that's what the ONR is looking for.

24  Q.  Go down to the next section, 6.1.  It talks about the

25  background of this program.

Moore, S. - Direct

1          And could you describe what the ONR, the Office of

2     the Naval Research, was talking about with respect to the

3     background upon which this program was based?

4     A.   Sure.  So, in a nutshell, what they're saying here is

5     that cyber attacks are growing explosively.  They have

6     advanced technology capabilities now, and we need to be able

7     to stop these attacks or mitigate them in real time, while

8     still being able to operate our networks effectively.

9          And they're also saying that, unfortunately, current

10    conventional network defense tools -- they're reactive, not

11    proactive, and these just aren't going to work.  So we're not

12    going to invest more money in reactive solutions that don't

13    work.  We're going to invest money, research, into proactive

14    solutions.

15    Q.   Let's go back to the first page of this document, and

16    under the response date -- was this the state-of-the-art at

17    about 2010, in the time frame of this paper or this proposal?

18    A.   Yes.

19    Q.   Okay.  If we go back to the second page of the document,

20    the first full paragraph, where it says, "To enable

21    war-fighter posture," do you see that?

22    A.   Yes.

23    Q.   Can you explain what the Office of Naval Research is

24    requesting in this proposal?

25    A.   Yes.  So they're saying, look, we know that we need to

———Moore, S. - Direct———

1   change our posture from these reactive forensic, historical

2   approaches to computer network defense, to completely pivot

3   and go to a proactive approach to cyber defense, which means

4   we need to, you know, stop the cyber attacks before they

5   occur in real time, you know, on live network traffic.

6          I should also add they're not saying they know how

7   this can be done.  They're saying this is what we need.  We

8   don't know how to do it.  We want -- we will pay people to

9   research this problem and develop new technologies that are

10  proactive, that are predictive.

11         MR. ANDRE:  Your Honor, I'm about ready to go to

12  another exhibit.  I know it's 4:00.  Do you want to adjourn

13  until tomorrow morning?

14         THE COURT:  Yes.  I was wondering if this would be a

15  good time.  If you're moving on to another exhibit, I think

16  this would be the right time for us to adjourn.

17         Dr. Moore, when we interrupt a witness's testimony

18  in the middle of it, so to speak, the rule is that you should

19  not consult anything or discuss anything with anyone that

20  would add to the knowledge of your subject matter of your

21  testimony.

22         In other words, you should take tonight off and

23  return to testify tomorrow without adding any new knowledge

24  of what your anticipated testimony is going to be.

25         THE WITNESS:  I understand, Your Honor.

```
 1              THE COURT:  All right.  So we'll be adjourned for
 2   today, and we'll try to resume at 10:00 Eastern Time.  I
 3   don't know where you're testifying from.
 4              Where are you?  Where are you, geographically?
 5              THE WITNESS:  Oh.  I'm in Portsmouth, New Hampshire.
 6              THE COURT:  I was wondering about the background.
 7              MR. GAUDET:  Your Honor, I was wondering why that
 8   boat is stalled.  It's been there the whole time.
 9              THE COURT:  Well, it's a tugboat.  I guess it
10   doesn't have any business today.  It must be on lockdown.
11              THE WITNESS:  The real time is just to my right
12   here.  It looks pretty much like that, except the boats are
13   actually moving.
14              THE COURT:  Okay.  Well, we'll be adjourned until
15   10:00 tomorrow morning --
16              MR. GAUDET:  Thank you, Your Honor.
17              THE COURT:  -- as far as the witness is concerned.
18   I'll ask counsel to stay on just a moment.
19              Is there anything else that we need to take up
20   today, counsel?
21              MR. ANDRE:  Nothing from Centripetal, Your Honor.
22   We're good.  Thank you.
23              MR. GAUDET:  And nothing from Cisco, Your Honor.
24   Thank you.
25              THE COURT:  Have you exchanged information as to who
```

```
 1    tomorrow's witnesses are expected to be?

 2              MR. ANDRE:  Yes, Your Honor.  Tomorrow we will --

 3    after Dr. Moore is off the stand, we have a couple short

 4    deposition clips of Cisco witnesses we're going to play for

 5    Your Honor, and then Dr. Michael Mitzenmacher, one of

 6    Centripetal's infringement experts, will be taking the stand

 7    and talking about three of the patents.

 8              THE COURT:  All right.  Okay.  Anything further from

 9    the defendants?

10              MR. GAUDET:  Nothing from Cisco, Your Honor.  Thank

11    you.

12              THE COURT:  All right.  Well, then, we'll be

13    adjourned until tomorrow morning at 10:00.

14              (The proceedings recessed at 4:03 p.m.)

15                            CERTIFICATION

16

17        I certify that the foregoing is a correct transcript

18    from the record of proceedings in the above-entitled matter.

19

20

21              _____/s/_____

22                       Carol L. Naughton

23                        May 7, 2020

24

25
```