1
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
2                   Norfolk Division

3
- - - - - - - - - - - - - - - - - -
4                                    )
    CENTRIPETAL NETWORKS, INC.,      )
5                                    )
            Plaintiff,               )        CIVIL ACTION NO.
6                                    )            2:18cv94
    v.                               )
7                                    )
    CISCO SYSTEMS, INC.,             )
8                                    )
            Defendant.               )
9  - - - - - - - - - - - - - - - - - -

10

11     TRANSCRIPT OF VIDEOCONFERENCE BENCH TRIAL PROCEEDINGS

12                    Norfolk, Virginia

13                     May 8, 2020

14                      Volume 3
                     Pages 326-421
15

16  BEFORE:  THE HONORABLE HENRY COKE MORGAN, JR.
              United States District Judge
17

18
    APPEARANCES:
19

20          KRAMER LEVIN NAFTALIS & FRANKEL LLP
            By:  Paul J. Andre
21               Lisa Kobialka
                 Counsel for the Plaintiff
22
            DUANE MORRIS LLP
23          By:  Matthew C. Gaudet
                 Christopher J. Tyson
24               Counsel for the Defendant

25


          Carol L. Naughton, Official Court Reporter

```
 1                         I N D E X

 2  PLAINTIFF'S
    WITNESSES                                            PAGE
 3
      SEAN MOORE
 4          Direct Examination By Mr. Andre (Resumed)     331
            Cross-Examination By Mr. Gaudet               350
 5          Redirect Examination By Mr. Andre             394
      RAJAGOPAL VENKATRAMAN
 6          Via Video Deposition Clip                     405
      SARAVANAN RADHAKRISHNAN
 7          Via Video Deposition Clip                     407
      DAVID McGREW
 8          Via Video Deposition Clip                     409
      SUNIL AMIN
 9          Via Video Deposition Clip                     410
      SANDEEP AGRAWAL
10          Via Video Deposition Clip                     419

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter

```
 1                           I N D E X
                            (Continued)
 2
                       E X H I B I T S
 3
     JOINT TRIAL EXHIBITS
 4   NO.                                           PAGE

 5     JTX-2                                        338
       JTX-3                                        340
 6     JTX-4                                        343
       JTX-5                                        347
 7

 8   PLAINTIFF'S TRIAL EXHIBITS
     NO.                                           PAGE
 9
       PTX-1113                                     332
10     PTX-373                                      335
       PTX-1910                                     405
11     PTX-1906                                     407
       PTX-111, Bates 817 and 842                   408
12     PTX-1905                                     409
       PTX-91                                       409
13     PTX-1896                                     410

14
     DEFENDANT'S TRIAL EXHIBITS
15   NO.                                           PAGE

16     DTX-1212                                     366
       DTX-1179                                     393
17     DTX-1181                                     397

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings resumed at 10:09 a.m.)

 2              THE CLERK:  Civil Action Number 2:18cv94, Plaintiff

 3    Centripetal Networks, Inc. vs. Cisco Systems, Inc.

 4              For the plaintiff, Mr. Andre, are you ready to

 5    proceed?

 6              MR. ANDRE:  We are.

 7              THE CLERK:  For defendants, Mr. Jameson, Mr. Carr,

 8    are you ready to proceed?

 9              MR. GAUDET:  This is Matt Gaudet, and Cisco is ready

10    to proceed.

11              THE CLERK:  Sorry about that.

12              THE COURT:  All right.  I understand there's a

13    problem with the witness.  Is there any other witness that

14    you can fill in that time with?

15              MR. ANDRE:  Your Honor, our other expert witness,

16    Dr. Cole, would have been available, but we did not give the

17    disclosure to Cisco, so they have not gotten the direct

18    examination exhibits, and we have not done the proper

19    disclosure, so it puts them at a disadvantage if we did that.

20              So we think the better part of the morning will be

21    taken up with Dr. Moore, and then we've taken some deposition

22    clips that we're going to play for the Court of Cisco's

23    engineers.  We've taken them out of order and put them up

24    front, to use the time instead of using it next week.  So

25    we've done --
```

1          THE COURT:  Well, you were going to use those,
2     anyway, weren't you?
3          MR. ANDRE:  Yes, we were going to use them anyway,
4     but we took them out of order.  We're putting them on today
5     instead of next week, the plaintiff depositions.
6          THE COURT:  How long are they going to take?
7          MR. ANDRE:  About 45, 50 minutes.
8          THE COURT:  Both of them together, you mean?
9          MR. ANDRE:  There are three of them in total, Your
10    Honor.  All three combined, about 45 to 50 minutes.
11         THE COURT:  All right.  Well, let's -- do you have
12    another fact witness or deposition that you can use?  I don't
13    want to waste the time.
14         MR. ANDRE:  Your Honor, we have a total of five
15    depositions that we can play.  We haven't cleared that with
16    Cisco, but we have Mr. Amin and Mr. Agrawal that we can play,
17    as well, and that will take about an hour and 40 minutes, in
18    total.
19         THE COURT:  Well, there's nothing you can do to
20    prepare for a videotaped deposition, so --
21         MR. ANDRE:  Your Honor, we're ready to go.
22         THE COURT:  Well, if we have that much time left,
23    we'll try to fill it in with those other depositions.  But,
24    meanwhile, let's continue with Dr. Moore.
25         MR. ANDRE:  Thank you, Your Honor.

————Moore, S. - Direct————

1           SEAN MOORE, called by the Plaintiff, having been

2     previously duly sworn, was examined and testified further as

3     follows:

4                     DIRECT EXAMINATION (Resumed)

5     BY MR. ANDRE:

6     Q.  Dr. Moore, would you turn your camera on, please?

7     A.  Hello?

8           THE COURT:  Good morning.

9           THE WITNESS:  Good morning.

10          THE COURT:  That tugboat is still in the same place.

11          MR. GAUDET:  It's a hard economy for everyone right

12    now.

13          THE WITNESS:  Actually, there's three tugboats, in

14    reality, out my window right now.

15          THE COURT:  Oh, okay.  Well, let's put them to work.

16          MR. ANDRE:  May I proceed, Your Honor?

17          THE COURT:  You may proceed, Mr. Andre.

18          MR. ANDRE:  Thank you.  May it please the Court.

19    BY MR. ANDRE:

20    Q.  Dr. Moore, when we left off yesterday afternoon, we were

21    discussing PTX-1112, the Office of Naval Research proposal

22    that we went through, to some degree.

23          Can we get that back on the screen, just the cover

24    sheet?

25          Do you recall that?

Moore, S. - Direct

1    A.  Yes.

2    Q.  Now, subsequent to this proposal, do you recall there was

3    an Office of Naval Research Industry Day?

4    A.  I don't know about the timing, necessarily, but normally

5    an Industry Day comes after the program announcement, such as

6    this document here.

7    Q.  Let me show you what's been marked as PTX-1113, 1-1-1-3.

8         Do you recognize this document?

9    A.  Yes.

10   Q.  And what is this document?

11   A.  This document is a slide presentation that was given at

12   the Industry Day about the Computer Network Defense Program

13   by the Office of Naval Research, ONR.

14   Q.  How did you become aware of this document?

15   A.  So it was given to me by Steven Rogers shortly after I

16   joined Centripetal.

17        MR. ANDRE:  Your Honor, I would like to move Exhibit

18   PTX-1113 into evidence.

19        THE COURT:  All right.  PTX-1113 will be admitted.

20        (Plaintiff's Exhibit PTX-1113 was received in

21   evidence.)

22   BY MR. ANDRE:

23   Q.  I want to turn your attention to Page 6 of this document.

24        There's a graph on this, on Page 6.  Could you

25   describe what this is demonstrating?

Moore, S. - Direct

1  A.   Yes.   I'll say this graph does a great job of capturing

2  the content of the Computer Network Defense Program.

3           So it's a graph, and the horizontal axis is time,

4  and it's demarcated in years, from 2000 through 2013.   And I

5  want to point out that at the time this presentation was

6  given, it was 2010, so some of the time involved the future.

7           The vertical axis is technology capability, and what

8  that refers to is both the technology capabilities of cyber

9  criminals and the attacks that they launch, as well as the

10  technology capability of, you know, conventional or, at the

11  time, legacy network defense systems.

12           So, as you can see, there's two lines in the graph.

13  The red line is the graph of the technology capability of

14  cyber criminals over time.   So you can see that the red line

15  in the graph is going along literally until around 2005,

16  2006, and then you suddenly see this explosive growth in the

17  technology capability of the cyber criminals, and that growth

18  continues well past 2010, the time when this slide was made,

19  into the future.

20           Also plotted is this black line, which is nearly

21  horizontal, and that's the technology capability of computer

22  network defense systems at the time, and you can see that

23  it's nearly flat.   And up until around the year 2005, it was

24  more or less keeping up with the threat capability, but after

25  that, the capability of the threat far exceeds the technology

—————Moore, S. - Direct—————

1    capability of the -- of computer network defense at the time.

2    Q.  And there's a yellow box on the bottom.  Could you read

3    that and just describe what that is discussing there?

4    A.  Sure.  It says, "Signature-based defenses of host A/V" --

5    antivirus -- "and network firewalls are ineffective.  We need

6    new ways to frame, understand, and reverse these trends."

7          So that first sentence says that the conventional

8    solutions at the time, which included network firewalls,

9    signature-based defenses, which are intrusion detection

10   systems, IDSs, it is normally called, and IPSs, intrusion

11   prevention systems -- ONR is saying these are ineffective,

12   they're not working, and, therefore, we need completely

13   different ways to attack this problem.  We've got to change

14   our technology capability so that that black line tracks with

15   the red line and, hopefully, exceeds it.

16   Q.  Let me show you what's been marked as PTX-373.

17          Dr. Moore, are you familiar with this document?

18   A.  Yes.

19   Q.  What is this document?

20   A.  This is the award information document for a research

21   contract that we were awarded by Department of Homeland

22   Security.

23   Q.  Can I get that captured just a little bit lower on that

24   screen, down to the amount?  Thank you.

25          And, Dr. Moore, what --

───────Moore, S. - Direct───────

1          MR. ANDRE:  Your Honor, I would like to move PTX-373

2    into evidence.

3          MR. GAUDET:  No objection.

4          THE COURT:  PTX-373 will be admitted.

5          (Plaintiff's Exhibit PTX-373 was received in

6    evidence.)

7    BY MR. ANDRE:

8    Q.  You said this is an award grant.  First of all, what is

9    the network survivability, recovery, and reconstitution,

10   NS2R?  What's that referring to?

11   A.  That's referring to -- well, the Department of Homeland

12   Security -- particularly at that time, they were

13   publishing -- I'm going to call them position papers

14   outlining the major problems we're having with Homeland

15   Security in general.  And, in particular, in the area of

16   cyber security they were publishing what they called grand

17   challenges that needed to be solved.

18          One of those grand challenges was what they called

19   network survivability, recovery, and reconstitution, NS2R.

20   I'm going to refer to it that way the rest of the testimony

21   here.

22          But the problem they needed to -- they wanted to

23   solve, the major problem was how do we survive major attacks

24   on Internet infrastructure as well as overloading events?

25   And I just want to be clear.  So, you know, there were actual

Moore, S. - Direct

1   incidents that drove the need for this NS2R program and

2   solution.   One of those was 9/11, the 9/11 terrorist attacks.

3            So when those -- on 9/11, as the terrorist attacks

4   were occurring, you know, everybody was jumping onto the

5   Internet, onto the web, to try to find out what was going on.

6   This flooded the Internet with so much traffic that

7   effectively nobody could communicate, nobody could get the

8   information they were looking for.   So this is all legitimate

9   users trying to use the Internet.

10           What was -- what was particularly bad about that was

11  all the emergency responders and government officials that

12  were responsible for mitigating these terrorist attacks, they

13  couldn't use the Internet to communicate either.   And at that

14  point, albeit it was 20 years good, almost, they had already

15  become dependent on the Internet for their communication.   So

16  this was a major failure.

17           And in that same time frame, during the 2000s and

18  late 1990s, there were other major attacks on the Internet.

19  Like I say, most of these were underreported, but people like

20  me and my peers, we were aware of them.   They were also

21  attacks on Internet infrastructure.

22           So the result was that Department of Homeland

23  Security, in the 2010 time frame, issued grand challenges.

24  One of those challenges was we need to have a solution for

25  the NS2R problem, so we submitted a proposal, which we called

─────Moore, S. - Direct─────

1   NS2R Solution, and that led to us -- we were awarded our
2   research funding to attack this problem.
3   Q.  How much was that?
4   A.  Well, it says here, under the amount, it was nearly a
5   million dollars, 999,000.
6   Q.  If we go down to the middle of the first page, the
7   solicitation year and award year, could you just inform the
8   Court when this was all taking place?
9   A.  Yes.  The NS2R solicitation request came out in 2010, so
10  we were -- it looks like we were initially awarded in 2011.
11  Oh, this is actually the phase 2.  So phase 2 of the award
12  started in 2011 and -- yeah.
13  Q.  If you go to the bottom of the page, the principal
14  investigator, were you the principal investigator of this
15  research award?
16  A.  Yes.
17  Q.  If we go to the next page of this document, the second
18  page, there's a paragraph that describes what your directive
19  was.  Can you please describe what the Homeland Security
20  awarded you to do.
21  A.  Well, they awarded us a research contract; perform the
22  research that's necessary to develop a network protection
23  system capable of providing an NS2R service.
24          What that means is we needed to develop technologies
25  that will be able to protect the Internet infrastructure in

Moore, S. - Direct

1    the event of a major cyber attack or overloading incident

2    like 9/11.

3           Yeah.  So the DHS needs to achieve its mission to

4    secure, protect, and defend the U.S. Internet infrastructure.

5    They awarded us a research contract to help them achieve that

6    mission.

7    Q.  Okay.  Why don't we go back to your patents that are

8    involved in this trial and go to JTX-2.

9           This is the '806 patent.  Are you an inventor on

10   this patent?

11   A.  Yes, I am.

12          MR. ANDRE:  Your Honor, I would like to move in

13   JTX-2 into evidence.

14          MR. GAUDET:  No objection.

15          THE COURT:  JTX-2 will be admitted.

16          (Joint Exhibit JTX-2 was received in evidence.)

17          MR. ANDRE:  Thank you, Your Honor.

18   BY MR. ANDRE:

19   Q.  Dr. Moore, what was the problem that you were trying to

20   solve with the technology that's described in the '806

21   patent?

22   A.  Well, this technology is our technology that rapidly

23   swaps massive scale CTI policies that are applied to live

24   Internet traffic and to protect against cyber attacks, to

25   protect networks, and it does so -- even though it's live

--------Moore, S. - Direct--------

1    Internet traffic, it does so without dropping any packets or

2    sacrificing security.

3    Q.  Now, why is it important to swap rules during live

4    traffic?

5    A.  Well, in the context of operationalized cyber threat

6    intelligence -- again, I'm going to say CTI for "cyber threat

7    intelligence."  In the context of operationalized CTI, I

8    believe I discussed yesterday in my testimony that one

9    characteristic of cyber threat intelligence is that it's

10   constantly changing.  Not only is it massive scales, you've

11   got many millions of units of cyber threat intelligence, and

12   it's changing all the time.

13          So when you operationalize that CTI and create these

14   massive scale policies that you apply to live Internet

15   traffic, at a given time -- let's say we install the policy

16   at noon today, and then a couple hours later the cyber threat

17   intelligence has changed a lot during that time -- maybe new

18   cyber threat intelligence attacks may have been mitigated,

19   maybe you -- if you want to continue to protect the network

20   with the latest and greatest cyber threat intelligence, you

21   need to exchange the current policy you're using on live

22   Internet traffic with a new policy on live Internet traffic.

23   You have to swap these policies out.  You need to do it while

24   you're running live, and you need to do this without dropping

25   any of that Internet traffic and do it without, you know,

Moore, S. - Direct

1    temporarily sacrificing any security.

2    Q.  I'd like to show you what's been next marked as JTX-3,

3    the '176 patent.

4         Dr. Moore, are you an inventor on the '176 patent?

5    A.  Yes.

6         MR. ANDRE:  Your Honor, I'd like to move JTX-3 into

7    evidence.

8         THE COURT:  That will be admitted.

9         (Joint Exhibit JTX-3 was received in evidence.)

10   BY MR. ANDRE:

11   Q.  What technological problem were you trying to solve with

12   the '176 patent?

13   A.  I think it's best characterized as our correlation

14   technology that identifies malware-infected computers in your

15   network.

16   Q.  What does that mean, correlation technology that affects

17   -- computers that have already been infected?

18   A.  Typically, yes.  Yes.  So let me explain what the

19   correlation does.

20        So on the Internet you might have -- you have two

21   computers talking to each other.  One is your computer that

22   you want to protect.  The other computer -- let's just say

23   it's a cyber criminal computer.  And so there's a

24   communications link between those two computers.  Now, the

25   way the Internet works is the Internet actually breaks up

—Moore, S. - Direct—

 1   that single communication between the two computers into

 2   multiple different segments.

 3          If you look at any one of those individual segments,

 4   you can't tell what are the two computers on both sides of

 5   that communication, you can typically only tell one.  You may

 6   not be able to tell either one.  But what the correlation

 7   technology does is it sorts through all these different

 8   segments that are out there, and it figures out, oh, this

 9   segment and this different segment are actually part of the

10   same communication.  And then once you knit all those

11   segments together you can say, oh, my computer is

12   communicating with a cyber criminal computer because it's

13   been infected with malware that, you know, facilitates that

14   communication.  So we call it our technology for identifying

15   malware-infected computers.

16          THE COURT:  You call it what, now?  What do you call

17   it?

18          THE WITNESS:  It's our technology for identifying

19   malware-infected computers.

20   BY MR. ANDRE:

21   Q.  You do that through the correlation?

22   A.  Yes.  What we call the correlation function is the one

23   that knits those -- figures out what the different segments

24   are, and, therefore, is this computer malware infected and,

25   therefore, talking to a cyber criminal computer.

Moore, S. - Direct

1   Q.   Okay.  Can an organization use that information at a

2   later time to try to stop than kind of communication in the

3   future?

4   A.   They can stop it right away, if they want, yes.

5          So there's a couple things you can do.  Once you've

6   identified a malware-infected computer, you can immediately

7   stop it from communicating with the cyber criminal computer.

8   You would also want to then do what's called in the

9   industry -- you want to sweep the computer.  You want to

10  sweep it clean of any malware infections.

11  Q.   Let me show you what's been marked as JTX-4, which is the

12  '193 patent.

13         Are you an inventor on the '193 patent?

14  A.   Yes, I am.

15         MR. ANDRE:  Your Honor, I'd like to move JTX-4 into

16  evidence.

17         THE COURT:  JTX-4 is the -- why does it say B2 after

18  '193?

19         MR. ANDRE:  It's a mark that the Patent Office puts

20  on patents to give it some type of class.  It's not -- it's

21  what the Patent Office does.  I'm not sure what the

22  significance is.

23         THE WITNESS:  I don't know, either.

24         MR. GAUDET:  Your Honor, we will stipulate to that.

25         THE COURT:  All right.  We'll stipulate that none of

Moore, S. - Direct

1   us knows what it means.  Okay.

2         MR. ANDRE:  Yes.  We know that the Patent Office has

3   a way of marking things that are sometimes counterintuitive,

4   but they put "B2" up there.  I'm sure someone knows, but we

5   just never paid attention to it.

6         THE COURT:  Okay.

7         MR. ANDRE:  Your Honor, I would like to move JTX-4

8   into evidence, if I haven't done so already.

9         THE COURT:  It will be admitted.

10        (Joint Exhibit JTX-4 was received in evidence.)

11  BY MR. ANDRE:

12  Q.  Dr. Moore, what technological problem are you trying to

13  solve with JTX-4, the '193 patent?

14  A.  Well, this technology prevents exfiltrations by stopping

15  cyber criminals from stealing data off of your computer or

16  out of your networks.

17  Q.  What does that mean, "exfiltration"?  Explain that,

18  please.

19  A.  Well, I just said exfiltration is when a cyber criminal

20  steals data out of your computer or out of your network that

21  you're trying to protect.  So you have your -- the reason

22  they use the term "exfiltration" is the data is being taken

23  out, exfiltrated.  The value of the data is being exfiltrated

24  out of your assets, your computers, your networks to some

25  cyber criminal.

———Moore, S. - Direct———

1          THE COURT:  All right.  Well, as opposed to putting

2     malware in the computer, this would be like stealing bank

3     records or something.

4          THE WITNESS:  Exactly, stealing credentials, you

5     know, usernames and passwords to your bank accounts, your

6     Social Security Number, credit card number, Social Security

7     Numbers, et cetera, typically, or raw financial data that's

8     for your business.  Those are typical examples.

9     BY MR. ANDRE:

10    Q.  So this is a -- after your computer has already been

11    infected, this is the technology that keeps that data from

12    leaving the infected computer?

13    A.  Yes, that's one characterization.

14         THE COURT:  Well, in other words, they never get it.

15    They put -- their attack on the computer is for the purpose

16    of not transmitting malware but removing data, so, of course,

17    what you're doing is you're removing the data before it

18    reaches the intended recipient, which would be the person

19    trying to invade the computer communication.

20         THE WITNESS:  Yes.

21         THE COURT:  Here the end-user would be the same or

22    related to the person trying to invade, and the recipient

23    would be the same person, or at least related to each other.

24         Do you follow what I mean?

25         THE WITNESS:  I didn't hear the last part.

Moore, S. - Direct

1          THE COURT:  In other words, the recipient would be

2     the same person as the person invading the network, or

3     related to them, because the recipient is the one who wants

4     to get the information, so he would be the same one who is

5     invading it, or they would be allied in some way.

6          THE WITNESS:  Yes, that's correct, typically, and

7     that person or entity is a cyber criminal.

8          THE COURT:  Right.  Okay.

9     BY MR. ANDRE:

10    Q.  So is this patent directed towards blocking data leaving

11    your home computer going to the criminal?

12    A.  Well, your home computer, your business computer, yes.

13    So the data is being transferred out, exfiltrated out of your

14    network, and, yes, this technology stops that from happening.

15         THE COURT:  Well, if I use my credit card to pay

16    electronically, then this person would be trying to intercept

17    my credit card data --

18         THE WITNESS:  Yes.

19         THE COURT:  -- and malware would be sending it to

20    themselves.  I would be sending it to the seller of whatever

21    I was buying, but the malware would be trying to send it to

22    somebody else, or maybe both.  I mean, it wouldn't interfere

23    with it going to the seller, they would just try to send it

24    off on an off-ramp.

25         THE WITNESS:  Yes, that's one scenario.  There's

Carol L. Naughton, Official Court Reporter

Moore, S. - Direct

1    many scenarios, exfiltration scenarios.  The one you just

2    described is one of those scenarios.

3              THE COURT:  That's a little bit different than the

4    first scenario I gave you.  Okay.

5              THE WITNESS:  Yeah, there's many scenarios.

6              THE COURT:  Right.

7              THE WITNESS:  The first scenario you gave is indeed

8    an exfiltration.  The scenario you just provided is also an

9    exfiltration; albeit, the architecture is a little bit

10   different.

11             THE COURT:  Okay.

12             THE WITNESS:  In either case, a cyber criminal is

13   stealing sensitive data out of your network, out of your

14   computer.  It's not a good thing.  We want to stop that.

15             THE COURT:  Okay.

16   BY MR. ANDRE:

17   Q.  All right.  And the fifth patent in this trial is JTX-5,

18   the '856 patent.

19             Are you an inventor on this patent, as well?

20   A.  Yes.

21             MR. ANDRE:  Your Honor, I would like to move JTX-5

22   into evidence.

23             MR. GAUDET:  No objection.

24             THE COURT:  We have a "B2" again.

25             MR. GAUDET:  We'll make the same stipulation, Your

