827

```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                      NORFOLK DIVISION


 3


 4  CENTRIPETAL NETWORKS, INC.,    )
                                   )
 5            Plaintiff,           )
    v.                             ) Civil Action No.:
 6                                 )      2:18cv94
    CISCO SYSTEMS, INC.,           )
 7                                 )
              Defendant.           )
 8


 9


10


11       TRANSCRIPT OF VIDEOCONFERENCE BENCH TRIAL PROCEEDINGS


12


13                     Norfolk, Virginia
                        May 13, 2020

14


15                       Volume 6B
                       Pages 827-897

16


17  BEFORE:  THE HONORABLE HENRY C. MORGAN, JR.
             United States District Judge

18


19


20


21


22


23


24


25
```

Paul L. McManus, RMR, FCRR Official Court Reporter

```
 1   Appearances: (Via Zoomgov Video)

 2            KRAMER LEVIN NAFTALIS & FRANKEL, LLP
                    By: JAMES RUSSELL HANNAH
 3                      PAUL JOSEPH ANDRE
                        Counsel for Plaintiff
 4
              DUANE MORRIS, LLP
 5                    By: MATTHEW GAUDET
                        LOUIS NORWOOD JAMESON
 6                      Counsel for Defendant

 7                      I N D E X

 8                                              Page
     PLAINTIFF'S
 9   WITNESSES

10   MICHAEL MITZENMACHER
          Continued Cross-Examination by Mr. Gaudet    829
11        Redirect Examination by Mr. Hannah           865

12   ERIC COLE
          Direct Examination by Mr. Andre              873
13

14                    E X H I B I T S

15   DEFENDANT'S
     NO.
16
     DTX-1290                                          831
17   DTX-1650                                          837
     DTX-1296                                          849
18
     PLAINTIFF'S
19   NO.

20   PTX-561                                           888
     PTX-452                                           894
21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3          (Proceedings resumed at 2:07 p.m. as follows:)

4

5          THE COURT:  All right.  Mr. Gaudet, let's pick up

6  where we left off.

7          MR. GAUDET:  Thank you, Your Honor.

8                    CROSS-EXAMINATION (Cont'd.)

9  BY MR. GAUDET:

10  Q.   Dr. Mitzenmacher, do you recall when we broke for lunch we

11  were talking about the transactional-commit model that you're

12  accusing in the firewalls, correct?

13  A.   Yes.

14  Q.   Okay.  Now, I just want to establish what's new and what's

15  old.  So let's pull up Plaintiff's Exhibit 1196.

16          MR. GAUDET:  And Your Honor, Plaintiff's Exhibit 1196

17  should be, actually it's in your small binder as well.  It's in

18  both.  So the small binder for cross-examination should have it.

19          THE COURT:  I have it.

20          MR. GAUDET:  Okay.

21  BY MR. GAUDET:

22  Q.   And Dr. Mitzenmacher, you see the front page of this?  This

23  is a document in the 2013, at least it began in 2013 to talk

24  about the transactional-commit model.  Do you see that in the

25  title?

1   A.   I see transactional-commit model in the title, and I see

2   the first revision date of 9/12/2013.

3          MR. GAUDET:  Mr. Simons, let's go to Page 7 of this

4   document.

5          THE COURT:  Has this been admitted?

6          COURTROOM DEPUTY CLERK:  Yes.

7          MR. GAUDET:  Your Honor, I believe PTX1196 was

8   admitted in the plaintiff's case-in-chief.

9          THE COURT:  Okay.  Page 007.

10          MR. GAUDET:  007.  I think I made a joke about that,

11   Your Honor, and I drew no laughter.

12          Mr. Simons, let's highlight in the section right under

13   1 5, Proposal to Customer, first line, the phrase "We proposed a

14   transactional-commit model for ASA rule engine.  Okay?  Keep on

15   highlighting the behavior changes from the legacy model to the

16   proposed new model are described below.  Okay.

17   BY MR. GAUDET:

18   Q.   Dr. Mitzenmacher, can you confirm, based on this, that the

19   transactional-commit model you are accusing, that's the new

20   model, and the legacy model referenced on this document, that's

21   the old model, correct?

22   A.   I believe so.

23   Q.   Okay.  Now I want to set this side-by-side with the

24   document we were looking at last time, to bring this all

25   together to be sure we're absolutely clear, on what's what.

1        So let's pull up --

2            THE COURT:  I'm clear on that.

3            MR. GAUDET:  Okay, terrific.  Your Honor, one other

4    housekeeping item, which is we want to move to admit DTX-1290.

5    We discussed that just before lunch.  It had this, essentially

6    this same image with some slightly references.

7            THE COURT:  DTX-1290 will be admitted.

8                    (Exhibit DTX-1290 received in evidence.)

9            MR. GAUDET:  Thank you, Your Honor.

10           If we can, Mr. Simons, pull up the '806 claim language

11   chart.

12   BY MR. GAUDET:

13   Q.   We're going to, Dr. Mitzenmacher, while we're getting that

14   pulled up, we're going to shift gears just little bit and I want

15   to focus on the issue of caching.  And to orient, you see that

16   beginning at about Element G there, beginning at Element G, I

17   should say, there's a reference to "signaling each processor to

18   process packets in accordance with the second rule set."  Do you

19   see that?

20   A.   Yes.

21   Q.   Okay.  And when you signal the processor to process

22   packets, it sets off a string of things, right?

23   A.   Yes.

24   Q.   Okay.  One of those is H1, you have to cease processing

25   packets, right?

1    A.    Yes.  With the understanding of the descriptions in the

2    patent; that is, you may have to complete whatever is in flight

3    and then you'll stop and wait for the next step.

4    Q.    And you cache the one or more packets, right?

5    A.    Yes.  You cache the packets that you ceased processing.

6    Q.    Then, then we reconfigure the device, reconfigure the

7    device then, to process packets with the second rule set or the

8    new rule set, right?

9    A.    That looks like H3.

10   Q.    Okay.  And then when you're done with that reconfiguration,

11   then you resume processing and you do that with the new rule

12   set, is that fair?

13   A.    Roughly speaking, sure.

14   Q.    Okay.  Now you're saying that this cache, that these --

15   let's -- and this caching is satisfied by something called the

16   packet buffer, right?

17   A.    Yes.

18   Q.    Okay.  Now, packet buffering, right, I mean that, you can't

19   process any packets without a packet buffer; is that fair?

20   A.    I'm not quite are clear on your question.  I mean...

21   Q.    This is my point.  Okay.  Packet buffering is a thing that

22   happens as a matter of course any time you process a packet in

23   any context; is that fair?

24   A.    You may typically have a packet buffer, and that packet

25   buffer is be used to hold packets for various reasons.

1   Certainly.

2   Q.   And whether or not -- I'm sorry, were you complete, Dr.

3   Mitzenmacher?

4   A.   I mean, I'm just agreeing you can have a packet buffer.  I

5   guess I'm not quite clear what buffer we're talking about quite

6   yet, but I imagine you'll clarify with your questions.

7   Q.   Well, and I mean this generally:  Whether or not you have

8   ceased processing some packets, any time you're processing

9   packets, there's going to be a packet buffer that's holding the

10  packet you're working on and it's holding the next one in line?

11  A.   I mean, the packet buffer I don't think, if I understand,

12  you would be holding the packet you're working on.  At that

13  point it should be out of the buffer.  If there are packets

14  waiting there may be packets being held in a packet buffer that

15  would be awaiting processing, including, for instance, in this

16  situation.

17  BY MR. GAUDET:

18  Q.   Okay.  And let's pull up Plaintiff's Exhibit 1917.  This

19  was some deposition testimony you cited yesterday.

20          MR. GAUDET:  Now Your Honor, this has already been

21  admitted.  This should be in the Plaintiff's -- well, I assume

22  it's in the Plaintiff's binder.  It's Plaintiff's Exhibit 1917.

23          THE COURT:  Yes.

24  BY MR. GAUDET:

25  Q.   And Dr. Mitzenmacher, you pointed to this testimony

1  identifying the fact that there was a packet buffer to support

2  your argument that that must be a cache, right?

3  A.   A packet buffer is a cache, yes.

4  Q.   Okay.  Now, there was testimony from this same witness on

5  the previous page that spoke to the issue of packet buffers as

6  well -- or actually let me -- I don't expect you to know that

7  off the top of your head, so let me withdraw that question.

8  A.   Okay.

9  Q.   Let's just put up, let's put up DTX-1650.  And you see the

10 one PTX-1917 that's Page 26.  Do you see that?  So now this is

11 that same witness, but the prior page.  And moving on to your

12 answer.  So if -- I'll give everyone a moment to read that.

13           MR. GAUDET:  Your Honor, let me know if you're ready

14 to proceed.

15           THE COURT:  Yes.

16 BY MR. GAUDET:

17 Q.   Dr. Mitzenmacher, is your understanding consistent with

18 Mr. Hughes, that all routers have packet buffers where the

19 packets are stored before processing, that's the way that Cisco

20 has done packet processing since its inception?  For decades?

21 A.   I mean, I think I can't speak for all routers or in

22 particular for all Cisco routers.  I recognize that packet

23 buffers may appear for a variety of reasons in a variety of

24 places.

25 Q.   Okay.  Now, the word cache, the word cache, that's a

1  well-known word, right?

2  A.   Yes.  Although -- yeah.  Yes, it's a well-known word in

3  computing.

4  Q.   Okay.  None of the documents you cited yesterday actually

5  used the word cache, right?  Talked about buffers?

6  A.   I don't know.  I can't recall.  Again, a buffer is a

7  typical way that you would -- or one of the ways you would

8  implement the cache.  They both refer to memory.

9  Q.   But the mere fact that a product has a buffer -- let me

10 strike that.

11      The mere fact that a router or a switch has a buffer

12 doesn't tell you much by itself other than the fact that you've

13 got a router or switch, because they have all have buffers:  Is

14 that fair?  What do you mean all routers have buffers?

15      THE COURT:  What he apparently means is that all Cisco

16 routers have buffers.

17      MR. GAUDET:  Absolutely.  And I thought the witness

18 actually expanded out a little bit beyond that, but Your Honor's

19 point is very well taken.

20 BY MR. GAUDET:

21 Q.   All it tells you is you've got a Cisco router or buffer

22 since their inception -- I'm sorry, let me strike that.

23      THE COURT:  I think yesterday the evidence was that

24 buffers and caches were relatively the same thing.

25      MR. GAUDET:  And Your Honor, that was his point, and

1   that is the point I intend to impeach; that buffering is a

2   common thing that has to be there in every -- to have a

3   processor; a cache is a specific thing that is different.

4           THE COURT:  What does a buffer do?

5           MR. GAUDET:  Your Honor -- well, is that to me or the

6   witness?

7           THE COURT:  The witness.

8           THE WITNESS:  Oh, sure.  A buffer is typically

9   something that, it's a memory that holds something.  Often for

10  future use.  Typically buffers have some sort of ordering

11  associated with them.  So like a first-in/first-out buffer is

12  very common, and in that case, as things arrive they may be held

13  in the buffer, and the first thing that came in would be the

14  first thing that came out.  But it's a memory for holding

15  things.

16          THE COURT:  What's a cache?

17          THE WITNESS:  A cache is also often used, is used in

18  the same way as a memory for holding things.  They're very

19  similar.  And with a cache you don't typically or necessarily

20  have an ordering associated with it.  I mean, it can have an

21  ordering, but it doesn't have to.  But a cache is typically used

22  as a memory that holds information that you expect to be using

23  in the near future.

24          THE COURT:  Okay.

25          MR. GAUDET:  And Your Honor, that's about as far as we

