3253

```
 1            IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
 2                   NORFOLK DIVISION

 3

 4   CENTRIPETAL NETWORKS, INC.,   )
                                   )
 5           Plaintiff,            )
     v.                            ) Civil Action No.:
 6                                 )      2:18cv94
     CISCO SYSTEMS, INC.,          )
 7                                 )
             Defendant.            )
 8

 9

10

11      TRANSCRIPT OF VIDEOCONFERENCE BENCH TRIAL PROCEEDINGS

12

13                   Norfolk, Virginia
                     June 11, 2020
14

15                   Volume 22
                  Pages 3253-3427
16

17   BEFORE:  THE HONORABLE HENRY C. MORGAN, JR.
              United States District Judge
18

19

20

21

22

23

24

25
```

Paul L. McManus, RMR, FCRR Official Court Reporter

3254

```
 1   Appearances: (Via Zoomgov Video)                                    12:00:02
                                                                         12:00:02
 2           KRAMER LEVIN NAFTALIS & FRANKEL, LLP                        12:00:02
                    By: PAUL ANDRE                                        12:00:02
 3                       JAMES RUSSELL HANNAH                             12:00:02
                         Counsel for Plaintiff                           12:00:02
 4                                                                        12:00:02
             DUANE MORRIS, LLP                                            12:00:02
 5                  By: LOUIS NORWOOD JAMESON                             12:00:02
                         MATTHEW CHRISTOPHER GAUDET                       12:00:02
 6                            I N D E X                                   12:00:02
                                                                         12:00:02
 7                                                                        12:00:02
                                                                         12:00:02
 8                   Plaintiff       Defendant       Rebuttal            12:00:03
                                                                         12:00:03
 9   Infringement:                                                       12:00:03
                                                                         12:00:03
10   '193           3262            3270            3281                 12:00:03
     '806           3283            3292            3300                 12:00:03
11   '205           3301            3310            3313                 12:00:03
     '856           3314            3324            3332                 12:00:03
12   '176           3334            3427            3350                 12:00:03
                                                                         12:00:04
13   Validity:      Defendant       Plaintiff       Rebuttal            12:00:04
                                                                         12:00:04
14   '193           3354            3362            3366                 12:00:04
     '806           3368            3375            3379                 12:00:04
15   '856           3381            3386            3392                 12:00:04
     '176           3394            3398            3402                 12:00:04
16                                                                       12:00:04
     Willfulness:   Plaintiff       Defendant       Rebuttal            12:00:04
17                                                                       12:00:04
                    3406            3411            3414                 12:00:04
18                                                                       12:00:04
                                                                         12:00:04
19

20

21

22

23

24

25
```

Paul L. McManus, RMR, FCRR Official Court Reporter

3255

1                       P R O C E E D I N G S                              12:00:04

2                                                                          12:00:04
                                                                           12:00:04
3            (Proceedings commenced at 10:02 a.m. as follows:)            12:00:04

4                                                                          12:00:04

5            COURTROOM DEPUTY CLERK:  Civil Action No. 2:18cv94,          10:02:43

6    Plaintiff, Centripetal Networks, Inc. v. Defendant, Cisco           10:02:47

7    Systems, Inc.                                                        10:02:47

8            For the plaintiff, Mr. Andre, Mr. Noona, are you ready      10:02:51

9    to proceed?                                                          10:02:53

10           MR. NOONA:  Good morning, Your Honor.  We are.              10:02:56

11           COURTROOM DEPUTY CLERK:  For the defendants, Mr. Carr,      10:02:59

12   Mr. Jameson, are you ready to proceed?                               10:03:00

13           MR. JAMESON:  Yes, we are.                                   10:03:02

14           THE COURT:  All right.  I've looked at the schedule.        10:03:05

15   It looks fine to me.  So I guess we hear from Centripetal first?     10:03:10

16           MR. ANDRE:  Thank Your Honor.  May it please the            10:03:17

17   Court.  Paul Andre.  I hope we stick to the schedule.  We'll do     10:03:19

18   our best.                                                            10:03:22

19           First of all, I'd like to start off with thanking Your      10:03:24

20   Honor.  This has been a great, an interesting privilege trying      10:03:26

21   the very first Zoom case in federal court.  We appreciate Your      10:03:30

22   Honor's patience with us.                                            10:03:34

23           I also want to thank the court staff.  Lori, Brandon,       10:03:36

24   Carol, Paul and everyone behind scenes for making this as           10:03:38

25   seamless as possible.  It has been a truly unique experience,       10:03:43

3256

```
1    and I know how much hard work this takes to do it right.          10:03:45

2            We started this case, Your Honor, talking about          10:03:49

3    Centripetal.  And I put a timeline up.  And you'll see the slide  10:03:53

4    as we go through them.  And this is a company that literally      10:03:56

5    when they were formed in 2009 in the basement of Steven Rogers'   10:04:00

6    house, they wanted to change the world.  They wanted to change    10:04:05

7    the way things were done.  They wanted to create a new market.    10:04:07

8    And they believed they could.  Mr. Rogers had had 40-plus years   10:04:10

9    of secure communication under his belt.  He saw a problem that    10:04:15

10   he thought he could uniquely solve with the people he knew.  And  10:04:19

11   in this case we've brought our top executives.  We brought        10:04:27

12   Mr. Rogers, the president, CEO and founder.  We brought Dr. Sean  10:04:31

13   Moore, the chief technology officer and chief scientist.  We      10:04:36

14   brought Jonathan Rogers, the chief operating officer, and Chris   10:04:39

15   Gibbs, the vide-president of global sales.  We brought our        10:04:42

16   executives here to tell Centripetal's story.  Notably absent      10:04:45

17   from Cisco was any of their executives.  They brought engineers,  10:04:51

18   but no executives.  And that speaks volumes.  We'll talk about    10:04:54

19   that later.                                                       10:04:57

20           The story that we told about Centripetal was a company    10:04:59

21   that started off with a new idea.  They worked very hard at       10:05:01

22   their ideas, many times without pay.  They raised a lot of money  10:05:08

23   to fund their new ideas.  And they protected their ideas.  They   10:05:12

24   filed patents.  The five patents in this case are a result of     10:05:16

25   those filings.  They put the time and effort in, and they do      10:05:24
```

3257

 1  what young startup companies are supposed to do.  They protected

 2  their IP.

 3          What they didn't know was that there was a press

 4  release that would change their world.  You saw this exhibit

 5  many times.  PTX-452.  On June 20th, 2017, says "Cisco unveils a

 6  network -- one of the most significant breakthroughs in

 7  enterprise networking.  They didn't realize in June of 2017 how

 8  this press release was going to change their world.  It took

 9  them five months to learn that what Cisco had done was take the

10  technology that Centripetal provided to them and used it in

11  their own products.  What they didn't realize when this press

12  release came out in June 20th, 2017 was nearly eight and a half

13  to nine years of work was going to be put in jeopardy.  Because

14  when you have the biggest company in the word, biggest

15  networking company in the world using your technology, it's

16  nearly impossible to compete.  So it was eight and a half to

17  nine years worth of work, tens of millions of dollars that they

18  raised to fund that work, was in jeopardy.

19          We gave you a timeline to show you how Cisco and

20  Centripetal had interactions starting in June of 2015 all way

21  till the end of 2016, December of 2016.  For a year and a half

22  Centripetal thought they had a potential partner with Cisco.

23  They were looking for investment.  They were looking for a

24  co-partnership with them, presenting their own products, and

25  they believed them.  In '15 they gave all public confidential --

3258

```
 1  I mean non-confidential information.  In January 2016, six
 2  months after meeting with Cisco, Cisco wanted to sign a
 3  non-disclosure agreement to get more information, and from
 4  January 2016 to December 2016, Centripetal, under the belief
 5  that they were being protect under the non-disclosure agreement,
 6  they gave them everything.  They told them about their
 7  algorithms, they told them about their patents, they told them
 8  about their technology, they demonstrated it numerous times.
 9  Cisco kept coming back and asking for more.  And they provided
10  it to them.  It wasn't until six months after they had their
11  last meeting that Cisco launched the Network Intuitive.
12          Now in this case, to prove our infringement, we
13  provided the Court with a lot of exhibits.  Maybe too many at
14  times.  But we kind of serve two masters here with the Federal
15  Circuit and the District Court.  We're always concerned that we
16  don't give enough evidence, the Federal Circuit would not like
17  it.  But we did give a lot of proof, and we're going to go
18  through those today.  The key exhibits.  Not all of them,
19  obviously.  The key exhibits we're going to go through today.
20          But what I want to focus on now before we start
21  turning to infringement is how Cisco responded to those claims
22  of infringement.  They had a non-infringement formula.  They
23  first said Cisco did not provide security.  That's incredible.
24  I want to talk about that.  They mischaracterized our expert's
25  testimony, they rewrote the claim language, they used they
```

10:07:19
10:07:23
10:07:27
10:07:30
10:07:36
10:07:39
10:07:41
10:07:44
10:07:47
10:07:50
10:07:53
10:07:58
10:08:02
10:08:04
10:08:08
10:08:10
10:08:13
10:08:17
10:08:19
10:08:22
10:08:25
10:08:29
10:08:33
10:08:40
10:08:44

3259

| | | |
|---|---|---|
| 1 | cartoon diagrams, never their own technical documents, to show | 10:08:47 |
| 2 | how the systems worked, and they ignored their technical | 10:08:51 |
| 3 | documents.  What I want to talk about very quick, then I'm going | 10:08:55 |
| 4 | to turn it over it Mr. Hannah to talk about the '193 patent. | 10:08:58 |
| 5 | The first point is they denied their product provides security, | 10:09:01 |
| 6 | which was an credible statement.  We showed you the SEC filing | 10:09:05 |
| 7 | in which Cisco talked about, they announced that they were | 10:09:09 |
| 8 | presenting a brand-new technology, network-based technology from | 10:09:12 |
| 9 | a security standpoint.  The Catalyst 9000 switches represented | 10:09:16 |
| 10 | the initial build of intent-based networking.  Security was | 10:09:20 |
| 11 | foundational.  And in the SEC filing, you look at that last | 10:09:23 |
| 12 | sentence, "We intend to protect and provide security against the | 10:09:29 |
| 13 | entire tech continuum, before, during and after a cyber attack." | 10:09:32 |
| 14 | Before, during and after. | 10:09:37 |
| 15 | They come to this court and said they don't do it | 10:09:39 |
| 16 | before, they don't do it during, they only do it after.  But | 10:09:41 |
| 17 | they told the SEC, the public, the world, they did it before, | 10:09:46 |
| 18 | during and after that cyber attack. | 10:09:49 |
| 19 | They also launched a brand-new operating system.  The | 10:09:53 |
| 20 | IOS was a -- built from the ground up.  And you see at the top, | 10:09:58 |
| 21 | "Built for security.  At Cisco, security is our top priority." | 10:10:01 |
| 22 | And yet, they built a brand-new operating system from the ground | 10:10:04 |
| 23 | up, focused on security, and they said it did not provide | 10:10:08 |
| 24 | security. | 10:10:12 |
| 25 | We showed you PTX-1287 where they talk about the | 10:10:12 |

3260

```
 1   Catalyst 9000 switches.  They detect and stop threats, once      10:10:18
 2   again, going with the before, during and after time period       10:10:22
 3   again.  But they come to this court saying they don't do it       10:10:26
 4   before, they don't do it during, they don't do it after.         10:10:30
 5         We showed you PTX-199.  This is Catalyst At A Glance        10:10:33
 6   where it talks about end-to-end security.  "Detect and stop      10:10:37
 7   threats, even with encrypted traffic.  Putting security above    10:10:40
 8   everything helps putting security above everything helps you     10:10:44
 9   innovate while keeping your assets safe."                        10:10:50
10         We showed you Exhibit PTX-1260.  Once, against built       10:10:53
11   for security, Catalyst switches.  Says it detects and stops      10:10:59
12   threats.  End-to-end security integrated.                        10:11:02
13         We looked at the StealthWatch, Exhibit 482.                10:11:05
14   StealthWatch talks about detect and respond to threats in        10:11:10
15   real-time.  There's a big debate about what is real-time.        10:11:14
16   Shouldn't be any debate at all.  Everyone knows what real-time   10:11:18
17   is.  They denied what real-time was.  Real-time is real-time.    10:11:22
18   When it's not real-time, they say near real-time.                10:11:25
19         Going to PTX-992 talks about StealthWatch being able       10:11:30
20   to detect advanced threats before we can turn into a breach.     10:11:34
21         Finally, turning to the benefits of StealthWatch,          10:11:38
22   "Real-time detection after attacks by immediately detecting      10:11:41
23   malicious connections."  Immediately connecting.  They deny what 10:11:47
24   the word immediately means.  They talked about proactive         10:11:51
25   protection as well in Exhibit PTX-962.                           10:11:54
```

3261

| | |
|---|---|
| 1 | Now their formula for invalidity involved Cisco used | 10:11:58 |
| 2 | old stuff.  I said that in my opening statement.  And you look | 10:12:02 |
| 3 | at what they used, they used what I call the Name Game.  My | 10:12:06 |
| 4 | favorite name game I use at these kind of trials is the Ford | 10:12:09 |
| 5 | Mustang.  You look at a '65 Ford Mustang and a 2020 Ford | 10:12:12 |
| 6 | Mustang, they're both Mustangs, but they're very different cars. | 10:12:17 |
| 7 | You may like a '65 better.  I prefer to have a '65.  But they're | 10:12:20 |
| 8 | different cars altogether.  But they're both called Ford | 10:12:24 |
| 9 | Mustang, but they're very, very different.  What Cisco did was | 10:12:28 |
| 10 | say the old StealthWatch and new StealthWatch, the same thing. | 10:12:30 |
| 11 | Old Catalyst, new Catalyst, same thing.  They had brand names, | 10:12:34 |
| 12 | but that was it. | 10:12:37 |
| 13 | Finally I want to turn to whether or not saying to the | 10:12:38 |
| 14 | public about this new network, chuck Robbins, their CEO, we'll | 10:12:40 |
| 15 | talk about this, this is Exhibit 1890.  Talked about how they | 10:12:44 |
| 16 | had to -- the most significant achievement in 10 years.  They | 10:12:47 |
| 17 | had to rewrite 25 years of source code and had to rewrite the | 10:12:51 |
| 18 | entire operating system.  They talked about Encrypted Traffic | 10:12:55 |
| 19 | Analytics being one of the most revolutionary innovations that | 10:12:57 |
| 20 | are out there. | 10:13:02 |
| 21 | And finally, before I turn it over to Mr. Hannah, they | 10:13:02 |
| 22 | also talked about Cisco launched a new era in networking in | 10:13:05 |
| 23 | PTX-451 saying that the Catalyst switching portfolio constitute | 10:13:08 |
| 24 | mobile cloud performance integrated security.  We're releasing | 10:13:13 |
| 25 | something no one in the market can do, which is basically the | 10:13:18 |

 1   ability to understand whether there is malicious traffic in          10:13:22

 2   encrypted traffic without decrypting it.                            10:13:26

 3          So Your Honor, I'm going to turn it over to Mr.              10:13:28

 4   Hannah.  I know we're on a clock here, but this is what we'll be    10:13:31

 5   looking at when we look at these.  So I'll roll out of the way      10:13:33

 6   and let Mr. Hannah take it over.                                    10:13:37

 7          MR. HANNAH:  First off, I just want to thank Your            10:13:53

 8   Honor, thank also the court staff, thank everyone who's helped      10:13:56

 9   participate in this trial and made it come to fruition.  It has     10:13:59

10   been a pleasure, and we do appreciate it.                           10:14:02

11          If it may please the Court, may I proceed?                   10:14:05

12          THE COURT:  You may.                                          10:14:08

13          MR. HANNAH:  Thank you, Your Honor.  So I'll be              10:14:08

14   talking about the '193 patent.  The '193 patent is what we've       10:14:10

15   characterized as the forward or drop patent.  And echoing Mr.       10:14:17

16   Andre's statements, this is a way to keep your assets safe.  You    10:14:21

17   keep your assets safe by being able to program the switches and     10:14:25

18   routers to prevent malicious traffic and malicious actors from      10:14:29

19   exfiltrating your data from the network.  And that's what we        10:14:34

20   talked about during this trial again and again.  The '193           10:14:39

21   prevents data transfers to protected resources, but it allows       10:14:44

22   date transfers to unprotected resources.  And the reason is         10:14:47

23   simple:  You want to protect those resources, these servers that    10:14:51

24   have your credit card information, that have your personal          10:14:56

25   information from being accessed, but at the same time, you don't     10:14:58

1   want to hinder productivity.  You want to allow a user to be

2   able to do their work on the daily basis, but you still want to

3   protect those protected resources.  And that's what the '193

4   patent is about.

5           We showed you Dr. Mitzenmacher and we showed you a

6   number of exhibits.

7           THE COURT:  All right.  What was the filing date on

8   this patent?

9           MR. HANNAH:  It is on -- the filing date is

10  March 12th, 2013.  That's the priority date, Your Honor.

11          THE COURT:  Right.  Okay.  Go ahead.

12          MR. HANNAH:  So Dr. Mitzenmacher was our expert who

13  testified regarding the '193 patent, and he showed you a number

14  of exhibits that are listed here on the screen.  He was also the

15  one that identified Cisco's infringing switches.  As Your Honor

16  knows, this is the Catalyst 9000 platform and included the 9300,

17  the 9400 and the 9500.

18          We also discussed the infringing routers.  This was

19  the Aggregated Services Router, the Integrated Services Router,

20  and the Series 4000 Integrated Services Router.  All of these

21  switches and routers, they have one thing in common.  Well,

22  multiple things in common, but one thing in particular for

23  infringement:  They all include the same operating system.  And

24  that's 16.5 and later versions of the IOS.  And based on that

25  operating system, they contain a number of functionality,

1    including this quarantine functionality.                                    10:16:34

2         And so when we look at Dr. Mitzenmacher's opinion, his                  10:16:38

3    opinion was that these 9000 switches, the routers, the ASR                  10:16:43

4    routers, the ISR routers, they infringe the '193 patent.  And               10:16:50

5    it's just the switches and routers.  One of the points that                 10:16:55

6    comes out from this case was trying to confuse this issue, but              10:16:57

7    it's just the switches and routers and it's the functionality               10:17:01

8    that they include on those switches and routers.  And what they             10:17:03

9    do is they have packet filtering rules and they perform a number            10:17:08

10   of different things in a number of different stages and steps.              10:17:12

11   So first they apply what are these SGT tags.  We had discussion             10:17:15

12   about this.  They call them Scalable Group Tags, they call them             10:17:21

13   Secure Group Tags.  There's no dispute they operate in the same             10:17:26

14   manner:  That you apply these tags to the packets.                          10:17:29

15        THE COURT:  All right.  They apply the tags when the                   10:17:33

16   packets enter the network?                                                  10:17:39

17        MR. HANNAH:  When the packets are going from -- they                   10:17:42

18   can be applied when they come into the network, but also when a             10:17:46

19   user on the network has been quarantined, these tags will be                10:17:49

20   applied to all of the traffic that is leaving from that user.               10:17:55

21   So this is how the user is able to access -- not access                     10:18:02

22   protected resources, but be able to access things like the                  10:18:07

23   Internet.                                                                   10:18:11

24        THE COURT:  Why do they put the tags on?                               10:18:13

25        MR. HANNAH:  They put the tags on in order to identify                 10:18:15

| | | |
|---|---|---|
| 1 | the user as being quarantined.  So when I -- | 10:18:17 |
| 2 | THE COURT:  Who is the user? | 10:18:26 |
| 3 | MR. HANNAH:  The user could be an employee in a | 10:18:27 |
| 4 | corporation. | 10:18:29 |
| 5 | THE COURT:  All right.  So are they tagged on -- as I | 10:18:31 |
| 6 | recall, when it enters, but the tag doesn't automatically cause | 10:18:35 |
| 7 | it to quarantine. | 10:18:43 |
| 8 | MR. HANNAH:  That's correct, Your Honor.  That's | 10:18:44 |
| 9 | correct. | 10:18:47 |
| 10 | THE COURT:  In other words, it goes through another | 10:18:47 |
| 11 | switch or router after the tag is put on it? | 10:18:49 |
| 12 | MR. HANNAH:  That's exactly correct, Your Honor. | 10:18:56 |
| 13 | THE COURT:  And it's at that point that the decision | 10:18:57 |
| 14 | is made whether or not to quarantine the packet? | 10:19:00 |
| 15 | MR. HANNAH:  That's exactly correct, Your Honor. | 10:19:05 |
| 16 | Exactly correct.  You attach those tags, another switch or | 10:19:07 |
| 17 | router will look at that tag.  Based on that tag it will | 10:19:11 |
| 18 | determine and apply a quarantine policy.  That's what we're | 10:19:14 |
| 19 | talking about in the second bullet point.  Looking at that tag, | 10:19:17 |
| 20 | it applies this quarantine policy.  Based on that policy, the | 10:19:21 |
| 21 | switch or the router is going to make a decision.  It's going to | 10:19:25 |
| 22 | either prevent the data transfer from going to a protected | 10:19:30 |
| 23 | resource, and it does that by applying these operators that are | 10:19:36 |
| 24 | discussed in the claims.  This is the deny bridge or the deny | 10:19:40 |
| 25 | route that Dr. Mitzenmacher talks about.  That's one option. | 10:19:42 |

 1  The second option is based on, if the packet is destined for an                    10:19:47

 2  unprotected resource such as the Internet or something else that                   10:19:53

 3  is not your credit card database, it will apply a second                           10:19:58

 4  operator which says, okay, I'm going allow this packet to go                        10:20:01

 5  forward.  And that's the analysis that the switches and the                         10:20:05

 6  routers do.                                                                         10:20:10

 7          So we looked at a number of -- a lot of evidence with                       10:20:14

 8  the switches and routers.  And if we go to the next slide we see                    10:20:18

 9  that this is fundamentally built into the switches.  This is                        10:20:21

10  PTX-126 talking about this security is built into the switches.                     10:20:26

11          We go to the routers.  If we look at the routers on                         10:20:31

12  the next slide, this is PTX-1226, talking about how this                            10:20:33

13  security is built into the routing solutions.                                       10:20:38

14          Looking at 1262, which is on next slide, this is some                       10:20:42

15  of the evidence showing these are the Scalable Group Tags.  This                    10:20:46

16  is how those tags are applied and analyzed.  This is from the                       10:20:50

17  switches from PTX-1262.                                                             10:20:53

18          We go to PTX-1280.  It talks about how the SGT                              10:20:57

19  assignment is changed which creates the quarantine based on the                     10:21:02

20  tag we just discussed, Your Honor.  And then these fabric edge                      10:21:06

21  devices, the switches and the routers, those apply the                              10:21:11

22  quarantine policy that we just discussed to allow whether we're                     10:21:13

23  going to have network access or not.                                                10:21:17

24          This is summed up in a diagram in which it shows how                        10:21:19

25  the quarantine procedures works.  So you have the supplier or                       10:21:24

1   your employee.  This diagram uses the supplier.  And it          10:21:29

2   determines, okay, we need to quarantine the supplier because it   10:21:36

3   looks like there might be some malicious activity going on.       10:21:38

4          So if you go to the next slide, you apply the             10:21:42

5   quarantine policy at the switch.  And as you can see, all of the  10:21:45

6   protected resources are in red.  And so your first operator,      10:21:49

7   your deny bridge, deny route, will deny that supplier from going  10:21:54

8   to any of those.  However, if that supplier is trying to go to    10:21:59

9   the Internet, trying to do their work, trying to do whatever      10:22:03

10  they wanted to do, it's allowed to the Internet.  And that's the  10:22:07

11  second operator.  The second operator says this is going to the   10:22:10

12  Internet, that data transfer is okay, I'm going to allow it.      10:22:13

13          THE COURT:  When do they put the tags on?                10:22:17

14          MR. HANNAH:  As you said, they put the tags as soon as   10:22:19

15  the --                                                            10:22:21

16          THE COURT:  Where in this diagram do they put the tags   10:22:25

17  on?                                                               10:22:25

18          MR. HANNAH:  It's not really shown in this diagram.      10:22:26

19  And that is going to be within where the quarantine circle is,    10:22:28

20  within that.  It will be the first switch -- like you said, Your  10:22:31

21  Honor, the first switch that the supplier goes to through that    10:22:36

22  traffic gets the tag applied.  And then a subsequent switch or a  10:22:39

23  subsequent router will look at that tag and apply the             10:22:42

24  quarantine.  That's exactly what Your Honor, the scenario that    10:22:46

25  Your Honor said.  This is just showing that you have the, some    10:22:50

| | |
|---|---|
| 1 | data transfers that are prevented and other data transfers that | 10:22:53 |
| 2 | are allowed.  That's what this is showing. | 10:22:56 |
| 3 | THE COURT:  All right. | 10:23:00 |
| 4 | MR. HANNAH:  Your Honor, so if we look at the claims, | 10:23:00 |
| 5 | and we look at what all of these claims that -- we walked | 10:23:03 |
| 6 | through each of these claims.  You receive the packets, you | 10:23:06 |
| 7 | apply these packet filtering rules to event a particular type of | 10:23:10 |
| 8 | data transfer, that's important, to prevent the data transfer, | 10:23:13 |
| 9 | you apply the operator, and you drop the packet.  And then if | 10:23:17 |
| 10 | it's allowed, it's responsive that it doesn't correspond to that | 10:23:20 |
| 11 | criteria, then you apply the second operator which forwards the | 10:23:24 |
| 12 | packet.  That's what these claims require and that's exactly | 10:23:27 |
| 13 | what this functionality does. | 10:23:31 |
| 14 | When we look at the non-infringement case, the only | 10:23:32 |
| 15 | element that was challenged was the one or more packet filtering | 10:23:36 |
| 16 | rules configured to prevent a particular type of data transfer | 10:23:40 |
| 17 | from a first to a second network.  What happened was on | 10:23:43 |
| 18 | cross-examination they actually admitted that this element was | 10:23:48 |
| 19 | present.  I took the -- or crossed Dr. Crovella.  And during his | 10:23:51 |
| 20 | cross, I was very specific and I was very clear.  I asked "Let's | 10:23:59 |
| 21 | on the quarantine rules.  Now, the quarantine rules, those are | 10:24:06 |
| 22 | packet filtering rules, correct?" | 10:24:09 |
| 23 | "Yes, they are." | 10:24:12 |
| 24 | He admitted that they're packet filtering rules.  Then | 10:24:13 |
| 25 | I asked him a second question right away.  I said "Now, those | 10:24:16 |

1   quarantine rules, they are capable of preventing data transfer,          10:24:20

2   correct?"                                                                 10:24:23

3           "Certainly, yes."                                                 10:24:26

4           When you look at the claim, if you look at the claim             10:24:27

5   language and you look at what they're trying to contest,                  10:24:30

6   Dr. Crovella on cross-examination admitted that that element is           10:24:34

7   present.                                                                  10:24:38

8           So what did they do for non-infringement?  They                   10:24:41

9   rewrote the claims.  Instead of saying that you have packet               10:24:45

10  filtering rules that are configured to prevent a data transfer,           10:24:50

11  which Dr. Crovella admitted that they had, they rewrote the               10:24:53

12  claims and came up with a non-infringement position saying that           10:24:57

13  you have to inspect the payload of the packet.  That's not what           10:25:02

14  the claim says.  That's a complete rewriting of the claim.                10:25:06

15  Claim says that you prevent a particular type of data transfer,           10:25:11

16  and all of the evidence that we've shown, including the                   10:25:14

17  cross-examination of their witness, proves that all these                 10:25:17

18  elements are met.                                                         10:25:20

19          If Your Honor has any questions, I'm happy to answer              10:25:23

20  those, otherwise we can pass it to the other side.                        10:25:27

21          THE COURT:  All right.  I'll hear from the other side.            10:25:32

22          MR. JAMESON:  Good morning, Your Honor.  Woody                    10:25:42

23  Jameson.  May I proceed?                                                  10:25:43

24          THE COURT:  You may.                                              10:25:46

25          MR. JAMESON:  Thank Your Honor.  It's been a long                 10:25:46

1    trial, and we're all ready to be done.  I want to echo the                    10:25:48

2    comments from Mr. Andre.  Thanks to you for persevering through                10:25:53

3    all this with us, and thanks to your staff.  They have been                    10:25:57

4    amazing in helping us get through this process.                                10:26:01

5          I want to -- I was actually shocked by what Mr. Andre                    10:26:05

6    said, that Cisco's denied that we provide security.  I                         10:26:10

7    literally -- I don't even know what he's talking about.  I mean,               10:26:15

8    we began this case in my opening statement putting up books that              10:26:18

9    are thousands of pages long talking about Cisco providing                      10:26:22

10   network security going back to 1999.  Books that we provide to                 10:26:26

11   the industry to teach them about network security.  Courses that              10:26:32

12   actually Dr. Cole, their expert, has taken as part of him                      10:26:35

13   learning how to be an expert in this case and in the industry.                 10:26:38

14   Cisco is proud of the network security that it provides.  It                   10:26:44

15   just doesn't infringe these patents.                                          10:26:50

16          And the observation that we didn't bring our                           10:26:54

17   high-ranking executives to this case, Your Honor, this is a                    10:26:58

18   patent case.  We're dealing with technical issues, and we                      10:27:04

19   brought the most sophisticated, knowledgable technical                         10:27:07

20   subject-matter experts from Cisco to testify about the                         10:27:12

21   technology that's at issue in this case.  Hari Shankar, Peter                  10:27:17

22   Jones, David McGrew, Michael Scheck, Danny Llewallyn.  These are              10:27:22

23   the people that actually developed the products that are being                 10:27:26

24   accused of infringement.  That's exactly what you're supposed to              10:27:30

25   do in this case.                                                              10:27:35

```
 1              With that, Your Honor, this is our opportunity to put      10:27:39

 2   the pieces of the puzzle together.  I know at times during this      10:27:43

 3   trial there's been occasions where things didn't seem to fit or      10:27:47

 4   things didn't seem to be relevant.  But we now have a complete       10:27:52

 5   record.  And what we're going to do today is we're going to show     10:27:55

 6   why we don't infringe these patents.  Mr. Gaudet and I, we           10:27:59

 7   believe in the strength of our case.  With every bit of             10:28:03

 8   conviction, we know we don't infringe these patents.  And at         10:28:07

 9   times, the search for the truth through their subject-matter         10:28:12

10   experts or their technical experts has caused frustration.  Has      10:28:15

11   caused confusion.  I will never, ever hear the word                 10:28:21

12   "obfuscation" again without a mental image of Your Honor.  I         10:28:25

13   think that would be true of the experts and all the lawyers in       10:28:30

14   this case.  But the confusion and the frustration at times has       10:28:35

15   been because there is a cavernous gap between what the claim          10:28:41

16   language actually covers and what they are accusing of               10:28:46

17   infringement.  And the gap at times is so big that things just       10:28:51

18   don't make sense.  And we are going to pull that together for        10:28:57

19   you today.                                                          10:29:01

20              But before I turn it over to Mr. Gaudet, I want to        10:29:03

21   start with the bedrock principle of patent law and patent            10:29:08

22   infringement, and that is that Centripetal has the burden to         10:29:14

23   show that every limitation of every claim is met.  And as these      10:29:17

24   cases state, the failure to meet a single limitation is              10:29:23

25   sufficient to negate infringement of the claim.  And I put this      10:29:28
```

```
 1   up here because, Your Honor, the words of these claims matter.     10:29:31

 2   The steps and the ordering of the claims matter.  The antecedent   10:29:39

 3   basis issues in referencing back up to earlier elements in the     10:29:44

 4   claims, it all matters when you try to show infringement.  And     10:29:48

 5   when you focus on the words -- and that's, you know, the name of    10:29:55

 6   the game is the claim, and the words in the claim, they can't      10:29:58

 7   show infringement.                                                 10:30:02

 8           The other legal issue -- and we've been, quite frankly     10:30:05

 9   the parties have been back and forth about this now for the        10:30:09

10   better part of however long we've been going.  Non-infringement    10:30:11

11   and invalidity can be argued in the alternative.  And we have      10:30:15

12   made reference to 01 Communique a number of times, but I wanted    10:30:19

13   to put up some language from the case, because it's really         10:30:24

14   important.  And in that case, and this is a quote, "Citrix also    10:30:27

15   presented an alternative invalidity defense that focused on its    10:30:32

16   prior art BuddyHelp product.  It argued that under the trial       10:30:36

17   court's claim construction, claims 24 and 45 were valid, but not   10:30:42

18   infringed, but that if Communique attempted to expand the scope    10:30:47

19   of its claims to include the accused system, then the claims       10:30:52

20   would be invalid in light of the prior art."  And the Federal      10:30:57

21   Circuit held.  "There was nothing improper about this argument."   10:31:01

22           And that is what our experts have done.  They have         10:31:07

23   explained why we don't infringe, but when they have turned to      10:31:11

24   invalidity, they have accepted as correct Centripetal's           10:31:16

25   infringement contentions and explained why the patents would be    10:31:21
```

1   invalid under the infringement contentions.

2        The final point from this case.  "As we have

3   previously recognized, when an accused product and prior art are

4   closely aligned, it takes exceptional linguistic dexterity to

5   simultaneously establish infringement and evade liability."

6        That's what we have here.  And Centripetal does not

7   have the exceptional linguistic dexterity to walk that tight

8   rope.

9        And Your Honor, a final point on the law and then I'm

10  going to turn it over to Mr. Gaudet.  And we already heard it in

11  the opening:  What matters here is the technical operations of

12  the product.  It's not about marketing materials.  And we cite

13  to you a number of cases that say just that.  "Marketing

14  materials are insufficient evidence of infringement when

15  unsupported by evidence of the actual operation of the product."

16  I've never seen so many marketing materials in my life in a

17  patent case.  We want to focus on the technical documents.  And

18  what we should be looking at in this kind of case we should be

19  looking at source code.  We should be looking at technical

20  specifications.  Maybe we should look at white papers and data

21  sheets.  But the least-relevant evidence is marketing materials,

22  and that is what they have built their case on.

