1     IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF VIRGINIA
2        Norfolk Division

3
- - - - - - - - - - - - - - - - - -
4              )
  CENTRIPETAL NETWORKS, INC.,  )
5              )
     Plaintiff,    )   CIVIL ACTION NO.
6              )    2:18cv94
  v.            )
7              )
  CISCO SYSTEMS, INC.,    )
8              )
     Defendant.    )
9              )
- - - - - - - - - - - - - - - - - -
10

11
   TRANSCRIPT OF VIDEOCONFERENCE BENCH TRIAL PROCEEDINGS
12
        Norfolk, Virginia
13        June 25, 2020

14         Volume 23
        Pages 3428-3507
15

16 BEFORE: THE HONORABLE HENRY COKE MORGAN, JR.
      United States District Judge
17
 APPEARANCES:
18     KAUFMAN & CANOLES, P.C.
      By:  Stephen E. Noona
19        - and -
     KRAMER LEVIN NAFTALIS & FRANKEL LLP
20     By:  Paul J. Andre
       Counsel for the Plaintiff
21
     TROUTMAN SANDERS LLP
22     By:  Dabney J. Carr, IV
       - and -
23     DUANE MORRIS LLP
      By:  Louis N. Jameson
24       Counsel for the Defendant

25

3429

```
1                         I N D E X

2    PLAINTIFF'S
     WITNESS                                         PAGE
3
      JAMES MALACKOWSKI
4          Direct Examination By Mr. Andre          3432

5
     DEFENDANT'S
6    WITNESS                                         PAGE

7     STEPHEN BECKER
           Direct Examination By Mr. Jameson        3439
8

9

10                     E X H I B I T S

11   PLAINTIFF'S
     NO.                                             PAGE
12

13    PTX-1248                                       3449

14
     DEFENDANT'S
15   NO.                                             PAGE

16    DTX-1714                                       3446
      DTX-1715                                       3447
17

18

19

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter

```
 1              (Proceedings commenced at 11:01 a.m.)        10:50:41
 2         THE CLERK:  Civil Action Number 2:18cv94, Plaintiff  11:01:33
 3    Centripetal Networks, Inc. v. Defendant Cisco Systems, Inc.  11:01:38
 4         For the Plaintiff, Mr. Noona, Mr. Andre, are you   11:01:41
 5    ready to proceed?                                       11:01:45
 6         MR. NOONA:  We are, Your Honor.                    11:01:48
 7         THE CLERK:  For Defendant, Mr. Carr, Mr. Jameson,  11:01:51
 8    Mr. MacBride, are you ready to proceed?                 11:01:56
 9         MR. JAMESON:  Yes, we are, Your Honor.             11:01:59
10         THE COURT:  All right, counsel, I suppose the first  11:02:00
11    question is do you want to call on -- do either of you want  11:02:02
12    to call on your expert witnesses to comment on the new data  11:02:11
13    that's been submitted to the Court?                     11:02:15
14         MR. ANDRE:  Your Honor, your video is not on.  Your  11:02:17
15    audio is on, but your camera is not on.                 11:02:26
16         There you are.  We've got you now.                 11:02:32
17         THE COURT:  Okay.  Well, you heard the question.  Do  11:02:35
18    you wish to -- either one of you wish to call your damages  11:02:40
19    experts to comment on the effect of the new data on their  11:02:49
20    opinions, or no?  Or do you want to proceed with argument on  11:02:56
21    damages, and if the Court has any questions for the experts,  11:03:00
22    I'll ask them?                                          11:03:06
23         MR. ANDRE:  Your Honor, this is Paul Andre, for    11:03:08
24    Plaintiff Centripetal.                                  11:03:11
25         If it would help the Court, we'd be glad to put    11:03:12
```

Carol L. Naughton, Official Court Reporter

| | | |
|---|---|---|
| 1 | Mr. Malackowski on to talk about the new data.  As we | 11:03:15 |
| 2 | informed the Court, Mr. Gunderson's daughter is getting | 11:03:19 |
| 3 | married this weekend, so he has wedding plans.  And | 11:03:22 |
| 4 | Mr. Malackowski is available. | 11:03:25 |
| 5 | We've submitted our findings on Thursday based on | 11:03:30 |
| 6 | the information that was provided.  There was subsequent | 11:03:33 |
| 7 | information provided which we did not update the Court on | 11:03:36 |
| 8 | yet.  If you'd like to hear about that, we'd be glad to do | 11:03:40 |
| 9 | so, if you find it would be helpful. | 11:03:46 |
| 10 | THE COURT:  Well, it's up to counsel as to whether | 11:03:50 |
| 11 | you'd like to call him or not. | 11:03:52 |
| 12 | MR. ANDRE:  Your Honor, I just have a very short | 11:03:54 |
| 13 | discussion about that data, if that's okay with you; the | 11:03:58 |
| 14 | plaintiff would like to do so. | 11:04:01 |
| 15 | THE COURT:  How long do you think that's going to | 11:04:07 |
| 16 | take? | 11:04:10 |
| 17 | MR. ANDRE:  10 to 15 minutes from Centripetal, Your | 11:04:11 |
| 18 | Honor. | 11:04:13 |
| 19 | THE COURT:  All right.  Well, what about the | 11:04:14 |
| 20 | defense? | 11:04:16 |
| 21 | MR. JAMESON:  Your Honor, this is Woody Jameson.  I | 11:04:17 |
| 22 | would like to have the opportunity for Dr. Becker to comment | 11:04:21 |
| 23 | on the information he provided. | 11:04:24 |
| 24 | THE COURT:  How much time do you think you need? | 11:04:25 |
| 25 | MR. JAMESON:  I think 10 to 15 minutes, for him to | 11:04:28 |

```
                    ─Malackowski, J. - Direct─
```

1    explain some of the issues, would be plenty.                    11:04:31

2            THE COURT:  All right.  Well, I'll grant each side       11:04:34

3    15 minutes to have their experts testify; plaintiff first.      11:04:39

4            MR. ANDRE:  Thank you, Your Honor.                       11:04:45

5            If I can get Mr. Malackowski to turn his camera on.      11:04:47

6            (Witness sworn.)                                         11:04:53

7            MR. ANDRE:  May I proceed?                               11:05:11

8            THE COURT:  You may proceed.                             11:05:13

9            JAMES MALACKOWSKI, called by the Plaintiff, having       11:05:13

10   been first duly sworn, was examined and testified as follows:   11:05:13

11                       DIRECT EXAMINATION                           11:05:14

12   BY MR. ANDRE:                                                    11:05:14

13   Q.  Mr. Malackowski, I want to go to our slide deck.            11:05:15

14           MR. ANDRE:  And, Your Honor, we've provided a slide      11:05:18

15   deck to you, and we'll start on slide 4.                        11:05:21

16           THE COURT:  This is in the smaller binder, I think.      11:05:28

17           MR. ANDRE:  That's correct.                              11:05:33

18           THE COURT:  Okay.                                        11:05:33

19   BY MR. ANDRE:                                                    11:05:34

20   Q.  So in slide 4, Mr. Malackowski, could you describe           11:05:36

21   what -- when we received the data from Cisco, what was the       11:05:43

22   predecessor products early on and how it changed?                11:05:46

23   A.  Yes, sir.                                                    11:05:50

24           Your Honor, the focus of our update was to look at       11:05:52

25   predecessor products to the accused products.  On June 18th,    11:05:55

Malackowski, J. - Direct

| | | |
|---|---|---|
| 1 | we received an update from Cisco that contained the list of | 11:05:59 |
| 2 | predecessor products shown on the left half of the screen. | 11:06:03 |
| 3 | In the three columns of data, you can see each of the product | 11:06:06 |
| 4 | numbers.  Approximately 24 hours later, on June 19th, we | 11:06:10 |
| 5 | received an updated set of information that contained fewer | 11:06:14 |
| 6 | product numbers but, as we will see, significantly greater | 11:06:19 |
| 7 | sales described as predecessor products. | 11:06:24 |
| 8 | Q.  If we go to the next slide, slide 5, does that describe | 11:06:27 |
| 9 | the sales that you're talking about? | 11:06:30 |
| 10 | A.  It does.  Your Honor, the blue bars show, for each fiscal | 11:06:33 |
| 11 | year, the data that was presented by Cisco on June 18th.  In | 11:06:36 |
| 12 | comparison, you can see the green bars are the updated | 11:06:42 |
| 13 | information; fewer products but obviously the value of the | 11:06:46 |
| 14 | green bars is greater, especially in fiscal year 2017 and | 11:06:50 |
| 15 | 2018. | 11:06:56 |
| 16 | MR. ANDRE:  Mr. Jameson, Woody, could you mute your | 11:07:01 |
| 17 | line.  We're getting some feedback.  We think it might be | 11:07:02 |
| 18 | from that.  Thank you. | 11:07:05 |
| 19 | BY MR. ANDRE: | 11:07:05 |
| 20 | Q.  Let's go to the original data that was submitted on | 11:07:07 |
| 21 | June 18th, the next slide, slide 6, and describe what we're | 11:07:10 |
| 22 | looking at here. | 11:07:15 |
| 23 | A.  Yes.  My original task was to look at the predecessor | 11:07:16 |
| 24 | switches in comparison to the accused switches.  Obviously, I | 11:07:20 |
| 25 | do this for all the product categories, but this was the | 11:07:24 |

Carol L. Naughton, Official Court Reporter

3434

Malackowski, J. - Direct

| | | |
|---|---|---|
| 1 | original data as I saw it on the 18th.  And I was very | 11:07:28 |
| 2 | focused on, first, annual information, and then I went into | 11:07:32 |
| 3 | more detail. | 11:07:37 |
| 4 | Q.  In that fiscal year '18, where there were roughly almost | 11:07:38 |
| 5 | equal sales of the predecessor product and the new Catalyst | 11:07:42 |
| 6 | switches, was that the transition year when Catalyst was | 11:07:47 |
| 7 | released? | 11:07:51 |
| 8 | A.  It was, yes, sir. | 11:07:52 |
| 9 | THE COURT:  Fiscal year '18 ends in, what, July 1st | 11:07:53 |
| 10 | of '18?  Or '19? | 11:07:57 |
| 11 | THE WITNESS:  Fiscal year '18 would end in July of | 11:08:00 |
| 12 | '19, Your Honor. | 11:08:06 |
| 13 | THE COURT:  Okay. | 11:08:13 |
| 14 | BY MR. ANDRE: | 11:08:18 |
| 15 | Q.  So if we go to the next slide -- and describe to the | 11:08:19 |
| 16 | Court what we're looking at here based on the first set of | 11:08:22 |
| 17 | information that was sent to us. | 11:08:26 |
| 18 | A.  It's my understanding the Court requested to see this | 11:08:29 |
| 19 | data monthly, so slide 7 simply breaks the data received into | 11:08:34 |
| 20 | a monthly basis showing the predecessor switches in red and | 11:08:38 |
| 21 | then, on a monthly basis, the accused 9000 switches in blue. | 11:08:41 |
| 22 | And, again, this was all using the original dataset. | 11:08:46 |
| 23 | Q.  And then based on the update after we filed our | 11:08:49 |
| 24 | submission last Thursday, could you go through the same | 11:08:53 |
| 25 | analysis and go to the next slide and describe what we saw | 11:08:56 |

Carol L. Naughton, Official Court Reporter

Malackowski, J. - Direct

| | | |
|---|---|---|
| 1 | here. | 11:08:59 |
| 2 | A.  So at direction of counsel, I then changed my work to | 11:09:00 |
| 3 | focus on the updated Cisco information, again starting with | 11:09:03 |
| 4 | the annual data.  So, Your Honor, this shows the updated | 11:09:07 |
| 5 | information for predecessor switches versus accused switches | 11:09:10 |
| 6 | by fiscal year, and then, again, I also detailed the data | 11:09:14 |
| 7 | monthly.  That would be the next slide. | 11:09:21 |
| 8 | Q.  And the average predecessor revenue, that red line, what | 11:09:23 |
| 9 | is that referring to? | 11:09:27 |
| 10 | A.  My understanding is the Court had interest in | 11:09:28 |
| 11 | understanding the rate of growth, or increase, in the accused | 11:09:31 |
| 12 | products above the predecessor products, essentially looking | 11:09:36 |
| 13 | to the predecessor switches as a baseline and understanding | 11:09:39 |
| 14 | its sales improved on the baseline, perhaps associated with | 11:09:43 |
| 15 | the technology that's at issue in this case. | 11:09:47 |
| 16 | Q.  If we go to the next slide, could you tell the Court | 11:09:49 |
| 17 | what -- this is a monthly breakdown? | 11:09:54 |
| 18 | A.  Yes.  In my opinion, consistent with the Court's request, | 11:09:56 |
| 19 | it is important to look at this information monthly.  And so, | 11:10:00 |
| 20 | Your Honor, in some respects this is the most important | 11:10:04 |
| 21 | chart. | 11:10:07 |
| 22 | It shows, on a monthly basis, the updated | 11:10:07 |
| 23 | predecessor revenue for the 3000 series switches as compared | 11:10:11 |
| 24 | to the accused data for the 9000 series switches, and I did a | 11:10:17 |
| 25 | calculation showing the monthly average for the predecessor | 11:10:22 |

─────Malackowski, J. - Direct─────

1    prior to infringement.  That represents the red line.                    11:10:26

2         So if you calculate the average of the predecessor                  11:10:30

3    3000 switches, draw that line across the page, then                      11:10:33

4    everything above that line in blue represents the increase of            11:10:38

5    the accused switches over the predecessor baseline.  It was              11:10:44

6    my understanding --                                                      11:10:49

7         THE COURT:  Now, what did you base the predecessor                  11:10:51

8    baseline on?  The sales prior to fiscal year 2019?                       11:10:53

9         THE WITNESS:  Prior to the first accused                            11:11:00

10   infringement for these products, Your Honor.                             11:11:02

11        THE COURT:  Which would be in October of '17.  Well,                11:11:04

12   the date was June of '17, but we don't have a monthly --                 11:11:22

13        THE WITNESS:  We took the first accused data as the                 11:11:36

14   starting point for the monthly revenue.  So you can see                  11:11:41

15   accused data would be August '17, that small blue bar at the             11:11:44

16   very bottom.                                                             11:11:49

17        THE COURT:  That was the first sale of the accused                  11:11:51

18   data?                                                                    11:11:53

19        THE WITNESS:  Yes, sir.                                             11:11:53

20        THE COURT:  All right.  Well, what was the                          11:12:01

21   difference between the data submitted on the 18th and the                11:12:03

22   data submitted on the 19th?                                              11:12:09

23        THE WITNESS:  So the overall difference in data can                 11:12:11

24   be shown in the first set of bar charts, but if you look at              11:12:16

25   the difference in the accused products versus the predecessor            11:12:22

———Malackowski, J. - Direct———

1    products for the switches, it's about a 40 percent increase          11:12:25

2    for the switches, 40.9 percent increase over the predecessor         11:12:28

3    baseline.                                                            11:12:34

4              THE COURT:  All right.                                     11:12:38

5              THE WITNESS:  And so, Your Honor, I essentially            11:12:40

6    repeated this accounting analysis for each of the accused            11:12:44

7    product categories, and if counsel flips through the charts,         11:12:47

8    you'll see this at a detail level for each category.                 11:12:49

9              So here we're starting by looking at Aggregation           11:12:52

10   Services Routers, first on an annual basis; next slide, we           11:12:57

11   looked at the Integration Services Routers, or the ISRs, on          11:13:00

12   an annual basis; and then next slide, Your Honor, I looked at        11:13:05

13   the routers together on a monthly basis, and here, again, you        11:13:08

14   can see the red predecessor sales as compared to the blue            11:13:12

15   accused sales.                                                       11:13:17

16             I calculated the average sales for the predecessor         11:13:19

17   products; I set that as the baseline; and then I calculated          11:13:23

18   everything that was above the baseline for the accused sales         11:13:28

19   to show you the rate of growth.                                      11:13:30

20             THE COURT:  All right.                                     11:13:33

21             THE WITNESS:  If we go to the next product category,       11:13:35

22   this is the Firepower adaptive security, first starting on an        11:13:37

23   annual basis.  We can see the transition in fiscal year 2018.       11:13:42

24   Next, we can look at that data on a monthly basis; same              11:13:46

25   analysis, calculate the baseline based upon the predecessor          11:13:50

—Malackowski, J. - Direct—

1    data, mark that baseline as a red horizontal line, and          11:13:54
2    determine the increase in sales on a monthly basis above the    11:13:59
3    line.                                                            11:14:03
4          Next category is the Stealthwatch revenue, again,          11:14:04
5    beginning annually; next chart, looking at it monthly,          11:14:09
6    drawing the average for the predecessor, creating the           11:14:15
7    horizontal red line, calculating everything above the line.     11:14:19
8          Next chart, the Firepower Management Center, or FMC,       11:14:25
9    revenue, again, starting with the annual data; next chart       11:14:32
10   digging into the monthly data, determining the average          11:14:36
11   monthly predecessor data, drawing the red line, calculating     11:14:41
12   what was above the red line.  In this case, the amount above    11:14:45
13   the red line is fairly modest.                                  11:14:49
14         The next chart, ISE, Identity Services Revenue, same       11:14:52
15   analysis, starting with annual data; next chart, looking to     11:14:59
16   monthly data, calculating the predecessor average, drawing      11:15:03
17   the red line, determining the overage and the next --           11:15:07
18   BY MR. ANDRE:                                                    11:15:16
19   Q.  By the way, this is the last slide, yes.                    11:15:16
20   A.  Finally, looking at the last slide, which is the accused    11:15:18
21   Digital Network Architecture, I understand there was no         11:15:23
22   predecessor product, and so I was then able to summarize for    11:15:26
23   each product category what were the sales that were above the   11:15:30
24   predecessor baseline.                                           11:15:35
25         MR. ANDRE:  Your Honor, that's the extent of our          11:15:37

─────Becker, S. - Direct─────

