# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Norfolk Division

| | |
|---|---|
| **CENTRIPETAL NETWORKS, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:18cv00094-HCM-LRL |
| | ) |
| **CISCO SYSTEMS, INC.** | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT CISCO SYSTEMS, INC.'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR ADDITIONAL AND AMENDED FINDINGS AND
AMENDED JUDGMENT UNDER RULE 52(b) AND TO CONVERT
THE JUDGMENT TO A PARTIAL FINAL JUDGMENT UNDER RULE 54(b)**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 2

II. BACKGROUND ............................................................................................................. 3

III. ARGUMENT ................................................................................................................... 4

    A. Legal Framework ................................................................................................ 4

    B. The Court Should Make Findings Of Fact That Centripetal Failed To Prove Any Acts Of Direct Infringement ....................................................................... 6

        1. Centripetal Did Not Prove Deployment Of The Specific Combination Found To Infringe The '856 Patent ............................................................ 7

        2. Centripetal Did Not Prove Deployment Of The Specific Combination Found To Infringe The '176 Patent ............................................................ 8

        3. Centripetal Did Not Prove Deployment Of The Specific Combination Found To Infringe The '193 Patent ............................................................ 8

        4. Centripetal Did Not Prove Deployment Of The Specific Combination Found To Infringe The '806 Patent ............................................................ 9

    C. The Court Should Amend The Damages Award And Judgment .......................... 11

        1. Any Damages Should Be Commensurate With The Scope Of Infringement Proven At Trial ........................................................................................ 11

        2. The Court Should Limit Any Damages To U.S. Sales ............................. 13

    D. The Court Should Convert The Judgment To A Partial Final Judgment Under Rule 54(b) ................................................................................................................. 15

IV. CONCLUSION .............................................................................................................. 16

**I.     INTRODUCTION**

Following a bench trial, this Court issued its Opinion and Order (Dkt. 621) in the above-captioned matter on October 5, 2020 ("Order"). The Order includes this Court's Findings of Fact and Conclusions of Law that the use of certain Cisco products in certain specific combinations infringes U.S. Patent Nos. 9,917,856 (the "'856 Patent"); 9,500,176 (the "'176 Patent"); 9,686,193 (the "'193 Patent"); and 9,203,806 (the "'806 Patent"). The Order awards past damages in the amount of $755,808,545 "for all of the infringing products based upon gross revenue." Order at 149.

It is undisputed that the accused products are sold separately and that (for instance) Cisco switches, routers, or firewalls may be bought and used without buying the other products in the combined systems found to infringe. Centripetal did not prove that Cisco or anyone else ever made, used, or sold a directly-infringing combination in the United States. Cisco sought findings on these issues (Dkt. 424 ¶¶ 263-264, 397, 497-498, 785-786; Dkt. 474 ¶¶ 36-37, 66-67), but the Court did not make them. Cisco requests that the Court amend its findings and judgment to include findings that Centripetal did not prove any acts of direct infringement or the extent of any alleged direct infringement.

Additionally, Centripetal's damages theory—which presumed that Centripetal was entitled to royalties on all units of the accused products without regard for whether they were used in the required combinations or whether the combinations were even made, used, or sold in the United States—is unsupported. In particular, the Court should find that: (1) Centripetal failed to prove any acts of direct infringement through the use of the accused products in combinations found to infringe; (2) Centripetal failed to prove entitlement to royalties on all sales of accused products, as there is no evidence that all units sold were used in infringing combinations; (3) Centripetal failed

to prove entitlement to royalties on worldwide (rather than just U.S.) sales of the accused products; and (4) the highest damages award supported by the record, if any, is that presented by Cisco's expert Dr. Becker, namely $3,014,561. In the alternative, even accepting all other aspects of Centripetal's damages methodology for purposes of this motion, the royalty base and downstream damages calculations should be adjusted to cover only U.S. sales.[1]

