**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | | |
|---|---|---|
| CENTRIPETAL NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:18-cv-00094-HCM-LRL |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFF CENTRIPETAL NETWORK, INC.'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT CISCO SYSTEMS, INC.'S MOTION FOR A NEW TRIAL**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................ 1

II.    RELEVANT FACTS ................................................................................... 1

III.   ARGUMENT ............................................................................................. 2

    A.    The Court Is Permitted to Weigh the Evidence and Assess the Credibility of Witnesses ..................................................................................4

    B.    The '176 Patent ...............................................................................4

        1.    The Court Found Infringement Based on Substantial Evidence Supporting Centripetal's Infringement Contentions. .........................................4

        2.    The Court Considered and Rejected Cisco's Non-Infringement and Invalidity Positions. ....................................................................5

        3.    Danny Llewallyn's Declaration Recounts the Same Information Cisco Presented at Trial. .......................................................................8

    C.    The '806 Patent ...............................................................................12

        1.    The Court Found Infringement Based on the Substantial Evidence Supporting Centripetal's Infringement Contentions. .........................................12

        2.    The Court Considered and Rejected Cisco's Non-Infringement and Invalidity Positions. ....................................................................13

        3.    Peter Jones' Declaration Does Not Present Anything New. ............................14

    D.    Damages and Willfulness ..................................................................16

        1.    The Court's Order was Tethered to Centripetal's Contentions and Evidence Presented at Trial. ....................................................................17

        2.    Cisco Had Every Opportunity to Address the Information Presented. ............19

        3.    The Court's Order Identifies Numerous Different Factual Findings to Support a Higher Royalty. ....................................................................20

        4.    Cisco's Other Challenges to Damages Order are Wrong and a Red Herring. ....................................................................21

5.      Cisco Makes No Showing Whatsoever to Disturb the Court's Robust Willfulness Ruling. ............................................................................................23

IV.     CONCLUSION.......................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amrine v. Bowersox*,
238 F.3d 1023 (8th Cir. 2001), *cert. denied*, 534 U.S. 963 (2001)..........................................8

*Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*,
99 F.3d 587 (4th Cir. 1996) ......................................................................................................3

*Berlinger v. Wells Fargo, N.A.*,
No. 2:11-cv-459-FtM-29CM, 2016 WL 11423815 (M.D. Fla. Sept. 6, 2016).........................8

*Brown v. Wright*,
588 F.2d 708 (9th Cir. 1978) ..................................................................................................23

*Cline v. Wal-Mart Stores, Inc.*,
144 F.3d 294 (4th Cir. 1998) ....................................................................................................2

*Commil USA, LLC v. Cisco Sys., Inc.*,
135 S. Ct. 1920 (2015).............................................................................................................7

*Connelly v. Blot*,
No. 1:16-cv-1282, 2017 WL 11501501 (E.D. Va. Oct. 18, 2017) ...........................................9

*Goldblum v. Klem*,
510 F.3d 204 (3d Cir. 2007)......................................................................................................8

*Guisao v. Secretary, Dep't of Corr.*,
No. 8:15-cv-9-T-35AAS, 2018 WL 10883771 (M.D. Fla. Mar. 26, 2018)..............................8

*Johnson & Towers Baltimore, Inc. v. Vessel "Hunter"*,
824 F. Supp. 562 (D. Md. 1992) .............................................................................................20

*In re Knaus*,
47 B.R. 63 (Bankr. W.D. Mo. 1985).......................................................................................22

*Lin v. Rohm & Haas Co.*,
No. 11-cv-3158, 2016 WL 11696452 (E.D. Pa. Mar. 14, 2016) ..............................................4

*Lorme v. Delta Air Lines, Inc.*,
No. 03-cv-5239 (GBD), 2005 WL 1653871 (S.D.N.Y. July 13, 2005)....................................9

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011).....................................................................................................................6

i

*Nat'l Starch & Chem. Co. v. M/V "MONCHEGORSK"*,
    No. 97 Civ. 1448 (KTD), 2000 WL 1610902 (S.D.N.Y. Oct. 26, 2000) ................................4

*Sardis v. Overhead Door Corp.*,
    446 F.Supp.3d 47 (E.D. Va. 2020) ........................................................................3

*Sylvester v. Callon Energy Servs., Inc.*,
    724 F.2d 1210 (5th Cir. 1984) ............................................................................4

*Twigg v. Norton Co.*,
    894 F.2d 672 (4th Cir. 1990) ..............................................................................3

*United States v. Carolina E. Chem. Co.*,
    639 F. Supp. 1420 (D.S.C. 1986) ........................................................................3, 5

*United States v. Porter*,
    924 F.2d 395 (1st Cir. 1991) ...........................................................................4, 5

*United States v. Staff*,
    275 F. App'x 788 (10th Cir. 2008) .......................................................................8

*Watkins v. Casiano*,
    No. CCB-07-2419, 2009 WL 2578984 (D. Md. Aug. 17, 2009),
    *aff'd*, 413 F. App'x 568 (4th Cir. 2011)..................................................................9

*Williams v. Quality Tech., Inc.*,
    No. 1:19-cv-106, 2020 WL 807526 (E.D. Va. Feb. 18, 2020) .............................................3

**Statutes**

35 U.S.C. § 282 ...............................................................................................6

**Other Authorities**

Federal Rule of Civil Procedure 59 ...................................................................... 1, 3-5, 8, 9

Federal Rule of Civil Procedure 52 .......................................................................4

## I.     INTRODUCTION

This Court issued its October 5, 2020 Opinion and Order (Dkt. No. 621, "Order") based on both parties' contentions, testimony and other evidence presented at a bench trial in the above-captioned matter.  Defendant Cisco Systems, Inc.'s ("Cisco") motion for a new trial under Federal Rule of Civil Procedure 59(a)(2) (Dkt. No. 626, "Motion") should be denied because there were no new theories of liability and Cisco had a full opportunity to address the evidence presented, such that Cisco did not suffer any prejudicial surprise.  The Court's Order squarely addressed both Centripetal Networks, Inc.'s ("Centripetal") and Cisco's contentions in the case, and made findings in weighing and addressing the evidence presented and the credibility of the witnesses.  Indeed, the Federal Rules of Civil Procedure expressly permits and requires the Court to make findings of fact and law.

The entirety of Cisco's Motion is based upon ignoring the detailed analysis and findings the Court made based on the evidence presented at trial.  For example, what Cisco claims is "new" with respect to the two patents raised in its Motion, is an analysis of Cisco's non-infringement positions, which the Court determined was not credible in light of all of the evidence.  Indeed, where reconsideration of a judgment is an extraordinary remedy, which is only used sparingly, Cisco's Motion fails to pass the red face test.