```
                    ─Moore, S. - Direct─
```

 1   Honor.

 2            THE COURT:  All right.  Yes, JTX-5 will be admitted.

 3            (Joint Exhibit JTX-5 was received in evidence.)

 4            MR. ANDRE:  Thank you, Your Honor.

 5   BY MR. ANDRE:

 6   Q.  Dr. Moore, what problem were you -- what technological

 7   problem were you trying to solve with the '856 patent?

 8   A.  This is our encrypted threat filtering technology, which

 9   stops cyber attacks even when those attacks are encrypted.

10   Q.  Can you describe the technology generally?

11   A.  So you mean how does the technology work?

12   Q.  Yeah, yeah.

13   A.  Oh, okay.  Well, this is interesting, because on we're

14   trying to identify attacks, and is this communication an

15   attack?  And if the communication has been encrypted, we

16   can't necessarily read -- if it's all encrypted, we can't

17   read the communication or observe the communication to figure

18   out if it's an attack.

19            However, with an encrypted communication there's

20   lots of associated -- there's lots of information associated

21   with that encrypted communication that's unencrypted.  For

22   instance, the -- well, the characters of the encrypted

23   communication itself, there's often protocol exchanges

24   beforehand that are done in the clear and can be observed in

25   setting up the encrypted communication, for instance, there's

———Moore, S. - Direct———

1   other unencrypted information associated with that encrypted

2   communication.  And what we do is we look at that unencrypted

3   information -- in some cases we have to generate the

4   information and figure out, oh, this is an attack, this

5   encrypted communication actually represents an attack, or

6   not, and then we take the appropriate network protective

7   action for that attack.

8             THE COURT:  And that has to be based on threat

9   intelligence that you've acquired and put in with your policy

10  rules and policies.  Since you can't read it, you have to

11  base it on history.

12            THE WITNESS:  Yes.  So I'll say, you know, that's

13  the way we do it.  We've -- you know, as I've said many

14  times, we've operationalized cyber threat intelligence, and,

15  therefore, we can bring CTI to this problem, as well as other

16  information, and figure out if a communication is an attack.

17  BY MR. ANDRE:

18  Q.  So the five patents we've just discussed, do some of

19  them -- are some of them directed toward blocking attacks

20  coming into the network?

21  A.  Into the network?  Well, yes.  I mean, they're all

22  technology involved with defending, protecting networks, so

23  that involves attacks in both directions.

24  Q.  That's what I was going to ask you.  Some of the

25  patents -- are they directed to attacks after they've

Moore, S. - Direct

1    successfully attacked a network to keep data from going

2    outside the network, the exfiltration?

3    A.  I think the answer is, "Yes."  I mean, there's just so

4    many scenarios to describe, I'm just trying to do the simple

5    high-level scenarios.  But, basically, I feel like our

6    technology can defend against most cyber attacks in whatever

7    architecture form they may have.

8             MR. ANDRE:  Thank you, Dr. Moore.  I've got no

9    further questions.

10            THE COURT:  All right.  Are you ready to

11   cross-examine?

12            MR. GAUDET:  Your Honor, I am ready to

13   cross-examine, but I think we have to take just a moment in

14   order to e-mail the cross-examination exhibits over to

15   Centripetal.

16            THE COURT:  All right.

17            MR. GAUDET:  And as soon as --

18            THE COURT:  Do I have those?

19            MR. GAUDET:  Your Honor, you should have a binder

20   that says "Sean Moore Cross-Examination."

21            (There was a pause in the proceedings.)

22            THE WITNESS:  May I ask a question?

23            THE COURT:  Yes.

24            THE WITNESS:  Do I have this cross-examination

25   binder?  Okay.

————————Moore, S. - Cross————————

```
 1              MR. GAUDET:  If it makes you feel better, none of

 2    the witnesses on either side will have the cross-examination

 3    binder.

 4              (There was a pause in the proceedings.)

 5              MR. ANDRE:  Counsel, we received the e-mail of the

 6    cross-examination exhibits, so you may proceed whenever

 7    you're ready to go.

 8              MR. GAUDET:  And I was waiting for the go-ahead from

 9    Judge Morgan.  I believe he's getting his papers in order.

10              THE COURT:  Correct.

11              (There was a pause in the proceedings.)

12              THE COURT:  Okay.  You may proceed.

13              MR. GAUDET:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15    BY MR. GAUDET:

16    Q.  And good morning, Dr. Moore.

17    A.  Good morning.

18    Q.  I'm Matt Gaudet.  I represent Cisco.

19              And prior to yesterday, you and I had never met

20    before; is that right?