```
 1    need to go on that point.  We're going to obviously give you

 2    some more perspective on it from our own witnesses.

 3              THE COURT:  All right.

 4              MR. GAUDET:  I'd like to move to admit DTX-1650.

 5              THE COURT:  Is that the Hughes?

 6              MR. GAUDET:  It is, Your Honor.

 7              THE COURT:  What's the designation?

 8              MR. GAUDET:  Your Honor, that's DTX-1650.

 9              THE COURT:  DTX-1650.  And that's Hughes.

10              MR. GAUDET:  That's Hughes.  It's the counter.

11              THE COURT:  2589.

12              Well, something is wrong here, because the citation at

13    the bottom contains more information that I'm looking at.

14              MR. GAUDET:  Your Honor, there is a series of

15    objections and lawyer colloquy, and we did our best to remove

16    that rather than burdening Your Honor with that material.  So

17    these were the, this was everything in terms of the --

18              THE COURT:  Okay.

19              MR. GAUDET:  -- that's my understanding.

20              THE COURT:  All right.  And you want that admitted?

21              MR. GAUDET:  We want this admitted, yes, Your Honor.

22              THE COURT:  All right.  That's admitted.

23                        (Exhibit DTX-1650 received in evidence.)

24              MR. GAUDET:  Thank you.

25    BY MR. GAUDET:
```

1   Q.   With respect to the --

2          MR. GAUDET:  Let's go back to the claim language,

3   Mr. Simons, if you would.

4   BY MR. GAUDET:

5   Q.   Dr. Mitzenmacher, in the claim, whatever it is that a cache

6   is, let's leave aside any discussion, any debate about that for

7   a minute, whatever it is that the cache element is in H2, that's

8   got to happen in response to a signal that, to process packets

9   in accordance with the second rule set.  And if you look at

10  claim element H, that tells you the signal, and then H2 tells

11  you that you've got to cache something responsive to that

12  signal.  My question, is that generally fair?

13  A.   I mean, I think you're just reading the claim elements, but

14  sure, I think I understand that.

15         MR. GAUDET:  And just very briefly Your Honor, there

16  is one snippet of source code that I wanted to raise with the

17  witness, and to do that we would have to ask just very briefly

18  to seal the courtroom.

19         THE COURT:  All right.  Is this in the same exhibit

20  that the plaintiff used?

21         (Confidential Testimony to Page 843, Line 2 redacted

22  and filed under seal.)

23                         *  *  *

24

25

1                              *  *  *

2   BY MR. GAUDET:

3   Q.   Dr. Mitzenmacher, let's actually pull up PTX-1291.  This is

4   a document you discussed yesterday.

5              THE COURT:  Is that already in evidence?

6              MR. GAUDET:  It is in evidence, Your Honor.  It should

7   be in their binder.  And we're again --

8              THE COURT:  1291?

9              MR. GAUDET:  1291.  And we're again going to a Page

10  007 in this one.

11             THE COURT:  All right.

12             MR. GAUDET:  Give me one second.

13  BY MR. GAUDET:

14  Q.   Dr. Mitzenmacher, this document relates to the Firepower

15  Management Center, correct?

16  A.   I believe so, yes.

17  Q.   It talks about the various ways that the Firepower

18  Management Center can pull in threat intelligence; is that fair?

19  A.   I think that's one of the things it talks about.

20  Q.   And the Court asked a question of you yesterday and I want

21  to be sure I understand.  Threat intelligence arrives at the

22  Firepower Management Center, correct?  Or the Threat

23  Intelligence Detector, correct?

24  A.   Yes.

25  Q.   And then the Firepower Management Center uses that

1   intelligence to create rules; is that correct?

2   A.   So I would say it's getting rules and rule information from

3   it, and it is then constructing a rule set to pass on to the

4   devices.  In doing so, it may eliminate some of the rules it

5   received or decide to change them or to include or not include

6   them.  But it obtains rules and then optimizes, preprocesses and

7   optimizes them.

8   Q.   A rule has a condition and then an action, right?  That's

9   what makes it a rule?

10  A.   Yes.

11  Q.   Your understanding is that the Firepower Management device

12  is receiving things from third parties that have a condition and

13  an action that's required if that condition is satisfied?

14  A.   Yes.  That's some of the threat information it receives,

15  yes.

16  Q.   Okay.  I just wanted to clarify it.

17           MR. GAUDET:  Your Honor, that's all I have on this

18  patent.  We can move on to the last patent, with your

19  permission.

20           THE COURT:  Okay.  Now we're moving to the '205

21  patent?

22           MR. GAUDET:  That's correct, Your Honor.

23           THE COURT:  What did we call this?  The dynamic

24  security patent?  I think that's what we called it.

25           THE WITNESS:  Yep.  Yes, sir.

```
1              THE COURT:  Okay.

2              MR. GAUDET:  And if we could, Mr. Simons, pull up

3   JTX-1?  And I want to go to claim 63.  Should be almost at the

4   back of the document.

5              Your Honor, the good news is I do think this will be

6   the quickest of the three patents.

7              THE COURT:  JTX-1, page -- that's Bates 63?  563, is

8   it?

9              MR. GAUDET:  Your Honor, I referred to it as claim 63.

10  And let me --

11             THE COURT:  Oh, I thought you said page.  I'm sorry.

12             MR. GAUDET:  I apologize.  Claim 63.  And we will have

13  a Bates number for you in just a moment.

14             Let's blow up claim 63.  I'm sorry, Your Honor, it's

15  Bates number 538 within JTX-1.

16             THE WITNESS:  I just want to state I have a copy of

17  that in my binder, so if I look the other way I'm looking at a

18  paper copy.

19             MR. GAUDET:  Terrific.

20             THE COURT:  Okay.

21             MR. GAUDET:  Let's blow up claim 63, Mr. Simons.

22  BY MR. GAUDET:

23  Q.   Now, Dr. Mitzenmacher, the '205 patent and claim 63, it

24  claims a specific type of a rule; is that generally fair?

25  A.   I mean it talks about at least one rule specifying.  Is
```

1   that what you're referring to, or...

2   Q.   Yeah.  And I'm sorry, let me be more specific.  Let's

3   highlight the Receive element.  Just highlight in yellow the

4   entire Receive element.

5        You see towards the end of the second line there's a

6   reference to "at least one rule specifying."  Do you see that?

7   A.   Yes.

8   Q.   Okay.  And it's got a specific -- a set of network

9   addresses, correct?

10  A.   Yes.

11  Q.   And this rule also has to specify a Session Initiation

12  Protocol, SIP, Uniform Resource Identifier, URI, correct?

13  A.   So again, I think this has, I think, come up before, so I

14  think you're reading it differently.  It says that there's a

15  comprising at least one rule specifying a set of network

16  addresses and a Session Initiation Protocol, Uniform Resource

17  Identifier.  So my understanding that at least one rule is

18  specifying those things, it doesn't have to be one rule

19  specifying those things, because otherwise it would just say one

20  rule.

21  Q.   Okay.  Can we agree at least one rule has to specify a

22  Session Initiation Protocol, SIP, Uniform Resource Identifier,

23  URI?

24  A.   Yes.  That's part of it, I think.

25  Q.   And I want to, again, to orient ourselves, where does

```
1   this -- where are you saying this rule lives?  What device, what

2   Cisco device has this rule?

3   A.   So in the cases this would be sort of the end devices, the

4   routers and switches or the firewalls.

5   Q.   I want to talk a little bit more about that long phrase,

6   Session Initiation Protocol, SIP, Uniform Resource Identifier,

7   URI.  Do you see that?

8   A.   Yes.

9   Q.   Okay.  And you talked a little bit on direct about

10  something called Voice Over Internet Protocol, Voice Over IP.

11  So that's using the Internet to make telephone calls, correct?

12  A.   Yes.

13  Q.   And so it's sort of you're using the Internet as a way of

14  getting calls around the world using, as opposed to using the

15  telephone company and their wires; is that generally fair?

16  A.   I mean, I think that's at least part of the intention of

17  Voice Over IP is to allow that and other functionalities as

18  well.

19  Q.   And this Voice Over IP way of making telephone calls,

20  that's been around for a couple of decades; is that fair?

21  A.   You know, I'd have to look up when it started.  It's been

22  around at least a while.