23        And with that, I am going to turn it over to Mr.

24  Gaudet to talk about the '193 patent.

25        MR. GAUDET:  Thank you.  And good morning, Your Honor.

1   I am jumping forward to slide 14 in your binder.  Let me start          10:33:14

2   by also thanking the Court and the Court staff --                       10:33:20

3           THE COURT:  What binder is this we're talking about?            10:33:23

4           MR. GAUDET:  Your Honor, you should have a Cisco                 10:33:26

5   closing binder that's got our presentation in it.                       10:33:29

6           THE COURT:  Okay.                                               10:33:45

7           MR. GAUDET:  And we'll actually jump -- this is now              10:33:46

8   the '193 patent.  We'll jump all the way to Slide 16, Your              10:33:48

9   Honor.                                                                  10:33:51

10          Your Honor, I listened to Mr. Hannah's closing very             10:34:05

11  carefully, and it actually sounds to me like it would be what we        10:34:09

12  fundamentally have here is a dispute about the claim scope; that        10:34:11

13  in their view, this patent broadly covers dropping or allowing         10:34:16

14  packets.  And that's just not what the patent's about.  And if         10:34:20

15  it was, it would have died in the IPR.  But they told the Patent        10:34:24

16  Office something very specific to save the patent.  What this           10:34:29

17  patent's about specifically is a particular type of rules that         10:34:32

18  stop exfiltration.  And I've got here some language from the           10:34:36

19  background, it's the specification, that points to the fact that        10:34:40

20  these aren't just any old drop or allow rules, these are               10:34:43

21  specific rules to stop exfiltrations.                                   10:34:46

22          Now, why does that matter?  Okay.  We agree, all we're         10:34:50

23  talking about here are the quarantine rules.  Are quarantine           10:34:53

24  rules, do they satisfy this one or more packet filtering rules         10:34:56

25  configured to prevent a particular type of data transfer from          10:35:02

```
1   the first network to the second network.  That's the dispute.     10:35:06
2   And what this comes down to, Your Honor, is what that claim       10:35:09
3   language means.                                                   10:35:13
4           Your Honor, as our expert, the specification, the         10:35:15
5   claim language, their statements to the Patent Office and one of  10:35:22
6   their experts all confirmed, this claim requires what everyone    10:35:26
7   refers to as a two-stage.  And Your Honor, the first stage, the   10:35:30
8   first stage we've highlighted the claim language here in green.   10:35:39
9   That's the question, where is the packet going?  What's the       10:35:43
10  destination?  Where did it come from, where is it going?  And     10:35:46
11  Your Honor, quarantine rules do that.  That is what the           10:35:49
12  quarantine rules do.  But that's all the quarantine rules do.     10:35:51
13  They say where did it come from, if it came from a quarantined    10:35:54
14  user, where is it going, and it drops it for almost all           10:35:59
15  destinations and it will allow it for certain others.  But        10:36:02
16  that's it.  That is the first stage of the rule that is the       10:36:05
17  first stage of the filtering process.  That's all they do.        10:36:09
18          That's not what this patent covers.  To get this          10:36:14
19  patent and to keep it valid, there is a second stage.  And that   10:36:17
20  second stage, Your Honor, is where we win this patent.  It's      10:36:22
21  where we win this case.  The second stage requires that you look  10:36:25
22  to see what particular type of data transfer it is.  And that's   10:36:29
23  where the rubber hits the road in terms of exfiltrations.         10:36:34
24  Particular types of data transfers indicate exfiltrations.  So   10:36:38
25  it's not that block all packets to a given destination.  It's     10:36:43
```

```
1    that you only block these packets to the given destination that      10:36:50

2    have the particular type of data transfer.  That's in the claim      10:36:53

3    language, but it's in a lot of other places, Your Honor.             10:36:57

4             The next place I will go is the specification.  This        10:36:59

5    language in the specification, it refers to the claims as having     10:37:06

6    a two-stage process.  Says the first stage uses this 5-Tuple         10:37:10

7    that's in the header and it determines if the network policy         10:37:16

8    allows any communications between the resources.  That's the         10:37:19

9    destination stuff.  The language in red is the second stage.         10:37:22

10   It's when the application packet field headers are -- when the       10:37:27

11   second -- I'm sorry.  The second highlight here, the second          10:37:35

12   stage determines if the policy allows the specific method or         10:37:38

13   type of communication; e.g., file read, file write, encrypted       10:37:42

14   communications between the resources.                                10:37:47

15            Now Your Honor, I realize this is in the                    10:37:49

16   specification.  It matches up with the claim language.  But you      10:37:51

17   may say, well, is that enough?  Is that enough to be sure?  This     10:37:55

18   is the nail in the coffin, Your Honor.  When we filed, when          10:37:59

19   Cisco filed an IPR on this patent on this very claim,                10:38:03

20   Centripetal told the Patent Office this claim requires a             10:38:07

21   two-stage process.  And what I have highlighted here is -- this      10:38:11

22   is, these are their words, this is their response to the IPR         10:38:16

23   petition -- they're quoting exactly the same language from the       10:38:19

24   specification I just showed you.  It's the same patent from the      10:38:23

25   same passage.  And they say, "In the second stage you have to        10:38:28
```

1   determine if it allows the specific method." They go on, Your   10:38:31

2   Honor. They said it three times to the Patent Office. This is   10:38:35

3   now the same document, DTX-369 at Bates 18. And the red one is   10:38:39

4   the relevant one. "Second. And responsive to that   10:38:44

5   determination, the computing system applies an operator   10:38:49

6   configured to drop packets associated with the particular type   10:38:52

7   of data transfer." And up at the top where they again refer to   10:38:55

8   this as this two-stage process.   10:38:58

9         Your Honor, they did it a third time. This is now   10:39:04

10  DTX -- Page 21, the same document. "The '193 patent introduced   10:39:10

11  the concept of applying an operator that can determine whether   10:39:14

12  the packet is associated with a particular type of data   10:39:17

13  transfer."   10:39:20

14        So you may ask, why does this matter? Why does it   10:39:22

15  matter that they said something in an IPR? How does that count?   10:39:25

16  And Your Honor, the Federal Circuit has definitively answered   10:39:29

17  that question. It's the top cite here on slide 23, Aylus   10:39:32

18  Network v. Apple. The Federal Circuit said that Patentee, here,   10:39:38

19  Centripetal, their statements and their preliminary response to   10:39:42

20  an IPR petition, which is exactly what we just looked at, they   10:39:46

21  have the same binding effect as any other prosecution history   10:39:49

22  statement. It's as if they said that same thing in the original   10:39:54

23  prosecution to get the claims allowed. And the second quote   10:39:58

24  here really says it all, that "Extending the prosecution   10:40:02

25  disclaimer doctrine to IPR proceedings will ensure that claims   10:40:05

1   are not argued one way to maintain their patentability," namely,     10:40:09

2   two stages, you've got to have, look for the specific type of          10:40:15

3   data transfer, "and in a different way against accused                10:40:19

4   infringers" when suddenly all that matters is the first stage.         10:40:23

5   And the Federal Circuit held it applies to your statements even        10:40:28

6   statements in the preliminary response, it doesn't matter if the       10:40:31

7   Patent Office agreed or not, they're binding.                          10:40:36

8           But there's more, Your Honor.  Dr. Orso confirmed              10:40:39

9   this.  Dr. Orso, their invalidity expert, I cross-examined him         10:40:41

10  on it.  This is now slide 24.  "You agree it requires these two        10:40:45

11  stages?"  And I have the last question here, "No. 2," reading          10:40:49

12  from his report, "using an operator to determine whether the          10:40:54

13  rules allow for the particular type of data transfer.  That's          10:40:57

14  the second stage?"  He agreed.                                         10:41:01

15          So Your Honor, at this point let's, now that we                10:41:04

16  understand you've got to have these two stages, it's not good          10:41:08

17  enough just to look at what the destination packet or origin,          10:41:11

18  you have to figure out what type of data transfer it is.  How do       10:41:18

19  we apply that here in the accused products?  Well, I do think          10:41:21

20  Mr. Hannah agrees with me that the only thing that's accused          10:41:24

21  here are these quarantine rules.  Slide 25.  We had this up            10:41:26

22  before during the course of trial, but this is Dr. Mitzenmacher        10:41:30

23  acknowledging that the only thing he accused were the quarantine       10:41:32

24  rules.  So this patent rises or falls on whether or not               10:41:36

25  quarantine rules perform this second state of that; namely, if        10:41:41

1  after and in addition to looking at a destination and a source,   10:41:46

2  do quarantine rules look at the particular type of data transfer   10:41:49

3  such that some things going to that address are okay, other   10:41:53

4  things are not.  And there is no dispute.  They absolutely do   10:41:58

5  not do that.  There can be no dispute.   10:42:01

6          This document, Your Honor, is a document Dr.   10:42:03

7  Mitzenmacher relied on.  The packet comes in to a router, if   10:42:05

8  it's got this tag on it, apply input SGACL, that looks at this   10:42:11

9  tag.  If the tag is from -- if the tag has, if it's there, it   10:42:19

10  knows that it can go to certain destinations, it can't go to   10:42:24

11  other destinations.  That's the end of it.   10:42:28

12          And Your Honor, to summarize how the quarantine works,   10:42:30

13  and we've got all the evidence at the bottom here, a quarantine   10:42:36

14  treats all packets from a quarantined computer the same way   10:42:40

15  based only on the destination, all right?  So a packet from a   10:42:45

16  quarantined computer, it might be the most innocuous, safe thing   10:42:49

17  in the world, it still gets blocked.  It might be the deadliest   10:42:53

18  thing in the world, it gets blocked.  It's irrelevant what's in   10:42:57

19  the packet.  Quarantining is based only on the packet's address.   10:43:00

20  And Your Honor, the witnesses agreed on this.  You know,   10:43:08

21  Dr. Crovella, I asked him, "Let's get to the punch line.  Is a   10:43:11

22  quarantine a two-stage rule process?"  He said No.  I mean, it   10:43:15

23  "only looks at" -- the  green portion of the slide was the   10:43:18

24  header" where the packet's coming from and where it's going.  It   10:43:23

25  does not ask whether the packet is part of a particular type of   10:43:25

1   data transfer."                                                    10:43:29

2        And Your Honor, I want to pull up -- I ask the                10:43:30

3   plaintiff, if you would, pull up the slide that plaintiff put      10:43:33

4   up, slide 33.  Because they quoted some testimony from Dr. Orso    10:43:37

5   and I want to be real clear about -- not Dr. Orso, from            10:43:41

6   Dr. Crovella, and I want to take a look at that.                   10:43:46

7        This is what Mr. Hannah cited as literally the only           10:43:50

8   evidence that a quarantine rule could do this second step.  What   10:43:52

9   type of data transfer.  Look at the question Dr. Crovella was      10:43:57

10  asked.  "The quarantine rules, they are capable of preventing      10:44:01

11  data transfer."  Of course.  They block everything.  Of course     10:44:06

12  they prevent data transfer.  They don't prevent a particular       10:44:09

13  type of data transfer.  If you apply the first stage and you       10:44:14

14  block everything to a particular destination, by definition you    10:44:19

15  have blocked, you have prevented a data transfer in a very         10:44:24

16  overarching way.  That is not what this patent requires.  The      10:44:27

17  patent requires that you block a particular type of data           10:44:32

18  transfer.  And nobody in this case has ever suggested that a       10:44:38

19  quarantine can figure out if something is a particular type of     10:44:42

20  data transfer.                                                     10:44:47

21        Let's go back to our slides.                                 10:44:51

22        THE COURT:  You're already over time, so let's wind          10:44:55

23  this up.                                                           10:45:00

24        MR. GAUDET:  Thank you, Your Honor.                          10:45:01

25        THE COURT:  They haven't done their rebuttal yet.            10:45:02

1          MR. GAUDET:  I was simply going to make the point,

2  Your Honor, that Dr. Mitzenmacher agreed -- this is now

3  slide 29 -- he agreed that quarantines are simply based on the

4  source and the destination.

5          And Your Honor, we have a second non-infringement

6  position, but the truth is, this is the one, this is the one

7  that I think we should win this patent on.  With that, I'll sit

8  down.

9          THE COURT:  All right.

10          MR. HANNAH:  Thank Your Honor.  May I proceed?

11          THE COURT:  You may.

12          MR. HANNAH:  Thank you.

13          So Your Honor, as anticipated, there's a lot of talk

14  about changing the claim language, and so I want to go back to

15  what the claim language says.  If we go to slide 31 of our

16  slides, which is claim 18, this is the actual claim language.

17  And it does not say that you have a packet filtering rule that's

18  configured to inspect for a particular type of data transfer or

19  to inspect the payload.  It says it's configured to prevent a

20  particular type of data transfer.  And I think one of the points

21  that has to be made crystal clear is that every time that

22  Dr. Orso, the IPRs or anyone else that is reading this patent as

23  it's written and when they talk about the two-stage process,

24  they're talking about the first stage is the packet filtering

25  rule that's configured to prevent -- prevent, that's a key

```
 1   word -- the particular type of data transfer, the second stage      10:46:37

 2   is applying the operator.                                           10:46:41

 3           I want to go to, if I can see Dr. Orso's testimony          10:46:44

 4   that counsel just showed you, it's on slide 24 from opposing        10:46:48

 5   counsel.                                                            10:46:52

 6           Counsel showed you this testimony and quickly got off       10:47:01

 7   of it and saying that Dr. Orso agreed that you have to inspect      10:47:03

 8   the payload or do some type of thing.  Look at what his answer      10:47:10

 9   actually is.  His answer does not agree with the question.  He      10:47:13

10   says the application of the operator is the second stage.  And      10:47:18

11   of course it is.  Because that's what the patent requires.  When    10:47:22

12   you look at the record and you look at the IPRs, that's exactly     10:47:25

13   what the IPRs say.  The patent was allowed or institution didn't    10:47:29

14   get granted because Cisco failed to prove that an operator was      10:47:34

15   applied.  That's the second stage they were talking about.         10:47:38

16           Now I want to look, they spent a lot of time looking        10:47:42

17   at the specification.  Let me show you figure 3 of the '193        10:47:46

18   patent which is JTX-4.  This is from the specification, and it     10:47:50

19   shows what these operators can be.  Again, counsel's trying to     10:48:06

20   manipulate the claim language, but when you look at what the       10:48:11

21   operators can be, there's a column right there, and it says it     10:48:15

22   can be allow or a block operator.  And that's exactly what these   10:48:19

23   quarantine rules do.  You look at the packet filtering, you        10:48:23

24   apply the packet filtering rules, and if it's going to a           10:48:27

25   protected resource, you apply the block operator.                  10:48:30
```

1          With that, Your Honor, I have no more argument unless

2    you have any questions.

3          THE COURT:  No.

4          MR. HANNAH:  Thank you, Your Honor.

5          THE COURT:  Let's move on to the next --

6          MR. ANDRE:  Your Honor, I get the privilege of doing

7    the '806 patent.  This is the rule swapping patent.  You

8    preprocess rule sets and you process packets in accordance with

9    the rule sets and the second rule set.  The patent has a

10   priority date of January 11th, 2013.

11         Dr. Mitzenmacher was our expert on this patent.  Once

12   again, he provided overwhelming evidence of infringement.  There

13   are two product sets that we're going to be talking about,

14   switches and router plus the DNA Center and then the firewalls

15   plus the DNA -- plus the Firepower Management Center, and we'll

16   have to break these up into two different product offerings.

17         So the switches and routers with the DNA Center,

18   Digital Network Architecture center, if you look at how it's set

19   up and you'll see this is a common theme over these next two

20   patents.  You have a management center, in this case it's the

21   DNA Center, and it ingests threat intelligence.  And it, threat

22   intelligence, it then sends things down to the routers and

23   switches.  When we get to the firewalls you'll see the Firepower

24   Management Center does the same thing, it sends it down to the

25   firewalls.  It's just a management center to manage dynamic

1    security policies or in this case rule swapping.  It creates the          10:50:06

2    rules based on the ingestion of threat intelligence.          10:50:10

3          Now, Dr. Mitzenmacher's opinion on the switches and          10:50:14

4    routers is that the Catalyst 9000 switches, the routers in          10:50:16

5    combination with the DNA infringe '806 patent.  The DNA Center          10:50:21

6    ingests rules from a variety of cyber threat intelligence          10:50:25

7    sources, preprocesses the rules to create optimized policies          10:50:27

8    which are distributed to their switches and routers.  When the          10:50:33

9    new rules are available and sent to the switches and routers,          10:50:36

10   the switches and routers will perform a rule swap without          10:50:39

11   dropping packets.  And that's going to be a key thing.  That was          10:50:42

12   the big innovation.  How are you going to swap these rules out          10:50:44

13   and not drop packets?  It's a very important aspect of this          10:50:47

14   patent.          10:50:51

15         We showed you a white paper, DTX-1263, that talks          10:50:51

16   about how the DNA Center operates within the routers and          10:50:57

17   switches, how information is in constant flowing back and forth.          10:51:02

18   You see that the DNA Center is learning, it's ingesting this          10:51:05

19   threat intelligence, and ingests this intelligence and when the          10:51:09

20   rules are ready it sends it down where the routers and switches          10:51:13

21   can do the swapping.          10:51:15

22         What we saw in this case, and this is a technical          10:51:20

23   specification, Exhibit 1195, this is the Hitless ACL.  This is          10:51:24

24   the new feature that changes -- does the rule swapping without          10:51:29

25   dropping.  So no packets should drop.  If you look it what the          10:51:35

1   problem defined, this is a 2017 document, Exhibit 1195, the                10:51:39

2   problem was that packets were being dropped when they were doing           10:51:45

3   the previous rule swapping.  And we'll see that when get to                10:51:48

4   validity where they're overlapping the rules and packets were             10:51:51

5   dealing dropped.  With the Hitless ACL Change Flow, the key here          10:51:55

6   was packets would not be dropped.  And there is a algorithm, you          10:51:58

7   can see it, an 11-step algorithm that is defined on how these             10:52:01

8   rules are swapped.  Now, the evidence that we got in this case,           10:52:05

9   Dr. Mitzenmacher showed you a lot of technical documents.                 10:52:12

10  Probably some of the best evidence we got is from Mr. Peter               10:52:15

11  Jones, the witness for Cisco.  This was in his deposition.  "             10:52:18

12          What do you mean by Hitless?"  This is Hitless ACL.               10:52:24

13  So he's talking about changing from rule set A to rule set B and         10:52:28

14  not drop packets in the middle or have them subject to the               10:52:32

15  rules.  So what he's saying is you don't -- you're going to have         10:52:35

16  those packets coming in and at some stage between the two                10:52:39

17  packets is where it would get updated.  So that's what he was            10:52:41

18  talking about.                                                           10:52:45

19          Now so at trial, Mr. Jones came in to testify and talk           10:52:46

20  about this Hitless ACL, and on this next slide it's very                 10:52:50

21  difficult to read, it's in your binder, slide 43, and we're also        10:52:55

22  going to put it in as an exhibit to the proposed findings of            10:52:58

23  fact.  Next slide.                                                       10:53:01

24          THE COURT:  Just a second.                                       10:53:05

25          MR. ANDRE:  It's very difficult to read.                         10:53:13

1          THE COURT:  Slide 43.                                    10:53:15

2          MR. ANDRE:  Slide 43 in our binder.  That's correct,     10:53:16

3    Your Honor.                                                    10:53:18

4          THE COURT:  Wait a minute.  Let me find it.              10:53:20

5          MR. ANDRE:  Sure.                                        10:53:22

6          THE COURT:  Okay.                                        10:53:34

7          MR. ANDRE:  So Mr. Hannah, this is Mr. Hannah's entire    10:53:35

8    cross-examination of Mr. Jones.  I put the whole thing in      10:53:38

9    without edits.  I just put it on the right-hand column.  This   10:53:41

10   was it from start to finish other than the pleasantries of good  10:53:44

11   afternoon.  And Mr. Hannah went through this testimony and just  10:53:47

12   basically read the claim language, claim 9, into this testimony.  10:53:55

13   Every single element is met here.  You can just look at         10:53:59

14   Mr. Jones' testimony and he admitted each one of the claim      10:54:03

15   elements.  You combine that with Dr. Mitzenmacher and the      10:54:07

16   preponderance of the evidence is there.  It's much more than    10:54:09

17   preponderance of the evidence.                                 10:54:12

18          "When you talk about receiving a first rule set and a    10:54:14

19   second rule set," Mr. Hannah asked him, "the Catalyst switches,  10:54:16

20   do they receive rule sets," plural.  "That's correct".  And that  10:54:20

21   comes from the DNA Center.  That's where the rule set comes     10:54:22

22   from.  He says that's correct.  And then we're talking about    10:54:26

23   preprocessing and configuring the processors and getting all the  10:54:28

24   preprocessing step down.  How the Catalyst processes these rules  10:54:32

25   in order to process the rules, in order to process these rules,  10:54:37

```
 1  the Catalyst switch must compile them right in order to     10:54:41

 2  implement the results?  That's correct.  In doing the compiling,  10:54:44

 3  it compiles these rules while the old rules are still processing  10:54:48

 4  packets.  So you're not able to switch it out while you're still  10:54:52

 5  processing the new rules.  He said that's correct.  And then  10:54:55

 6  talking about once the compilation is complete, a signal is sent  10:54:58

 7  to processer saying, hey, we're ready.  It's done.  He said  10:55:02

 8  that's correct.  And you can read the rest of the testimony.  I  10:55:05

 9  won't read it all into the record.  I know we're on time.  But  10:55:08

10  you can read this testimony and it syncs up exactly with the  10:55:11

11  claims.  10:55:15

12          Now Dr. Mitzenmacher showed you the Hitless ACL  10:55:18

13  documents.  We showed you the data sheets, the white papers.  10:55:21

14  Mr. Jones' testimony is probably some of the best evidence  10:55:28

15  you'll see, and actually we'll see in the proposed finding of  10:55:31

16  fact.  That's how we proved infringement by more than a  10:55:35

17  preponderance of the evidence of the DNA Center with the  10:55:38

18  Catalyst switches and the routers.  10:55:43

19          The next product offering was the Firepower firewalls  10:55:46

20  with the Firepower Management Center.  Now if you look at how  10:55:49

21  this is configured, it's very similar to the switches and  10:55:53

22  routers.  You see the Firepower Management Center as the kind of  10:55:56

23  the management center of all these different firewalls, and it  10:56:01

24  ingests threat intelligence.  Now, this was an issue that I did  10:56:06

25  the cross-examination Mr. Shankar, and one of the things they  10:56:09
```

 1   left out was Threat Intelligence Director, TID.  I don't know if    10:56:15
 2   you remember that in their slides.  I pointed that out, the          10:56:18
 3   Threat Intelligence Director is a new add-on to the Firepower        10:56:21
 4   Management Center that ingest these rules, ingests intelligence      10:56:25
 5   and then makes these rules and distributes them to the              10:56:27
 6   firewalls.                                                          10:56:31
 7          Now, Dr. Mitzenmacher --                                      10:56:32
 8          THE COURT:  Now, do they do that before it reaches the        10:56:34
 9   destination?                                                        10:56:38
10          MR. ANDRE:  It creates the rule.  The swapping is done       10:56:39
11   down in the firewalls, but the rules are created up in the --       10:56:41
12   the ingestion of the rules are done in the management center.       10:56:44
13   They're sent down, they're compiled, once you make the rules,       10:56:51
14   you've got to compile them into a rule set and then put them        10:56:54
15   into the system.                                                    10:56:56
16          THE COURT:  And once you've put them into the system         10:56:57
17   it filters the packets before they reach the destination?          10:57:08
18          MR. ANDRE:  That's correct.                                  10:57:13
19          THE COURT:  Not afterwards?                                  10:57:15
20          MR. ANDRE:  That's correct.  And they can block             10:57:15
21   packets that the rules say don't let through, and if the            10:57:18
22   packet -- there's no rules to not let them through, they will       10:57:21
23   let them through.  It stops them before they get to the             10:57:24
24   destination.  This is the proactive, preventative technology        10:57:26
25   that's in the routers and switches, it's in the firewalls as        10:57:30

```
 1   well.                                                              10:57:33

 2          Dr. Mitzenmacher talked about you they ingest the          10:57:35

 3   rules and the new rules are available and sent to the firewalls   10:57:37

 4   and they perform a rule swap.                                     10:57:40

 5          Now let me talk about the Threat Intelligence              10:57:42

 6   Director.  This is on slide 47.  This is Exhibit 1289.  It talks  10:57:44

 7   about the Threat Intelligence Director ingests data from threat   10:57:51

 8   intelligence sources and publishes it to all the devices it's     10:57:57

 9   managing.  And if you recall, when I talked with -- when it says  10:58:01

10   "The Threat Intelligence Director, after initial deployment of    10:58:06

11   access control policies to managed devices, you can configure     10:58:08

12   sources, indicators and observables without redeploying on the    10:58:12

13   system automatically."  They automatically publish these new      10:58:16

14   data to the elements.  And the piece of the testimony that I got  10:58:19

15   from Mr. Shankar during cross-examination was right on point.     10:58:21

16   Actually go back to that slide.  I also want to point out one     10:58:25

17   other thing.                                                      10:58:28

18          I'm sorry, in the figure on the left, this is what         10:58:28

19   Your Honor just asked.  When a threat indicator incident is       10:58:31

20   fully realized, the system takes the configuration action,        10:58:35

21   monitor, block, partially block or no action.  That's that        10:58:40

22   preventative, proactive stuff that we're talking about.  So once  10:58:44

23   you put the rules in place on the firewalls, it can do all        10:58:48

24   these, it can monitor, it can block it, partially block, take no  10:58:51

25   action.                                                           10:58:54
```

1        I took Mr. Shankar on cross-examination.  So I said

2    after the Threat Intelligence Director, after ingesting this

3    threat intelligence, sends down the rules to the firewall, the

4    firewall can take action to monitor, block, or partially block

5    or take no action at all; is that correct?  He says that's

6    correct.  And he gave an analogy which I really liked and I

7    actually said I liked the analogy about the FBI Top 10 Wanted

8    List, and that Top 10 Wanted List changes, it sends out new

9    information, they can send it daily, they can send it hourly,

10   and those new updates occur and they would occur on a very

11   regular basis.  And those are the automatic updates of the rules

12   and rule swapping that's taking place in the firewalls.

13        What they call this in the firewalls -- and go to the

14   next slide, something called the transactional-commit model.  We

15   showed you PTX-1196 and they defined the problem.  They had,

16   packets were being dropped during large compilations of rules

17   and they wanted to avoid them.  So they said "By knowing what's

18   important to customers, we propose a transactional-commit model.

19   With the legacy model, new rules will take affect immediately

20   during compilation.  In contrast with the proposed

21   transactional-commit model, new rules will not take effect until

22   compilation is done and stable.  During compilation, packets

23   will still match the old rules."  So the use old rules until the

24   get the new rules in place.  Once you got the new rules in

25   place, you do the swap.

1      Now we get to the next slide.  This was from the

2  transactional-commit model.  The key here is it prevents -- the

3  figure is not coming up here.

4      "It prevents packet drops while compiling large rule

5  sets during high traffic rate."  So this is the key to the

6  transactional commit model.

7      Now for non-infringement purposes, what Cisco

8  attempted to do was -- and you probably recall this testimony --

9  go to the next slide -- they said you had to reprocess the

10  processed packet.  And you remember, you probably remember from

11  Dr. Reddy talking about this.  He said you had to reprocess.

12  Dr. Reddy actually said -- and Your Honor asked him some

13  questions on this.  This is at trial transcript 2635 13 through

14  2636, 11.  He's saying that once you process a packet you have

15  to reprocess the packet.  That was the basis for his opinions.

16  And it's just not the case.  It was like that's not what happens

17  in the system and that's not what happens in the claim.  The

18  claim was very clear that you don't process a packet with the

19  new rules until the new rules are fully in place and you can go

20  from there.  And Mr. Hannah on cross-examination of Dr. Reddy,

21  he looked are at figure 4 from JTX-2 and actually showed that

22  that was not how it was done.  That's not correct.  And he

23  looked at it in figure 4 to show that Dr. Reddy's interpretation

24  of the claim was incorrect.

25      So with that, Your Honor, unless you have any further

```
 1  questions, I will pass it to the other side and reserve a couple    11:01:57

 2  minutes for rebuttal.                                               11:02:00

 3           THE COURT:  All right.  Are you ready on cross?            11:02:01

 4           MR. GAUDET:  Your Honor --                                 11:02:14

 5           THE COURT:  I mean for argument?                           11:02:15

 6           MR. GAUDET:  Yes.  I was on mute, Your Honor.              11:02:17

 7           We will start on slide 41 of the Cisco binder.  And       11:02:19

 8  Your Honor, again, I think what we really have here is a basic      11:02:22

 9  dispute about what the claim covers.  As complicated as the        11:02:26

10  technology is, I think we probably agree on the most relevant      11:02:30

11  points.  But what Centripetal is suggesting is that they have a     11:02:35

12  patent on the concept of not dropping packets.  And if you         11:02:38

13  don't --                                                           11:02:42

14           THE COURT:  Now wait a minute.  What --                    11:02:43

15           MR. GAUDET:  Slide 41, Your Honor.                         11:02:47

16           THE COURT:  Oh, I'm sorry.  I was looking at 42.           11:02:49

17           MR. GAUDET:  Yes.  This is the claim language, and I       11:02:53

18  was going to, just before I get to the claim language I just        11:02:55

19  wanted to kind of give you some --                                 11:02:58

20           THE COURT:  All right.                                     11:02:59

21           MR. GAUDET:  -- introductory remarks.                      11:03:00

22           And that is, Your Honor, listening to Mr. Andre,          11:03:02

23  again, I don't know that on the material facts we have a big       11:03:04

24  dispute.  This is really about what the claim covers.  And         11:03:09

25  Centripetal's position seems to be that they got a patent on the   11:03:14
```

1   concept of not dropping packets during rule swaps, and as long          11:03:18

2   as you don't drop packets, you must infringe their patent.  And         11:03:23

3   that is absolutely not what the claims say.  The claims cover a          11:03:27

4   very specific way of not dropping packets during a claim swap,           11:03:30

5   and that's what I want to take you through, Your Honor.                  11:03:36

6           This slide, slide 41, has the claim as they originally          11:03:38

7   filed it.  We have seen this sort of thing before.  And then on          11:03:44

8   the right-hand side is the claim as it was actually issued.  And         11:03:48

9   what you can see is there is a lot of new language they had to           11:03:54

10  add.  And I highlighted in red the language I'm going to focus           11:03:56

11  on in this argument.  It was new.  And it had to be added in             11:04:00

12  order to get this patent.  And Your Honor, what this language            11:04:05

13  says is that a device is using its first set of rules.  A second         11:04:08

14  set of rules arrives.  And then -- this is so important -- the           11:04:14

15  first part that is in red, responsive to being signaled to              11:04:18

16  process packets in accordance with the second rule set.  In             11:04:23

17  other words, in response to being told, hey, the second rule            11:04:27

18  set's here, the new rule set's here, you need to do something --        11:04:30

19  in response to that signal.  The way that they don't drop              11:04:33

20  packets is you now cease processing of packets and you cache            11:04:37

21  these packets.  You do something different than what you were           11:04:41

22  doing before.  And Your Honor, our basic non-infringement point         11:04:44

23  is it's definitely not that time stands still.  That's not at           11:04:48

24  all what happens.  It's that the processing of packets in all of        11:04:51

25  the accused systems happens on a regular interval.  For example,        11:04:57

1    in the new products it's two clock cycles.  And between every          11:05:01

2    packet that ever comes into the system, every -- this is              11:05:07

3    milliseconds -- every two clock cycles a packet is processed,         11:05:11

4    okay?  It doesn't matter if the rule sets are being swapped or        11:05:15

5    not being swapped.  And they have no idea if they have been           11:05:19

6    swapped or not being swapped.  Every two clock cycles, a packet       11:05:22

7    moves out of the buffer and gets processed.  And so there is          11:05:26

8    never something different.  The fact that the rules arrived           11:05:31

9    don't cause a signal to say, hey, do something different with         11:05:37

10   respect to how you're processing, stop processing for a while or      11:05:41

11   take an extra pause.  Nor is there a signal that says, hey, do        11:05:44

12   something extra or different with respect to the caching.  And        11:05:48

13   that's what the claim requires.  The way that this claim avoids       11:05:52

14   dropping packets is when the new rule arrives, instead of trying      11:05:56

15   to use it right away while it's getting it ready, okay, it            11:06:01

16   doesn't use the old rule set either.  It caches the packets as        11:06:06

17   they're coming in, it stops processing, and then eventually it        11:06:10

18   starts again.                                                         11:06:15

19        And the fundamental difference is that in our system,            11:06:15

20   we don't do anything different.  The processing happens on            11:06:18

21   exactly the same cadence, and every witness said that, and           11:06:22

22   that's the testimony Mr. Andre put up, and the buffering, which       11:06:26

23   they're calling caching happens on exactly the same cadence.          11:06:29

24   There is no difference.  And even if you were to find that            11:06:32

25   processing ceases during those two clock cycles, and even if you      11:06:39

1  were to find that buffering is the same thing as caching, none                    `11:06:42`

2  of that happens in any way in response to a signal related to                      `11:06:46`

3  the arrival of the new rule set.  It happens.  It doesn't -- the                   `11:06:51`

4  buffering doesn't even know that there's been a new rule set.                      `11:06:57`

5          And Your Honor, to explain why this matters, in the                       `11:07:00`

6  prosecution history they tried to get, they -- there is a prior                    `11:07:05`

7  art reference that was just keep on buffering as packets come                      `11:07:09`

8  in, you know, that sort of thing, and the way this was                             `11:07:13`

9  distinguished by Centripetal was to say in that prior art                          `11:07:17`

10 reference, the queues, right, are configured to hold packets for                   `11:07:21`

11 processing.  That's just a standard buffer operation, just like                    `11:07:26`

12 us.  You're just waiting for processing.  They say Nowhere                         `11:07:29`

13 does -- that's the prior art name -- indicate that the queues                      `11:07:32`

14 are configured to cache packets for which processing has ceased.                   `11:07:36`

15 It's something different.                                                          `11:07:41`

16         And Your Honor, their inventor said the same thing.                        `11:07:44`

17 Dr. Moore, we've played -- this was about a four- or five-page                     `11:07:47`

18 answer.  We played the entire answer for you.  I've got the last                   `11:07:51`

19 part of it, but certainly invite you, the whole thing is in the                    `11:07:56`

20 record, but he explained what the claimed caching is.  It's not                    `11:07:59`

21 just the same old process.  It's something different.  It's that                   `11:08:04`