```
 1    presentation for Mr. Malackowski.                              11:15:41

 2              THE COURT:  Okay.                                     11:15:44

 3              MR. ANDRE:  If you have any questions?  Or we'll      11:15:46

 4    turn it over to the other side, otherwise.                     11:15:48

 5              THE COURT:  Let me hear from the other side.          11:15:51

 6              MR. JAMESON:  Dr. Becker, is your camera on?          11:15:56

 7              DR. BECKER:  Can you hear and see me?                 11:16:05

 8              THE COURT:  Yes.                                      11:16:07

 9              MR. JAMESON:  Do we need to swear in Dr. Becker       11:16:19

10    again?                                                         11:16:21

11              THE COURT:  Yes.                                      11:16:30

12              (Witness sworn.)                                     11:16:31

13              STEPHEN BECKER, called by the Defendant, having been 11:16:31

14    first duly sworn, was examined and testified as follows:       11:16:31

15                        DIRECT EXAMINATION                         11:16:48

16    BY MR. JAMESON:                                                11:16:48

17    Q.  Good morning, Dr. Becker.                                  11:16:49

18    A.  Good morning.                                              11:16:51

19    Q.  Can you explain to the Court the additional data that was  11:16:51

20    found between June 18th and June 19th?                         11:16:55

21    A.  Yes, I can.                                                11:16:59

22              Just in advance of June 18th, when we were compiling 11:17:04

23    the materials for the Court based on what were, I think,       11:17:08

24    millions and millions of records of predecessor data that      11:17:13

25    Cisco pulled, when it got pulled together, I noticed on --     11:17:18
```

Carol L. Naughton, Official Court Reporter

Becker, S. - Direct

1   late on the 17th, early on the 18th, and as indicated in my                11:17:26

2   declaration, that sales data for the Catalyst 3000 -- well,                 11:17:29

3   specifically, the 3850 model and the Catalyst 4500 series                   11:17:37

4   were not in the data.  I don't know why it wasn't in the                    11:17:43

5   data, but it was clear that it was not in the data.                         11:17:47

6           I have indicated this in this missing data in the                   11:17:51

7   declaration and in the materials that we supplied.  Cisco                   11:17:57

8   scrambled and got that additional data to us, and the                       11:18:03

9   submission on the 19th provided an update that included that                11:18:06

10  Cisco 3850 series and 4500 series Catalyst switch data.                     11:18:11

11          That is the primary sort of addition, was to fill in                11:18:18

12  that one hole that existed in the data that we noticed on the               11:18:23

13  18th.                                                                       11:18:26

14          THE COURT:  Where is that declaration?  Is that an                  11:18:27

15  exhibit, or what?  Counsel?                                                 11:18:30

16          MR. JAMESON:  Your Honor, it was filed with the                     11:18:35

17  Court as a pleading.                                                        11:18:37

18          THE COURT:  Okay.  It's not in either of the books                  11:18:39

19  that I have.  That's why I'm asking.                                        11:18:46

20          MR. JAMESON:  That's right, Your Honor.  It was a                   11:18:48

21  pleading, and I'm trying to get the pleading number as we                   11:18:51

22  speak.                                                                      11:18:54

23          THE COURT:  All right.  I've got it.  Just a second.                11:18:54

24          Okay.  I think there's also data, on the 6000 series               11:20:12

25  in the data supplied by Cisco, which was footnoted.  Is that               11:20:22

Carol L. Naughton, Official Court Reporter

```
                         ─Becker, S. - Direct─
```

1   right?  I'm asking the witness.                                    11:20:31

2           THE WITNESS:  Sorry, could you ask that again.  It          11:20:37

3   was --                                                             11:20:39

4           THE COURT:  The 6000 series was also included in the       11:20:40

5   data supplied by Cisco.                                            11:20:45

6           THE WITNESS:  Yes.  So that's the 6000 series.             11:20:48

7   There are three major product series that are predecessors to      11:20:52

8   the accused Catalyst switch models; the 3000 series, the 4000      11:20:59

9   series, and the 6000 series.  And the 6000 was in the prior        11:21:05

10  data, and some of the 3000 series, and that's what then got        11:21:14

11  updated.                                                           11:21:17

12          THE COURT:  Okay.  All right.  You may proceed.            11:21:20

13  BY MR. JAMESON:                                                    11:21:20

14  Q.  And, Dr. Becker, was there daylight between you and            11:21:26

15  Mr. Malackowski with respect to what constituted the               11:21:32

16  predecessor products to the 9000 series one?                       11:21:35

17  A.  Yes.  There's substantial -- there's a substantial             11:21:40

18  difference.  Set aside this question of the update between         11:21:46

19  June 18th and June 19th, the slides that Mr. Malackowski just      11:21:49

20  presented, which have the updated data in them, are                11:21:57

21  comparisons that only treat the Cisco 3000 series switches as      11:22:02

22  predecessors to the Catalyst accused 9000 series switches,         11:22:09

23  and that is just -- frankly, it's inconsistent with the facts      11:22:14

24  and, I think, creates a very significant difference in the         11:22:18

25  picture that is painted with respect to the sales of the           11:22:23

Becker, S. - Direct

1    predecessor switches versus the accused switches.                  11:22:27
2    Q.  Do you have an understanding as to what are the                11:22:34
3    predecessor products to the Catalyst 9400 series switches?         11:22:38
4    A.  Yes.  So the predecessors to the Catalyst 9400 series          11:22:41
5    switches are the Catalyst 4500 series and the 6500 series.         11:22:51
6    Q.  So you included those in your calculation?                     11:23:00
7    A.  Yes.                                                           11:23:03
8    Q.  And with respect to the Catalyst 9500 series, do you have      11:23:04
9    an understanding as to what the predecessor products to that       11:23:13
10   series are?                                                        11:23:16
11   A.  Yes.  The Catalyst 9500 series switches were preceded by       11:23:17
12   the 4500 series and the 3850 series as the most direct             11:23:27
13   predecessors, although we see it's clear in the Cisco data         11:23:34
14   that there were significant sales of many different types of       11:23:39
15   switches, but the ones that most closely match and are listed      11:23:45
16   in the Cisco materials as the direct sort of upgrade path for      11:23:51
17   the 9500 series is the 4500 and 3850.                             11:23:58
18         THE COURT:  All right.  Now, you're saying that the         11:24:05
19   4500 series and the 3850 series were the predecessor of the       11:24:09
20   9500 series, right?                                               11:24:14
21         THE WITNESS:  Yes, Your Honor.                              11:24:18
22         THE COURT:  And you're saying that the 3000 series,         11:24:20
23   the 4500 series, and the 6500 series were predecessors to the     11:24:25
24   9000 series?                                                      11:24:36
25         THE WITNESS:  So the --                                     11:24:37

Carol L. Naughton, Official Court Reporter

—Becker, S. - Direct—

1      THE COURT:  Yes or no?  That's what I've written        11:24:40
2  down that you just said.                                    11:24:44
3      THE WITNESS:  The 6500 series, the 6000 series is a     11:24:46
4  predecessor for the 9400.                                   11:24:51
5      THE COURT:  The 6000 series?                            11:24:55
6      THE WITNESS:  Well, when I say "6000," I mean           11:24:58
7  specifically the model -- the primary model in there is the 11:25:01
8  6500.                                                       11:25:05
9      MR. JAMESON:  And, Your Honor, if it would be           11:25:08
10 helpful, I can pull up some documents --                    11:25:10
11     THE COURT:  Well, now, wait a minute.  Let me ask       11:25:13
12 the witness a question.                                      11:25:14
13     Are you saying that the 3000 series, the 4500           11:25:17
14 series, and the 6500 series were all predecessors of the 9400 11:25:21
15 series?  Are you saying that?                                11:25:32
16     THE WITNESS:  No.                                        11:25:33
17     THE COURT:  What are you saying?  Only the 6500?         11:25:35
18     THE WITNESS:  With respect to the Catalyst 9400          11:25:38
19 series accused switches, the predecessors are the 4500 series 11:25:43
20 and 6500 series.                                             11:25:50
21     THE COURT:  So no 3000?                                  11:25:57
22     THE WITNESS:  No.  No, Your Honor, not with respect      11:25:59
23 to the 9400.                                                 11:26:03
24     THE COURT:  Okay.  But the 4500 and the 3850, you        11:26:05
25 said, were the predecessors to the 9500 series?              11:26:12

Carol L. Naughton, Official Court Reporter

———————————Becker, S. - Direct———————————

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes, Your Honor. | 11:26:16 |
| 2 | THE COURT:  All right. | 11:26:18 |
| 3 | MR. JAMESON:  And, Your Honor, if it would be | 11:26:20 |
| 4 | helpful, we could show you three documents that will provide | 11:26:21 |
| 5 | a pretty good picture of this for you. | 11:26:26 |
| 6 | THE COURT:  It's up to you what you show me. | 11:26:30 |
| 7 | MR. JAMESON:  Let's pull up -- and, Your Honor, this | 11:26:33 |
| 8 | is a new exhibit that we're asking to show you in light of | 11:26:36 |
| 9 | kind of the request that you made for this information. | 11:26:40 |
| 10 | It would be -- Mr. Simons, if you can pull up what | 11:26:44 |
| 11 | we've marked as Defendant's Trial Exhibit 1714.  That should | 11:26:48 |
| 12 | be in your book. | 11:26:56 |
| 13 | THE COURT:  I've got two books.  Let's see here.  Is | 11:26:59 |
| 14 | it in the book "Schedules to the declaration"? | 11:27:03 |
| 15 | MR. JAMESON:  "Additional materials for damages | 11:27:09 |
| 16 | hearing." | 11:27:12 |
| 17 | THE COURT:  And what was that number? | 11:27:18 |
| 18 | MR. JAMESON:  It's Defense Exhibit 1714. | 11:27:22 |
| 19 | MR. ANDRE:  Your Honor, we don't have this exhibit. | 11:27:27 |
| 20 | This was not an exhibit that was disclosed in the case or on | 11:27:29 |
| 21 | the exhibit list, so we don't have this document. | 11:27:33 |
| 22 | MR. JAMESON:  Mr. Andre, it's been sent to you. | 11:27:36 |
| 23 | MR. ANDRE:  Was this document produced in this | 11:27:41 |
| 24 | litigation? | 11:27:43 |
| 25 | THE COURT:  No.  They just said it's a new exhibit, | 11:27:43 |

—————Becker, S. - Direct—————

1    but they said they sent it to you.                          11:27:46

2    BY MR. JAMESON:                                             11:27:55

3    Q.  Dr. Becker, if you would -- could you turn to the second  11:27:56

4    page of this exhibit, the DTX-1714, and just explain to the   11:28:00

5    Court what this shows.                                        11:28:06

6    A.  This document is a Catalyst 9400 series piece of          11:28:10

7    literature that describes the upgrade path from prior         11:28:19

8    generation Catalyst switches to the 9400 series, and you'll   11:28:24

9    see at the top there where it says, "Previous modular access  11:28:29

10   switches," it's listing the Catalyst 4500 and Catalyst 6500   11:28:34

11   as the previous modular access switches that they are then    11:28:41

12   saying, if you want to buy the latest access switch, you buy   11:28:46

13   the 9400, which is that right-most column.                    11:28:51

14         And they're identifying the features of the latest     11:28:58

15   access switch series -- namely, the 9400 -- that are being    11:29:04

16   provided as sort of upgrades and differences with the two     11:29:09

17   prior modular switch models.                                  11:29:14

18         THE COURT:  All right.  If this exhibit is             11:29:24

19   introduced, it will be introduced only for the purpose of     11:29:31

20   consideration of damages.                                     11:29:35

21         MR. JAMESON:  And, Your Honor, we would ask that       11:29:37

22   this be moved into evidence for that purpose.                 11:29:39

23         MR. ANDRE:  Your Honor, I'd like to object.  It        11:29:51

24   wasn't on the exhibit list, and I don't think it was produced 11:29:52

25   in the litigation to us, even if it's not on the exhibit      11:29:55

Becker, S. - Direct

| | | |
|---|---|---|
| 1 | list.  We've never seen this document. | 11:29:59 |
| 2 | MR. JAMESON:  Your Honor, this is a document that's | 11:30:02 |
| 3 | publicly available on Cisco's website that became relevant in | 11:30:04 |
| 4 | light of the request by the Court for this information. | 11:30:08 |
| 5 | THE COURT:  As I say, the Court will consider it on | 11:30:17 |
| 6 | the issue of damages only. | 11:30:21 |
| 7 | (Defense Exhibit DTX-1714 was received in evidence.) | 11:30:25 |
| 8 | MR. JAMESON:  Thank you, Your Honor. | 11:30:25 |
| 9 | Mr. Simons, can we pull up DTX-1715. | 11:30:28 |
| 10 | BY MR. JAMESON: | 11:30:33 |
| 11 | Q.  And, Dr. Becker -- | 11:30:34 |
| 12 | Mr. Simons -- well, first of all, what does this | 11:30:37 |
| 13 | show, Dr. Becker? | 11:30:40 |
| 14 | A.  This is the upgrade document for the 9500 series switch | 11:30:41 |
| 15 | family. | 11:30:47 |
| 16 | Q.  And if we could turn to the next page, Mr. Simons. | 11:30:47 |
| 17 | Can you explain what this shows, Dr. Becker? | 11:30:52 |
| 18 | A.  Yes.  This is providing essentially the same table that | 11:30:55 |
| 19 | we looked at on the prior document.  You can see on the | 11:30:58 |
| 20 | right-hand column it's called the "Latest fixed core switch." | 11:31:03 |
| 21 | That's the Catalyst 9500 series.  And they identified two | 11:31:07 |
| 22 | prior switch models as the, quote, previous fixed core | 11:31:12 |
| 23 | switches; the 4500 series and the 3850 series. | 11:31:17 |
| 24 | MR. JAMESON:  And, Your Honor, we would -- | 11:31:28 |
| 25 | THE COURT:  It appears this is on the Cisco website? | 11:31:29 |

Carol L. Naughton, Official Court Reporter

─────────────Becker, S. - Direct─────────────

| | | |
|---|---|---|
| 1 | MR. JAMESON:  Yes, Your Honor. | 11:31:34 |
| 2 | THE WITNESS:  Yes.  It's the Cisco public website. | 11:31:36 |
| 3 | THE COURT:  Okay.  It will be admitted for purposes | 11:31:40 |
| 4 | of damages only. | 11:31:44 |
| 5 | (Defense Exhibit DTX-1715 was received in evidence.) | 11:31:46 |
| 6 | MR. JAMESON:  Thank you, Your Honor. | 11:31:46 |
| 7 | And then, finally, we would like to go to PTX-1248, | 11:31:47 |
| 8 | Mr. Simons. | 11:31:51 |
| 9 | BY MR. JAMESON: | 11:31:55 |
| 10 | Q.  And, Dr. Becker, what is this document showing? | 11:31:57 |
| 11 | A.  So this is the upgrade document for the Catalyst 9300 | 11:32:00 |
| 12 | series switches. | 11:32:06 |
| 13 | Q.  And if -- | 11:32:07 |
| 14 | THE COURT:  I don't have 1248, in the same book at | 11:32:10 |
| 15 | least.  Is it in the other book? | 11:32:26 |
| 16 | MR. JAMESON:  Your Honor, it should have been in | 11:32:28 |
| 17 | there, in the same book.  It should have been right after the | 11:32:30 |
| 18 | last two documents.  This exhibit actually was -- portions of | 11:32:32 |
| 19 | this exhibit were previously admitted in this trial. | 11:32:38 |
| 20 | THE COURT:  I'm sorry.  You've got it out of order. | 11:32:44 |
| 21 | I assumed it came before 17, but it doesn't.  I've got it. | 11:32:46 |
| 22 | BY MR. JAMESON: | 11:32:51 |
| 23 | Q.  And, Dr. Becker, if we could go to the second page of | 11:32:52 |
| 24 | this PTX-1248, which is Bates 266, and if you could explain | 11:32:55 |
| 25 | what this is showing. | 11:33:00 |

3448

—Becker, S. - Direct—

1   A.   Yes.  So this, again, on the right-most column, it lists          11:33:02

2   the Catalyst 9300 series, and then there are three columns to        11:33:06

3   the left of that, what they call "Installed-base access             11:33:12

4   switches."  You call your installed-base the thing that is          11:33:18

5   essentially already out there, and we see the 3560, 3750,           11:33:22

6   3750G, and the 3850 series are identified as the primary            11:33:29

7   models that people would be upgrading from into a 9300 series       11:33:37

8   Catalyst switch.                                                    11:33:42

9        MR. JAMESON:  And, Your Honor, we would ask that               11:33:47

10  this be moved into evidence for the same limited purpose.           11:33:48

11       THE COURT:  In the damages material that Cisco                 11:33:51

12  supplied, Dr. Becker, does it say that -- or is it                  11:33:57

13  Mr. Becker?  Are the sales for 9300, 9400 and 9500 all listed       11:34:02

14  under the 9000 series, or are they listed separately?              11:34:15

15       THE WITNESS:  They are -- in my materials, they are            11:34:20

16  listed as the accused 9000 series, and when you see a line in       11:34:23

17  my materials that says "Accused 9000 series," I'm referring         11:34:32

18  to the 9300, 9400, and 9500 series.                                 11:34:36

19       THE COURT:  All right.  So we don't have separate              11:34:41

20  figures for the three of those?                                     11:34:43

21       THE WITNESS:  I don't know whether, in the details            11:34:46

22  that we provided, it has that breakout.                             11:34:52

23       Actually, in the materials that I submitted, there             11:34:58

24  is a schedule called Schedule 1.1, and it does provide a            11:35:02

25  breakout of 9300, 9400, and 9500.                                   11:35:10

─────Becker, S. - Direct─────