Finally, the Judgment entered in this case does not dispose of all the claims put at issue by the Complaint. *Compare* Amended Complaint, Dkt. 29, *with* Judgment, Dkt. 622. This Court stayed the entire case pending *inter partes* review ("IPR") by the United States Patent and Trademark Office's Patent Trial and Appeal Board (the "Board") of most of the asserted claims, but later lifted the stay as to a subset of the patents and claims for which IPR was not instituted. Order Granting Motion to Stay, Dkt. 58. The Board ultimately found almost all of the stayed claims unpatentable (excepting five dependent claims of one patent), and Centripetal has appealed the Board's decisions. As to all of those claims, the case is still stayed. Order Granting-in-Part Motion to Lift Stay, Dkt. 68. Because the current judgment does not resolve all the claims raised by the Complaint, the Court's decision is not final or appealable. Cisco submits that the appropriate course is to enter a partial final judgment under Federal Rule of Civil Procedure 54(b) so that Cisco can appeal the decision on the claims the Court has decided.

## II.     BACKGROUND

Centripetal's infringement allegations at trial were based upon the use of multiple separately-sold products used together in specific ways. Centripetal offered no evidence that anyone actually made or used any infringing combination. Relatedly, Centripetal offered no

---

[1] Cisco maintains its position on the issues as to which the Court did make findings and conclusions adverse to Cisco and reserves the right to challenge them on appeal.

evidence of the extent to which any of the millions of product units in its royalty base were used in infringing combinations, and the record cannot support a finding that all of them were so used. Centripetal thus failed to prove that the revenues forming its royalty base were tied to actual instances of infringement. That failure means that the damages award improperly covers products—such as switches, routers, and firewalls—that were used only in *non-infringing* systems, e.g., because they were not used together with Stealthwatch, Identity Services Engine, or other features essential to the Court's infringement findings. The law requires a patentee to tailor its damages demand to the extent of infringement, yet Centripetal did not.

Although Cisco raised these issues at trial,[2] the Court made no findings on them. Cisco respectfully requests that the Court make such findings now, as set forth herein.

### III.     ARGUMENT

#### A.     Legal Framework

Federal Rule of Civil Procedure 52(b) permits a party to request the Court to "amend its findings—or make additional findings—and [the court] may amend the judgment accordingly." The primary purpose of a Rule 52(b) motion is "to correct manifest errors of law or fact." *Morrow Corp. v. Harleysville Mut. Ins. Co.*, 110 F. Supp. 2d 441, 445 n.4 (E.D. Va. 2000). A party may move for amended or additional findings even where doing so would "in effect reverse the judgment. If the trial court has entered an erroneous judgment, it should correct it." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1358 (Fed. Cir. 2006) (internal quotation marks omitted).

---

[2] *See, e.g.*, Dkt. 424 ¶¶263-264, 397, 497-498, 785-786; Dkt. 474 ¶¶ 36-37, 66-67; Tr. 3472:17-20 (Cisco's closing) ("[A]t a bare minimum, you would need to go through on a patent-by-patent basis, look at the accused combination, and figure out what the numbers are for each accused combination, and Mr. Gunderson made no effort to do that at all.").

To infringe a patent, a party must engage in one of the acts that 35 U.S.C. § 271 defines as infringement. Of relevance here, the mere sale of components needed to form an infringing combination does not prove direct infringement under § 271(a). *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528 (1972); *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 344 (1961) ("[I]f anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant.").

The Patent Act specifies that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Damages cannot be speculative, and "the trial court must carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). "Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *Id.* Thus, the patentee must offer evidence proving the extent of infringing use and tie its damages claim to that evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334-35 (Fed. Cir. 2009) ("The damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers.").

Federal Rule of Civil Procedure 54(b) provides that, where there are multiple claims at issue:

> [T]he court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a

5

judgment adjudicating all the claims and all the parties' rights and liabilities. Conversion of partial judgment to a final appealable judgment requires the Court to determine that there is no just reason for delay of the appeal and to state the rationale for its certification. *See Fox v. Baltimore City Police Dep't*, 201 F.3d 526, 530-31 (4th Cir. 2000). The power to enter a partial final judgment is discretionary, exercised in light of "judicial administrative interests," "the equities," and giving weight to the "policy against piecemeal appeals." *Reiter v. Cooper*, 507 U.S. 258, 265 (1993) (internal quotation marks omitted); *cf. e.Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 727 (Fed. Cir. 2014) (holding that district court did not abuse its discretion in converting partial judgment of non-infringement to partial final judgment under Rule 54(b) where case against another party involving the same patents and issues was already being appealed).