## II.    RELEVANT FACTS

In the 178 page Order, the Court methodically addressed the parties' contentions, the extensive evidence and testimony presented and weighed the credibility of all of the foregoing. In doing so, the Court found that Cisco did not infringe U.S. Patent No. 9,137, 205, but infringed U.S. Patent Nos. 9,686,193, 9,917,856, 9,500,176 ('the '176 Patent") and 9,203,806 ("the '806 Patent").  Order at 23; Dkt. No. 622.  The Court also rejected Centripetal's request for injunctive relief and issued for a period of six years an ongoing royalty for Cisco's infringement based on the record evidence.  Order at 162, 165; Dkt. No. 622.

For the '176 and '806 Patents, the Court found that Centripetal proved infringement based on the evidence Centripetal presented at trial.[1] Order at 68-72, 98-107. The Court also analyzed Cisco's alternative theories of non-infringement, finding that they were simply not credible based on Cisco's evidence and its witnesses. In doing so, the Court weighed the evidence and found that even if Cisco's non-infringement contentions were accepted, Cisco's evidence and testimony contradicted such claims. Thus, the Court found that even Cisco's non-infringement contentions— which Cisco now improperly seeks to recast as "new" theories— would not be successful in light of the evidence at trial. The Court's infringement findings in its Order is based upon the clear weight of the evidence and not any manifest error of law or mistake of fact.

As to the Court's opinions regarding damages and willfulness, the Court thoroughly analyzed the evidence from start to finish in the case, even holding a separate hearing on damages along with additional evidence. As damages is a composite of all evidence, the Court's Order detailed its analysis of the *Georgia Pacific* factors, identifying, where appropriate, the various factors that had an influence on the royalty, several of which commanded an upward influence on the royalty. Order at 126-142. Contrary to Cisco's suggestion, however, the Court did not make an unfounded determination regarding a single *Georgia Pacific* factor based on comparing sale data from June 2016-2017 to increase the royalty figure. Motion at 8-9. Furthermore, the Court's determination on willfulness was also based upon a complete analysis of the *Read* factors and not a single factor. Order at 155-161.

## III.    ARGUMENT

"The decision to grant or deny a new trial is within the sound discretion of the district court." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). In the Fourth Circuit, the trial court must set aside the verdict and grant a new trial if "(1) the verdict is against the clear weight of the evidence, (2) is based upon evidence which is false, or (3) will result in a

---

[1] In thoroughly assessing all the evidence of infringement and validity, the Court ultimately held that infringement and validity for all four patents was "clear and not a close call." Order at 159.

miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Sardis v. Overhead Door Corp.*, 446 F.Supp.3d 47, 53-54 (E.D. Va. 2020), quoting *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001); *see also Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). This standard for jury trials is applied similarly to non-jury cases. *Williams v. Quality Tech., Inc.*, No. 1:19-cv-106 (LMB/MSN), 2020 WL 807526, at *10 (E.D. Va. Feb. 18, 2020) (Rule 59 "has been interpreted as allowing a new trial to be granted in a nonjury action only if a new trial might be obtained under similar circumstances in a jury action.") (citations omitted).

Here, Cisco has not pointed to anything that is a "manifest error of law or mistake of fact." *Id.*; *see also United States v. Carolina E. Chem. Co.*, 639 F. Supp. 1420, 1423 (D.S.C. 1986) ("[A] motion for new trial in a nonjury case … should be based upon manifest error of law or mistake of fact and a judgment should not be set aside except for substantial reasons.") (citation omitted). In fact, in support of its Motion, Cisco cites a single case, *Twigg v. Norton Co.*, 894 F.2d 672, 674-75 (4th Cir. 1990), which involved surprise witness testimony that altered the plaintiff's liability theory and that the parties conceded prejudiced the appellant. Motion at 2. That is far cry from this case, where there was no "surprise" testimony and Cisco is claiming that the Court (as opposed to Centripetal) came up with "new theories" of liability and damages. The sole case cited in Cisco's Motion does not support its position, and in fact shows the Motion should be denied.

As demonstrated below, to contrive its Motion, Cisco takes out of context cherry-picked portions of the Order where the Court explained why Cisco's contentions in the case had no credibility. Indeed, the portions of the Court's order that Cisco seeks to cast as "new" theories are actually the Court's analysis of Cisco's non-infringement and Centripetal's damages contentions—which Cisco had every opportunity to address at trial. Disguised in this way, Cisco's Motion amounts to nothing more than an attempt to seek a second bit at the apple. As a result, Cisco was well aware of all issues and had a chance to be fully heard on its evidence and the contentions presented at trial.

### A. The Court Is Permitted to Weigh the Evidence and Assess the Credibility of Witnesses

Cisco's Motion is a challenge to the trial court's ability to weigh the evidence and assess the credibility of the witnesses. The Court, however, is charged with weighing the evidence and making findings, as it did here and determining what the right outcome is, even if – as Cisco wrongly contends— it was not argued by the parties. *See, e.g.*, *Nat'l Starch & Chem. Co. v. M/V "MONCHEGORSK"*, No. 97 Civ. 1448 (KTD), 2000 WL 1610902, at *3 (S.D.N.Y. Oct. 26, 2000) (rejecting motion for new trial and to amend judgment and holding "I exercised my powers as fact finder and weighed the evidence … to reach the conclusions I did and I see no grounds to depart from my original determinations."); *Lin v. Rohm & Haas Co.*, No. 11-cv-3158, 2016 WL 11696452, at *8-9 (E.D. Pa. Mar. 14, 2016) (denying Rule 52 and Rule 59 motions "merely because [p]laintiff would have weighed the evidence differently," since "credibility findings [were] certainly within [the court's] power as the factfinder"); *United States v. Porter*, 924 F.2d 395, 399 (1st Cir. 1991) ("[T]he issue is one of credibility and the district court, acting as factfinder, has the legal power to accept the [] testimony as true.") (citations omitted); *Cf. Sylvester v. Callon Energy Servs., Inc.*, 724 F.2d 1210, 1216 (5th Cir. 1984) ("…we here acknowledge the fact-finder's broad powers to resolve conflicting evidence."). . Noticeably absent from Cisco's Motion is any case law supporting the notion that the Court is precluded from making additional determinations regarding liability and damages based on the mountain of evidence presented.

Thus, even setting aside Cisco's improper and incorrect characterizations of the Court's rulings as grounded in "new" rationales, Cisco's Motion fails at its threshold.

### B. The '176 Patent

#### 1. The Court Found Infringement Based on Substantial Evidence Supporting Centripetal's Infringement Contentions.

Cisco's Motion rings hollow because the Court determined that Cisco infringed the '176 Patent based upon Centripetal's infringement contentions and the evidence presented. Centripetal presented evidence at trial that Cisco's infringing routers and switches in

combination with Stealthwatch infringe the '176 Patent, because the traffic entering and leaving each of the infringing routers and switches are correlated using the new Stealthwatch system. Order at 68–72. Specifically, Centripetal's infringement expert, Dr. Cole, identified infringement where logs are generated based on a packet's ingress and egress out routers or switches. Order at 70. The Court's Order points to PTX-1060, which is a Cisco technical document dated December 2017, and Dr. Cole's testimony proving that the switches have the ability to export NetFlow on ingress and egress. Order at 72-73. The Court's Order further identified the agreement of Cisco's expert, Dr. Almeroth, that the routers and switches can be configured to export NetFlow on ingress and egress. Order at 73. As there was no dispute that Cisco makes, uses, sells and offers for sale the infringing routers and switches and Stealthwatch, the Court found that these systems and the computer readable media of the infringing systems satisfy each and every element of the Asserted Claims of the '176 Patent. This finding is based on Centripetal's contentions at trial and is not a new theory of liability.