21    A.  I believe that's true.

22    Q.  Okay.  I think we actually have a Louisiana connection.

23    I saw that you attended both Tulane University, in

24    New Orleans, and the University of New Orleans; is that

25    right?
```

─────Moore, S. - Cross─────

1    A.   Yes.

2    Q.   I grew up in South Louisiana, so you have a Cajun on your

3    hands, once again.

4    A.   Where did you grow up?

5    Q.   In Lafayette, Louisiana, actually, right in the middle.

6    A.   My family is from the Lafayette area.

7    Q.   That's terrific.  Well, I'll tell you what:  When this is

8    over with, we're going to have a conversation about that.

9    Maybe even some Boudin or something like that is going to

10   come up.

11            MR. ANDRE:  Only if you pay for it.

12   BY MR. GAUDET:

13   Q.   Dr. Moore, you do have a Ph.D., correct?

14   A.   Yes.

15   Q.   However, you never did any formal coursework directed to

16   cyber security, correct?

17   A.   Not directly on cyber security, but it's -- how do I put

18   it?  If you study TCP/IP protocol, which certainly everybody

19   did back when I was in graduate school, you know, security is

20   just a component of that.  You have to understand all these

21   protocols equally to be able to understand cyber security.

22   Q.   Okay.  Well, before -- you had quite a few jobs after you

23   got your Ph.D. and before you started at Centripetal, right?

24   A.   Yes.

25   Q.   Okay.  But in all of that work prior to starting at

```
                        ─────Moore, S. - Cross─────
```

1    Centripetal, none of your prior work directly related to
2    cyber security, right?
3    A.  So I would not characterize it that way.  You said,
4    "directly related to cyber security."  A lot of my work
5    related to cyber security.  What I didn't do in my previous
6    jobs to Centripetal was research solutions to cyber security
7    defense.
8    Q.  Okay.  You were deposed in this case, right, sir?
9    A.  Yes.
10   Q.  Let's pull up the deposition transcript, Page 40, lines
11   20 to 24.
12           THE COURT:  Where is that?
13           MR. GAUDET:  Your Honor, that's going to be the
14   first tab in your booklet, which should be the depositions
15   from this case.
16           THE COURT:  20 to -- page 20?
17           MR. GAUDET:  Your Honor, it's page 40, line 20 to
18   line 24.
19   BY MR. GAUDET:
20   Q.  "QUESTION:  Okay.  Prior to starting as Chief Technology
21   Officer at Centripetal in April of 2010, did any of your
22   prior work relate to or was it directed to cyber security?
23           "ANSWER:  Not directly."
24           Were you asked that question, and did you give that
25   answer?

Moore, S. - Cross

1    A.  Yes, that seems to be the case.

2    Q.  And with respect to indirect work, your indirect work

3    experience, sir, you generally knew that cyber security was a

4    major issue, but you didn't work on solving those problems

5    previous to joining Centripetal, right?

6    A.  Again, you know, the context matters.

7            THE COURT:  That's what he just finished saying.

8            MR. GAUDET:  Thank you, Your Honor.

9    BY MR. GAUDET:

10   Q.  As of 2010, it was well known that a network device could

11   allow packets to enter into a network pursuant to certain

12   rules, right?

13   A.  That's a pretty broad question and characterization, so

14   are you saying that it was known that packets could enter a

15   network?

16           I mean, can you ask the question again?  I really

17   don't understand the question.

18   Q.  Sure.  So as of October 2010, it was well known that a

19   network device could allow packets to enter into a network

20   pursuant to certain rules, right?

21   A.  Sure.  You know, network devices, routers, switches -- I

22   mean, they all have some sort of rules about how are we going

23   to switch, how are we going to route, how are we -- access

24   control.  Let's call it that.

25   Q.  Okay.  As of 2010, it was also well known that a network

———Moore, S. - Cross———

1    device could block packets from entering into a network

2    pursuant to certain rules, right?

3    A.   In general terms, in whatever context you mean that in,

4    sure.  Network devices typically have capability to be

5    configured to drop or block certain packets.

6    Q.   Okay.  Now, one of your responsibilities at Centripetal

7    is deciding what technologies to seek patent protection on,

8    right?

9    A.   I guess you could characterize it that way.  I mean, we

10   create, invent, technologies, and some of them we decide to

11   patent.  I should say pursue patent protection.  You know, we

12   don't patent them, our patent lawyers do the patenting

13   process.

14   Q.   Sure.  And Centripetal only patents technologies that it

15   believes are an essential component or essential to its

16   products, right?

17   A.   Well, we patent -- I mean to the extent that, you know,

18   we -- our ideas and technologies that we create are, you

19   know, always related to our products for defending networks,

20   so -- I mean, the question was a little convoluted.  Maybe if

21   you ask it again, I can answer it in the context that I just

22   gave.

23   Q.   Okay.  Would you say that, generally, you only patent

24   ideas or technologies that you believe are an essential

25   component or essential to your product; "yes" or "no," sir?

————Moore, S. - Cross————

1   A.  I mean, that's a fair characterization, sure.  I mean, we

2   only spend our time developing ideas, technologies, for

3   defending networks.

4   Q.  Right.  Well, you're really targeting Centripetal's

5   product line and making decisions on what to patent, right?

6   A.  Well, that's -- again, to me that's a convoluted

7   question.  Whatever the technologies we create and invent, I

8   mean, those are part of our product, so it seems like you

9   asked the question backwards, to me.

10  Q.  Okay.  Well, let me ask it this way:

11          Starting from the beginning, is the decision to

12  patent -- when you're making that decision, you're really

13  targeting the Centripetal product line, "yes" or "no"?

14  A.  That's a fair characterization, sure.

15  Q.  Now, talking about the Centripetal product line,

16  RuleGATE -- you're familiar with RuleGATE, right?

17  A.  Yes.

18  Q.  Okay.  And RuleGATE literally has the word "gate" in it,

19  right?  We can agree on that one?

20  A.  Yes.

21  Q.  Okay, good.  You would characterize the RuleGATE product

22  as a gateway, right?

23  A.  Well, so context matters here.  So a gateway is a -- at

24  least in the communication space, it's a term that generally

25  means an interface, and in the context of networking it means

—————Moore, S. - Cross—————

1    it's an interface between two different types of networks and

2    allows one network to communicate with the other network,

3    which are different types, and the gateway is an interface.

4    If you didn't have the gateway, then the two networks could

5    not communicate or interact with each other.

6    Q.  Understanding that definition of gateway, you agree

7    RuleGATE is a gateway, correct?

8    A.  The context -- yes.  The context matters, of course, to

9    the definition of a gateway, but yes, we -- it's a gateway.

10   Q.  And using that same context, these two networks, one of

11   the networks is secured, and one of the networks is

12   unsecured, correct?

13   A.  Well, we would use the terminology one network is

14   protected and one is not.

15   Q.  Okay.  Fair enough.

16          Now, I just want to get a quick visual image of

17   this.  So we're going to pull up a demonstrative that I don't

18   think you've seen before, but hopefully you can follow it.

19          So, Mr. Simon, if you would pull up the gateway

20   demonstrative.

21          Okay.  So can you accept that in this demonstrative

22   we've represented a network in the kind of the big box in the

23   center of the screen that's a protected network, and then off

24   to the left is the Internet, and that's an unprotected

25   network.  Is that all -- can you generally accept that as a

—————Moore, S. - Cross—————

1    representation there?

2    A.  Not necessarily.  So what's protecting --

3    Q.  That's what I was going to say.  That's a great point.

4    Let me do this in baby steps.

5             Will you accept that this is two different networks,

6    before we talk about protection at all?

7    A.  I'll accept it when you tell me what the gateway does.

8    It looks like the gateway is acting as an interface between

9    the network on the right and the Internet on the left, but

10   what's that gateway doing?

11   Q.  Okay.  Let's assume that's right --

12            THE COURT:  Mr. Gaudet, somehow the term

13   "obfuscation" is entering my mind.

14            MR. GAUDET:  My only question was going to be where

15   the RuleGATE goes.  That's it.

16            THE COURT:  Well, I think you could get at it more

17   efficiently.

18            MR. GAUDET:  Sure.

19   BY MR. GAUDET:

20   Q.  The RuleGATE goes where that gateway is.  Is that fair?

21   A.  You could -- well, okay.  Again, I don't know what

22   gateway you're talking about -- context -- but I will say

23   this:

24            You can put a RuleGATE wherever you want.  Where you

25   want to put it is typically a boundary between the network

--------Moore, S. - Cross--------

 1    that you want to protect and the network that you're trying
 2    to protect yourself from.  Typically, in many, if not -- or,
 3    you know, most of our deployments, the RuleGATE is located at
 4    Internet access links or Internet access points.
 5    Q.  Okay.
 6    A.  So typically what we have is an enterprise network, on
 7    the right in this diagram, and the Internet on the left, and
 8    the RuleGATE is located at that point.
 9    Q.  Okay.  Let's go ahead and take that exhibit down.
10          And I want to be very clear about something with
11    respect to RuleGATE.  One of the core ways that the RuleGATE
12    product is different from a conventional firewall is the
13    scale or number of rules that the RuleGATE can apply,
14    correct?
15          MR. ANDRE:  Objection, Your Honor.  This is not
16    relevant.  This is Cisco's attempt to do a product-to-product
17    comparison instead of a patent, our-patent-to-their-product
18    comparison.  They're trying to make RuleGATE the essence of
19    the inventions of the patent here.  This is an improper
20    product-to-product comparison that they're going down this
21    road with.
22          MR. GAUDET:  Your Honor, the witness testified for,
23    I think, an hour --
24          THE COURT:  I don't know what road he's going down,
25    which is my problem.

---Moore, S. - Cross---

1           I don't know where you're going, Mr. Gaudet.

2           MR. GAUDET:  Sure.  Your Honor, the allegation by

3     Centripetal is that we learned about RuleGATE and, based on

4     that, we copied their technology; that the core aspect of

5     RuleGATE is that they use five million rules at the gateway.

6     That's what they told us.  That's all been established with

7     this witness.  It's relevant --

8           THE COURT:  Well, I think -- whatever anybody else

9     thinks, I think a system that can handle five

10    million whatever they are -- bytes or bits -- as opposed to

11    one that can handle 10,000 is a significant difference.

12          MR. GAUDET:  Absolutely.  And as you'll hear in the

13    rest of the trial, we don't do five million.  We do an old

14    10,000, 20,000.  That was the only point I was establishing,

15    Your Honor.

16          THE COURT:  All right.  Well, that's the difference.

17    It doesn't mean anything more than that.  That's the

18    difference.

19          MR. ANDRE:  And, Your Honor, I'm objecting on

20    relevance grounds, because --

21          THE COURT:  I'm not saying the difference is

22    relevant, but we don't have to waste a lot of time trying to

23    say is that different.  It's different.  Whether it's

24    relevant, I'll have to determine at a future time.

25          MR. GAUDET:  Thank you, Your Honor.

Carol L. Naughton, Official Court Reporter

—————Moore, S. - Cross—————

1          MR. ANDRE:  And I just want to make the objection

2     that it's not relevant because it is an improper

3     product-to-product comparison, as opposed to a -- we're

4     supposed to compare our patents to their products, not our

5     product to their product.  That's my objection.

6          Thank you, Your Honor.

7          THE COURT:  I understand your point.

8     BY MR. GAUDET:

9     Q.  And to take the next step in just how relevant this is,

10    sir, the creation of the technologies that underlie the

11    patents-in-suit, it has an assumption that there is the

12    capability to process these very large security policies,

13    right, these five million policies?

14    A.  So, again, I need more context.  It's hard for me to

15    follow your question there.  Maybe you can ask the question

16    again, and I'll try to parse it.  I want to get this right.

17    Q.  Okay.  Let's pull up your deposition at Page 48, line 18.

18    And this is going to go to Page 49, line 3.  It says:

19          "QUESTION:  Why?

20          "ANSWER:  Well, the technologies that underlie this,

21    the five patents-in-suit, I would say that the -- you know,

22    the patents or the technologies in some cases depend on the

23    ability to have the scaleable property.

24          "What do you mean by that?

25          "I mean by that that these -- you know, the

—————————Moore, S. - Cross—————————

1    technologies, the way they're -- the conceptions, the idea of
2    creating these technologies has an underlying assumption
3    that, oh, there's this capability to process very large
4    security policies."
5           Were you asked that question, and did you give that
6    answer -- or those questions and answers?
7           MR. ANDRE:  Objection, Your Honor.  The question on
8    line 18, "Why," doesn't give the predicate question.
9           THE WITNESS:  I need a lot more context, but, yes.
10          MR. GAUDET:  Your Honor, my question was literally
11   reading his words.  My question was his answer.
12          THE COURT:  Yes, but the point is why are you asking
13   him this?
14          MR. GAUDET:  Sure.  Let's back it up.  Let's pull up
15   more.
16          THE COURT:  Because it doesn't seem to be a prior
17   inconsistent statement, so why are you asking him this?
18          MR. GAUDET:  My question to him is the creation of
19   the technologies that underlie the patents-in-suit.  It has
20   an assumption that there is the capability to process the
21   very large security policy.  The patents --
22          THE COURT:  Well, I think it also has the ability to
23   process very small capacities.  It could do either one.
24          It can handle larger capacities.  That's -- we
25   just -- I just finished saying to you that there's a

———————Moore, S. - Cross———————

```
 1    difference between the capability of handling 10,000 and the
 2    capability of handling five million, and we all agreed on
 3    that.
 4              MR. GAUDET:  Yes, sir.
 5              THE COURT:  So I don't understand the purpose of
 6    this, other than obfuscation --
 7              MR. GAUDET:  Your Honor, I'll --
 8              THE COURT:  -- and I abhor obfuscation.  I've always
 9    tried to find a bumper sticker that said that.  I understand
10    that they exist, but I haven't been able to find one.  So
11    let's get to something that's meaningful here.
12              MR. GAUDET:  Okay.
13    BY MR. GAUDET:
14    Q.  Dr. Moore, are you familiar with the term "false
15    positives"?
16    A.  Again, there's no context around that, but, you know, I'm
17    generally familiar with that term, sure.
18    Q.  Okay.  Do you agree that, in general, it's a bad idea to
19    block traffic that's actually legitimate business traffic?
20    A.  Well, yeah, that -- I mean, again, I'd appreciate more
21    context, but, nevertheless, yeah, that's a general principle,
22    and you don't want to block legitimate business traffic.
23    Q.  Okay.  And something that a gateway, like a RuleGATE,
24    might do is to block legitimate business traffic
25    accidentally.  Is that fair?
```

Moore, S. - Cross

1  A.  Well, that's something we don't want to happen, so we,

2  you know, take great pains to make sure that doesn't happen.

3  Q.  Okay.  And in 2016, sir, do you recall that there was a

4  discussion about Centripetal needing to reduce the number of

5  false positives in RuleGATE?

6  A.  So are you referring to some particular communication?

7  I --

8  Q.  Sure.  If we --

9  A.  You're asking me a very broad question about time, and I

10  can't recall those type of details.

11  Q.  That's fair.

12          If we could pull up DTX-1212.

13          The only point I'm trying to establish is that

14  Centripetal was having discussions about its high false

15  positive rate with respect to RuleGATE.

16          DTX-1212.  If we go to the fourth page of this

17  document, at the bottom of this document, do you see that's

18  you, sir, Sean Moore?

19  A.  Yes.

20          MR. GAUDET:  And, Your Honor, this should be in your

21  binder, sir.

22          THE COURT:  All right.  Well, how are the pages

23  numbered?

24          MR. GAUDET:  In the binder, Your Honor --

25          THE COURT:  I've got the label, but I'm on Page 4?