23  Q.   Okay.  And the Session Initiation Protocol, SIP, Uniform

24  Resource Identifier, URI, that's sort of like the function of a

25  telephone number; is that generally fair?
```

 1   A.   It certainly can be.  It's, you know, it's an

 2   identification or way of identifying, I guess, a resource.  You

 3   know, if it gets -- I think it's broader than just a telephone

 4   number, but one of the roles it could play is sort of an

 5   equivalent or like a version of like a telephone number in this

 6   sort of system.

 7   Q.   Okay.  And there's an Internet standard that actually

 8   defines what a Session Initiation Protocol, SIP, Uniform

 9   Resource Identifier, URI, is that standard is -- I'm sorry, go

10   ahead.

11   A.   Yeah.  There are standards that talk about these things.

12   Q.   And that's Standard Request for Comment or RFC 3261.  Does

13   that sound familiar?

14   A.   Yeah, I think so.

15   Q.   Okay.  Let's pull up DTX-1296.

16           THE COURT:  Did you say PTX?

17           MR. GAUDET:  Your Honor, Defendant's.  DTX.  And this

18   should be in the small cross-examination binder, Your Honor.

19           THE COURT:  DTX.

20           MR. GAUDET:  DTX.

21           THE COURT:  1296.  Is this already in evidence or not?

22           MR. GAUDET:  It is not in evidence and I will move it

23   into evidence.

24           THE COURT:  This is the SIP.  And you're moving that

25   into evidence?

```
 1              MR. GAUDET:  Yes, Your Honor.  We move Defendant's

 2   Exhibit 1296 into evidence.

 3              THE COURT:  That will be admitted.

 4                   (Exhibit DTX-1296 received in evidence.)

 5   BY MR. GAUDET:

 6   Q.   Dr. Mitzenmacher, are you familiar with the document that's

 7   marked Plaintiff's -- I'm sorry, Defendant's Exhibit 1296?

 8   A.   I believe I've seen this before and I think I probably

 9   referenced it in my report.

10   Q.   Okay.  And the title there, SIP Session Initiation

11   Protocol, do you see that?

12   A.   Yes.

13   Q.   And that's the same SIP Session Initiation Protocol that's

14   referenced in the claim?

15   A.   That's my understanding.

16   Q.   Okay.  And this is one of these Internet standards that

17   allows everybody to be systems that can communicate and get

18   along and interoperate.  Is that generally fair?

19   A.   Yeah.  I mean, I think this might have been talked about in

20   the tutorials.  You know, there are working groups that train,

21   create rules, which is one of the documents from those groups.

22   Q.   And let's turn to Page 148 of the document.

23              MR. GAUDET:  Which, Your Honor, should be the second

24   page in your binder.

25              THE COURT:  Okay.
```

1    BY MR. GAUDET:

2    Q.    And Dr. Mitzenmacher, you see the top of the page says SIP

3    and Uniform Resource Identifiers?

4    A.    Yes.

5    Q.    And the SIP, that's the Session Initiation Protocol in the

6    claim language, correct?

7    A.    Yes.

8    Q.    And the Uniform Resource Indicator, is that the same thing

9    as the Uniform Resource Indicator, URI, in the claim?  Is that

10   fair?

11   A.    Yeah.  It is sort of odd.  I hadn't noticed this before

12   about the sort of cross language here.  In the title it uses

13   Indicator, in the patent it uses Identifier.  I typically think

14   of the "I" there as being Identifier.  But you know, I can't

15   believe there is much of a difference.

16   Q.    I was going to say, you're comfortable that they're

17   referring to the same thing; is that fair?

18   A.    I believe they're likely meant to be referring to the same

19   sort of thing.

20   Q.    Let's -- about halfway down the page there's something that

21   says SIP and SIPS URI components.  Do you see that?

22   A.    Yes.

23           MR. GAUDET:  Let's highlight that, Mr. Simons.

24           THE COURT:  What are we looking at now?

25           MR. GAUDET:  I wanted to call your attention to the

1   first sentence that says the SIP and SIPS schemes follow the

2   guidelines in RFC 2396.  We can highlight that sentence.

3   BY MR. GAUDET:

4   Q.   See that?

5   A.   Yes.

6   Q.   What is a SIP scheme?

7   A.   I believe it's -- you know, I mean it's just saying that

8   when you are following the Session Initiation Protocol, or the

9   SIPS is the secure version that I believe uses TLS -- sorry,

10  another acronym.  That uses additional security on top of the

11  Session Initiation Protocol.

12  Q.   Okay.  And then after that paragraph there's an example

13  that starts with the word SIP.  Do you see that?

14  A.   Yes.

15  Q.   It's really the form, right, of an example.  It starts with

16  SIP colon.  Do you see that?

17  A.   Yes.

18  Q.   So likewise a Session Initiation Protocol, SIP, Uniform

19  Resource Identifier, URI, address it starts with that SIP colon

20  scheme, correct?

21  A.   I mean, in this example or this formatting, you know,

22  generally in such situations it may be implicit or understood.

23  Q.   Okay.  Sir, the -- now turning back to the accused

24  products, a Session Initiation Protocol, SIP, Uniform Resource

25  Identifier, URI, that doesn't appear in the header of a packet;

1  is that correct?

2  A.   SIP URI? --

3  Q.   Yeah.  That address would not be in the header of a packet;

4  is that fair?

5  A.   I, I think, you know, I think we'd have to get more

6  concrete in the question, since, you know, for instance, the SIP

7  corresponds to a certain port, and that would be in the header

8  of the packet.  You know, the hostname can appear in the packet

9  when it's an IP address.  So I think it's just an ill-formed

10  question.  It would depend on the context.

11  Q.   Okay.  And I want to be sure you get the context.  The

12  entire address, the entire SIP, Session Initiation Protocol,

13  Uniform Resource Identifier address, would not be contained in

14  the header of a packet; is that fair?

15  A.   Again, I think I'd have to caveat it with the statements I

16  was making.  It will depend on what you were referring to,

17  particularly as the address, which can be the IP address, domain

18  and so on.  So like I don't think I can completely agree with

19  that.

20  Q.   Okay.  Sir, in the course of your direct examination you

21  never showed us a rule on a router or switch that had a Session

22  Initiation Protocol, Uniform Resource Identifier identified in

23  the rule, right?

24  A.   I don't recall my exact testimony, but I think if I would

25  say with the understanding that a SIP URI can be denoted or

1   correspond to the host as described here, I think I would

2   disagree with that.  But I would have to look over my testimony,

3   and I'm pretty sure we had rules that had hosts as IP addresses

4   shown.

5   Q.   Let me try it this way.  Would you agree that you never

6   showed a rule in the direct examination that started with a SIP

7   protocol, an actual rule on a router or switch that started with

8   the -- that had an address that started with SIP, that SIP

9   scheme?

10  A.   Again, that may have been put in in other forms or other

11  formats such as the port number.  I mean, I don't think it was

12  necessarily formatted that way, like it wrote the letters out,

13  but there were, as I described in both my literal and DOE

14  infringement analyses, rules that corresponded to these SIP

15  URIs.

16  Q.   We talked about some StealthWatch source code, do you

17  recall that?

18  A.   Yes.

19  Q.   Okay.  And do you recall that the top of that StealthWatch

20  source code -- let me see if I can do this without asking to

21  seal the courtroom -- but it related to something called the

22  flow sensor.  Do you recall that?

23  A.   It may have.  I'm not -- I don't remember the code

24  document, but if you say it related to a flow sensor, that would

25  be fine.

1    Q.   It says what it says and we'll have our experts.  This is

2    the point I want to confirm with you:  A flow sensor, that's a

3    different Cisco product than a Cisco router or a Cisco switch,

4    correct?

5    A.   A flow sensor?  I honestly can't recall the entire usage of

6    Cisco's uses of that terminology so I wouldn't want to say

7    without going back and checking.  I just can't recall.

8    Q.   You also, sir, you relied on -- let me ask you --

9             MR. GAUDET:  Pull up Plaintiff's Exhibit 1289.  We'll

10   go to Bates pages 1911.

11            THE COURT:  Now, 1289, whose exhibit is this?

12            MR. GAUDET:  Your Honor, this was the plaintiff's

13   exhibit that, it should be in the plaintiff's binder, and I

14   believe it was admitted, Your Honor.

15            COURTROOM DEPUTY CLERK:  Yes.

16            THE COURT:  1289.  And what page?

17            MR. GAUDET:  Page 1911, Your Honor.

18            THE COURT:  Can you give me the Bates number of that?

19            MR. GAUDET:  Your Honor, the Bates number is 1911 --

20   I'm sorry, so 6310.1911.  So it should end in 1911, Your Honor.

21            THE COURT:  All right.  I've got a 1912.  I don't have

22   a 1911.

23            MR. GAUDET:  Let's go to 1912.  That's fine.

24   BY MR. GAUDET:

25   Q.   So Dr. Mitzenmacher, do you see Page 1912 here?

1  A.   Yes.

2  Q.   Okay.  And this is -- this was the page that you rely on in

3  your direct examination as evidence that a Cisco firewall could

4  satisfy the claim element relating to the Session Initiation

5  Protocol, Uniform Resource Identifier?  Do you recall that?

6  A.   I mean, I think I was using this to say this is some of the

7  information that is examined and looked at and pulled out in the

8  preprocessor for later rules.  One of the things it looks at is

9  the URI.

10  Q.   Okay.  And what I want to do now is set this side-by-side

11  with Defendant's Exhibit 837.

12          MR. GAUDET:  And Your Honor, this is one of those

13  moments that we did the best we could to predict things, but

14  this came up during the direct examination, so we emailed a copy

15  during the break.  You don't have this document in your binder.

16  BY MR. GAUDET:

17  Q.   Dr. Mitzenmacher, you see trial exhibit references

18  Sourcefire's 3D6 system.  Do you see that?

19  A.   Yes.

20  Q.   Sourcefire's 3D system, that was a Sourcefire system

21  dealing with security, correct?

22  A.   I can't recall that I've opined on, for instance, this

23  specific system.  You know, you can state that.  I don't recall

24  if I examined this system.  It doesn't like it.  It looked like

25  this might have been studied on the validity side, which I

```
 1   wasn't studying.

 2   Q.   Are you generally familiar with Sourcefire?

 3   A.   I am aware of Sourcefire as a company as it relates to this

 4   case.