22 caching would be used in this sense.  In the context for, oh,                      `11:08:07`

23 those packets that you're already currently processing through                     `11:08:11`

24 the old policy, you don't want to put those back on the buffer                     `11:08:14`

25 from whence they were extracted in the first place.                                `11:08:18`

1        If we go to the second paragraph.                       11:08:21

2        You want to put them a higher-speed cache memory, so    11:08:23

3   that once you're ready to start processing those packets again   11:08:26

4   you can get to them as quickly as possible.                 11:08:29

5        And the last part.  Making sure you're securing those  11:08:32

6   cache packets according to the new policy.  The things that  11:08:35

7   you -- it's not just business as usual, it's you have to do  11:08:40

8   something new and different.  And that's exactly what's missing.  11:08:44

9        So what's the proof of how we actually operate?  And   11:08:48

10  the truth is there's no disagreement.  I didn't see any evidence   11:08:51

11  Mr. Andre put up that was inconsistent with anything I'm going   11:08:54

12  to tell you; that Hitless ACL updates, Mr. Jones says, it is   11:08:56

13  applied to a given string of packets without disabling packet   11:09:03

14  processing while the change is made.  It just does exactly the   11:09:06

15  same thing it was doing before.                             11:09:09

16       Here in slide 46 he says in the answer, "It's a fixed   11:09:11

17  time pipeline.  There will be a packet every two or four     11:09:15

18  internal clock periods" -- two with the newer ones, four with   11:09:19

19  the older ones -- "and the switch happens between those."   11:09:21

20       And he showed this diagram and basically, you know,    11:09:25

21  packets come in into the bottom, bottom left, and every -- in   11:09:28

22  the newer ones, every two clock cycles, packet goes up to that   11:09:33

23  top buffer and the header goes into this thing called the    11:09:38

24  ingress-forwarding controller, all right?  And it's processed   11:09:41

25  and every two seconds it just keeps on happening, keeps on   11:09:44

1   happens -- sorry.  Clock cycles, not seconds.  Clock cycles.          11:09:51

2          Every two clock cycles that keeps on happening, and            11:09:55

3   then the middle green, the lookup tables, that's what gets            11:09:57

4   changed in between the two clock cycles.  But the buffering and       11:10:00

5   the processing doesn't change in any way because of that.  In         11:10:05

6   other words, there's nothing saying stop the processing, do           11:10:09

7   something different with the processing, start caching.  There's      11:10:12

8   not even a signal.                                                    11:10:15

9          And so when he was asked this question, bottom here,           11:10:17

10  "Please explain any relationship between the packet buffers           11:10:21

11  complex and the Hitless ACL rule update technique that we talked      11:10:24

12  about yesterday."  "There is no relationship."                        11:10:28

13         And I want to pull up the slide, Plaintiff's slide 43,         11:10:30

14  to show you what Mr. Andre pointed to from the same witness.          11:10:35

15  Because again, I think we're in complete agreement about the          11:10:38

16  facts.  Your Honor, what I want to point to you is it's the           11:10:45

17  second-to-last row.  This is where he has the testimony.  But         11:10:48

18  what they have done is you've got to start reading before you         11:10:54

19  get to the second-last row in the claim language.  Because it's       11:11:00

20  that phrase right before that says "configure each processor of       11:11:03

21  the at least two processors to, responsive to being signaled, to      11:11:07

22  process in accordance with the second rule set.  In response to       11:11:13

23  a signal that the new rule set is here, you've got to do              11:11:17

24  something different.  And what is the testimony on the right?         11:11:20

25  It just says, yeah, every two clock cycles, two or four,              11:11:22

1    depending on the product, we process a packet, and that's it.          11:11:27

2    And that's all it says.  And during that break you swap from the       11:11:32

3    old to the new.  We agree.  That's not what the claim requires         11:11:36

4    though, Your Honor.  The claim requires that something has to          11:11:39

5    happen in response to a signal that the new rule set arrived.          11:11:42

6    And that something is that you cease processing packets.  You do       11:11:47

7    something about the processing and then you cache the packets in       11:11:51

8    response.                                                              11:11:55

9            Let's go back to our slide set.                                11:11:56

10           And the accused routers operate in exactly the same            11:12:02

11   way.  And you know, Your Honor, what they're accusing here, this       11:12:05

12   basic buffering, the first part here is, that's -- I mean, the         11:12:09

13   process of buffering a packet before you process it, that's been       11:12:12

14   around since Cisco's inception.  That's always the way you do          11:12:16

15   things.  That's literally all they're accusing.  The Patent           11:12:20

16   Office didn't give them a patent on that.                             11:12:23

17           And Your Honor, the same thing for firewalls.  The            11:12:26

18   same point in the firewalls.  This is slide 50.  And I want to        11:12:29

19   jump forward just a little bit here.  The question, why is it --       11:12:35

20   why does the patent cease processing and cache packets?  What is      11:12:39

21   the purpose of this in the patent, to give this some context.        11:12:43

22   And this is in the background of the specification.  They're          11:12:46

23   defining the problem.                                                 11:12:49

24           THE COURT:  Mr. Gaudet, you've got to pay attention to        11:12:50

25   the clock.  You keep running over.                                    11:12:54

1           MR. GAUDET:  Your Honor, I'm on 13 minutes, I believe.          11:12:58

2   I thought I had a 15-minute allocation.  I know that Mr. Andre,          11:13:00

3   I think, may have -- but I thought I was on 13 minutes.  I was          11:13:03

4   trying to pay attention to the clock and I thought I had 15.          11:13:06

5           THE COURT:  All right.          11:13:11

6           MR. GAUDET:  Your Honor, this is the final point here.          11:13:12

7   According to the background, the problem was that while          11:13:15

8   implementing a new rule set -- this is highlighted -- a network          11:13:20

9   protection device might continue processing packets with the old          11:13:23

10  rule set.  In other words, after the new rule set arrives, you          11:13:27

11  might keep using the old one, and that's a problem.  That's what          11:13:32

12  the patent solves by saying stop processing and cache.  But Your          11:13:35

13  Honor, that's exactly what we do.  That's how Hitless ACL works.          11:13:40

14  We keep using the old rule set.  That's established by PTX-1293.          11:13:43

15          And the final point here, Your Honor, is you might ask          11:13:49

16  the question, why would you do that?  Why wouldn't you do what          11:13:53

17  the patent does?  And the answer is, from Mr. Shankar, it takes          11:13:56

18  several hours to get a new rule set ready, so spending an extra          11:14:00

19  couple minutes before you use it after it gets to the device is          11:14:05

20  just not that big of a deal.          11:14:07

21          We rejected the patent's solution.  We do what the          11:14:09

22  patent distinguished.  We do not, in response to the arrival of          11:14:13

23  a second rule set, of a new rule set, do any ceasing of          11:14:17

24  processing or any caching.          11:14:20

25          And Your Honor, that's all that I have on this one.          11:14:23

1          MR. ANDRE:  Your Honor, I'll just use a minute or two      11:14:32

2    so we can get back on schedule here.      11:14:34

3          If we go back to slide 43?      11:14:35

4          This is the testimony from Mr. Jones.  I know Your      11:14:38

5    Honor saw this testimony.  Mr. Gaudet says there's nothing that      11:14:41

6    says stop processing packets.  If you look down to the fourth      11:14:44

7    box on the right-hand side there's a question, "But there's a      11:14:51

8    signal that says stop processing packets with the old rule set      11:14:54

9    and start processing packets with the new rule set, correct?"      11:14:57

10          "Yes.  We swap the old to the new."  And you do that      11:15:01

11    swapping between, in between those clock cycles you mentioned.      11:15:04

12    That's when the packets are being stored in the buffer.  So Mr.      11:15:07

13    Gaudet says there's nothing they stop processing packets.  We      11:15:10

14    got direct testimony of Mr. Jones that says that, and we showed      11:15:14

15    him documents that showed the exact same thing.  In fact, there      11:15:17

16    is a signal that says stop processing packets while you switch      11:15:23

17    out the rules.      11:15:26

18          THE COURT:  Okay.      11:15:30

19          MR. ANDRE:  Your Honor, I'll let Mr. Hannah take over,      11:15:32

20    and he's going to be doing the '205 patent now.      11:15:33

21          MR. HANNAH:  Thank Your Honor.  May I proceed?      11:15:43

22          THE COURT:  Yes.      11:15:45

23          MR. HANNAH:  Thank you.      11:15:47

24          So the '205 patent, this is again one of the patents      11:15:47

25    covered by Dr. Mitzenmacher.  This patent talks about providing      11:15:50

1  dynamic security policies to a variety of network devices.  And          11:15:55

2  this is what allows for the processing of the SIP traffic and            11:15:58

3  the encapsulation.  That's what this patent specifically talks           11:16:01

4  about.  And we heard a lot of testimony about this.                      11:16:07

5          Next slide we see Dr. Mitzenmacher again provided a              11:16:09

6  number of exhibits, and in this, for this scenario it's similar          11:16:12

7  to the '806 in that we have both the switches and the routers            11:16:15

8  with DNA, that's one contention, and then the firewalls plus the         11:16:20

9  Firewall Management Center as the other contention.  And so I'll         11:16:25

10 start with the switches and routers with the DNA Architecture.           11:16:29

11         So we turn to that, it's a similar slide Mr. Andre               11:16:34

12 just showed, but what we're focusing on here is we have the DNA          11:16:36

13 Center that's going to be processing these different rules and           11:16:41

14 these different processes, these dynamic policies and pushing            11:16:44

15 them down to the Catalyst switches, the routers and the                  11:16:47

16 Aggregated Services Routers and the Integrated Services Routers.         11:16:51

17         We turn to Dr. Mitzenmacher's opinion and we see that,          11:16:55

18 again, he says the Catalyst 9000 switches and all the routers            11:17:00

19 with the DNA, they infringe the '205.  The DNA Center is a               11:17:03

20 security policy management server, and we showed a number of             11:17:07

21 documents, and we'll show a couple this morning, that sends              11:17:10

22 policies to the switches and routers.  These switches and                11:17:13

23 routers, they enforce the policies, and that includes enforcing          11:17:15

24 rules that process SIP traffic.  And we showed a number of               11:17:20

25 documents in which they process SIP traffic.                             11:17:23

1      We also showed a number of documents in which

2   encapsulation is performed, and that's the last element that's

3   provided here.  And that's done through this thing -- one of the

4   ways that this is done is through tunneling.  And we explained

5   where that tunneling is, and you rewrite the header of the

6   packet, you send it through this tunnel so you can process it at

7   the other end of tunnel.

8          So starting with the policies, the dynamic security

9   policies from the security policy management server.  That's the

10  DNA.  And it says in 1294, PTX-1294, you create these policies,

11  you allow the creation of policies based on business intent for

12  the particular part of network, and these configurations can be

13  adjusted dynamically based on the network conditions.  These are

14  the dynamic security policies that we're talking about with the

15  '205 patent.

16         If we go to the next slide, we talked about how the

17  DNA Center is going to be sending these policies to the switches

18  and we showed how, that the switches have the ability to process

19  SIP traffic.  There's a lot of testimony, and the highlighting

20  looks like it's a little off here, it should be highlighting the

21  SIP traffic for the voice phones here.  And there was a lot

22  of -- there was some testimony which we'll look at later that

23  they do this for security purposes; that the switches and

24  routers, they don't look at SIP for security at all, that it's

25  done for monitoring phone calls.  That's not what their

11:17:25
11:17:28
11:17:32
11:17:36
11:17:39
11:17:42
11:17:45
11:17:48
11:17:50
11:17:55
11:18:01
11:18:05
11:18:07
11:18:11
11:18:15
11:18:18
11:18:22
11:18:25
11:18:31
11:18:34
11:18:37
11:18:40
11:18:44
11:18:47
11:18:51

1    documents say.  You look at their technical documents, it says       11:18:55

2    that they have SIP traffic and they do it for security purposes.     11:18:58

3           We also showed you a number of documents about                11:19:02

4    encapsulation for the switches and routers.                          11:19:03

5           THE COURT:  Wait a minute.  Let's look at that last           11:19:07

6    one.  Where does it say security?                                    11:19:08

7           MR. HANNAH:  At the very top, Your Honor.  So it's            11:19:10

8    Advanced IOS Security.  This is an overview.  And then it talks       11:19:13

9    about how you have data plane security and control plane             11:19:16

10   security.  And then the highlighting got moved, it looks like,       11:19:19

11   but the, if you look under the fifth bullet point, or it's the       11:19:24

12   second one underneath the Data Plane Security, the second small      11:19:28

13   bullet point -- there you go.  Thanks, Geoff -- SIP traffic for      11:19:36

14   phones, part of the data plane security that we're talking about     11:19:40

15   here.  And this is the same operating system that works on the       11:19:44

16   switches and routers that we've talked a lot about over the          11:19:48

17   weeks.                                                               11:19:51

18          We showed you PTX-524 as an example of encapsulation,         11:19:51

19   the switches an routers they can do condition.  They do this for     11:19:57

20   a variety of reasons.  Again, it's for these tunneling reasons,      11:20:01

21   it's able to be able to create these protocols so that you can       11:20:04

22   send these packets to another destination for a variety of          11:20:08

23   purposes.  If you have two offices, if you want other monitoring     11:20:11

24   or processing.  We showed you a number of these encapsulation        11:20:15

25   documents.                                                           11:20:19

1           THE COURT:  You can send it to other destinations.  Do          11:20:19

2    you block it from going to its original destination with this          11:20:21

3    technology?          11:20:26

4           MR. HANNAH:  You reroute it from going from its          11:20:27

5    original destination through the tunnel.  Absolutely, Your          11:20:32

6    Honor.  At the other end of the tunnel you can determine whether          11:20:34

7    you want to block it at that point or you can allow it to go to          11:20:36

8    its destination, or you can do whatever you want through the          11:20:39

9    tunnel.  But the point --          11:20:42

10           THE COURT:  Before it reaches the destination?          11:20:43

11           MR. HANNAH:  Absolutely.  That's what encapsulation is          11:20:46

12    all about.  It is that you change the header of the packet so          11:20:48

13    you send it through the tunnel, and then once you do that, it          11:20:52

14    diverts it from its -- routes it from its original destination          11:20:56

15    to the, through the tunnel.  And if you look, Your Honor, it          11:21:00

16    says Encapsulations, Generic Routing Encapsulation, it talks          11:21:05

17    about how you do this routing through the tunnel.          11:21:09

18           THE COURT:  Well, if you're tapping a telephone with          11:21:13

19    this technology, if it doesn't go to its original destination,          11:21:15

20    what is there to tap?          11:21:23

21           MR. HANNAH:  That's, it's not -- this patent is not          11:21:25

22    about tapping telephones.  That's what the defendants are trying          11:21:27

23    to characterize it as.  It's about providing security.  What          11:21:31

24    happens is, you have bad actors who can send malicious traffic          11:21:35

25    through the SIP traffic.  So you think it might be a SIP, it          11:21:40

1  might be a phone call, it might be, you might think it's VoIP                11:21:45

2  traffic, and so you don't inspect it at all and it's allowed to             11:21:51

3  go through.  The malicious actors have targeted that vector.  So            11:21:53

4  now that's exactly why that last document I just showed you, you            11:21:58

5  have to apply security to that vector.  It's not just a phone               11:22:02

6  call.  It's another road that they can get into your network.               11:22:07

7  And so that's what the '205's about.  It's about providing                  11:22:13

8  security over that channel.  It's not about monitoring phone                11:22:17

9  calls.  That's the mischaracterization that we've got from the              11:22:21

10 defendants.  And as I show later in slides, their expert                    11:22:26

11 actually made the affirmative statement that the '205 is not                11:22:33

12 about security at all.  And if you look at the claims, you look             11:22:35

13 at the title, you look at the title of the patent, it talks                 11:22:38

14 about security.                                                             11:22:41

15          So I'd like to just move quickly to the firewalls and            11:22:44

16 the Firepower Management Center, and it has the same                        11:22:49

17 functionality.  We look at the architecture.  It's the Firepower           11:22:52

18 Management Center.  It receives this threat intelligence and                11:22:57

19 pushes these policies to all of the firewalls.  Dr.                        11:22:59

20 Mitzenmacher's opinion was similar for the firewalls.                       11:23:03

21          If you go to the next slide, specifically it shows              11:23:06

22 that you have these firewalls, they had Firepower Management                11:23:09

23 Center that is the security policy management center.  It sends             11:23:12

24 these policies to the firewalls.  The firewalls enforce these               11:23:15

25 pollices.  They provide security.  And they process the SIP                 11:23:19

```
1    traffic.  And then the firewalls have the capability to          11:23:22

2    encapsulate those packets via this tunneling.  This is shown in  11:23:26

3    the documents.                                                   11:23:29

4              You look at PTX-1289, it talks about how you have      11:23:30

5    security intelligence -- this the Threat Intelligence            11:23:34

6    Director -- and you have these policies that are created to form 11:23:35

7    these IP addresses, URLs and domains, and you can send these     11:23:40

8    policies without requiring redeployment.  That's the dynamic     11:23:43

9    nature of these policies.                                        11:23:49

10             Let's go to the next slide.  I think this is actually  11:23:51

11   going to really help, Your Honor, and answer your specific       11:23:53

12   question.  It's not about monitoring phone calls.  Look at the   11:23:56

13   highlighting here for SIP keywords.  It says "Four SIP keywords  11:23:59

14   allow you to monitor SIP session traffic for exploits."  For     11:24:03

15   security.  You're not tapping phones.  You're not trying to say, 11:24:07

16   you know, see what's going on.  You're looking at the SIP        11:24:12

17   traffic because it's a hidden vector, it's another road that     11:24:16

18   attackers can use because you think it's a phone call.  It's an  11:24:20

19   exploit.  And that's what this firewall does.  It looks at the   11:24:24

20   SIP traffic and tries to see, okay, is this going to be          11:24:28

21   malicious?                                                       11:24:31

22             And right here on this slide it also -- this is        11:24:31

23   PTX-1289 -- it shows an example rule that's used to look at the  11:24:33

24   SIP header and match the field.  You alert if you have any of    11:24:38

25   these suspicious kind of operations that are going to be         11:24:43
```

1  happening, and you are going to be able to alert and react to          11:24:45

2  those and block that traffic.                                          11:24:50

3           That's exactly what the next slide shows.  It's the          11:24:52

4  same document, this document shows all these features.  You            11:24:54

5  extract the SIP header and you pass the -- you pass it to the          11:24:58

6  rules engine for further inspection.  You don't monitor the            11:25:03

7  phone call, you look at the SIP header, you look at the traffic        11:25:06

8  and look at the rules to say, okay, let's inspect this traffic         11:25:10

9  for security purposes.                                                 11:25:13

10          The firewall in PTX-1293 also has this capability of         11:25:16

11 performing the tunnel.  This is the encapsulation we're talking        11:25:21

12 about.  It specifically says you have a secure connection.             11:25:25

13 "It's called the tunnel.  The ASA uses these tunneling protocols       11:25:29

14 to negotiate security, create and manage tunnels and encapsulate       11:25:32

15 packets, transmit them through the tunnel and then unencapsulate       11:25:38

16 them."  That's what the firewall had the capability of doing.          11:25:42

17          THE COURT:  Well, when you encapsulate it, does that         11:25:44

18 stop it from reaching its destination?                                 11:25:48

19          MR. HANNAH:  It does, Your Honor.  It'll send it             11:25:50

20 through the -- instead of going to the destination, it diverts         11:25:51

21 it, it routes it going to the, to the tunnel.  And it has to do        11:25:54

22 that by changing the header.                                           11:25:59

23          THE COURT:  Where does it go?                                11:26:01

24          MR. HANNAH:  It can go whenever you want it                  11:26:03

25 programmed.  It can go to another end to do some work, to              11:26:05

```
 1   monitor -- I mean to enforce or to look at the traffic some        11:26:09

 2   more.  You can go, you can send it to, if you had a corporation    11:26:12

 3   or another office, you might want to send it over there, might     11:26:15

 4   have some higher processing.  But all the claims require is the    11:26:19

 5   ability to encapsulate this traffic and be able to send it         11:26:23

 6   through these tunnels and provide the security function.           11:26:27

 7           If you look at the next slide, this is the claim set,      11:26:32

 8   and their non-infringement arguments are largely based on          11:26:36

 9   rewriting the claims again.  First, you have a single rule that    11:26:40

10   specifies a set of network addresses.  That's just a plain        11:26:47

11   rewrite of the rule, at least one rule.                            11:26:52

12           And then they have this argument that you have to have     11:26:54

13   SIP colon in the rule.                                             11:26:56

14           If we turn to the next slide, this was debunked during    11:26:59

15   cross-examination.  During cross-examination, we showed him the    11:27:04

16   plain language and it says "The asserted claims do not require a   11:27:07

17   single rule, correct."                                             11:27:09

18           "No, there can be multiple such rules based on the         11:27:10

19   claim language."                                                   11:27:13

20           We also debunked the fact that you have to have SIP in     11:27:14

21   the rule itself.  You look in the specification, we showed this.   11:27:17

22   This is on column 14.  It specifically has an example of a SIP     11:27:22

23   URI and it does not include the SIP colon.  That's because you     11:27:29

24   don't need that for security purposes.  For security purposes,     11:27:32

25   you just need the information necessary to determine if it was     11:27:35
```

1   coming from a bad place.                                                   11:27:38

2           Now as I alluded to earlier, we talked about                      11:27:40

3   Dr. Jeffay's trial testimony, and his entire testimony was based          11:27:42

4   on this monitoring phone calls and that the -- and he was asked,          11:27:45

5   this is on redirect, "With respect to No. 5, risk mitigation              11:27:50

6   with multiple security, is the '205 patent even about security?"          11:27:55

7           "No, no, it's about helping law enforcement."                     11:27:57

8           This goes largely to his credibility.  You look at the            11:28:00

9   claim language.  The claim language is absolutely the '205 is             11:28:03

10  about security.                                                           11:28:07

11          Go to the next slide.                                             11:28:08

12          A security policy management server.  Of course the               11:28:09

13  '205 is about security.  A packet security gateway.  That is              11:28:12

14  what the routers, switches and firewalls are acting as.  And              11:28:16

15  they have dynamic security policies.  So his notion that you              11:28:20

16  don't have security, it completely cuts against the credibility          11:28:24

17  and shows that the '205 is infringed by those products.                   11:28:29

18          THE COURT:  So are you accusing the firewalls as well?            11:28:32

19          MR. HANNAH:  Absolutely, Your Honor.  The firewalls is            11:28:36

20  what I just showed where it has the SIP headers that get                  11:28:38

21  extracted from exploits.  So it's the routers and switches plus           11:28:41

22  DNA and then the firewalls with the Firepower Management Center.          11:28:44

23          THE COURT:  Okay.  Cross-examination?  He used up most            11:28:50

24  of the time.                                                              11:29:00

25          I keep saying cross-examination.  Response?                       11:29:01

1        MR. GAUDET:  Yes.  Your Honor.                          11:29:07

2        THE COURT:  After six weeks of cross-examination...     11:29:09

3        MR. GAUDET:  Let's go to Slide 61.  And Your Honor,     11:29:12

4   after six weeks, this is now the third patent that I think we  11:29:14

5   fundamentally have a disagreement about what the patent covers.  11:29:19

6        Your Honor, just, this is -- actually let me go back   11:29:23

7   to slide 59 here.                                             11:29:28

8        Your Honor, you're exactly right.  And Dr. Jeffay laid  11:29:32

9   it out that what this claim covers is wire tapping.  You have to  11:29:36

10  send, according to the claim, and I'll get you there, you have  11:29:40

11  to send the original packet all the way to the end, otherwise  11:29:42

12  there's nothing to wire tap.  Now I'll walk you through the   11:29:47

13  claim.                                                        11:29:50

14        Mr. Hannah did something sort of interesting in trying  11:29:50

15  to argue why it was that the patent, the patent covers blocking  11:29:52

16  and security in the form of blocking.  He went to our accused  11:29:59

17  products and said see in the accused products, there's no     11:30:02

18  tapping.  There's blocking, and we agree with that, but that's  11:30:05

19  why we don't infringe.                                        11:30:09

20        Your Honor, the language from the specification here   11:30:11

21  talks about exactly what happens in figure 6.  It's this law  11:30:13

22  enforcement scenario.  And this is now figure 6.  What we have  11:30:16

23  up here is this reflects the ability -- this line here, is just  11:30:21

24  the ability of processing SIP traffic that's been around for 25  11:30:27

25  years.  Upper left, there's a phone call made from that user  11:30:30

1   equipment device, it goes over the Internet, it lands at the            11:30:34

2   user in the bottom right who has got this, effectively, phone           11:30:38

3   number which is this SIP URI there in the payload.  That's been         11:30:42

4   around for 25 years.                                                    11:30:48

5            This is what the patent changes.  It stops that call.         11:30:50

6   If it matches with the SIP URI who you want to wire tap, you            11:30:53

7   encapsulate it.  But it's not enough just to encapsulate.  The          11:31:02

8   claim requires a lot more.  And I highlighted in red the lot            11:31:05

9   more, Your Honor.  After you encapsulate it, you send it down to        11:31:09

10  this network device that's in the bottom left.  You have to copy        11:31:13

11  the information and then you forward it to the original                 11:31:18

12  destination called the Destination Network Address.  You cannot         11:31:23

13  block it.  You have to forward it.  If you block it, you cannot         11:31:26

14  possibly satisfy this claim.  And it's just that simple.  And           11:31:30

15  everything he's accusing is blocking.  Is stopping the phone            11:31:34

16  call.                                                                   11:31:37

17           And then the last element is that you route, you know,        11:31:38

18  you actually carry out this routing to the monitoring device.           11:31:41

19  Your Honor, this wasn't some minor thing.  We've got here on            11:31:45

20  slide 63, this was a big part of the reason that the Patent             11:31:54

21  Office allowed the claim.  In the Notice of Allowance the               11:31:57

22  examiner literally quoted everything to the bottom of this              11:32:02

23  slide.  Beginning with the "encapsulate at least one packet",          11:32:05

24  they quoted everything in element E down to "network address            11:32:08

25  with copy and forward."  And they said this is why you're               11:32:14

 1   different.  This is why you're different than the prior art.

 2   You're not just processing SIP traffic.  And they didn't even

 3   try to satisfy this.

 4        And Dr. Jeffay pointed out, Dr. Mitzenmacher and now

 5   Mr. Hannah never suggested this process of encapsulating,

 6   sending it to a device that copies and then forwards.  And

 7   that's a very specific thing.  It would require a bunch of

 8   equipment and a bunch of engineering and a bunch of software,

 9   and they have never pointed to anything.  Mr. Hannah generally

10   said there's encapsulation and then took this leap that

11   therefore there must be every other claim element with

12   absolutely no evidence.  And Dr. Mitzenmacher didn't even try.

13        I think it's clear Dr. Mitzenmacher is accusing the

14   blocking of packets.  That's slide 65.  He said it again in

15   Slide 66.  And this is now Slide 67, Dr. Jeffay's explanation.

16   He said it's not about blocking packets.  Because if you block

17   packets, intuitively there's no call to tap, and you obviously

18   are not forwarding the original packet to its destination, thus

19   it's literally the opposite of the claims.

20        The other thing with respect to the doctrine of

21   equivalents, Dr. Mitzenmacher said that blocking would be

22   equivalent to what the claim requires.  Blocking is the opposite

23   of what the claim requires.  But beyond that, Your Honor, for

24   this and for the other patents that were involved in

25   prosecution, when they had to add these elements or make

1   statements about them, there can be no doctrine of equivalents.    11:34:02

2   You don't get to use the doctrine of equivalents on elements    11:34:03

3   that you had to add in order to overcome prior art.    11:34:06

4           The second point, Your Honor, and I'll just, I'll be    11:34:12

5   very brief on this one, it's just the point about what a SIP URI    11:34:14

6   is.  And this is the second independent reason.  And I think the    11:34:18

7   punch line here is, as Dr. Jeffay explained, the SIP URI has to    11:34:24

8   identify somebody specific.  Because what they're saying is it's    11:34:30

9   just a domain name, it's just unc.edu.  And that's just not good    11:34:33

10  enough.  And Your honor, I think I'm going try to save us some    11:34:38

11  time.  That's everything that I have.    11:34:41

12          THE COURT:  All right.  Any rebuttal?    11:34:45

13          MR. HANNAH:  Just briefly, Your Honor.    11:34:50

14          If we go back to slide 66 from our slide deck.    11:34:50

15  Counsel tries to say that the evidence that we point to,    11:34:54

16  everything says that you're going to block.  And I just want to    11:34:57

17  point out what the documents actually say.    11:35:01

18          Says "Four SIP keywords allow you to monitor the SIP    11:35:03

19  session traffic for exploits."    11:35:07

20          If we go to the -- talks about monitoring for it.    11:35:08

21          And if you go to the next slide, and this is    11:35:11

22  deliberate, if you look at Slide 67, "You extract the SIP header    11:35:14

23  when present and passing it for further inspection."    11:35:18

24          So this whole notion that we're requiring blocking    11:35:21

25  that's in the products and that the products only block and they    11:35:26

```
 1   don't do inspection, is just contrary to the documents.          11:35:29

 2          With that, Your Honor, unless there's any further         11:35:33

 3   questions, we can move on to the next patent.                    11:35:35

 4          THE COURT:  I think we actually move on to a recess.      11:35:39

 5          MR. HANNAH:  Yes, Your Honor.                             11:35:41

 6          MR. GAUDET:  Mr. Hannah and I teamed up to actually       11:35:45

 7   get ahead of schedule a little bit, Your Honor.                  11:35:47

 8          THE COURT:  You did.  You're five minutes ahead.  So     11:35:50

 9   we'll take a recess until -- well, this says we'll resume at     11:35:54

10   11:40.                                                           11:36:04

11          MR. GAUDET:  I think we were going to stop at 11:40.      11:36:09

12          THE COURT:  Yeah.  We're going to stop at 11:40.          11:36:14

13   Right.  We'll take a recess until 11:55.                         11:36:15

14          MR. GAUDET:  Thank you, Your Honor.                       11:36:22

15          (Recess taken from 11:37 a.m. to 11:57 a.m.)              11:36:23

16          THE COURT:  All right.  We are on the '856 patent.        11:57:47

17          MR. ANDRE:  That's correct.  The '856 patent.  May I      11:57:47

18   proceed?                                                         11:57:54

19          THE COURT:  Yes.                                          11:57:54

20          MR. ANDRE:  Your Honor, as you know, the '856 patent      11:57:54

21   is the one we call the encrypted traffic patent, the detection   11:57:56

22   of network threats in encrypted traffic without decrypting using 11:58:00

23   threat intelligence and using the unencrypted portion of         11:58:05

24   encrypted packets to determine that there are threats.           11:58:10

25          Dr. Eric Cole was our expert on this case.  There's a     11:58:13
```

1  nice picture of Dr. Cole, not the mugshot.  And he showed a lot      `11:58:16`

2  of exhibits to prove the infringement case.                          `11:58:20`

3         Now if we go to the next slide, PTX-989, this was kind        `11:58:24`

4  of the base foundation of Dr. Cole's testimony.  This is the         `11:58:28`

5  system that we're talking about.  And if you look at it, it's        `11:58:33`

6  called the ETA Solution with the Catalyst 9K.  That's the title      `11:58:38`

7  of this.  And this is PTX-989 at Page 33.  Has the Catalyst 9000     `11:58:41`

8  series switches with the ETA on them.  It sends NetFlow exports      `11:58:48`

9  up to StealthWatch, StealthWatch has ETA as well, and the            `11:58:53`

10 Cognitive Threat Analytics, it also see on the right-hand corner     `11:58:58`

11 it gets Threat Grid, it gets third-party threat intelligence as     `11:59:00`

12 well.  It does analytics up in the Cloud up there in the             `11:59:04`

13 Cognitive Cloud and determines what are threats and what are not     `11:59:08`

14 threats, it then sends that information over to the Identity         `11:59:12`

15 Service Engine, the ISE on the left-hand side, and then the          `11:59:15`

16 Identity Service Engine can send rules down to the Catalyst to       `11:59:19`

17 say what's good and what's bad and what it should block and what     `11:59:22`

18 it shouldn't block.  That's the COA, the Change of                   `11:59:25`

19 Authorization.                                                       `11:59:29`

20        Now, Dr. Cole's opinion with respect to this system          `11:59:29`

21 was that the 9000 switches and ASR and ISR routers embedded with     `11:59:33`

22 ETA working with StealthWatch, which is integrated with ETA and      `11:59:38`

23 CTA, the Cognitive Threat Analytics, and Identity Service            `11:59:42`

24 Engine, infringe the '856 patent.                                    `11:59:42`

25        It's important to note the infringing system receives        `11:59:48`

1   data indicating network-threat indicators including a domain         11:59:51

2   name.  That's the threat intelligence feeds from the third           11:59:51

3   parties and from others up in the Cloud.  They also get it from      11:59:56

4   the initial data packet.  They get filtering out when packets        11:59:59

5   are coming through.  This is the IDP also provides threat            12:00:03

6   intelligence.  That's at the switch and router.  They also get,      12:00:07

7   as I said, StealthWatch through the third party.                     12:00:11

8           The switches and routers identify packets that include      12:00:13

9   unencrypted and encrypted data.  They perform the initial of         12:00:17

10  these packets initially based on the Uniform Resource Locator,       12:00:19

11  which is that domain name, and protocol version.  So when the        12:00:21

12  packets come through you get initial filtering, and then a           12:00:26

13  representations of those packets are sent to StealthWatch for        12:00:31

14  additional filtering and analysis.  That's the NetFlow data that     12:00:32

15  we've heard so much about.                                           12:00:36

16          The infringing system then can route packets that are       12:00:37

17  determined to comprise data that correspond to network threat        12:00:42

18  indicators to a proxy.  In this case it's a null interface.          12:00:46

19  That was Dr. Cole's opinion.  He provided that opinion in a          12:00:48

20  narrative on the next slide that I showed you, I believe it was      12:00:53

21  yesterday or the day before.  Sometime this week.  I've lost         12:00:58

22  track of time.  This was Dr. Cole's testimony.  And he also, he      12:01:01

23  did it with the -- a system that we showed earlier, and he also      12:01:05

24  did it here.  He talks about how the whole system is infringing      12:01:10

25  this claim.                                                          12:01:13

```
 1              Now, if we go back to that figure and annotate it, and      12:01:15

 2  Dr. Cole actually talked about this and that previous slide            12:01:20

 3  talked about this, he says he used badguys.com as an example of        12:01:23

 4  a bad site.  So if badguys.com is identified as a bad actor, the       12:01:28

 5  threat indicator said this is bad, that badguys.com is sent over       12:01:37

 6  to the Identity Service Engine to say this is a bad site.  The         12:01:43

 7  Identity Service Engine will then write a rule and send that           12:01:47

 8  down to the switches or routers saying block badguys.com, don't        12:01:50

 9  let it get to its intended destination.  So when badguys.com           12:01:55

10  comes into that switch and router, switch or router, that rule        12:02:00

11  is in place, it's going to drop the packet, dump it, put it in        12:02:04

12  the null interface.  You have to route it somewhere.  You have        12:02:08

13  to route it to a proxy, and it has to be delivered there,             12:02:11

14  otherwise badguys.com will keep sending that in perpetuity.  You     12:02:14

15  have to have a destination it reaches.  That's the reason you        12:02:18

16  have to send it to a proxy.  That testimony went largely            12:02:20

17  uncontested.                                                         12:02:24

18              We showed you deposition testimony of principal          12:02:25

19  engineer at Cisco, Sunil Amin.  It says "Would StealthWatch send    12:02:30

20  a message to the Catalyst switches?"                                12:02:35

21              Said "I believe that's true.  And in responding to      12:02:36

22  that message from StealthWatch, may route a package in a            12:02:40

23  particular way.                                                     12:02:43

24              Said "In what way would the Catalyst switch route       12:02:45

25  packages based on a message from StealthWatch?                      12:02:47
```

1          "Example, "drop packets, i.e., not forward them."         12:02:48

2          So StealthWatch sends a message, it goes the Identity      12:02:52

3   Service Engine and it gets down to the Catalyst switches.        12:02:53

4          We also showed in the trial testimony, Mr. Llewallyn,      12:02:57

5   it says "It may be used as part of an attack in the future.  Do  12:03:00

6   you see that line?"                                              12:03:09

7          "Yes."                                                    12:03:10

8          "So the host is quarantined off the operator, then in     12:03:11

9   the future, yes, the bad guy can't reach him."                   12:03:11

10         And you say "What stops the bad buy," is the question      12:03:16

11  from the Court.  "Where is he stopped, and by what means?"       12:03:18

12         Mr. Llewallyn says "What happens is the ISE," the         12:03:21

13  Identity Services Engine, "it talks to the switches and routers  12:03:24

14  in the Enterprise."  Said he didn't know a whole lot about it,   12:03:27

15  but big picture, it causes it be routed to a space that causes   12:03:31

16  no harm."                                                        12:03:31

17         "What causes it to be routed to a space?"                 12:03:34

18         "This Identify Services Engine, when you issue the        12:03:37

19  quarantine operation -- actually, from my understanding,         12:03:38

20  reconfigure the switches and routers to say for this particular  12:03:41

21  host, if someone is trying to reach this particular host, send   12:03:44

22  them over to a different place that doesn't matter.  They call   12:03:47

23  it the null zero.  That's the null interface.  It just drops the 12:03:50

24  packets."                                                        12:03:54

25         That's what their engineer talked about.                  12:03:55

1           Dr. Cole actually showed testing I thought that was --

2           THE COURT:  Wait a minute.  Let me look at that last

3    one.