```
 1              THE COURT:  Well, you just said it didn't.        11:35:19
 2              THE WITNESS:  Well, the summary schedules -- the  11:35:20
 3    annual summaries that I provided roll everything up, but then 11:35:24
 4    there is a subsidiary schedule that is one of the pages in  11:35:28
 5    the -- I think it's about 70 pages of materials that I      11:35:32
 6    provided do have the breakout of these models down at the   11:35:35
 7    individual model level.                                     11:35:43
 8              THE COURT:  All right.                            11:35:45
 9              (Plaintiff Exhibit PTX-1248 was received in       11:35:45
10    evidence.)                                                  11:35:45
11    BY MR. JAMESON:                                             11:35:45
12    Q.  Dr. Becker, are there any areas of disagreement you care 11:35:51
13    to comment between what you submitted to the Court and what 11:35:56
14    Mr. Malackowski submitted to the Court?                     11:36:00
15    A.  Yes.  I think if we -- if it's possible to go to the    11:36:02
16    materials that I submitted, I could identify one significant 11:36:09
17    difference.                                                 11:36:17
18    Q.  Direct us where you would like to go, Dr. Becker, and we 11:36:20
19    can pull it up.                                             11:36:22
20    A.  Okay.  In the materials that I submitted on June the 19th 11:36:24
21    that include the missing 3850 and 4500 series data, the front 11:36:30
22    group of pages, if we go to the very first page, it's a     11:36:41
23    schedule that is the '856 patent summary.                   11:36:45
24    Q.  Do you want to do that on the U.S. basis or worldwide   11:36:52
25    basis?                                                      11:36:57
```

Becker, S. - Direct

```
 1    A.  Well, if we want to be apples to apples with what      11:36:57

 2    Mr. Malackowski presented, I would say go to the sixth page 11:37:02

 3    into this set, and this is on a worldwide basis.            11:37:05

 4            What you can see, the Catalyst switch data is where 11:37:11

 5    Mr. Malackowski and I have a difference.  I think with      11:37:17

 6    respect to the other categories, there would not be any, as 11:37:20

 7    you say, daylight between Mr. Malackowski's presentation and 11:37:25

 8    mine, but with respect to Catalyst switches, you'll see that 11:37:29

 9    the predecessor Catalyst switch models listed for fiscal 2017 11:37:33

10    is $4.876 billion.                                          11:37:39

11            So the 12 months -- kind of completely clean 12     11:37:44

12    months prior to the introduction of the accused Catalyst    11:37:49

13    models, those Catalyst 3000 series, 4500 series, and 6500   11:37:53

14    series total just under $5 billion, $4.9 billion of sales.  11:38:01

15    And you can see in the next column, in fiscal 2018, it      11:38:09

16    actually sold 5 billion of those models.                    11:38:12

17            And then if you look at the accused Catalyst 9000   11:38:15

18    series line, you'll see that those accused Catalyst models, 11:38:20

19    of course, the first year that they were sold is a partial  11:38:26

20    year, so it's only $817 million in the half of the year that 11:38:30

21    they were -- that they're accused, but if we go to fiscal   11:38:35

22    2019, you can see it's 5.2 billion, and then in fiscal 2020, 11:38:40

23    it's 4.8 billion.                                           11:38:46

24            So the stark difference that Mr. Malackowski showed 11:38:49

25    us on his slide 8 suggested that there was a very significant 11:38:54
```

—————Becker, S. - Direct—————

1    difference, but Mr. Malackowski's bar chart only includes the      11:39:02

2    3000 series switches.  It does not include the 4500 or 6500        11:39:06

3    series, which were, as we saw, predecessors to the accused         11:39:13

4    models.                                                            11:39:19

5            THE COURT:  All right.  Well, you're saying that           11:39:22

6    this chart is correct and his isn't.                               11:39:25

7            THE WITNESS:  Yes, sir.  I'm saying that his               11:39:28

8    excludes two models that sold close to -- oh, I think it's         11:39:32

9    over $2 billion worth of sales, and they are clearly               11:39:39

10   predecessors to the accused models, and he doesn't have any        11:39:43

11   revenue associated with those in any of the charts that he         11:39:47

12   presented.                                                         11:39:51

13           THE COURT:  But this chart does include it?                11:39:51

14           THE WITNESS:  Yes, Your Honor, it does.  This chart        11:39:54

15   does include it, and the monthly schedules that are provided       11:39:56

16   behind this do include it.                                         11:40:00

17           THE COURT:  All right.                                     11:40:08

18   BY MR. JAMESON:                                                    11:40:16

19   Q.  Dr. Becker, with respect to the sale of the DNA Center         11:40:16

20   products, did your calculations include a predecessor             11:40:20

21   product?                                                           11:40:24

22   A.  With respect to the DNA Center, it does include a              11:40:24

23   predecessor.  There were predecessor models to the DNA, the       11:40:35

24   accused model.  Mr. Malackowski shows the DNA Center              11:40:41

25   appliance just showing up at the date of its introduction,        11:40:46

—Becker, S. - Direct—

1    and there was a predecessor model for that.                    11:40:55
2    Q.  And, Mr. Simons, if we can go back to the '856 patent       11:40:57
3    slide --                                                        11:41:11
4           THE COURT:  Where would you find -- did you chart        11:41:12
5    the predecessor to the DNA like that chart you just showed      11:41:13
6    us?                                                             11:41:18
7           THE WITNESS:  Yes.  That would be shown on the --        11:41:19
8    for example, the '205 patent summary would show it, which      11:41:27
9    is -- Mr. Simons, it's Page 8 of the submission that says       11:41:36
10   '205 patent-WW.  So if you go -- stay with the patent          11:41:40
11   summaries in the front of the document, please.                11:41:48
12          MR. JAMESON:  Mr. Simons, to the very beginning of       11:41:53
13   the document in the '205 patent, worldwide summary.            11:41:56
14          THE WITNESS:  Keep going.  That shows it right           11:42:02
15   there.  So the Digital Network Architecture, you can see       11:42:07
16   about halfway down the page.  That has a predecessor.          11:42:13
17          THE COURT:  What is it?                                  11:42:35
18          THE WITNESS:  It is -- well, for part of the time,       11:42:35
19   that actual DNA Center product was out there, and let me see   11:42:40
20   with respect to -- let me get my data.                         11:42:50
21          I don't have the specific model numbers.  I could       11:43:22
22   get those.  I don't have that at my fingertips, but there      11:43:25
23   were predecessor models, there was an appliance and software   11:43:28
24   products that performed the same functions and role that the   11:43:35
25   DNA Center -- the accused DNA Center hardware began providing  11:43:40

Becker, S. - Direct

1   when it was introduced in September of 2017.                    11:43:46

2        THE COURT:  All right.  I think your time is about          11:43:54

3   up, Mr. Jameson.                                                 11:43:56

4        MR. JAMESON:  One final question, Your Honor, and           11:43:58

5   I'll be done.                                                    11:44:00

6   BY MR. JAMESON:                                                  11:44:01

7   Q.  Dr. Becker, does any of the data that you provided to the    11:44:01

8   Court change any of your opinions in this case?                  11:44:04

9   A.  It does not.                                                 11:44:07

10        MR. JAMESON:  Thank you, Your Honor.                        11:44:09

11        THE COURT:  All right.  Well, I'll hear argument,           11:44:12

12   first from the plaintiff.                                        11:44:22

13        MR. ANDRE:  May I proceed?                                  11:44:59

14        THE COURT:  You may.                                        11:45:01

15        MR. ANDRE:  And we'll pick up on slide 24 in the            11:45:02

16   book that we gave you, Your Honor.                               11:45:09

17        Now, in the 2015-2016 time period -- if we can go to       11:45:12

18   presentation mode, Geoff.                                        11:45:19

19        THE COURT:  All right.  I got it.                           11:45:27

20        MR. ANDRE:  Okay.  The slide 24, this was an exhibit        11:45:28

21   we entered, PTX-1450.  This was an SEC filing from the           11:45:32

22   2015-2016 time period.                                           11:45:38

23        What we showed in this case, Your Honor, was that          11:45:39

24   Cisco recognized that their switches and routers were going      11:45:41

25   to be commoditized, and that was what they wanted to avoid,      11:45:46

Carol L. Naughton, Official Court Reporter

1    so they went through a process of redesigning and trying to        11:45:49

2    come up with a new networking solution.  That's what this         11:45:52

3    case is really about.  And you remember the famous press          11:45:56

4    release you saw many times, PTX-452, about the launch of the      11:46:00

5    new era of networking, and they successfully launched that in     11:46:04

6    the summer of 2017.                                                11:46:08

7            And the next slide, 25, in the SEC filing in              11:46:09

8    2017-2018 time period, they state, quote, "In fiscal 2017,        11:46:18

9    they announced the initial development of new network product     11:46:22

10   offerings that feature intent-based networking technology."       11:46:25

11   And they focused on security.  The impetus of this or kind of     11:46:31

12   the anchor of this whole product offering was the Catalyst        11:46:35

13   9000 series of switches.                                          11:46:39

14           Now, this was such a successful launch, and we            11:46:40

15   showed you in the next slide, in PTX-333, the CEO announced       11:46:44

16   that --                                                           11:46:51

17           THE COURT:  Where are you?                                11:46:52

18           MR. ANDRE:  Slide 26, Your Honor.                         11:46:54

19           THE COURT:  All right.  I'm looking at slide 25.          11:47:00

20           MR. ANDRE:  Slide 25 is the SEC filing from the           11:47:04

21   2017-2018 time period.                                            11:47:08

22           THE COURT:  All right.  Just a second.                    11:47:10

23           MR. ANDRE:  And that's PTX-1449.                          11:47:17

24           THE COURT:  All right.  We're on 26 now?                  11:47:36

25           MR. ANDRE:  Yes.  This is PTX-333.  This is during        11:47:38

| | |
|---|---|
| 1 | an earnings call.  This is where Chuck Robbins, the Chairman | 11:47:41 |
| 2 | and CEO of Cisco, announced that "Cyber security continues to | 11:47:45 |
| 3 | be a top priority" for the business, "driving another | 11:47:49 |
| 4 | consecutive quarter of double-digit growth."  This was the | 11:47:53 |
| 5 | double-digit-growth issue that came up in our case, and you | 11:47:56 |
| 6 | see above where the CFO, Kelly Kramer, announced that | 11:47:59 |
| 7 | "security was up 14 percent with strong performances." | 11:48:03 |
| 8 | THE COURT:  All right. | 11:48:07 |
| 9 | MR. ANDRE:  If we go to slide 27, showing PTX-515, | 11:48:08 |
| 10 | this is where the CEO trumpets the 9K advances.  He says it's | 11:48:13 |
| 11 | the company's fastest selling product ever.  And you see in | 11:48:20 |
| 12 | the document it says, "There have been many highlights and | 11:48:22 |
| 13 | headlines about the Catalyst 9000 product family and its | 11:48:25 |
| 14 | meteoric rise since it was launched in June 2017."  "Fastest | 11:48:31 |
| 15 | ramping product in Cisco's history."  "Fastest to exceed | 11:48:31 |
| 16 | $1 billion quarterly run rate."  And then at the very bottom, | 11:48:37 |
| 17 | "Cisco more than doubles its Catalyst 9000 customer base," | 11:48:37 |
| 18 | "Cisco winner in campus switching." | 11:48:45 |
| 19 | Now, what this shows is this launch in the summer of | 11:48:46 |
| 20 | 2017 was a game changer for Cisco.  It took them out of the | 11:48:50 |
| 21 | commoditization business and put them into a whole new | 11:48:56 |
| 22 | vertical.  They now offered network infrastructure with | 11:49:00 |
| 23 | security, and it's hugely successful. | 11:49:05 |
| 24 | Now, we just saw Mr. Becker talk about how the | 11:49:07 |
| 25 | growth wasn't that great.  He included a lot of other | 11:49:11 |

1    switches in there, and a lot of those didn't quite sync up,          11:49:15
2    and we can talk about that in a few minutes, but what the CEO        11:49:18
3    is talking about, and what the market recognized, was a             11:49:22
4    tremendous growth of taking network infrastructure and adding       11:49:25
5    security to it.                                                      11:49:30
6          And because of this technology that they put into             11:49:30
7    their systems, the systems -- the technology that we have           11:49:34
8    accused of infringing here and provided the evidence of             11:49:37
9    infringement, they had great financial gains, and their sales       11:49:42
10   went up by double digits in the security market.                    11:49:46
11         So what we're seeking, Your Honor, in this case, for          11:49:51
12   damages, for past damages -- and slide 28 summarizes this.          11:49:53
13   We're looking for a reasonable royalty.  We took the -- what        11:49:57
14   Mr. Gunderson did is take the actual revenues, he apportioned       11:50:03
15   the revenues to the smallest saleable practicing unit, as the       11:50:07
16   case law requires, and got to the actual footprint of the           11:50:12
17   invention.                                                          11:50:14
18         He then applied a royalty rate of 8 to 10 percent            11:50:14
19   and showed what that would result in as far as damages.  And        11:50:17
20   damages ranged between 445.6 to 557 million.  Now, this is          11:50:20
21   not the newest numbers we got just last week, because it only       11:50:26
22   goes through December 2019.  We don't have any 2020 numbers         11:50:31
23   in this.  So that's the reason --                                   11:50:35
24         THE COURT:  What did you apply the percentage to?            11:50:35
25         MR. ANDRE:  We did it to the apportioned revenues.          11:50:39

1    We took the revenues of the accused products over the time          11:50:42

2    period from June of '17 through December of 2019; we then did       11:50:45

3    an apportionment -- and we'll go through the apportionment          11:50:51

4    that we did -- based on top-line functionality, and then we         11:50:54

5    applied the percentages to that.                                    11:50:58

6            So that's the reason we're asking for the                   11:51:01

7    accounting, because the damages period ended in December and,       11:51:03

8    obviously, we're in June, and now we have those numbers,            11:51:07

9    based on last week.  We just don't have them in -- we're not        11:51:10

10   presenting it in our case in chief.                                 11:51:12

11           We're also looking for the relative pre- and                11:51:14

12   post-judgment interest and then the enhanced damages.               11:51:16

13           And let me talk a little bit about some of the              11:51:20

14   issues Your Honor raised.  And we'll go to the next slide.          11:51:22

15   This is the royalty rate.  This is the 10 and 5 percent that        11:51:23

16   we used in the Keysight.  And Your Honor mentioned that, with       11:51:26

17   Keysight, you're not sure how you would weigh that because it       11:51:30

18   was in the middle of litigation.                                    11:51:35

19           This is relevant, to me, because a few years back I         11:51:36

20   had a series of trials in front of Judge Strom in Omaha,            11:51:38

21   Nebraska.  And we had a case against AT&T and Sprint and then       11:51:44

22   T-Mobile.                                                           11:51:48

23           In the case against AT&T, we did the whole trial.           11:51:49

24   We got right to the morning of my closing argument, and             11:51:52

25   Ms. Kobialka and the teams took all night negotiating a             11:51:55

1    settlement.  So when I got up in the morning to go do my         11:51:58
2    closing argument, they had settled the case.                     11:52:01
3            So the very next case with Sprint --                     11:52:03
4            THE COURT:  Why don't you turn them loose again?         11:52:06
5            MR. ANDRE:  Well, we tried.  Ms. Kobialka is like a      11:52:09
6    pit bull once she gets ahold of something.                       11:52:13
7            She pulled an all-nighter, and her crew, and they        11:52:18
8    got the case settled, and we went to the next trial against      11:52:20
9    Sprint, and we wanted to use that settlement agreement, and      11:52:21
10   Sprint raised the argument saying that it's not relevant         11:52:24
11   because it was in the middle of litigation.  It actually         11:52:26
12   happened right before closing.                                   11:52:26
13           And Judge Strom -- he let that settlement in, and we     11:52:27
14   got the verdict against Sprint, and then that went up on         11:52:33
15   appeal to the Federal Circuit, and they raised this issue        11:52:37
16   that came up in this court, is that that settlement             11:52:39
17   agreement, because it happened in the middle of litigation --    11:52:41
18   here it's at the very end of litigation -- it shouldn't have     11:52:41
19   been admitted; it wasn't relevant.                               11:52:44
20           And this is a quote from the Federal Circuit.  This     11:52:46
21   is the *Prism Technology v. Sprint* case.  I actually argued    11:52:48
22   this Federal Circuit argument, as well, so it kind of hits me   11:52:52
23   personal.                                                        11:52:54
24           And it says, "The circumstances of the AT&T              11:52:55
25   settlement agreement affect the Rule 403 assessment in ways     11:52:58

3459

1    that support the district court's admission of the                11:53:03
2    agreement."                                                        11:53:03
3            And if you read this quote, it actually talks about        11:53:03
4    how this settlement agreement is more probative than a             11:53:05
5    pretrial case.  It says -- it takes away a lot of the              11:53:11
6    mystery.  The case is before the parties.                          11:53:15
7            And in the example of Keysight, they saw our case          11:53:17
8    and how strong it was.  There was still a risk we would not        11:53:20
9    have gotten a jury verdict; there was a risk they could have       11:53:24
10   invalidated the patent; there's all that kind of stuff.            11:53:24
11           But what this case -- the proposition it stands for        11:53:27
12   is that the settlement agreement that was reached right            11:53:30
13   before the closing argument can actually be more reliable and      11:53:34
14   more probative than one that was before the litigation.            11:53:37
15           So that's the reason we think the Keysight                 11:53:41
16   settlement agreement is relevant.  And there's no other           11:53:46
17   license agreement in this entire case.  Cisco said they            11:53:50
18   didn't have any license agreement.  So this experience I had       11:53:53
19   with Judge Strom and then at the Federal Circuit really kind       11:53:56
20   of played very heavily in my mind why we wanted to use the         11:54:00
21   Keysight settlement agreement.                                     11:54:03
22           And then when it comes to the apportionment level,         11:54:06
23   this, once again, hits me kind of personal.  If we go to the       11:54:09
24   next slide, we did the top-level function apportionment.  You      11:54:12
25   remember Dr. Striegel talked about this.  The reason we did        11:54:17

3460