## B. The Court Should Make Findings Of Fact That Centripetal Failed To Prove Any Acts Of Direct Infringement

Centripetal failed to prove that anyone directly infringed the patent claims at issue by making, using, or selling the specific combinations of products that the Court found to infringe, much less that this was done in the United States during the term of the relevant patents. *See* Dkt. 424 ¶¶ 263-264, 397, 497-498, 785-786; *id.* at 236-237 (Proposed Conclusion of Law ¶ 3); Dkt. 474 ¶¶ 36-37, 66-67; 35 U.S.C. § 271(a). Rather, Centripetal showed only that Cisco sold the individual products that, at most, *could possibly* be combined to produce the accused combinations. The mere making or sale of components that could be used to form an infringing combination does not prove direct infringement. *See Deepsouth*, 406 U.S. at 528; *Aro*, 365 U.S. at 344. Accordingly, the Court should find that Centripetal did not prove that Cisco directly infringed any patent on any occasion.

Centripetal focused its trial presentation on direct infringement, and it never mentioned the

issue of indirect infringement under 35 U.S.C. § 271(b) or (c) during its examination of witnesses or in its closing statement. Centripetal forfeited its opportunity to argue indirect infringement for the asserted claims even before trial, when its operative complaint pled inducement only for method claims that it later dropped.[3] The Court thus made no finding of indirect infringement, for which Centripetal offered no proof in any event.[4]

### 1. Centripetal Did Not Prove Deployment Of The Specific Combination Found To Infringe The '856 Patent

Centripetal argued, and the Court found, that claims 24 (system claim) and 25 (computer readable media claim) of the '856 Patent are infringed by Cisco's accused switches (Catalyst 9000 series) and routers (ASR 1000 and ISR 1000 and 4000), but only when used in combination with Cisco's separate Stealthwatch and Identity Services Engine (ISE) products. *See* Order at 32, 41; Tr. 886:6-11. In addition, Centripetal's expert, Dr. Cole, stated that Encrypted Traffic Analytics (ETA) and Cognitive Threat Analytics (CTA) are also required in order to infringe the '856 patent.

---

[3] *See, e.g.*, Amended Complaint, Dkt. 29, ¶ 97 ("Cisco indirectly infringes the '193 Patent pursuant to 35 U.S.C. § 271(b) by instructing ... others ... to perform one or more of *the steps of the method claims* ... of the '193 Patent" (emphasis added)), *id.* ("one or more *method claims* of the '193 Patent, including Claims 1-17 and 20" (emphasis added)), ¶ 100 ("These documents provide instructions ... to perform one or more of the *steps of the method claims* ...." (emphasis added)), ¶ 101 ("Cisco knew ... that it was inducing others ... to infringe by practicing ... one or *more method claims* of the '193 Patent." (emphasis added)). In the Amended Complaint, Centripetal pled inducement in the following causes of action: 2nd ('193 Patent), 4th ('176 Patent), 10th ('806 Patent), 18th ('205 Patent), and 22nd ('856 Patent).

[4] Even if Centripetal had preserved an inducement argument, Centripetal's failure to prove any act of direct infringement would also doom any attempt to argue induced infringement under 35 U.S.C. § 271(b), since direct infringement by a third party is an element of induced infringement. *See, e.g.*, *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ("[L]iability for inducement must be predicated on direct infringement."); *see also id.* at 923 (a defendant "cannot be liable for inducing infringement that never came to pass"). Moreover, Centripetal did not attempt to prove the other elements of induced infringement, including that Cisco induced any third party to directly infringe or had specific intent to induce infringement. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

Tr. 1057:11-19. However, Centripetal did not identify a single situation in which Cisco made, used, or sold all of these products together to a customer in the infringing combination. This Court found as a general matter that "[n]etwork administrators can use different combinations of these devices and methods to achieve optimal security personalized for their network." Order at 17. The Court did not find that Cisco's switches and routers are only ever used with Stealthwatch and ISE, and the record would not support such a finding.