## 2. The Court Considered and Rejected Cisco's Non-Infringement and Invalidity Positions.

In its thorough Order, in addition to finding infringement based on the evidence supporting Centripetal's positions, the Court also addressed Cisco's non-infringement positions for the '176 Patent, which it found lacked credibility in light of the evidence. Under Rule 59, the Court is permitted to weigh the evidence and consider the credibility of witnesses. *E.g.*, *Porter*, 924 F.2d at 399 ("[T]he issue is one of credibility and the district court, acting as factfinder, has the legal power to accept the [] testimony as true."). Here, the Court made specific findings on Cisco's specific positions and witnesses.[2] It is these alternative theories of non-infringement that Cisco now improperly seeks to recast as "new theories of liability" in order to manufacture its Motion. Cisco's Motion is mere disagreement with the Court's determination that, even under

---

[2] In fact, in the "Overview of the Evidence" portion of the Order, the Court stated that "Cisco's retained expert witnesses often contradicted Cisco's own documents as well as Cisco's own engineers." Order at 24.

Cisco's alternative theory of non-infringement, the evidence at trial proved that Cisco infringed—even under Cisco's view of the world.  Order at 73-79.

The crux of Cisco's non-infringement argument for the Asserted Claims of the '176 Patent was that Cisco's routers and switches do not correlate ingress and egress out of the same device and that was done by multiple devices.  Apart from rejecting this defense as being contrary to the documents and testimony at trial, the Court also found it contrary to the testimony presented and Cisco's technical documentation.  Specifically, the Court's Order cited Cisco's expert, Dr. Almeroth, who testified that the Asserted Claims of the '176 Patent are not limited to a single network device.  Order at 74-75 (testifying that a network device could be more than one network device based on the claim language).  Thus, Dr. Almeroth's opinion that Cisco did not infringe the Asserted Claims because the infringing routers and switches do not process ingress and egress (i.e., correlate) on the same device was not a true non-infringement defense because he agreed that one can infringe the Asserted Claims where multiple devices correlate traffic just as Cisco's systems do.

Further underscoring how Cisco's non-infringement positions lacked credibility is the Court's factual finding that the operation of the products and documentary evidence proved that Stealthwatch correlated information from multiple devices.  Order at 75-78.  Thus, the Court demonstrated that, irrespective of Cisco's contention that the devices allegedly do not correlate ingress and egress traffic, Cisco's expert, Dr. Almeroth, agreed that the '176 Patent also covers correlating traffic from multiple devices and Cisco's own technical documents demonstrate that information from multiple devices can be used and correlated in the infringing Stealthwatch.  Order at 76 (showing the proxy data and Netflow data is processed within Stealthwatch).  Thus, Dr. Almeroth's non-infringement opinion was wholly undermined in light of the evidence.

Furthermore, Cisco misses the mark with its invalidity argument and somehow makes its invalidity positions contingent upon Centripetal's infringement allegations.  That, however, is a straw man.  Cisco, as a party asserting invalidity, independently bears the burden of proving invalidity by clear and convincing evidence at trial.  35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd.*

*P'ship*, 564 U.S. 91 (2011). Such a showing is not dependent upon Centripetal's infringement allegations. *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1928 (2015) ("the long-accepted truth—perhaps the axiom—that infringement and invalidity are separate matters under patent law" and "the issues of infringement and validity appear in separate parts of the Patent Act.") (citations omitted). Indeed, Cisco was able to file two separate *inter partes* review ("IPR") requests before the Patent Trial and Appeal Board ("PTAB") on September 17, 2018, (Dkt. No. 46-1 at 4, ¶ 9 (Cisco declaration identifying the two IPR petitions filed on September 17, 2018 before the PTAB against the '176 Patent) challenging validity, which was 13 months before Centripetal served its responses to interrogatories seeking Centripetal's infringement contentions and 16 months before Centripetal served its expert reports regarding infringement. *See* Dkt. No. 83 at 5 (Cisco's motion to compel regarding Centripetal's October 23, 2019 response to Interrogatory No. 1 seeking Centripetal's infringement contentions); *see also* Dkt. No. 70 at 2.

Moreover, the Court found that Cisco's asserted prior art, Old Stealthwatch, was updated to include the infringing functionality based on the evidence at trial. Order at 82. In particular, the Court found that the Old Stealthwatch system required a human analyst to correlate information from logs that were generated from a variety of devices. Order at 81. The Court found that this did not meet the claims of the '176 Patent which requires a component of the system or computer code to perform the correlation. This functionality was not added until version 7.0.0 of Stealthwatch which was released in 2019 and where CTA was improved with the ability to leverage threat detection from the analysis of WebFlow, produced by Syslogs, and Netflow telemetry by correlating the data. Order at 79-80. As a result, Cisco's validity argument fell flat.

Finally, Cisco's passing mention of the slightly modified claim construction made during trial (Motion at 2) is a red herring. There was no claim construction issue with regard to the '176 Patent. Rather, this was Cisco's non-infringement argument regarding the claim term found in the Asserted Claims that "a network device" must be the same device. This, as explained above,

was wholly undermined with the admission of Cisco's expert that "a network device" in the Asserted Claims of the '176 Patent could involve more than one device. Order at 75 ("Therefore, even if the Court were to accept Dr. Almeroth's conclusion that the accused devices do not process ingress and egress out of the same device, it would still find infringement on the basis that the Cisco system correlates logs between multiple devices within the network on either ingress or egress.") Thus, Cisco cannot suggest that there was any gross injustice or new theories of liability because as demonstrated at trial, the positions that Cisco and its witnesses took at trial, was built on a house of cards.