```
                        ──────Moore, S. - Cross──────

 1              MR. GAUDET:  Page 4 --

 2              THE COURT:  This is the one that says -- but I don't

 3      see a "4" anywhere.

 4              MR. GAUDET:  Your Honor, I apologize for that.  It's

 5      physically the fourth page.

 6              THE COURT:  All right.  Are there Bates numbers on

 7      these pages?

 8              MR. GAUDET:  Yes, Your Honor.  The Bates number at

 9      the bottom ends in 93.

10              THE COURT:  All right.  Well, maybe it would help to

11      give the Bates number.  Okay.

12              MR. GAUDET:  I will do that.  Thank you, Your Honor.

13              THE COURT:  Let me read this.

14              (There was a pause in the proceedings.)

15              THE COURT:  Okay.

16      BY MR. GAUDET:

17      Q.  My first question is simply that at the bottom of Page 4

18      that is Dr. Moore.  That's a message coming from you; is that

19      correct, Dr. Moore?

20      A.  Well, there's a header there that says -- that has my

21      e-mail address, but I don't see the message that that's

22      associated with.

23      Q.  And so the next page, if we pull up the next page at the

24      same time -- side by side, please.

25              The remainder of your response is at the top of this
```

—————————Moore, S. - Cross—————————

1  next page.  Do you see that?

2  A.  Okay.  Sure.

3  Q.  Okay.  And you're responding to a message from someone

4  named Andre ter Weele.  Do you see that?

5  A.  That appears to be the case.

6  Q.  Okay.  And who is Mr. ter Weele?

7  A.  Andre was an employee of Centripetal.  He's no longer

8  employed with Centripetal.  I believe he was a sales

9  engineer, yes.

10  Q.  Okay.  If we highlight the paragraph that begins with the

11  word "Secondly," -- "Secondly, we focused the product

12  line..."

13       And I just wanted to highlight it.  I did not want

14  to obscure the rest of the document.  And do you see the

15  second --

16       What I was going to ask you is that the second

17  sentence says, "Customers that have some CTI knowledge

18  realize there is a high false positive rate with using

19  CTI" -- that's cyber threat intelligence, right?

20  A.  Yes.

21  Q.  -- "so they are even more wary of a blocking RuleGATE."

22  Do you see that?

23  A.  Weary, but, yes.

24  Q.  Okay.  And then at the top of that page, your response

25  is, quote -- and we'll highlight this top paragraph -- "Agree

——————Moore, S. - Cross——————

1    with many of Andre's points.  Maybe most of all with the need

2    to reduce false positives.  That is a problem we've had for a

3    long time."  Do you see that?

4    A.  Yes.

5    Q.  Okay.

6         MR. GAUDET:  And, Your Honor, with that, we move

7    this exhibit into evidence, Defendant's Exhibit 1183.

8         THE COURT:  The Court will admit Bates number 084694

9    and 084693 into evidence.

10        As I've said before, Mr. Gaudet, I don't want to

11   take a very lengthy document and introduce the whole document

12   when the only thing we're looking at is two pages.

13        MR. GAUDET:  Thank you, Your Honor, and we will get

14   that tightened up.

15        And, Your Honor, I misspoke on the document number

16   for the record.  The document number there, is actually

17   DTX-1212.

18        THE COURT:  Well, I think that's what you said.

19   That's what I wrote down.

20        MR. GAUDET:  Thank you, Your Honor.

21        (Defense Exhibit DTX-1212 was received in evidence.)

22        THE COURT:  All right.  I'm just going to put the

23   last two numbers, 93 and 94.  But let's try to do that.  I

24   mean, it's very unhandy, this binder here.  It's hard to work

25   with.  One of the reasons is you've got I don't know how many

—————Moore, S. - Cross—————

1   pages there, when you're using two, which is one of the

2   things we talked about in advance.

3           MR. GAUDET:  Thank you, Your Honor.

4   BY MR. GAUDET:

5   Q.  Dr. Moore, are you familiar with the technology called

6   NetFlow?

7   A.  Yes, I'm familiar with NetFlow as a logging technology

8   and as a logging standard.

9   Q.  And Cisco created the technology called NetFlow, correct?

10  A.  That's my understanding.  I don't know for sure.

11  Q.  You agree with me that prior to 2016, Centripetal did not

12  have any technology solution in its product lines for looking

13  at NetFlow records, analyzing them, and raising alarms based

14  on NetFlow.  Is that fair?

15  A.  No, I don't think that's fair.  Here's why:

16          So we design our solutions to work with any logging

17  standards, and so, you know, that includes things like -- I

18  know we work with like syslog, with CEF, with JSON.  We might

19  work with IPFIX.  NetFlow is just another logging standard.

20  Whether we, you know, work with -- in actual deployments, we

21  may or may not be ingesting NetFlow logs.  I don't know for

22  sure.

23          It's just another logging standard, so I really --

24  well, that's my answer.

25  Q.  Is it fair to say -- I want to be sure I understand --

————Moore, S. - Cross————

1   that you don't believe that prior to '16, 2016, Centripetal

2   had any technology solution in its product lines for looking

3   at NetFlow records, analyzing them, and raising alarms or

4   not, based on NetFlow?  You don't believe that was the case

5   prior to 2016?

6   A.  I wouldn't characterize it that way.  Again, I'll repeat

7   what I said earlier, which is we design our solutions to work

8   with any logging standard.  So, you know, NetFlow is just

9   another logging standard.  Whether any particular deployment

10  was, you know, actually ingesting NetFlow, I don't know for

11  sure.

12          THE COURT:  What is NetFlow?

13          MR. GAUDET:  Your Honor, NetFlow is the summary of

14  packets that --

15          MR. ANDRE:  Your Honor, I prefer Mr. Gaudet not to

16  testify.

17          MR. GAUDET:  I apologize, Your Honor.  I thought you

18  were directing that question at me.  I apologize.

19          THE COURT:  All right.  I mean, is NetFlow some sort

20  of proprietary property of Cisco?

21          MR. GAUDET:  Your Honor -- well, I'm sorry.  Is that

22  to me, or is that to the witness?

23          THE COURT:  To the witness.  I mean, the witness is

24  testifying.

25          What is NetFlow?

—————————Moore, S. - Cross—————————

```
 1          THE WITNESS:  Okay.  So I understand NetFlow to
 2    be -- well, let me say this:
 3          In networking technology in general, you often want
 4    to log events -- or in computer technology in general, you
 5    want to log events, things that happen in a networking
 6    context, you know, so you have an historical record of what
 7    happened.  My computer booted up.  You take a log of that.
 8    In the networking context, it's like, well, this connection
 9    was made between two computers.  You make a log of that, for
10    instance.  It's typically historical data that you can go
11    back and figure out, well, what happened?
12          So what I understand NetFlow to be is it's a -- it's
13    a product that looks at Internet traffic, at packet traffic,
14    and it will create logs of that packet traffic.  So now --
15          THE COURT:  Is that like the hundred or so providers
16    that you subscribe to to obtain CTI?
17          THE WITNESS:  No, no.
18          THE COURT:  Is it something -- if your -- if I had
19    your RuleGATE on my iPhone, would NetFlow just be a different
20    app?  Or can it be described that way?
21          THE WITNESS:  So if you had a RuleGATE, or I would
22    say our network protection system, on your phone, on your
23    iPhone, I would say you have our network protection system
24    app on your phone.
25          THE COURT:  Well, would NetFlow be a different app?
```

———Moore, S. - Cross———

1          THE WITNESS:  NetFlow is -- it's not a network
2     protection application, it's a network logging application.
3     It's applied, generally, in packets, in the Internet or
4     flowing across these communications, and what NetFlow does is
5     it will log those packets; for instance, you know, what time
6     the packet came through, what type of packet was it, some of
7     the information that may have been in the packet, like the
8     packet header information.  As I understand it, it's a
9     packet-logging system, so it will tell you these packets
10    traversed this network link.
11         THE COURT:  Well, are you saying that NetFlow
12    doesn't -- would not add anything to your system?  Or just
13    that it's not part of your system?
14         THE WITNESS:  Not directly.  Now, we do log
15    information in our network protection system, and we do use
16    those logs to help us protect the customer's network.  So, as
17    I said earlier, there's lots of different logging protocols
18    and standards and products, so we design our solutions to
19    work with any standard logging solution, logging format.
20    NetFlow, in my perspective, is just another logging --
21         THE COURT:  Well, I still don't understand the
22    difference between NetFlow and these hundred CTI sources that
23    you subscribe to.  What's the difference between the two?
24         THE WITNESS:  Oh, okay.  Well, in my mind they're
25    completely unrelated to each other.  So the cyber threat

---

Moore, S. - Cross

---

1    intelligence, as I described yesterday, is just intelligence

2    reports on cyber criminals, what computers they own, and what

3    types of attacks they're launching.  So that's just raw

4    intelligence data.

5           THE COURT:  But it was obtained by doing the same

6    thing that NetFlow does.

7           THE WITNESS:  No, it's just published information

8    that the CTI providers provide.  So they'll publish their

9    intelligence reports.  It's just like somebody publishing --

10          THE COURT:  I know, but the source of what they give

11   you was obtained in the same manner as NetFlow obtains its

12   information.  Is that correct?

13          THE WITNESS:  No.  I don't know how a given CTI

14   provider obtains its information.  I mean, generally what

15   they do is what's called detonating malware, and they see

16   what it does, but that's not -- you know, logging is just a

17   general concept, and NetFlow just logs packet communications.

18   It doesn't know anything about the packets.  It doesn't know

19   that there's any cyber threat intelligence associated with

20   the packets.  It just logs the events.  They're completely

21   unrelated.

22          I don't know how to make that clear.  I guess I'm

23   failing in doing that, and I apologize for that.

24          THE COURT:  I don't know how to make my question any

25   more clear.

—————————Moore, S. - Cross—————————

1          It sounds to me as if the only way your sources of

2    CTI can get information is by logging the history of what

3    traveled over the Internet, and it seems like NetFlow is also

4    logging the history of what went over the Internet.  So they

5    both obtain data in the same manner.  NetFlow may not be

6    logging it for the purpose of obtaining CTI, but it seems

7    like what they did by logging is the same thing as what your

8    sources must have done to obtain the CTI that they supplied

9    you.

10         THE WITNESS:  I will -- yes.  I would imagine, I

11   would speculate, that, yes, some CTI providers may use

12   logging technology to collect cyber threat intelligence.

13         THE COURT:  Okay.  Well, then, the next question

14   is -- I think the question was does your system obtain any

15   information from NetFlow, and apparently you're saying it

16   does not.

17         THE WITNESS:  I'm saying it could.  NetFlow is just

18   another logging standard.  We -- our system uses lots of

19   logs, in whatever standard formats that are out there.

20         THE COURT:  But you don't use that one?

21         THE WITNESS:  We could and --

22         THE COURT:  Well, that's not the question.  The

23   question is "do you," not "could you."

24         THE WITNESS:  So, then, my answer is I don't know

25   for sure.  We may have an implementation or deployment out

—Moore, S. - Cross—

1    there where, you know, the customer wants us to use NetFlow.

2    Our solutions are designed to work with any logging format.

3           THE COURT:  So you could use it, if you wanted to.

4           THE WITNESS:  Yes.

5           THE COURT:  It's capable of doing it.

6           THE WITNESS:  Yes.

7           THE COURT:  Your system is capable of using NetFlow,

8    but you don't know whether it does or not?

9           THE WITNESS:  That's -- yes.

10          THE COURT:  All right.  Mr. Gaudet, you may proceed.

11          MR. GAUDET:  Thank you, Your Honor.

12   BY MR. GAUDET:

13   Q.  With respect to the capabilities, I want to go back to

14   2016.  Okay?

15          As of 2016, Centripetal did not have a technology

16   solution in its product lines for looking at NetFlow records,

17   analyzing them, and raising alarms based on NetFlow, correct?

18   A.  That's not correct.

19   Q.  Okay.  Let's pull up your deposition, Page 193, line 12

20   to line 16.

21          And, actually, before we -- let's actually go all

22   the way up to Line 3, because I want you to see where I got

23   the 2016 date.

24          THE COURT:  Where are we?  193, line what?

25          MR. GAUDET:  The complete section is Line 3 to line

Moore, S. - Cross