 5   Q.   Okay.  And Cisco bought Sourcefire in 2013?

 6   A.   That is, I think -- I'd have to check the date, but that's

 7   again how I understand Sourcefire relates to the case.

 8   Q.   Okay.  Let's go to Page 2 of this document.  And you see --

 9             THE COURT:  Page?

10             MR. GAUDET:  The second page, Your Honor.

11             THE COURT:  Which would be Bates 589?

12             MR. GAUDET:  It should be Bates 002, Your Honor.

13             Your Honor, I've been informed that there was a

14   problem and that Page 2 did not make it to you.  I'm just going

15   to ask one question on this one and then we'll move to the page

16   that you do have, which is:

17   BY MR. GAUDET:

18   Q.   Just for context, do you see at the very bottom of this

19   page it references a November, 2011 --

20             THE COURT:  Can you blow that up?  I can't read it.

21             MR. GAUDET:  Let's below that up.

22             MR. HANNAH:  And Your Honor, we would just like to

23   object on foundational grounds.  The witness just said that he

24   hasn't seen or opined on this document, so it appears that

25   counsel's just going to be testifying about this document since
```

1    the witness can't talk about it.

2           THE COURT:  We can look at the language on the

3    document, see what it says.

4           MR. GAUDET:  That's all I'm going to do, Your Honor.

5           THE COURT:  You're going to have to blow it up.

6           MR. GAUDET:  Yes.  So blow up that, and...

7    BY MR. GAUDET:

8    Q.   Dr. Mitzenmacher, my question --

9           THE COURT:  All that is is a date.

10          MR. GAUDET:  That's it.

11   BY MR. GAUDET:

12   Q.   On the face of this document it at least appears that it

13   was published in November of 2011.  Is that at least what the

14   face of the document would suggest?

15   A.   I'm sorry, what that a question?  That sounded like a

16   statement.

17   BY MR. GAUDET:

18   Q.   Simply, the face of the document states November 10 --

19   sorry, November 1st, 2011.  That's the only question.

20   A.   I see the text that you blew up.

21   Q.   Now let's turn to Page 589 of this document.  And what I

22   want to do is highlight on the left in blue from "decoding" down

23   to about just before "SIP preprocessor options".

24          MR. GAUDET:  Give us just one minute.

25          Don't blow it up, highlight it.

1          I apologize, Your honor.  We're working out the kinks.

2          And then on the left side here -- so the right side

3    from "decoding".  The first bullet down through the

4    second-to-last bullet.  SIP Rule Keywords.

5    BY MR. GAUDET:

6    Q.   And my question here, Dr. Mitzenmacher, is just to confirm

7    that the language that you relied on is literally verbatim the

8    language that appears in a document from Sourcefire on the

9    right?

10   A.   So I mean, I think there are some changes between the two,

11   but I would certainly I also note that there's similar language.

12   Q.   You mean the formatting is different, sir?

13   A.   Like in the bullets below, I notice some extra words and

14   page numbers and other things like -- I'm just saying they're

15   not exactly the same, but I agree with you, that there's similar

16   language in both.

17   Q.   That's plenty.

18        And then with respect to --

19          THE COURT:  Now, wait.

20          MR. GAUDET:  I'm sorry, Your Honor?

21          (Pause in the record.)

22          THE COURT:  Well, they're not the same, that's for

23   sure.

24          THE WITNESS:  That's what I said.  They're not the

25   same, but they have similar, some similar language.

1           THE COURT:  Well, they're not the same.

2           MR. GAUDET:  Your Honor, the formatting is different,

3  and I think --

4           THE COURT:  No --

5           MR. GAUDET:  -- there's an extra.

6           THE COURT:  -- no, it's more different than the

7  formatting.  There's just more volume --

8           MR. GAUDET:  On the older one.

9           THE COURT:  -- on the right than there is on the left.

10          MR. GAUDET:  Yeah.  And let me ask a better question.

11  BY MR. GAUDET:

12  Q.   All the words in the newer one, all those words in the

13  newer one were included in the older one.  That's really the

14  point.

15  A.   I mean, do you want me to do the exercise of doing a check?

16  Like, I mean, it's on the screen.  If you really want me to do a

17  word-by-word check I can try and take a few minutes.  But again,

18  I haven't seen this other document before so, you know...

19  Q.   That's fine.

20          THE COURT:  I can tell you that they're not the same.

21  The formatting's different and the words are different.

22          MR. GAUDET:  Your Honor, our point is that the one on

23  the right, the older document, includes all of the words from

24  the one on the left.  There's an extra sentence or two in the

25  highlighted portions, but unless we've missed it, I apologize,

1    but all of these words on the left appear in the older document

2    on the right.  That was the point.

3              THE COURT:  Well, that may be, but --

4              MR. GAUDET:  That was it.

5              THE COURT:  -- they're not the same.

6              MR. GAUDET:  There are more words than the one on the

7    right.  That's obvious.

8              MR. GAUDET:  Right.

9              THE COURT:  I don't know what effect the more words

10   have on the meaning of the two.  Maybe the witness can tell us

11   if it does or doesn't.

12   BY MR. GAUDET:

13   Q.   And Dr. Mitzenmacher, do you have any comment on the

14   additional words?

15   A.   I mean, I haven't looked.  Like I say, I haven't seen this

16   document before.  I haven't studied it.  I suppose you're going

17   to have witnesses that can talk about it if -- but you know --

18             MR. GAUDET:  Your Honor, again, this is just one of

19   those moments where -- I'm sorry.

20             THE WITNESS:  I don't think it affects my analysis, if

21   that's what you're asking.

22             MR. GAUDET:  That's it.  We were simply laying a

23   foundation with this witness, and we're going to bring it

24   together when it's our turn to put our case on.  That's as far

25   as we're going to go with this, Your Honor.

```
 1              THE COURT:  Well, the witness says he doesn't think it

 2   affects his analysis, so...

 3              MR. GAUDET:  Last point on this patent --

 4              THE COURT:  Well, this new thing is not going to be

 5   admitted until it's identified.

 6              MR. GAUDET:  Yes, Your Honor.

 7              THE COURT:  Exhibit 837, DTX-837 is not admitted at

 8   this time.

 9              MR. GAUDET:  Yes.

10   BY MR. GAUDET:

11   Q.   Now, the other issue that we talked about -- let me strike

12   that, actually.

13        Let's pull back up the claim language if we could.

14        This is claim 63 of the '205 patent we were looking at

15   earlier.  I can probably start without having the claim language

16   up.  You recall talking about encapsulation, right, Dr.

17   Mitzenmacher?

18   A.   Yes.

19   Q.   And you referred to that as sort of a detour where a packet

20   arrives, it gets encapsulated and then it gets rerouted?

21   A.   Yes.

22   Q.   Okay.  And now, sir, on direct examination did you identify

23   a rule that has, as the condition, the presence of a Session

24   Initiation Protocol, SIP, Uniform Resource Identifier, as the

25   condition, and the result being if it's got that SIP URI
```

1  address, then it will encapsulate the packet.  Did you show us a

2  rule that actually did all this?

3  A.   I mean, I don't think the claim language calls for a

4  specific rule to encapsulate.  I realize there's some -- I think

5  that has come up before.  I don't think that the claim language

6  specifically calls for that.  I can't recall that I would have

7  shown something like that in my testimony.  I don't think I

8  focused on that point.  But you know, given the rule potential

9  for routing, I think that there are cases where it would have

10  that potential, yes.

11  Q.   Okay.  Encapsulation, the idea of encapsulating packets,

12  that's not something Centripetal invented, right?  That basic

13  concept has been around for a long time?

14  A.   At a high level, I believe that concept existed prior to

15  Centripetal.

16  Q.   Okay.  And you'll also agree with me, sir, that the

17  possibility that there could be a rule that identifies a Session

18  Initiation Protocol, SIP, Uniform Resource Identifier, URI, and

19  that same packet also gets encapsulated, that mere possibility

20  is not enough to satisfy the claim.  The claim requires that

21  there actually be such a rule that satisfies those elements?

22  A.   My understanding is this is a system claim, so it would

23  have the code to do all these things.  It would have a code for

24  rules and the code for the encapsulations and so on as I've

25  described.  So I guess I'm not quite clear on your question.  I

1  think sort of the requirements you're asking about sound more

2  like a method claim issue to me, but... that's a legal question.

3       My understanding is it has the code, it has the

4  functionality to do all these things.

5  Q.   And your point is the system doesn't have to be actually

6  configured with the rule?  Is that your point?

7  A.   No.  My point is like the system is configured to do all

8  these actions, right?  You know, someone may have to set up a

9  rule to do it, but the system has the code to do all this,

10  right?  It's configured to do this.

11  Q.   You haven't shown us any examples of where someone actually

12  set up a rule to do this, right?

13  A.   Set up an example?  I don't recall specifically showing

14  that.  But again, what I was showing was the code, the

15  functionality, the system that's set up to do that.  Again, I

16  think of the -- you know, showing things like that is what

17  I've -- corresponds to like a method claim analysis.

18  Q.   I've got one more question.  And this is going back on the

19  806 patent, so I guess I'm treading back, but I think it's

20  really one question.

21       Of course those are famous last words.  Maybe the

22  least-credible things lawyers ever say.

23       On the '806 patent, that's the rule-swapping patent, right?

24  A.   Okay.  Is that the question?

25       No, just...

1   Q.   I'm done.

2        (Inaudible.)

3   Q.   In the accused products, packets are buffered as part of

4   packet processing and filtering even when rules are not being

5   swapped, right?

6   A.   There may be multiple reasons why you put a packet in a

7   buffer or keep a packet in a buffer.  Of course here we're

8   talking about, in the patent you're talking about having a

9   packet in the cache because it's not ready to process precisely

10  because you're doing the rule swap, and that's what I was

11  focused on.  There may be other things going on in the system.

12  I'm focused on the claim, and the claim talks about caching

13  because you're swapping the rules, as we've discussed.  And

14  that's what's going on.

15            MR. GAUDET:  That's everything I have.

16            THE COURT:  All right.

17            MR. HANNAH:  May I proceed, Your Honor?

18            THE COURT:  I was afraid you were going to say that.

19  I hope you'll proceed very rapidly.

20            MR. HANNAH:  All right.  Thank you, Your Honor.  And I

21  just want to clarify some of the confusing points that came up

22  during the examination.

23            MR. HANNAH:  So we could go backwards or we could

24  start with the '193, we can start with the '205.  I don't know

25  what Your Honor prefers in terms of your notes.