4           MR. ANDRE:  This is Slide 82 on our deck.  It just

5    drops the packets.  So --

6           THE COURT:  Okay.

7           MR. ANDRE:  -- Dr. Cole, being the kind of

8    cybersecurity guy he is, he wanted to do his own test on this.

9    So he actually did.  Showed the Court a series of tests he did.

10   On the left he had the Encrypted Traffic Analytics, turned on

11   the switch that he was testing.  He went to badguys.com.  And

12   you can see that there is all the information that was picked up

13   from badguys.com.  It even got the domain name.  It shows

14   badguys.com in the bottom right blue box.  Actually picked up

15   the domain name.  That's the filtering it does after it gets to

16   the switches and routers.  If there's a rule that said

17   badguys.com should be blocked, at that point it will route it to

18   the null interface.  He turned ETA off and you see what showed

19   up.  Nothing.  The badguys.com just went through.  It was not

20   detected.  Not determined what was encrypted and what was not

21   encrypted.  It was not reading and doing that filtering at the

22   switch and router at that point.  Dr. Cole testified to that to

23   his testing.

24           Now, we go to the next slide.  We go to PTX-584, this

25   is one of the exhibits you used about StealthWatch.  Talked

1    about StealthWatch maintains a Global Risk Map.  It's a behavior      12:05:31

2    profile.  This is that third-party threat feeds it gets.  Global     12:05:35

3    Risk Map and Encrypted Traffic Analytics data reinforces using       12:05:39

4    advanced security analytics.  It says "Upon discovery of             12:05:43

5    malicious encrypted flow can be blocked or quarantined by            12:05:46

6    StealthWatch.  It does that by going through the Identity            12:05:50

7    Service Engine and blocking it at the switch and router."            12:05:52

8    That's what Dr. Cole talked about.                                   12:05:54

9          Going back to Mr. Llewallyn's testimony at trial, he           12:05:58

10   also reaffirmed this.  Said "Now StealthWatch working with other     12:06:01

11   products and Cisco's security suite, in this case the Identity       12:06:06

12   Services Engine, can proactively protect against threats,            12:06:08

13   correct?"                                                            12:06:11

14         Said, "Well, it's based on manual operations though.           12:06:12

15         "But it's on the code.  The computer can do it, right?         12:06:15

16         "Yes.  It provides a way to quarantine the host by             12:06:17

17   clicking a button.  You can address those threats faster.  Both      12:06:20

18   proactively with threat detection and retroactively with            12:06:25

19   advanced forensics; is that correct?                                 12:06:29

20         "That's correct."                                              12:06:31

21         You can do it proactively, you can block the threat            12:06:31

22   proactively, they get through, you can do it with, retroactively     12:06:35

23   by advanced forensics as well.                                       12:06:38

24         The key to all this, one of the keys, along with              12:06:40

25   analytics, was ETA flow records.  This was added in in 2017.         12:06:44

1  The flow records were modified, the NetFlow was modified to

2  allow the initial data packets, the Sequence of Packet Lengths

3  and Times and other aspects that you would get in the flow

4  records, and the Initial Data Packet that contains mostly

5  protocol related to data in headers such as Service Name

6  Indicators, the SNI.  That's the domain names we're talking

7  about.  Protocol versions and other things that you can see

8  there.  So when they added in ETA flow records, that allowed

9  them to start looking at the encrypted traffic at the switches

10 and routers and being able to start filtering them out and doing

11 threat determinations on this type of encrypted traffic without

12 decryption.

13         Now if we go to the next slide, this was once again

14 more confidential technical documents from Cisco.  If you look

15 at the left, they're striking the balance.  They say "The

16 industry's first network with the ability to find threats in

17 encrypted traffic without decryption."  That's key.  That's part

18 of the claim language.  You're looking at the unencrypted

19 portion.  "Secure and manage your digital network in real time,

20 all the time, everywhere."  They do it proactively.  They do it

21 in real-time.

22         And it talks about "We enhanced the network's sensor

23 to detect malicious patterns."  So they've taken the switches

24 and routers and now they are sensors.  They're just not switches

25 and routers, they have fundamentally changed what they do with

1    the Catalyst 9000 and the new operating system.                12:08:19

2          How does ETA work?  It looks at these three elements.    12:08:23

3    The Initial Data Packet, which we talked about, the Sequence of    12:08:27

4    Packet Lengths and Times, and the Threat Intelligence Map.     12:08:30

5    That's that third-party global stuff.  So they use all three of    12:08:36

6    this and the analytics to figure out what's good and what's bad.    12:08:39

7          If you look at the Global Risk Map, this is what it's     12:08:46

8    referring to.  You can see here they talk about "We model and    12:08:49

9    use 20 features of 150 million malicious risk and               12:08:53

10   security-related events."  They talk about they use the domain    12:08:56

11   data.  The feature includes domain data, Whois data.  That is    12:08:59

12   absolutely what's required.                                     12:09:04

13         Mr. Llewallyn confirmed when we talked about the          12:09:04

14   Global Risk Map, "So the second paragraph talks about,          12:09:08

15   "StealthWatch maintains a Global Risk Map, a very broad behavior    12:09:11

16   profile about servers on the Internet, identifying servers.  Do    12:09:16

17   you see that?                                                   12:09:19

18         He says "Yes."                                            12:09:19

19         "It identifies the bad guys out there, StealthWatch       12:09:19

20   does, that may be used as an attack in the future, right?       12:09:23

21         "That's correct."                                         12:09:26

22         So this is information that is going to be used by a      12:09:27

23   potential attack in the future.  The proactive behavior we're    12:09:31

24   talking about.                                                  12:09:34

25         Now, Dr. Schmidt's testimony regarding                    12:09:34

1   non-infringement is that he believed that the claim required          12:09:40

2   that it be a decryption of the packets.  He rewrote the claim.          12:09:43

3   Simply the patent goes further and requires the ability to          12:09:47

4   decrypt information.  So you see the red language in that bottom          12:09:50

5   claim?  That's what he added in.  Instead of just routing by the          12:09:54

6   packet filtering system to the proxy, once it gets in the proxy          12:09:57

7   it has to decrypt the packets, and that's just not in the claim.          12:09:59

8   His entire non-infringement opinion is based on that.          12:10:03

9          You also -- Dr. Schmidt's credibility was, I think, in          12:10:06

10   severe jeopardy.  He talked about that when we showed him this          12:10:09

11   document how the switches and routers can detect and stop          12:10:14

12   threats before, during and after, and I asked him, I said it's          12:10:17

13   your opinion detect and stop threats, does that mean detect and          12:10:21

14   stopping threats before they get the host?  He said it's not          12:10:25

15   clear.  Wasn't sure about it.          12:10:27

16          And lastly, Dr. Schmidt's credibility has to be called          12:10:29

17   into question as well because when we talked about the issue of          12:10:32

18   real-time and catching them in the act, when he say real-time          12:10:34

19   does not mean real-time, it means two to four hours.  Your          12:10:39

20   testimony is between two to four hours.  He said yes.  I showed          12:10:43

21   him a document and said, well, here it says real-time detection          12:10:46

22   of attacks by immediately detecting malicious connections in a          12:10:50

23   local environment.  I said so does the word immediately chance          12:10:51

24   your sentence [sic]?  He said, again, immediately is always          12:10:55

25   relative to something.  Also said about catching them in the act          12:10:59

1   doesn't mean catching them in the act, it means catching them          12:11:02

2   after the fact.  I used my analogy of breaking into my house and       12:11:04

3   stealing all my jewelry and furniture and such, and he said            12:11:08

4   yeah, that's catching them in the act if they catch them two           12:11:12

5   weeks later.  So I think Dr. Schmidt's credibility is severely         12:11:15

6   called into question on this one.                                      12:11:19

7           And that's all I have, Your Honor.  I'll save the rest         12:11:20

8   of my last couple minutes for rebuttal.                                12:11:22

9           THE COURT:  All right.                                         12:11:39

10          MR. JAMESON:  Your Honor, may I proceed?                       12:11:42

11          THE COURT:  Yeah.                                              12:11:45

12          MR. JAMESON:  I am going to start with somewhat of an          12:11:47

13  unusual place for the '856 patent, but it really provides             12:11:49

14  important context.                                                     12:11:53

15          As you've heard, Centripetal contends that the                12:11:53

16  RuleGATE product practices every single patent being asserted in      12:11:58

17  this case.  And if you look at the bottom left-hand corner of         12:12:02

18  this slide, you see that they say RuleGATE practices the '856         12:12:05

19  patent.  And you've seen this slide before, and this shows where      12:12:09

20  RuleGATE is.  And it's a, it's a real-time threat detector that       12:12:14

21  sits on the wire in front of firewalls and the network.  And the      12:12:22

22  reason why I show that to you is because there is a complete           12:12:27

23  disconnect between what this claim covers and what they are           12:12:32

24  accusing.  And with that, can we now go to slide 77?                  12:12:36

25          Your Honor, they're accusing what Dr. Almeroth                12:12:44

1   referred to in his technology tutorial as an allow-and-detect

2   technology, or what I believe you, I believe, called

3   after-the-fact technology, where network threats have gotten

4   into the network and you start to analyze them to see if they

5   are malicious.  And that's what they're accusing against a

6   claim.  And Your Honor, I said in my opening, the language in

7   the claim is critically important.  And we've got to understand

8   what this claim is about, and it begins at claim element A.

9   It's a packet filtering system.  So we're talking about

10  filtering packets.  And there's multiple steps that you do in

11  this packet filtering system.  You identify packets that

12  comprise the unencrypted data, you identify packets that

13  comprise the encrypted data, and once you've identified that,

14  you then determine certain packets that might be encrypted that

15  correspond to a threat, and then the next thing you do is you

16  filter those packets.  And you filter not only the packets that

17  comprise the unencrypted data, but you also filter the

18  determined packets that comprise the encrypted data.  And once

19  you have done the filtering of packets, you then route the

20  filtered packets to a proxy.  This claim is all about filtering

21  packets.  And you're doing that real-time in a network.  And

22  Your Honor, they want you to believe that they basically

23  invented using unencrypted data to detect bad things in

24  encrypted data.  And if that's actually what they invented, they

25  would have been able to convince the Patent Office basically

1   stopping at claim element E.  But they didn't.  Everything you

2   see in red was added during the course of prosecution.  The

3   filtering the packets, the determine packets and the routing,

4   that was all added in order to get the claim issued.  And that's

5   critically important to the non-infringement issues.

6            I'm sorry, Your Honor, you were still reading.  Let

7   me...

8            THE COURT:  No, go ahead.  That's all right.

9            MR. JAMESON:  Okay.  And we asked the inventor on this

10  patent about what's this invention all about.  And the first

11  question was "Did you assume that Centripetal was the first

12  company to conceive of having an automated security system that

13  looked at the unencrypted fields of packet and for cybersecurity

14  threat detection purposes?

15           "Answer.  I assumed we wouldn't be.  I assumed the

16  uniqueness was using RuleGATE.  That's their product."

17           And then the next question:  "So you would be

18  surprised if Centripetal was the first company to have automated

19  computer systems for threat detection based on the unencrypted

20  portion of an encrypted computer network session; is that fair?

21           "Answer:  Yes."  The inventor would have been

22  surprised by that.

23           There are two reasons why we don't infringe this

24  claim.  The first one is that we -- that StealthWatch does not

25  filter packets using the packet filtering rules as required by

1   the claim limitations F, F1 and F2.  And Your Honor, this claim          12:16:17

2   language could not be any clearer.  Beginning with claim element         12:16:25

3   F, you have to filter, in F1, packets comprising the portion of          12:16:30

4   unencrypted data, and you have to filter the determined packets          12:16:36

5   comprising the encrypted data.  And we're filtering packets.             12:16:41

6   And we asked Dr. Cole, where is the packet filter located in the         12:16:47

7   system?  And he gave an unequivocal answer.  The packet filter           12:16:53

8   that's in StealthWatch Cloud with Cognitive Threat Analytics.            12:16:58

9   It's in StealthWatch.                                                    12:17:03

10          And then we asked a follow-up question:  "But the                12:17:08

11  original packet that came in that router or switch, they keep on         12:17:10

12  going and then the representations of those packets and NetFlow          12:17:14

13  records, they go up to StealthWatch.  I think we've got                  12:17:17

14  agreement on that, right?                                                12:17:21

15          "Answer:  Yes, that is generally how it works."                  12:17:23

16          The packets keep going to their intended destination,           12:17:29

17  and StealthWatch receives NetFlow records.                               12:17:31

18          Briefly, Your Honor, this happened just a couple days           12:17:39

19  ago, one of the most straightforward questions I've ever asked           12:17:41

20  an expert.  "Dr. Jaeger, does the filtering packets in claim             12:17:45

21  element F require filtering packets?"  This led to the two and a         12:17:51

22  half minute answer, and the Court, spot-on, "The question only          12:17:55

23  refers to F1 through F2, it doesn't refer to G."                         12:18:00

24          Rather than answering the question yes, it would be             12:18:05

25  the equivalent of saying is a red light red?  Well, of course it         12:18:07

1  is.  Does the claim language filtering packets require filtering          12:18:11

2  packets?  He couldn't give me an answer.  And the reason why he          12:18:15

3  didn't give me an answer is because Dr. Jaeger knew that          12:18:20

4  StealthWatch -- it's impossible for StealthWatch, the accused          12:18:23

5  device, to meet this claim element, can filter packets.  That is          12:18:28

6  an impossibility.          12:18:32

7          And we got testimony taken from Mike Scheck of Cisco          12:18:36

8  on this very point.  "And from the very beginning, with          12:18:39

9  StealthWatch in 2010, was StealthWatch ever a proactive tool?          12:18:44

10          "Answer:  It was not.          12:18:46

11          "Question.  Why not?          12:18:51

12          "Answer:  Because the architecture has been the same          12:18:53

13  since 2010.  It has always been a NetFlow consumption tool and          12:18:54

14  it has never been inline in a way to be, actually be          12:18:58

15  preventative.          12:19:03

16          "Question:  Has it ever received packets?          12:19:04

17          "Answer:  It has not.          12:19:06

18          "Question:  Can StealthWatch filter packets?          12:19:08

19          "Answer:  It cannot.          12:19:12

20          "Question:  Can StealthWatch block packets as they          12:19:14

21  arrive into the network?          12:19:17

22          "Answer?  They cannot."          12:19:19

23          Similar testimony was from Mr. Llewallyn.          12:19:22

24          And Your Honor, when it came to the --          12:19:27

25          THE COURT:  Didn't say much from Mr. Llewallyn.          12:19:30

1    MR. JAMESON:  I'm sorry.  I'll go back to it.  It's in    12:19:33

2  the slides and I knew I was running out of time.  I'm being told    12:19:36

3  that I'm good on time.    12:19:40

4    But what Mr. Llewallyn said in his first answer was,    12:19:42

5  "But as far as NetFlow goes, the packets are long gone and the    12:19:44

6  statistics about the packets are reported after the fact.    12:19:49

7    "Question:  Would it be physically possible to block    12:19:52

8  those packets based on threat detection by ETA, CTA,    12:19:54

9  StealthWatch Flow Collector or any of that?    12:19:59

10    "Answer:  No."    12:20:04

11    Mr. Llewallyn actually wrote the source code for    12:20:04

12  StealthWatch, and Your Honor --    12:20:07

13    THE COURT:  Okay.  I've seen enough.    12:20:08

14    MR. JAMESON:  -- with respect to this limitation,    12:20:11

15  Dr. Cole did not point to any source code.  Instead, what he    12:20:12

16  pointed to -- and I know this was confusing in the record, but    12:20:19

17  it's so disconnected from the issue which is why it's    12:20:23

18  confusing -- he pointed to a thing called Cryptographic Audits.    12:20:26

19  And it is this diagram or this field in StealthWatch where    12:20:32

20  literally in a database you can filter on a field.  It's got    12:20:40

21  nothing to do with filtering packets.  And it's a human that    12:20:47

22  does this.  It's a human filtering on a field.  And this was    12:20:54

23  confusing and it was a complete disconnect, because this has    12:20:59

24  absolutely nothing to do with filtering packets.    12:21:03

25    More testimony from the inventor.  "And the invention    12:21:10

1   of '856 patents, the actual threat detection again was on a                    12:21:14

2   packet-by-packet basis inline, correct?                                        12:21:18

3        "That was my understanding."                                              12:21:21

4        There was nothing that was happening up in                                12:21:24

5   StealthWatch that had anything to do with this patent.  And he                 12:21:26

6   said that in his first Q and A.                                                12:21:30

7        And so Your Honor, it's an impossibility for                              12:21:35

8   StealthWatch to filter packets, and for that reason, we do not                 12:21:41

9   meet claim elements F, F1 and F2.                                              12:21:44

10       And there can be no DoE because of all these                              12:21:52

11   limitations were added during prosecution for the same reasons                12:21:56

12   that Mr. Gaudet already outlined with respect to the other                    12:22:00

13   patents.                                                                      12:22:03

14       Turning to the last issue, and I know I think you -- I                    12:22:11

15   suspect you feel like you've already heard enough about this,                 12:22:16

16   but this is a critically important issue.  And this is -- I                   12:22:20

17   think it's a claim construction issue.                                        12:22:23

18       The accused proxy system, which they're saying is a                       12:22:27

19   null interface, it is our view, it's our expert's view, that it               12:22:30

20   is not a proxy system that intervenes to prevent threats in the               12:22:35

21   communications between devices.  And we went through this with                12:22:39

22   Dr. Cole, we went through this with Dr. Jaeger and we looked at               12:22:47

23   the specification of the '856 patent to gain insights on what is             12:22:50

24   the proxy system of the '856 patent.  And Dr. Cole acknowledged             12:22:56

25   that packets are routed to a proxy system so that a proper                    12:23:04

1  analysis can be done.  A null interface doesn't do a proper

2  analysis, it drops packets.  Dr. Jaeger agreed that a proxy

3  system could be used for further analysis or processing on

4  packets sent to it.  We then provide you these cites from the

5  specification.  Because what we see is in the specification, the

6  only proxy system described in the '856 patent is a system that

7  the combines a proxy device 112 with proxy device 114.

8          The other thing we learned is that there is no

9  disclosure of the proxy device dropping a packet in the '856

10  patent specification.  Instead, what is disclosed as dropping

11  packets is this thing called the RuleGATE device.  It's a

12  different device in the specification.

13          And then Your Honor, we provide the cites to

14  everything that the proxy system can do according to the

15  specification.  It can set up a TCP session, it can receive

16  packets comprising data encrypted from a computer, it can

17  decrypt the data, it can generate one or more corresponding

18  packets comprising unencrypted data, and it can receive one or

19  more packets from the other proxy device.  But the one thing

20  that is not disclosed is that the proxy system in the '856

21  patent specification drops packets.

22          And the only issue here, Your Honor, and this is what

23  Dr. Cole points to, is he says that the null interface is a

24  proxy system.  And the document that he relies on, it describes

25  the null interface, and it states the null interface is not a

1  physical interface, it's a virtual interface, is always up, the

2  null interface, it never forwards or receives traffic, but

3  routes to -- but packets are routed there to be dropped.  It's a

4  packet graveyard.  And that's exactly what our expert testified

5  to, is that it is a packet graveyard.  It is a black hole and

6  that it doesn't intervene in anything.  And for that reason, it

7  cannot be the proxy system as construed by the Court in light of

8  the written description.  For that reason, Your Honor, we don't

9  meet claim element G and we don't infringe the '856 patent.

10         Again, claim element G was added during prosecution,

11 so there can be no prosecution under -- no infringement under

12 the doctrine of equivalents.

13         And Your Honor that's all I have on the '856 patent.

14         THE COURT:  All right.  Any rebuttal?

15         MR. ANDRE:  Yeah, Your Honor, just very briefly.

16         Counsel started off showing our product and said it

17 operates only inline.  I'd like to show slide 147 of our slide

18 deck.

19         This is a blog that Cisco published on our technology.

20 And you can see on the right-hand side there is a RuleGATE

21 inline and there's a RuleGATE out-of-band or out of line.  You

22 can see what that blue box, that orange diagonal mark going

23 through that, the RuleGATE, they keep saying it's inline only.

24 That's just not the case.  That's obfuscation.

25         Second thing, they keep trying to parse, doing this

```
 1   legal jiu jitsu to try to say that the claims mean something        12:27:01

 2   that they don't.  And they just, they keep cutting all the          12:27:05

 3   different claims, taking pieces here and there.  But in the end      12:27:09

 4   they forget that that is a system we're talking about.  They say     12:27:10

 5   StealthWatch doesn't filter packets.  Dr. Cole talked about         12:27:15

 6   filtering many times throughout his testimony.  They showed that     12:27:20

 7   one clip every time.                                                12:27:24

 8           If we go to the trial transcript, 955, Line 23 to 956       12:27:25

 9   Line 2, and it says "And you provided evidence previously about      12:27:32

10   how the system filters through on domain names."  This is right      12:27:41

11   out of the claim language.                                          12:27:44

12           He said, "We showed several pieces of evidence showing      12:27:44

13   domain names, even some testing that I performed that utilized       12:27:48

14   domain names."  This is the badguys.com.  That filtering of         12:27:48

15   those domain names was done at the routers and switches.            12:27:54

16   Packets are being filtered there."                                  12:27:57

17           In cross-examination, Mr. Jameson asked him, and this       12:28:00

18   is on trial transcript 1132, Lines 12 through 24.  "Now, when I      12:28:05

19   crossed you earlier today you told me on multiple occasions that     12:28:08

20   the packet filter in the accused system is found in                 12:28:08

21   StealthWatch.  Do you recall that?                                  12:28:08

22           "Yes, I do.  The main filtering is in StealthWatch.         12:28:20

23   This question was where did it begin.  It begins by analyzing        12:28:22

24   the encrypted and unencrypted in the router and switches, but        12:28:25

25   then the main filtering is performed in StealthWatch.               12:28:28
```

1          "So just to be clear, with respect to the packet

2    filtering element is in StealthWatch, right?

3          "The main packet filtering where we're analyzing the

4    encrypted and unencrypted is in StealthWatch, because ETA is in

5    the router and switch, the initial beginning of classifying

6    encrypted and unencrypted begins in the routers and switches."

7          The initial filtering, Dr. Cole has stated on many

8    occasions, I have multiple cites, initial filtering begins in

9    the routers and switches.  Representations of those packet are

10   then sent to StealthWatch for further analysis.  But to say

11   that -- ignore the routers and switches as part of the system as

12   Mr. Jameson just did, focusing only on StealthWatch, that's the

13   whole crux of their defense, is just ignoring half of the

14   infringing system.  Or two thirds of it, actually.

15         So that's all I got on that, Your Honor.  I think we

16   said enough and we'll stay on time.

17         THE COURT:  All right.  Let's move on to the last

18   patent.

19         MR. ANDRE:  Last patent is the '176 patent, Your

20   Honor.  This is the correlation patent.

21         THE COURT:  Right.

22         MR. ANDRE:  Once again, Dr. Cole provided the expert

23   testimony for us on this.  He used multiple exhibits.  This

24   involves the switches and routers -- and if we go to the next

25   slide -- and just StealthWatch.  This does not involve the

1    Identity Services Engine.                                           12:29:51

2         Now the accused infringing system Dr. Cole talked             12:29:54

3    about is StealthWatch, and it gets logs from routers and           12:29:56

4    switches.  It can be one router and switch, it can be multiple     12:30:01

5    routers and switches.  The claims say a network device, meaning    12:30:05

6    one or more.                                                        12:30:08

7         Dr. Cole talked about on many occasions he gave               12:30:10

8    examples of one, but can be one or more.  All this really is is    12:30:13

9    logs that come from the switches and routers, go up to             12:30:17

10   StealthWatch where they're -- the analytics are performed there    12:30:21

11   to determine that there is threats.                                12:30:24

12        So Dr. Cole's opinion was that the Catalyst 9000              12:30:28

13   switches and ASR -- and Aggregated Services Router and             12:30:32

14   Integrated Services Routers, embedded with ETA, working with       12:30:35

15   StealthWatch, integrated with ETA and CTA, infringes this          12:30:38

16   patent.  The routers and switches connecting networks              12:30:41

17   together -- so any time you have a router and switch you have      12:30:44

18   different networks -- that identify packets from one network to    12:30:47

19   the other, and it generates log entries such as NetFlow or         12:30:50

20   Syslog or any kind of log entries you want to use, NetFlow is      12:30:53

21   the predominant one in Cisco's systems.  They also looked at       12:30:55

22   Syslogs corresponding to the packets.  The log entries are sent    12:30:59

23   to StealthWatch where the Cognitive Threat Analytics will          12:31:02

24   correlate the log entries from different networks, and based on    12:31:05

25   that correlation, a rule is generated and that is sent out to a    12:31:09

```
1   device in the first network.  It's just provisioning the rule.      12:31:12

2   And that's what this is about.  This is about looking at traffic     12:31:15

3   as it's coming across these network devices, routers and             12:31:19

4   switches, taking log entries of that information, doing              12:31:22

5   analysis, and trying to use intelligence to figure out if           12:31:29

6   there's some threat, and if there is, it will generate a rule       12:31:31

7   and send it to that device, a device on the network to enforce.     12:31:35

8           THE COURT:  Is this rule generated before it is            12:31:38

9   received?                                                            12:31:43

10          MR. ANDRE:  It will be generated in StealthWatch and        12:31:44

11  then StealthWatch will send it out.  So it'll be a rule that        12:31:45

12  will be generated in StealthWatch, and then StealthWatch will       12:31:48

13  send it to another device.                                          12:31:52

14          THE COURT:  Before it reaches its destination?             12:31:53

15          MR. ANDRE:  In this case -- no, not the logs.  These       12:31:57

16  are -- this is an instance where you don't have information         12:32:00

17  about the packets coming through.  So this is about looking at      12:32:04

18  packets as they're coming through and it generating information     12:32:09

19  about them.  So this is a little bit different than trying and      12:32:12

20  block them at the source.  This is once you get information, you    12:32:15

21  can generate rules and send it to the ISE, you can use these for   12:32:19

22  exfiltration, you can do it for infiltration, future               12:32:24

23  infiltrations.                                                      12:32:28

24          THE COURT:  The question is are the rules applied         12:32:29

25  before it reaches the destination?                                  12:32:31
```

1          MR. ANDRE:  Not, not the -- the log information, no,          12:32:35

2    Your Honor.  The rules will be applied -- because what happened,    12:32:38

3    has happened, you have to correlate thousands of these packets.    12:32:41

4    You're getting packets from all these different routers and        12:32:46

5    switches.  And so this is a correlation where you're looking at    12:32:49

6    potential threats.  So the idea here is that when all this         12:32:53

7    information is being correlated, packets are still allowed to go   12:32:56

8    through unless they've been stopped for other reasons.  Packets    12:32:59

9    are going through the system and they're trying to figure out      12:33:02

10   threat information based on this packet information they have       12:33:06

11   not seen before.  There's no threat intelligence about it.  So     12:33:09

12   they're trying to generate it.  And they're doing it through a     12:33:11

13   correlation step.  So the rule comes into effect after the         12:33:13

14   correlation is done.                                               12:33:17

15          THE COURT:  Is the correlation done before it reaches       12:33:22

16   its final destination?                                             12:33:27

17          MR. ANDRE:  No.  The logs that are being -- that the        12:33:28

18   packets that are -- the logs that are going up, they would have    12:33:32

19   reached their final destination, Your Honor.                       12:33:34

20          THE COURT:  So this is reactive instead of proactive?       12:33:36

21          MR. ANDRE:  It is, Your Honor.  This is more looking        12:33:39

22   at reactive technology and trying to figure out if there's         12:33:41

23   something going on.  What happens in many instances, and you       12:33:45

24   heard this in some of the tutorials both by Dr. Medvidovic and     12:33:49

25   Cisco's expert, that when an attack occurs, there is different     12:33:54

1   pivot points they come into, and they're coming into the          12:34:00

2   network, they may not have achieved their goal yet, but they're    12:34:02

3   trying to get into the network.  So you try to stop before         12:34:06

4   there's a total breach and exfiltration of information or a        12:34:09

5   total infiltration of the network.  But it is reactive in         12:34:11

6   nature, this patent is, because it has to do the correlation       12:34:17

7   before it actually generates a log -- before it generates a        12:34:19

8   rule.                                                              12:34:22

9           THE COURT:  All right.                                     12:34:26

10          MR. ANDRE:  If we look at the testimony of Mr.             12:34:27

11   Llewallyn, we talked about this exactly.  The example he showed   12:34:29

12   is exactly how it works.  They're just not one router or switch,  12:34:38

13   it's usually several routers and switches.  And it's very common  12:34:40

14   to get these logs from numerous routers and switches.  So you're  12:34:43

15   getting log entries from numerous routers and switches going up   12:34:47

16   to StealthWatch, and that's what's going, the analytics in the    12:34:51

17   Cloud.  And from the analytics, it's going to try to generate     12:34:53

18   threat intelligence.  That's where the threat intelligence comes  12:34:57

19   from.                                                             12:34:59

20          Now, Dr. Cole did test on this very aspect as well.        12:35:02

21   We go to PTX-408.  He actually did set up his switch to specify   12:35:08

22   the ingress and egress.  So he was looking at how the flow        12:35:17

23   monitor occurs going from one or the other or both.  And you can  12:35:21

24   configure to get the logs from both.  And that's from the first   12:35:25

25   and second network, essentially.  But if you're getting it from   12:35:31

1  numerous switches and routers, you're getting it from the first

2  and second network irregardless.

3          Now, if we go to the next slide, this is what we're

4  talking about when we're talking about correlation.  This is

5  PTX-569.  Says "StealthWatch Enterprise integrates with the

6  Cloud based multi-stage machine learning analytics engine that

7  correlates threat behaviors seen in the local environment with

8  those seen globally.  It employs a funnel of analytics

9  techniques to detect advanced threats."

10          So what we're trying to do here is look at what's

11  happening locally, getting this information and then correlating

12  it to figure out what are the threats that are out there.  These

13  are unknown threats at this point.  They're trying to identify

14  them at this point.  So that's what the correlation is all

15  about.

16          We go to the next slide, this is StealthWatch with

17  Cognitive Threat Analytics.  This slide talks about StealthWatch

18  integrates with Cognitive Threat Analytics.  "This involves the

19  addition of a new information panel on the CMS, enhances

20  StealthWatch further by leveraging the CTA's Cloud-based

21  analytics engine that correlates threat behavior seen in the

22  enterprise with those seen globally."