```
 1    this is because, once again, it's another case I tried here        11:54:20
 2    in Northern California in front of Judge Friedman.                  11:54:23
 3           We tried the case, and we had a technical expert do          11:54:26
 4    top-level function apportionment, just like Dr. Striegel did.       11:54:29
 5    It's the exact same methodology.  The other side argued that        11:54:33
 6    it wasn't appropriate because you shouldn't give equal weight       11:54:36
 7    to the boxes and et cetera, et cetera, and some things fit          11:54:40
 8    in, and some things don't.                                          11:54:41
 9           We got the jury verdict in that case.  Took it up on         11:54:45
10    the appeal to the Federal Circuit.  I, once again, argued           11:54:45
11    this case to the Federal Circuit, and they said this                11:54:48
12    top-level function apportionment is exactly the right way of        11:54:51
13    doing apportionment.  It's exactly the way Dr. Striegel did         11:54:54
14    it.                                                                 11:54:59
15           So I wanted to give those two, really, personal              11:54:59
16    experiences for me because, once again, we tried the case, we       11:55:02
17    took it to the Federal Circuit, they approved of this               11:55:05
18    methodology in saying that it should be one of the ways of          11:55:07
19    doing it.                                                           11:55:12
20           So the evidence we present in the case with the              11:55:13
21    damages in particular, we first looked at how profitable the       11:55:17
22    Cisco's accused products were.  And you saw that, in this           11:55:20
23    case, that the switches and routers and all the appliances          11:55:24
24    had a very high profitability.                                      11:55:30
25           I mean, this is hardware, and they're having                 11:55:32
```

| | | |
|---|---|---|
| 1 | profitability ranging anywhere from 56 to 91 percent, | 11:55:34 |
| 2 | 91.5 percent.  The Digital Network Architecture, which they | 11:55:39 |
| 3 | kind of give away for free, is the only one that showed no | 11:55:43 |
| 4 | gross profit.  But the profit levels were astounding. | 11:55:45 |
| 5 | We then looked at the apportioned royalty, and this | 11:55:48 |
| 6 | is what we talked about, the top-line function apportionment. | 11:55:51 |
| 7 | So we did an apportionment of the Catalyst switches.  We took | 11:55:55 |
| 8 | the total revenue and got a base and apportioned it down to | 11:55:58 |
| 9 | 31 percent of the revenue.  And you see 25 percent for the | 11:56:02 |
| 10 | Aggregation Services Routers, 44 percent for Integration | 11:56:02 |
| 11 | Services Routers, et cetera. | 11:56:09 |
| 12 | That's the apportionment that Dr. Striegel did based | 11:56:10 |
| 13 | on his technical analysis.  And he took the lowest number. | 11:56:13 |
| 14 | For example, the Catalyst switches, the functionality in some | 11:56:17 |
| 15 | of them were 5 and 13 and 6 and 13, but we went to the lowest | 11:56:20 |
| 16 | number, 4 and 13.  We gave the most conservative number in | 11:56:23 |
| 17 | each instance. | 11:56:28 |
| 18 | So that was how we got our apportionment royalty | 11:56:30 |
| 19 | base.  We applied this percentage of apportionment to the | 11:56:33 |
| 20 | sales number.  And when you do that, on the next slide, you | 11:56:33 |
| 21 | see that these are the total sales we had at that time of | 11:56:37 |
| 22 | switches and routers and et cetera, and you see the Catalyst | 11:56:43 |
| 23 | switches were $8 billion.  You were just told Dr. Becker's | 11:56:46 |
| 24 | number is closer to $11 billion if you were to put updated | 11:56:50 |
| 25 | numbers in, but it's $8 billion at the time we had it. | 11:56:52 |

```
 1              We took the apportionment value of 31 percent.  That    11:56:56
 2   gives you the apportioned revenue, the royalty base.  So the       11:56:59
 3   royalty base was $5.53 billion.  No instead of having the          11:57:02
 4   $16 billion, we apportioned down to $5 billion, which is a         11:57:08
 5   pretty significant apportionment, down almost more than            11:57:12
 6   one-third.  So it's almost a 68, 69 percent apportionment,         11:57:15
 7   taking those revenues out to get to the footprint of the           11:57:19
 8   invention.                                                         11:57:22
 9              Now, as I said earlier, then we had to figure out       11:57:24
10   what royalty rate to apply to this apportioned base of            11:57:28
11   $5.53 billion, and we asked Cisco, Do you have any comparable     11:57:33
12   licenses?  And in their interrogatories, they said they're        11:57:36
13   not aware of any Patent License Agreement that relates to the     11:57:40
14   functionality of the accused instrumentality.                     11:57:42
15              So Cisco said they had no licenses whatsoever.  So     11:57:46
16   the only license that was relevant in this case is Keysight      11:57:48
17   and how the Court weighs that Keysight license.                   11:57:51
18              So we took the Keysight license, and we applied the   11:57:54
19   royalty rate of 10 and 8 percent.  The 10 percent rate was      11:57:58
20   based on the fact that it was a competing product.  These are   11:58:02
21   competing products.  This is taking sales out of               11:58:08
22   Centripetal's pockets.  So we went into a higher royalty      11:58:10
23   rate.                                                          11:58:14
24              We reduced it down 2 percent, less than all the    11:58:15
25   patents that are found to be infringing.  So you apply the 8  11:58:17
```

Carol L. Naughton, Official Court Reporter

1    and 10 percent to the royalty basis of each one of these        11:58:21

2    categories, and you get these numbers we talk about;            11:58:23

3    $555.2 million at 10 percent and $444.3 million at 8 percent.    11:58:28

4         So that's what Mr. Gunderson provided in his               11:58:33

5    opinions.                                                        11:58:37

6         Now, one of the things that was interesting in the         11:58:38

7    last two weeks, after Your Honor ordered Cisco to provide the    11:58:41

8    numbers of the predecessor products and the current             11:58:45

9    products -- and we looked at the actual increase in             11:58:48

10   revenues -- now, we only applied it to the 3000 series.  And    11:58:52

11   that was based on what the evidence was that went into this     11:58:59

12   case.                                                            11:59:02

13        The two exhibits we just saw, they weren't produced        11:59:02

14   in this case; we never saw them before.  What we had was the    11:59:05

15   closing argument, and this was Cisco's attorney, and they're    11:59:08

16   doing the line of how the 9000 switch evolved.  And this is     11:59:13

17   on Page 3369 through 3370 of the trial transcript.             11:59:18

18        And Cisco's attorney said, "And so what we see here       11:59:22

19   on top, the history of the Catalyst 9000 is 3850 and 3650."     11:59:26

20   So they said that the history was the 3850 and 3650, and        11:59:31

21   that's what evolved to the 9000 series of switches.  And so     11:59:36

22   when Peter Jones is working on it, and as you see, you can go   11:59:41

23   through it, in 2016 there's a 3650 and 3850; in 2019 there's    11:59:42

24   a Catalyst 9000 released with these updates.                    11:59:46

25        So we based that on the evidence that went into this       11:59:49

```
 1    case, that plus Exhibit 1248, PTX-1248.  So we limited that    11:59:53
 2    to the 3000 series on those explicit statements from Cisco's   11:59:58
 3    counsel.                                                       12:00:04
 4            We then looked at the overage based on those          12:00:04
 5    revenues, and we go to the next slide, and this is slide 22,   12:00:08
 6    I'm sorry.  This is out of order, Your Honor.  This is going   12:00:14
 7    back to slide 22 in your book.                                 12:00:16
 8            If we look at the accused switches and the increase    12:00:18
 9    in revenues based on the 3000 series compared to the 9000     12:00:21
10    series -- and you saw the increase in revenues over this time  12:00:26
11    period -- and we apply a royalty rate, and you get a royalty   12:00:29
12    rate of -- royalty numbers based on this increased sale,       12:00:33
13    looking at the footprint here, of $557 million at 10 percent  12:00:38
14    and $446 million at 8 percent.                                 12:00:42
15            What is somewhat remarkable about that -- and this     12:00:45
16    is based on just the raw numbers they put forward -- is that   12:00:48
17    is almost spot on with Dr. Gunderson's apportionment method.   12:00:52
18    At 10 percent, he had $555 million, instead of 557, and at     12:00:56
19    8 percent, he had $444 million, instead of 446.                12:01:01
20            So if we did just the royalty based just on increase   12:01:05
21    and revenues that these new products offered, they come out    12:01:09
22    almost spot on with what Mr. Gunderson had argued based on     12:01:12
23    the apportionment that was done with Dr. Striegel.             12:01:16
24            So those are the damages that we're looking at --      12:01:28
25    the actual numbers.                                            12:01:34
```

| | | |
|---|---|---|
| 1 | We're also seeking other remedies in this case, as | 12:01:35 |
| 2 | we've talked about.  If we can go back to slide 36 and 37, we | 12:01:39 |
| 3 | are looking for injunctive relief. | 12:01:42 |
| 4 | Now, we appreciate the important role that Cisco | 12:01:45 |
| 5 | plays in the networking industry and networking business and | 12:01:49 |
| 6 | in the role that security plays, and we don't want to take | 12:01:53 |
| 7 | those routers and switches off the market.  That's not what | 12:01:57 |
| 8 | our goal is here. | 12:02:00 |
| 9 | Our goal is injunctive relief to stop infringement | 12:02:01 |
| 10 | of the firewalls.  That's a direct competing product, and our | 12:02:04 |
| 11 | product, RuleGATE, can go in there. | 12:02:08 |
| 12 | Monetary compensation cannot address the irreparable | 12:02:11 |
| 13 | harm that Centripetal has been facing since Cisco's come onto | 12:02:16 |
| 14 | this market.  We've lost market share, not only to Cisco, but | 12:02:20 |
| 15 | to other companies that are copycatting it.  We heard | 12:02:22 |
| 16 | evidence of that.  We've had injury to our reputation.  We're | 12:02:27 |
| 17 | not the ones in the forefront now, as we were before, early | 12:02:28 |
| 18 | on.  There's the willful nature of the infringement, because | 12:02:32 |
| 19 | we were -- we had an NDA signed with Cisco, and Cisco is a | 12:02:36 |
| 20 | roadmap for their copycats, their competitors. | 12:02:41 |
| 21 | The balance of hardship clearly weighs in favor of | 12:02:44 |
| 22 | Centripetal.  It's a small company fighting day-to-day to | 12:02:47 |
| 23 | survive against Cisco, and taking the technology out of their | 12:02:49 |
| 24 | firewalls so Centripetal can put their appliances into that | 12:02:53 |
| 25 | network is not going to have a dramatic effect on Cisco, but | 12:02:59 |

1    it would have that on Centripetal.                      12:03:04

2            THE COURT:  What did you just say?              12:03:08

3            MR. ANDRE:  That taking the infringing technology    12:03:11

4    out of Cisco's firewalls, only the firewalls -- we're not    12:03:14

5    asking to take it out of the routers and switches.  Taking it    12:03:18

6    out of the firewalls, it would not have a material impact on    12:03:21

7    Cisco.  Their big business is routers and switches.  But it    12:03:24

8    would have a major impact on Centripetal.               12:03:29

9            If we can put our RuleGATE products into these    12:03:32

10   networking systems using advanced technology, that would have    12:03:37

11   a material impact on Centripetal and wouldn't have a hardship    12:03:41

12   on Cisco.  So that's the reason we want the injunction on the    12:03:45

13   firewalls only.                                          12:03:48

14           The injunction does serve the public interest.    12:03:49

15   Obviously, patents are there to prevent people from       12:03:52

16   unlawfully or, without licenses, putting their -- taking    12:03:57

17   someone's technology and just using it.  It does protect them    12:04:02

18   from innovation and innovative companies like Centripetal.    12:04:06

19           Public interest is also served.  As you heard in    12:04:10

20   this case, Centripetal's product is fast.  It can do 5    12:04:12

21   million rules compared to 10,000 rules.  It is a better    12:04:15

22   product offering.  Centripetal can offer better security at    12:04:18

23   the firewall than what Cisco can do.  And Centripetal can    12:04:22

24   meet the public need for this technology.  We have the    12:04:28

25   infrastructure and the capability to ramp up and supply sales    12:04:31

```
 1    for any of those Cisco firewalls.                      12:04:36

 2            With the routers and switches, all we're asking for  12:04:39

 3    is a running royalty.  We think that if they want to keep the  12:04:41

 4    infringing technology in the routers and switches, that's   12:04:44

 5    okay, but they should pay a royalty going forward for the   12:04:47

 6    life of these patents, as long as that technology is in.   12:04:50

 7            So that's what we're asking for, Your Honor, on the  12:04:58

 8    additional remedies outside of the monetary damages for the  12:05:00

 9    past infringement.                                    12:05:03

10            Unless Your Honor has any questions, I'll turn it   12:05:05

11    over to Mr. Jameson and let him give his argument.    12:05:07

12            THE COURT:  All right.                         12:05:10

13            MR. ANDRE:  Thank you.                         12:05:11

14            MR. JAMESON:  Your Honor, may I proceed?       12:05:14

15            THE COURT:  You may.                           12:05:18

16            MR. JAMESON:  Mr. Andre, could we pull up slide 26,  12:05:18

17    please.                                               12:05:21

18            Your Honor, there was testimony about this at trial,  12:05:21

19    and I just want it to be crystal clear that the double-digit  12:05:33

20    growth in security, that 14 percent, if you look in the   12:05:38

21    record -- it's at around Page 1531 -- the security segment of  12:05:41

22    the market has no reference to switches and router   12:05:48

23    technology.  That is a different segment in Cisco's breakout  12:05:52

24    of how it reports earnings for its product.           12:05:58

25            And there's testimony on that in the record, so I   12:06:01
```

```
 1    just wanted to make that point clear.                    12:06:04
 2             And then, Lori, I need to pull up a PowerPoint.  Can  12:06:07
 3    I just share the screen, and will it work that way?      12:06:13
 4             THE CLERK:  Yes, sir.                            12:06:16
 5             MR. JAMESON:  Okay.  I think that works.         12:06:44
 6             Your Honor, this is in your binder that we submitted  12:06:47
 7    to the Court, as well, and I wanted to begin with a very  12:06:50
 8    important point here, which is the various accused        12:06:57
 9    combinations --                                           12:07:01
10             THE COURT:  Which book is this in?               12:07:02
11             MR. JAMESON:  It should be in "Additional materials  12:07:05
12    for damages hearing."  It should be the first document.   12:07:07
13             THE COURT:  All right.  I've got it.             12:07:13
14             MR. JAMESON:  And I'm at slide 3.                12:07:15
15             The accused combinations is a very important point  12:07:18
16    in this case because when you look at the patented        12:07:22
17    improvement, which is, if we're going to get to damages in  12:07:27
18    this case, that's what it's all about.  There is a consistent  12:07:30
19    proof thematic throughout this case that Centripetal points  12:07:38
20    to the patented improvements in the management appliance;  12:07:40
21    Stealthwatch, DNA, ISE, FirePower Management Consoles.   12:07:45
22             They're not pointing to the patented improvements in  12:07:55
23    the Catalyst switches in the Aggregation Services Routers, in  12:07:57
24    the Integration Services Routers, or in the firewalls that  12:08:01
25    are at issue, because those products have been in the    12:08:06
```