### 2. Centripetal Did Not Prove Deployment Of The Specific Combination Found To Infringe The '176 Patent

The Court found, in line with Centripetal's arguments, that claims 11 (system claim) and 21 (computer readable media claim) of the '176 Patent are infringed by Cisco's accused switches (Catalyst 9000 series) and routers (ASR 1000 and ISR 1000 and 4000), but only when used in combination with Stealthwatch. Order at 69, 72. Centripetal's own expert Dr. Cole also opined that CTA must be enabled for infringement of the '176 patent. Tr. 995:19-21; 1106:1-4; *see also* Order at 70 (citing to the "new Stealthwatch with CTA" as a required element). However, as explained above, Centripetal did not prove use of each of these components in combination. Indeed, Cisco advises *not to use* Stealthwatch in the configuration found to infringe the '176 Patent. *See* PTX-569 at 039282; Tr. 2172:10-16, 2177:7-12, 2180:23-2181:3 (recommending not exporting both ingress and egress NetFlow records). The Court did not find that Cisco's switches and routers are only ever used with Stealthwatch, and the record would not support such a finding.

### 3. Centripetal Did Not Prove Deployment Of The Specific Combination Found To Infringe The '193 Patent

With respect to the '193 Patent, Centripetal nominally argued that claims 18 (system claim) and 19 (computer readable media claim) are infringed by Cisco's accused switches (Catalyst 9000

series) and routers (ASR 1000 and ISR 1000 and 4000). Order at 86. However, Centripetal's infringement proof also relied extensively on ISE to establish infringement of the '193 Patent. *See, e.g.*, Tr. 470:6-471:14, 504:14-506:25. The Court's infringement analysis for the '193 Patent likewise depends on actions performed by the separate ISE device. *See, e.g.*, Order at 19 (identifying ISE as a "device"), 90 ('193 infringement analysis depends on switches and routers "aided with Cisco's Identity Services Engine," and that "[t]he Cisco packet-filtering system operates by using the Identity Services Engine"). The Court reinforced the essential role of ISE in the accused implementation in its invalidity analysis, relying on the presence of ISE to distinguish the accused products from their prior art versions. *Id.* at 97. Despite ISE's central role in the Court's analysis, Centripetal offered no evidence of any act of direct infringement through the use of switches and routers together with ISE. Again, the Court did not find that Cisco's switches and routers are only ever used with ISE, and the record would not support such a finding. *See, e.g.*, Tr. 1058:3-9 (Centripetal's expert Dr. Cole admitting that ISE is "sold independently").

### 4. Centripetal Did Not Prove Deployment Of The Specific Combination Found To Infringe The '806 Patent

Finally, Centripetal argued, and the Court found, that claims 9 (system claim) and 17 (computer readable media claim) of the '806 Patent are infringed: (1) by Cisco's accused switches (Catalyst 9000 series) and routers (ASR 1000 and ISR 1000 and 4000) *together with* Cisco's Digital Network Architecture (DNA) Center hardware; and separately (2) by Cisco's firewall products (either the Firepower appliance (1000, 2100, 4100, 9300 series), or the legacy ASA 5500 with Firepower services) *together with* Firepower Management Center (FMC). Order at 100. With respect to the routers and switches, the Court's findings make clear that the DNA Center is a separate "network management device" (*id.* at 18) that is required for the Court's infringement

9

findings. *Id.* at 101, 106; *see, e.g.*, Tr. 179:18-181:11 (plaintiff's opening: "Now, the switches with the DNA infringe '806 and '205 patent. Same with the routers and DNA."). Centripetal's infringement analysis relied on the use of the DNA Center, yet it put forth no evidence that switches or routers are invariably used with DNA.