**3. Danny Llewallyn's Declaration Recounts the Same Information Cisco Presented at Trial.**

Because Cisco is simply wrong that it was purportedly surprised with a new "theory," the Court need not even reach the Llewallyn declaration. But, there is nothing new in his declaration either, despite Cisco attempts to suggest that it contains purportedly new evidence that Cisco would have presented at trial. Motion at 4-6. Courts roundly reject supposedly "new" evidence in post-trial motions and deny requests for a new trial where—as here— evidence was known and available at trial and the movant simply chose not to rely on it. *See, e.g.*, *Berlinger v. Wells Fargo, N.A.*, No. 2:11-cv-459-FtM-29CM, 2016 WL 11423815, at *1 (M.D. Fla. Sept. 6, 2016) (denying Rule 59(a)(2) motion, stating "[T]hey fail to show how this information was previously unavailable to them. Therefore, the affidavit is not new evidence and cannot be used to revisit issues already decided by this [c]ourt."); *Guisao v. Secretary, Dep't of Corr.*, No. 8:15-cv-9-T-35AAS, 2018 WL 10883771, at *2 (M.D. Fla. Mar. 26, 2018) (rejecting evidence "counsel either did know or should have known about") , citing *United States v. Staff*, 275 F. App'x 788, 790 (10th Cir. 2008) (finding that evidence was not "new" because it was available and could have been presented at trial); *Goldblum v. Klem*, 510 F.3d 204, 226 n.14 (3d Cir. 2007) ("Evidence is not 'new' if it was available at trial, but a petitioner merely chose not to present it to the jury."); *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001) , *cert. denied*, 534 U.S. 963 (2001) (approving district court's determination on remand that "evidence is new only if it

was not available at trial and could not have been discovered earlier through the exercise of due diligence"); *Lorme v. Delta Air Lines, Inc.*, No. 03-cv-5239 (GBD), 2005 WL 1653871, at *5 n.6 (S.D.N.Y. July 13, 2005) (denying motion for a new trial where post-verdict expert report was "not new [evidence], rather it contain[ed] the same opinions expressed at trial and considered by the jury."); *Watkins v. Casiano*, No. CCB-07-2419, 2009 WL 2578984, at *3 (D. Md. Aug. 17, 2009), *aff'd*, 413 F. App'x 568 (4th Cir. 2011) ("There is nothing in Dr. Goldman's latest affidavit, attached to the plaintiffs' motion for new trial, that he could not have offered had he been recalled to testify in rebuttal"); *Connelly v. Blot*, No. 1:16-cv-1282 (AJT/JFA), 2017 WL 11501501, at *3 (E.D. Va. Oct. 18, 2017) (denying Rule 59(a)(2) motion where movant "presented no facts or circumstances that would justify such relief, as she had ample opportunity to properly present, disclose in pre-trial discovery, and prove [her] claim; and to allow her to do so now would unfairly prejudice the defendant").

As shown below, the Llewallyn declaration is nothing more than what Cisco already presented at trial, or what Cisco could have rebutted at trial, but did not. For example, the Llewallyn declaration states that CTA does not correlate packets. Dkt. No. 626-1 (Llewallyn Decl.) at ¶¶ 7-8. This is precisely the same non-infringement argument Cisco made at trial with Dr. Kevin Almeroth, which the Court rejected. Order at 72; Trial Tr. at 2239:17-2240:14, 2248:5-25 (Dr. Almeroth testifying that he did not believe that the infringing products correlate packets). In fact, Dr. Almeroth at trial referred to Mr. Llewallyn's testimony to support his opinion that CTA does not correlate Netflow ingress and egress records from a switch or a router, which is the very same argument that Cisco alleges is new. *Compare* Trial Tr. at 2249:1-18 *with* Dkt. No. 626-1 (Llewallyn Decl.) at ¶ 8. As this Court pointed out in its Order, Dr. Almeroth conceded that the infringing switches and routers are capable of sending ingress and egress logs to Stealthwatch which includes CTA. Order at 73 (citing Trial Tr. at 2286:10-19). This evidence proves Centripetal's infringement claims that the infringing routers and switches with Stealthwatch system can correlate ingress and egress traffic.

Moreover, Cisco's citation to a litigation-created diagram is not credible "new" evidence, particularly where Mr. Llewallyn already testified about the diagram during trial. *Compare* Dkt. No. 626-1 (Llewallyn Decl.) at ¶¶ 4-6 *with* Trial Tr. at 2146:21-2148:7 (Mr. Llewallyn describing the flow from Computer A to Computer B), 2150:8-20 (describing Stealthwatch Flow Collector), 2152:3-14 (Mr. Llewallyn describing NetFlow records). Cisco cannot reasonably claim that this is "new" evidence that it was unaware of that it could have presented at trial. Finally, Mr. Llewallyn makes references to Syslogs/WebFlow in his declaration as well at PTX-1065. Dkt. No. 626-1 (Llewallyn Decl.) at ¶¶ 9-11. Cisco cannot credibly claim that it was not aware of Centripetal's assertions of infringement by Syslog/WebFlow as Dr. Cole directly addressed this in his testimony. Trial Tr. at 1114:14-1116:5 (Dr. Cole testifying that Syslog is correlated by Stealthwatch after receiving the information from the infringing switches and routers just like NetFlow). Specifically, Dr. Cole testified that Stealthwatch can correlate traffic from multiple devices on a network. Trial Tr. at 1114:24-1116:20 (Dr. Cole testifying the Netflow and Syslog data can be correlated from multiple devices).

In the face of this testimony and assertion of infringement, however, Cisco elected not rebut it. Irrespective of whether a proxy device was at issue, Cisco did not rebut the fact that the correlation of Syslog/WebFlows and NetFlows in the new version of Stealthwatch with any witness, including Mr. Llewallyn, despite the overwhelming evidence presented at trial that the Court's Order identified. Order at 70-71; *see also* PTX-1009 at 9 ("CTA can now leverage detections from the analysis of WebFlow telemetry to improve the efficacy of analyzing NetFlow telemetry from Stealthwatch. This is accomplished by the system through correlation of both telemetry types."); PTX-1065 at 5 ("Stealthwatch will then correlate the received syslog and relates it to the flows collected from network devices before and after the proxy, providing deeper visibility into customers web traffic."); Trial Tr. at 1114:14-1116:5; *see also* PTX-591 at 522. Cisco's failure to address this evidence when it had the opportunity to do so, as it was raised at trial is only to Cisco's detriment and certainly not grounds for a new trial. Ultimately, the Court's infringement findings was not dependent upon a "proxy" device, as Cisco suggests.

Thus, the Llewallyn declaration provides no additional "new" evidence of non-infringement as Cisco could have presented it, and it does not rebut the Court's finding of infringement.

Similarly, the Llewallyn declaration regarding de-duping and weblogs is irrelevant to the issue of validity. Dkt. No. 626-1 (Llewallyn Decl.) at ¶¶ 12-15. As this Court noted, the "generation of rules responsive to correlations was an added functionality with the addition of CTA into Stealthwatch." Order at 82. The Llewallyn declaration does nothing to address the generation of rules responsive to correlation. In paragraphs 12 to 14 of his declaration, Mr. Llewallyn discusses de-duplication of NetFlow records. Dkt. No. 626-1 (Llewallyn Decl.) at ¶¶ 12-14. However, these statements are irrelevant to generating rules responsive to correlation, which the claims require. Furthermore, in paragraph 14 of his declaration, he makes reference to threat intelligence feeds, which simply repeats what he testified to at trial. *Compare* Dkt. No. 626-1 (Llewallyn Decl.) at ¶ 14 *with* Trial Tr. at 2167:13-2168:5 (testifying about threat intelligence feeds). The Court determined that Cisco's arguments lacked credibility because Cisco failed to provide clear and convincing evidence on the "correlate" and "responsive to" functionality. Order at 80-82 (noting that CTA and ANC policies were new features not present in earlier versions of Stealthwatch); *see also* PTX-1893 at 11 (noting what is new in Stealthwatch); PTX-569 at 272; PTX-595 at 179 (2019 document showing how "ANC policies have replaced the previous quarantine and unquarantine feature."). Finally, in paragraph 15 of his declaration, Mr. Llewallyn states that Stealthwatch was able to "ingest weblogs from proxies and associate that with data from NetFlow" while citing DTX 343. Dkt. No. 626-1 (Llewallyn Decl.) at ¶15. However, Cisco already relied on DTX 343 for its invalidity argument at trial and this Court found, as a factual matter, that the prior versions of Stealthwatch still did not contain the "correlate" and "responsive to" functionality. Order at 80-82. Accordingly, the Llewallyn declaration does not provide any "new" information that Cisco had either already provided to Court during trial or could have presented at trial and should be disregarded.