```
 1   16.  Your Honor, I'll read it into the record so that the
 2   record is clear, with your permission, if that's okay.
 3              THE COURT:  Yes.
 4   BY MR. GAUDET:
 5   Q.  Beginning at Line 3:
 6              "All right.  In Centripetal's product lines prior to
 7   2016, did Centripetal have a solution that would detect
 8   threats and raise alarms based on an analysis of NetFlow?
 9              "ANSWER:  Based on an analysis of NetFlow?  I don't
10   know what that means, so I don't know how to answer that
11   question, but I don't know what you mean by 'based on an
12   analysis of NetFlow.'  NetFlow is a standard for log data
13   content.
14              "QUESTION:  So did Centripetal have any technology
15   solutions in its product lines for looking at NetFlow
16   records, analyzing them, and raising alarms or not, based on
17   NetFlow?
18              "ANSWER:  I don't believe so."
19              Were you asked those questions, and did you give
20   those answers?
21   A.  Yes.
22   Q.  Okay.  Now, sir, you are not aware of any work by
23   Centripetal in artificial intelligence before 2016, correct?
24   A.  So that's -- that's not a correct statement.
25              Artificial intelligence is -- that's a very vague
```

———Moore, S. - Cross———

1    term.  That's a marketing term for certain types of numerical
2    algorithms.
3    Q.  Okay.  Let's pull up your deposition at Page 17, and this
4    is going to be lines 12 to 15.  And this one says:
5           "QUESTION:  And was Centripetal doing any work on
6    artificial intelligence prior to that project in late 2016?
7           "ANSWER:  Not that I'm aware of."
8           Were you asked that question, and did you give that
9    answer?
10   A.  I was asked that question, I gave that answer, but what I
11   don't understand here, or what needs to be qualified here, is
12   the context of all this.
13          I have to look at other parts of this deposition.
14   I'm questioning, well, what do you mean by artificial
15   intelligence and describing it, and, you know, the way the
16   questions were asked, in the context, yes, I gave that
17   answer.
18   Q.  Now, you testified about the technology underlying the
19   patents today, correct?
20   A.  Yes, I described the technology underlying some of those
21   patents.
22   Q.  Now, let's pull up DTX-1179.
23          THE COURT:  Just a second.  Let me find it.
24          MR. GAUDET:  Sure.  DTX-1179.
25          THE COURT:  All right.

───────Moore, S. - Cross───────

1   BY MR. GAUDET:

2   Q.  Dr. Moore, DTX-1179, the top of it, is an e-mail from you

3   to Steven Rogers and Jonathan Rogers, dated January 15, 2018;

4   is that correct?

5   A.  That appears to be correct, yes.

6   Q.  Okay.  And Steven Rogers is the CEO of Centripetal,

7   correct?

8   A.  Yes.

9   Q.  Okay.  Now, let's to kind of work our way through this

10  communication.

11         So let's go down to Page 3, which is going to be

12  Bates number 325839.  Do you see that?

13  A.  Do I?  Yes.

14  Q.  Okay.  Okay.  And let's actually do this side by side

15  with the following page, as well.  Now, the bottom message

16  here Mr. Rogers is sending to you saying, "I hope you guys

17  are sitting down when you watch this.  I knew it was

18  flagrant, but not this flagrant."

19         Do you see that?

20  A.  "Mr. Rogers" being Jonathan Rogers, not Steven Rogers,

21  but, yes.

22  Q.  Correct.  Okay.  And what he is referring to is the top

23  of the next page, and is a video from Cisco.  Do you see

24  that?

25  A.  It's a link that appears to be to a video, yes.

Moore, S. - Cross

1    Q.   Okay.  And you then respond to this message, and now I

2    want to put the -- I believe it's going to be the Bates

3    number that ends 38, along with 39, on the screen together.

4              And what we'll do here is blow up -- no, that's --

5    38 and 39.  Okay.

6              What we'll do is blow up your response together.  It

7    starts at the bottom of the page, Bates number 38, and it

8    runs up to the top of 39.  Do you see that?

9    A.   I see -- yeah, you've highlighted it or boxed it here,

10   okay.

11   Q.   And that's -- Mr. Simon, let's go ahead and bring them

12   together so that we can have it all kind of -- okay.

13             Now, you say, "I don't think there is direct

14   infringement here," in response to Mr. Jonathan Rogers'

15   e-mail about Cisco, correct?

16             MR. ANDRE:  Your Honor, I object to this call-out,

17   because it's cutting out the response right above it from

18   Dr. Moore.  This is misleading.

19             MR. GAUDET:  Your Honor, I don't want to mislead the

20   witness.  I'm just trying to make it easy to read.

21             THE COURT:  What are we talking about?  What's left

22   out?

23             MR. ANDRE:  There's a -- right above that there's a

24   follow-up from Dr. Moore in which he clarifies --

25             THE COURT:  Above it?

Moore, S. - Cross

1          MR. ANDRE:  On that page, the second page, there's
2     an e-mail in which he says, "On second thought and after
3     further review, I may have spoken too soon."
4          THE COURT:  Well, it's on the -- it's not before
5     that, it's after that.  Well, it's before that, as far as the
6     e-mail.
7          MR. ANDRE:  On the e-mail -- the e-mail they're
8     showing on the screen now is dated 10:08 -- I mean it's timed
9     at 10:08 a.m., and then ten minutes later he follows up and
10    changes this e-mail.  So this is taken out of context.
11         MR. GAUDET:  Your Honor, respectfully, Mr. Andre
12    will have the opportunity to walk this witness through the
13    e-mail, but I presented the entire portions of this message,
14    and we'll get to the things that happened later in time after
15    that.
16         MR. ANDRE:  My issue is the call-out, Your Honor.
17         THE COURT:  All right.  I think this is a good time
18    to take a recess.
19         The question about AI in the deposition transcript
20    there, I'm very curious to know if that is -- whether or not
21    that was, as claimed by the witness, taken out of context.
22    Because if it was, the Court does not like to see statements
23    cherry-picked out of lengthy depositions where one sentence
24    is inconsistent with the other.
25         Now, you might say that that's the job of the other

Moore, S. - Cross

1    attorney, to find it, but with the number of documents and
2    the length of the documents we're talking about here, I don't
3    want to see that kind of cherry-picking taking place, if
4    indeed it was.  It may not be.  I don't know.  But the
5    witness says that he said other things about AI in his
6    deposition that would indicate that.
7            That's one of my really pet peeves, and particularly
8    in patent cases, because there are so many documents involved
9    that if somebody picks one statement out knowing that it's
10   cherry-picking something that's inconsistent with other
11   statements and doesn't also present the other statements, it
12   makes the Court's job very difficult.
13           We'll resume at five minutes to 12:00.
14           (Recess from 11:37 a.m. to 11:57 a.m.)
15           THE COURT:  I'm having difficulty, in the recent
16   questioning, seeing the ball.  I don't know if the witness or
17   the lawyer are trying to hide the ball, or both, or neither,
18   but the hidden-ball trick doesn't work in this court.
19           You may resume.
20           MR. GAUDET:  Thank you, Your Honor.  There are only
21   two more points, and I want to -- I think, really, we started
22   both of them.
23           I do want to return to the artificial intelligence
24   piece, and I want to, as best I can, get the full record out
25   there, Your Honor.

—————Moore, S. - Cross—————

1   BY MR. GAUDET:

2   Q.  Dr. Moore, do you recall that there was a project that

3   Centripetal was hired to do in 2016 that related to

4   artificial intelligence?

5   A.  Can you give me some more specifics?  That's a very broad

6   question.

7   Q.  Okay.  Were you awarded a research contract from the

8   Department of Homeland Security that involved data science

9   and machine learning in the context of cyber security?

10  A.  I'll say that in the 2016 time frame, we were awarded a

11  research contract by the Department of Homeland Security to

12  research what we called -- a project that we called AI

13  Analyst.

14  Q.  And AI -- that's "artificial intelligence," correct?

15  A.  That's what we intended the acronym to stand for, yes.

16  Q.  Okay.  Now, that AI Analyst project that Centripetal

17  started in late 2016, that was designed to accelerate the

18  productivity and efficiency and quality of human cyber

19  analysts.  Is that fair?

20  A.  That was one of the goals of the research, yes.

21  Q.  Okay.  And was there an instance in which the artificial

22  intelligence work that Centripetal had been doing that the

23  output of the AI algorithm or algorithms is to alarm that a

24  specific threat has occurred?

25  A.  So I need to provide a whole lot of context behind an

─────Moore, S. - Cross─────

1    answer to that question, a lot of context.

2           So let me be clear.  When we -- so, for instance,

3    our network protection system, that's a machine learning

4    system.  That's our product, the network protection system,

5    RuleGATE, we discussed, is a component of that.

6           The cyber threat intelligence that we get from our

7    providers, they -- you know, some of them use artificial

8    intelligence and machine learning to generate that cyber

9    threat intelligence.  And, you know, we have technologies

10   embedded in our machine learning system and network

11   protection system that are, you know, what the market would

12   call artificial intelligence --

13          THE COURT:  Well, the difficulty is that I don't

14   think we have a consensus definition of the term "artificial

15   intelligence."  I think artificial intelligence means

16   different things to different people in different contexts.

17   So trying to classify something as artificial intelligence or

18   not is an imperfect approach.  So I just don't think we can

19   just use that term.

20          To me, to my understanding of what I think of as

21   artificial intelligence, if a program is able to absorb

22   threat data and thereafter, and based on that, add a new rule

23   of policy to the program, which it thereafter uses, I think

24   of that as artificial intelligence.  But this is not a field

25   in which I'm an expert.  That's just the way I think of it.

Moore, S. - Cross

1    I don't know who else thinks of it that way.  So I think

2    we've got to be careful of how we use that term.

3            MR. GAUDET:  Thank you, Your Honor.  I'm going to

4    move on.  I was just trying to get back through the whole

5    record, because we certainly don't intend to obfuscate.

6            THE COURT:  Well, I think that's the problem with

7    using the term -- you know, you didn't use artificial

8    intelligence or whatever until -- or whatever, because I just

9    don't think there's a universal agreement on what constitutes

10   artificial intelligence.

11           MR. GAUDET:  Thank you, Your Honor.  I'm simply

12   going to resume going through the document that we identified

13   as Defendant's Exhibit 1179.

14           THE COURT:  Okay.

15           MR. GAUDET:  And what I want to do --

16           THE COURT:  We're on Page 38 and 39?  Is that it?

17           MR. GAUDET:  I believe that's where we left off.

18           THE COURT:  Or Bates 838 and 839.

19           MR. GAUDET:  And what I want to do, just to be sure,

20   I want the witness to see the whole thing.  And it's a little

21   awkward in that I can't give him the whole document, but what

22   we'll do is start at the end of the document and work

23   backwards to be sure that he can see all the communications

24   as they happened in sequence.

25           THE COURT:  That's the trouble; when you look at

———Moore, S. - Cross———

1    e-mails, they go backwards, when copies are supplied, and

2    it's confusing.

3            MR. GAUDET:  That's right.

4    BY MR. GAUDET:

5    Q.  So if we start --

6    A.  May I?  I'm sorry to interrupt you, but this is not the

7    complete e-mail chain that I'm seeing here.

8    Q.  It's not.  I think I can only put two pages up at a time

9    but -- I'll tell you what, if you'd like to read the entire

10   e-mail chain before you answer any questions, with the

11   Court's permission, that's certainly fine by me.

12   A.  Okay.  Well, I think it's important to show the context

13   of all this, and -- I mean, you know, I believe out of

14   context you're quoting me as saying, well, there's -- you

15   know, I don't think there's district infringement here --

16           THE COURT:  Well, wait a minute.  Let me say this:

17           If we look at Bates 840 and 841, which is the

18   beginning, it begins with the video at the top of 840.

19   There's no content before that, other than people's names and

20   titles.  So it starts at the bottom of Page 839, it appears,

21   which follows the video.

22           In other words, I assume, Dr. Moore, that you looked

23   at the video.  Did you look at the video?

24           THE WITNESS:  I don't recall exactly, but it appears

25   that I did, just from the nature of my responses.

---

Moore, S. - Cross

1          THE COURT:  That's the way it looks, so I think it's
2    fair to start at the bottom of 839.
3          THE WITNESS:  And my point was, again, you need to
4    view the whole e-mail to get the context, because at the end
5    of this e-mail, as I recall, I say there is, you know,
6    infringement here.
7          THE COURT:  Well, we'll get to that.
8          THE WITNESS:  Okay.
9          THE COURT:  We'll get to that, because -- but we
10   have to start at Page 839 and work backwards in order to look
11   at the e-mails in the order in which they were sent, because
12   when you copy them they come out in inverse order, when you
13   put them on a document like this.
14         So let's start at the bottom of Page 839.
15   BY MR. GAUDET:
16   Q.  At the bottom of Page 839, Dr. Moore, Jonathan Rogers
17   writes to you that, "I hope you guys are sitting down when
18   you watch this," and he goes on and forwards a video about a
19   Cisco product; is that correct?
20   A.  Yes.
21         MR. GAUDET:  And then, with the Court's permission,
22   I was going to pull together just the next message and put
23   that up on the screen at the same time, or we can leave it up
24   here exactly the way that it is, whichever is more useful.
25         THE COURT:  Well, it's directed to me.  I've got the

---

Carol L. Naughton, Official Court Reporter

————Moore, S. - Cross————

 1   paper.  I can look at it.  Just take it in the order that it

 2   goes.

 3           MR. GAUDET:  Okay.

 4   BY MR. GAUDET:

 5   Q.  And so your response is -- begins at the bottom of

 6   Page 38, and in the first line you say, "I don't think there

 7   is" --

 8           THE COURT:  Wait a minute.  38?  We're still on

 9   Page 39.

10           MR. GAUDET:  Your Honor, there's a confusing point

11   in here that I'll just explain, which is his message.  The

12   next actual message in the chain, believe it or not is the

13   one that's on the bottom of 38, but it's recopied.  It pastes

14   something that he had sent six months earlier.  That's where

15   that Sean Moore thing appears in the middle of Page 39.

16           THE COURT:  Well, I see that.  It says, "Okay" -- so

17   that's pasted in there.  All right.

18           MR. GAUDET:  That's correct, Your Honor.

19           THE COURT:  Okay.  Let's look and see what it says.

20           (There was a pause in the proceedings.)

21           THE COURT:  Okay.  So this would have preceded the

22   one on the bottom.  This is way back in June of '17.  All

23   right.

24           So the next one, I assume, would be in proper order.

25           MR. GAUDET:  That's correct.  I'll clarify that with

———————Moore, S. - Cross———————

1    the witness, Your Honor.

2    BY MR. GAUDET:

3    Q.  Dr. Moore, in your e-mail dated January 15, 2018, at

4    10:08 a.m., at the bottom of Page 38, did you paste into that

5    e-mail on January 15, 2018, a copy of a message that you had

6    sent on June the 26th, 2017, which appears in the middle of

7    Page 39?

8    A.  That appears to be the case.

9    Q.  Okay.  So in terms of what was actually happening then,

10   this January 15, 2018, e-mail, that was the second e-mail

11   that occurred in this sequence, and it included a copy of an

12   earlier message.  Is that fair?

13   A.  Yes.

14   Q.  Okay.

15           MR. GAUDET:  So, Your Honor --

16           THE COURT:  Okay.  I can read it.  It says, "I don't

17   think there is direct infringement here.  They're using

18   AI/machine learning with CTI to detect, not enforce, possible

19   malicious activity offline.  That technology is without

20   decryption, and our AI/machine learning technology is

21   different.  AI/machine technology solves a different problem

22   altogether.  Actually, Steven noticed this last June and

23   asked me to look at it.  I..."

24           I mean, I can read these.  I can go through and read

25   them.

─────Moore, S. - Cross─────

1           "On second thought, I may have spoke too soon.  This

2     may well be used in some of our malware.  Let's take another

3     look."

4           All right.  So this is Monday, five minutes later.

5     "They say they're applying threat information to traffic on

6     the wire, in the switches, so traffic does not have to be

7     encrypted..."

8           Okay.  That's Jonathan's observations.  All right.

9     Then we go to Page 37.

10          MR. GAUDET:  If you would pull up Page 37.

11          THE COURT:  What?

12          MR. GAUDET:  I apologize.  I was speaking with our

13    graphics person, Mr. Simon.

14          THE COURT:  Well, I'm looking at it.  I've got the

15    page right in front of me, 837.

16          Jonathan Rogers is the author of this, not

17    Dr. Moore.  "It looks like they're doing exactly what we

18    patented and say so in the white paper.  Initial data packet

19    is used to obtain packet data from the first packet or flow.

20    It allows extraction of interesting data..."

21          What's HTTP/URL and DNS?  What do all those initials

22    mean, Dr. Moore?

23          THE WITNESS:  Well, those are Internet protocols, so

24    HTTP is the transfer protocol that's typically used with web

25    sites.  And DNS stands for domain name system.  It's called

—————Moore, S. - Cross—————

1   the telephone book of the Internet.  It translates website

2   names to IP addresses so you can send information.

3          THE COURT:  Well, what are the words HTTP/URL?  What

4   words do those represent?

5          THE WITNESS:  HTTP stands for hypertext transfer

6   protocol, and URL stands for uniform resource locator.

7          THE COURT:  Okay.  TLS versions.  What does TLS

8   stand for?

9          THE WITNESS:  TLS stands for transport layer of

10  security.

11         THE COURT:  All right.  Rogers again wrote, "I

12  agree.  It looks like a pretty clear case of infringement.

13  If we don't respond to this," et cetera.  And then Sean says,

14  "I reviewed the data sheet that Jonathan attached.  Yes,

15  there are many infringements of several of our patents/patent

16  families."

17         Okay.  I've read them all, Mr. Gaudet.  Do you want

18  to question the witness about these?

19         MR. GAUDET:  Yes, Your Honor, and it's just a

20  handful of questions.

21  BY MR. GAUDET:

22  Q.  Let's go back to the first message that actually came

23  from Dr. Moore.  That will appear, I believe, on 38 to 39.

24         Now, this is at the bottom of 38, and it runs over

25  to the top of 39.  Do you see that?  Dr. Moore?

———Moore, S. - Cross———

1  A.  Yes.  I'm sorry.  I didn't realize you were talking to

2  me.

3  Q.  Okay.  And at this point you explain the reason that you

4  believe, at that moment in time, that there was no direct

5  infringement, right?

6  A.  Well, let me provide some context here.

7       First of all, I -- when I say "infringement," I

8  don't mean that in a legal sense, because I'm not a patent

9  lawyer.  I'm speaking colloquially.  I mean, something along

10  the lines of, it looks like somebody copied our technology or

11  our ideas.

12       I also want to point out, too, that in all this

13  correspondence I'm, you know, questioning.  I say things like

14  I don't think; i.e., I'm not sure.  I also add question marks

15  into my writing that says, I think this is what we're doing,

16  but I'm not sure.

17       So there's just not enough information in the video

18  link or the URL that was provided earlier to really, you

19  know, understand is there copying going on here or not.

20  Q.  Well, that's what I actually want to focus on.

21       In this message, you're understanding -- in this

22  message when you said there is -- you don't think there is

23  direct infringement, your understanding of how Cisco products

24  operated was that they're using what you refer to as

25  AI/machine learning with CTI to detect, not enforce, possible

1   malicious activity offline, okay?  That was your

2   understanding of the products that at that moment in time led

3   you to think there would be an infringement.

4   A.  I think "understanding" is a very strong word.  I'm

5   saying I'm not sure.  I have questions marks.  I don't think;

6   I'm not sure.  So I'm not going to agree to that

7   characterization, because that's my understanding.

8           I actually don't understand what they're doing, and

9   I'm clear about that.

10  Q.  And that's my point.  Later in the e-mail chain, when you

11  then thought, maybe there is an infringement, you thought

12  that this understanding of the products -- maybe it's wrong.

13  Maybe Cisco is operating inline, maybe Cisco is enforcing.

14  Is that fair?

15  A.  Well, I didn't quite follow your question.

16          Are you saying later in this e-mail by "earlier in

17  the exhibit"?

18  Q.  Correct, correct.

19  A.  Okay.  Well, yes.  I mean, if you follow the e-mail

20  chain, I'm provided more and more information, more detailed

21  information.  I mean, at the beginning of this, this thing

22  that I referred to with Steven, it's like one sentence in a

23  press release, or something like that.  There's no -- there's

24  almost no information to understand what's going on.

25          The video link, I don't think, helped very much.

————Moore, S. - Cross————

1    Then Jonathan provided a white paper, which I recall is

2    several pages long and goes into much more detail about

3    what's being done.  Then I studied that white paper, it

4    appears, and then I said, you know, now that I have a better

5    understanding, I think there is some copying, you know, what

6    I call infringement of our patent.

7    Q.  That white paper is describing a product called Encrypted

8    Traffic Analytics, or ETA.  Is that fair?

9    A.  As best I recall, yes.  I mean, do we actually quote

10   the -- in this e-mail chain?

11   Q.  If we --

12   A.  I believe that's the case.

13   Q.  Okay.

14           THE COURT:  Encrypted -- what is that, now,

15   Encrypted what?

16           MR. GAUDET:  Traffic Analytics, or ETA.

17           THE COURT:  Okay.

18   BY MR. GAUDET:

19   Q.  And my question is:  Sitting here today, you don't know

20   whether or not Encrypted Traffic Analytics operates in the

21   way reflected at 10:08 a.m. -- namely, it detects, it doesn't

22   enforce, and it's offline -- or if Encrypted Traffic

23   Analytics operates differently than that, correct?

24   A.  Well, I'm just -- I'll quote myself at 10:18.  I'm

25   saying, "On second thought and after further review, I may

─────Moore, S. - Cross─────

1    have spoke too soon."

2    Q.  So you didn't know one way or the other how the products

3    actually operate?

4    A.  Again, I can only infer so much from the limited

5    information I had at that point, and I'm questioning all

6    along -- you know, at least in my mind, I'm making it clear

7    that I don't really understand what's going on here, but

8    depending on how -- you know, what I think may be going on,

9    thinking about it, I'm making speculative conclusions as to

10   what might be going on.

11   Q.  That's fair.

12        Last question:  You don't explicitly recall any

13   phone calls or conferences that you participated in between

14   Centripetal and Cisco.  Is that fair?

15   A.  That's, I would say, not correct.  I recall being invited

16   to a meeting between Centripetal and Cisco by Jonathan Rogers

17   at some point.

18   Q.  Okay.  Do you recall whether or not you actually attended

19   that meeting?

20   A.  I recall that I attended the meeting.

21   Q.  Do you recall --

22   A.  The meeting that I'm thinking of.

23   Q.  Sure.  Do you recall anything explicit that was said?

24   A.  Well, let's be clear.  I just want to make sure.

25        You are obviously referring to some particular

Carol L. Naughton, Official Court Reporter

────────── Moore, S. - Cross ──────────

1   meeting, and, you know, I recall having been invited to a

2   meeting with Cisco, I recall attending.  But you seem to have

3   a specific meeting in mind, and can you help me with that?

4   Q.  Sir, I actually mean to ask the question very generally,

5   that do you recall any calls or conferences that you

6   participated in between Centripetal and Cisco?  Do you recall

7   them explicitly?

8   A.  I recall there was -- I recall one meeting.  Again,

9   Jonathan Rogers invited me to attend.  It was his meeting.

10  But, you know, I generally recall the nature of the meeting,

11  but specific details, you know, I'm probably vague on those.

12  Q.  You don't have an explicit memory of any detail of who

13  said what.  Is that fair?

14  A.  I'd say that's fair.  Sure.  I don't have an explicit --

15  you know, if you ask me did we talk about X, I'll answer I

16  don't remember explicitly, but given the nature of the

17  meeting, we may have.

18  Q.  All right.  That's all that I have.  Thank you,

19  Dr. Moore.

20       MR. GAUDET:  Oh, actually, there is -- we need to

21  move DTX-1179 into evidence.  That was the last e-mail that

22  we looked at, Your Honor.

23       THE COURT:  DTX-1179?  Yeah, right.  That will be

24  admitted.

25       (Defense Exhibit DTX-1179 was received in evidence.)