```
 1              THE COURT:  Doesn't make any deference.

 2              MR. HANNAH:  All right.  Let's start with the '205

 3   then since it's fresh in our minds.

 4                      REDIRECT EXAMINATION

 5   BY MR. HANNAH:

 6   Q.   Doctor, if we would go to JTX-1, if we go to column 14 of

 7   the document, that ends in Bates No. 530.  Column 14.

 8              THE COURT:  530, column 14.

 9              MR. HANNAH:  Yes.

10   BY MR. HANNAH:

11   Q.   Doctor, you remember on your examination counsel was asking

12   you questions regarding the SIP URI?

13   A.   Yes.

14   Q.   And he was asking you questions as to whether the SIP

15   portion actually had to be within the SIP URI.  Do you remember

16   that?

17   A.   Yes.

18   Q.   So if we look at column 14, and starting at the top going

19   to about line 10, can you explain for the Court how this informs

20   your opinion as to whether the actual letters SIP have to be in

21   the rule or if it can just be the domain name?

22   A.   I mean, the patent discusses SIP URI, and I think it uses

23   this example like exampleuser@exampledomain.com and there is no

24   SIP, S-I-P, colon.  That's because, again, I think it's

25   understood.  That's the scheme or the protocol.  There may be
```

1  many contexts where you don't need those actual letters to be

2  able to understand if you're blocking things related to that SIP

3  URI.

4  Q.   And just to be clear, the accused routers and switches,

5  they use the domain name as part of the header in performing

6  their analysis for the SIP traffic; is that right?

7  A.   That's part of what they look at, yes.

8  Q.   All right.  Doctor, I'd like to turn your attention to the

9  '806 patent.  And for the '806 patent, counsel showed you the

10  deposition testimony of Martin Hughes, which was DTX-1650.

11           MR. HANNAH:  Can we put that up, please?

12  BY MR. HANNAH:

13  Q.   Now Doctor, I'm not sure that this got driven home or not,

14  but when you read the last question and answer, does this inform

15  your opinion as to whether the Cisco employees themselves equate

16  caches and packet buffers?

17  A.   Yeah.  I mean, so I guess -- so he was asked a question

18  about storing a packet in a cache, and he himself, you know,

19  says oh, yeah, that's put in a packet buffer where packets are

20  stored before processing.  So he connects or understands caches

21  and buffers are sort of, you know, used to refer to sort of

22  memory to hold items.

23  Q.   Doctor, during your testimony again with -- your

24  cross-examination with regard to the '806 patent, there was some

25  notion from counsel that there's no delay in the new system

1   between swapping rules.  Do you remember him talking about this

2   delay aspect?

3   A.   Yeah.

4   Q.   So if we go to PTX-1196 which was shown to you on direct

5   examination, I'd like just to remind you and show you Page 7 of

6   this document, and in particular the last line.

7            THE COURT:  Wait a minute.  This is PTX...

8            MR. HANNAH:  1196.

9            THE COURT:  1196 at Page 007?

10           MR. HANNAH:  Yes, Your Honor.

11           THE COURT:  All right.  What's the language you're

12   referring to here?

13           MR. HANNAH:  So the last line of 1.4 where it says

14   "Customer Needs", it specifically says that "As long as the

15   whole update transaction is atomic; i.e. no gap between removal

16   of old rules and addition of new rules, it is acceptable to have

17   a reasonable amount of delay for the new rules to take effect."

18           Doctor, can you please explain how this informs your

19   opinion as to whether there is an amount of delay in the new

20   systems that are accused of infringement between when the old

21   rules take effect -- I mean between when the new rules take

22   effect versus the old rules?

23   A.   Yeah.  I mean, like I said, there has to be some delay.

24   There's a switchover, and we talked about that.  With regard to

25   the code, you know, you have to actually do the switch, validate

1  that the switch took effect and signal that the switch took

2  effect and then start up the processing again.  So there's

3  certainly going to be some delay, right?  And the issue is,

4  really is just is it a -- obviously whenever there's a delay in

5  a system you'd like to minimize it.  And as it says here, is it

6  acceptable?  The question you have to ask in design is, is it

7  acceptable to have that delay.  And here, you know, as it says,

8  it is acceptable to have a reasonable amount of delay for the

9  rules to take effect.  Particularly when the other option is to

10  run the risk, as discussed earlier in here, of having dropped or

11  dropped packets, packets that are dropped because they couldn't

12  be handled because the system was overloaded.

13  Q.   And you anticipated my next question, is that the old

14  system tried to eliminate the delay, but this new system

15  introduces some delay between the old rule set and the new rule

16  set; is that right?

17  A.   It has this acceptable amount of delay, right, but it does

18  that by doing a different sort of structure precisely to avoid

19  the problems in the old system.

20  Q.   Thank you, Doctor.

21      Now let's turn to the '193 patent.  And the 193 patent, I

22  want to look at the claims.  We can look at claim 18, but it has

23  the same corresponding limitation in claim 19.  And if we look

24  at the responsive -- we can just blow the "responsive to", the

25  first "responsive to".

```
 1          Now, there was some discussion, and I have to admit it was

 2   a bit confusing in terms of this element, and I just want to ask

 3   you to clarify for the record, how do the switches and routers

 4   prevent a particular type of data transfer using the header

 5   information?

 6   A.   In particular I was talking about preventing exfiltration,

 7   and the exfiltration is based on a certain host.  And so you

 8   would -- the primary goal of the quarantine is to block that

 9   host from accessing certain other networks.  And it does that

10   through the header information.  It can block.  It looks at the

11   person trying to reach out from inside and it blocks to where

12   they can go to.  So that's based on the header information.

13   Q.   And if we look at PTX-1262, which you referred to in your

14   direct testimony, and if we look at the page ending in Bates

15   number 999.

16            THE COURT:  Just a minute.  Where are you now?

17            MR. HANNAH:  PTX-1262, and in particular on page, it's

18   77 of the document, but Page 999 is the Bates number.

19            THE COURT:  All right.

20   BY MR. HANNAH:

21   Q.   If we look at "Policy And ACL", and Doctor, do you remember

22   testifying about this in your direct testimony with regard to

23   the '193 patent?