23          So what this patent is about Your Honor, is looking

24  all the information you can possibly get.  You can get it from

25  third parties, you can get it from the local traffic, you're

```
1   trying to use all this information.  And this is a new way of        12:36:59
2   trying to detect threats.  That's what this patent is about:         12:37:02
3   Using new methodologies, new analytics to detect threats through     12:37:05
4   correlation of local traffic and third-party stuff.  It's the        12:37:10
5   local traffic doing those logs --                                    12:37:15
6           THE COURT:  So what's new about it is introducing the        12:37:17
7   third-party sources, is that what you're saying?                     12:37:19
8           MR. ANDRE:  No, it's correlating the logs, Your Honor.       12:37:22
9   Remember Your Honor, before ETA and before all this information,     12:37:26
10  the logs are just basically used for accounting purposes.  Just      12:37:30
11  doing number counting.  It wasn't done -- you aren't trying to       12:37:35
12  get threat intelligence out of log information.  So what was new     12:37:38
13  here was there was this base of information of logs, there are       12:37:43
14  seven or eight different logging standards, logs that are done       12:37:51
15  for accounting purposes to see what the flow looks like, what        12:37:54
16  traffic looks like going across a switch or router.  So what         12:37:58
17  this invention is about is using those logs to say let's enhance     12:38:01
18  those logs and get information from those logs that we can           12:38:06
19  actually maybe detect threats from.  And you can correlate the       12:38:10
20  logs amongst themselves, that's the key here, you can also           12:38:13
21  correlate with other aspects as well.  You can correlate any way     12:38:16
22  you want, but you have to correlate the logs together.  That         12:38:19
23  local information is kind of the key here.                           12:38:21
24          So that's what's new:  Taking something that has been        12:38:24
25  done for years, which was the logging information, it's been         12:38:27
```

1   done for years, and then trying to figure out a way to make that          12:38:31

2   useful other than just accounting, other than just trying to             12:38:33

3   figure out what information is being -- the flow rates and the            12:38:37

4   number of packets going through per hour, per second or whatever          12:38:42

5   it is.  So they took this information and now using it for                12:38:46

6   security.  That was something brand new.                                  12:38:49

7           That was something that was introduced into the                   12:38:52

8   StealthWatch system in 2017.  They weren't doing it before then.          12:38:54

9   This is something that you look at now and you think, well, of            12:38:59

10  course they would do that.  But they weren't doing that.  No one          12:39:03

11  was doing it.                                                             12:39:06

12          So if you go to the next page, and actually this is               12:39:08

13  where it was introduced.  This is the StealthWatch System 6.10.           12:39:11

14  This is in 2017.  It says "Cognitive Threat Analytics can now             12:39:16

15  leverage detections from analysis of WebFlow telemetry to                 12:39:19

16  improve the efficiency of analyzing NetFlow activity from                 12:39:23

17  StealthWatch.  This is accomplished by system through                     12:39:26

18  correlation of both telemetry types."  These are the logs that           12:39:28

19  are going up.  WebFlow is the Syslogs and other type of logs in           12:39:30

20  NetFlow correlating logs that are going into the system.  So              12:39:36

21  this increased the detection of threats it says by approximately          12:39:40

22  10 percent.                                                               12:39:44

23          Now, the only non-infringement position that Cisco                12:39:45

24  took in this case was by rewriting claim language.  What their            12:39:54

25  expert said was a network device has to be the same network               12:40:04

1   device.  The logs have to come from -- the packets have to come

2   from the same network device.  And it has to be a single network

3   device.  The same packets are being used as well, not all the

4   correlation of all different packets.  That was the only

5   position that -- the non-infringement position that their expert

6   took.  You have to completely take the claim language and

7   rewrite it to get there.

8           Mr. Llewallyn actually testified that In the case of

9   switch or routers, can generate both an ingress and egress

10  NetFlow record?  And he said that's correct.  It can be

11  configured to do that.  The switch and router can be -- he

12  worded even if you were to rewrite the language as their expert

13  proposed, you can still get NetFlow records with ingress and

14  egress which are the two networks.

15          And then when asked has anything been done in the code

16  to deal with that problem, he said some customers do export

17  ingress and egress.  So it's capable and some do it for their

18  own reasons.  He's added the ability to configure the

19  StealthWatch to ignore one of those sides from the double

20  counts.  So you still get it from the single network.

21          So even if you took the language as they rewrote it in

22  the claims, they would still infringe.  You can't rewrite the

23  claim that way, because that is not how the system works and

24  that wasn't the testimony that was provided.

25          I'll save the rest of my time for rebuttal, Your

1   Honor.                                                    12:41:32

2          THE COURT:  All right.                             12:41:33

3          MR. JAMESON:  Your Honor, in response to your      12:41:39

4   questions, I think Mr. Andre has acknowledged a very important   12:41:42

5   point, which is he called this a reactive patent, and they're   12:41:46

6   trying to read a reactive patent on StealthWatch, which is a   12:41:53

7   reactive technology.  And to your point, and I think this fact   12:42:01

8   is now crystal clear, that whenever we're involving           12:42:06

9   StealthWatch, we always know that the packets that have been   12:42:08

10  transmitted have received -- they have been received by their   12:42:12

11  intended destination.                                    12:42:16

12         What I would like to do again is start with the claim   12:42:20

13  language going to the next slide.  And Your Honor, we're being   12:42:23

14  accused of rewriting the claim, but if we're rewriting the   12:42:36

15  claim, then Centripetal's expert, Dr. Cole, he rewrote the claim   12:42:38

16  as well, because his infringement theory is crystal clear:  That   12:42:42

17  the ingress NetFlow record and the egress NetFlow record, they   12:42:48

18  have to be entering into or coming out from the same device, and   12:42:54

19  that the correlating step in C, that whatever's going to be --   12:43:02

20  the correlating step, it has to be with respect to the ingress   12:43:08

21  record and the egress record that was originated by the same   12:43:17

22  device.  And I'm going to get to Dr. Cole's testimony on that.   12:43:20

23         We give you the cites from the trial.  And both on   12:43:30

24  direct and on cross he was asked the question "What's the   12:43:35

25  network device that you are accusing of infringement?"  And he   12:43:38

1   says "It's the same switch or router.  It receives packets."          12:43:42

2        THE COURT:  Well, you haven't quoted the question and          12:43:46

3   answer here, you've --                                               12:43:50

4        MR. JAMESON:  Let's quote his question and answer.  I          12:43:52

5   was going to do a summary.  But let's get to what he says.          12:43:54

6        "Can you describe what we're looking at with both          12:44:00

7   these elements?                                                     12:44:03

8        "Answer:  Yes.  So you have your router or switch and          12:44:04

9   you have network one and you're sending packets to network one.          12:44:10

10  It's initially received, and when it's received here it          12:44:13

11  generates logs.  It would then generate logs.  Then, with this          12:44:16

12  router or switch, takes the same packet and sends it out or is          12:44:21

13  transmitting it."                                                   12:44:25

14       And then he goes on.  "So essentially it's the same          12:44:29

15  router or switch that receives the packet and generates logs and          12:44:33

16  takes the packet, transmits it, and generates a second series of          12:44:38

17  logs.  So the activity is performed by the same device."          12:44:41

18       We go on to the next paragraph.  "But the activity of          12:44:50

19  receiving and transmitting and generating the logs is the same          12:44:54

20  activity.  So in order to be concise, we're going to cover all          12:44:58

21  four of those together, because it's the same device."          12:45:02

22       And Dr. Almeroth methodically took this infringement          12:45:16

23  theory apart, and so now the theory is changing after the fact.          12:45:22

24       This diagram was put up in front of Dr. Cole and we          12:45:30

25  walked him through it.  We've got the testimony here.  It's the          12:45:34

1    same point as the last slide.  You've got an accused switch or          12:45:38

2    router, packets go into it and go out of it, that's the ingress,        12:45:42

3    that's the egress, and a NetFlow record is created on the               12:45:46

4    ingress side, a egress NetFlow record on the egress side, and           12:45:51

5    then they would get sent up to StealthWatch.                            12:45:56

6              THE COURT:  There are no arrows here on this diagram.         12:46:00

7              MR. JAMESON:  Right.  The NetFlow record would go up          12:46:04

8    to StealthWatch.  No, we all agree with that.                           12:46:05

9              THE COURT:  Well, that throws me off when you --              12:46:09

10             MR. JAMESON:  Sorry about that.  We should have               12:46:13

11   extended the arrows.  But the arrows absolutely would go up to          12:46:15

12   StealthWatch.  And Centripetal certainly would agree with that,         12:46:19

13   otherwise they wouldn't have an infringement case.                      12:46:22

14             And this is what he said.  This is very important.            12:46:28

15   What are we correlating?  And he says that "The correlating             12:46:29

16   and" --                                                                 12:46:37

17             "Cognitive analytics is then going to do an analysis          12:46:37

18   on this data along with machine learning and threat                     12:46:41

19   intelligence; is that fair?                                             12:46:44

20             "Answer:  It performs a serious of correlation on, and        12:46:46

21   the important thing for me are the ingress and egress NetFlow           12:46:50

22   data.  That's what you have to correlate according to claim             12:46:56

23   element C."                                                             12:47:01

24             And then he says "There's nothing in the claim that's         12:47:03

25   exclusive to just those two, so there can be other data in there        12:47:07

1   as long as those two NetFlow records are being correlated."   12:47:13

2           His point was you may correlate with some other stuff   12:47:17

3   as well, but at a bare minimum you have to correlate those two   12:47:21

4   NetFlow records.  And that was the next question.   12:47:25

5           "Okay.  But just to be crystal clear about that point,   12:47:28

6   it's your opinion that the ingress NetFlow record and the egress   12:47:32

7   NetFlow record are actually correlated in Cognitive; is that   12:47:36

8   fair?   12:47:40

9           "Answer:  In Cognitive Threat Analytics, correct."   12:47:42

10          That's what has to be correlated.   12:47:45

11          Here is how the system actually works.  The person   12:47:49

12  that designed it and wrote the code.  And we provide the trial   12:47:52

13  testimony.  "StealthWatch was built to assume NetFlow records   12:47:58

14  are all ingress.  When both ingress and egress NetFlow records   12:48:02

15  are sent to StealthWatch, that's considered an error   12:48:10

16  configuration."   12:48:14

17          We provided testimony and documents.  Cisco tells   12:48:16

18  customers not to send both ingress and egress to StealthWatch.   12:48:20

19          Most importantly, we showed code that Mr. Llewallyn   12:48:27

20  wrote, Cisco wrote code to ignore egress NetFlow records to   12:48:31

21  rectify the error.  Want it to reject any egress NetFlow records   12:48:37

22  that were sent to StealthWatch.   12:48:44

23          And then the final point, and this is actually   12:48:46

24  different, whatever NetFlow records are sent to StealthWatch,   12:48:48

25  they're not sent to Cognitive Threat Analytics for analysis.   12:48:54

1   And this document confirms that testimony.  "For devices that   12:49:01

2   use logical interfaces enabling both may cause flow collector to   12:49:09

3   double report traffic stats in non-interfaced documents.  We   12:49:14

4   usually ask the customer to choose which dataset is most   12:49:18

5   important."  And this comes from the section of this exhibit,   12:49:21

6   Troubleshooting NetFlow Configuration using StealthWatch.   12:49:26

7          And this is exactly what Dr. Almeroth testified as to   12:49:32

8   why we don't infringe.  Generating ingress and egress NetFlow   12:49:36

9   records, that's considered an error.  If StealthWatch were to   12:49:41

10  receive both, it would result in an unnecessary double-counting,   12:49:47

11  another error.   12:49:53

12          And finally, StealthWatch never passes the ingress and   12:49:54

13  egress NetFlow records to Cognitive for correlation at all.   12:49:58

14          Dr. Cole cited three pieces of evidence, and Dr.   12:50:07

15  Almeroth went through every single one of them, and actually one   12:50:10

16  of them was just showed at slide 101 by Mr. Andre where it   12:50:15

17  referenced WebFlow data.  Well, that's not what the claim   12:50:20

18  requires.  The claim does not require correlating NetFlow data   12:50:24

19  with WebFlow data that comes from a different device on the   12:50:28

20  network.  It has to come from the same device, per Dr. Cole.   12:50:32

21          Dr. Jaeger, who is their invalidity expert, he tried   12:50:41

22  to rescue the case in rebuttal by making the claim construction   12:50:45

23  argument that Mr. Andre just proffered.  But the problem for   12:50:49

24  Centripetal is that was not Dr. Cole's infringement theory.  His   12:50:55

25  infringement theory was crystal clear:  We've got one device,   12:51:01

1   the NetFlow records come from the ingress and egress, they get          12:51:03

2   sent up to StealthWatch, but the evidence is crystal clear that         12:51:06

3   StealthWatch rejects and does not correlate those two records.          12:51:10

4   Therefore, we cannot infringe the correlation element.                  12:51:15

5          Final point, and this gets to the last elements, D, D1           12:51:20

6   and D2, and this is the accused system does not generate and            12:51:27

7   provision rules.  And Your Honor, go back up -- you know, I             12:51:32

8   won't go backwards in time, but if you go back up to the claim          12:51:38

9   element A2 -- well, actually I'm going to.  Because this is             12:51:43

10  important.  I'm going to go back to 101 real quick.                      12:51:47

11         I'm going the wrong way.  Can you take me to 101                  12:51:50

12  please, Mr. Simons?                                                     12:51:52

13         Your Honor, this is a system claim.  And in A2, the               12:51:56

14  processor and the memory cause the system to do everything that         12:52:02

15  follows.  The system.  Identify, generate.  Identify, generate,        12:52:08

16  correlate.  The system responsive to the correlating, you              12:52:14

17  generate one or more rules and you provision with the one or            12:52:19

18  more rules, a device.  It's the system that does that.                  12:52:22

19         Can we go back to 113, please?                                   12:52:27

20         The problem with the infringement argument is that the          12:52:33

21  system does not generate and provision the rules.  What they are        12:52:37

22  accusing of infringing claim elements D, D1 and D2, it's the            12:52:44

23  generation of an alarm or an alert.  And an alarm or an alert is        12:52:51

24  not a rule.  Those are sent to a system administrator to decide         12:52:56

25  what it might want to do by way of a diagnostic or further              12:53:01

1  preventive action. And that was the point Dr. Almeroth made.

2  Alerts and alarms are not rules. As he stated, "Raising an

3  alert there's suspicious behavior for a particular host is not a

4  rule configured to identify the packets received as a required

5  element of D2."

6      Instead, the way the accused system works is that when

7  Cognitive or StealthWatch generates an alert or an alarm because

8  of the possibility of suspicious behavior, you recall the

9  testimony about Adam the Analyst. At that point in time, the

10 alert or the alarm is sent to the StealthWatch Management

11 Console, at which point in time Adam the Analyst can undertake

12 an evaluation as to what to do. It can decide to take no action

13 at all, or it can decide to limit access to the network. Quite

14 frankly, Adam the Analyst may decide to create a new rule. But

15 that's all manual by the human. And once that happened, Adam

16 the Analyst would then send a message to ISE, at which point in

17 time ISE could take action. And so there is human intervention

18 all over what they are accusing of an infringement, and an alert

19 or an alarm is not a rule per the Court's claim construction,

20 and therefore these final elements D1 and D2 or not met for a

21 second reason.

22      And whether it's this patent or any patent we're

23 talking about, what I just told you about StealthWatch, there's

24 always human intervention before anything gets sent back down to

25 a network. So any claim that doesn't allow for human

1    intervention means it cannot read on StealthWatch.          12:55:30

2              And with that, Your Honor, that's the summary of our   12:55:33

3    non-infringement position.                                  12:55:37

4              MR. ANDRE:  Your Honor, just a few minutes in      12:55:41

5    rebuttal?                                                    12:55:43

6              THE COURT:  Yes.                                   12:55:43

7              MR. ANDRE:  Okay.  So with respect to reactive versus   12:55:44

8    proactive, as we've shown you in numerous documents earlier   12:55:50

9    today, StealthWatch can be both proactive and reactive in   12:55:54

10   nature.  That's the nature and what the product is.  Says it can   12:55:57

11   be proactive to block threats and also be used forensic    12:55:59

12   reactively.  That's undisputed, but that is -- you know, the   12:56:04

13   document speaks for themselves.                             12:56:08

14             With respect to the actual claim language, if we go   12:56:09

15   back to slide 102 on our slide deck, this was an issue of   12:56:13

16   cross-examination where it says "the packets received by a   12:56:19

17   network device," everyone agrees in this case a network device   12:56:25

18   means one or more network devices, not the same one.  The fact   12:56:30

19   that they refer back to the network devices with the antecedent   12:56:34

20   basis later means the one or more network devices.  Dr. Cole   12:56:38

21   gave one example of using a single network device, and that's   12:56:43

22   where they landed, because they said that single network device   12:56:46

23   doesn't do both ingress and egress.  That was the key to their   12:56:49

24   whole non-infringement case.  It didn't do ingress and egress.   12:56:53

25   And then we showed Mr. Llewallyn's testimony.  Because Dr. Cole   12:56:57

1   tested it, and I showed you his test where he used both ingress   12:57:02

2   and egress.   12:57:05

3              If we go to slide 103, the next slide, this was Mr.   12:57:06

4   Llewallyn's testimony.  Again, can generate both ingress and   12:57:10

5   egress NetFlow records.  That is correct.  It can be configured   12:57:17

6   to do so.  The switch or router can.  The code is there.  We   12:57:19

7   have a system and a code claim.  The code is on the system to   12:57:23

8   generate both ingress and egress records.   12:57:28

9              Then they said he wrote code so where those ingress   12:57:32

10  and egress records would not be sent over for analysis.  And   12:57:36

11  this was direct testimony.  "Have you done something in the code   12:57:40

12  to deal with that problem?   12:57:42

13             "Some customers do export ingress and egress for their   12:57:43

14  own reasons."  So people do it.  But you can do it, it's in the   12:57:48

15  code.  They do it.   12:57:51

16             "I've added the ability to configure the StealthWatch   12:57:53

17  Flow Collector to ignore it."  So you can actually have the   12:57:55

18  coding in order as well.  You can ignore the ingress and egress.   12:57:59

19  But the code is on the box.   12:58:03

20             When Dr. Cole did his test, he enabled both of them.   12:58:04

21  He enabled it on the StealthWatch, he enabled it on the Catalyst   12:58:07

22  switches.  The fact that you're able to configure a system in a   12:58:11

23  different way doesn't mean the code's not there.   12:58:17

24             Your Honor, I think at that point we can --   12:58:22

25             THE COURT:  Well, where does this generate rules?   12:58:25

| | |
|---|---|
| 1 | MR. ANDRE:  Well, the rules are generated based on the | 12:58:30 |
| 2 | correlation, Your Honor.  So the correlation is done up in | 12:58:32 |
| 3 | StealthWatch up in the analytics Cloud, the Cognitive Threat | 12:58:36 |
| 4 | Analytics.  So all -- | 12:58:41 |
| 5 | THE COURT:  StealthWatch generates the rules? | 12:58:44 |
| 6 | MR. ANDRE:  That's correct, Your Honor.  And then | 12:58:46 |
| 7 | StealthWatch provisions that rule to another device to enforce | 12:58:49 |
| 8 | it.  We showed an example of the Identity Services Engine and | 12:58:53 |
| 9 | Dr. Cole's direct testimony.  StealthWatch takes the -- | 12:58:58 |
| 10 | THE COURT:  Let me look at that again. | 12:59:02 |
| 11 | MR. ANDRE:  The testimony from Dr. Cole? | 12:59:06 |
| 12 | THE COURT:  Well, where the rule is generated and | 12:59:09 |
| 13 | where it goes after it's generated. | 12:59:15 |
| 14 | MR. ANDRE:  Well, the claim just requires generating | 12:59:18 |
| 15 | the rule and provisioning it to the device. | 12:59:20 |
| 16 | THE COURT:  The claim says the rule will be generated | 12:59:25 |
| 17 | and sent somewhere? | 12:59:28 |
| 18 | MR. ANDRE:  And sent somewhere, yes.  It doesn't | 12:59:30 |
| 19 | require where it's being sent.  But we have the -- I didn't show | 12:59:32 |
| 20 | it in my summary here, Your Honor.  Let me see if I can find... | 12:59:36 |
| 21 | It's the exhibit, I think it's 1189.  Doesn't look | 12:59:41 |
| 22 | right.  It was like a 2,000-page document.  It was one of those | 12:59:55 |
| 23 | long ones, Your Honor. | 01:00:01 |
| 24 | MR. JAMESON:  Actually, Mr. Andre, I think what you're | 01:00:17 |
| 25 | looking for is the page before where Adam the Analyst takes | 01:00:19 |

```
 1   over.                                                                01:00:22

 2            MR. ANDRE:  Sorry, Mr. Jameson, what exhibit are you        01:00:36

 3   talking about?                                                       01:00:38

 4            MR. JAMESON:  Well, it was the, it was the exhibit          01:00:39

 5   that I -- it's my slide 116.  PTX-1089.  I was at 1239.  And         01:00:40

 6   this was the very document that I relied on that I think the         01:00:53

 7   page before is what you all relied on, and then we just actually     01:00:56

 8   provided exactly what happens.  So you would want to pull up         01:00:59

 9   1238.                                                                01:01:04

10            MR. ANDRE:  1238?  Let's see.                               01:01:18

11            THE COURT:  I remember seeing this exhibit, but I           01:01:20

12   don't remember...                                                    01:01:21

13            MR. ANDRE:  There it is, Your Honor.  Let me just pull      01:01:22

14   up this figure here.                                                 01:01:24

15            So this is the figure that Dr. Cole used in his direct      01:01:28

16   testimony and also used in his -- he showed source code for         01:01:32

17   this.  So the suspicious behavior, zero, is notice for the host.    01:01:37

18   That's in StealthWatch.  And then it applies the ANC policy,        01:01:42

19   quarantine.  That's the rule that is being sent over to the ISE.    01:01:46

20   And then ISE can then say, okay, enforce this rule, whatever.       01:01:53

21   It doesn't matter for the purposes of this claim, it's just         01:01:58

22   sending the rule over to, provisioning it to another device.        01:02:02

23   What the ISE does with it, shows here, it goes down and puts        01:02:05

24   that rule onto the switches and does -- enforces the rule or the    01:02:09

25   policy.                                                              01:02:14
```

1      This was the actual document that Dr. Cole relied

2  upon, and his testimony is on page 1005 on that document.

3      THE COURT:  Is this an exhibit?  What is this?

4      MR. ANDRE:  Yes, this is PTX-1089.  Geoff, what page?

5      MR. JAMESON:  It's PTX-1089 at 1238.  And the next

6  page explains actually what's going on, which is 1239, which is

7  what I just used.

8      THE COURT:  Okay.

9      MR. JAMESON:  And those two pages together tell the

10  story about that diagram and what's happening on 1239.

11      THE COURT:  Okay.

12      MR. ANDRE:  All right, Your Honor, I think we're up to

13  our lunch break now.

14      THE COURT:  Yeah, let's take our lunch break until

15  2:00.

16      MR. JAMESON:  Thank you, Your Honor.

17      (Recess taken from 1:04 p.m. to 2:01 p.m.)

18      THE COURT:  All right.  Counsel ready for the

19  invalidity arguments?

20      MR. GAUDET:  Your Honor, we are.

21      THE COURT:  All right.  I think the first patent is

22  '193.

23      MR. GAUDET:  That is correct, Your Honor.  And we're

24  going actually start though on slide 4 of the book just for a

25  moment, kind of get oriented.  Mr. Simons, if you would pull

1   up 4?                                                                          02:01:46

2           Your Honor, Mr. Jameson touched on this this morning,                  02:01:51

3   but this is, again, just to be very clear about our invalidity                 02:01:54

4   methodology, it's completely based on the <u>01 Communique</u>                 02:01:58

5   approach, which is namely we do not think we infringe these                    02:02:02

6   patents, and if you agree with them, then we wouldn't contest                  02:02:05

7   that the patents are valid.  For any patent that you agree we do               02:02:08

8   not infringe, we agree then we have not satisfied our burden to                02:02:11

9   invalidate.  But any patent that you find we have infringed,                   02:02:16

10  then based on that necessary claim scope, the patent would have                02:02:19

11  to be invalid.  And that's exactly the methodology that the                    02:02:22

12  Federal Circuit endorsed in the <u>01 Communique</u> case.                     02:02:26

13          Your Honor, with that introduction I'll turn to                        02:02:31

14  slide 120 which gets us specifically into the '193 patent.                     02:02:34

15          Your Honor, this is the exfiltration patent.  Just to                  02:02:41

16  get oriented, again we showed has the two-stage filtering                      02:02:49

17  process.  You see the origin and the destination in that first                 02:02:53

18  stage, then you determine the particular type of data transfer                 02:02:57

19  in the second stage.  We will agree the prior art's not going to               02:03:00

20  show that.  So you would have to disagree with that claim scope,               02:03:03

21  and if you do and find infringement, then the claim will be                    02:03:06

22  invalid.  And that's our point.  That if to find infringement,                 02:03:11

23  the claim will have to be invalid.                                             02:03:14

24          So the summary here about what was in the prior art,                   02:03:17

25  that is kind of interesting, what we showed was the prior art                  02:03:20

1   had the Cisco switches and routers like they're accusing today;   02:03:23

2   the prior art had the Identity Services Engine, that's the thing   02:03:27

3   they say creates the quarantine command --   02:03:30

4          THE COURT:  Excuse me.  Let me call -- Brandan?  I   02:03:34

5   probably pushed the wrong button here.   02:03:49

6          COURTROOM DEPUTY CLERK:  Oh, I did that.  I'm sorry.   02:03:52

7          THE COURT:  I want to look at you, not at me.   02:03:53

8          All right.  Go ahead.   02:03:59

9          MR. GAUDET:  Okay.  Thank you, Your Honor.   02:04:00

10          What I was saying on this slide is, what we looked at   02:04:01

11   in the prior art was what they had originally accused, which was   02:04:04

12   switches and routers that get a quarantine command from the   02:04:08

13   Identity Services Engine, and then we've got StealthWatch here,   02:04:13

14   because Dr. Mitzenmacher in his direct examination on   02:04:16

15   infringement, he referenced StealthWatch 24 times.  They're now   02:04:20

16   saying that StealthWatch is not part of the infringement case at   02:04:27

17   all; that they're not accusing StealthWatch.  And if that's the   02:04:29

18   case, then it means it's that much easier for this patent to be   02:04:33

19   invalid, because now all we've got are switches and routers that   02:04:38

20   get quarantine commands.  And that is certainly prior art.   02:04:42

21          And Your Honor, this chart has a lot of words up here   02:04:47

22   and I'm not going to work through all these words right now.   02:04:53

23   This is to show you how, for each of the claim elements, we've   02:04:56

24   got a column with Centripetal's infringement theory, a column   02:05:01

25   for the corresponding functionality in the prior art, and then a   02:05:06

1   column for evidence that shows that.

2          The first few rows of the top row is just talking

3   about switches and routers.  Then the next row that they receive

4   packets.  This was where Dr. Mitzenmacher had talked about

5   StealthWatch.  If he is, StealthWatch doesn't receive packets,

6   but just, today just like then, it would receive these

7   summaries.  So if that's good enough today, that was good enough

8   back then, but now they're not even apparently accusing

9   StealthWatch.  They're just talking about routers and switches

10  receiving packets.  And they have always received packets.

11         Then the next set of limitations, Your Honor, again,

12  this filtering and what-not, they had accused StealthWatch, and

13  by the same token, StealthWatch back in the prior art we showed

14  could look for exfiltrations.  Now they have withdrawn that and

15  now it's just the two latter bullets in the middle; namely, that

16  a human administrator can initiate a quarantine using the

17  Identity Services Engine and that a quarantine will stop packets

18  from going to a particular destination.  That is unquestionably

19  in the prior art, Your Honor.

20         And then the last piece was essentially the same.

21         And so Your Honor, if you accept their infringement

22  theory of this very general reading of the patent, the patents

23  have to be invalid and none of the things they showed you, none

24  of the things about the recent press releases and all of the

25  great things about ETA had anything to do with their

1   infringement read, apparently, on this patent.

2        So here is kind of the history of the relevant prior

3   art here.  We've got the sites.  We've proved all this up, that

4   in April 2011, Cisco released the Identity Services Engine.

5   That's the thing that issues the quarantine.  In March, 2012,

6   Cisco and Lancope, which used to own StealthWatch, integrated

7   the Identity Services Engine with StealthWatch.  So StealthWatch

8   is a factor.  Check that box.  And then in April of 2012, Cisco

9   released Identity Services Engine 1.1, and that would actually

10  have that quarantine button on it.  And also in April of 2012

11  Cisco actually marketed a system called the Cyber Threat Defense

12  Solution which was routers, Identity Services Engine and

13  StealthWatch.  Which, ironically, is actually now apparently

14  more than their infringement read.  All of that was before

15  March 12 of 2013.

16        Let me pause just a moment.  This was collectively a

17  system, and so for purposes of anticipation, a system, the

18  system is the reference.  The Cyber Threat Defense Solution

19  system.  That's a single reference proved up by various

20  documents and various other evidence, okay?  If you want to

21  consider each of the items separately, you could also consider

22  it through obviousness, and that would, obviously you would

23  combine these things because the document said combine these

24  things.  So it's sort of a lay-down hand, if you will, of an

25  obviousness case where the documents literally say combine these

1    things.                                                                02:08:28

2            Your Honor, we've presented a number of documents from         02:08:28

3    April, 2012, some before that.  This is an example of an April,        02:08:31

4    2012 document.  There were two other documents that were similar       02:08:36

5    in terms of the formatting but different documents, different          02:08:41

6    information, same date, April 9th, 2012 that explain this              02:08:46

7    system.  And it has all the pieces here.  It's got routers and         02:08:50

8    switches and Identity Services Engine and you name it.                 02:08:54

9            So what was -- and this is a lot more complicated than         02:08:58

10   their infringement read.  So what was it that their argument           02:09:03

11   was?  What's their answer?  Well, what we heard from Dr. Orso          02:09:06

12   was that back in the day, quarantines were different than they         02:09:11

13   are today; that the old quarantine was a "shutdown."  It totally       02:09:15

14   shut down a device.  That was the old quarantine.  And that            02:09:21

15   today, today the new quarantine allows you to select which IP          02:09:25

16   addresses you can send to.  So you don't totally shut things           02:09:32

17   down.  Well, Your Honor, that's just not true.  That's just not        02:09:35

18   what the evidence shows.  This was the -- this is the graphic          02:09:40

19   user interface what the user would actually use in the prior           02:09:44

20   art, and Dr. Orso had to concede that, in the dropdown menu in         02:09:46

21   the middle left, quarantine is different than shutdown.                02:09:51

22           Quarantine then is exactly the same thing as                   02:09:55

23   quarantine today.  You select which IP addresses, in other            02:09:58

24   words, which addresses, which destinations, you can still send        02:10:02

25   packets to.  It's typically like the help desk.  A different          02:10:05

1   option is the shutdown that Dr. Orso was talking about.  And we          02:10:10

2   also presented you with API or Application Program Interface             02:10:13

3   documents that showed you the same thing.  We've just got the           02:10:18

4   trial cites here because we spent a lot time with Dr. Crovella          02:10:21

5   proving up exactly how prior art quarantines work, and also Dr.        02:10:24

6   Orso had to concede the same thing.  There is no difference.            02:10:30

7           And this is now the testimony from Dr. Crovella making          02:10:33

8   the point, and it's a point about that previous image we just          02:10:37

9   looked at.  It shows "Question:  Dr. Crovella, what's on that           02:10:40

10  page."  And he says "Certainly, very simply, it's showing an           02:10:44

11  operator could initiate a quarantine using the Identity Services       02:10:48

12  Engine in 2012 prior to the priority date of the patent."  And         02:10:50

13  he goes on to say, you know, that's exactly what they're               02:10:55

14  accusing today.                                                         02:10:59

15          And the next question is interesting as well.  Said            02:11:00

16  "In both 2012 and today" -- this is the last question -- "does        02:11:03

17  that human analyst have to decide to do a quarantine like this.        02:11:08

18          "Yes.  It's a manual process.  It requires a human to         02:11:11

19  perform it.  It was manual then, it's manual today."                   02:11:14

20          There is nothing they have accused and no evidence            02:11:17

21  that would ever have an automated quarantine.  It's always the        02:11:20

22  result of, I think we called them Adam the Analyst, the human         02:11:23

23  saying let's quarantine that device.  It's all the same.               02:11:27

24          And so Your Honor, I just want to make a couple other         02:11:30

25  points, then I'm done on this patent.                                  02:11:33

 1          First is that there was no second -- this issue of            02:11:35

 2    secondary indicia of non-obviousness.  In other words, even if       02:11:39

 3    something seems obvious, if the patent holder can show there         02:11:44

 4    must be this other evidence that proves it must not have been so     02:11:48

 5    obvious, that's a very hard showing.  They have to show specific      02:11:50

 6    claim elements how evidence ties specifically to patent, and         02:11:54

 7    Dr. Striegel didn't even try to do that.                            02:11:58

 8          The last issue is the other argument that Centripetal          02:12:01

 9    made was that we didn't identify the level of skill in the art       02:12:06

10    for a person of ordinary skill in the art.  And it's sort of        02:12:09

11    interesting.  And we briefed this in response to their 52(c)         02:12:12

12    motion:  Neither party did.  It wasn't disputed.  And if we had     02:12:17

13    to do it, so did they.  I mean, the claims are read from the         02:12:20

14    perspective of one of ordinary skill in the art, so that would      02:12:24

15    be equally dispositive for them.  But the reality is it's not        02:12:27

16    dispositive for either one of us, because the cases they've          02:12:31

17    cited don't say that you have to define the level of ordinary        02:12:34

18    skill in the art.  If it's not disputed, it's not something that     02:12:37

19    you have to do.  If it's a disputed issue and it would be            02:12:41

20    helpful you can certainly do it, but the cases they cited did        02:12:46

21    not say that this was some sort of dispositive error.  In fact,      02:12:48

22    one them suggested you could just take the plaintiff's               02:12:52

23    definition if you're the only one who did it.  And our experts      02:12:55

24    the only time this came into play, was to say would one of          02:12:58

25    ordinary skill in the art have known to combine the Identity         02:13:03

1   Services Engine, the router and StealthWatch.  And of course

2   they would, because Cisco literally told you to.  This is not a

3   hard obviousness combination.  This is, as I said, sort of a

4   lay-down hand of an obvious combination.

5           Your Honor, that's everything I have on this.

6           THE COURT:  All right.

7           MR. HANNAH:  May I proceed?

8           THE COURT:  Yes.

9           MR. HANNAH:  Good afternoon, Your Honor.

10          The issue with Cisco's validity case is it has some

11  fundamental holes in the proof that they offer.  Everyone knows

12  that validity requires clear and convincing evidence, and we do

13  not have any proof, much less clear and convincing proof, that

14  the prior art systems that they allegedly say existed in the

15  prior art meet the claim elements.