```
1    marketplace for the better part of two decades and they've      12:08:10
2    been dealing with packet-filtering rules and blocking traffic   12:08:13
3    and rule swapping and things like that for a long, long time.   12:08:17
4    And so that's an important point to keep in mind when you get    12:08:21
5    to damages, which is:  Where is the patented improvement?        12:08:27
6           With respect to Mr. Gunderson's analysis, Dr. Becker      12:08:31
7    hit on this at trial.  And Mr. Gunderson went all in.  He did    12:08:38
8    a one-stop shopping that Cisco owes $446 million to              12:08:43
9    $557 million based on an infringement of all five patents and    12:08:51
10   all five patents being found invalid.                           12:08:55
11          He did no analysis on a patent-by-patent basis.          12:08:57
12   That is very important because, for example, his royalty base   12:09:02
13   remains the same no matter what patent might be infringed or    12:09:07
14   valid, but the dates of first infringement are wildly across    12:09:13
15   the board with respect to the various patents, and so at a      12:09:21
16   bare minimum, that royalty base should be changing every        12:09:23
17   single time that we're talking about a specific patent.         12:09:26
18          And so big picture; he's all in.  It's five             12:09:30
19   infringements, five valid patents.                              12:09:35
20          Now, with respect to the three data points that he       12:09:38
21   uses, Dr. Becker called this a three-legged stool, and that     12:09:40
22   if any leg of the stool is broken or flawed, the entire         12:09:47
23   analysis breaks down.  And, respectfully, every single leg of   12:09:51
24   his stool is flawed.                                            12:09:55
25          Beginning with the Keysight royalty rate, you            12:09:58
```

```
 1    presided over that trial.  You've heard all the differences      12:10:01
 2    of what led to that two-page term sheet, a midtrial               12:10:05
 3    settlement, a worldwide license to 23 patents.  Keysight was      12:10:10
 4    a direct competitor --                                            12:10:17
 5            THE COURT:  Why do we talk sometimes about U.S.           12:10:21
 6    sales and other times about worldwide sales?                      12:10:25
 7            MR. JAMESON:  Well, Your Honor, candidly, our view        12:10:28
 8    of the world is that this is a patent case about U.S. patents     12:10:30
 9    and that U.S. sales should be at issue.  They're making the       12:10:34
10    argument that they're entitled to worldwide sales.  We            12:10:38
11    obviously disagree with that, and that's why Dr. Becker, in       12:10:42
12    his supplemental material he provided to the Court, he has        12:10:45
13    broken this down on both the U.S. and a worldwide basis.          12:10:49
14            THE COURT:  Well, I mean, if the products were made       12:10:53
15    in the U.S., or designed in the U.S., it wouldn't make any        12:10:59
16    difference where they were sold, would it?                        12:11:07
17            MR. JAMESON:  And there has been evidence in this         12:11:10
18    case that certain things that they're accusing are not in the     12:11:13
19    United States.  And --                                            12:11:16
20            THE COURT:  Well, I don't think everything was in         12:11:20
21    the United States.  I think that's right.                         12:11:22
22            MR. JAMESON:  That's right.                               12:11:25
23            And, Your Honor, the point about beginning with the       12:11:27
24    Keysight royalty rate is, somehow or another, Mr. Gunderson       12:11:29
25    ignores the lump sum payment for past damages, which is what      12:11:34
```

| | | |
|---|---|---|
| 1 | we're fighting about here, and instead, he goes to the | 12:11:38 |
| 2 | running royalty rate that was 5 percent and 10 percent for | 12:11:41 |
| 3 | directly competitive products, and somehow or another, he | 12:11:45 |
| 4 | bumps that up to 8 to 10 percent, and that just doesn't make | 12:11:51 |
| 5 | any logical sense at all.  He made no attempt to demonstrate | 12:11:55 |
| 6 | technical comparability or comparability between -- | 12:12:01 |
| 7 | THE COURT:  Does the running royalty apply to future | 12:12:05 |
| 8 | sales or past sales or both? | 12:12:08 |
| 9 | MR. JAMESON:  It applied to a three-year term | 12:12:10 |
| 10 | following the trial. | 12:12:12 |
| 11 | THE COURT:  So it was future sales. | 12:12:15 |
| 12 | MR. JAMESON:  Future sales. | 12:12:17 |
| 13 | THE COURT:  All right.  Well, 25 million could apply | 12:12:18 |
| 14 | to past sales, couldn't it? | 12:12:23 |
| 15 | MR. JAMESON:  But he didn't, Your Honor, and | 12:12:26 |
| 16 | Keysight and Centripetal didn't agree to a running royalty | 12:12:28 |
| 17 | for past sales.  They agreed to a lump sum.  And the | 12:12:32 |
| 18 | testimony in this case is that's what Cisco would prefer, is | 12:12:35 |
| 19 | a lump sum payment, which is ultimately what Dr. Becker did. | 12:12:39 |
| 20 | And keep in mind the Keysight agreement -- | 12:12:43 |
| 21 | THE COURT:  Well, it seems like every time somebody | 12:12:46 |
| 22 | gets into a running royalty rate, the case comes right back | 12:12:49 |
| 23 | to the Court in a dispute over what the royalty applies to. | 12:12:53 |
| 24 | MR. JAMESON:  That is exactly right, and the running | 12:12:59 |
| 25 | royalty in the Keysight case was for a worldwide license to | 12:13:02 |

```
 1    23 patents.  Here we're dealing with five patents on a U.S.      12:13:07
 2    basis.  And Dr. Becker went through all of this in his          12:13:11
 3    testimony, as to why that rate just doesn't make any sense      12:13:14
 4    and should not be used, and if you throw out that rate, then    12:13:18
 5    Mr. Gunderson's analysis, at that point, the stool is broken.   12:13:21
 6    You go to the royalty base.                                     12:13:26
 7          He's got 100 percent of every sale of every product      12:13:29
 8    that's at issue in this case regardless of the accused          12:13:34
 9    combination.  That cannot be right.                             12:13:36
10          THE COURT:  Well, no, he didn't.  He apportioned it      12:13:39
11    based on the functionality of the various elements of the      12:13:42
12    system.                                                         12:13:50
13          MR. JAMESON:  Your Honor, I'm going to get to that       12:13:51
14    next, but his beginning royalty base is 100 percent of every   12:13:53
15    router and switch that was sold, regardless of whether it's    12:13:58
16    part of an accused combination, and we would need to -- you    12:14:01
17    would -- at a bare minimum, you would need to go through on a   12:14:07
18    patent-by-patent basis, look at the accused combination, and   12:14:11
19    figure out what the numbers are for each accused combination,  12:14:15
20    and Mr. Gunderson made no effort to do that at all.            12:14:17
21          And in addition, there's a bunch of accused products    12:14:20
22    in his -- non-accused products in his base, such as tables     12:14:24
23    and replacement parts that are sold separately, and again,     12:14:30
24    Dr. Becker said that that number -- it approaches almost       12:14:35
25    $4 billion of non-accused products.  And so his base is        12:14:39
```

```
 1    flawed.                                                  12:14:44
 2            And then to your point about the apportionment   12:14:45
 3    issue, which is the third leg of the stool, Your Honor,  12:14:48
 4    Dr. Striegel's analysis -- it can't even get out of the  12:14:55
 5    batter's box.  He acknowledged that he did no analysis of the 12:14:58
 6    incremental value of the patented improvement, and that's 12:15:01
 7    what apportionment is all about.                         12:15:04
 8            And instead, he took -- he took 100 percent of   12:15:06
 9    processors, and he took 100 percent of ASICs, and he took 12:15:10
10    100 percent of switching technology, despite it being    12:15:15
11    absolutely beyond debate that processors and switches and 12:15:18
12    switching technology -- that that's got nothing to do with 12:15:25
13    the patented improvement in the inventions.  And every single 12:15:28
14    one of our technical experts took Dr. Striegel to task for 12:15:33
15    that.                                                    12:15:38
16            And so if -- and at a bare minimum, he had an    12:15:38
17    obligation to do a further apportionment analysis, and he 12:15:42
18    didn't do so, and so that leg of the stool is broken.  And 12:15:45
19    when all three legs of the stool are broken, Mr. Gunderson's 12:15:49
20    analysis -- it just doesn't work.                        12:16:02
21            So where do you go?  You go to Dr. Becker's      12:16:05
22    analysis.  And he is the only expert in this case that has 12:16:08
23    done an analysis on a patent-by-patent basis, and he     12:16:10
24    literally drilled down, and as part of his analysis, he  12:16:16
25    looked for what is the patented improvement; what is the 12:16:20
```

Carol L. Naughton, Official Court Reporter