With respect to the firewall products, the Court's opinion contains no detailed findings of fact as to how these different devices implement the claim limitations. However, the Court's overall conclusion makes plain that an infringement finding depends on combining the firewall products with FMC's Threat Intelligence Director feature. Order at 101 ("*Firepower Management Center's Threat Intelligence Director receives rule sets* from various sources and preprocesses the rule sets to create optimized policies which are distributed to firewalls." (emphasis added)), *id.* ("Similarly, when new rules are available and sent to Cisco's firewalls *from the Firepower Management Center*, Cisco's firewalls will perform a rule swap without dropping any packets." (emphasis added)). Centripetal's infringement analysis hinged on the use of FMC, but it presented no evidence that FMC is always used with the firewalls (or that it even could be for the accused functionality). *See, e.g.*, Tr. 181:12-182:6 (plaintiff's opening, focusing on FMC in combination with firewalls). The unrebutted testimony at trial from Cisco engineer Hari Shankar was that FMC cannot implement the allegedly infringing functionality. Tr. 2507:3-2508:6, 2508:23-2509:21, 2510:11-2512:6, 2512:9-2515:12.

Accordingly, the Court did not find the patents infringed solely by the sale or use of Cisco routers, switches, or firewalls, but only if those products are used together with (for switches and routers) DNA Center or (for firewalls) FMC. Centripetal did not prove, and the Court did not find, any act of combining the accused switches, routers, or firewalls with the other devices necessary to yield the arrangements found to infringe. The Court did not find that Cisco's switches and

routers are only ever used with DNA Center, or that the firewalls are only ever used with FMC, and the record would not support such a finding.

### C. The Court Should Amend The Damages Award And Judgment

#### 1. Any Damages Should Be Commensurate With The Scope Of Infringement Proven At Trial

Even if Centripetal had shown some act of direct infringement, the Court would still have to amend the damages award because Centripetal made no attempt to show the actual extent of infringement. Centripetal did not show, and the Court did not find, that every one of the accused products would meet the claims' limitations when sold or used by themselves. There was no evidence and no finding that switches and routers used without Stealthwatch, ISE, DNA Center, CTA, or ETA—or firewalls used without FMC—would infringe any asserted claim. Accordingly, the Court must limit any damages award to the economic impact of the *combinations* held to infringe. *Lucent*, 580 F.3d at 1334-35; *Oak Indus., Inc. v. Zenith Elecs. Corp.*, 726 F. Supp. 1525, 1543 (N.D. Ill. 1989).

Centripetal's damages theory was not so limited, and it therefore cannot be the basis of a damages award. Centripetal's damages testimony instead proceeded on the assumption that Centripetal was entitled to royalties on *all units* of the Cisco products, regardless of whether they were combined in the manner accused of infringement. Centripetal's damages expert confirmed that this was his approach. Tr. 1500:22-1501:5 ("I simply put the revenues together for each of the products during the appropriate time period."). *See also* Tr. 1551:1-7, 1546:19-1547:9 (confirming that he did not analyze how many customers used the combination of products alleged to infringe each of the patents).

The only damages theory presented at trial that could survive Centripetal's failure of proof

11

is that of Cisco's damages expert Dr. Becker, who offered a detailed analysis of Cisco sales records showing that the *maximum* number of customers who could have purchased the accused product combinations was far lower than the amount of gross sales for each individual product. Dr. Becker testified that the sales data for the accused products was "extremely detailed ... down at the invoice and line item level" and that it "identified the customer name ... [providing] a fairly complete picture of who bought what and when over the damages period." Tr. 2864:4-18. He explained this level of detail was needed since the infringement allegations relied on "very specific versions of very specific products, and in many instances in specific combinations." Tr. 2864:19-25; *see also* Tr. 2874:7-17 ("By ignoring this, these product combinations, I think [Centripetal's damages expert's] analysis leads him to a place that far exceeds the footprint of the inventions in this case.").

Dr. Becker was the only expert to analyze the specific sales data and offer an opinion on the maximum number of customers who even could have purchased the specific product combinations required by the Court's infringement findings. Tr. 2877:5-2880:16. He explained the maximum number of customers for each patent. Tr. 2877:5-2878:5 (addressing the '856 patent); *see also* Tr. 2902:7-2905:7 (addressing the '193 patent), 2905:14-2907:3 (addressing the '176 patent), 2910:17-2912:15 (addressing the '806 patent). Beyond that, the evidence at trial showed that of the 2,493 customers who activated Stealthwatch, only 82 had enabled CTA, which is required for Stealthwatch to communicate with the CTA cloud and invoke specific ETA functionality (such as detection of malware in the unencrypted information in the ETA NetFlow elements) that the Court found necessary to infringe the '856 Patent. Order at 34-37 (citing PTX-989 at 033), 46 (citing PTX-570 at 593); Tr. 1693:10-1694:10, 2894:19-2895:20.