## C. The '806 Patent

### 1. The Court Found Infringement Based on the Substantial Evidence Supporting Centripetal's Infringement Contentions.

Cisco's Motion does not dispute the evidence of infringement Centripetal presented at trial, which included evidence that Cisco's infringes the '806 Patent with respect to its using, making, selling and offering for sale 1) Cisco's infringing routers and switches in combination with DNA Center and 2) Cisco's infringing firewalls with Firepower Management Center. Order at 98-110. After analyzing the evidence, the Court determined that Centripetal proved Cisco infringed the '806 Patent based on what Centripetal contended at trial. Specifically, Centripetal's infringement expert, Dr. Mitzenmacher, identified infringement where DNA Center receives rule sets from various sources and preprocesses the rule sets to create optimized rules which are distributed to Cisco's switches and routers, which then, in turn, perform a rule swap without dropping packets. Order at 100-101. The Court's Order points to Cisco documents including PTX-1195, which is a Cisco technical document that describes FED 2.0 Hitless ACL Update, and Dr. Mitzenmacher's testimony proving that the rule swap on switches and routers occurs without dropping packets. Order at 100-101. Similarly, the Court found that Firepower Management Center's Threat Intelligence Director receives rule sets from various sources and preprocesses the rule sets to create optimized rules which are distributed to Cisco's firewalls, which then in turn, performs a rule swap without dropping packets. Order at 101. As with infringing switches and routers with DNA Center, the Court's Order identifies Cisco documents, including PTX-1196, which is a Cisco technical document that describes a new mechanism for rule swapping without dropping packets for firewalls, as well as Dr. Mitzenmacher's testimony demonstrating why the rule swap on firewall occurs without dropping packets. Order at 101. Thus, as there was no dispute that Cisco makes, uses, sells and offers for sale the 1) infringing routers and switches and DNA Center and 2) infringing firewalls with Firepower Management Center, the Court found that these systems and the computer readable medium of the infringing

systems satisfy each and every element of the Asserted Claims of the '806 Patent. This finding is based on Centripetal's contentions at trial and is not new.

### 2. The Court Considered and Rejected Cisco's Non-Infringement and Invalidity Positions.

For the '806 Patent, the Court underwent a thorough and detailed analysis explaining why Cisco was liable for infringing the '806 Patent. Indeed, the Court summarized the infringement evidence Centripetal presented and addressed each of Cisco's three non-infringement positions which the Court simply found was not credible in light of the evidence presented at trial. Order at 107-110 (identifying three arguments advanced by Dr. Narasimha Reddy and rejecting each one).

With respect to processing of packets with a first and second rule set, the Court explained in its Order that Cisco's non-infringement position that the claims require a single packet to be processed with the first and the second rule set instead of swapping rule set between packets was "incorrect" and credited Centripetal's infringement evidence demonstrating that the infringing products swap rule sets while packets are stored in a buffer. Order at 108, 110 ("First, Cisco is *incorrect when it states the claims require a reprocess of packets*. The claims clearly state that all that is required is a process through a second rule set." (emphasis added)). The Court also held that even under Cisco's non-infringement argument that requires a single packet to be processed with two different rule sets, Cisco would still infringe based on Cisco's evidence. Specifically, the Court cited to Dr. Peter Jones, Cisco's distinguished engineer and Cisco own documents who confirmed that a packet can be analyzed by a first rule set during ingress and a second rule set during egress. Order at 102-103 (explaining the processing of packets through ingress forwarding controller, packet buffer complex, and egress forwarding controller), 110 ("Mr. Jones and Cisco's technical documents confirm that the accused devices apply rules on <u>both</u> ingress into the devices and on egress out of the device." (emphasis in original)); *see also* Trial Tr. at 2563:2-6 (Dr. Jones explaining that the egress forwarding controller applies ACL rules), 2564:6-22 (explaining that the ingress forwarding controller also applies ACL rules that

will either discard the packet or forward the packet), 2566:20-2567:5 (testifying that packets will sit in the packet buffer complex), 2572:2-13 (testifying that during the swap of the rules sets, there is no processing of packets); DTX 562 at 43 (showing ingress forwarding controller, packet buffer complex, and egress forwarding controller). In other words, even under Cisco's non-infringement argument, the Court found that Cisco infringes because the packet would not be dropped while a new rule set is loaded and that same packet would be analyzed under both the old (first rule set) and the new (second rule set) as the packet makes its way through the device. Order at 102-103.

In its Motion (Motion at 6), Cisco recasts the Court's Order to argue that the Court *sua sponte* created a new infringement theory when, in fact, the Court was explaining that Cisco's non-infringement position would not stand in light of the evidence presented at trial. However, as explained above, the Court did not create a new theory of infringement, but rather debunked Cisco's non-infringement position further demonstrating that Cisco had no credible defense at trial. In other words, infringement of the '806 Patent was not a close call because even if the Court adopted Cisco's view of the world, the evidence still proved that Cisco was liable.

Similarly, Cisco's arguments about invalidity and willfulness are irrelevant because they misinterpret the Court's Order. In particular, Cisco's arguments are premised on the notion that the Court created a new infringement argument. However, as set forth above, the Court did not fabricate a new infringement contention but instead held that Cisco's non-infringement position lacked credibility and even if adopted would not save Cisco from infringing the '806 Patent in light of the evidence presented at trial. Accordingly, Cisco's motion for a new trial with respect to the '806 Patent should be rejected.

### 3. Peter Jones' Declaration Does Not Present Anything New.

Cisco submitted the declaration from Peter Jones, suggesting that it is as new evidence that Cisco would have cited at trial. Motion at 8-9. However, his declaration reflects precisely what he testified to at trial. In particular, the Jones declaration claims that he would have

testified about the processing of packets by the ingress and egress forwarding controllers using ACL rules. Dkt. No. 626-2 (Jones Decl.) ¶ 8. That, however, was precisely what he testified to at trial. Specifically, he explained that incoming and outgoing packets would be processed by the ingress and egress forwarding controllers using ACL rules. Trial Tr. at 2566:10-19, 2568:10-2569:6 (testifying about packets being processed by ingress and egress forwarding controllers); *see also* Trial Tr. at 2563:2-6 (explaining that the egress forwarding controller applies ACL rules), 2564:6-22 (explaining that the ingress forwarding controller also applies ACL rules that will either discard the packet or forward the packet), 2565:11-24 (same); Order at 102-103. Thus, the Jones declaration is not anything "new," as Cisco proclaims.