```
────────────Moore, S. - Redirect────────────
```

 1          THE COURT:  Is there any redirect?

 2          MR. ANDRE:  Yes, Your Honor.  Paul Andre

 3  redirecting.

 4                    REDIRECT EXAMINATION

 5  BY MR. ANDRE:

 6  Q.  Dr. Moore, if we go back to DTX-1179, in the very last

 7  e-mail in this chain, which is at the top of the first page,

 8  it says that you reviewed data sheets/white papers of

 9  Jonathan attached.  "Yes, there are many infringements of

10  several of our patents/patent families."

11          What was it about the data sheet and white paper

12  that you read that gave you that opinion?

13  A.  As best I recall, the white paper was on the order of

14  probably four or five pages long.  It gave more details about

15  the techniques that they were using to do Encrypted Traffic

16  Analytics.  So after reading that, you know, it became

17  apparent to me that I believed that there was infringement,

18  by which I mean copying of our ideas, our technology, of

19  several of our patents/patent families.

20          I just want to be careful.  I'm not a patent lawyer,

21  but my colloquial sense of, are things being copied?  You

22  know, my thoughts were, yes.  But, again, you know, without

23  doing extensive review and having more extensive information,

24  I can't tell for sure.

25          THE COURT:  Do we know what white paper that was and

———Moore, S. - Redirect———

1    who produced it?

2          THE WITNESS:  So I believe Jonathan -- in this

3    e-mail chain, the white paper was attached.  I believe it was

4    called "Encrypted Traffic Analytics," and I believe that it

5    was produced by Cisco.

6          MR. ANDRE:  Your Honor, I'd like to show Exhibit

7    DTX-1181.

8          THE COURT:  DTX-1181.  Is that in the binder here?

9          MR. ANDRE:  I don't think so, Your Honor.

10         THE COURT:  I don't think it's in my binder.

11         MR. GAUDET:  Your Honor, it actually is in the

12   defense binder.  You should have a paper copy as DTX-1181 in

13   your cross-examination binder.

14         THE COURT:  I've got 79, 80, and I've got 81.  Yes,

15   I do.

16         Okay.  Next question?

17   BY MR. ANDRE:

18   Q.  Does this look like the white paper that you were

19   referring to that you reviewed when you came to that

20   conclusion?

21   A.  As best I recall, yes.

22   Q.  And this white paper is --

23   A.  Excuse me.  I assume there's more pages here.  As I

24   recall, the white paper that I read -- yeah, okay.  There's

25   several pages here, yeah.  Okay.  I just want to make sure

Moore, S. - Redirect

1    that first page you had up wasn't just a one-page data sheet.

2            Yes, this appears to be the document that I was

3    referring to.

4    Q.  If you turn to the fourth page of that document --

5            THE COURT:  Give me the Bates number.

6            MR. ANDRE:  The Bates number ending in 899, Your

7    Honor.

8            THE COURT:  Okay.

9    BY MR. ANDRE:

10   Q.  And if you look on the right-hand column, the bottom

11   paragraph, you'll see somebody talking about "additional data

12   packet."  Do you see that?

13   A.  Yes.

14   Q.  And if we go back -- I don't know if we can do this

15   technically.

16           If we go back to 1179, that's the paragraph that's

17   quoted in Jonathan Rogers' e-mail to you.  I don't know if we

18   can pull them up and show them side by side.

19           DTX-1179.  Pull up that bottom paragraph, and then

20   pull up the bottom paragraph there.

21           Is that the same paragraph that he's referring to,

22   as best as you can tell?

23   A.  It appears to be.  I'm not going to do a letter-by-letter

24   match, but, yes, it appears to be the same paragraphs.

25   Q.  So based on the fact that Mr. Rogers was talking about a

———Moore, S. - Redirect———

1  white paper or data sheet and he quoted the same paragraph in
2  this document that's marked DTX-1181, would you conclude that
3  this is the white paper that you reviewed to come to your
4  conclusion that there was infringement?
5  A.  Yes, but in the context of what I mean by "infringement."
6  I want to be careful about that.
7  Q.  I appreciate you leaving the infringement up to the
8  lawyers.
9  A.  Yeah.
10        MR. ANDRE:  Your Honor, I'd like to move in Exhibit
11  DTX-1181 into evidence.
12        MR. GAUDET:  No objection.
13        MR. ANDRE:  You can take that down, Geoff, from the
14  screen.
15        (There was a pause in the proceedings.)
16        (Defense Exhibit DTX-1181 was received in evidence.)
17        MR. ANDRE:  May I proceed, Your Honor?
18        THE COURT:  Yes.  I was just waiting for you to ask
19  your next question.
20        MR. ANDRE:  I'm sorry.  Is DTX-1181 admitted?
21        THE COURT:  Yes.
22        MR. ANDRE:  Okay.  Thank you.
23  BY MR. ANDRE:
24  Q.  And, Dr. Moore, you reviewed this entire white paper to
25  come to your technical conclusion about the copying or the

————Moore, S. - Redirect————

1    same technology in Cisco's product and in your patents?

2    A.   I probably did.

3    Q.   Okay.  Now I want to talk about the logging standard that

4    we discussed a little earlier in your cross-examination.

5    A.   Okay.

6    Q.   And you had mentioned that the Centripetal product was

7    able to actually capture flow records, correct?

8              THE COURT:  Capture what?

9              MR. ANDRE:  The flow records, the flow.

10             THE COURT:  Flow?

11             MR. ANDRE:  The flow, yes.  I'm probably using the

12   wrong terminology.

13   BY MR. ANDRE:

14   Q.   These logging standards, you mentioned five of them; is

15   that correct?  You mentioned -- let me spell them for the

16   court reporter.

17             There's syslog, s-y-s-l-o-g.  There's IPFIX,

18   I-P-F-I-X, NetFlow, N-e-t-F-l-o-w, C-E-F, and JSON, J-S-O-N.

19   Those are the five standards you mentioned in your

20   cross-examination, correct?

21   A.   I believe I did, yes.

22   Q.   Now, NetFlow is the one that Cisco invented, right?  Or

23   the one they used.

24   A.   Sure, yeah.  Again, I testified I think they invented it,

25   but I don't know for sure.

—————————Moore, S. - Redirect—————————

1   Q.  And these other logging standards, do you know who

2   invented -- or who uses sysflow -- or not really invented it,

3   but which companies -- like is it Juniper or Hewlett-Packard,

4   or who uses these standards, these logging standards?

5   A.  So these are logging standards.  People use the right

6   tool for the job, so in some cases it's -- some people prefer

7   to use JSON logging format for particular problems, and

8   others want to use NetFlow for other problems.  It's just --

9   you know, they're all standards, tools, solutions that are

10  designed to work with most, if not all, of the standards.

11          So, you know, I'm -- who invented them or how they

12  became standardized -- and a lot of times these standards, I

13  mean, de facto standards -- I can't say for sure.  All I can

14  say is they're logging standards.  Everybody uses them.  They

15  use the right logging tool for the job, whatever that may be.

16  Q.  And does the Centripetal customer get to choose which

17  logging standard they want to use on the Centripetal

18  RuleGATE, if they buy it?

19  A.  Well, I'd phrase it a different way.  Well, so you

20  specifically said the RuleGATE.  I want to understand that,

21  you know, we don't just provide only RuleGATE.  I mean,

22  that's part of a bigger solution, our network protection

23  system.

24  Q.  Okay.  So let me restate that.

25          In Centripetal's network protection system, does the

—————Moore, S. - Redirect—————

1   customer get to choose which logging standard they want to
2   use?
3   A.  Well, I -- so let me put it this way:
4          There's parts of our solution, our network
5   protection solution, that are designed to ingest logs and
6   manipulate log data.  These solutions ingest -- as I said,
7   they're designed to work with any logging format.
8          Some of our customers, they say, well, you know, we
9   want you to integrate this information into your network
10  protection system from another part of our system, and it's
11  log information, and it's whatever log information --
12  whatever format they provide.
13         If it's NetFlow, I'm sure our, you know, SEM
14  solution, then, is NetFlow.  If the customer wants us to, you
15  know, use or ingest information from one of their systems in
16  a given log format, I'm sure our system can do it.
17         It's kind of the opposite of what you asked, because
18  what you asked doesn't quite make sense.  I'm sorry to be
19  obtuse here, but if the customer asks us, hey, can you take
20  our records, our information in this particular log format
21  into your SEM swap log analyzer, we're going to say, of
22  course we can.
23         MR. ANDRE:  Your Honor, I've got no further
24  questions.  I've been accused by my own witness of being
25  obtuse.

Moore, S. - Redirect