24   A.   Yes.

25   Q.   And if we look at the second line and highlight that whole
```

1   thing, it starts with TCAM matching?

2   A.    Yes.

3   Q.    So can you explain how this informs your opinion that a

4   particular type of data transfer can be prevented using the

5   header information?

6   A.    Sure.  So you're trying to prevent a type of data flow

7   from, potentially from one location to another location or in

8   particular, from potentially several locations out to another

9   location.  And that's handled by a combination of information

10  such as the IPv4 addresses.  You look at the addresses of the

11  people who are trying to communicate, and in particular, as we

12  talked about, that SGT, the Scalable Group Tag, right.  So that

13  group tag is what says, hey, this is actually a host that's been

14  quarantined.  So you don't even have to say I'm going to

15  restrict this host, although that will be the action.  You say I

16  can restrict these collections of hosts from reaching the

17  outside world because they all have this Scalable Group Tag.

18  Q.    And just to be clear, you can look at this information not

19  in the payload but in the header as well, correct?

20  A.    Yes.  This is additional information.  It's not just the

21  information we were talking about.

22  Q.    And finally, Doctor, you were asked a number of questions

23  about certain actions that had to be performed in order to meet

24  limitations.  Can you explain the types of claims that we have

25  in this case, the system and computer-readable media and what's

1   required in order to infringe?

2   A.   Right.  So you know, system claims in particular, you have

3   to have a system that has the functionality to perform the

4   operations.  And all of these systems have that functionality.

5   The functionality is embedded in the code, right, in the code

6   that runs on the hardware, that runs these machines.  And that's

7   also why it satisfies the computer-readable media claims.  I

8   mean all of this is, you know, the software that runs on these

9   machines, these instructions that tell the machines to carry out

10  these processes, and all of them, all of these components have

11  the code that allow them to do these steps.

12            MR. HANNAH:  All right.  Thank you, Doctor.

13            Your Honor, I have no further questions.

14            THE COURT:  All right.  Is there any --

15            MR. GAUDET:  Your Honor, there are a few points we

16  might want to explore, but I think it makes sense for all

17  involved for us to do it with our own witnesses.

18            THE COURT:  What?

19            MR. GAUDET:  I'm sorry, I thought you were asking if I

20  had any recross.

21            THE COURT:  I am.

22            MR. GAUDET:  The short answer is no.  There is some

23  points that I may have wanted to explore, but I think it makes

24  sense for us simply to do them with our own witnesses.

25            THE COURT:  All right.  Will this witness -- can he be

1   released or is he going to be recalled or what?

2           MR. HANNAH:  He can be released, Your Honor.  We're

3   not going to recall him.

4           THE COURT:  All right.  Doctor, you're excused as a

5   witness.  And what that means is that you cannot discuss your

6   testimony with any other witness in the case until the case is

7   concluded.  But you may, if you wish, observe the case on audio

8   if you have any interest in doing so.

9           THE WITNESS:  All right.  Thank you, sir.

10          THE COURT:  But other than that, you're excused.

11          THE WITNESS:  Thank you, sir.  Thank you everyone.

12          MR. GAUDET:  Thank you, Dr. Mitzenmacher.

13          THE COURT:  Are you ready with the next witness?

14          MR. ANDRE:  We are, Your Honor.  Paul Andre for

15   plaintiff Centripetal.  I just had to switch out my name on the

16   camera there.  And we're calling Dr. Eric Cole to the stand.

17          THE COURT:  Dr. Harry...

18          MR. ANDRE:  Eric Cole.  E-r-i-c, C-o-l-e.

19          THE COURT:  Eric?

20          MR. ANDRE:  Yes.  Eric Cole.

21          THE COURT:  C-o-l-e?

22          MR. ANDRE:  Yes.

23          THE COURT:  Where are you, Dr. Cole?

24          THE WITNESS:  I am in my home office.  I have a studio

25   here because we do a lot of podcasts and interviews and training

1    classes.

2              THE COURT:  I mean geographically.

3              THE WITNESS:  Oh, sorry.  Ashburn, Virginia.

4              THE COURT:  Where in Virginia?

5              THE WITNESS:  Ashburn.  Right near Dulles Airport.

6              THE COURT:  Ashburn.  Okay.

7              You may proceed, Mr. Andre.

8              MR. ANDRE:  Thank Your Honor.

9              ERIC COLE, having been duly sworn, was examined and

10   testified as follows:

11                       DIRECT EXAMINATION

12   BY MR. HANNAH:

13   Q.   Good afternoon, Dr. Cole.

14   A.   Good afternoon.

15   Q.   Thank you for waiting patiently for us to get to you.

16              THE WITNESS:  My pleasure.

17              THE COURT:  Let me collect a new set of books here.

18              (Pause in the record.)

19              THE COURT:  All right.  You may proceed.

20              MR. ANDRE:  Thank Your Honor.

21   BY MR. ANDRE:

22   Q.   Dr. Cole, let's start out with talking about your

23   qualifications.  Can you tell us -- and there's a slide for

24   this -- could you tell us about your education?

25   A.   I have a Bachelor's and Master's degree in computer science

1  from New York Institute of Technology.  I have my Doctorate from

2  Pace University, in which my dissertation was focused on

3  cybersecurity, data protection and data leakage.

4  Q.   And could you tell us about some of your certifications in

5  cybersecurity?

6  A.   Yes.  In cybersecurity there is two main certifications.

7  The first one is Certified Information Systems Security

8  Professional, and that's sometimes abbreviated -- I know we have

9  a ton of acronyms in this case -- CISSP.  And that I earned in

10 the mid '90s and was one of the first few hundred people to have

11 my CISSP, and I still maintain that certification today.

12       The second main certification in cybersecurity is the

13 Global Security Essential Certification, known as GSEC.  And

14 that certification I do not actually hold, because I created the

15 certification and wrote the test questions.  So it would be a

16 conflict of interest for me to actually take that exam.

17 Q.   I noticed that you were a Commissioner of cybersecurity for

18 the 44th President.  Have you worked for the White House and

19 other Presidents as well, and what did you do for the White

20 House?

21 A.   Yes.  So I've advised the last three Presidents of the

22 United States on cybersecurity.  It was the previous President

23 actually formed a commission, so I was one of the Commissioners,

24 or I was one of the authors of the guide for protecting

25 cyberspace.  I was also involved in securing the President's

 1  Blackberry when that rolled out, and also for securing and

 2  protecting his social media accounts.

 3  Q.   Let's start with -- go to the next slide -- and talk about

 4  some of your employment.  I see you started your career at the

 5  Central Intelligence Agency from 1991 to 1996.  Could you tell

 6  us, what did you do for the CIA?

 7  A.   For the CIA I focused in several different areas.  I

 8  started off as a artificial intelligence programmer where I

 9  actually built expert witness tracking systems that would help

10  the government track, find, terrorists across the world.  I

11  then, from that programming experience in artificial

12  intelligence, I then moved into cybersecurity where I was a

13  professional hacker for eight years focusing in on identifying

14  vulnerabilities, flaws and exposures and breaking into various

15  systems around the world.

16  Q.   And I notice you were at the CIA kind of right when the, a

17  little bit from the Internet was taking off and became popular

18  in the mid '90s until a little bit after.  Did your training at

19  the CIA, did it involve trying to break -- how the Internet was

20  working and how it would be vulnerable to security attacks?

21  A.   Absolutely.  As you mentioned, in the early '90s this was

22  before the World Wide Web existed.  We had early connections.

23  So we were one the key testers in a lot of the various

24  protocols, and I was involved in many different working groups

25  in terms of the different protocols we've heard about, Transport

1  Control Protocol, TCP, and Internet Protocol, IP.  I was on many

2  of those different working groups helping to influence, protect

3  and secure those protocols.

4  Q.   And did you get any awards when you were at the CIA or any

5  commendations?

6  A.   Yes, I was received many awards.  Multiple awards from the

7  DCI, the director rate of Central Intelligence.  I received one

8  of those for actually building and testing some various security

9  protocols.  I received a second one for actually helping catch

10  one of the most wanted terrorists in the world.  And then a

11  third one for building some internal communication systems.

12  Q.   I won't go through all your employment, but I want to

13  address a few of them.  I see from 1999 to present you have been

14  at the SANS Institute, Director of Cyber Defense and Senior

15  Fellow.  What does that entail?

16  A.   SANS is another acronym.  That stands for System

17  Administration and Network Security.  And they're one of the

18  most common, most popular training courses -- sorry, training

19  companies in the world.  They give courses all around the world

20  in various locations.  And I joined them when they were

21  relatively small and they were running one- or two-day

22  conferences.  I was responsible for their cyber defense

23  curriculum.

24       When I left the CIA, I switched from offense to defense,

25  because what I realized is offense is easy.  It's easy to break