16          As Dr. Orso pointed out during his, in our rebuttal

17  case, there are wholesale elements that their expert didn't even

18  address.  And we're going to get to those.  Based on those,

19  based on not being able to even address the elements, the

20  validity case goes out the window.

21          So we turn to the next slide.  This is the '193

22  patent.  And it's valid over the Cisco's Cyber Threat Defense.

23  Now, we know that if we go to the next slide, the Catalyst

24  switches, we've shown a lot of evidence of this, was built from

25  the ground up.  It's a new switch, a new product that came out,

1   and it was built from the ground up and integrated security.  So        02:14:46

2   for them to say that the old switches are the same as the new           02:14:50

3   switches cuts directly against what their CEO said, what their          02:14:53

4   documents say, and what all their manuals say.  And so based on         02:14:57

5   that fundamental premise that the old switches are the same             02:15:04

6   thing as new switches, it just doesn't make sense.  It                  02:15:06

7   definitely doesn't rise to clear and convincing evidence.               02:15:09

8           Let's look at the particular elements that are missing          02:15:11

9   from the prior art and from Dr. Crovella's deficient opinion.           02:15:15

10  You've seen this slide with Dr. Orso.  During his direct                02:15:21

11  testimony, Dr. Crovella never explained the quarantine in the           02:15:24

12  prior art.  He never did.  When you look through the record, he         02:15:29

13  never explained what the quarantine is.  All he says is there is        02:15:33

14  the word quarantine and that's it.  They didn't show you                02:15:37

15  anything during closing because it doesn't exist in the trial           02:15:42

16  record.  The only person that explained what the quarantine is          02:15:44

17  was Dr. Orso in the rebuttal case.  And he showed that the              02:15:49

18  quarantining is different.  In the prior art, the quarantining          02:15:52

19  would completely shut down all communications from an endpoint          02:15:58

20  completely.  That is fundamentally different than how the brand         02:16:05

21  new Catalyst switches and routers work today.  Because the              02:16:10

22  quarantining today will allow a particular type of data transfer        02:16:13

23  based on the quarantine policy or block a particular type of            02:16:19

24  data transfer based on that quarantine policy.  That's not how          02:16:22

25  it worked before these new Catalyst switches.  And that's the           02:16:26

1  only evidence that we have in the record about what the          02:16:30

2  quarantining does in the prior art versus the quarantining here. 02:16:32

3  Because of that, there's no packet filtering rules as claimed.   02:16:37

4  As we discussed during the infringement earlier this morning,    02:16:41

5  the packet filtering rules allow particular type of data         02:16:45

6  transfer; that particular type of data transfer is to            02:16:50

7  unprotected resources or it'll block particular types of data    02:16:53

8  transfer to protected resources.  There is nothing like that in  02:16:57

9  the prior art.  Again, as I said, it completely shuts down the    02:17:01

10 endpoint.                                                        02:17:08

11       The third and fourth bullet on this is that there is      02:17:09

12 just no discussion or proof of a first operator at all.  Or no   02:17:12

13 discussion or proof of a second operator.  We still didn't hear  02:17:16

14 it, even today.  Even in closing arguments we didn't hear        02:17:19

15 anything about a first or second operator.  And that's because,  02:17:23

16 again, it didn't exist.                                          02:17:25

17       The only -- and we're going get to this -- the only       02:17:28

18 operators that they mentioned when you search for the word       02:17:31

19 operator is this human operator.  But that's not what's required 02:17:33

20 in the claims or in the patent specification.                    02:17:36

21       Now I want to take to you DTX-711.  DTX-711 is a          02:17:40

22 document that they used in their case.  Dr. Crovella used this.  02:17:45

23 But all he did was show the word quarantine on the later pages.  02:17:50

24 That's all he did.  He did not show the actual operation.        02:17:55

25       And if you go to the second page which Dr. Orso talked    02:18:00

1    about, it shows that you shut down the port of the endpoint.        02:18:03

2    That means no communications from that endpoint.  You can't         02:18:08

3    allow data transfer to protected resources.  You can't allow        02:18:13

4    data transfer to unprotected resources.  You shut down the port     02:18:17

5    of that endpoint completely.  That's what the quarantine did in     02:18:21

6    the prior art.                                                      02:18:24

7            We turn to the operators.  And we showed this slide         02:18:27

8    during Dr. Orso's testimony.  And again, Dr. Orso testified, we     02:18:31

9    searched the transcript, he looked at it, he listened to the        02:18:37

10   testimony, and I asked him, during the rebuttal case, did he        02:18:40

11   identify an operator.  He said no.  This is an example of the       02:18:45

12   operator that was identified.  He threw in the word a lot, he       02:18:48

13   said operator a lot, but every single time he's talking about       02:18:51

14   the operator is the human who is overseeing the computer            02:18:54

15   networks.  And that's not -- that is clearly what is not            02:18:57

16   required in the claims.  Because when you look at the -- when       02:19:01

17   you look at the specification and you go to figure 3, which we      02:19:04

18   showed -- the highlighting should be on "operator", it looks        02:19:09

19   like it got moved over -- but as you can see, the operator is       02:19:13

20   not a human.  The operator is the allow or block that gets          02:19:17

21   applied when you analyze the traffic.  And this is an important     02:19:23

22   point, because this is the exact same element that Cisco could      02:19:29

23   not prove during the IPRs.  We showed this during the rebuttal      02:19:35

24   case.  In the IPRs, Cisco put its best art forward.  It tried to    02:19:40

25   invalidate the '193 patent.  And the Board came back, the PTAB      02:19:47

1   board came back and said you have not proven with sufficient          02:19:54

2   evidence that there is an operator in the prior art.  It's the       02:19:57

3   same for this case.  They simply -- not only did they not show      02:20:01

4   it in the art at all, they don't even mention it during their       02:20:06

5   invalidity case.                                                    02:20:10

6            So this is just additional evidence showing that they      02:20:11

7   cannot show it in any of the prior art, in any of the prior art,    02:20:15

8   and these are two elements of the claims that we just have no       02:20:19

9   evidence for at all in the record.                                  02:20:23

10           And with that, Your Honor, we're missing at least four     02:20:26

11  elements out of these claims.  We're missing the responsive to a    02:20:30

12  determination element from 18 and 19 that requires these packet     02:20:34

13  filtering rules that can allow certain traffic but block other      02:20:39

14  traffic.  We do not have the first operator which is shown on       02:20:43

15  this slide for both claims 18and 19.  And if you go to the next     02:20:46

16  slide, we're also missing the corresponding packet, the            02:20:50

17  corresponding rules that will allow the traffic and the second      02:20:53

18  operator that allows that traffic.  We have simply no evidence      02:20:57

19  of that in the record, and based on that, and the '193 is valid.    02:21:01

20           Unless Your Honor has any further questions, that's        02:21:08

21  all I have for the '193.                                            02:21:11

22           THE COURT:  Any rebuttal?                                  02:21:15

23           MR. GAUDET:  Very briefly, Your Honor.                     02:21:16

24           I think there were two issues he raises.  With respect     02:21:18

25  to the quarantine, we cited, gosh, it was about 30 -- it was a      02:21:20

1   good chunk of testimony from Dr. Crovella, and I want to call          02:21:27

2   out some specific lines where Dr. Crovella went through source         02:21:33

3   code about the Internet services engine.  It was DTX-1433,             02:21:38

4   discussed at Lines 24, 57, 23, to 2460, 8.                             02:21:43

5          He went through a number of documents in chapter and            02:21:50

6   verse showing how the quarantine worked and that it's exactly          02:21:53

7   like today, where the quarantine, you drop packets that have a         02:21:56

8   particular destination.  And it's interesting, and Dr. Orso            02:22:00

9   confirmed the same thing on cross-examination, said this is one        02:22:04

10  of those examples where Mr. Hannah and I can debate it, but the        02:22:07

11  record says what it says.  And we think it's pretty clear.             02:22:10

12         With respect to the operator issue, Your Honor, this            02:22:13

13  is the classic case of the patentee cannot say one thing to the        02:22:16

14  Patent Office and something different on infringement.  Their          02:22:22

15  argument about what the operators were on infringement is that         02:22:25

16  anything that drops a packet is an operator.  Anything that            02:22:29

17  allows the packet is the other operator, all right?  We proved         02:22:33

18  convincingly that goes back decades; that of course a quarantine       02:22:37

19  can drop a packet or allow a packet.  There's, according to            02:22:41

20  their infringement theory, there's no magic whatsoever.  And of        02:22:44

21  course Dr. Crovella doesn't think that that is an operator,            02:22:47

22  because we don't -- that's not the way the claim should be             02:22:52

23  construed and we don't infringe.  However, if you accept that          02:22:55

24  that is an operator, then we have demonstrated overwhelmingly          02:22:59

25  that of course that's exactly what quarantines do.  It will drop       02:23:03

1  all traffic to a given destination and they will allow traffic                02:23:08

2  not going that destination regardless of the content.                         02:23:11

3          Your Honor, that's all that I've got on that.                          02:23:14

4          THE COURT:  All right.  The next patent is '806.                       02:23:22

5          MR. GAUDET:  '806, Your Honor, that one's me as well,                  02:23:32

6  then I'll turn it over for a final time to Mr. Jameson after                  02:23:33

7  this patent.                                                                  02:23:37

8          So Your Honor, the first slide on this one is 128.                     02:23:42

9  And again, Your Honor, to orient you, the '806 patent is the                  02:23:49

10 patent of the rule swapping, okay?  And our prior art case is                 02:23:57

11 essentially what's in this very straightforward testimony from                02:24:01

12 Peter Jones, all right?  It gets more complicated when                        02:24:05

13 Centripetal starts making their arguments, but this is it.                    02:24:10

14 Centripetal is accusing the Catalyst 9000 ACL Hitless Update.                 02:24:13

15 So the question, were these the first Catalyst switches to have               02:24:19

16 the Hitless ACL rule update?  They were not.  What other                      02:24:22

17 Catalyst switches used that Hitless Update technique?  Example                02:24:27

18 would be the Catalyst 6500.  Specifically, the model called the               02:24:30

19 Supervisor 2T.  And when was that product released?  2011.                    02:24:35

20 Point blank.                                                                  02:24:41

21         THE COURT:  I thought that Cisco had said that the                     02:24:42

22 Catalyst 9000 was not an offshoot of the 6500 it was an offshoot              02:24:49

23 of the 3500?                                                                  02:25:01

24         MR. GAUDET:  That is exactly right, Your Honor.  And                   02:25:03

25 this is going to put all of that in context, okay?                            02:25:05

1          Mr. Jones worked on both of them.  He's familiar with          02:25:08

2  both of them.  And Your Honor, this is going to take a second,          02:25:12

3  but it's so important to get these facts nailed down, because          02:25:16

4  this answers the entirety, I believe, of Centripetal's argument,          02:25:19

5  okay?          02:25:25

6          This is kind of a funny-looking set of time lines, but          02:25:25

7  what this shows is the Catalyst 9000, that's using the IOS XE          02:25:28

8  all right?  That family, its history is on the top.  The          02:25:33

9  Catalyst 6500, its history is on the bottom.  The stuff in green          02:25:38

10 is before Hitless ACL was used at all.  The stuff in red is          02:25:43

11 after Hitless ACL was used at all.  And so what you can see is,          02:25:50

12 on the top, the history of the Catalyst 9000 is 3850 and 3650,          02:25:55

13 when Peter Jones was working on it, and you move through here by          02:26:02

14 2016, 3650, 3850, 2019, Catalyst 9000 is released without          02:26:08

15 Hitless ACL Update.  In 2018, for the first time, the Catalyst          02:26:14

16 9000 and IOS-XE have Hitless ACL Update.  Separate history line.          02:26:20

17          Down below, the Catalyst 6500 history using the IOS,          02:26:28

18 in June or July of 2011, a very particular version released with          02:26:35

19 the IOS(50)SY was released with this same Hitless ACL Update          02:26:40

20 feature, but it did not make it into the Catalyst family because          02:26:49

21 it's a different source code line until 2018.  Those are the          02:26:52

22 facts.          02:26:57

23          And Your Honor, with respect to the 2011, so we're at          02:26:58

24 6500, there are a number of documents that confirm it in          02:27:06

25 addition to Mr. Jones's testimony.  The top document, this is a          02:27:09

1   2011 document, DTX-648, ACL Hitless Atomic Update.  "This new          02:27:12

2   feature makes sure the production traffic is not affected by ACL       02:27:20

3   modification.  The traffic will use the new ACL only when this         02:27:23

4   one is fully programmed in hardware."  That is the essence of          02:27:27

5   Hitless ACL.                                                           02:27:30

6           And the same thing, different document below it.  It          02:27:32

7   allows updates to ACL without interrupting traffic.  So that's         02:27:35

8   what is going on the 6500 side.                                        02:27:39

9           What's going on up in the Catalyst 9000 side?  Well,          02:27:42

10  Your Honor, they used different hardware, different -- you know,       02:27:46

11  obviously, different software, and the timeline was just               02:27:53

12  different.  And why does that matter?  All right.  An                  02:27:56

13  extraordinarily confusing part of this trial -- and I                  02:28:00

14  understand, and I wish there was a way to make it clearer -- was       02:28:03

15  Centripetal tried to argue that there are two different versions       02:28:08

16  of Hitless ACL, okay?  They argued that the Catalyst 9000 had          02:28:12

17  some different version of Hitless ACL to the left of this red          02:28:18

18  bar, and that in 2018 what the Catalyst 9000 did was just get a        02:28:23

19  new and improved version of Hitless ACL.  And the reason they          02:28:32

20  made that argument is that when Hitless ACL was introduced for         02:28:36

21  the first time in the Catalyst 9000, the documents referred to         02:28:41

22  the old way of doing things and they disparaged the old way of         02:28:44

23  doing things.  But the old way of doing things was not Hitless         02:28:48

24  ACL, it was the version of the Catalyst 9000 and its predecessor       02:28:52

25  that had no Hitless ACL.  And that's obviously not the prior art       02:28:56

1   we're relying on.  So let me show you where the confusion came      02:29:00

2   in.                                                                 02:29:03

3           This is the document we looked at yesterday.  This is      02:29:05

4   two pages, one after the other, okay, of the document that the      02:29:06

5   plaintiff relied on talking about the Catalyst 9000.  This is       02:29:11

6   the document that came out describing that for the first time       02:29:14

7   the Hitless ACL Update was going to be available, okay?  And the    02:29:21

8   right side is describing what that's going to be.  It says          02:29:28

9   "Hitless Atomic ACL Change Flow.  For this new feature, Hitless     02:29:31

10  Atomic ACL" -- exactly the same words, same description as the      02:29:37

11  2011 Catalyst 6500 -- "no packets will drop."  Explains all         02:29:43

12  about it.  All about the things that it's going to do, all          02:29:47

13  right?  That is the same thing that was done in 2011.               02:29:51

14          Now, what Centripetal tried to argue is that the thing     02:29:54

15  on the left which was just the old version of Catalyst 9000         02:29:59

16  without any Hitless ACL, was somehow Hitless ACL 1.0.  It was       02:30:04

17  some worse version that was the same thing that was back in the     02:30:10

18  prior art.  And that's just not what this document says.  This      02:30:12

19  document on the left never refers to the old system that            02:30:16

20  Catalyst 9000 used as Hitless ACL.  Because it wasn't.  It          02:30:21

21  simply didn't exist.  That's what all of the trial evidence         02:30:26

22  indicates.  If it were, then somewhere on the left-hand page you    02:30:30

23  would have found the phrase Hitless ACLS.                           02:30:34

24          I've said a lot, why does this matter?  Because all of      02:30:38

25  the evidence in the case shows that the thing they were accusing    02:30:41

1   that was adopted in the Catalyst 9000 in 2018 is the same thing          02:30:45

2   that existed in a different family, a different device, back in          02:30:49

3   2011.                                                                    02:30:56

4           THE COURT:  Why does it use the phrase "The current             02:30:58

5   Hitless" with something feature under Software Requirement?              02:31:03

6           MR. GAUDET:  Absolutely, Your Honor.  QoS is Quality            02:31:09

7   of Service.  It's got nothing to do with Hitless ACL.  I mean,           02:31:12

8   Hitless ACL, ACL are the rule changes.  There are other Hitless          02:31:18

9   functionalities, but not Hitless ACL.  ACLs are the Access               02:31:23

10  Control Lists.  That's talking about -- so the phrase is talking         02:31:28

11  about the fact that there are only certain kinds of rules that           02:31:33

12  you can switch with Hitless ACL, and that list was similar to            02:31:40

13  that other thing was called Hitless QoS which is Quality of              02:31:46

14  Service.  Hitless could -- again, if they meant that the thing           02:31:52

15  with respect to rule swaps was Hitless ACL, they would have said         02:31:55

16  it.  It's just talking about something different, Your Honor.            02:31:59

17  That's the answer.                                                       02:32:01

18          Your Honor, this now just makes all the                         02:32:06

19  correspondences.  It's similar to what we showed before.  There          02:32:10

20  was one other argument that the plaintiff made.  The other               02:32:14

21  argument that the plaintiff made was that we didn't say anything         02:32:16

22  about receiving packets and preprocessing.  And again, to orient         02:32:19

23  you, this would be in the claim elements B down through at least         02:32:25

24  E.  And this is there's a management device that's going to push         02:32:31

25  rules down to the routers or switches.  And that management              02:32:35

1   device has to receive rules and then it does some work on the

2   rules and it sends them down, okay?  Now, they argued that we

3   literally said nothing about that, and I'll show you what we

4   said.  This was Dr. Reddy, all right?  And he was asked

5   specifically about these limitations B through G.  And the

6   question.  "Then if we go to the next column that corresponds to

7   limitations B through G, you have a reference on the far right

8   to rule sets created and updated.  ACLs.  Do you see that?

9   That's what they're talking about?

10              "Yes, I do.

11              "And what does that correspond in the middle, in the

12  middle column with respect to Centripetal's theory?"

13              Said, "Well, Centripetal alleges that the digital

14  network architecture, that's DNA, allows these rules to be

15  updated on the ACL, need to be updated on the Cisco switches,

16  and corresponding L-A-M-I-R-A Management System in the Cisco

17  products used to be called Prime Network Management System.  And

18  so it allowed similar features and similar functionality as

19  being alleged in the middle.

20              "And the Prime Management Center that you'll be

21  testifying about, what does that correspond to?

22              "Corresponds to DNA."

23              He says more.  We put a document in.  This is DTX-525.

24  These were the release notes dated July of 2011 for this

25  management system.  And again, Your Honor, there's no magic

1   here: If the switch or device is switching rules, the rules    `02:34:06`

2   have to come from somewhere, right? And the rules get received    `02:34:10`

3   by this management device and they get set up and processed and    `02:34:15`

4   pushed down to everything. That's not -- that process is not    `02:34:19`

5   new. That's exactly what the Cisco Prime Network did.    `02:34:24`

6         And so middle of the question says, "Well, what is    `02:34:26`

7   Cisco Prime Network Control System?    `02:34:30`

8         "Answer: This is a network management system that was    `02:34:32`

9   available to manage Cisco products in the 2011 time frame."    `02:34:34`

10        We go to Bates Page 2 and Mr. Jameson asked, "Dr.    `02:34:39`

11   Reddy, can you explain the significance of this bullet on Bates    `02:34:42`

12   2?    `02:34:45`

13        He says "This is showing the Prime Network to manage    `02:34:46`

14   up to 5,000 Cisco Catalyst switches." Okay?    `02:34:50`

15        Last point, then I'm done, Your Honor. This is    `02:34:53`

16   actually the last slide I think that you'll see from me.    `02:34:55`

17        Again, bring it back to the claims, Dr. Reddy. How    `02:35:00`

18   does it impact?    `02:35:03`

19        And he says, B through G -- those were the very things    `02:35:04`

20   that Centripetal's arguing that we ignored -- require processing    `02:35:08`

21   of packets through a rule set. And this requires, as I've shown    `02:35:11`

22   you in the infringement theory, Hitless Update and a network    `02:35:16`

23   management system. And the accused product combination, it's a    `02:35:18`

24   Digital network Architecture or Firepower Management Center.    `02:35:22`

25   Similar functionality existed in the Prime Network Management    `02:35:26`

1    System that was available in 2011.

2              Your Honor, that's all that I have on this.

3              THE COURT:  All right.

4              MR. HANNAH:  Your Honor, may I proceed?

5              THE COURT:  You may.

6              MR. HANNAH:  I wrote it down, I think I wrote it down

7    three or four times, that the word confusing was used.

8    Confusing evidence is not clear and convincing evidence.  All we

9    heard was attorney argument about these timelines and the 3500,

10   the 6500.  None of that was presented during trial.  The only

11   thing that was presented during trial was that the Hitless ACL

12   was updated and it was updated with the 2.0 version in the

13   Catalyst switches.

14             I'd just like to show the very -- the cover page of

15   PTX-1195.  It doesn't say FED 2.0 Hitless ACL New Addition, it

16   says Update.  They had a Hitless functionality and it changed.

17   The old Hitless functionality would overlap rules.  And Dr. Orso

18   explained why.  Because they wanted to apply the new rules as

19   soon as possible.  The new version as shown on this document,

20   released in 2017, said we're dropping packets using the old

21   Hitless technology.  We need to replace it and we're going to

22   replace it with the rule swap of the '806 patent.  So the very

23   cover of this document cuts directly against the attorney

24   argument that was just made about there was never a Hitless

25   functionality ever at all on these Catalyst switches.

```
 1              Turning to the slide deck, there's the same          02:37:28
 2   fundamental problem with the validity case the defendant have in  02:37:34
 3   that they just fail to prove a number of elements in the        02:37:39
 4   patents.  I'm going to touch on it a little bit, but Dr. Orso   02:37:42
 5   explained it thoroughly that the original Hitless functionality 02:37:51
 6   did not swap rules and instead caused old rules and new rules to 02:37:56
 7   overlap.  And we can show the slide deck just to get us oriented 02:38:01
 8   here.                                                           02:38:10
 9              A couple down, Geoff.  Slide 115.                    02:38:26
10              Rule swapping was not introduced into switches until  02:38:36
11   2017 with the FED 2.0.  And I'm going to touch on that and I'm  02:38:39
12   going to show you exactly, point out what Dr. Orso pointed out. 02:38:45
13              One key thing that we still haven't heard is that    02:38:50
14   Cisco Prime, we don't know how it works.  We didn't hear it from 02:38:53
15   Dr. Reddy, we didn't see any documents about how it could      02:39:01
16   receive rules.  And even on closings we still don't know how   02:39:06
17   Cisco Prime works.  All we have is some vague statement that    02:39:12
18   says it has similar functionality to DNA.  Well, first, we     02:39:17
19   proved that's wrong because DNA was built and released in 2017, 02:39:22
20   and we showed documents of that.  But that vague evidence is not 02:39:26
21   clear and convincing evidence.  They needed to prove that the  02:39:33
22   Cisco Prime received the first and second rule set and did more 02:39:36
23   than that; that it preprocessed those first and second rule sets 02:39:39
24   just like the DNA Center does today.  We showed ample evidence  02:39:43
25   of that, about how it preprocessed rules, sends out policies.   02:39:49
```

1   Nothing of that nature worked at the Cisco Prime and we have no          02:39:52

2   evidence of that in the record.                                         02:39:56

3          So we go to the next slide.  Dr. Orso explained this             02:40:00

4   very thoroughly in which he mapped the old ACL Hitless                  02:40:05

5   functionality on the left and he actually showed the same              02:40:13

6   diagram that the defendant showed during their direct testimony        02:40:18

7   during Dr. Reddy's testimony.  But Dr. Reddy failed to show the         02:40:22

8   comments.  All they showed was the figure and said, oh, this           02:40:27

9   figure maps this figure.  Well, if you actually look at it, the        02:40:32

10  bullet points don't match.  Dr. Orso briefly touched that, but         02:40:34

11  that wasn't fundamental to his opinion.  What was fundamental is       02:40:38

12  the explanation about how it worked.  And Dr. Orso mapped that         02:40:41

13  exactly to this figure on the left.  He showed how a new policy        02:40:45

14  is used temporarily.  Why is that new policy used temporarily?         02:40:49

15  Because what they're trying to do is apply the new rules as soon       02:40:54

16  as possible.  So they create this new, they create this new           02:40:56

17  policy and then they start writing these drop labels while the         02:41:01

18  old rules are still being implemented.  While they're still           02:41:05

19  being used.  And then they have to go through, use this label         02:41:09

20  policy.  And if you remember, Dr. Orso pointed exactly to where       02:41:12

21  those labels were in the description of the 6500.  How they used      02:41:16

22  these labels.  And then they would delete this new policy, this       02:41:20

23  temporary policy, again shown exactly in the comments.  What was      02:41:24

24  happening?  Packets were dropping.  It causes overlap.  It           02:41:28

25  causes conflicts with the rules and they had to move on in 2017.     02:41:33

 1          And if you look at everything on the right, there's no       02:41:38

 2   use of a new policy, there's no overlap, there's no policy drop      02:41:41

 3   label that's being used.  You don't need that functionality if       02:41:46

 4   you're just going to swap rules and you don't have to delete         02:41:49

 5   this new policy -- amongst other changes.  I mean, there's some      02:41:52

 6   significant changes there -- and what does that result?  Well,       02:41:55

 7   first it results in infringement, but it also results in no          02:41:57

 8   packets being dropped.                                               02:42:00

 9          Now we go to the next slide.  Dr. Orso performed a            02:42:05

10   similar analysis of trial testimony and he looked to see was         02:42:11

11   there any description of receiving rules.  Literally looking for     02:42:15

12   those words to see if that was in there.  Couldn't find it.  If      02:42:20

13   you look for the word preprocess, again, it's completely absent      02:42:25

14   from the record.  Saying that they're similar functionality is      02:42:29

15   not clear and convincing evidence about how a prior art system       02:42:34

16   works, especially when you don't even mention the words of the       02:42:37

17   claim.                                                               02:42:40

18          So for these reasons, if you turn to the next slide,          02:42:41

19   there was no proof of receiving a first and second rule set,         02:42:45

20   there's no proof of preprocessing a rule set in the prior art,       02:42:49

21   because of that you can't perform anything after preprocessing.      02:42:54

22   And if you go to the last slide, there's just absolutely no          02:42:57

23   proof that the prior art swapped rule sets.  The only evidence       02:43:02

24   in the record is that the prior art overlapped rule sets and         02:43:07

25   that the new system, the '806, the one that reads on the '806        02:43:11

1   patent, that's the system that swaps.                          02:43:14

2           Unless Your Honor has any questions, that's all I     02:43:18

3   have.                                                          02:43:23

4           THE COURT:  Any rebuttal?                              02:43:23

5           MR. GAUDET:  Your Honor, very briefly, and I will keep 02:43:24

6   us ahead of schedule.                                          02:43:26

7           If we could, Mr. Simons, pull up Plaintiff's 1195,    02:43:28

8   Page 1.                                                        02:43:34

9           Your Honor, I want to start by addressing this same   02:43:41

10  document.  This is the document -- it's a 2017 document talking 02:43:43

11  about the forthcoming change in the Catalyst 8000.  And let's  02:43:49

12  just look at the words, right?  It's describing the Hitless ACL 02:43:53

13  Update at the top.  Mr. Hannah suggested that means it's an    02:43:58

14  update to Hitless ACL functionality.  No, that's the title of  02:44:03

15  the functionality.  You're updating the rules.  You're updating 02:44:08

16  the ACL.  It's been called Hitless ACL Update since 2011.  And 02:44:12

17  to show you that, let's go to slide 130.  ACL Hitless Atomic   02:44:17

18  Update.  It's not an update to Hitless ACL, it's that the      02:44:29

19  software is talking about the Hitless way to update rules.     02:44:34

20          And let's go back to 1195.  It's all over this        02:44:39

21  document.  What does this document do?  Two lines down, it adds 02:44:44

22  support for Hitless Atomic ACL Update feature.  Because that   02:44:50

23  feature didn't exist in the prior version of Catalyst or the   02:44:55

24  prior version of FED that this is talking about, okay?         02:45:00

25          Likewise, if we go to Page 4 of this document, this is 02:45:05

1   where it's talking about the new feature, okay?  Look at the                 02:45:10

2   first line under 2.2 Hitless Atomic ACL Change Flow.  "For this              02:45:14

3   new feature, Hitless Atomic ACL Change Flow."  That's the new                02:45:20

4   feature in Catalyst 9000, okay?  It's the same thing that was in             02:45:25

5   Catalyst 6500 in the prior art, and there is simply -- if what               02:45:30

6   Mr. Hannah was saying were right, this document with refer to                02:45:35

7   the old thing as Hitless.  There is literally nothing that                   02:45:38

8   substantiates this claim that there was some earlier version of              02:45:42

9   Hitless that was different.                                                  02:45:46

10          And when I say confusion, you know, lawyer argument                  02:45:48

11  can create a lot of confusion.  There's nothing on the face of               02:45:54

12  these documents that supports the argument or that, when read on             02:45:57

13  their face, would create confusion.  That was my first point.                02:46:01

14          Second point, and this will be quicker.                             02:46:04

15          With respect to Cisco Prime, that's the management                   02:46:07

16  center, Your Honor.  Dr. Reddy told you everything you need to               02:46:09

17  know.  The only role of the management system according to                   02:46:13

18  Centripetal is it gets rules and it sends those rules down to                02:46:16

19  the switch.  And that's exactly what he showed Cisco Prime did               02:46:22

20  and that's everything we have to do to match their infringement              02:46:29

21  theory.                                                                      02:46:32

22          And Your Honor, with that, that's everything that I                  02:46:32

23  have.                                                                        02:46:33

24          THE COURT:  All right.                                              02:46:37

25          Let's move to the '856 patent.  The '205 patent was                  02:46:50

1    not challenged for validity, right?                                       02:47:14

2            MR. JAMESON:  That's correct, Your Honor.                         02:47:17

3            We're slide 137, and I'm going to be brief.  We're               02:47:19

4    going to stay ahead of schedule.                                         02:47:31

5            THE COURT:  Okay.                                                 02:47:43

6            MR. JAMESON:  Your Honor, there is a consistent theme            02:47:44

7    with respect to invalidity, and Mr. Gaudet has laid out what             02:47:46

8    it's all about.  Again, this is another patent that we do not            02:47:52

9    believe we infringe.  But if you disagree with us, then Cisco            02:47:58

10   predecessor products would meet the elements at the same level           02:48:07

11   that Centripetal has proven up.                                          02:48:13

12           The priority date for the '856 patent is even easier            02:48:16

13   than the last couple you've looked at.  It's December 23rd,              02:48:21

14   2015.  So we're moving obviously a lot more forward in time.             02:48:25

15           We've got the same strategy, and this is going to be            02:48:32

16   laid out in our filing this afternoon where we work through              02:48:39

17   these lists with pinpoint cites.  But we explain what they're            02:48:43

18   accusing on the left, what is the same functionality or features        02:48:51

19   in the prior art, and then we provide the evidence shown in              02:48:57

20   support on the right for each claim limitation.  And I am                02:49:02

21   confident that I'm going hear from Mr. Andre that the '856               02:49:08

22   patent is all about CTA and ETA, and that's not what invalidity         02:49:16

23   is all about.  We've got to look at what's the scope of the             02:49:21

24   claims that they're suggesting they have by way of claim scope,         02:49:26

25   and then we have to compare that to the features and                    02:49:33

1   functionality in the prior art.

2          And if you look at the prior art column beginning just

3   at the second row, but I don't think there's anybody that's

4   going to challenge the issue about switches and routers.  It is,

5   I think, beyond dispute that StealthWatch had been receiving

6   threat intelligence, including IP addresses and domain names,

7   going back since it's been in existence.  And we provided some

8   testimony to that effect.  I think where they're challenging us

9   is whether or not claim limitations C and D can be met with our

10  predecessor products, which is whether or not we were able to

11  identify unencrypted data and whether or not, using the

12  unencrypted data, we could then determine whether or not

13  encrypted data was bad or malicious.  And on that point I want

14  to take a look at the next slide, which is DTX-364 at Bates 015.

15  And we talked a little bit with Dr. Jaeger about this yesterday,

16  and he was making the argument that port 443 doesn't necessarily

17  have anything to do with encrypted data.  But if you look at the

18  specification that we compare it to on the right-hand side at

19  column 6, 36 through 45 and columns 18 at lines 9 through 18,

20  even the '856 patent acknowledges that "one or more ports (e.g.

21  port 443) indicated by transport layer headers in the packets

22  indicating the connection between hosts 106 and 142 will be

23  utilized to establish an encrypted communication session."