```
 1   value of the patented improvement?  And that is exactly what    12:16:23
 2   the law requires.  At slide 7, the patentholder should only     12:16:26
 3   be compensated --                                               12:16:31
 4        THE COURT:  He lost me, Mr. Jameson, when he said          12:16:34
 5   that the only value to the security alerts was when it          12:16:39
 6   alerted and reduced it by a percentage of how many alerts       12:16:52
 7   there were as compared to how many packets were checked.        12:17:00
 8   There's no way the Court will accept that analysis.             12:17:07
 9        MR. JAMESON:  Is that with respect to the '856            12:17:11
10   patent?                                                         12:17:14
11        THE COURT:  Well, I think he did it on all the            12:17:16
12   patents, actually.                                              12:17:20
13        MR. JAMESON:  Well, Your Honor, he went through a         12:17:21
14   detailed analysis as to what he believed to be the patented    12:17:23
15   improvement in each patent, and we've got a number of slides   12:17:27
16   that show that.                                                 12:17:30
17        THE COURT:  Well, that particular theory borders on       12:17:32
18   the absurd.                                                     12:17:41
19        MR. JAMESON:  Your Honor, for every single patent,        12:17:46
20   he identified what he believed to be the patented improvement  12:17:49
21   and isolated the value of that.  And I will -- I can take you   12:17:53
22   through the --                                                  12:17:59
23        THE COURT:  Please don't do that again.  I've got it      12:18:01
24   in the record.                                                  12:18:04
25        MR. JAMESON:  Your Honor, I would be -- I would love      12:18:04
```

1    to respond to a question because Dr. Becker's analysis is          12:18:06
2    spot on under the law, and Mr. Gunderson's analysis could not      12:18:10
3    be more flawed.                                                     12:18:14
4            THE COURT:  I'm not talking about Mr. Gunderson's          12:18:17
5    analysis, but to expect the Court -- I mean, the analogy we        12:18:19
6    used -- the other side used, which I think is spot on,             12:18:25
7    talking about something spot on, is that an air bag in a           12:18:31
8    car -- or I suppose the same would apply to a seat belt -- is      12:18:36
9    of no value unless it deploys.  And that's -- as I said, that      12:18:43
10   borders on the absurd, and he made a huge reduction based on       12:18:51
11   that analysis.                                                     12:18:56
12           MR. JAMESON:  Your Honor, he --                            12:19:01
13           THE COURT:  Of course, most of the damages here           12:19:03
14   relate to switches and routers, as opposed to other parts of       12:19:07
15   the system.                                                        12:19:14
16           MR. JAMESON:  Your Honor, if we actually look at          12:19:17
17   what they identify as the so-called patented improvement,          12:19:20
18   it's not in the routers or switches, it is in the appliances       12:19:26
19   that manage or work with the routers and switches, and that        12:19:29
20   is exactly what Dr. Becker focused on as part of his               12:19:32
21   analysis.  The accused routers and switches --                     12:19:38
22           THE COURT:  That's not what Mr. Llewallyn and             12:19:40
23   Mr. Jones said.                                                    12:19:45
24           MR. JAMESON:  Your Honor, Mr. Llewallyn and               12:19:46
25   Mr. Jones -- they provided testimony that the accused routers      12:19:49

Carol L. Naughton, Official Court Reporter

 1   and switches and firewalls have been doing what is being          12:19:52
 2   accused for the better part of a decade, and that's what we        12:19:56
 3   show on slide 9, which is the routers and switches and             12:20:02
 4   firewalls, that we have been doing packet filtering, rule          12:20:06
 5   swapping, we've been using NetFlow, we've been processing          12:20:11
 6   rules, we've been dropping and blocking packets -- we've been      12:20:16
 7   doing that forever.  That's conventional technology in our         12:20:19
 8   routers and switches.                                              12:20:23
 9            And so the question becomes, What is the patented         12:20:24
10   improvement in these various patents?  And this is what these      12:20:29
11   slides, beginning at slide 10, on a patent-by-patent basis,        12:20:35
12   that's what we're trying to drill down into here.                  12:20:40
13            Prior to March 13th of 2018, Cisco routers and           12:20:46
14   switches, we were dropping packets; we were exporting NetFlow      12:20:52
15   records; we were analyzing NetFlow records; we were creating       12:20:58
16   rules and sending them down through the system.  And at a          12:21:04
17   high level, that appears to be what Centripetal is saying          12:21:08
18   this patent is about, but they focus on ETA.  Because they         12:21:13
19   had to find something new with respect to the '856 patent,        12:21:20
20   they focus on ETA.                                                 12:21:23
21            And a very important point:  The date of first           12:21:24
22   infringement here is March 13, 2018, it's not June 2017 when      12:21:31
23   ETA was announced.  It's a year later.  So we don't go back        12:21:37
24   to June 2017 with respect to this patent.  It's a different        12:21:41
25   damages period.                                                    12:21:45

| | |
|---|---|
| 1 | But what Dr. Becker did is focusing on what is new | 12:21:47 |
| 2 | and different, which is they're saying it's ETA working with | 12:21:51 |
| 3 | Cognitive Threat Analytics.  He looked at the actual:  How is | 12:21:59 |
| 4 | it being used in the marketplace?  What is the benefit of | 12:22:02 |
| 5 | this new technology?  And he focused on, first of all, the | 12:22:05 |
| 6 | number of customers that are actually using Stealthwatch, and | 12:22:09 |
| 7 | it was 2,493.  It's a whole lot less than the 98,800 | 12:22:14 |
| 8 | customers that have purchased routers or switches. | 12:22:22 |
| 9 | And then he looked at the testimony in the case. | 12:22:26 |
| 10 | How many customers are actually sending ETA-enabled NetFlow | 12:22:29 |
| 11 | to Stealthwatch and CTA for analysis?  And, Your Honor, it's | 12:22:34 |
| 12 | undisputed; the number is incredibly small.  And that is what | 12:22:37 |
| 13 | damages is about; what is the benefit of the patented | 12:22:43 |
| 14 | improvement?  And that's how he leads to his number of a | 12:22:47 |
| 15 | little over $2 million for the '856 patent.  And he proceeded | 12:22:51 |
| 16 | to do this for every patent. | 12:22:55 |
| 17 | And with respect to the '193 patent, he shows | 12:22:59 |
| 18 | everything that was already in the marketplace that appears | 12:23:04 |
| 19 | to be covered by the '193 patent, and it was the | 12:23:08 |
| 20 | implementation of packet-filtering rules.  Cisco's routers | 12:23:12 |
| 21 | and switches have been implementing packet-filtering rules | 12:23:18 |
| 22 | going back before the year 2000. | 12:23:21 |
| 23 | ISE was implemented in March of -- April of 2011. | 12:23:24 |
| 24 | ISE allows you to send quarantine commands.  Well, that's | 12:23:31 |
| 25 | what they're saying the '193 patent is all about.  Well, | 12:23:35 |

1    we've been doing that for eight years now.  So the question        12:23:39
2    becomes, What is the patented improvement relative to what we      12:23:44
3    have been doing?                                                   12:23:49
4            And Dr. Becker's analysis is it's very, very small,        12:23:51
5    because in order for them to make out their infringement case      12:23:58
6    for the '193 patent, despite all of their protests, they go        12:24:02
7    to Stealthwatch.  They reference Stealthwatch 24 times.  They      12:24:07
8    relied on CTA source code.  They relied on ISE source code.        12:24:12
9    And the reason that they do that is that information has to         12:24:17
10   be sent down from those devices through the routers and the        12:24:22
11   switches.  And the routers and the switches, what are they         12:24:26
12   doing?  They're implementing yet one more rule.  They've been      12:24:29
13   implementing rules for a decade, 10,000 or more, and that was      12:24:34
14   the point that Dr. Becker was making.                              12:24:38
15           The '193 patent, from a value proposition, it's just       12:24:41
16   one more rule that a router or a switch can implement.  And        12:24:45
17   what is the value of that?  It's not that valuable.                12:24:50
18           He goes through the same analysis for the '176             12:24:58
19   patent.  What existed previously?  What comes later?  What's       12:25:01
20   the patented improvement?  And again, the patented                 12:25:08
21   improvement that Centripetal relies on, they tie it to             12:25:13
22   changes in Stealthwatch and Cognitive Threat Analytics.  It's      12:25:18
23   got nothing to do with the routers or the switches.               12:25:23
24           And, in fact, if you look to the bottom right of           12:25:28
25   slide 14, actually, the date of first infringement, based on      12:25:31

Carol L. Naughton, Official Court Reporter

3479

1    the record evidence in this case, is going to be either April          12:25:37
2    of 2018 or sometime in 2019, because that's what Dr. Cole             12:25:40
3    relied on to prove up infringement.  It is not going back to          12:25:48
4    August of 2017.                                                        12:25:51
5            And again, the correlation and the sending of                 12:25:55
6    NetFlow up to Stealthwatch, that's been happening in the              12:26:01
7    marketplace for six years, at least.  And that's what                12:26:04
8    Dr. Becker focused on.                                                 12:26:10
9            And the important point of his analysis was that in           12:26:12
10   Cisco's experience, only .4 percent of threats are actually          12:26:20
11   identified using Cognitive Threat Analytics, and that was the         12:26:27
12   trigger point for Centripetal's infringement theory.  And            12:26:32
13   with that kind of de minimus use, that's how you value the           12:26:37
14   benefit of the patented improvement, and that led to                 12:26:44
15   Dr. Becker's analysis that this patent was worth a little            12:26:46
16   over $400,000.                                                         12:26:49
17           THE COURT:  Well, I guess if only .4 percent of seat          12:26:55
18   belts or air bags deployed, then they're only worth                   12:27:03
19   .4 percent of what it cost to put them in the system.                 12:27:13
20           MR. JAMESON:  Your Honor, I don't believe that was            12:27:17
21   Dr. Becker's point.  I believe if you look at the trial              12:27:18
22   transcript, what Dr. Becker said is that, if the air bag is          12:27:22
23   disabled, even if it's in the car, it's of no value.  That           12:27:29
24   was his point, if you look at the trial record.                      12:27:34
25           Obviously, if a car is sold with an air bag, of              12:27:37

Carol L. Naughton, Official Court Reporter

| | |
|---|---|
| 1 | course there's value in it, and he acknowledged that.  But | 12:27:39 |
| 2 | when it comes to damages, we have to figure out -- and again, | 12:27:44 |
| 3 | that's a very important point, because I know that's what he | 12:27:49 |
| 4 | testified to. | 12:27:52 |
| 5 |      THE COURT:  Of course, one threat that turned out to | 12:27:52 |
| 6 | include malware could cause millions of dollars in damages, | 12:27:59 |
| 7 | couldn't it? | 12:28:08 |
| 8 |      MR. JAMESON:  Well, certainly, a network threat that | 12:28:10 |
| 9 | gets through firewalls and gets past -- gets through | 12:28:13 |
| 10 | Stealthwatch and all the various security equipment that's | 12:28:17 |
| 11 | out there, it could -- | 12:28:21 |
| 12 |      THE COURT:  If that's all it was worth, your sales | 12:28:23 |
| 13 | wouldn't be so high. | 12:28:25 |
| 14 |      MR. JAMESON:  Your Honor, the switches and routers | 12:28:28 |
| 15 | sales are so high because Cisco is the leading company that | 12:28:30 |
| 16 | has been selling switches and routers going back to the | 12:28:33 |
| 17 | 1980s.  In fact, an interesting point is, even during this | 12:28:37 |
| 18 | litigation, the entity that actually bought an accused 9300 | 12:28:41 |
| 19 | switch from Cisco is Centripetal, because they needed the | 12:28:46 |
| 20 | best switching technology in the marketplace. | 12:28:49 |
| 21 |      They didn't buy it for network.  They didn't buy it | 12:28:52 |
| 22 | for network security.  They bought it because switches and | 12:28:54 |
| 23 | routers sold by Cisco are the best in the industry.  And do | 12:28:57 |
| 24 | switches and routers -- do they also implement security?  Of | 12:29:03 |
| 25 | course, they do.  But the fact that a network breach could be | 12:29:07 |

| | | |
|---|---|---|
| 1 | worth millions of dollars -- well, I mean, we still have to | 12:29:13 |
| 2 | look at what the patents cover.  We have to look at what the | 12:29:16 |
| 3 | patents cover, and these patents don't cover blocking all | 12:29:20 |
| 4 | network threats; they just don't.  I mean, the '806 patent is | 12:29:25 |
| 5 | a rule-swapping patent.  The '193 patent is literally the | 12:29:29 |
| 6 | implementation of a single rule. | 12:29:34 |
| 7 | And with respect to what's going on with | 12:29:40 |
| 8 | Stealthwatch and CTA, the fact that CTA is only being used in | 12:29:44 |
| 9 | .4 percent of threats, it doesn't mean that there's not other | 12:29:57 |
| 10 | technology that's being used to block those threats.  That's | 12:30:01 |
| 11 | just the percentage that's being used by CTA, and that's what | 12:30:04 |
| 12 | they're accusing of infringement with respect to the '176 | 12:30:09 |
| 13 | patent. | 12:30:14 |
| 14 | I mean, hopefully, these threats don't get into the | 12:30:15 |
| 15 | network because Cisco's firewall has blocked them, or maybe | 12:30:17 |
| 16 | Stealthwatch has done some kind of an analysis that is | 12:30:22 |
| 17 | allowed to implement a rule to stop future traffic from | 12:30:26 |
| 18 | coming in, but we've got to look at, from a damages | 12:30:31 |
| 19 | perspective, what are they accusing of infringement?  And | 12:30:35 |
| 20 | here, it's the interactions with CTA, and there's a very | 12:30:40 |
| 21 | limited-use case with respect to CTA. | 12:30:45 |
| 22 | And then, finally, with respect to the '205 patent, | 12:30:50 |
| 23 | again, this isn't tied to the routers and the switches, this | 12:30:56 |
| 24 | is tied to the management appliances.  Routers and switches | 12:31:03 |
| 25 | have been handling SIP traffic going back to, again, the year | 12:31:08 |

| | | |
|---|---|---|
| 1 | 2000.  Firewalls have been processing SIP traffic going back | 12:31:14 |
| 2 | to the year 2000. | 12:31:20 |
| 3 | The trigger point for infringement in this case, it | 12:31:21 |
| 4 | was tied to the release of the DNA Center in June of 2019, | 12:31:26 |
| 5 | and with respect to the firewalls, it was tied to the release | 12:31:37 |
| 6 | of the threat intelligence director in October of 2017, and | 12:31:44 |
| 7 | so the patented improvement, if any, that's what you look at | 12:31:49 |
| 8 | for purposes of a damages analysis, and that is exactly what | 12:31:54 |
| 9 | Dr. Becker did. | 12:31:59 |
| 10 | And he apportioned down, trying to find the patented | 12:32:01 |
| 11 | improvement, and it's not in the routers and the switches, | 12:32:06 |
| 12 | but it's in the appliances that are working with the routers | 12:32:11 |
| 13 | and the switches, and that resulted in a number of just over | 12:32:15 |
| 14 | $360,000. | 12:32:22 |
| 15 | I already hit on the '806 patent, but, again, Your | 12:32:26 |
| 16 | Honor, the record is unequivocal on this.  Rule swapping that | 12:32:30 |
| 17 | they're accusing of infringement, with respect to the '806 | 12:32:38 |
| 18 | patent, that's been happening in the Catalyst switches going | 12:32:42 |
| 19 | back to the year 2011 with the Catalyst 6500, and it was | 12:32:45 |
| 20 | happening back in 2013 with the ASA appliances when they | 12:32:51 |
| 21 | introduced the Transactional Commit Model software. | 12:32:59 |
| 22 | And that's what that patent is driving at, rule | 12:33:03 |
| 23 | swapping.  We've been doing that for nine years -- literally | 12:33:07 |
| 24 | what they're accusing, we've been doing for the better part | 12:33:13 |
| 25 | of a decade.  How do they create their infringement?  They go | 12:33:16 |

| | | |
|---|---|---|
| 1 | to the management appliances, and they say that there's | 12:33:19 |
| 2 | something new and different in the DNA Center, which was | 12:33:23 |
| 3 | released in late 2019, and that's the date of first | 12:33:28 |
| 4 | infringement as supported by the evidence at trial.  And | 12:33:35 |
| 5 | there's something about the DNA Center with preprocessing of | 12:33:39 |
| 6 | rules that they're going as the patented improvement, and | 12:33:43 |
| 7 | that's what Dr. Becker, again, focuses on. | 12:33:48 |
| 8 | And with respect to the '806 patent, based on what | 12:33:53 |
| 9 | Cisco has been doing with their firewalls and switches for | 12:33:57 |
| 10 | close to a decade, he found minimal improvement as to what | 12:34:02 |
| 11 | existed in the prior art, because Cisco's prior management | 12:34:07 |
| 12 | appliances -- they were pushing rules down as well.  And so | 12:34:11 |
| 13 | you have to ask yourself, What is the value proposition?  And | 12:34:16 |
| 14 | he said that there was no incremental profit, and therefore, | 12:34:20 |
| 15 | under the Georgia-Pacific analysis, he ultimately came out to | 12:34:24 |
| 16 | a number that was a little -- right at $260,000. | 12:34:28 |
| 17 | And I think it's really important to understand | 12:34:46 |
| 18 | that, when you are looking at these products like | 12:34:49 |
| 19 | Stealthwatch and ETA and Cognitive Threat Analytics, | 12:34:54 |
| 20 | Cognitive Threat Analytics -- listen, it's existing | 12:35:01 |
| 21 | technology, and Cisco hopes that it will explode over time, | 12:35:05 |
| 22 | but right now, the use case, it is de minimus.  And | 12:35:10 |
| 23 | Stealthwatch has been a product in the marketplace since | 12:35:16 |
| 24 | 2005.  That's where over 99 percent of the after-the-fact | 12:35:19 |
| 25 | analysis is being done. | 12:35:24 |

```
 1              THE COURT:  Do you think that, if there had been a        12:35:25
 2    negotiation, that the plaintiffs would have accepted total          12:35:30
 3    damages of $3 million?                                              12:35:36
 4              MR. JAMESON:  Well, Your Honor --                         12:35:39
 5              THE COURT:  3,300,000, do you think they would have       12:35:41
 6    accepted that?                                                      12:35:47
 7              MR. JAMESON:  To respond to Mr. Andre's comment           12:35:47
 8    about settlement offers and they were trying hard, there's         12:35:51
 9    never been a settlement offer made in this case.  So there's       12:35:55
10    never even been a real-world negotiation, much less a              12:35:57
11    hypothetical negotiation.                                          12:36:00
12              THE COURT:  Do you think that, if you would have         12:36:01
13    offered that, that they would have accepted that?                  12:36:01
14              MR. JAMESON:  Your Honor, they should have.  They        12:36:04
15    absolutely should have.  And, Your Honor, the fact that            12:36:06
16    there's an order-of-magnitude difference between what             12:36:14
17    plaintiff is seeking and what Dr. Becker says is the right        12:36:17
18    measure of damages, it doesn't mean that Dr. Becker, in any       12:36:25
19    way, shape, or form, is anything other than 100 percent          12:36:28
20    correct, because if you look at each one of these patents,        12:36:32
21    look at the struggle that they had to get each patent issued      12:36:38
22    by the Patent Office, narrowing amendment after narrowing         12:36:42
23    amendment after narrowing amendment --                            12:36:48
24              THE COURT:  That happens all the time.  We all know     12:36:51
25    that, Mr. Jameson.                                                 12:36:53
```

| | | |
|---|---|---|
| 1 | MR. JAMESON:  Well, Your Honor -- | 12:36:54 |
| 2 | THE COURT:  How many patents are issued on the first | 12:36:55 |
| 3 | time? | 12:36:57 |
| 4 | MR. JAMESON:  Your Honor, the problem -- | 12:37:00 |
| 5 | THE COURT:  I know a little bit more about it than | 12:37:02 |
| 6 | that. | 12:37:06 |
| 7 | MR. JAMESON:  The prosecution history of these | 12:37:06 |
| 8 | patents is extensive, and the claims got longer and longer | 12:37:08 |
| 9 | and longer, and when a claim gets longer, the claim gets | 12:37:11 |
| 10 | narrower and narrower and narrower. | 12:37:16 |
| 11 | And the law in the Federal Circuit is crystal clear | 12:37:19 |
| 12 | that what we are trying to achieve in looking at damages is | 12:37:26 |
| 13 | what is the value of the patented improvement.  And in each | 12:37:32 |
| 14 | one of these cases, the value proposition, if any, it is | 12:37:37 |
| 15 | de minimus, or minimal, based on what came before it, what | 12:37:44 |
| 16 | are the conventional components that are covered by the | 12:37:48 |
| 17 | claims, and that explains Dr. Becker's analysis. | 12:37:52 |
| 18 | This is -- and respectfully, Dr. Becker has done | 12:37:58 |
| 19 | exactly what I believe that the Federal Circuit expects | 12:38:07 |
| 20 | parties to do in trying to identify incremental value of the | 12:38:10 |
| 21 | patents. | 12:38:15 |
| 22 | THE COURT:  All right.  Well, I'll disregard your | 12:38:16 |
| 23 | statement that no settlement offer was made in the case, | 12:38:18 |
| 24 | because that's not admissible evidence.  It's not in | 12:38:24 |
| 25 | evidence, and nobody has a right to argue that.  So move on. | 12:38:27 |