Of course, a proper tally of sales of the accused combinations of products would at most provide a ceiling for the damages calculation, because there is no evidence that any of these 82

customers also had the third required device, i.e., ISE. Tr. 2877:23-2878:5. In contrast, Cisco presented unrebutted testimony that most customers that have ISE do not also have Stealthwatch. Tr. 1700:24-1701:6, *see also* Tr. 1700:8-10 (ISE works with non-Cisco products), 1700:11-23 (confirming that Stealthwatch is usable and has value separate from ISE). The mere fact that a customer purchased products capable of use in an infringing system does not prove that the customer arranged *all* of the products it purchased in an infringing system.

The Court's damages award appears to assume that every product sold made its way into an infringing combination. The Court employed a royalty base that reflected invoice gross revenues for all accused products sold between June 20, 2017 and June 20, 2020, with no adjustment for products not used in infringing combinations. Order at 148-149. The Court likewise considered the profit margins and increase in revenues during the alleged damages period for each product line separately, not for lines in combination with each other. Order at 133-134, 139-140.

Accordingly, the Court should amend its findings on damages, to the extent damages are awarded, to reflect the only theory supported by the evidence, which is Dr. Becker's. This would reduce the damages award to $3,014,561. *See* DTX-1693.

## 2. The Court Should Limit Any Damages To U.S. Sales

Separately, if the Court awards damages under Centripetal's theory, it should at least find that Centripetal did not prove that it was entitled to a royalty on Cisco's non-U.S. sales, and adjust the damages award accordingly.

Mr. Gunderson presented evidence of sales of accused products on both a worldwide and U.S.-only basis. Tr. 1512:18-21 & PTX-1629 at Schedule 5 (worldwide); Tr. 1513:13-19 & PTX-1629 at Schedule 5.2 (U.S.). When Mr. Malackowski presented his updated sales figures, he

likewise submitted worldwide and U.S. figures. Dkt. 479. In the Order, however, the Court adopted Mr. Malackowski's updated revenue calculations based on worldwide sales, finding a pre-apportionment royalty base of $21,467,079,878. Order at 147 (citing Dkt. 488, Ex. 7; the $21,467,079,878 amount comes from "Updated Schedule 5" which is based on worldwide revenues). The U.S.-only figures from Mr. Malackowski's Updated Schedule 5.2 would yield a significant decrease in the pre-apportionment royalty base and in the damages award.

The patent laws "do not … provide compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l., Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013). Here, Centripetal did not present any evidence that would support a finding that Cisco's non-U.S. sales are acts of infringement for which Centripetal is entitled to compensation.

Centripetal argued at trial that Cisco compiled source code for certain products in the United States and that this was the equivalent to "making" the accused systems in the United States. *See* Tr. 463:13-464:19, 1514:1-11; *but see* Tr. 3470:5-21 (Court noting that it appeared not all of the allegedly infringing acts were done in the United States). And in its Order, the Court found that certain source code is compiled in the United States. *See* Order at 32 (Stealthwatch), 86 (accused switches and routes), 100 (accused switches, routers, and firewalls). These findings as to where certain source code is compiled, however, do not support a conclusion that Cisco's revenues for non-U.S. sales were generated from accused product *combinations* made, sold, or used in the United States. Here, each asserted claim is a "system" or "computer readable media" with various other hardware elements, such as processors and memory. Thus, to make the accused systems in the United States, all of the requisite elements of the system—e.g., processors, memory, etc.—must be combined into a system *in the United States*. *Centillion Data Sys. v. Qwest*

14

*Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1288 (Fed. Cir. 2011) (finding that to "make" a system under § 271(a), a defendant must combine all of the claim elements). Compiling source code is only one step in the manufacturing process, and source code by itself is not even capable of being combined with other hardware elements. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 449-50 (2007).