Moreover, his testimony and declaration only further confirm the infirmities of Cisco's non-infringement positions that the Court debunked and found would still be infringing. Neither Cisco nor Mr. Jones dispute that a packet may be processed using a first rule set at ingress and second rule set on egress. Indeed, he specifically testified the FED 2.0 Hitless ACL Update caused the Catalyst switches to use the old rule set on packets until the new rule set was ready. Trial Tr. at 2571:18-2572:17. Further he testified that packets sit in the packet buffer complex before they are processed at egress. Trial Tr. at 2566:20-2567:5; *see also* Trial Tr. at 2618:1-10, 2619:4-13 (Dr. Reddy testifying regarding to packets being held in the packet buffer complex). Accordingly, the Court correctly found that the Catalyst switches would still infringe under Cisco's non-infringement theory because if a packet entered into a device during a rule swap, the packet would be processed with the first rule set at ingress, stored in a buffer during the rule swap, and processed by the second rule set at egress after the swap was completed. Thus, the Jones declaration provides no additional evidence, nor does it even preclude infringement, even under Cisco's debunked non-infringement theory.

Similarly, the Jones declaration that he would have testified about the prior version of the Hitless ACL Update is irrelevant because the prior version of Hitless ACL Update did not swap rules, but rather caused them to overlap which resulted in dropped packets. Dkt. No. 626-2 (Jones Decl.) at ¶ 12; Trial Tr. at 2552:20-23 (testimony that the prior version would drop

packets while switching rules); Trial Tr. at 2569:13-22 (explaining that the Catalyst 9000 switches were not the first to have the hitless ACL rule update); Trial Tr. at 2550:18-25 (the new infringing products contain a new FED 2.0 Hitless ACL Update); Trial Tr. at 3026:7-3027:2 (Dr. Alexandro Orso explaining that the accused FED 2.0 Hitless ACL Update is different from prior versions); PTX-1195 at 3 ("Currently whenever there is a change to the ACE in an ACL, the data will drop packets during the change to hardware programming."), 4 ("For this new feature Hitless (Atomic) ACL Change, no packets should drop while programming the new TCAM entries."). Accordingly, the Jones declaration that he would provide additional testimony that the ingress and egress use ACL rules for prior versions of Catalyst switches is irrelevant because the rule sets are not swapped in the older versions of the products. Dkt. No. 626-2 (Jones Decl.) at ¶ 12. Instead, the rules overlap which fails to meet the limitations of the asserted claims of the '806 Patent. Thus, the Jones declaration provides no new evidence that would support invalidity of the asserted claims of the '806 Patent.

### D. Damages and Willfulness

Cisco claims to be surprised by a comparison of the products' and their financial performance before and after June 2017 – the date both parties' damages experts agreed is the date of the hypothetical negotiation and of first infringement for purposes of the damages analysis. To make this remarkable assertion, Cisco ignores the fact that Centripetal's damages case was rife with such comparisons, which Cisco had a full and fair opportunity to cross examine and refute. Indeed, it was precisely because of the parties' dueling expert opinions and evidence that the Court ordered Cisco to produce additional sales data and expert testimony to facilitate a fuller picture of *the very comparison* that Cisco now claims to be surprised by. Trial Tr. at 3416:1-10 (citing evidence of sales "increasing by double digits every quarter" and "seasonal variations in sales," "to get an accurate picture, we needed to look at the monthly sales *over a period of time and see if there was any trends there*...I don't know *what else Dr. Becker's going to think of the figures*.") (emphasis added). Cisco's assertions of surprise strain

credulity.  In any event, Cisco does not dispute that the challenged comparison was only one of several factors providing an upward influence on the royalty rate.  Importantly, the Court observed that the revenue increases corroborated other evidence in the record.  Order at 139.

### 1.  The Court's Order was Tethered to Centripetal's Contentions and Evidence Presented at Trial.

Centripetal's damages case was a culmination of a great deal of evidence, including comparisons of Cisco's predecessor products with its launch of the infringing technology as the Court did in its Order.[3]  Cisco's assertion that Centripetal never argued such comparison "might be relevant" could not be further from the truth.

Centripetal's damages experts described the transition occurring with Cisco's products and business.  For example, Mr. Gunderson testified that Cisco's 2016 SEC Form 10-K noted that, in 2016, Cisco "expect[ed] to face increased competition from companies that develop networking products based on commoditized hardware," which he interpreted as describing a business "need[] … [for] something that their customers would want, [to] help drive profits and revenue."  Trial Tr. at 1452:7-21.  Also in 2016, Cisco commented to analysts that "commoditization [w]as a major challenge for Cisco's switching business."  Trial Tr. at 1456:19-1457:8; PTX-1460 at 993.  Cisco's 2019 SEC Form 10-K painted a different picture, for example explaining how Cisco was "combining a number of security technologies" to "deliver[] an end-to-end zero trust architecture."  Trial Tr. at 1453:22-1454:17; PTX-560 at 771.  Mr. Gunderson testified that "these patents and this technology helped [Cisco] with that strategy."  Trial Tr. at 1454:18-24.  With the introduction of the infringing technology, Cisco saw "double-digit growth."  Trial Tr. at 1455:12-19; PTX-333 at 427.  Mr. Gunderson also pointed to Cisco's

---

[3] It is unfortunate that Cisco spins the Court's request to provide monthly sales figures as evidence of confusion and an inadequate record when in reality it was seeking relevant information to resolve the parties' dueling expert opinions and evidence.  As the Order notes, Cisco's expert, Dr. Becker, provided "figures for those [products] accused by the defendants, although not on a month-to-month basis."  Trial Tr. at 2969:8-12.  The Court requested monthly data covering largely the same period since "[t]here was testimony about there being seasonal variations in the sale of products," and monthly sales figures were necessary "to get an accurate picture."  Trial Tr. at 3416:5-10.

documents highlighting feature comparisons of the infringing products to predecessor products. Trial Tr. at 1459:10-1464:13. For example, a comparison for the Catalyst 9300 "include[d] the Encrypted Traffic Analytics," which is "part of [the] technology [that was] accused," and was the "first model to do so." Trial Tr. at 1461:8-24. A similar comparison of the Cisco 4000 Series routers compared prior technology with the new technology that included the DNA Center and StealthWatch. Trial Tr. at 1462:16-1464:13; PTX-1507. Similarly, a comparison for the Firepower services "tout[ed] the benefits … of the technology at issue." Trial Tr. at 1464:21-1466:12; PTX-197 at 207; *see also* PTX-1035 (showing top 10 benefits of StealthWatch and ISE); PTX-276 (selling Encrypted Traffic Analytics with StealthWatch). Cisco's contention that Centripetal never presented a comparative damages model strains credulity and is obviously inconsistent with the trial record.