```
 1            THE WITNESS:  Maybe that's the wrong word.  I'm just
 2    saying these are very complex questions you're asking, and I
 3    want to make sure that I get the answer correct from a
 4    technical standpoint.
 5            MR. ANDRE:  Well, thank you, Dr. Moore.  I
 6    appreciate it.
 7            And, Your Honor, there's a possibility we'll call
 8    Dr. Moore back in our rebuttal case, so we're not excusing
 9    him from this trial at this time.  So I think he has to be
10    under the -- he won't be watching the rest of the trial, I'm
11    sorry to say, Dr. Moore.
12            THE COURT:  Well, if there's a possibility that you
13    may be recalled, Dr. Moore, what that means is that you
14    cannot -- well, I don't know.  Was he designated as an expert
15    witness?
16            MR. ANDRE:  No, Your Honor, he's not, but he may
17    come back in our rebuttal case, when we rebut the validity
18    aspect of Cisco --
19            THE COURT:  He was not designated as an expert
20    witness?
21            MR. ANDRE:  No, he's a fact witness.
22            THE COURT:  All right.  Well, then, you cannot
23    confer with -- you cannot discuss your testimony with any
24    other witness in the case, nor may you discuss the testimony
25    of any other witness in the case with your attorney.
```

1          In other words, the fact that you may be recalled

2     means that you're not entitled to know what any other witness

3     said in the case --

4          THE WITNESS:  I understand.

5          THE COURT:  -- whether on your side or on the other

6     side.  So you cannot, for example, listen in to the rest of

7     the trial on audio --

8          THE WITNESS:  I understand.

9          THE COURT:  -- or in any other format or discuss it,

10    personally, or by electronics, or anything else.  You just

11    cannot confer with any other witness in the case, nor can you

12    confer with any attorneys or anybody else in the case about

13    what another witness testified.

14          You can confer about what you intend to testify to,

15    but not what somebody else has already testified to.

16          THE WITNESS:  I understand, Your Honor.

17          THE COURT:  If there are no further questions for

18    the witness, then I'll excuse him for the time being.

19          MR. GAUDET:  No further questions, Your Honor.

20          MR. ANDRE:  No further questions.  Thank you, Your

21    Honor.  And thank you, Dr. Moore.

22          THE WITNESS:  Thank you.

23          (Witness excused.)

24          THE COURT:  Have you got a 15-minute video?

25          MR. ANDRE:  We have one that's 7 minutes and another

```
 1    about 18 minutes.  Do you want the shorter one or the longer

 2    one?

 3              THE COURT:  Does it make any difference to you the

 4    order in which we present them?

 5              MR. ANDRE:  We'll do the short one first, Your

 6    Honor, and then we'll do the long one after lunch.

 7              And Ms. Kobialka will be introducing the exhibits

 8    and what not, so I'll slide out of the way.

 9              THE WITNESS:  Am I supposed to leave now?

10              THE COURT:  Yes.  Thank you, Doctor.

11              THE WITNESS:  Thank you.

12              MS. KOBIALKA:  Good afternoon, Your Honor.  Lisa

13    Kobialka, on behalf of Centripetal.

14              At this time we'd like to play the deposition of

15    Mr. Rajagopal Venkatraman.

16              THE COURT:  Who?  What is the name of this person?

17              THE WITNESS:  The last name starts with a V.  It's

18    Venkatraman, V-e-n-k-a-t-r-a-m-a-n.

19              And, Your Honor, for your convenience, we have

20    provided a binder to you with the deposition that the parties

21    have agreed to, as well as the exhibits, and Mr. Venkatraman

22    will be designated.  This deposition is PTX-1910.

23              THE COURT:  Wait a minute.  Let me get rid of the

24    papers on the last witness before I try to get the ones from

25    the new one.
```

1           What is it you have for me on this witness?  What's

2    the witness's first name?

3           MS. KOBIALKA:  I'll spell it for you.  It's

4    R-a-j-a-g-o-p-a-l.

5           THE COURT:  Okay.  I don't see that name.

6           MS. KOBIALKA:  Your Honor, it's the last one on the

7    index.  We put them in alphabetical order, all of the

8    depositions that the parties have agreed to in terms of --

9           THE COURT:  Oh, yes, there it is.  Putting them all

10   in the same book was not a good idea.  Let me read the

11   summary first.

12          MS. KOBIALKA:  Okay.

13          (There was a pause in the proceedings.)

14          THE COURT:  All right.

15          MS. KOBIALKA:  At this time we'll play PTX --

16          MR. GAUDET:  One clarifying point.  Is PTX-1910 --

17   is that the actual deposition excerpt, Ms. Kobialka?

18          MS. KOBIALKA:  That's correct, that both parties

19   agreed to.  The counters, as well.

20          MR. GAUDET:  We just wanted to have the numbering

21   convention straight, as well.  Thank you.

22          THE COURT:  All right.  PTX-1910 is a video

23   deposition which you are now going to play for me, and also

24   there's a transcript of the deposition available to the

25   Court, as well as a summary.  All right.  You may proceed.

```
 1              (A video deposition clip of RAJAGOPAL VENKATRAMAN
 2   was played in open court.)
 3              MS. KOBIALKA:  Your Honor, at this time we wanted to
 4   move in PTX-1910 into evidence as an exhibit.
 5              THE COURT:  All right.  That will be admitted.
 6              (Plaintiff's Exhibit PTX-1910 was received in
 7   evidence.)
 8              THE COURT:  Am I going to learn at some point what
 9   layer 2 and layer 3 mean?
10              MS. KOBIALKA:  Yes.  Our experts are going to
11   explain that to you.  That will be part of the presentation.
12              THE COURT:  Okay.
13              MS. KOBIALKA:  So, Your Honor, we have another
14   deposition clip that we wanted to play.  It's longer, though.
15   It's about 17, 17-and-a-half minutes, or so, and we would
16   want to move that one in, as well.
17              What would you like to do as far as timing?  What is
18   your preference?
19              THE COURT:  My preference is to adjourn for lunch
20   until 1:55.
21              (Recess from 12:53 p.m. to 1:59 p.m.)
22              THE COURT:  All right, counsel.  Are you ready with
23   your next deposition?
24              MS. KOBIALKA:  Yes, Your Honor.  So the next
25   deposition that we'd like to play -- and this is also in your
```

```
 1    binder -- the last name starts with a R.  It's Mr. Saravanan
 2    Radhakrishnan.  And I can spell the last name for you.
 3    There's a reason why they asked me to actually
 4    announce those, because Mr. Andre cannot say these words.
 5              MR. GAUDET:  Your Honor, we were going to request
 6    that Ms. Kobialka do that for us, too.
 7              MS. KOBIALKA:  The last name is
 8    R-a-d-h-a-k-r-i-s-h-n-a-n.
 9              THE COURT:  Radhakrishnan.  I can say it faster that
10    I can write it.
11              MS. KOBIALKA:  And, for the record, Your Honor, we
12    have marked this deposition clip with the following trial
13    exhibit number.
14              THE COURT:  Okay.
15              MS. KOBIALKA:  It is PTX-1906, and it should be
16    included in your binder, as well.
17              THE COURT:  I have it.
18              MS. KOBIALKA:  He refers to an exhibit during the
19    deposition, and that is PTX-111.
20              THE COURT:  What did you say?  What is PTX-111?
21              MS. KOBIALKA:  The exhibit that he's testifying
22    about in the deposition clip that we'll be providing.
23              THE COURT:  All right.  Let's see.  Here's the
24    summary and his exhibit.
25              Now why is this exhibit so long?  How many pages in
```

1    the exhibit did he refer to?  We don't need all this paper in

2    here.  When we get to the exhibit, we'll mark the pages that

3    were referred to in the deposition, and that's what will be

4    admitted.

5           We discussed this before the trial, and I

6    specifically said that what I would like to do is, with these

7    multipage exhibits, just mark the pages to which reference is

8    made.  The others will be available but not marked as

9    exhibits, because there's a limit on how much we can look at.

10          All right, let's proceed.

11          MS. KOBIALKA:  Mr. Thomas, you may begin.  Thank

12   you.

13          (A video deposition clip of SARAVANAN RADHAKRISHNAN

14   was played in open court.)

15          THE COURT:  All right.

16          MS. KOBIALKA:  Your Honor, at this time we would

17   like to move in that deposition clip, which has been marked

18   as PTX-1906.

19          MR. GAUDET:  No objection.

20          THE COURT:  That will be admitted.

21          (Plaintiff's Exhibit PTX-1906 was received in

22   evidence.)

23          MS. KOBIALKA:  And then for PTX-111, which was the

24   document that was discussed during that deposition clip, I

25   have the specific pages, if you'd like that, by Bates number,

1    that would refer to --

2          THE COURT:  Well, it was just one page, wasn't it,

3    plus the title page?

4          MS. KOBIALKA:  That's correct.

5          THE COURT:  All right.  So it would be Page 817 and

6    Page 842.

7          MS. KOBIALKA:  That's correct.  And we'd like --

8          THE COURT:  I'm using the last three digits of the

9    Bates number, that we do for patents.

10         So it would be Exhibit 111, Bates 817 and 842, were

11   admitted.

12         (Plaintiff's Exhibit PTX-111, Bates 817 and 842, was

13   received in evidence.)

14         MS. KOBIALKA:  Thank you, Your Honor.

15         THE COURT:  Okay.

16         MS. KOBIALKA:  The next deposition that we have to

17   play for you is Mr. David McGrew -- it's also in your

18   deposition binder there for you -- and this clip has been

19   marked as PTX-1905.

20         THE COURT:  What is the person's name?

21         MS. KOBIALKA:  David McGrew, M --

22         THE COURT:  Okay.

23         MS. KOBIALKA:  We have a ten-minute deposition clip

24   for him, and during that deposition he references the exhibit

25   that's been marked PTX-91, that's also in your binder there.