```
 1  into systems.  There's always vulnerabilities, there's always
 2  flaws.  And to be honest with you, I got a little bored.  So I
 3  switched to defense which is a much harder problem to protect
 4  and secure critical systems.  So at SANS I was responsible for
 5  their cyber defense curriculum where I wrote four of their most
 6  popular courses, including Security Essentials, which is their
 7  No. 1-selling course, and that has sold to over 50,000 people
 8  and I've personally, in a classroom environment, have taught
 9  over 25,000, and in virtual environments, an additional 30,000.
10  Q.   And if we go down a little further I see you were the chief
11  scientist at Lockheed-Martin.  What did you do for
12  Lockheed-Martin and how did you get there?
13  A.   I got at Lockheed-Martin because they acquired one of the
14  companies that I started.  We started a company called The Sytex
15  Group, Inc, which is sometimes referred to as TSGI.  And in that
16  group, I was responsible for their intellectual property and
17  doing research and development in new areas of cybersecurity.
18  And based on several of the contracts that we had and some of
19  the advanced research that we were doing, Lockheed-Martin
20  actually decided to acquire us.  Typically when a company like
21  Lockheed acquires a government contractor, it's usually because
22  they want the contracts, and they tend to, unfortunately, lay
23  off a lot of people.  But based on my expertise in
24  cybersecurity, the current CEO and President, Bob Stevens at the
25  time, kept me on as his chief scientist.  So I was responsible
```

1  for responding to any breach, any issues or any problems with

2  cybersecurity across all of Lockheed-Martin.

3  Q.   And did you -- was that involving the defense industry?

4  A.   Yes.  The defense industry.  So I don't know if you recall

5  when there was the hack against the Joint Strike Fighter from

6  foreign countries.  I still remember I got the call at 2 a.m. on

7  a Saturday morning, and I was on an airplane at 3:30 flying to

8  Texas to help resolve and minimize the damage and exposure from

9  that attack.

10  Q.   And the last one I want to talk about is McAfee.  You're

11  the senior vice-president and chief technology officer.  Can you

12  tell us about your time at McAfee?

13  A.   Yes.  I was recruited by McAfee around the 2009 time period

14  because that was a interesting transition time in cybersecurity

15  where a lot of the traditional measures were not really working

16  very well and they were losing market share.  So they brought me

17  in to head up their technology division, and I worked very

18  closely with customers, analyzing different technology, and

19  eventually rebuilt and revamped their entire product line.  And

20  I was also actively involved in not only licensing our

21  technology, but also licensing third-party technology and

22  acquiring and bringing in third-party companies to help augment

23  our security product offering.

24  Q.   Last bullet point there says you worked eight years in the

25  government from various departments:  The CIA, the Department of

1  Defense, FBI, et cetera.  Do you hold top-secret clearances?

2  A.   Yes.  I believe, if I'm counting correctly, I'm up to five

3  right now.  I have a CIA clearance; a Department of Defense

4  clearance, a National Security Agency, NSA, clearance; a

5  Department of Energy Clearance; and an NRC, Nuclear Regulatory

6  Commission clearance.

7       And just on a side note, several years ago when NRC started

8  moving more to cyber and they needed to go in and do cyber

9  evaluations of all the computers at nuclear power plants, I was

10 actually one of the authors of the cyber regulation for the NRC,

11 which is what all of the inspectors are using today to make sure

12 those critical digital assets at nuclear power plants are

13 properly secure and properly protected.

14 Q.   If we go to the next slide, I just want to talk very

15 briefly about some of the books you've written.

16      The book on the far left is the *Network Security Bible*.

17 Who uses that book?

18 A.   That's a book that's used wide-range across the industry.

19 I know a lot of colleges use it in their cybersecurity courses.

20 I know a lot of companies have bought anywhere from 30 to 500

21 copies for their entire staff.  And it's also utilized in a lot

22 of different third-party programs.

23 Q.   On top of that book it says -- I'm reading it here, my eyes

24 are not that good -- "compliment your Cisco Academy course

25 instructions."  Is it used, is it part of the Cisco training as

1  well?

2  A.   Yes.  Cisco has a publication division called Cisco Press,

3  and they have various certifications.  And as part of those

4  certifications in different areas, including network security,

5  they have third-party reference books that they utilize.  And my

6  book is one of those reference books that they utilize for their

7  academy.

8  Q.   Now, are all your books geared towards cyber professionals

9  or do you have some books for the laypeople and kids?

10  A.   My original focus was on technology.  So you'll notice my

11  first book was *Hackers Beware*.  Then we have *Network Security*

12  *Bible* 1st and 2nd Edition, *Advanced Persistent Threat, Insider*

13  *threat*, but what I realized several years ago is the problem

14  isn't necessarily the technical people don't know the

15  technology, it's that the average, the doctors, the lawyers, the

16  teachers, the parents, they don't understand that they're a

17  target and that cyber security is their responsibility.  So I

18  started writing books to help protect families and parents

19  online, which the main book being *Online Danger*.

20        MR. ANDRE:  Your Honor, at this point we'd like to

21  tender Dr. Cole as an expert in cybersecurity and the

22  cybersecurity industry.

23        THE COURT:  Any voir dire from counsel for the

24  defense?

25        Mr. Jameson, I see your picture.  Is there any voir

1   dire?

2           MR. JAMESON:  I was on mute, Your Honor.

3           There is no voir dire and there is no objection to the

4   tender with respect to Dr. Cole offering his expert opinions

5   with respect to infringement.

6           I would note for the record that we have a *Daubert*

7   motion pending that's Document 247, and that *Daubert* motion

8   deals with the fact that we expect that Dr. Cole is actually

9   going to be offering opinions in the form of expert opinions on

10  the issue of whether or not Cisco copied technology from

11  Centripetal, and we believe that that is a factual issue that

12  has nothing to do with expert credentials.  And so we would just

13  like to note for the record that that *Daubert* motion is pending

14  and we do not believe that that's an area for expert testimony.

15          THE COURT:  Well, we'll -- if the proponent of the

16  witness gets into that area, we'll deal with your motion at that

17  time.

18          MR. JAMESON:  Thank you, Your Honor.

19          THE COURT:  And we accept the qualifications of

20  Dr. Cole to testify in the specified areas as an expert.

21          MR. ANDRE:  Thank you, Your Honor.

22  BY MR. ANDRE:

23  Q.   Dr. Cole, what was your assignment in this case?

24  A.   My assignment in this case was to review Cisco's public

25  documents, confidential documents, engineer's deposition, source

1  code, and actually test the products, and then determine if the

2  defendant's products infringed two of the patents that, in this

3  case, we are calling the '856 patent and the '176 patent.

4  Q.   Before we get into it, the '856 patent first, when I talk

5  about cybersecurity, what do you mean, how do you understand

6  that term to be applied?

7  A.   Cybersecurity, as you can imagine, is a very broad term.

8  The way that I look at it, it's all about managing risk to your

9  critical assets and critical information.  Cybersecurity is all

10 about understanding and mitigating those overall risks.  One

11 thing that's important to point out is 100 percent security in

12 any practical sense doesn't exist unless you disconnect from the

13 grid.  Because if you have 100 percent security, that's zero

14 functionality.  So the way you need to look at it is any time

15 you're adding in functionality, you're decreasing the security.

16 So when you have a system that has a lot of functionality or a

17 lot of capability, it's not going to be 100 percent secure.

18 There is going to be some exposures or issues.  So to me,

19 cybersecurity is about prevention is ideal, but detection is a

20 must.  You need to recognize that you won't be able to prevent

21 all attacks, and really what you're tying to do with

22 cybersecurity is to contain and control the damage, is to get

23 proper visibility, do proper analysis so you can catch the

24 attack very quickly and contain, minimize and control the

25 overall damage to an organization or an individual.

1  Q.    And I believe you were listening in on Dr. Mitzenmacher's

2  testimony when Judge Morgan asked why is it important to have

3  security at all these different places on routers and switches

4  and firewalls and throughout?  Why is layered security

5  important?

6  A.    Layered security, what we sometimes refer to as defense in

7  depth, is based on a simple premise that no single measure is

8  going to be able to protect you.  These threats are fairly

9  advanced and fairly sophisticated, and so you need to have as

10  many different layers all working together in order to have a

11  cohesive level of protection.

12       A great example I like to use is the U.S. military.  The

13  U.S. military has multiple branches of the military, and many of

14  those branches have airplanes planes and many of those branches

15  have boats, but if you get more specific, they're different

16  types of airplanes with different branches of the military based

17  on what their mission and focus is.  And therefore, even though

18  the United States military and Department of Defense might have

19  some overlap in terms of airplanes, boats and tanks, they're

20  different for different functions, and when you put them all

21  together, they provide a very comprehensive solution to protect

22  the United States.  And we do the same thing with cybersecurity.

23  You might have some overlap in some of the different technology,

24  but you really want to have that defense in depth in order to

25  protect, secure and get that visibility so you can contain and

1  control those threats in a timely manner.

2          THE COURT:  Well, this sounds as if you have to have

3  different policies and rules on different firewalls, switches

4  and routers.  That's what we've been talking about, are

5  firewalls, switches and routers.  If you've got the same rules

6  on all them, how does that offer you defense in depth?

7          THE WITNESS:  Well, there's a couple ways that works.

8  If you have the same device that has the same rules, the

9  attacker still has to spend effort trying to break into each

10 one, and you're slowing them down in order to get a better

11 chance of catching them.  But Your Honor, you're right:  In most

12 cases, the effectiveness of these devices really comes in on

13 using the capabilities to be able to build customized rules for

14 each of these different areas and organizations.

15         For example, I have a bank that I'm responsible for

16 protecting and they have five different devices, and each one

17 has specialized, customized rules on each one.  It's the

18 effectiveness of the rules with the technology that allows that

19 bank to have visibility, contain and control the damage.

20         THE COURT:  Okay.

21 BY MR. ANDRE:

22 Q.   Let's start with the first patent that you're going to be

23 discussing, the '856 patent.  Now, what are we calling this

24 patent?

25 A.   We're calling this the encrypted traffic patent.

1  Q.   All right.  I'm going to show you what's already been moved

2  into evidence, JTX-5, which is the '856 patent.

3            MR. ANDRE:  And could we pull up Claims 24 and 25?

4  BY MR. ANDRE:

5  Q.   Could you describe generally speaking what is claim 24

6  discussing?

7            THE COURT:  Well, 25 is not very legible on the

8  screen?

9            MR. ANDRE:  Well, I'm sorry, yes.  It's not on the

10 screen.  We'll pull up in a second.  The way the screen is put

11 together we can't pull them up at the same time.  We're just

12 putting 24 up there now.

13           THE COURT:  All right.

14 A.   So 24 is a system claim, and what that really deals with is

15 being able to detect threats in encrypted traffic without

16 actually decrypting the traffic.  So by utilizing information in

17 unencrypted headers and unencrypted packets, you're able to

18 determine if there's any threats within that encrypted traffic

19 without decrypting it.  Then you actually can go in and route

20 those packets to a proxy system so proper analysis can be done

21 to minimize those network threats to that environment.

22 Q.   If we turn to claim 25, what is that covering?

23 A.   Except for the beginning portion, this is a

24 computer-readable media claim.  But as we'll see in a little

25 bit, the rest of the claims are very, very similar, and in many

1  cases identical to claim 24.  So it's really dealing with the

2  same challenge of being able to detect threats in encrypted

3  traffic without decrypting it and then, based on those threats,

4  be able to route that to a proxy system so appropriate action

5  can be taken.

6  Q.   And what was the -- with respect to the '856 patent, what

7  was the summary of your opinions?  I believe we have a slide on

8  that.

9  A.   The summary of my opinion is that Cisco's switches and

10 routers, with Cisco's StealthWatch and Cisco's Identity Services

11 Engine, infringe the '856 patent on claims 24 and 25.

12 Q.   Now let's talk about encrypted traffic and exactly why that

13 causes problems to traditional security.  Could you describe --

14 the headers and payloads, how traditional security detected

15 malware or bad traffic?

16 A.   A lot of the focus -- if you go back more than five years

17 ago, a lot of the focus in cybersecurity was really performing

18 advanced analytics on the payload.  So you have technologies

19 like firewalls that start looking at the payload.  You have

20 Network Intrusion Detection Systems, which is sometimes referred

21 to as a NIDS, N-I-D-S, which is Network Intrusion Detection

22 System.  You also have another technology, Network Intrusion

23 Prevention Systems, known as NIPS, and the focus has always been

24 on how could we do more-advanced analytics of the payload?  How

25 could we go and look at the payload and find out what the