24  Because that's how port 443 is used.  And then going back to the

25  left-hand side, that's also how the protocol HTTPS is used, as

1   that signifies an encrypted communication.                         02:52:02

2          And so then we look at -- and this what StealthWatch        02:52:06

3   shows, an alarm or an alert has been sent to the StealthWatch      02:52:12

4   console, and it is identified that rule No. 1 on the right-hand    02:52:18

5   side that there is an encrypted communication and potentially      02:52:23

6   there's something suspicious with it.  And it then sends an        02:52:30

7   alarm to the StealthWatch Management Console.  And the question    02:52:35

8   becomes, well, how do you know that an encrypted communication     02:52:41

9   might be bad or dangerous or malicious?  Well, going back in       02:52:47

10  time with old StealthWatch as they called it yesterday, old       02:52:55

11  NetFlow, as apparently they would call it, that's exactly what    02:53:01

12  old NetFlow records could be used for, is that you could use      02:53:05

13  those NetFlow records to do an analysis of them to evaluate       02:53:10

14  whether or not there was malicious traffic potentially in the    02:53:15

15  network.                                                          02:53:24

16         And the fact there are new -- the fact that there are     02:53:24

17  two new fields in a NetFlow record today that are used by ETA,   02:53:28

18  these patent claims don't say one word about the two new fields. 02:53:34

19  If they did, we might have a different issue.  But all they talk 02:53:39

20  about is, at a broad level, whether or not you can use           02:53:42

21  unencrypted information to identify encrypted information.       02:53:46

22         And that's what this very next slide shows.  DTX-364.    02:53:52

23  And this is, I want to focus on the text here.  It says as you   02:53:59

24  can see from the target host group column, the reason this rule  02:54:07

25  fired is because the target of the communication was an IP      02:54:14

1   address in the Zeus botnet controller's host group.  When            02:54:18

2   StealthWatch did its analysis it was able to identify, because       02:54:26

3   it had in its threat intelligence that this IP address was a         02:54:33

4   dangerous IP address, and the reason it knew that was because        02:54:39

5   the record that came up, certain of the fields in that record        02:54:45

6   include the IP address.  And that's actually, when you go to the     02:54:50

7   right-hand side that's exactly what the '856 patent                  02:54:56

8   specification teaches as well as to how you are going to analyze     02:54:59

9   potential encrypted information.  It states it will "cause           02:55:05

10  RuleGATE to determine, based on one or more network addresses        02:55:11

11  included in the network layer headers, that the packets comprise     02:55:16

12  data corresponding to the network threat indicators."               02:55:20

13        And as I understand it, that was the focus of Dr.              02:55:24

14  Jaeger's attack on us.  And I'm sure it may expand in closing,       02:55:26

15  but that's what I heard yesterday.                                   02:55:34

16        And then going back to this, Your Honor, we have been          02:55:40

17  crystal clear about this:  StealthWatch is incapable of              02:55:45

18  filtering packets.  Can't do it.  Because packets don't go to        02:55:49

19  StealthWatch.  And for that reason, we don't infringe.  But if       02:55:54

20  the filtering of packets in F1 and F2 means something different      02:56:00

21  than filtering packets and it basically means filtering any          02:56:06

22  results of anything that you can find on the StealthWatch            02:56:12

23  console, well, we've been doing that forever.  Because Adam the      02:56:15

24  Analyst, using the StealthWatch console, he can drill down           02:56:22

25  through hitting buttons to analyze information, filter               02:56:30

1   information any way -- not any way.  Many duplicate ways.  And          02:56:36

2   again, that's actually shown, Your Honor, just looking at the          02:56:41

3   top of the left-hand side of DTX-364, those little blue arrows,        02:56:46

4   those are buttons you can filter on to obtain additional               02:56:53

5   information about what's going on.  And Your Honor, at some            02:56:57

6   level you might be going, well, that can't be what filtering          02:57:02

7   means.  But that's exactly what Dr. Cole relied on.  He relied        02:57:07

8   on the ability to filter within documents to satisfy these claim      02:57:13

9   limitations.  And so this is the goose/gander rule.                   02:57:18

10          And then finally -- I'm sorry, Your Honor, I keep on          02:57:26

11  hitting the wrong button.  Let me back up.                            02:57:31

12          With respect to the routing and the quarantining and         02:57:37

13  the proxy interface, actually Mr. Gaudet just took you through        02:57:40

14  this.  There is no doubt that ISE in the prior art could             02:57:44

15  quarantine computers, and when it quarantined computers, that        02:57:49

16  packets would be blocked.  And so if that's good enough current      02:57:58

17  day, then it was good enough back in the day.                        02:58:04

18          The final point that I wanted to hit on, and it's the        02:58:13

19  lack of written description.  Dr. Jaeger -- actually I think it       02:58:17

20  was Dr. Jaeger, criticized Cisco yesterday because the argument      02:58:23

21  was they haven't shown any documents that support their lack of      02:58:29

22  written description defense.  And Your Honor, that was a new one      02:58:37

23  on me.  Because the only document that can be used to support a      02:58:42

24  lack of written description defense is the written specification     02:58:47

25  itself.  And it's either in there or it's not in there.  And if      02:58:52

1  it's not in there, then there's your evidence to support your          02:58:59

2  written description defense.  And what we know is they believe          02:59:03

3  that these claims, these packet filtering claims are broad              02:59:08

4  enough to encompass NetFlow and analyzing NetFlow records, and          02:59:14

5  that it's broad enough to encompass threat detection using              02:59:23

6  artificial intelligence and machine learning.  And you can read         02:59:26

7  the specification from now for the rest of time, and neither one        02:59:32

8  of those concepts is anywhere in that specification.                    02:59:36

9         We've got some other reasons here, but Your Honor, I             02:59:41

10  will stop for now.                                                     02:59:44

11         THE COURT:  All right.                                          02:59:48

12         MR. ANDRE:  May I proceed, Your Honor?                          02:59:53

13         THE COURT:  Yes.                                                02:59:53

14         MR. ANDRE:  I don't want to play cards with Mr.                 02:59:55

15  Jameson, because he has that rule heads I win, tails you lose.         02:59:56

16  That's the way they have been trying this whole case.  We can't        03:00:00

17  win regardless.  If we win, we lose.  That's just an unusual           03:00:03

18  strategy, but I guess it's a good one if you can pull it off.          03:00:07

19         Fact of the matter is, Your Honor, the issue with the          03:00:12

20  encrypted traffic was a big problem, and everyone knew it and          03:00:15

21  people were doing research on it.  If you go to my favorite            03:00:18

22  press release ever, PTX-452, and it's also PTX-1135, this was          03:00:23

23  when Cisco announced the launch of this new networking.  And it        03:00:29

24  says that "Cisco's Encrypted Traffic Analytics solves a network        03:00:33

25  security challenge previously thought to be unsolvable."  That's       03:00:40

1  one of their executives who said that.  Truth be known, why

2  their executives didn't show up at this trial, they would have

3  to defend all these statements they made.  They can't come in

4  here and say to this Court we said all of that to our investors,

5  to the public, but we really didn't mean it.  That's why they

6  weren't here.  That's why they brought engineers to talk about

7  really complex, picayune details that really didn't matter at

8  the end of the day.

9        The press release talks about the Encrypted Traffic

10  Analytics being a, solving an unsolvable problem.  It also talks

11  about the Catalyst switches being introduced, and a new family

12  of switches being built from the ground up.

13        If you look at the actual user manual for the Catalyst

14  switches, PTX-1417, it says "Before the introduction of the

15  Catalyst 9000 series, detecting attacks that hide inside

16  encrypted sessions required unwieldy and expensive measures."

17  They're talking about decrypting.  "Cisco solved this problem by

18  delivering Encrypted Traffic Analytics on the Catalyst 9000

19  switch."  Came out in 2017.  That's Page 107 of that document.

20        The piece they keep missing here.  They keep talking

21  about filtering packets for this patent.  The switch and

22  routers, they start the filtering process.  They have to filter.

23  That's the first step of filtering.  They send representation up

24  to StealthWatch to do further filtering.  When they talk about

25  the Encrypted Traffic Analytics with the new Cisco network and

1   StealthWatch on PTX-561, they once again state that "Cisco, with

2   its experience in networking infrastructure market conducted

3   extensive research and has introduced an innovative and

4   revolutionary technology."  That's how they're describing it.

5   Innovative and revolutionary.  They're coming into court the

6   last six weeks saying we could do it all along.  We have been

7   doing it for years.  There's noting innovative or revolutionary

8   about this.

9          In their internal presentation on PTX-970 they say

10  "Now available, Cisco's Encrypted Traffic Analytics.  Industry's

11  first network that can find threat in encrypted traffic without

12  decryption."  Without decryption is bold in their own document.

13  That's what our patents are talking about, using the

14  non-encrypted portion to look at the encrypted portion without

15  decrypting it.

16         Their CEO trumpeted the success of the Catalyst 9000

17  switches saying "The key innovation on these 9000 switches was

18  Encrypted Traffic Analytics."

19         And finally if we go back to the figure, we show the

20  ETA solution with the 9K.  We added this red text.  The ETA was

21  released in June of '17.  Catalyst 9000 released in June of '17.

22  Cognitive Threat Analytics was integrated with StealthWatch in

23  '17.  This is all well-after the time of the patent in 2015.

24         Now, the '856 patent is valid over the alleged prior

25  art for a lot of reasons.  One, and the easiest one is there's

1  no clear and convincing evidence to the contrary.  The old

2  switches and routers did not have Encrypted Traffic Analytics

3  and they do not filter based on whether it was encrypted or not.

4  The ETA embedded on them was a game-changer.

5          The old StealthWatch did not have any concept of

6  determining network threat indicators in encrypted packets by

7  analyzing data from the unencrypted portions of the packet.  The

8  concept just wasn't there.  It was not even considered.  The old

9  switches and routers and old StealthWatch did not filter

10  encrypted network traffic based on the unencrypted portions.

11  Didn't happen.  They decrypted it.  That's how they used to do

12  it.  If you wanted to see what was in this encrypted traffic,

13  you decrypted it.  ETA was not released until '17, CTA was not

14  integrated until '17 either.  Those are the basic reasons.

15          Now they brought Dr. Schmidt on to talk about this,

16  and he used seven documents to try to show the old

17  StealthWatch -- and didn't show any of the switches or

18  routers -- the old StealthWatch can do.  Five of the documents

19  DTX-311, DTX-343, DTX-364, DTX-380 and DTX-993, those five

20  documents, some of these documents are very long, 100 pages, 80

21  pages.  These are very dense documents.  The word "encryption"

22  does not appear.  Just doesn't appear.  It's just not there.

23  Encryption, crypt, cipher, decryption, nothing like that.  The

24  concept was not even present, was not even is considered.

25          The two documents which the word encrypted appeared

```
 1   on, they used seven documents total, had nothing to do with     03:05:38

 2   trying to determine what was in the encrypted packets.          03:05:41

 3        The old StealthWatch did NetFlow, but it didn't do         03:05:45

 4   NetFlow that could distinguish the encrypted -- using the       03:05:50

 5   unencrypted portion to try to figure out what was in the        03:05:55

 6   encrypted portion.                                              03:05:58

 7        The ETA flow records added in all these new fields,        03:05:59

 8   Initial Data Packet being probably the most important one, but  03:06:02

 9   also the Sequence of Packet Lengths and Times.  That's what was 03:06:06

10   added into the ETA flow records.  That was not there in the old 03:06:10

11   StealthWatch.  IP addresses that will carry the day for you, and 03:06:16

12   it's not what is required by the claims.                        03:06:21

13        If we look at what's actually missing from the prior       03:06:27

14   art and what Dr. Jaeger talked about, there was nothing in the  03:06:29

15   switches or routers that were identifying packets comprising    03:06:34

16   unencrypted data and encrypted.  The concept just wasn't there. 03:06:37

17   It wasn't thought of.  The packets, there was no distinguishing 03:06:42

18   between the two.  They had to add that in to the switches and   03:06:45

19   routers.                                                        03:06:47

20        Nothing in the old StealthWatch or the switches --         03:06:49

21   they don't even talk about the old Identity Services Engine in  03:06:52

22   their allegations -- but none of that was trying to determine   03:06:59

23   what was in the encrypted part by looking at the unencrypted    03:07:04

24   part.  That was that third element.                             03:07:07

25        Filtering based on the domain name or any of these         03:07:11
```

1  fields were just not, once again, not considered.

2       And then routing based on what was determined by the

3  figured packets just did not exist.

4       One of the things that they keep bringing is the idea

5  that they could do this with Adam the Analyst.  I'd like to meet

6  this Adam fellow, because he's got some magic in him.  One of

7  the things that is essential about these claims, all the claims

8  in this case, there are system claims and they are CRM claims.

9  None of them are method claims.  They seem to think that if it's

10 method claim you might have a problem with Adam the Analyst, but

11 with system claims, is the computer able to do it?  If I turn

12 the computer on, it's going to do a lot of things.  If I push

13 buttons, it's going to do a lot of things.  It's the computer

14 doing it, it's not the analyst writing the rules, it's not the

15 analyst creating stuff.  This is the analyst just pushing

16 buttons.  So it makes no difference if Adam the Analyst is

17 pushing buttons or not, or if he could have used this model in

18 StealthWatch to come up with these possible elements.  No art

19 out there suggested it.  No one did it.

20       With respect to written description, Dr. Jaeger talked

21 about all the written support for the elements that they

22 identified in the '856 patent.  Counsel just mentioned that one

23 thing is not stated in here is NetFlow.  NetFlow is not

24 mentioned in the '856 patent.  He asked a lot of our witnesses,

25 did you use NetFlow to determine this encrypted traffic?  Is

```
1   that something you used.  Keep in mind that previous slide, two     03:08:49

2   slides earlier when they add at the end the ETA flow records        03:08:55

3   into NetFlow, that wasn't until 2017.  This patent was filed in     03:08:58

4   2015.  In 2015, NetFlow was actually useless for determining the    03:09:04

5   difference between encrypted traffic and unencrypted traffic.       03:09:11

6   It didn't -- the concept did not exist.  It wasn't until they       03:09:14

7   made this major renovation, wasn't until after they met with        03:09:16

8   Centripetal, they come up with this revelation of how to use        03:09:22

9   this type of information that NetFlow became useful.                03:09:24

10          That's all I have, Your Honor, unless you have any          03:09:32

11  questions.                                                          03:09:34

12          THE COURT:  No.                                             03:09:36

13          MR. JAMESON:  Your Honor, just a few comments.              03:09:38

14          I will agree with Mr. Andre with respect to the last        03:09:42

15  two claim elements, that if you apply those claim elements the      03:09:44

16  right way, then the patents are valid.  But with respect to the     03:09:47

17  elements that he also checked or used Xs on, I just showed you      03:09:51

18  documents that absolutely showed that the old technology was        03:09:57

19  using unencrypted information to identify malicious threats in      03:10:02

20  encrypted flows.  And he put up a bunch of documents and said       03:10:07

21  the word description or decryption doesn't appear in any of         03:10:14

22  them, or encryption doesn't appear in any of them, but that's a     03:10:17

23  word game.  Because the very document, one of the very five         03:10:20

24  documents that he relied on was the very document I put up          03:10:23

25  today, which was 364 at Bates 015, where we showed that the port    03:10:26
```

1   443 and the HTTPS is a reference to an encrypted flow just                      03:10:33

2   described in the patent specification.                                          03:10:41

3          Mr. Andre, could we pull up slide 125, please?                           03:10:48

4          Your Honor, I put up that marketing document in my                       03:10:59

5   opening because -- well, I did it for a reason.  I knew we were                  03:11:01

6   going to dealing with this all day long.  But you shouldn't have                03:11:07

7   to bring your CEO to a trial in a patent case to explain                        03:11:11

8   marketing documents, and you shouldn't be criticized for                        03:11:16

9   bringing some of the smartest engineers in the world to explain                 03:11:21

10  the picayune details of the technology.  Because this is a                      03:11:27

11  patent case.  But I am tired of seeing these documents.  There                  03:11:32

12  is, there is not a single word in PTX-515 that you can tie to a                 03:11:39

13  claim element of any asserted patent in this case.  Encrypted                   03:11:48

14  Traffic Analytics, it might be accused as a product, but the two                03:11:55

15  new fields in Encrypted Traffic Analytics, the Initial Data                     03:12:01

16  Packet field that Mr. McGrew invented, and the SPLT field that                  03:12:05

17  Mr. McGrew and his team invented back in 2014 to '15, they don't                03:12:11

18  appear in any claim.  They don't appear in the patent                           03:12:17

19  specification.  And the idea that the Catalyst 9000 is purely                   03:12:21

20  about Encrypted Traffic Analytics and nothing else, I would just               03:12:27

21  simply ask you to read more of this document.  But we can even                  03:12:31

22  look at what we see here.  Multi gigabit technology, 90W UPOE                   03:12:36

23  Plus, onboard hosting.  We can't go to the next page.  There                    03:12:42

24  were a lot of key innovations in the Catalyst 9000 switch that                 03:12:46

25  Cisco is absolutely very, very proud of.  But to go back to                    03:12:52

 1   where I started, which is whether we're talking invalidity or          03:13:07

 2   infringement, we've got to look at the words of the claim.  And        03:13:11

 3   we can't genericize these claims and point to a document like          03:13:16

 4   this one right here and say Encrypted Traffic Analytics,               03:13:23

 5   therefore your invalidity defense is over because that was a new       03:13:27

 6   product; or vice versa, look at Encrypted Traffic Analytics and        03:13:32

 7   go we're accusing something that has to do with encrypted data,        03:13:36

 8   therefore you infringe.  That's just not, that's not good              03:13:41

 9   enough.                                                                03:13:44

10          That is really I have on this patent, and so absent            03:13:46

11   questions, we'll turn to the final patent, Your Honor.                 03:13:52

12          THE COURT:  All right.  '176, the correlation patent.          03:13:59

13          MR. JAMESON:  '176.  And are you ready, Your Honor?            03:14:09

14          THE COURT:  Yes.                                               03:14:21

15          MR. JAMESON:  Once again, I guess we're going to be            03:14:26

16   playing the game of heads we win and tails they lose, because          03:14:27

17   it's our same theory.  It's the one that 01 Communique                 03:14:33

18   completely endorsed.  But what we have shown here, and Dr.             03:14:37

19   Almeroth went through this in, quite frankly, painstaking detail       03:14:44

20   during the trial, is he took Centripetal's infringement theory        03:14:51

21   and he conceded on cross-examination on multiple occasions that,       03:14:56

22   you're right, I don't think, based on a proper claim scope, that      03:15:00

23   this patent is invalid.  But if you're going to go after as           03:15:09

24   broad a level as what you are, then it's his opinion that the          03:15:15

25   claims are invalid.  And starting at the top, he went through         03:15:20

1  documents and he showed that we've got switches and routers.        03:15:26

2  And then with respect to claim elements B1 through B4, he showed     03:15:30

3  that switches and routers have been receiving packets and           03:15:36

4  generating NetFlow records -- I mean, NetFlow was the standard,      03:15:41

5  Your Honor, back in 2004.  And so by definition they have been       03:15:45

6  receiving packets and generating NetFlow records.                   03:15:49

7           Where the disconnect came was, is claim element C.  Is      03:15:54

8  the claim element why Dr. Almeroth didn't think we infringe.         03:16:00

9  Can old StealthWatch, can it correlate NetFlow records from a        03:16:06

10 ingress and an egress of the same switch or router?  The answer      03:16:16

11 is it cannot.  But if you can establish infringement by              03:16:21

12 correlating a NetFlow record with other information, other           03:16:30

13 threat intelligence, Syslog information, then StealthWatch has       03:16:36

14 been doing that since well-before the priority date.  And Your       03:16:41

15 Honor, the priority date I didn't raise.  The priority date is       03:16:46

16 February 10, 2015 for this patent.                                   03:16:52

17           THE COURT:  I'm sorry, what is that?                       03:16:58

18           MR. JAMESON:  February 10, 2015.                           03:17:01

19           THE COURT:  Why do I have May 15th, 2015?  Have I got      03:17:06

20 that wrong?                                                          03:17:10

21           MR. JAMESON:  Either I'm wrong with what I have            03:17:11

22 written down here or --                                              03:17:13

23           THE COURT:  I may have written them down wrong.            03:17:17

24           MR. JAMESON:  Your Honor, at this point I could have       03:17:20

25 written it down wrong as well.  But it's on the face of the          03:17:21

```
 1   patent.  I think that's the right date though.                    03:17:26

 2           THE COURT:  What does it say?                              03:17:33

 3           MR. JAMESON:  Oh, it was based on the, it's based on       03:17:36

 4   the continuation application.  That's where the priority date is   03:17:41

 5   coming from.  You've got the filing date of May 15.               03:17:46

 6           Mr. Simons, pull that up just so it's clear what's         03:17:50

 7   going on here.                                                     03:17:53

 8           The file date for the patent -- it's Row 22, if you        03:17:55

 9   can highlight that?                                                03:17:57

10           And then that, this was a continuation of an               03:18:01

11   application that was filed February 10, 2015.  So that's where     03:18:05

12   the priority date comes from.                                      03:18:09

13           THE COURT:  Okay.                                          03:18:13

14           MR. JAMESON:  And then Mr. Simons, if we could briefly     03:18:18

15   go back to slide 145?                                              03:18:21

16           And Your Honor, I've actually already hit on this          03:18:24

17   evidence, but this is the evidence that Dr. Almeroth relied on     03:18:26

18   where he showed processors and instructions and memory for        03:18:30

19   element A., and we got the testimony on the preceding slide, or    03:18:35

20   the cites to the testimony.                                        03:18:39

21           He relied on this document to show that you could          03:18:42

22   generate NetFlow records and identify packets based on summary    03:18:46

23   information, and that's DTX-311 at 010.  That was claim element    03:18:53

24   B.                                                                 03:18:59

25           He then went back in time and he showed documents that     03:19:04
```

1   talk about the StealthWatch appliance and provides real-time                03:19:12

2   data correlation, visualization and consolidated record                     03:19:16

3   reporting of combined NetFlow and identity analysis.  And I've               03:19:22

4   got to step back just because, you know, this is a prior art                 03:19:26

5   document, and even this document says provided real-time data                03:19:30

6   correlation.  Somehow or another that would be used against us               03:19:35

7   because now NetFlow is real-time.  I think it just means that it             03:19:38

8   can do it quickly.  But just an example of how --                           03:19:42

9           THE COURT:  That's not what I think real-time means.               03:19:47

10          MR. JAMESON:  Okay.  Well, I don't think so either.               03:19:49

11          THE COURT:  I don't think it means...                              03:19:54

12          MR. JAMESON:  Yeah.  Okay.                                         03:19:55

13          And then finally just another a document, DTX-343 at               03:19:57

14  002 where he was correlating NetFlow with other things.  And                03:20:02

15  this was SLIC, SLIC threat intelligence feeds.  And all that                03:20:07

16  could be used to create alarms that would then be pushed down to           03:20:12

17  a system administrator to then to take further action with                  03:20:20

18  respect to provisioning the network.                                       03:20:24

19          And then finally, Your Honor, I wanted to hit on lack             03:20:28

20  of written description.  And it's really the same point.  It's             03:20:35

21  really the same point all over again.  The '176 patent doesn't            03:20:40

22  talk about processing NetFlow records, doesn't talk about using           03:20:46

23  artificial intelligence or machine learning, it doesn't talk              03:20:50

24  about any of the concepts that are discussed here.  And again,            03:20:56

25  I'm not sure what more we're supposed to do when it comes to              03:20:59

1   written description other than to show the absence of disclosure          03:21:03

2   in the patent.                                                            03:21:10

3          With that, Your Honor, I will turn it over to Mr.                  03:21:11

4   Andre, absent questions.                                                  03:21:13

5          THE COURT:  All right.  Mr. Andre?                                 03:21:17

6          MR. ANDRE:  Your Honor, the accused systems here                   03:21:20

7   involve StealthWatch, routers and switches that provide logs to          03:21:25

8   StealthWatch.                                                             03:21:32

9          And you can go to the next slide, Geoff, please.                   03:21:33

10          Now, what happens up in StealthWatch is kind of the              03:21:37

11   key aspect here.  Logs go up to StealthWatch, whether it be             03:21:41

12   through NetFlow or Cisco logs, any kind of logs, whatever it is,        03:21:48

13   and they go up --                                                       03:21:51

14          THE COURT:  Is this the one that can be of any, of              03:21:52

15   hundreds of sources?                                                     03:21:56

16          MR. ANDRE:  It can be, Your Honor.  It can be logs             03:22:00

17   from anywhere.  They are -- the logs can come from, if you have         03:22:01

18   one switch and router on the network, it will come from the one        03:22:08

19   switch or router; if you have 10, it will come from 10.                 03:22:13

20          The key issues for this patent with regards to                   03:22:16

21   validity is what's going on inside StealthWatch.  It's just not         03:22:21

22   putting those logs into a database and keeping them.  It's doing        03:22:24

23   something with them.  It's doing analytics.  And it's doing it          03:22:27

24   with Cognitive Threat Analytics.  That was integrated with             03:22:31

25   StealthWatch in June of 2017.  And it didn't begin correlation         03:22:35

1   of logs in the switches and routers until April, 2018.  So they          03:22:39

2   say they have this technology earlier, but they didn't have               03:22:44

3   Cognitive Threat Analytics in StealthWatch.  They didn't have             03:22:49

4   the correlation of logs in Cognitive Threat Analytics until June          03:22:51

5   of 2017, April 2018.                                                      03:22:57

6            Now, could they send logs up to StealthWatch?  Yeah.            03:23:00

7   Put it in a database and register those log.  They didn't do              03:23:04

8   anything with them.  Certainly didn't do what is required in the          03:23:09

9   patent where you correlate those logs to try and figure out if           03:23:12

10  some bad stuff's about to happen.  So when you have the                   03:23:15

11  responsive to correlation by the packets, you generate a rule             03:23:20

12  based on that, and you provision that rule to a device in that            03:23:24

13  first network, that just is not even a concept that was thought           03:23:28

14  of prior to the filing dates of this patent.                              03:23:31

15           Now, there's many reasons why Cisco did not meet their          03:23:38

16  burden of clear and convincing evidence.  The first one -- and            03:23:43

17  this was just a unusual thing to have someone say -- Dr.                   03:23:48

18  Almeroth, their invalidity expert, said testified using the               03:23:51

19  proper claim construction the claims are valid.  That's just              03:23:55

20  something that I don't know how that gets past the clear and              03:23:58

21  convincing evidence standard.  The Cognitive Threat Analytics             03:24:02

22  wasn't integrated in StealthWatch until 2017.  The old                    03:24:03

23  StealthWatch did not perform the claimed correlation based on             03:24:07

24  log entries and the claims responsive to the correlation of               03:24:11

25  generating the rule and provisioning the rule.                            03:24:15

1          Now, one of the things we talked about is the claims

2    don't require that all logs come from the same device.  That's

3    just an issue -- it's a red herring.  It can come from the same

4    device.  It's not required.  It can come from one or more.

5          When we talked to Mr. Llewallyn I asked him when

6    Cognitive Threat Analytics was it integrated with StealthWatch,

7    when did it happen, he says in 2017.  Then version 6.1 --

8    6.10.3.  That's his trial testimony.  So the Cognitive Threat

9    Analytics was not even in StealthWatch until 2017, two years

10   after the patent was filed.  The priority date.  So without the

11   Cognitive Threat Analytics, you get no correlation.  And that's

12   the whole crux of the patent.

13         I mentioned Dr. Almeroth's testimony.  And it was very

14   unusual testimony, to be quite candid.  If you applied the same

15   interpretation you applied for infringement for the invalidity,

16   the claim would be valid, right?  He says that's correct.  And

17   that's their heads I win, tails you lose thing.  But he said I'm

18   not offering opinions on what I believe is a proper claim scope.

19   I have never heard an expert say that.  And I think that's

20   something that you can just take and you can't discount it by

21   saying we're doing it in the alternative.  He's a technical

22   expert.  He's not a lawyer.  Lawyers make alternative arguments

23   all the time.  The technical expert should be giving, under

24   oath, sworn testimony what they believe to be correct.  I've

25   never had an expert say I'm giving an opinion I think is wrong.

1   So I think that is enough to take care of the clear and          03:25:51

2   convincing evidence standard.                                    03:25:54

3           When you look at the actual claim language and you see   03:25:57

4   what we're challenging here as not being in the prior art.  The  03:26:02

5   packets that are received by the network device in the first     03:26:07

6   network and logs going up, we didn't challenge that.  That is in 03:26:10

7   the prior art.  Logs going up have been going up forever.  The   03:26:14

8   correlating based on those logs, that's new.  There's nothing    03:26:19

9   that shows correlating.  Those logs were merely accounting       03:26:24

10  procedures only.  They went to a database for accounting         03:26:28

11  purposes only.  Then in 2018 Cisco started using them to figure  03:26:30

12  out threat detections.                                           03:26:36

13          In responsive to the correlation, the next element and   03:26:38

14  two sub elements, generate a rule configured to identify packets 03:26:42

15  received from that threat indication and you provision that rule 03:26:47

16  to a device, that was not even contemplated by Cisco's previous  03:26:51

17  systems.                                                         03:26:57

18          With respect to the written description, Dr. Jaeger      03:27:09

19  went in, and I took some of the highlight clips.  He showed for  03:27:12

20  each element that was challenged portions in the specification   03:27:16

21  that showed written description.  Once again, they go back to    03:27:22

22  the tried-and-true method that we didn't refer to NetFlow in our 03:27:25

23  patents.  As I said, NetFlow was not being used for correlation  03:27:31

24  at that time.  NetFlow was not being used for ETA.  NetFlow was  03:27:34

25  not being used for that type of information at that time.  We    03:27:39

1    were using other type of log entries.  You heard it from our        03:27:42

2    inventors and our technical people.  We weren't using NetFlow,       03:27:46

3    we were using Syslog.  We were using other logging information.      03:27:49

4    The fact that they figured out how to use NetFlow for their          03:27:52

5    logging information to detect threats, generate a rule and           03:27:57

6    provision that rule, well, I'm glad they came around to our way      03:28:00

7    of thinking and started infringing our patent.                       03:28:04

8              That's all I have, Your Honor.                             03:28:07

9              THE COURT:  Any rebuttal?                                  03:28:10

10             MR. JAMESON:  Very briefly, Your Honor.                    03:28:12

11             We're playing ping-pong on what the law is, and Mr.       03:28:15

12   Andre is just wrong on the law under 01 Communique.  He keeps        03:28:19

13   talking about the fact that Cognitive Threat Analytics was new.      03:28:23

14   It is.  It was new.  But Cognitive Threat Analytics is a machine     03:28:26

15   learning in the Cloud tool, and there's not a claim element in       03:28:31

16   this case that mentions machine learning in any way, shape or        03:28:35

17   form.  That is a red herring.  He is making the argument because     03:28:39

18   that we are accusing a new product, it is impossible to have an      03:28:46

19   invalidity case.  And invalidity is not about a new product, a       03:28:51

20   new ETA, or a new Cognitive Threat Analytics.  It's about           03:28:56

21   whether or not the same function or features or functionality        03:29:00

22   can be found in the art that comes within the scope of the           03:29:04

23   claims.                                                              03:29:09

24             And can we pull up slide 133, Mr. Andre?  Because         03:29:11

25   we've seen it a lot yesterday and again today, and I'm actually      03:29:19

1   going to just ask a question:  Is this an exhibit or a                    03:29:26

2   demonstrative?  Because I have no idea what this is.  Is this an          03:29:31

3   exhibit in the case, Mr. Andre?  I'm just -- because I don't             03:29:36

4   know.                                                                    03:29:39

5           MR. ANDRE:  Are you asking me?                                   03:29:45

6           MR. JAMESON:  I'm asking whether this is an exhibit in           03:29:46

7   the case.  I don't know what this is.  Or is it a demonstrative?         03:29:48

8           MR. ANDRE:  Well, it is a demonstrative based on the             03:29:53

9   actual, the StealthWatch that's in exhibit number -- what number        03:29:55

10  is that, guys?  I forget the exhibit.  These figures come from          03:30:03

11  an actual technical document from Cisco.  But I put the red             03:30:07

12  lines in that said logs, and we put the red text in of when             03:30:12

13  these things were integrated.  The actual StealthWatch itself,          03:30:16

14  the Cloud, the blue box is from technical documents, and those          03:30:18

15  little Catalyst switches are from the technical documents as            03:30:22

16  well.                                                                    03:30:26

17          THE COURT:  What technical documents are they from?             03:30:26

18  In other words, this is not something that was copied straight          03:30:28

19  out of some technical document, this was created based on               03:30:34

20  something.  What was it based on?  The figures themselves come          03:30:43

21  from -- what's the -- was it 389?                                       03:30:49

22          MR. ANDRE:  One second, Your Honor.  I put all my               03:30:57

23  infringement stuff up.                                                   03:31:02

24          Oh.  989, Your Honor.  989 has a flow --                        03:31:09

25          THE COURT:  Is this plaintiff's or defendant's 989?            03:31:11

1          MR. ANDRE:  PTX-989 at Page 33.  So what we did, Your            03:31:15

2    Honor, is show, it shows a single Catalyst switch going up to          03:31:20

3    the StealthWatch, and what we did is we just added four                03:31:25

4    additional Catalyst switches in to show it can be more than one.       03:31:30

5    That's the original figure, it goes up to StealthWatch, the           03:31:33

6    Catalyst switch.                                                       03:31:36

7          THE COURT:  That's slide 27?                                     03:31:37

8          MR. ANDRE:  Slide 77, Your Honor.                                03:31:40

9          THE COURT:  Oh.                                                  03:31:41

10         MR. ANDRE:  So what we did was we took the, that                 03:31:43

11   figure for the StealthWatch and the Catalyst switch going up and      03:31:45

12   we just showed what it would look like if you had multiple            03:31:48

13   Catalyst switches, which we added.  This is the ETA solution          03:31:52

14   with the Catalyst 9K.  We didn't show the ISE, it wasn't             03:31:56

15   relevant to the infringement.                                         03:32:00

16         THE COURT:  Okay.  Okay.                                         03:32:01

17         MR. JAMESON:  All right.  So Your Honor, I would                 03:32:03

18   just -- obviously am now going to make an observation because         03:32:05

19   they have relied on it a lot yesterday and today.  All the red        03:32:08

20   logs is not shown in the exhibit that they pulled it from.  They      03:32:14

21   created a bunch of additional switches, they added some red           03:32:18

22   language and boxes to the right.  So I mean this is, yeah, this       03:32:22

23   is the ultimate demonstrative.  But the final point that I'm          03:32:25

24   going to make is whatever this -- actually I'm going to use Mr.       03:32:28

25   Andre's word for one time in this trial:  Whatever this cartoon       03:32:34

3405

1  is showing, it is certainly not Dr. Cole's infringement theory.  `03:32:39`

2  And the record will speak for itself as to Dr. Cole's  `03:32:42`

3  infringement theory, which is that the NetFlow records have to  `03:32:47`

4  come from the same router or switch.  `03:32:52`

5           And with that, Your Honor, I don't have anything else  `03:32:55`

6  on the '176 patent.  `03:32:57`

7           THE COURT:  All right.  I think that counsel wanted to  `03:33:02`

8  also discuss non-monetary damages?  You've got that on your  `03:33:14`

9  schedule.  `03:33:22`

10          MR. ANDRE:  Well, Your Honor, we had 10 minutes each  `03:33:30`

11  reserved for just talking about non-monetary issues, relating to  `03:33:32`

12  damages or the like.  `03:33:37`

13          THE COURT:  Do you think it's better to handle this  `03:33:42`

14  now or when we --  `03:33:44`

15          MR. ANDRE:  Well, Your Honor, what we want to talk  `03:33:46`

16  about is -- I think it's -- we can just tee it up now, and if it  `03:33:49`

17  comes in a little bit later, it's just ten minutes.  What we  `03:33:52`

18  want to talk about in some degree is the willful infringement  `03:33:56`

19  issue, because --  `03:33:58`

20          THE COURT:  All right.  `03:33:59`

21          MR. ANDRE:  -- it's a non-monetary issue, but it is  `03:33:59`

22  related to damages.  Or could be.  `03:34:02`

23          THE COURT:  All right.  `03:34:06`

24          MR. ANDRE:  That's what we wanted to talk about.  Then  `03:34:06`

25  we'll talk briefly about what we're looking at for equitable  `03:34:08`

```
1   relief as well.  But we can do that later as well.               03:34:13

2           MR. JAMESON:  I'm sorry, so what are we...               03:34:15

3           Judge, what would you like to hear from us on today?     03:34:17

4   I'm not sure if I'm completely following.                       03:34:19

5           THE COURT:  Well, you mentioned willfulness and         03:34:25

6   non-monetary relief.  It seems to me that we ought to talk about 03:34:34

7   whatever relief, if any, the Court's going to grant when we talk 03:34:44

8   about damages.  But I think if you want to talk about           03:34:50

9   willfulness now, that's appropriate.                            03:34:58

10          MR. ANDRE:  Okay, Your Honor.                            03:35:00

11          MR. JAMESON:  Your Honor, our preference would be to    03:35:02

12  wait, but we'll obviously do whatever --                        03:35:04

13          Actually, the reason why I want to wait, Mr. Andre, is  03:35:08

14  because I'm tired.                                              03:35:11

15          MR. ANDRE:  Your Honor, I think we got a little time    03:35:13

16  left in the day, I would like to just go through the willfulness 03:35:15

17  issue and discuss this.                                         03:35:18

18          THE COURT:  All right.  I'll give you 10 minutes on     03:35:19

19  willfulness.                                                    03:35:21

20          MR. ANDRE:  Thank Your Honor.                           03:35:22

21          As Your Honor has seen in this case, the timeline of    03:35:23

22  that Centripetal's interaction with Cisco, you notice that in   03:35:27

23  2015 there were multiple meetings.  They were non-confidential.  03:35:32

24  No NDA was signed.  And at that point Cisco's IP started hitting 03:35:35

25  our website.  In 2016 throughout the entire year after an NDA   03:35:42
```

1   was signed, there were multiple meetings, multiple

2   presentations.  Very highly proprietary, confidential

3   information was provided to Cisco.  Seven months after the last

4   meeting and last presentation was given to them, they launched

5   their Network Intuitive.