```
 1          MR. JAMESON:  Your Honor, with respect to injunctive    12:38:34
 2   relief, today is the first that we've heard what they're      12:38:41
 3   asking for by way of an injunction.  I will note that in the  12:38:48
 4   findings of facts, they've not made any findings of fact with 12:38:53
 5   respect to injunctive relief.  They've not attempted to meet  12:38:59
 6   the four-factor test, and the idea that they believe that     12:39:02
 7   somehow or another firewall technology should be enjoined at  12:39:09
 8   some broad level, when Cisco has been offering firewalls in   12:39:13
 9   the marketplace for two decades, is clearly overreaching.     12:39:17
10          And we provide you with some law on injunctive         12:39:23
11   relief; actually, some of it, I think it comes from Your      12:39:29
12   Honor.  As you stated in the *BASF* case, "Injunctions are a  12:39:32
13   drastic and extraordinary remedy which should not be granted  12:39:38
14   as a matter of course."                                       12:39:42
15          There's obviously a huge public interest issue here,   12:39:43
16   and quite frankly, to your point about preventing cyber       12:39:48
17   threats, there is a huge interest in preventing cyber         12:39:53
18   threats, and Cisco is one of the best in the country at doing 12:39:58
19   that.  So enjoining their firewall technology would be a huge 12:40:00
20   disservice to the public interest.                            12:40:05
21          There is also not a presumption of irreparable harm    12:40:09
22   in a patent infringement case, and Centripetal has made no    12:40:13
23   showing of irreparable harm in this case.  And, in fact,      12:40:17
24   they've made no showing of a causal nexus between any harm to 12:40:22
25   Centripetal in Cisco's alleged infringement.  Instead,        12:40:27
```

| | | |
|---|---|---|
| 1 | they've just said, at a 100,000-foot level, that Centripetal | 12:40:30 |
| 2 | has not been as successful as they would like, and they blame | 12:40:35 |
| 3 | it on Cisco. | 12:40:38 |
| 4 | But the reality is Centripetal and Cisco are not | 12:40:40 |
| 5 | direct competitors.  The direct competitors in the threat | 12:40:45 |
| 6 | intelligence gateway market was Keysight/Ixia.  They sued | 12:40:50 |
| 7 | Keysight/Ixia, a direct competitor, and what did they do? | 12:40:56 |
| 8 | They licensed it.  They took money.  It goes to show that | 12:41:01 |
| 9 | money damages are available.  The other direct competitors | 12:41:05 |
| 10 | are Looking Glass, Bandura, and Arbor Networks.  Centripetal | 12:41:09 |
| 11 | has taken no action with respect to them. | 12:41:14 |
| 12 | The record in this case is crystal clear that | 12:41:16 |
| 13 | Centripetal believes that its threat intelligence gateway | 12:41:19 |
| 14 | product is complementary to Cisco's firewall technology.  It | 12:41:25 |
| 15 | is not competitive, and in the slides that follow, we provide | 12:41:31 |
| 16 | you chapter and verse with that evidence. | 12:41:34 |
| 17 | I could skip over the routers and switches because | 12:41:39 |
| 18 | they're not seeking an injunction on that. | 12:41:43 |
| 19 | The other point that I would make in a big picture | 12:41:45 |
| 20 | is the U.S. Government is a huge customer of Cisco, and it's | 12:41:48 |
| 21 | not just for routers and switches, it's for network security, | 12:41:54 |
| 22 | it's for their firewall technology, as well; over a billion | 12:41:57 |
| 23 | dollars in sales that we sell to the U.S. Government. | 12:42:00 |
| 24 | THE COURT:  The fact that they're not seeking an | 12:42:03 |
| 25 | injunction on routers and switches doesn't mean that the | 12:42:07 |

| | | |
|---|---|---|
| 1 | Court would not award that remedy.  The fact that they | 12:42:12 |
| 2 | haven't asked for it here, I have some reluctance about the | 12:42:18 |
| 3 | wisdom of, if I award damages, of awarding an injunction as | 12:42:26 |
| 4 | to one patent, or one accused product, and a running royalty | 12:42:36 |
| 5 | as to another.  I'm not sure if that makes any sense. | 12:42:46 |
| 6 | MR. JAMESON:  Well, respectfully -- | 12:42:55 |
| 7 | THE COURT:  Of course, I can understand why the | 12:42:58 |
| 8 | plaintiff would ask for that, because if you look at the | 12:43:01 |
| 9 | numbers, the numbers on the sale of firewalls would not | 12:43:04 |
| 10 | result in much damages by way of a running royalty.  That | 12:43:14 |
| 11 | would come from switches and routers.  So I can understand | 12:43:18 |
| 12 | why they'd ask for that form of relief, but I'm not sure it | 12:43:24 |
| 13 | makes sense to me because, as I say, that would be the best | 12:43:30 |
| 14 | financial outcome, I would think, for Centripetal. | 12:43:44 |
| 15 | MR. JAMESON:  Your Honor, Centripetal doesn't even | 12:43:51 |
| 16 | sell routers and switches.  They can't fill a market demand | 12:43:53 |
| 17 | for routers and switches, and that's part of the test for an | 12:44:00 |
| 18 | injunction; who's going to fill the void?  Centripetal | 12:44:03 |
| 19 | doesn't sell firewalls.  Who's going to fill the void? | 12:44:07 |
| 20 | Centripetal sells a threat intelligence gateway that they | 12:44:11 |
| 21 | have admitted is not competitive with firewalls. | 12:44:14 |
| 22 | And this is really important.  I need to show you | 12:44:17 |
| 23 | this testimony.  This is Centripetal's document that was | 12:44:21 |
| 24 | created in May of 2018.  This is after they've sued Cisco for | 12:44:28 |
| 25 | infringement.  And you've seen this diagram; it's PTX-1132. | 12:44:34 |

| | | |
|---|---|---|
| 1 | And it shows that their product is a complementary product. | 12:44:39 |
| 2 | It sits next to a firewall, and it sits next to a network | 12:44:47 |
| 3 | where you would find Stealthwatch and other routers and | 12:44:51 |
| 4 | switches and other appliances. | 12:44:54 |
| 5 | And this is what their own witnesses said about this | 12:44:57 |
| 6 | product in this trial: | 12:45:01 |
| 7 | Steve Rogers, the founder:  "We designed our system | 12:45:02 |
| 8 | in such a way that you could leave the existing | 12:45:07 |
| 9 | infrastructure in place.  We would leave what you got there | 12:45:12 |
| 10 | and put this new system in along with the things you already | 12:45:16 |
| 11 | had.  It was a complementary product." | 12:45:19 |
| 12 | Another answer he gave:  "Many of the banks and | 12:45:24 |
| 13 | others that we were talking to at the time had these things | 12:45:28 |
| 14 | in.  They were required to have a firewall, a web proxy, and | 12:45:31 |
| 15 | an IPS.  They were required to have it.  They have to have -- | 12:45:36 |
| 16 | banks and other companies have to have all these technologies | 12:45:41 |
| 17 | to comply with regulations, so we couldn't go in and say, | 12:45:45 |
| 18 | well, you know, if you put our system in, you don't need | 12:45:50 |
| 19 | these things.  So we worked in conjunction with them." | 12:45:53 |
| 20 | THE COURT:  It's not a question of whether they need | 12:45:56 |
| 21 | a physical switch or a physical router.  It's a question of | 12:45:59 |
| 22 | what is embedded in them. | 12:46:04 |
| 23 | MR. JAMESON:  The point is Mr. Rogers was readily | 12:46:11 |
| 24 | acknowledging that they are a complementary product to | 12:46:19 |
| 25 | Cisco -- | 12:46:24 |

Carol L. Naughton, Official Court Reporter

| | | |
|---|---|---|
| 1 | THE COURT:  That's right.  That's right.  The | 12:46:25 |
| 2 | physical switch or the physical firewall or the physical | 12:46:27 |
| 3 | router is not what they're selling, what they're selling is a | 12:46:32 |
| 4 | patented method of equipping those items with security | 12:46:38 |
| 5 | devices -- | 12:46:48 |
| 6 | MR. JAMESON:  Your Honor -- | 12:46:52 |
| 7 | THE COURT:  -- not the physical products. | 12:46:54 |
| 8 | MR. JAMESON:  They're selling a product that sits | 12:46:56 |
| 9 | next to the firewalls that Mr. Andre -- | 12:47:00 |
| 10 | THE COURT:  And in the middle of the network, | 12:47:04 |
| 11 | according to their evidence.  It sits on both sides of the | 12:47:07 |
| 12 | firewall. | 12:47:11 |
| 13 | MR. JAMESON:  Your Honor, this is their -- this is | 12:47:15 |
| 14 | their white paper. | 12:47:18 |
| 15 | THE COURT:  Well, that's a gateway.  That's one of | 12:47:22 |
| 16 | their products.  That's not the whole range of what they're | 12:47:23 |
| 17 | selling. | 12:47:26 |
| 18 | MR. JAMESON:  Your Honor, they only have one | 12:47:28 |
| 19 | product.  You can either buy it as an appliance, or you can | 12:47:32 |
| 20 | buy it as a subscription.  And I would ask that you read | 12:47:34 |
| 21 | PTX-1132 at 780 because they spell it out in spades at this | 12:47:38 |
| 22 | document right here as to where they fit in the marketplace. | 12:47:43 |
| 23 | And again, this is post-suing Cisco. | 12:47:47 |
| 24 | And Mr. Parnell, he provided similar testimony.  "Do | 12:47:55 |
| 25 | you have an understanding of whether or not Centripetal's | 12:48:02 |

```
 1    products actually are intended to replace a firewall, router,       12:48:05
 2    or switch?"                                                         12:48:10
 3            THE COURT:  I understand that they're not.  What            12:48:11
 4    they do is, if the Court believes their evidence, they              12:48:14
 5    improve the functionality of those items, they don't replace        12:48:18
 6    them.                                                               12:48:21
 7            MR. JAMESON:  Well, Your Honor, right now, I'm               12:48:23
 8    talking about injunctive relief.  That's what I'm talking           12:48:26
 9    about.  And when you are a complementary product, the fact          12:48:29
10    that you may improve something, that certainly would not be a       12:48:32
11    basis for an injunction.                                            12:48:35
12            THE COURT:  Well, I can't enjoin you from selling           12:48:37
13    firewalls, routers, and switches; that's for sure.  Obviously      12:48:44
14    not; I can't enjoin you from doing that.  You've been selling       12:48:54
15    firewalls, routers, and switches.  The question is what is          12:49:01
16    the functionality of your firewalls, routers, and switches?         12:49:06
17            MR. JAMESON:  And, Your Honor, that gets back to my         12:49:14
18    point on damages.  To the extent that there's any                   12:49:18
19    improvements -- and I'm acting like there are, because we           12:49:25
20    obviously don't believe that there is, and so I just say that       12:49:28
21    for the record.  We don't infringe on these patents.  If we         12:49:32
22    do, then the patents are invalid.                                   12:49:35
23            But if you're trying to find the patented                   12:49:37
24    improvement, if any, in these various patents, it's not in          12:49:41
25    the routers and the switches and the firewalls.  It would be        12:49:44
```

Carol L. Naughton, Official Court Reporter

```
 1    in the management appliances that are working with those         12:49:49
 2    devices, and that's the point that I was trying to make --       12:49:55
 3            THE COURT:  Their case is that the functionality of      12:50:00
 4    the firewalls, switches, and routers is improved.  That's        12:50:08
 5    their case.                                                      12:50:14
 6            MR. JAMESON:  Based on technology --                     12:50:19
 7            THE COURT:  It's not that they build a better            12:50:22
 8    switch, it's functionality.                                      12:50:25
 9            MR. JAMESON:  Based on technology that is pushed          12:50:33
10    down through the routers and the switches and the firewall       12:50:35
11    from the management appliances.  That is the point I am          12:50:37
12    trying to make, that is, if you accept their arguments as        12:50:41
13    true.  That is why they have all of these combinations at        12:50:45
14    issue in this case.                                              12:50:50
15            And even with respect to the '193 patent, despite        12:50:52
16    them saying we're only accusing the routers and the switches,    12:50:57
17    the evidence to prove up infringement had everything to do       12:51:00
18    with Stealthwatch and the source code and ISE and CTA, and       12:51:03
19    that's the point that I am trying to make.                       12:51:13
20            Routers and switches and firewalls have been             12:51:17
21    blocking traffic, have been implementing rules, have been        12:51:22
22    rule swapping going back before the year 2010.                   12:51:27
23            THE COURT:  You've said that hundreds of times,          12:51:32
24    Mr. Jameson.  What they are saying is that their patents         12:51:35
25    improve the functionality of those products.  That's what        12:51:43
```

3493

```
1    they're saying.                                              12:51:47
2              MR. JAMESON:  We obviously disagree.              12:51:49
3              THE COURT:  So I understand that they are not     12:51:51
4    selling routers, switches, and firewalls.  They're selling a 12:51:56
5    way to improve their functionality, according to their case. 12:52:06
6    And, yes, it is in combination with other products, in most  12:52:14
7    cases at least.                                              12:52:24
8              MR. JAMESON:  The other point that I wanted to    12:52:28
9    make -- and I'll wrap up, Your Honor -- is when you expand    12:52:30
10   past the threat intelligence gateway market, which is where  12:52:35
11   they have direct competition with --                         12:52:39
12             THE COURT:  Yeah, I remember seeing that piece of  12:52:41
13   paper.                                                       12:52:43
14             MR. JAMESON:  This was actually a document that    12:52:44
15   Malackowski relied on during the trial.  The threat          12:52:48
16   intelligence market in the cyber security market is huge, and 12:52:53
17   it's not just Cisco that is out there.  I mean, there's 49    12:52:57
18   companies on this list, and then the document says it's only  12:53:01
19   exemplary, it's not complete.  It is a huge market.           12:53:05
20             And Centripetal is -- to the extent that they say  12:53:10
21   they may be competing with Cisco, they're competing with     12:53:16
22   every single company in the cyber security market, as well,  12:53:19
23   every company that sells threat intelligence, and firewalls, 12:53:23
24   and anything that can help a company with network security.   12:53:28
25   And so it's not like this is a two-company market where we're 12:53:34
```

3494

1    the only direct competitor of them; the evidence is far from          12:53:41
2    the contrary on that.                                                 12:53:45
3         THE COURT:  Well, your papers say that you're the               12:53:46
4    only company that can do this.                                        12:53:48
5         MR. JAMESON:  We're the only company -- well, we're             12:53:51
6    certainly proud of the fact, Your Honor, that we are the --          12:53:54
7    we sell the best routers and switching technology in the            12:53:57
8    world, and we have for a long time, and we're proud of our          12:54:01
9    network security.  We will not shy away from that.                   12:54:04
10        THE COURT:  I understand.  And your technical                   12:54:08
11   documents as well as your public documents say that you're           12:54:12
12   the only company that can do this.                                   12:54:22
13        MR. JAMESON:  Your Honor, we certainly believe in              12:54:27
14   our products, but I will tell you, and I've provided you with        12:54:29
15   case law -- I provided you with case law in the liability           12:54:33
16   closing, but we know that a patent case is not about                 12:54:39
17   marketing documents.  It's about source code and technical          12:54:41
18   documents.                                                           12:54:44
19        THE COURT:  I said technical documents, Mr. Jameson.           12:54:46
20        MR. JAMESON:  Your Honor, the final point that I               12:54:56
21   wanted to make was on kind of the public interest factor.           12:54:59
22        This is just a list of U.S. Government customers of            12:55:02
23   Cisco.  What we provide to them from a cyber security               12:55:09
24   perspective is obviously critical at times.  It is a matter         12:55:17
25   of national security.  But it's not just the U.S. Government.        12:55:22

Carol L. Naughton, Official Court Reporter

| | | |
|---|---|---|
| 1 | We sell our technology to hospitals and to schools.  We sell | 12:55:27 |
| 2 | it to banks.  We sell it to companies that manage financial | 12:55:32 |
| 3 | information, our personal financial information, and so there | 12:55:37 |
| 4 | is a huge public interest in making sure that the best | 12:55:41 |
| 5 | network security is available to them, and so the public | 12:55:47 |
| 6 | interest factor would weigh substantially against any | 12:55:52 |
| 7 | injunctive relief in this case. | 12:55:59 |
| 8 | And with that, Your Honor, absent any questions, | 12:56:01 |
| 9 | Your Honor, I will wrap up. | 12:56:04 |
| 10 | THE COURT:  All right.  Well, I have to wrap up | 12:56:08 |
| 11 | anyway, but I have a question for Mr. Andre to be thinking | 12:56:20 |
| 12 | about, and that is: | 12:56:25 |
| 13 | Mr. Andre, why should the Court, if it grants relief | 12:56:27 |
| 14 | in this case, grant injunctive relief as to firewalls and | 12:56:30 |
| 15 | grant you a running royalty as to routers and switches, or | 12:56:37 |
| 16 | intelligence management systems such as CTA, ETA, ISE?  The | 12:56:47 |
| 17 | great volume of sales is in routers and switches. | 12:56:58 |
| 18 | And I've got a judge's meeting at 1:00, so we'll be | 12:57:03 |
| 19 | adjourned until 2:00.  I'll give you a chance to answer that | 12:57:10 |
| 20 | question after lunch, and I'll give Mr. Jameson a chance to | 12:57:16 |
| 21 | respond to whatever your answer is, but I'm somewhat troubled | 12:57:28 |
| 22 | by the idea of granting one form of relief as to one accused | 12:57:33 |
| 23 | product and another as to a different accused product.  I've | 12:57:40 |
| 24 | never done that before. | 12:57:45 |
| 25 | We'll be adjourned until 2:00. | 12:57:48 |

```
 1              (Recess from 12:57 p.m. to 2:02 p.m.)              01:55:12

 2         THE COURT:  All right, Mr. Andre, do you wish to        02:02:28

 3    address the question the Court put to you?                   02:02:33

 4         MR. ANDRE:  Sure, Your Honor.  And the honest answer    02:02:36

 5    is, Your Honor, we're just trying to be more pragmatic.  We  02:02:40

 6    would like to have an injunction against all the functions   02:02:43

 7    that we're accusing of infringement and have them rip it out 02:02:47

 8    of all their systems.  That would be our preference.         02:02:51

 9         We didn't want to try to ask the Court for more than    02:02:53

10    what we thought we could get because of the magnitude of that 02:02:57

11    request.  We read all of Cisco's technical documents and     02:03:00

12    their public documents where they said this was the most     02:03:04

13    important technology since sliced bread, and we thought the  02:03:07

14    Court would be hesitant to rip it out, to be quite candid.   02:03:14

15         After hearing Mr. Jameson's closing argument today,     02:03:16

16    it doesn't seem that important to him at all.  It sounds     02:03:18

17    pretty de minimus.  So if we had our druthers, I think we    02:03:23

18    would prefer to get an injunction against all of the         02:03:26

19    technology in there.  If they can rip out the technology from 02:03:29

20    the routers and switches and firewalls and sell the firewalls 02:03:31

21    and routers and switches without the technology, that would  02:03:37

22    be our preference.                                           02:03:39

23         THE COURT:  Well, suppose the Court decided on a        02:03:42

24    running royalty.  One of the pieces the Court would have to  02:03:48

25    face is that, in deciding what a running royalty is, with    02:03:53
```

```
 1    Cisco's domination of the market, it's a lot easier for Cisco    02:04:01
 2    to sell this technology than it is for your company to sell      02:04:06
 3    it.  So that would have to be reflected in any royalty rate.     02:04:14
 4            I don't think that that's been recognized by your        02:04:21
 5    experts, but that's something that occurs to the Court, that     02:04:27
 6    Cisco, with its enormous domination of the market, has the       02:04:35
 7    sales force and the repeat business that they've had for many    02:04:42
 8    years, and it's easier for them to sell a new product than it    02:04:51
 9    is for you or any other start-up company, and I haven't seen      02:04:54
10    that reflected in a consideration of the royalty rate.           02:04:58
11            MR. ANDRE:  Your Honor, it wasn't addressed by our       02:05:05
12    experts in this case for the very reason that injunction         02:05:08
13    would be preferable.                                             02:05:14
14            With respect to the running royalty, what we did in      02:05:16
15    the Keysight agreement, we gave them three years to kind of      02:05:19
16    sunset their product; either find a new technology or take it    02:05:22
17    out.  So we gave them a three-year license.  And that was a      02:05:25
18    10 percent royalty rate on the competing products on gross       02:05:29
19    revenues, and we thought that was a fair royalty on gross        02:05:33
20    revenues.  It wasn't apportioned in any way.  And we thought     02:05:37
21    that was a fair royalty rate going forward for the three-year    02:05:41
22    period.  So that's how we worked that out in that case.          02:05:46
23            What we were contemplating here is something along       02:05:49
24    the same lines for the running royalty, but --                   02:05:53
25            THE COURT:  You mean for a limited period of time?       02:05:58
```

Carol L. Naughton, Official Court Reporter