Accordingly, assuming damages are awarded, the Court should revise the damages royalty base to reflect U.S.-only sales.[5] The Court should make further findings to adjust the future damages calculation, willfulness enhancement, and prejudgment interest calculation consistent with the revised royalty base and past damages amount.

### D. The Court Should Convert The Judgment To A Partial Final Judgment Under Rule 54(b)

Finally, the Court should convert its judgment into a partial final judgment under Rule 54(b), to reflect the fact that certain claims in this case remain undecided.

The complaint in this matter asserted 11 patents. *See* Amended Complaint, Dkt. 29. Cisco petitioned for *inter partes* review of nine of those patents, and the Board instituted review on at least some claims in seven of them. *See* Order Granting-in-Part Motion to Lift Stay, Dkt. 68, at 2. The Court initially stayed the entire case pending the results of the IPRs. *See* Order Granting Motion to Stay, Dkt. 58. It later lifted the stay as to asserted patent claims not subject to IPR, but left the stay in place for the others. *See* Order Granting-in-Part Motion to Lift Stay, Dkt. 68. This resulted in the stay being lifted as to all asserted claims of four patents (the '856, '806, '193, and '176), and some asserted claims of a fifth patent (the '205). *Id.* Ultimately the Board held almost

---

[5] Cisco disagrees with other aspects of the Court's damages findings and conclusions and reserves all rights to challenge these issues on appeal.

all of the claims it reviewed unpatentable. Centripetal appealed the Board's decision in all of the IPRs. Some of those appeals are fully briefed and ready for argument before the Federal Circuit, and others are not yet fully briefed.

Although this Court entered a judgment on October 5, 2020, it covers only the patent claims at issue in the trial, not the stayed patent claims. The judgment does not resolve all the claims between the parties and is accordingly not final or appealable. Cisco respectfully requests that the Court enter an amended judgment stating that it is a partial final judgment under Rule 54(b), including the required express determination that "there is no just reason for delay." Fed. R. Civ. P. 54(b).

## IV. CONCLUSION

The Court should amend its findings of fact and the resulting judgment to reflect that Centripetal did not prove any act of direct infringement at trial; that Centripetal's damages theory accordingly is unsupported, that the damages award, if any, should be no more than $3,014,561; and separately that, even accepting Centripetal's damages methodology, the royalty base and downstream damages calculations should be adjusted to exclude non-U.S. sales.

The Court should also amend the judgment to reflect that it is a partial final judgment under Rule 54(b).

Dated: November 2, 2020                           CISCO SYSTEMS, INC.


                                                  By: _____/s/_____
                                                         Of Counsel

Dabney J. Carr, IV, VSB No. 28679
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutman.com

Neil H. MacBride, VSB No. 79883
**DAVIS POLK & WARDWELL LLP**
901 15th Street, NW
Washington, DC  20005
Telephone:  (202) 962-7000
Facsimile:  (202) 962-7111
neil.macbride@davispolk.com

Louis N. Jameson (admitted pro hac vice)
Matthew C. Gaudet (admitted pro hac vice)
John R. Gibson, VSB No. 72968
Jennifer H. Forte (admitted pro hac vice)
**DUANE MORRIS, LLP**
1075 Peachtree Street, N.E., Suite 2000
Atlanta, Georgia 30309-3929
Telephone: (404) 253-6900
Facsimile: (404) 253-6901
wjameson@duanemorris.com
jrgibson@duanemorris.com
jhforte@duanemorris.com

Joseph A. Powers (admitted pro hac vice)
**DUANE MORRIS, LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Facsimile: (215) 689-3797
japowers@duanemorris.com

Nicole E. Grigg (formerly Johnson) (admitted pro hac vice)

**DUANE MORRIS, LLP**
2475 Hanover Street
Palo Alto, CA 94304-1194
Telephone: (650) 847-4150
Facsimile: (650) 618-2713
NEGrigg@duanemorris.com

*Counsel for Defendant Cisco Systems, Inc.*