Consistent with how Centripetal presented its damages case, the Court's Order weighed the evidence and made its own conclusions. For example, the Court's Order cites to PTX-1135, a June 20, 2017 Cisco press release announcing the "network of the future," representing that Encrypted Traffic Analytics solved the "network security challenge previously thought to be unsolvable." Order at 138-139. It also cites to PTX-515, a November 2017 Cisco article published on its website, touting the release of its infringing products "launched in 2017." It stated that "Catalyst 9000 product family and its meteoric rise since it was launched in June 2017." Order at 134-136; PTX-515 at 426. That November 2017 press release also highlighted how, in roughly four months, Cisco had "double[d] its Catalyst 9000 customer base," making Catalyst 9000 the "fastest ramping product in Cisco's history" and the "fastest to exceed $1B quarterly run rate." *Id.* The chart on page 140 of the Order is what Centripetal's expert, Mr. Malackowski, presented to the Court, and the Court found that it confirmed the numerous public representations that Cisco had made about the 2017 launch of the network of the future in June of 2017 discussed in the Order's preceding pages. *See* Order at 134-141.

In addition, the Court found that the infringing software significantly improved existing hardware by not only adding security functionality, but speed and scalability as well. Order at

140-141.  The Court's Order explicitly cites to the trial testimony of Cisco's expert, Dr. Reddy, and PTX-547, which was Centripetal's presentation made to Cisco on February 4, 2016, explaining to Cisco why it needed Centripetal's patented technology.  Order at 140-141.  Again, this inherently comparative evidence was relevant to what Cisco had done before it launched its "network of the future" in June of 2017 that included the infringing functionality and proved Cisco's representations regarding the success of these new products.  Order at 138-139.  Thus, Centripetal's damages case always included consideration of what Cisco was doing prior to the release of the infringing products, which was announced in June of 2017.

Furthermore, Cisco's damages theory for all the patents in the case was not to give ***any*** value for the infringing switches and routers.  Trial Tr. at 2905:14-2907:9, 2938:1-15; Trial Tr. at 2948:24-2949:11; *see also, e.g.*, DTX 1708, DTX 1709.  Thus, whether there was one infringing router/switch or, multiple infringing routers/switches in combination that was entirely irrelevant to Cisco's rebuttal damages theory which excluded *all* revenues of switches and routers from its damages calculation.  Therefore, Cisco's cries of prejudice regarding multiple devices ring hollow.  Motion at 6.

### 2.    Cisco Had Every Opportunity to Address the Information Presented.

The requested financial data and use of it was not new and Cisco had every opportunity to address the information presented.  The experts' assignment "was to look at the predecessor switches in comparison to the accused switches" and understand the rate of growth or increase in the infringing products above the predecessor products.  Trial Tr. at 3433:23-3435:15.  The Court specifically told Dr. Becker in response to his question about potentially excluding certain products that "you're not limited by what I ask for" and "[i]f there's something else along these lines -- you know what I'm thinking about -- that you think would be helpful, go ahead and include it."  Trial Tr. at 2977:7-12.  Cisco had every opportunity at trial to address this additional damages evidence on June 25, 2020, which was 2½ weeks after the Court initially requested it on June 8, 2020, and after the parties had disclosed their submissions regarding the requested

information.  In fact, on June 25, 2020, Cisco elicited Dr. Becker's views on the additional sales data and Centripetal's expert's presentation of that data.  *See generally* Trial Tr. at 3439:17-3453:9 (answering questions about whether there was "daylight between" his and Mr. Malackowski's presentation); Trial Tr. at 3449:12-3453:9 (Dr. Becker's answers to questions regarding the "areas of disagreement" between what Dr. Becker submitted to the Court and what Centripetal's expert submitted).

Cisco even presented new evidence on June 25, 2020 regarding the purported predecessor products to the Catalyst 9000 series, and moved new Cisco marketing materials that Cisco had never produced, identifying the differences between these Catalyst switches and the predecessor products.  Trial Tr. at 3442:2-3444:2 and 3445:3-3447:5 (testifying about predecessor models and Cisco's feature comparisons dated 2019 that lists the feature comparisons between the unaccused predecessor models and the infringing switches).  This roundly undermines its belated claim of surprise.  *See Johnson & Towers Baltimore, Inc. v. Vessel "Hunter"*, 824 F. Supp. 562, 566-67 (D. Md. 1992) ("NHIG's argument that it was surprised by the [c]ourt's judgment is undermined by its own response…. In both its pleadings, and in testimony presented by it at trial, NHIG seems to have anticipated [the] charges against it.") (citation omitted).

### 3. The Court's Order Identifies Numerous Different Factual Findings to Support a Higher Royalty.

There were numerous different facts that supported a higher royalty rate, which the Court identified throughout the Order, and it was not simply based upon the table that Cisco seems to take issue with in its Motion.  By way of example, the Court's findings for *Georgia Pacific* factor 8 and factor 9 supported a higher royalty.  Order at 126-127 (Factor 8 covers the profitability of the product, its commercial success and popularity and Factor 9 covers the utility and advantages of the patented invention over old modes or devices, if any, that had been used for achieving similar results).  Specifically, the Court found that the fact that Cisco did not present any non-infringing alternative, its previous business acquisitions, Cisco's technical and marketing documents and the undisputed evidence of the high profits Cisco achieved supported a

higher royalty rate.  Order at 136, 139.  Nonetheless, Cisco argues and only cites in its Motion snippets of the Court's analysis of *Georgia Pacific* factor eleven, which is the great extent that Cisco made use of the patented invention and any evidence that shows the value of that use (Order at 127 and 140) to suggest that this was the reason for an increased royalty figure.  Motion at 9-10, citing Order at 139-140 and 142.  This is misleading because it misses the totality of the Court's analysis of all the *Georgia Pacific* factors and the evidence which Cisco had every opportunity to address at trial.

> **4.**      **Cisco's Other Challenges to Damages Order are Wrong and a Red Herring.**

Cisco is equally incorrect in its suggestion that June 20, 2017 is limited to just the issuance date of the '193 Patent.  Motion at 11.  It is also the date of Cisco's public statement identified that date as when it "unveil[ed the] network of the future."  Order at 64, 84; PTX-1135.  The June 20, 2017 press release noted the availability of Catalyst 9300 & 9500 (June 2017), Catalyst 9400 (July 2017), DNA Center (August 2017), and Encrypted Traffic Analytics ("ETA") (scheduled for September 2017).  PTX-1135 at 947.  This is also consistent with testimony that Cisco began the process of constructing ETA in early 2017.  Trial Tr. at 1027:4-15 ("[Agrawal] believes it was early 2017 that Cisco put together their requirements document or blueprint on how to go about building Encrypted Traffic Analytics.").  Cisco "failed to cite any Cisco technical document produced post June 20, 2017."  Order at 37.  "The evidence at trial supports a first infringement date of June 20, 2017."  Order at 125.