```
 1              THE COURT:  All right, I have that.  Give me just a
 2    moment.
 3              (There was a pause in the proceedings.)
 4              THE COURT:  All right.  You may proceed.
 5              MS. KOBIALKA:  Mr. Thomas.
 6              (A video deposition clip of DAVID McGREW was played
 7    in open court.)
 8              MS. KOBIALKA:  At this time, Your Honor, we'd like
 9    to move into evidence PTX-1905, which is Mr. McGrew's
10    deposition clip, along with the exhibit that he testified
11    about, which is PTX-91.
12              MR. GAUDET:  No objection, Your Honor.
13              THE COURT:  Okay.  PTX-1905 is the video.
14              (Plaintiff's Exhibit PTX-1905 was received in
15    evidence.)
16              THE COURT:  And PTX-91 is the brochure, or whatever
17    you call it.  They'll both be admitted.
18              (Plaintiff's Exhibit PTX-91 was received in
19    evidence.)
20              MS. KOBIALKA:  Thank you.
21              Your Honor, the next deposition we have is actually
22    in a different binder, I believe, that you received this
23    morning.  It's a much smaller binder.  And the deposition
24    would be of Mr. Sunil Amin, A-m-i-n.
25              THE COURT:  All right.  We've got two witnesses in
```

1   this binder, apparently.

2           MS. KOBIALKA:  That's correct.  It would be the

3   second witness, Mr. Sunil Amin, and we've identified his

4   deposition clip as PTX-1896.  And there are no exhibits in

5   connection with this deposition.

6           THE COURT:  All right.  Let me look at the summary

7   just a minute.

8               (There was a pause in the proceedings.)

9           THE COURT:  What is ISE?

10          MS. KOBIALKA:  The Identity Services Engine.

11          THE COURT:   Identity Services Engine.

12              (There was a pause in the proceedings.)

13          THE COURT:  All right.  You may proceed.

14          MS. KOBIALKA:  Thank you.

15              (A video deposition clip of SUNIL AMIN was played in

16  open court.)

17          MS. KOBIALKA:  Your Honor, at this time we'd like to

18  move in the deposition clip of Mr. Amin, which is PTX-1896.

19          MR. GAUDET:  No objection, Your Honor.

20          THE COURT:  That will be admitted.

21              (Plaintiff's Exhibit PTX-1896 was received in

22  evidence.)

23          MS. KOBIALKA:  Your Honor, there is one other

24  deposition where we have a dispute about a portion of the

25  clip the parties have met and conferred on, and then

1   separately there are 11 other depositions which are included

2   in that big binder the parties have agreed upon that we

3   wanted to go head and submit and have moved into evidence,

4   which we weren't planning to play.  We don't have the clips

5   prepared.

6          THE COURT:  You mean you weren't planning to read

7   them at all, just have the Court read the depositions?  Is

8   that what you intended?

9          MS. KOBIALKA:  Yes, that's what we had intended to

10  do.  It would be an awfully long time, with the deposition

11  excerpts along with the counters, to have them both played,

12  so we prepared the summary and then the entire clip, and then

13  the exhibit that's referred to.  The parties had agreed that

14  that could be submitted to the Court to be moved into

15  evidence.

16         THE COURT:  But not played during the trial.

17         MS. KOBIALKA:  That's correct.  We can reference

18  them with the experts at that point and provide explanations

19  of them.  As you can see, some of them are highly technical,

20  and it made sense that after they were in evidence that we

21  could then have the experts refer to them.  Some of them are

22  just very long, with the counters.

23         THE COURT:  Well, it's up to you how you wish to

24  present them, as long as there's no dispute between the

25  parties.  But if you've got -- looking at the size of that

1    volume, if you think the Court can read all those pages,

2    that's not realistic.

3           MS. KOBIALKA:  I understand, Your Honor.  I think

4    the idea was -- some of that is the background information

5    that's provided in there, and it may be we need to excerpt

6    out of some of the exhibits.  Because what's included in your

7    binder is the complete exhibit that was referenced during the

8    deposition testimony, but we could excerpt that for you and

9    reduce the size down.

10          Alternatively, we might be able to reach an

11   agreement with the other side where, really, the small

12   selections that we want the Court to focus on for purposes of

13   expert testimony are played, but then the rest of the

14   counters in context for the Court can be provided.  That was,

15   as I understood, the point of the summaries, to assist the

16   Court in orienting you as to who these people are, what their

17   positions are, and their backgrounds.

18          THE COURT:  Do you have any estimate of how long

19   those depositions -- the time it would take to read them, all

20   of them?

21          MS. KOBIALKA:  To read the -- into the record?

22          THE COURT:  I don't mean read them, I mean show them

23   on video.

24          MS. KOBIALKA:  It would -- I have a feeling the time

25   is five, six hours, potentially, given how it does take

1    longer when you play the entire excerpt.

2            And I do note that there were some counters.  You

3    know, we would have maybe five minutes of testimony, and the

4    counters that we received in an effort to eliminate disputes

5    made one particular excerpt about 45 minutes.  And so it just

6    doesn't -- at a certain point, it doesn't make sense for us

7    to play the whole thing, but that's what happened with the

8    counter-designations in an effort to reduce the disputes.

9            THE COURT:  Well, what I'm trying to arrive at,

10   Counsel, is some way for the Court to find out what it needs

11   to find out on all of these videos without a lot of

12   surplusage.  It's up to counsel to come up with a solution to

13   that, because I don't think it's realistic for the Court to

14   take five or six hours to read technical material which

15   probably would require multiple readings in order to

16   understand.

17           So counsel should reduce those to a manageable

18   volume, if they expect the Court to consider that as part of

19   the evidence which will go into its ruling, or which will be

20   considered for its ruling.  Because if they're technical

21   terms, full of all these abbreviations, the Court -- that was

22   one problem with this deposition, it had all these

23   abbreviations in them.  Some of them I was familiar with, and

24   some of them I wasn't.

25           So to try to read technical depositions that are

1   probably going to be full of abbreviations is not realistic,

2   unless they're edited down to what is actually needed.  So

3   that should be done by counsel.

4        MS. KOBIALKA:  Your Honor, why don't we propose

5   meeting and conferring to reduce those 11 depositions down

6   that you have in that big binder, and maybe we can address

7   the one other deposition clip that we do have ready to play

8   for you and address the specific dispute in that; that is,

9   Mr. Agrawal's deposition.  And that's in the smaller

10  deposition binder, and we can address that, if that is

11  agreeable to the Court and my co-counsel here.

12       THE COURT:  Yes, let's start on the one.  How long

13  is this one?

14       MS. KOBIALKA:  So this deposition of Mr. Sandeep

15  Agrawal is 18 minutes, but we do have a dispute with some of

16  the counters.  We accepted many of the counter-designations,

17  but Cisco added at the end of the transcript some of the

18  cross-examination of the witness, and our objection to it is

19  it lacks foundation because the cross-examination by Cisco's

20  counsel of Cisco's own witness doesn't have anything to do

21  with what has been previously designated, and it's not a

22  proper counter.

23       So we objected to it.  If this is information that

24  they want to get in, they can bring this witness,

25  Mr. Agrawal, who is a Cisco employee, to trial.  But to

```
 1    cross-examine your witness, make reference to documents that
 2    weren't part of the earlier excerpts, doesn't have any
 3    foundation and is an improper counter-designation.
 4              And I can actually point you to --
 5              THE COURT:  Was the part that they added -- was that
 6    taken at the same time and place as the rest of the
 7    deposition?
 8              MS. KOBIALKA:  It was, but --
 9              THE COURT:  Okay.  So what you're saying is that
10    they added material that -- this is their employee, who
11    presumably would be an adverse witness; that they added
12    material as part of their counter-designations that went
13    beyond your examination evidence?
14              MS. KOBIALKA:  That's correct.
15              THE COURT:  All right.  Well, I think -- wasn't that
16    something we talked about before the trial?
17              MS. KOBIALKA:  For third parties, but not for your
18    own employees.
19              So for third parties we -- the ruling, as I
20    understood it from the Court, you weren't going to bring them
21    back.  However, for Cisco's employees, they -- that was not
22    to be included.  It should not go beyond the scope of the
23    examination that's being addressed.
24              THE COURT:  Well, they don't have to bring the
25    employee in.  They can just put the designation in as part of
```

1    their case, by video if they want to.

2         MS. KOBIALKA:  That's fine, but they shouldn't be

3    attempting to add it into our current designations.  And,

4    like I said --

5         THE COURT:  Well, are you agreed on what constitutes

6    new materials in this deposition that you've proposed to

7    read?

8         In other words, can we say, okay, starting on

9    Page so-and-so this is where they get into new materials?  I

10   mean, are you agreed on when that starts?

11        MS. KOBIALKA:  I think that we would agree where

12   this dispute lies, yes.  I can identify it specifically, and

13   we have provided the disputed portions in the binder, the

14   small binder, of deposition transcripts so you can see the

15   two competing proposals.  And the testimony that Cisco is

16   seeking to include is highlighted in yellow for your

17   reference, and I'm happy to point you to it.

18        THE COURT:  Where is it?

19        MR. GAUDET:  Your Honor, this is Matt Gaudet, for

20   Cisco.  We did want to answer your question, as well, as to

21   whether or not there is an agreement that this material is

22   new or if it's actually within the scope.  But just with that

23   note, whenever you're ready to hear us on that.

24        THE COURT:  Well, that seems to me to be a waste of

25   time.  In order for the Court to determine whether it's in

```
 1    the scope, I'd have to hear the whole deposition to make that
 2    determination.  So if counsel can agree on the disputed
 3    portion, all you have to do is read it as part of your case
 4    instead of reading it now.
 5              MR. GAUDET:  Your Honor, Chris Tyson, on our team is
 6    the individual who knows that that concerns --
 7              MR. TYSON:  Yes, Your Honor.  I will just briefly
 8    address this.
 9              This is -- I mean, Your Honor gave, I think, some
10    pretty clear counsel to both sides about cherry-picking
11    testimony.  This is a witness that was asked the question --
12    he's a marketing witness, and he was asked the question,
13    "When did development of Encrypted Traffic Analytics begin?
14    Did it begin in 2017, after you wrote a document?"  His
15    initial answer was, "Yes."  He then provided an answer to
16    another question about development that happened earlier than
17    that.
18              So the part of the -- the part of the testimony that
19    Centripetal does not want you to hear --
20              THE COURT:  How many pages of testimony is in
21    dispute?
22              MR. TYSON:  I think it's probably less than a
23    minute.  Maybe it's a minute.  It's maybe -- I would say
24    about --
25              MS. KOBIALKA:  Half a page.
```

1          MR. TYSON:  -- half a page.

2          Honestly, Your Honor, I would say the testimony

3     speaks for itself.  They asked a question about when a

4     product was developed, and I asked them later, on redirect,

5     "When you were asked earlier about the, quote/unquote,

6     development, what did you understand that to mean?"  And then

7     I followed up with a number of questions.  I think it's

8     clearly within the rule of fairness and consistent with your

9     counsel to both sides this morning.  I'm kind of surprised

10    that we're having this conversation.

11         THE COURT:  Well, if it's that brief, we'll just

12    hear the whole thing.

13         MS. KOBIALKA:  Okay, Your Honor.  So then we have

14    that deposition clip prepared.

15         This is Mr. Agrawal, which we have identified for

16    the record as PTX-1895.

17         THE COURT:  All right.  Let me get the summaries

18    first.

19         (There was a pause in the proceedings.)

20         THE COURT:  Okay.

21         MS. KOBIALKA:  And, Your Honor, there is an exhibit

22    that is referenced in the testimony that is PTX-8.  Only the

23    cover of the document is referenced, and at the end of the

24    testimony -- this is the cross-examination -- when there are

25    questions about some other document, I wanted to be clear

1    that is not a reference to PTX-8.  It's not a reference to

2    what has been testified before, which is part of the reason

3    for our objection.

4              THE COURT:  All right, let's go.  What is this

5    person's name?

6              MS. KOBIALKA:  This is Mr. Agrawal.

7              And, Mr. Thomas, this is the 19-minute version.

8              (A video deposition clip of SANDEEP AGRAWAL was

9    played in open court.)

10             MS. KOBIALKA:  Your Honor, at this time we'd like to

11   move in the deposition clip that you saw that is PTX-1895,

12   along with the exhibit that was testified to specifically and

13   was marked as Exhibit 3 in the testimony, but that is trial

14   Exhibit PTX-8.

15             THE COURT:  Well, the only reference was to the

16   cover page, so the Court -- this exhibit doesn't have any

17   Bates numbers or other numbers on it that I see, so the Court

18   will admit the cover page of Exhibit 8.

19             MS. KOBIALKA:  So, Your Honor, those are all the

20   deposition clips that we are prepared to play.  We will meet

21   and confer with counsel on the remaining 11 that were in the

22   binder, and if we can narrow those down would you like us to

23   then replace the binders that you have?  I want to make sure

24   we do this in the most easiest and most efficient way for

25   you.

420

```
 1              THE COURT:  Yes.  I'd like you to replace them.

 2              Is there any update on the doctor's brother-in-law,

 3    was it?

 4              MS. KOBIALKA:  I'm just looking at the team.  I

 5    don't believe -- we don't have an update at the moment.  We

 6    are hopeful that Dr. Mitzenmacher can testify on Monday, but

 7    we will have a witness ready to testify on Monday, no matter

 8    what, once we understand what is going on.

 9              THE COURT:  All right.  Is there anything else that

10    we need to deal with today?

11              MS. KOBIALKA:  Nothing on behalf of Centripetal,

12    Your Honor.

13              MR. GAUDET:  Nothing on behalf of Cisco, Your Honor.

14    Thank you.

15              THE COURT:  How many more witnesses does the

16    plaintiff anticipate?

17              MS. KOBIALKA:  I'm sorry, I didn't memorize -- hold

18    on.  Let me look at my list here.

19              We have ten more witnesses.

20              THE COURT:  Ten more?

21              MS. KOBIALKA:  Yes.

22              THE COURT:  That doesn't include the ones on video,

23    does it?

24              MS. KOBIALKA:  That does not include the ones on

25    video.
```

1           THE COURT:  How many of the ten are experts?

2           MS. KOBIALKA:  Eight.

3           THE COURT:  Eight?  Okay.  All right.  Is there

4    anything further?

5           MR. GAUDET:  Not for Cisco, Your Honor.

6           THE COURT:  Anything from the defense?

7           MR. GAUDET:  No, Your Honor.

8           THE COURT:  All right.  Well, we'll be ready to

9    resume at 10:00 Monday morning.

10           MS. KOBIALKA:  Thank you, Your Honor.

11           (Proceedings recessed at 3:38 p.m.)

12                          CERTIFICATION

13

14      I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above-entitled matter.

16

17

18           _____/s/_____

19                       Carol L. Naughton

20                        May 8, 2020

21

22

23

24

25

Carol L. Naughton, Official Court Reporter