```
 1   adversary is doing, how they're working and operating and trying
 2   to break into the systems.
 3   Q.   What effect does encryption have on those type of systems?
 4   A.   As soon as you go in and encrypt the payload, it allows the
 5   adversary to go into stealth mode.  Essentially they drop below
 6   the radar and they're able to sneak in and cause significant
 7   damage.  Because if your technology, like your Network Intrusion
 8   Detection System, your Network Intrusion Prevention System and
 9   some of your advanced firewalls requires payload analysis but
10   you can't read the payload, they are going to be ineffective and
11   miss the attack.  And this is one of the reasons why you have
12   examples where you have large hotel chains that had 500 million
13   records compromised.  They didn't detect the attack for over
14   years, and the reason is because all their technology was
15   looking at the payload, the attacker was encrypting the payload
16   and therefore the technology was not capable of catching or
17   finding the attack.
18   Q.   And in this case we're going to be talking about Cisco's
19   Encrypted Traffic Analytics; is that correct?
20   A.   That is correct.  Sometimes referred to as ETA, with the
21   acronym standing for Encrypted Traffic Analytics.
22   Q.   Can we go ahead to the next slide?
23        Is the Encrypted Traffic Analytics technology important to
24   Cisco's systems?
25   A.   Yes.  This is critical to their systems because it now
```

1   allows them to be able to analyze encrypted traffic without

2   actually decrypting it, which is a huge advancement and a

3   critical component.  So now via ETA which is built into the

4   routers and also into the StealthWatch, now all of their

5   technology is able to analyze encrypted traffic without actually

6   decrypting it.

7   Q.   I'd like to show you what's been marked as PTX-561.

8        Dr. Cole, do you recognize this document?

9   A.   Yes, I do.  This is a Cisco public document that talks

10  about Encrypted Traffic Analytics with the new, the new Cisco

11  network and StealthWatch.

12            THE COURT:  Let me find that.  561.  This is PTX-561.

13  And this is ETA on Cisco's Network and StealthWatch.  And you've

14  used those two terms separately.

15            MR. ANDRE:  Your Honor, we'd like to move PTX-561 into

16  evidence.

17            MR. JAMESON:  No objection, Your Honor.

18            THE COURT:  That will be admitted.

19                 (Exhibit PTX-561 received in evidence.)

20  BY MR. ANDRE:

21  Q.   Dr. Cole, I'd like to focus on that bottom box.  This was a

22  document that came out in 2019, how Cisco identified the

23  importance of encrypted traffic at this time period.  Could you

24  comment on that, please?

25  A.   Yeah.  So they're utilizing a third-party source, Gartner,

1   which is a highly reliable research organization that many large

2   Fortune 50 companies rely on.  So this is a third-party source

3   saying that by 2019, 80 percent of all traffic will be encrypted

4   and 70 percent of network attacks will use encryption.  And if

5   you continue to read this document it shows that Cisco

6   understands this problem.  This is a growing problem over the

7   last several years, and in order to be able to deal with all

8   this encrypted traffic, especially encrypted traffic being used

9   by adversaries, encrypted traffic analytics became a critical

10  component in being able to identify threats as more and more

11  attackers utilized encrypted communication as a way to try to

12  hide or bypass traditional security measures.

13  Q.   If we turn to the second page of this document ending in

14  Bates number 630, there's a heading called Encrypted Traffic

15  Analytics.  If we blow that up first paragraph, and could you

16  describe how that first sentence -- what Cisco's talking about

17  when it talks about Encrypted Traffic Analytics?

18  A.   In my expert opinion, Cisco is recognizing their expertise

19  in network infrastructure and they realized with research that a

20  lot of this technology was becoming less and less effective as

21  more and more attackers encrypted their communication.  So they

22  introduced an innovative and revolutionary technology, Encrypted

23  Traffic Analytics, that allows them to be able to analyze

24  encrypted traffic without decrypting it.  And the reason why

25  this is so important and they keep emphasizing the without

1   encryption, is because the old previous way of dealing with

2   encrypted traffic was to actually decrypt it every single time.

3   Well, decrypting traffic is very, very slow.  It has a huge

4   security issue, because all of the keys are potentially exposed.

5   And now you could have major privacy issues where you're reading

6   private information that could violate a lot of the

7   cybersecurity regulations.  So in order to be able to analyze

8   encrypted traffic without decrypting it was a huge, huge

9   advancement.

10  Q.   If we go down to that same page on the bottom left corner

11  it says the solution elements, and I want to focus on the first

12  two, the Enterprise Switches and the Branch Routers.  Do you see

13  that?

14  A.   Yes, I do.

15  Q.   And are these the switches and routers that you'll be

16  giving your opinion on with respect to the '856 patent, the

17  Cisco Catalyst 9000 switching platform and the Cisco ASR 1000

18  series and 4000 series ISRs and 1000 series?

19  A.   Yes, they are.  These are some of the infringing components

20  that I mentioned on the previous slide.  And this also informs

21  me that these switches and routers have ETA technology embedded

22  within them.

23          THE COURT:  All right.  I want to make a note of these

24  before we move on.

25          (Pause in the record.)

1          THE COURT:  Okay.

2          MR. ANDRE:  Just one last thing on this document.

3    BY MR. ANDRE:

4    Q.   In the middle of the page it talks about the Encrypted

5    Traffic Analytics extracts four main data elements, and you see

6    there's four elements listed?

7    A.   Yes, I do.

8    Q.   And we're going to be talking about this a lot, but could

9    you just give an introduction of what we're going to be talking

10   about tomorrow, about what portions of the unencrypted data it

11   uses to detect the encrypted?

12   A.   So as this says, there's four main elements.  So the first

13   one is the Sequence of Packet Lengths and Time.  So this is

14   going to go in and look at timing conventions, length of the

15   packet, size of the packet.  And this is similar to if you're

16   examining packages and you're expecting to get a package that

17   has sneakers but it weighs 60 pounds, that's going to be

18   anomalous into what you're expecting, so it's able to look at

19   parameters in terms of length and time.  It then also looks at

20   the initial data packet where it's going to pull information

21   such as Hypertext Transfer Protocol, Universe Resource Locators,

22   domain name, system hostname and addresses.  It's also going to

23   look at the byte distribution and then also Transport Layer

24   Security, that's the next version of Secure Socket Layer, SSL,

25   which we've talked about.  So it's also going to look at some of

1  the unique characteristics of the Transport Layer Security

2  handshake and use all of those components that's unencrypted to

3  be able to analyze and identify threats within the encrypted

4  traffic without actually decrypting.

5          THE COURT:  Is that an exhaustive list of what you can

6  look at without de-encrypting?

7          THE WITNESS:  No, Your Honor.  These are the four main

8  elements that encrypted traffic analytics extracts and uses, but

9  there actually could be other information in the headers that

10 could also be extracted.

11         THE COURT:  Okay.

12         MR. ANDRE:  Your Honor, I'd like to show what's been

13 marked as PTX-452.

14         THE COURT:  Well, this would be a good time to stop.

15         MR. ANDRE:  Okay.

16         THE COURT:  PTX what?

17         MR. ANDRE:  452.  It was just one -- I was going to

18 talk about the release of this technology.

19         THE COURT:  Okay.  Go ahead.

20         MR. ANDRE:  Okay.  It will just be a couple minutes,

21 Your Honor.

22 BY MR. ANDRE:

23 Q.   Dr. Cole, what is this document?

24 A.   This is a document from Cisco that they talk about "Cisco

25 unveils the network of the future that can learn, adapt and

1   evolve," and they highlight and talk about the importance and

2   criticality of Encrypted Traffic Analytics able to analyze

3   encrypted traffic without actually decrypting it.

4   Q.   What's the date of this document here?

5   A.   June 20th, 2017.

6   Q.   And let's just go down the fifth paragraph in this

7   document.  And could you just read that first sentence into the

8   record from the quote from the Cisco executive?

9   A.   Yes, "Cisco's Encrypted Traffic Analytics solves a network

10  security challenge previously thought to be unsolvable."

11  Q.   What does he go on to say there on the ETA uses Cisco's

12  Talos?

13  A.   Yeah.  He then goes to talk about the Cyber Threat

14  Intelligence that feeds in.  It says "ETA, Encrypted Traffic

15  Analytics, uses Cisco's Talos cyber intelligence to detect known

16  attacks -- my pictures are cutting off -- "of signatures even in

17  encrypted traffic, helping to ensure security while maintaining

18  privacy."

19  Q.   Just in our last minute or two here, was looking at

20  encrypted traffic a problem that people were working on in your

21  industry for several years?

22  A.   Yes.  It was a big problem that many people were working on

23  and many people were trying to figure out how to be able to

24  analyze encrypted traffic without decrypting it, because as I

25  mentioned, the old solution of decrypting traffic just wasn't

1  working.

2          MR. ANDRE:  Your Honor, I'd like to move that exhibit

3  PTX-452, and we may revisit it tomorrow, but now is a good time

4  to take a break.

5          MR. JAMESON:  No objection.

6          THE COURT:  All right.

7                  (Exhibit PTX-452 received in evidence.)

8          THE COURT:  We'll terminate the hearing.  I'll ask

9  counsel to remain on.

10          All right.  Is there anything we can take care of at

11  this point that will help move things along tomorrow?

12          MR. ANDRE:  I don't think so, Your Honor.  This

13  witness, as you can tell, he's a little different, little faster

14  witness and we'll get through him pretty quickly in the morning,

15  and I think we'll be done with Dr. Cole's testimony in the

16  morning.  I imagine the cross-examination will all be done

17  pretty quickly as well, and we'll be very close to getting back

18  on schedule with us dropping the two other witnesses that we

19  talked about earlier.  We've also, we're streamlining some of

20  our examinations to make sure we get back on schedule.

21          THE COURT:  Are you intending to go into the copying

22  issue with this witness?

23          MR. ANDRE:  Yes, Your Honor, we will.  We're going to

24  lay a foundation of what he's looked at regarding Cisco's

25  communications with Centripetal, the information that

 1  Centripetal gave to Cisco, and then what is the -- based on his

 2  expertise in the industry, what is the likelihood that that

 3  information was copied.  Especially with respect to the

 4  Encrypted Traffic Analytics.

 5          THE COURT:  All right.  Well, I don't think I can pass

 6  on whether that comes within the range of expertise without

 7  hearing what it is.  So I'm not going to try to decide that

 8  today.

 9          MR. ANDRE:  Your Honor, just -- sorry.

10          THE COURT:  I'll hear it when I hear it.

11          MR. ANDRE:  Your Honor, just one housekeeping matter.

12  We had hoped to get a little further today, but Dr. Nenad

13  Medvidovic will be our next witness.  We originally had Jonathan

14  Rogers going, but we had to flip those orders around because Dr.

15  Medvidovic may have some availability issues on Monday, so we

16  just wanted to get those two switched around.

17          MR. JAMESON:  And Your Honor, Woody Jameson.  Just

18  want to note for the record that if they still intend to call

19  Mr. Chris Gibbs, he was not disclosed pursuant to the disclosure

20  obligations under the pretrial order.  He should have been

21  closed on Monday of this week, he was not, and the first we

22  learned that he might testify was this morning.

23          THE COURT:  What about that?

24          MR. ANDRE:  Your Honor, because of our dropping two

25  witnesses, that moved Mr. Gibbs up.  We could put him in on

896

```
 1    Monday, that would be fine, if that makes a difference to him.

 2              THE COURT:  Well, that may be better.

 3              MR. ANDRE:  And he's on our pretrial order as a

 4    potential witness to call, so this is not something that should

 5    be a --

 6              THE COURT:  Well, if he's in the pretrial order, it's

 7    just not -- they didn't get the proper notice under the

 8    protocol, that's all.

 9              MR. ANDRE:  That's fair enough, Your Honor.  It was --

10    when we decided to drop the two witnesses, the two expert

11    witnesses, that took over half a day, probably almost

12    three-fourths of the day out of the calendar, so that moved him

13    up that much faster.  We can push him to Monday.

14              THE COURT:  All right.  We'll be adjourned until

15    10 tomorrow.

16              (Whereupon, proceedings concluded at 4:06 p.m.)

17

18

19

20

21

22

23

24

25
```

1                          *CERTIFICATION*

2

3          *I certify that the foregoing is a true and correct*

4   *redacted transcript of Volume 6B of the proceedings held in the*

5   *above-entitled matter.*

6

7          _____

8                   Paul L. McManus, RMR, FCRR

9                        _____

10                             Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25