6           One of the things that I want to show in the timeline

7   if we go a couple slides forward, the website hits correspond to

8   our meetings.  One of the things we heard throughout this case

9   is that Cisco's people, some of the employees come in and saying

10  never heard of Centripetal, didn't want anything to do with

11  them, we saw their stuff, we didn't like it, but for a year and

12  a half they kept looking.  They hit our website.  And you look

13  at the next slide and you see how that corresponds to the

14  meetings they had through the year and a half.

15          We showed in this case that there was a

16  confidentiality agreement signed.  That was PTX-99.  And based

17  on that confidentiality agreement there was a presentation

18  given, and we showed the presentation as PTX-547 where

19  Centripetal's patented filtered algorithms were discussed, as

20  were the patents.

21          Go to the next slide.

22          We had Jonathan Rogers, the day after the meeting in

23  2016, they had the meeting on February 4th, 2016, on the 5th he

24  talked about, in a contemporaneous email, "The group seemed to

25  hone in on our filter technology and algorithms.  The algorithms

1  are a significant networking technology with broad applications          03:37:18

2  we productize for security.  There are also a few questions on            03:37:22

3  our patent."  And we heard Cisco's witnesses come in and say              03:37:26

4  they didn't talk about algorithms, they didn't talk about                 03:37:32

5  patents and there was nothing confidential.  This email states            03:37:35

6  otherwise.                                                                 03:37:38

7           We also saw an email from one of the attendees, one of           03:37:40

8  the engineers who attended the meeting on the same day of the             03:37:44

9  meet on February 4, 2016, Mr. Keanini.  And what he noted at the          03:37:47

10 end of his analysis was "What might be worth exploration is to            03:37:53

11 look at these algorithms" -- once again -- "they have and how             03:37:57

12 general purpose they may be for data synthesis - high                     03:37:59

13 performance set theoretical functions.  Again, knowing what               03:38:04

14 patent offices allow and not allow, I'd be very surprised if              03:38:08

15 they were able to make claims on the algorithms themselves.  We           03:38:11

16 don't know until we study their claims."  You heard them say              03:38:13

17 they didn't talk about patents, they didn't look at our patents,          03:38:17

18 we didn't talk about algorithms, but these contemporaneous                03:38:20

19 emails at the time say otherwise.                                         03:38:24

20          After the meeting they said they were no longer                  03:38:30

21 interested in Centripetal's technology, but five months later            03:38:32

22 they invited Centripetal to be one of their partners at Cisco            03:38:38

23 Live.  And they had a blog post, one of the Cisco's engineers            03:38:41

24 wrote about Centripetal, calling this really great technology.           03:38:46

25 He talked about how it could be deployed inline and out of band.         03:38:51

1   This is from Cisco's engineer, their blog, talking about our          03:38:54

2   technology, after we demonstrated the product to them again.          03:38:58

3           We then later in the year sent them a management              03:39:06

4   presentation.  Once again, still under NDA, where we talk about       03:39:09

5   a robust patent portfolio, and we actually gave the architecture      03:39:14

6   road map for our systems.  This is DTX-1270 -- PTX-1270.  And         03:39:19

7   even talked about it's very sensitive.  This is the kind of           03:39:33

8   information that we were giving Cisco because we thought we had        03:39:36

9   a potential to become partners with them, and it was under a          03:39:40

10  non-disclosure agreement.                                             03:39:44

11          After the communications ceased in 2016, in early            03:39:46

12  2017, we showed you during the opening statement testimony from       03:39:51

13  one of Cisco's engineers and asked "When did you specify the          03:39:56

14  requirements with respect to ETA?                                     03:40:02

15          He said "I believe it was 2017, early 2017."                 03:40:03

16          And so "You submitted a requirement document in early        03:40:07

17  2017?                                                                 03:40:09

18          "Yes.                                                         03:40:10

19          "And that is the point where development started on          03:40:11

20  ETA?"                                                                 03:40:13

21          And he said "Yes".                                           03:40:14

22          Cisco's brought in engineers saying they were doing          03:40:15

23  research on the encrypted traffic problem earlier than that.  I       03:40:17

24  don't doubt they were.  They didn't have the solution though          03:40:21

25  because what you see in the actual software functional and            03:40:27

1   design specification for ETA.  This is their document,                03:40:30

2   confidential document.  They had the initial draft of the              03:40:35

3   document in October of 2016 and they put in the requirement            03:40:39

4   section in February of 2017.  This is PTX-115.  You'll see that        03:40:43

5   all of the work that went into the software functional and             03:40:49

6   design specification really started in February of 2017 and            03:40:54

7   completed in June of 2017.                                             03:40:57

8          Now, there's been a lot made of whether they blatantly          03:41:04

9   copied the information that Centripetal provided them in these          03:41:10

10  meetings.  I've never had a case where we find evidence that           03:41:15

11  someone says, hey, I copied your stuff.  It just doesn't happen.       03:41:20

12  But here's what we know with respect to willful infringement:          03:41:24

13  They knew about our patents, they knew about our technology, we        03:41:27

14  educated them on how we solved the problems.  That's what these        03:41:31

15  algorithms are about.  We educated their engineering team,             03:41:35

16  several of their engineer teams about how we solved the problems       03:41:37

17  because we had a non-disclosure agreement.  How they used that         03:41:41

18  to solve their problems, as Dr. Striegel said yesterday, it's          03:41:44

19  highly likely, highly likely they used the information they            03:41:50

20  learned to solve the problems they had with Encrypted Traffic          03:41:55

21  Analytics, with rule swapping and others.                              03:41:57

22          Your Honor, that's all I need to talk about with               03:42:02

23  respect to willful infringement.  Thank you.                           03:42:04

24          THE COURT:  All right.  Does defendant care to                 03:42:08

25  respond?                                                               03:42:11

1          MR. JAMESON:  I don't want to respond, but I have no                03:42:13

2    choice, Your Honor.                                                       03:42:15

3          Dr. Striegel actually didn't say "highly likely", he               03:42:17

4    said it was plausible.  I have no idea what that means.                   03:42:21

5          Can we pull up PTX-115, please?                                     03:42:24

6          Your Honor, Dr. McGrew gave extensive testimony about              03:42:37

7    this.  And Mr. Simons, if you will highlight this document right          03:42:39

8    underneath the ETA software?                                             03:42:43

9          "This document describes the design of ETA on the                  03:42:48

10   Integrated Services Router, the 4K and the Aggregated Services           03:42:53

11   Router, 1K."  The record will speak crystal clear to this that          03:42:57

12   ETA was first implemented in switches, and that happened before          03:43:03

13   the February 4th, 2016 meeting with Centripetal, and once they           03:43:10

14   had it implemented in switches they then transitioned to                 03:43:17

15   implement it in routers.                                                 03:43:21

16         Can we pull up, I believe it was PTX-1270?                         03:43:30

17         I'm sorry, is that DTX-1270?                                       03:43:38

18         I'm sorry, Your Honor, that's a different                          03:43:50

19   presentation.  We can skip that one.                                     03:43:51

20         With respect to the February 2016 meeting, again, the              03:43:55

21   record's going to be clear on this.  There is a big difference           03:44:04

22   in Centripetal saying we've got patented algorithms and we've            03:44:07

23   got patents that cover our technology and actually affirmatively         03:44:11

24   disclosing an algorithm that somehow or another Cisco would use.         03:44:17

25   And the evidence is -- and quite frankly I don't know how you            03:44:21

1  would orally disclose an algorithm, because they're incredibly      03:44:25

2  math problems or equations.  But the testimony in the record is     03:44:28

3  unequivocal on that, that the actual algorithms were not            03:44:34

4  disclosed.  Centripetal made the point we have algorithms in our    03:44:38

5  technology which is why we can operate at five million rules,       03:44:43

6  which quite frankly, our response to that was it's an IPS on        03:44:47

7  steroids.  That's not a criticism of their technology.  Cisco      03:44:56

8  just didn't think that they needed it.                             03:44:58

9        And Your Honor, I believe it was you, maybe it was           03:45:01

10 during openings, that you said this sounds like two parties that    03:45:04

11 dated but they didn't get married.  And Your Honor, I think         03:45:09

12 that's exactly right.                                               03:45:15

13       And now I want to turn to slide 155, and I'm just            03:45:17

14 going hit on, very briefly, accusing a company of copying versus    03:45:26

15 accusing a company of infringement is two different things and      03:45:38

16 that's why they're saying willful infringement.  And we still       03:45:41

17 don't know what is the disclosure that they made to us that         03:45:45

18 could be copied.  It's vagaries.  And we actually don't know        03:45:49

19 what it was that we copied and put into our technology.             03:45:55

20       What we do know is -- and you have seen all of this          03:46:00

21 evidence in the record -- that what got Centripetal worked up       03:46:04

22 about this case was when Cisco announced that we were releasing     03:46:08

23 or had released Encrypted Traffic Analytics and Mr. Rogers saw a    03:46:13

24 description of it in a white paper and he says "I hope you guys     03:46:18

25 are sitting down when you watch this, I knew it was flagrant but    03:46:23

1    not this fragrant" -- we're going to skip that, this was                03:46:26

2    testimony about kind of their internal investigation, but what I        03:46:32

3    wanted to show you, Your Honor, is what was in that white paper         03:46:36

4    was Cisco's disclosure of the Initial Data Packet.  And down           03:46:42

5    here in the bottom right of slide 159, DTX-1179, Mr. Rogers             03:46:47

6    literally copied into his internal email correspondence the            03:46:53

7    Initial Data Packet.  And that's what he was going "This is what        03:46:59

8    they have copied.  This is blatant."  It's the Initial Data            03:47:03

9    Packet.  And that, Your Honor, is why we called Dr. McGrew to           03:47:07

10   trial:  To establish unequivocally that in April 29, 2015,             03:47:13

11   well-before the February 2016 meeting, Dr. McGrew and team was         03:47:23

12   publishing to the world that they had come up with the Initial         03:47:32

13   Data Packet.  And goes into excruciating detail as to what it          03:47:35

14   is.  And we asked him all of this testimony, I will not go             03:47:40

15   through it now, but he says this document was dated 2015, and he        03:47:46

16   explained how they created the Initial Data Packet back in 2015.       03:47:52

17   And then this is the timeline that we have that explains all the        03:47:58

18   work that they did beginning in late 2014, and that we                 03:48:01

19   actually -- he filed for a patent in May of 2015 in which the          03:48:06

20   Initial Data Packet was disclosed in the specification of the          03:48:12

21   patent.  And we discussed that at trial.  And I'm not going            03:48:16

22   through the rest of this because I think that's really where           03:48:23

23   their copying arguments were focused, is that somehow or another       03:48:28

24   we copied Encrypted Traffic Analytics.  And the timeline,              03:48:34

25   slide 165, it shows what Cisco was doing beginning in 2014 all         03:48:38

1   the way up until the February 4th, 2016 meeting.  And there was          03:48:47

2   disclosure after disclosure after disclosure of both Encrypted          03:48:55

3   Traffic Analytics, use of it in switches, use of the IDP, use of        03:48:57

4   the SPLT, and that there is no way from a timeline perspective          03:49:03

5   that that could have possibly have been copied from Centripetal.        03:49:08

6   And in fact, even Centripetal will admit that they have never           03:49:13

7   used an IDP or an SPLT, and it's not disclosed in any of their          03:49:18

8   patents.  And those are the two fields that are in ETA.                 03:49:22

9           The rest of the slides, Your Honor, we summarize the           03:49:29

10  testimony of the witnesses on the copying issue, and it's very          03:49:31

11  consistent.  It's Jonathan Rogers versus his dad, his brother,          03:49:38

12  every Cisco witness that has testified in this case, and there's        03:49:45

13  no "there" there.                                                        03:49:49

14          With that, Your Honor, I will say thank you for all            03:49:55

15  your time in connection with this trial.                                 03:49:58

16          MR. ANDRE:  Your Honor, may I respond just for two             03:50:00

17  minutes?                                                                 03:50:02

18          THE COURT:  Well, okay.                                        03:50:05

19          MR. ANDRE:  All I have to say is Encrypted Traffic             03:50:08

20  Analytics is a whole lot more than two fields.  It's a whole           03:50:10

21  process of doing analytics of that information.  Adding two            03:50:13

22  fields are helpful, but that's not what ETA is.                         03:50:18

23          They talk a lot about the fact they didn't invest in          03:50:21

24  the company.  They talked to us for a year and a half and didn't       03:50:26

25  invest, and I believe they -- Mr. Jameson just talked about            03:50:29

1   dating and didn't get married.  It's kind of like the old saying                    03:50:32

2   I heard, why buy the cow when the milk was free.  And that's                         03:50:36

3   what it is for thee guys.  They got our technology for free,                         03:50:39

4   they didn't have to pay for it.  That's all I have to say.                           03:50:43

5           Thank you, Your Honor.                                                       03:50:46

6           THE COURT:  All right.  Now I understand that where we                       03:50:48

7   are on the data the Court requested is it would be delivered to                      03:50:56

8   Dr. Becker I believe at the end of this week, which I'm not sure                     03:51:04

9   what the end of this week means.                                                     03:51:16

10          MR. JAMESON:  I've got on update on that, Your Honor,                        03:51:19

11  if you want me to give it to you.                                                    03:51:20

12          THE COURT:  Yes.                                                             03:51:21

13          MR. JAMESON:  I am being told that all of the -- all                         03:51:22

14  of the data is being produced to Dr. Becker tomorrow, that data                     03:51:28

15  will be produced to Centripetal when it is produced to Dr.                           03:51:36

16  Becker, and that Dr. Becker intends to submit a report to the                        03:51:41

17  Court, with your permission, by 4 p.m. next Thursday.  He's got                      03:51:46

18  to -- I mean, Your Honor, I'm not even going to try to explain                       03:51:53

19  how complicated the data is.  But that's what I'm being told.                        03:51:59

20          THE COURT:  All right.  Well, both sides can submit a                        03:52:08

21  report by 4:00 next Thursday.  I have no way of judging how long                     03:52:14

22  it's going to take to make a report on that data.  That's not my                     03:52:33

23  field.  So if he thinks he needs that amount of time, then both                      03:52:43

24  sides shall have that amount of time and they can submit                             03:52:49

25  simultaneous reports as to exactly their read on what that data                      03:52:52

3416

```
 1   is.  But there was this evidence where somebody was saying that       03:53:01
 2   their sales were increasing by double digits every quarter, I         03:53:15
 3   believe, and double digits could be 10 percent or 99 percent, I       03:53:23
 4   suppose.  So I don't know what that means, No. 1.                     03:53:32
 5          There was testimony about there being seasonal                 03:53:37
 6   variations in sales of products, and so that's why I felt, to         03:53:40
 7   get an accurate picture, we needed to look at the monthly sales       03:53:54
 8   over a period of time and see if there was any trends there or        03:54:04
 9   whatever.  I don't know what else Dr. Becker's going to think of      03:54:08
10   the figures.                                                          03:54:18
11          I think the plaintiff should submit a report from             03:54:29
12   their damages expert.  I don't think it would be right for them       03:54:37
13   to bring in somebody new on this.  Dr. Becker's doing it for the      03:54:41
14   defendant, so I think the plaintiff should use the financial          03:54:50
15   expert or one of the financial experts that they've already used     03:54:55
16   to make their report.                                                 03:55:02
17          And the question is when should we schedule another            03:55:12
18   hearing?  I've already -- I've got some other hearings                03:55:16
19   scheduled, although the only thing that I'm 100 percent sure of       03:55:36
20   infringement-wise is that this case has infringed on my              03:55:45
21   retirement.                                                           03:55:50
22          But what do we have... Let's see, if we get the report        03:55:51
23   next Thursday...                                                      03:56:06
24          COURTROOM DEPUTY CLERK:  If we get the report next            03:56:10
25   Thursday we have July 1st in the afternoon.                          03:56:20
```

3417

```
 1              THE COURT:  Well, next Thursday -- wait a minute, next    03:56:22
 2    Thursday would be the 18th?                                        03:56:26
 3              COURTROOM DEPUTY CLERK:  Next Thursday is the 18th.       03:56:32
 4              THE COURT:  All right.  What do I have on the 25th?       03:56:35
 5              COURTROOM DEPUTY CLERK:  You have nothing on the 25th.    03:56:43
 6              THE COURT:  All right.                                    03:56:46
 7              COURTROOM DEPUTY CLERK:  Could do it at 11:00 on the      03:56:52
 8    25th by Zoom.                                                       03:56:54
 9              THE COURT:  Yes.                                          03:56:56
10              COURTROOM DEPUTY CLERK:  June 25th at 11:00, counsel,     03:57:02
11    by Zoom?                                                           03:57:06
12              MR. ANDRE:  That's fine for plaintiff, Your Honor.       03:57:08
13              MR. JAMESON:  The only question I have is are you         03:57:11
14    going to want the experts available on the 25th, and if so, I've   03:57:16
15    got -- if we can have until at least tomorrow to see if -- or      03:57:21
16    later today to see if Dr. Becker's available?                      03:57:25
17              THE COURT:  Well, I want to get it done that week, so     03:57:33
18    if he's not available that day, we would move it closer.           03:57:36
19              MR. JAMESON:  That may actually be -- I have no idea.     03:57:43
20    I was just asking the question, because I've got no idea what      03:57:46
21    his availability is.                                               03:57:48
22              THE COURT:  I know when I was practicing law, of          03:57:50
23    course my experts were usually physicians, and they never let      03:57:52
24    testifying interfere with a skiing trip or a golf trip.  So I      03:57:58
25    know what the problems are in dealing with them.  So we'll have    03:58:04
```

3418

1   to verify the availability of the experts.                    03:58:10

2           MR. JAMESON:  We're checking as we speak.  And if for  03:58:18

3   some reason that doesn't work -- well, for whatever reason, if 03:58:24

4   it's for good cause, we would notify the Court immediately     03:58:27

5   either later today or tomorrow.                                03:58:29

6           THE COURT:  All right.                                 03:58:32

7           MR. ANDRE:  Your Honor, the good thing about using     03:58:33

8   this format, this the Zoom format is it works on the beaches and 03:58:34

9   ski slopes just as well as anywhere else.                      03:58:37

10          THE COURT:  That's true.                               03:58:41

11          MR. ANDRE:  The experts are going to run out of        03:58:44

12  excuses.                                                       03:58:47

13          MR. JAMESON:  That is true.  I think you're absolutely 03:58:48

14  right about that.                                              03:58:50

15          THE COURT:  I hadn't thought of that.  We could catch  03:58:51

16  them right on the slopes, couldn't we?                         03:58:54

17          MR. ANDRE:  Yeah.  Even lawyers have run out of        03:58:57

18  excuses now.  You can't use vacation as an excuse anymore for  03:59:00

19  hearings.  It's a new era.  A new day.                         03:59:03

20          THE COURT:  Right.  Right.                             03:59:06

21          MR. JAMESON:  And Your Honor, I'm going to ask just    03:59:07

22  for a point of clarification because I think I understand, but I 03:59:08

23  want to make sure the same rules of the road.  We're going to  03:59:11

24  turn the data over to the experts and they are going to create a 03:59:15

25  report that basically explains what the data shows, and that's 03:59:19

3419

```
 1   going to be the sum and substance of their report, not a revised    03:59:24
 2   damages opinion or something like that?  Because that's a whole      03:59:28
 3   new, that's a whole can of worms.                                    03:59:31
 4          THE COURT:  I agree with you.  No, I don't think -- I         03:59:34
 5   think they just want to say just as you said --                      03:59:35
 6          MR. JAMESON:  Okay.                                           03:59:44
 7          THE COURT:  -- how that data affects the opinion that         03:59:44
 8   they have already given, if any.                                     03:59:48
 9          MR. JAMESON:  Okay.                                           03:59:50
10          THE COURT:  What affect it would have.  But I don't           03:59:52
11   think they should come up with a new damages figure.  I think        03:59:54
12   the Court's going to have to do that if I award damages.  And as     03:59:59
13   I say, the Federal Circuit has talked about how difficult that       04:00:10
14   is.  But I think the Court's going to have to do that.  I don't      04:00:15
15   think we can reinvent the wheel at this point in the case.           04:00:22
16          So between now and then we'll be working on the issues        04:00:32
17   of infringement and invalidity.  I don't know if you want to be      04:00:52
18   further heard on the issue of willfulness or not.                    04:01:05
19          MR. ANDRE:  Your Honor, from plaintiff's point of            04:01:12
20   view, I think the record has been made and we have addressed it      04:01:13
21   here in closing.  I think the only thing that we would want to       04:01:17
22   address down the road is, you know, on the subsequent closing        04:01:21
23   would be the damages issue --                                        04:01:25
24          THE COURT:  All right.                                        04:01:29
25          MR. ANDRE:  -- and remedies.                                  04:01:30
```

3420

```
 1          THE COURT:  All right?  Does defendant agree with    04:01:32

 2   that?                                                        04:01:37

 3          MR. JAMESON:  Your Honor, I think a closing on damages 04:01:38

 4   would be appropriate.  I'm not sure what other remedies he's 04:01:40

 5   talking about, but I do agree we ought to have a closing on  04:01:44

 6   damages.                                                     04:01:47

 7          THE COURT:  Yeah.  Well, okay.                        04:01:49

 8          Well, I would say that the case certainly took a long 04:02:00

 9   time, but it involved very complicated and I think important 04:02:06

10   technology.  I just bought a self-driving car, and I thought 04:02:14

11   that I hope that the network which drives it will be secure.  I 04:02:24

12   hope nobody is able to put malware into self-driving cars to 04:02:35

13   cause collisions.                                            04:02:46

14          MR. ANDRE:  Especially as after-the-fact.            04:02:49

15          THE COURT:  Right.  Yeah.  I would hope it would be  04:02:52

16   proactive.                                                   04:02:57

17          MR. JAMESON:  Your Honor, I was actually at a CLE    04:02:58

18   about a year ago, and the people that are in that industry said 04:03:00

19   that is the single biggest issue that they're dealing with, is 04:03:04

20   cybersecurity relating to self-driving cars.                 04:03:08

21          THE COURT:  Yeah.  Well, I hope your guys' clients can 04:03:11

22   figure that out, or somebody can.                            04:03:17

23          But anyway, I think there's justification for the case 04:03:22

24   taking as long as it did.  I don't think it had anything to do 04:03:27

25   with the format.  I think the format worked very well.  If   04:03:32
```

3421

```
 1  anything, I think the Court's ability to evaluate the        04:03:36
 2  credibility of the witnesses was probably improved by the    04:03:42
 3  format, because I was not distracted by anything happening in 04:03:47
 4  the courtroom.  I was looking at the witness.  And I almost feel 04:03:52
 5  like I was about three feet from their face during the time they 04:03:58
 6  testified.  So I think that part of it was a non-issue.  I think 04:04:03
 7  we're going to see a lot more evidence presented in this format. 04:04:11
 8  Maybe not a full trial, although there's no reason why you    04:04:16
 9  couldn't have a full trial, but I certainly think we're going to 04:04:23
10  see more evidence presented this way, because I believe having 04:04:26
11  the witness testify live is more effective than watching a video 04:04:36
12  of a witness having been examined.  And of course having them 04:04:47
13  testify live means that the Court can ask its own questions, 04:04:53
14  which is certainly very important with respect to, particularly 04:04:57
15  with respect to expert witnesses and technical witnesses.  So I 04:05:01
16  expect we'll be seeing a lot more of this.  So that will be   04:05:09
17  interesting.                                                   04:05:22
18          One of my friends said that -- he's not quite as old 04:05:23
19  as I am -- but he said that we may have lived in the Golden Age 04:05:27
20  of civil trial work, because we actually tried some cases over 04:05:36
21  the years, which is pretty rare nowadays as a percentage, far 04:05:44
22  more patent cases tried than any other form of civil cases.  By 04:05:53
23  that I mean if you take the total number of patent cases filed 04:06:01
24  and the number that settled, it wouldn't reach the 98 percent 04:06:05
25  which applies to civil cases in general.  There's going to be 04:06:08
```

3422

1  more and more technology involved, I think, particularly in                    04:06:19

2  civil cases.  I don't know, in criminal cases you've got the                   04:06:33

3  confrontation clause, and I'm not sure what exactly will end up                04:06:39

4  satisfying the confrontation clause as far as technology is                    04:06:45

5  concerned.  That remains to be seen.                                           04:06:51

6          But anyway, I think it's worked very well, and I think                 04:06:54

7  counsel has been very cooperative and respectful in their                      04:06:58

8  presentations through the technology.  So that has been a big                  04:07:09

9  help.                                                                          04:07:14

10          Is there any -- again, it's somewhat unique the way                   04:07:24

11  we're resolving the case, having this extra information supplied              04:07:34

12  on damages.  And I think you raised the point, Mr. Jameson,                   04:07:45

13  which is certainly a good one, about how we identify exactly                  04:07:55

14  what the experts should be doing.  And I said that they should               04:08:03

15  analyze the data.  I'm not sure exactly how we should define                  04:08:16

16  that.  I mean, I'm just looking at what the monthly sales are.               04:08:23

17  And I did raise the issue of I don't know what the accounting                04:08:33

18  practices are of Cisco, whether they recognize subscription                  04:08:36

19  income on a cash basis or whether they recognize it when the                 04:08:45

20  subscription is signed or whether they recognize it one way for              04:08:58

21  tax purposes and another way for other purposes.  I don't know.              04:09:01

22          But when we say we expect the experts to analyze the                  04:09:08

23  figure, what do we mean?  It seems to me the only thing we mean              04:09:13

24  is that they correctly allocate it to the accused product.  I                04:09:18

25  don't think it's any more than that.  Does counsel think                     04:09:28

3423

```
1    otherwise?                                                      04:09:38

2          MR. JAMESON:  No, Your Honor.  That's exactly why I       04:09:40

3    asked the question.  I think that if they basically are         04:09:41

4    explaining, you know, this is the data I received and I did     04:09:47

5    whatever filtering on it that you need to do to figure out what 04:09:52

6    are the various monthly revenue numbers, put that into chart    04:09:57

7    form.  And you know, candidly, not that they're going to be,    04:10:03

8    because the data will be significant, but you know, I would     04:10:09

9    expect that the numbers that Mr. Gunderson comes up with and Dr.04:10:14

10   Becker comes up with, they should look pretty similar to each   04:10:17

11   other.  And then if they don't, obviously it seems to me that   04:10:23

12   would be a trying to figure out what happened.  Where is the    04:10:26

13   daylight.                                                       04:10:33

14         THE COURT:  Yeah.  I think that's right.  I would         04:10:34

15   expect them to be the same.  And as far as -- I think I also    04:10:36

16   mentioned how would that affect your report and/or your opinion,04:10:43

17   and they may say not at all.  I don't know.  I mean, I just     04:10:51

18   don't know.  We don't want them to recalculate damages based on 04:10:58

19   these figures or come up with a different theory of damages     04:11:06

20   based on these figures, we just want them to verify that, as    04:11:14

21   best they can determine, how these figures apply to the accused 04:11:18

22   products, patent by patent.                                     04:11:24

23         Do you have anything further to say about this, Mr.       04:11:39

24   Andre?                                                          04:11:43

25         MR. ANDRE:  No, Your Honor.  When we received the data    04:11:46
```

Paul L. McManus, RMR, FCRR Official Court Reporter

3424

1    originally from Cisco regarding the accused products we got it          04:11:49

2    on a day-by-day sale, so it was a pretty massive database they         04:11:53

3    gave us.  So we haven't figured out how to calculate that into         04:11:59

4    month-to-month, because we don't have the program to do it.  But       04:12:02

5    we are still looking into that.  But we haven't got the other          04:12:06

6    legacy products either.  So when we get that I think what we           04:12:10

7    want to do is just give you raw data, you know, put into the           04:12:13

8    right bucket and not try to do any type of manipulation of that        04:12:17

9    data, just basically adding it up and putting it in the right          04:12:20

10   bucket and for the right month.                                        04:12:23

11          THE COURT:  Well, that's what I had in mind.  I don't           04:12:26

12   know how to define it any further.                                     04:12:36

13          MR. JAMESON:  And Your Honor, I mean just, I think the         04:12:39

14   rules of engagement on this project are clear, but we're leaving       04:12:43

15   this to the experts to do the work, and we're not -- the lawyers       04:12:46

16   are staying out of it.                                                 04:12:49

17          THE COURT:  Yeah.  I mean, I'm not sure if you can              04:12:56

18   stay completely out of it, because they have got to do it --           04:13:04

19   it's got to be based on the accused products and it has to be          04:13:07

20   based and it has to be done patent-by-patent.                          04:13:14

21          MR. JAMESON:  Yeah, I --                                        04:13:17

22          THE COURT:  To that extent, I think you have to give           04:13:19

23   them enough guidance to do that.                                       04:13:22

24          MR. JAMESON:  Understood, Your Honor.  I overstated            04:13:26

25   "stay out of it", probably.                                            04:13:28

3425

```
 1              THE COURT:  Okay.  All right.  Now, any other        04:13:32

 2  questions that either side has about what happens now?  Have I   04:13:43

 3  got your --                                                      04:13:49

 4              MR. JAMESON:  Cisco's were filed.                    04:13:56

 5              THE COURT:  Have they been delivered?                04:13:59

 6              COURTROOM DEPUTY CLERK:  Cisco filed.                04:14:03

 7              LAW CLERK:  They have both been filed.               04:14:04

 8              MR. NOONA:  They have been filed.                    04:14:10

 9              THE COURT:  Because I'm not going to be here tomorrow, 04:14:10

10  so I hope we can get them today.  Or I hope we have them.        04:14:12

11              LAW CLERK:  We have them.                            04:14:21

12              THE COURT:  Do we have them in written form?         04:14:22

13              LAW CLERK:  I don't know if they have been delivered 04:14:24

14  by courier.                                                      04:14:26

15              THE COURT:  Do we have them in written form?         04:14:27

16              COURTROOM DEPUTY CLERK:  They haven't been delivered. 04:14:29

17  They're on ECF right now.  They're supposed to deliver them.     04:14:30

18              MR. JAMESON:  Your Honor, I'm told they're enroute   04:14:34

19  from our end.  Whatever that means.                             04:14:36

20              COURTROOM DEPUTY CLERK:  Okay.                       04:14:39

21              THE COURT:  Okay.                                    04:14:40

22              MR. ANDRE:  I believe Mr. Noona is sending them over 04:14:43

23  from our end as well.                                           04:14:44

24              COURTROOM DEPUTY CLERK:  Okay.                       04:14:46

25              THE COURT:  All right.                               04:14:47
```

3426

```
 1            MR. ANDRE:  I think we're sending two or three copies      04:14:48

 2  over.                                                               04:14:51

 3            COURTROOM DEPUTY CLERK:  I'll be here to accept them.      04:14:52

 4  Yes.  They were supposed to --                                      04:14:55

 5            MR. JAMESON:  And Your Honor, we included a signature      04:14:58

 6  block on ours if you just want to sign ours and we could all be     04:15:00

 7  done.                                                               04:15:04

 8            THE COURT:  Right.  Well, is there anything else          04:15:04

 9  before we adjourn for the day?                                      04:15:24

10            MR. ANDRE:  Nothing from plaintiff, Your Honor.  Thank    04:15:28

11  you for your time and patience.                                     04:15:29

12            MR. JAMESON:  And nothing from Cisco, Your Honor.  And    04:15:31

13  I share Mr. Andre's thanks for your perseverance through this.      04:15:33

14            THE COURT:  All right.  Well, we'll be adjourned until    04:15:39

15  whatever date we settled on for the damages argument.              04:15:45

16            MR. ANDRE:  Thank you, Your Honor.                        04:15:56

17            THE COURT:  All right.                                    04:15:56

18            (Whereupon, proceedings concluded at 4:17 p.m.)           04:15:58

19

20

21

22

23

24

25
```

Paul L. McManus, RMR, FCRR Official Court Reporter

1                           *CERTIFICATION*

2

3          *I certify that the foregoing is a true, complete and*

4    *correct transcript of Volume 22 of the proceedings held in the*

5    *above-entitled matter.*

6

7          _____

8                    Paul L. McManus, RMR, FCRR

9                    _____

10                            Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25