```
 1          MR. ANDRE:  Well, it could go for as long as they      02:06:01
 2   wanted if it's a running royalty, obviously, but we haven't   02:06:04
 3   really thought about if they want to sunset it out.           02:06:07
 4          When we came to an agreement with Keysight, it was     02:06:09
 5   that at three years they would make a determination whether   02:06:12
 6   they want to go back and try to negotiate another license     02:06:14
 7   agreement, or they'd have the technology out of their         02:06:18
 8   products.  We don't know what they're going to do, of course, 02:06:20
 9   if they think they can find a non-infringing alternative or a 02:06:23
10   design-around or if they're going to rip the technology out.  02:06:29
11   The world changes very quickly.                               02:06:30
12          THE COURT:  Well, all Cisco has to do is come at it    02:06:32
13   with a new set of routers and switches that they call the     02:06:40
14   1100 series and say that they're entirely different.          02:06:44
15          MR. ANDRE:  Yeah.                                      02:06:45
16          THE COURT:  Then they could avoid paying any           02:06:47
17   royalty.  I mean, litigation costs are not a factor to Cisco. 02:06:49
18          MR. ANDRE:  Right.  And that is a little bit of the    02:06:56
19   name game.  As counsel referred to earlier in this case, we   02:06:58
20   are actually in the middle of an arbitration with Keysight on 02:07:02
21   that very issue.  They changed the name, and we think they    02:07:07
22   should pay royalties on that change of name, so that is an     02:07:12
23   issue --                                                      02:07:15
24          THE COURT:  Well, that's already happened in this      02:07:16
25   case.                                                         02:07:18
```

| | |
|---|---|
| 1 | MR. ANDRE:  Yeah. | 02:07:18 |
| 2 | THE COURT:  It wouldn't be surprising to see it | 02:07:20 |
| 3 | happen again. | 02:07:23 |
| 4 | MR. ANDRE:  Yeah.  It's not an easy answer how -- | 02:07:25 |
| 5 | THE COURT:  Well, as the Federal Circuit recognizes, | 02:07:31 |
| 6 | there are no easy answers in fixing appropriate damages in a | 02:07:37 |
| 7 | patent case.  There just aren't any easy answers. | 02:07:42 |
| 8 | MR. ANDRE:  That's an absolute truth, Your Honor. | 02:07:46 |
| 9 | We deal with this in every case. | 02:07:49 |
| 10 | A few years back, I got an injunction against a | 02:07:53 |
| 11 | party, and they said they changed their -- that they took it | 02:07:56 |
| 12 | out of their product, and we didn't think they did, and then | 02:07:58 |
| 13 | we had a contempt issue come up. | 02:08:01 |
| 14 | So I think this is a tricky area with damages and | 02:08:05 |
| 15 | with injunction, and there's no easy answers.  The Federal | 02:08:07 |
| 16 | Circuit has been wildly divergent on how they see things, | 02:08:10 |
| 17 | depending on the panel you get, and we've experienced that | 02:08:15 |
| 18 | firsthand, and we've noticed it in the other case law, as | 02:08:18 |
| 19 | well. | 02:08:20 |
| 20 | I think most of the judges and juries struggle with | 02:08:21 |
| 21 | this, as do the attorneys presenting it.  We do our best, and | 02:08:25 |
| 22 | we try, like in this case, with a royalty rate, we use -- in | 02:08:29 |
| 23 | the case I argued to the Federal Circuit, I know how that | 02:08:33 |
| 24 | came down, and it's the same with the apportionment.  But | 02:08:36 |
| 25 | like I said, if we had our druthers and all things being | 02:08:38 |

1    equal, we'd like to have the technology --                    02:08:43

2            THE COURT:  Well, 10 percent of the sales of routers   02:08:45

3    and switches would be an enormous amount of money.            02:08:54

4            MR. ANDRE:  We're hoping for the 5 percent number,     02:09:03

5    Your Honor, because that would be -- with Keysight, we did    02:09:05

6    5 percent for the non-competing products and 10 percent for   02:09:07

7    the competing products.  So we're looking at 5 percent for    02:09:10

8    that.                                                         02:09:13

9            THE COURT:  These are competing products, aren't      02:09:13

10   they?                                                         02:09:15

11           MR. ANDRE:  Well, the technology is competing, but     02:09:16

12   as Mr. Jameson said, we don't sell routers and switches.      02:09:18

13           THE COURT:  Well, how do I -- if I granted an         02:09:23

14   injunction, I'd just have to say that they had to remove the  02:09:26

15   technology from the accused products, which include routers,  02:09:33

16   switches, firewalls, operating systems, Stealthwatch, ETA,    02:09:38

17   CTA.  So, as you say, that would be quite an impact, taking   02:09:48

18   your side of the case.  Taking their side of the case, it     02:10:06

19   would be a minimal impact.                                    02:10:09

20           MR. ANDRE:  Well, that was what we believed is -- we   02:10:10

21   hear them saying it's de minimus.  It sounds like they would  02:10:15

22   have no issue just ripping it out and going about their       02:10:18

23   business, but we -- I mean, to be candid with you, once       02:10:22

24   again, we think that's litigation posturing, and we think     02:10:24

25   this is extremely important technology.                       02:10:28

1        We think it changed the networking industry in 2017        02:10:29
2    when they launched it.  We're watching the market respond to    02:10:32
3    it.  We're watching other major players who are their same      02:10:36
4    magnitude of size.  Keysight was like 5 percent the size of     02:10:41
5    Cisco, and so they're a small player, as well, but we're        02:10:45
6    seeing these big players that are Cisco's competitors, and      02:10:48
7    we're seeing them now come into the same space competing with   02:10:54
8    Cisco.                                                          02:10:58
9        So we think it's immensely important technology, and       02:10:58
10   we would love to be in the position to hold the keys to that    02:11:01
11   with injunctive relief, if we could.  That's the reason we      02:11:07
12   split it the way we did, with the running royalty and the       02:11:11
13   injunction just for the firewalls, because there are            02:11:14
14   literally tons of firewall manufacturers.                       02:11:18
15       I think Cisco probably has less than 10 percent of          02:11:20
16   the firewall market, but for the routers and switches, they     02:11:23
17   have 80 percent of that market.  So that's the reason we        02:11:25
18   split it up the way we did, just from a pure pragmatic point    02:11:28
19   of view, but there's not a legal theory there that I can        02:11:31
20   point to that would say you should enjoin one and a running     02:11:37
21   royalty on the other.                                          02:11:42
22            THE COURT:  All right.                                 02:11:43
23            Mr. Jameson, do you care to respond?                   02:11:46
24            MR. JAMESON:  Yes, I do, Your Honor.  I think in       02:11:54
25   response, Your Honor, to the question that you posed before     02:11:57

```
 1    lunch, is that, under the Supreme Court's eBay v.          02:12:00
 2    MercExchange decision, that plaintiff clearly has the burden   02:12:07
 3    to show injunctive relief, and if they were able to --      02:12:10
 4          THE COURT:  Well, I mean, if I accept your argument   02:12:15
 5    about the value of this technology, it would be de minimus to  02:12:17
 6    remove it from your products.  You state that this technology  02:12:25
 7    makes virtually no difference to your technology.  So why    02:12:33
 8    shouldn't I order you to remove it, if it's so de minimus?   02:12:38
 9          MR. JAMESON:  Respectfully, Your Honor, the reason   02:12:42
10    why you shouldn't order us to remove it would -- again, we   02:12:44
11    now have to assume infringement and patent validity.  But   02:12:47
12    it's because plaintiff hasn't satisfied their burden.       02:12:50
13          And the law under eBay, as you followed in the BASF  02:12:53
14    vs. Commonwealth case, is -- the law is crystal clear; is   02:13:01
15    that a permanent injunction is an extraordinary remedy and  02:13:04
16    that the plaintiff has to establish the four-factor test, and  02:13:07
17    they would have to do it for any product or product         02:13:10
18    combination that they're seeking an injunction on, and they  02:13:14
19    would have to show irreparable harm, no adequate remedies at  02:13:18
20    law, hardship balance in their favor, and that an injunction  02:13:25
21    doesn't serve the public interest.                          02:13:30
22          And with respect to any part of that combination in  02:13:32
23    this case, they've not made that showing in any way, shape,  02:13:34
24    or form.  If, hypothetically, they had shown it with respect  02:13:39
25    to a particular product combination but not another product  02:13:44
```

Carol L. Naughton, Official Court Reporter

1    combination, there's no reason, that I'm aware of under the          02:13:49
2    law, that you couldn't issue an injunction with respect to a         02:13:53
3    narrow product combination but not others.                           02:14:00
4         But what we know from the evidence in this case is              02:14:03
5    that they simply have not made that showing, period, with            02:14:07
6    respect to any of the accused products, and it is absolutely         02:14:13
7    100 percent their burden, and if there's ever a case where           02:14:18
8    money damages can satisfy what Centripetal is looking for,           02:14:28
9    it's actually this one.                                              02:14:34
10        I mean, they took money damages in the Keysight                 02:14:36
11   litigation, and that was a direct competitor.  We are not a          02:14:40
12   direct competitor, and they've acknowledged that we're not a         02:14:43
13   direct competitor, and so --                                        02:14:47
14        THE COURT:  I don't think they've acknowledged that            02:14:51
15   you're not a direct competitor.                                     02:14:53
16        MR. JAMESON:  Well, I don't think there's any                  02:14:56
17   evidence in this record --                                          02:14:57
18        THE COURT:  I mean, you can say that the evidence              02:14:59
19   doesn't prove that, but I don't think they've acknowledged           02:15:02
20   that.                                                                02:15:04
21        MR. JAMESON:  Your Honor, that was the point I was             02:15:05
22   getting ready to make, is that there's no evidence in this           02:15:08
23   case that is going to establish that we're a direct                  02:15:11
24   competitor of theirs.                                                02:15:14
25        THE COURT:  Well, your technical documents say, and            02:15:17

```
1   your own witnesses, if I accept their view, contradict your        02:15:28
2   own experts; I mean, blatantly, if I accept their viewpoint.        02:15:32
3           And I don't think, given the history of this case          02:15:41
4   and the DNA -- what was it? -- NDA, the nondisclosure               02:15:48
5   agreement -- there's so many initials in this case, I can't         02:15:59
6   keep them all straight -- that anybody would ever say that,         02:16:02
7   if you did infringe these products, that you did it                 02:16:06
8   accidentally.                                                       02:16:11
9           The relationship between the parties is such that,          02:16:14
10  if the Court found that you infringed, given the conducts and       02:16:20
11  meetings and the similarity of the technology, to say that         02:16:26
12  you infringed accidentally would be a very unlikely outcome.        02:16:32
13          MR. JAMESON:  Well, Your Honor, I will respectfully         02:16:42
14  disagree that the evidence gets anywhere close to supporting        02:16:46
15  that theory.  We put on witness after witness after witness         02:16:50
16  that demonstrated our independent creation of every single         02:16:56
17  one of the products that are at issue.                              02:17:01
18          THE COURT:  I know.  I know.  And your witnesses            02:17:05
19  said that the products -- your experts said that the products      02:17:09
20  didn't do what your employees said it did do.                       02:17:12
21          MR. JAMESON:  And I would respectfully disagree with        02:17:20
22  that as well.                                                       02:17:25
23          THE COURT:  I think you do.                                 02:17:26
24          MR. JAMESON:  With respect to your question on              02:17:37
25  injunctive relief, they have not satisfied the burden, and it      02:17:39
```

```
 1   is their burden.  You could hypothetically try to figure out     02:17:44
 2   how to tailor a narrow injunction with respect to a segment      02:17:48
 3   of products if they had satisfied their burden, but they         02:17:55
 4   haven't, and I think that was the question that you posed         02:17:58
 5   before lunch.                                                     02:18:01
 6        I do believe, in the event that you were to find            02:18:04
 7   infringement and validity of a patent, that some kind of         02:18:08
 8   monetary damages on a go-forward basis could be fashioned.       02:18:13
 9   Mr. Andre mentioned a sunset provision.  If, in fact, you        02:18:20
10   were to find infringement and validity of a patent, I think     02:18:24
11   that approach would make sense in this case in lieu of          02:18:30
12   injunctive relief that they have not proven.                     02:18:36
13        And I think the final point that I will make is            02:18:40
14   that, if an injunction were granted, it is going to result in    02:18:44
15   satellite litigation.  That's just -- it's just going to        02:18:54
16   happen, because we certainly would make the effort to design     02:18:58
17   around, and I expect Centripetal is going to tell us that we     02:19:03
18   haven't done the right thing, and we're going to find ourself    02:19:07
19   right back in front of you or someone else in the Eastern        02:19:12
20   District of Virginia in fairly short order.                      02:19:16
21        THE COURT:  Well, if I award damages, you'll come          02:19:19
22   back and say that you have designed around it, anyway, and so    02:19:22
23   you don't owe a royalty, and they would say that you did.        02:19:31
24   These cases never end.  So that is just as likely a             02:19:34
25   possibility as a suit over the injunction, so there's not        02:19:39
```

```
 1    much of a choice there.                                      02:19:50
 2           MR. JAMESON:  Well, Your Honor, I think I've given    02:19:52
 3    you our perspective on your question.                       02:19:54
 4           THE COURT:  I think you have.  I think you have,      02:19:57
 5    Mr. Jameson.  I think you have.  And I'm not saying that     02:20:00
 6    you're not right about that.  I think it's just very        02:20:04
 7    difficult to come up with the right answer if a court decides 02:20:15
 8    the damages.  Everybody recognizes that.                    02:20:20
 9           And I recognize that both parties lose when they     02:20:25
10    spend their resources litigating instead of cooperating.  And 02:20:34
11    the country loses when it's a very important technology like 02:20:45
12    this.  So everybody loses all around when we have ongoing   02:20:49
13    litigation.  In other countries, people in the same business 02:20:58
14    seem to cooperate more than they do in this country, and that 02:21:03
15    is unfortunate.                                             02:21:11
16           Historically, Cisco's found a way to cooperate with  02:21:17
17    other people.  They've licensed products.  I was surprised  02:21:21
18    that you found no comparable license because you have -- you 02:21:26
19    licensed one of the products in this case for years before  02:21:31
20    you bought the company.                                     02:21:34
21           MR. JAMESON:  Dr. Becker addressed that issue during 02:21:43
22    his direct examination.                                     02:21:45
23           THE COURT:  Right.  Well, we've been going through   02:21:48
24    the record as best we can, and we'll continue to do so,     02:22:07
25    including what you have submitted on damages, if we get to  02:22:12
```

3507

1    that point.                                                  02:22:22

2          Is there anything further that either side wants to    02:22:36

3    bring to the Court's attention?                              02:22:40

4          MR. ANDRE:  Nothing from Centripetal, Your Honor.      02:22:42

5    Thank you.  Appreciate it.                                   02:22:44

6          MR. JAMESON:  Your Honor, absent your having some      02:22:46

7    burning question that I have failed to at least give an      02:22:49

8    answer to, nothing further.                                  02:22:52

9          THE COURT:  No.  I think you've tried to answer all    02:22:54

10   my questions as best you can.                                02:22:58

11         MR. JAMESON:  Thank you, Your Honor.                    02:23:02

12         THE COURT:  So we'll be adjourned.                      02:23:03

13         MR. ANDRE:  Thank you, Your Honor.  Have a good         02:23:05

14   weekend.                                                     02:23:07

15         (Proceedings adjourned at 2:23 p.m.)                    02:23:08

16

17                        CERTIFICATION

18

19     I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.

21

22

23        _____/s/_____

24                   Carol L. Naughton

25                   June 26, 2020


          Carol L. Naughton, Official Court Reporter