Cisco's attempts to suggest that the infringing technology was added into products much earlier in 2013 and 2014 is a red herring.  Motion at 10.  For the '806 Patent, the relevant timeframe was when Threat Intelligence Director was introduced in 2017, which is when Cisco was infringing, not when aspects of the transactional commit model was introduced.  Further, for the '193 Patent, Cisco cites to a forward looking software functional specification, which never states that IOS XE, which was also called Polaris, was released in 2013-2014.  In fact, much of the infringement evidence for the '193 Patent involved using mechanisms for quarantining some

traffic while allowing other traffic to proceed.  *See e.g.*, Trial Tr. at 494:3-495:14, 496:17-499:19, 501:10-502:10, 506:19-509:4, 519:2-520:13, 521:8-523:12, 528:3-530:24, 533:13-537:1.  Evidence of the quarantine being applied was in Cisco's technical document that indicates a copyright date as early as 2017.  PTX-1280 at 3 (noting "Copyright 2017 Cisco Systems, Inc.").

Further, while Cisco attempts to separate out the infringing technologies and individual patents (Motion at 10-11), the evidence is clear that they were sold and worked "in concert."[4]  Trial Tr. at 1492:22-1493:8 ("You would not be able to get this operationalization of threat intelligence if you removed any one of these patents.  They're made to work in concert and together to provide that benefit."); Trial Tr. at 923:2-5 ("This is a Cisco presentation talking about combining cognitive analytics with StealthWatch for malware detection.  And … it's important to point out the date of this document is June 2017.").  Mr. Gunderson explained that the technologies all work together and they are selling everything together as a solution, rather than just individual products.  Trial Tr. at 1464:4-13; 1466:6-17; 1467:3-1468:3.  Thus, there is no dispute that Cisco makes, uses, sells and offers for sale the devices.  Each of these acts are separate acts of infringement and thus, by way of example, Cisco's offering for sale of Stealthwatch with the infringing Catalyst 9000 series switches is an act of infringement.  *See e.g.*, Trial Tr. at 1472:8-25; 1474:1-8.

In sum, there was nothing *sua sponte* about the Court accepting a comparative damages model—that is precisely the model Centripetal put forth.  Cisco had every opportunity to present (and did present) a competing damages model, to cross-examine Centripetal's witnesses and evidence, and to defend against Centripetal's damages contentions and evidence presented.  The Court should deny Cisco's attempt to relitigate these issues.  *See, e.g.*, *In re Knaus*, 47 B.R. 63, 66 (Bankr. W.D. Mo. 1985) (denying motion to alter judgment where "there has been a full evidentiary opportunity, unimpaired by any [] extrinsic mistake" and holding that "rul[ing] now

---

[4] Similarly, Cisco's suggestion that Centripetal's damages contention did not account for multiple devices being accounted for in the damages model (Motion at 6) is also wrong.  Mr. Gunderson only counted revenues once for the infringing products, even if they infringed multiple patents.  *See e.g.*, Trial Tr. at 1500:25-1501:25.

that any deficiency in that evidence may be cured through a new trial would be to disturb the notions of justice and fairness underlying the law governing new trials"); *Cf. Brown v. Wright*, 588 F.2d 708, 710 (9th Cir. 1978) ("[D]efendant's desire to introduce additional evidence after losing the case did not constitute a proper ground for granting a new trial.").

> ### 5.     Cisco Makes No Showing Whatsoever to Disturb the Court's Robust Willfulness Ruling.

Based on nothing more than 3 throw-away lines in its Motion in utter disregard for the myriad facts showing Cisco's egregious behavior, Cisco attempts to open the Court's willfulness determination.  Cisco's attempt does not even approach a halfhearted argument.

Cisco's offhand assertions at the conclusion of its arguments regarding the '176 and '806 Patents that "Cisco cannot have willfully infringed a patent based on a theory Centripetal did not advance at trial" (Motion at 6) fails for the reasons set forth above and tellingly ignores the actual numerous grounds for the Court's willfulness determination.  Order at 155-161.

Likewise, Cisco's argument that the Court found support for the fourth *Read* factor in Cisco's significant sales after adding the infringing technology, is neither here nor there.  Setting aside that this fact is robustly supported by the record, Cisco points to only one fact of many that supported only one of nine *Read* factors. Cisco does not and cannot argue that even setting aside its post-infringement sales, the fourth *Read* factor – namely, Cisco's size and financial condition—would militate against enhanced damages.  Nor does Cisco contend that this single finding on a single factor undermines the Court's findings with respect to the remaining *Read* factors, nor can it.

Indeed, just by way of example, Cisco ignores the fact that the substantial evidence of willful infringement at trial was also based on Centripetal's communications of its patented technology during meetings and discussions under Non-Disclosure Agreement about Centripetal's RuleGATE patented technology, and Cisco's subsequent actions demonstrating infringement.  *See, e.g.*, Order at 149-152; Trial Tr. at 1019:2-1026:18, 1128:8-1129:5 (technical expert describing evidence of Centripetal's disclosure of its patented technologies to Cisco under

NDA and Cisco's intent to study Centripetal's patent claims); Trial Tr. at 982:16-992:7, 994:2-999:15, 1004:20-1005:19 (discussing evidence of Cisco's infringement after meetings with Centripetal); Trial Tr. at 1218:5-1225:2 (describing communication of '176 patented correlation technology under NDA); Trial Tr. at 1225:8-1228:23 (discussing communication with Cisco following WebEx meeting); Trial Tr. at 1237:4-1239:1, 1241:8-23, 1242:11-1244:23 (describing confidential disclosure of RuleGate correlation technologies through presentation and follow-up from Cisco); PTX-547 at 389-91; PTX-102 (contemporaneous email showing Cisco's questions about patents); DTX 1270 at 1, 25-28, 30 (detailing information about Centripetal's patents, patent applications, and confidential RuleGate correlation technologies).  Thus, Cisco's new argument related to prejudice is a red herring.

Ultimately, Cisco had a fair opportunity to address this evidence at trial.  The Court should not reopen the record to permit Cisco another bite at the apple.

## IV.  CONCLUSION

For at least the foregoing reasons, the Court should deny Defendant's motion to for a new trial.

Respectfully submitted,

Dated:  November 16, 2020

/s/ Stephen E. Noona
Stephen Edward Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 W Main St., Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com

Paul J. Andre
Lisa Kobialka
James Hannah
Hannah Lee
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
990 Marsh Road

Menlo Park, CA 94025
Telephone: (650) 752-1700
Facsimile: (650) 752-1800
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
hlee@kramerlevin.com

*ATTORNEYS FOR PLAINTIFF*
CENTRIPETAL NETWORKS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will automatically send notification of

electronic filing to all counsel of record.

/s/ Stephen E. Noona
Stephen E. Noona
Virginia State Bar No. 25367
**KAUFMAN & CANOLES, P.C.**
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com