**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **CENTRIPETAL NETWORKS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:18cv00094-HCM-LRL** |
| | ) | |
| **CISCO SYSTEMS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT CISCO SYSTEMS, INC.'S REPLY**
**IN SUPPORT OF ITS MOTION FOR A NEW TRIAL**
**UNDER FEDERAL RULE OF CIVIL PROCEDURE 59(a)(2)**

# TABLE OF CONTENTS

**Page**

I.      Centripetal Is Wrong On The Law ..................................................................................... 1

II.     Infringement Of The '176 Patent ...................................................................................... 4

III.    Infringement Of The '806 Patent ...................................................................................... 7

IV.     Damages ............................................................................................................................ 11

        A.      Centripetal Did Not Allege Key Aspects Of The Damages Theory Relied
               Upon By The Court .................................................................................................. 11

        B.      There Is Nothing In The Record To Support The Use Of June 20, 2017 As
               A Baseline to Compare Sales ................................................................................. 12

        C.      Cisco Had No Meaningful Opportunity To Respond To The Court's
               Decision To Compare Sales Before And After June 2017 ................................... 15

        D.      The Court's Sua Sponte Comparison Of Sales Played An Outsized Role In
               Its Damages Analysis ............................................................................................. 16

V.      Willfulness ....................................................................................................................... 16

VI.     Conclusion ........................................................................................................................ 17

i

## **TABLE OF AUTHORITIES**

**Federal Cases**

*01 Communique Lab., Inc. v. Citrix Sys., Inc.*, 889 F.3d 735 (Fed. Cir 2018) .........................7, 11

*Attwood v. Clemons*, 818 F. App'x 863 (11th Cir. 2020) .................................................................3

*Berlinger v. Wells Fargo, N.A.*, 2:11-CV-459-FTM-29CM, 2016 WL 11423815
 (M.D. Fla. Sept. 6, 2016) ....................................................................................................3

*Connelly v. Blot*, 116CV1282AJTJFA, 2017 WL 11501501 (E.D. Va. Oct. 18,
 2017) ...................................................................................................................................4

*Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020) .................................................3

*Gillespie v. St. Regis Residence Club, N.Y. Inc.*, 461 F. Supp. 3d 96 (S.D.N.Y.
 2020) ...................................................................................................................................3

*Goldblum v. Klem*, 510 F.3d 204 (3d Cir. 2007) .............................................................................4

*Guisao v. Sec'y, Dep't of Corr.*, 8:15-CV-9-T-35AAS, 2018 WL 10883771 (M.D.
 Fla. Mar. 26, 2018), certificate of appealability denied, 8:15-CV-9-T-35AAS,
 2018 WL 10883772 (M.D. Fla. May 11, 2018).................................................................3

*Guisao v. Sec'y, Florida Dep't of Corr.*, 806 Fed. Appx. 682 (11th Cir. 2020)...........................3

*Lin v. Rohm & Haas Co.*, 11-CV-3158, 2016 WL 11696452 (E.D. Pa. Mar. 14,
 2016) ...................................................................................................................................1

*Lorme v. Delta Air Lines, Inc.,* 03 CV 5239, 2005 WL 1653871 (S.D.N.Y. July
 13, 2005), *aff'd*, 251 Fed. Appx. 691 (2d Cir. 2007) ....................................................4

*Nat'l Starch & Chem. Co. v. M/V Monchegorsk*, 97 Civ. 1448 (KTD), 2000 U.S.
 Dist. LEXIS 15662 (S.D.N.Y. Oct. 20, 2000) ...........................................................1

*Sylvester v. Callon Energy Servs., Inc.*, 724 F.2d 1210 (5th Cir. 1984) .........................................2

*United States v. Porter*, 924 F.2d 395 (1st Cir. 1991) ....................................................................2

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020)................................................................2

*Watkins v. Casiano*, CIVIL CCB-07-2419, 2009 WL 2578984 (D. Md. Aug. 17,
 2009), *aff'd*, 413 Fed. Appx. 568 (4th Cir. 2011)........................................................4

**Rules**

Fed. R. Civ. P. 52 ..................................................................................................................3

Fed. R. Civ. P. 59 ...............................................................................................................1, 3

Cisco's Rule 59 memorandum, Dkt. 626 ("Motion"), demonstrated that the Court made a number of findings and conclusions that were not based on theories Centripetal advanced but were instead theories the Court created *sua sponte*.  In its opposition, Dkt. 629 ("Opp."), Centripetal does not identify any place in the record in which it advanced such theories, thus confirming the premise of Cisco's Motion.  Likewise, Centripetal does not dispute the veracity of the declarations that Cisco submitted under Rule 59(c) or offer opposing affidavits.  *See* Fed. R. Civ. P. 59(c) (providing 14 days to file opposing declarations).  The Court therefore should grant a new trial for Cisco to address these new theories.[1]

## I.      Centripetal Is Wrong On The Law

Centripetal cites a number of cases for the proposition that the Court can base its findings and conclusions on theories and allegations that were not presented by the burden holder (Centripetal).  *See* Opp. at 4.  None of these cases support Centripetal's claim that the court can devise new theories of infringement and damages without giving the defendant notice and a chance to respond (including through the development of fact and expert testimony).  *See Nat'l Starch & Chem. Co. v. M/V Monchegorsk*, 97 Civ. 1448 (KTD), 2000 U.S. Dist. LEXIS 15662, at *4-9 (S.D.N.Y. Oct. 20, 2000) (court had made credibility determinations and rejected the evidence that defendants offered to rebut the actual allegations made by plaintiff, and therefore court rejected the defendant's motion for a new trial and to amend judgment based on that same evidence); *Lin v. Rohm & Haas Co.*, 11-CV-3158, 2016 WL 11696452, at *5-8 (E.D. Pa. Mar. 14, 2016) (court made credibility determinations at trial in finding for the defendant – the party that did not have

---

[1] An alternative way for the Court to address the issues raised in Cisco's Motion would be to amend its Order to remove the findings that rest on theories Centripetal did not itself raise.

the burden of proof – and therefore rejected the plaintiff's motion for a new trial and to amend judgment); *United States v. Porter*, 924 F.2d 395, 399 (1st Cir. 1991) (criminal case in which the underlying decision was a credibility determination regarding allegations that were clearly made against the defendant, and the court of appeals affirmed the conviction and sentencing on appeal); *Sylvester v. Callon Energy Servs., Inc.*, 724 F.2d 1210, 1216-17 (5th Cir. 1984) (court vacated and remanded a decision of the district court and stated that although the fact-finder has "broad powers to resolve conflicting evidence, we recognize that the fact-finder may very well wish to consider the substantial evidence" and directed that it would be helpful for the lower court to resolve certain questions of fact).

Contrary to Centripetal's argument, the Supreme Court earlier this year confirmed the "party presentation" principle, i.e., that the parties themselves must frame the issues, in accordance with the burdens of proof, and that it is not for the court to redefine theories or find in favor of a burden-holder based on a theory not alleged by the burden holder. *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation. . . . 'in both civil and criminal cases, in the first instance and on appeal . . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.' . . . [O]ur system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible

for advancing the facts and argument entitling them to relief.'") (citations omitted).[2]

Likewise, Centripetal's string cite of cases on pages 8-9 of its Opposition does not address a defendant in Cisco's position, i.e., a defendant who responded to the claims the plaintiff alleged and advanced, was held liable on a different theory, and then sought the opportunity to present new evidence in response to the new theory.  Instead, these cases address requests by the party with the burden of proof to add evidence after failing to carry its burden of proof.  *See Berlinger v. Wells Fargo, N.A.*, 2:11-CV-459-FTM-29CM, 2016 WL 11423815, at *1-2 (M.D. Fla. Sept. 6, 2016) (denying plaintiff's motion under FRCP 52 and 59 after the court determined that "plaintiffs failed to establish that defendant breached any of its fiduciary duties to plaintiffs and found in favor of defendant"); *Guisao v. Sec'y, Dep't of Corr.*, 8:15-CV-9-T-35AAS, 2018 WL 10883771, at *1–2 (M.D. Fla. Mar. 26, 2018), certificate of appealability denied, 8:15-CV-9-T-35AAS, 2018 WL 10883772 (M.D. Fla. May 11, 2018) and *aff'd sub nom. Guisao v. Sec'y, Florida Dep't of Corr.*, 806 Fed. Appx. 682 (11th Cir. 2020) (after court determined petition for habeas corpus was time-barred, petitioner – who had the burden of proof – attempted to prove "actual innocence" exception, which requires evidence that was unknown and could not have been known at the time of trial, and the court found that the evidence was available at trial but petitioner chose not to

---

[2] *See also Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1975 (2020) ("But that is not respondent's argument, and as a general rule 'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'") (quoting *Sineneng-Smith*); *Gillespie v. St. Regis Residence Club, N.Y. Inc.*, 461 F. Supp. 3d 96, 115 (S.D.N.Y. 2020) ("The Court's analysis focused on the interpretation of that [contract] term because that was the focus of the parties' arguments and it is axiomatic that '[i]n our adversarial system of adjudication, [courts] follow the principle of party presentation.'") (quoting *Sineneng-Smith*); *Attwood v. Clemons*, 818 F. App'x 863, 869 (11th Cir. 2020) ("That issue has not been raised or briefed. Representative Clemons has never argued that the complaint states only individual as opposed to official capacity claims. . . . .. We take the case as it come to us and as framed by the parties.") (citing *Sineneng-Smith*).

3

present it); *Goldblum v. Klem*, 510 F.3d 204, 226 (3d Cir. 2007) (habeas corpus petitioner – who held burden of proof – failed to prove the "actual innocence" exception); *Lorme v. Delta Air Lines, Inc.,* 03 CV 5239 (GBD), 2005 WL 1653871, at *5 (S.D.N.Y. July 13, 2005), *aff'd*, 251 Fed. Appx. 691 (2d Cir. 2007) (plaintiff moved for a new trial after the jury found that defendant's negligence did not cause plaintiff's injuries following a collision); *Watkins v. Casiano*, CIVIL CCB-07-2419, 2009 WL 2578984, at *3 (D. Md. Aug. 17, 2009), *aff'd*, 413 Fed. Appx. 568 (4th Cir. 2011) (after jury found that defendant was not negligent in a medical malpractice case, plaintiff filed a motion for a new trial and the court acknowledged that while plaintiff was surprised by the trial testimony of defendant – who did not bear the burden of proof – defendant's trial testimony did not merit a new trial); *Connelly v. Blot*, 116CV1282AJTJFA, 2017 WL 11501501, at *1 (E.D. Va. Oct. 18, 2017) (following bench trial in which court found in favor of plaintiff enforcing a promissory note, court denied because plaintiff – the burden holder – did not present evidence of fees at trial).

## II.   Infringement Of The '176 Patent

The Court adopted a new theory of how the devices infringe the '176 Patent that is different from the theory Centripetal asserted, and Centripetal has shown nothing to the contrary. Centripetal's infringement theory at trial was based entirely on correlating NetFlow logs exported from a single device.  Centripetal did not argue infringement based on the correlation of NetFlow logs exported from *different* devices, which is the new theory of liability that the Court adopted *sua sponte*.   Motion 2-6.  Centripetal's Opposition contains no citations to the trial record where it presented such a theory.

Instead, Centripetal argues (Opp. at 4-5) that a single Cisco router or switch has the capability to export ingress and egress NetFlow logs.  While Cisco disputes that theory, it was at

4

least presented at trial, and Cisco responded to it.  The same is not true of the Court's new theory regarding correlation of NetFlow logs exported from *different* routers or switches.

Centripetal attempts to wave away the novelty of the Court's "multiple devices" infringement theory by asserting that the Court offered this theory in response to Cisco's non-infringement arguments.  This misses the point.  That the Court was responding to Cisco's non-infringement position does not change the fact that this was a new theory of infringement (including a new claim construction that Centripetal never raised), to which Cisco had no opportunity to respond.  Order at 74 ("However, a look at the specification of the '176 Patent informs the Court that this is not the only construction that would infringe the asserted claims."); *id.* at 75 ("Therefore, even if the Court were to accept Dr. Almeroth's conclusion that the accused devices do not process ingress and egress out of the same device, it would still find infringement on the basis that the Cisco system correlates logs between multiple devices within the network on either ingress or egress.").

Importantly, Centripetal never took the position, and Centripetal provides no citation to the record that would support the proposition, that CTA correlates NetFlow data from multiple routers or switches, or even other types of data from multiple routers or switches.  Mr. Llewallyn's declaration, provided with Cisco's motion, establishes that CTA does not perform such a claimed correlation.  Tellingly, Centripetal points to nothing to the contrary.

Centripetal attempts to confuse matters by pointing to Dr. Almeroth's testimony that the "a network device" claim limitation could be interpreted to mean "one or more" network devices. That Dr. Almeroth did not debate a legal claim construction issue on the fly at trial is of no moment; it is undisputed that the only infringement theory Centripetal (the burden holder) put forward at

trial was based on the *same network device* sending ingress and egress NetFlow data to Stealthwatch.  Had Centripetal or its infringement expert relied on a "one or more" construction of the phrase "a network device," then Dr. Almeroth would have explained why that theory breaks down as well—namely that the claims would still require correlation of packets received into a set of switches or routers with packets transmitted by the *same* set of devices; not just any "correlation" generically with other data.  Finding a document with the word "correlation" in it is not good enough; the claims requires correlation of packets entering with packets exiting the same thing.  Had Centripetal accused a group of switches or routers, Dr. Almeroth could have responded accordingly.  But because Centripetal did not raise the Court's new theory, Cisco had no notice of it and no opportunity to present responsive evidence at trial.

Finally, Centripetal's suggestion that its expert Dr. Cole testified regarding correlation of logs from multiple devices is incorrect.  *See* Opp. at 10.  Centripetal cites a brief discussion of Syslog data in Dr. Cole's redirect examination, which contains no suggestion that Stealthwatch can correlate logs from multiple switches or routers. Trial Tr. at 1114:24-1116:20.   More importantly, the cited testimony actually shows that Dr. Cole *does not* use Syslog as evidence of infringement.  Dr. Cole testified: "So customers can just use NetFlow by itself to do that correlation. It does not need to use the proxy data." *Id.* at 1116:12-13.  When asked what this means for infringement, Dr. Cole testified "This shows that the claim language says *it must be able to correlate the two NetFlows*. So this is confirming that it can correlate NetFlow by itself which would consist of ingress and egress NetFlow." *Id.* at 1116:23-1117:1 (emphasis added).  In sum, Dr. Cole never opined that correlation of Syslogs is infringing; his infringement theory relied entirely on correlation of NetFlow data.

6

Once again, Centripetal tries to brush away Mr. Llewallyn's declaration as providing the "same" testimony as was presented at trial.  Opp. at 9.  Specifically, Centripetal argues that "Dr. Almeroth at trial referred to Mr. Llewallyn's testimony to support his opinion that CTA does not correlate NetFlow ingress and egress records from *a switch or a router*, which is the very same argument that Cisco alleges is new."  *Id.* (emphasis added).  But as Centripetal's language shows, correlation of records *from a switch or router* was Dr. Cole's theory, to which Cisco responded. The new argument is the notion that CTA supposedly correlates records from a switch/router with records from a *different* switch/router.  Mr. Llewallyn had no reason to address such a theory at trial, and he did not address it because Centripetal never presented such a theory at trial. Mr. Llewallyn's supplemental declaration is Cisco's first chance to proffer this evidence, and the Court should order a new trial so that Cisco can present his testimony in full detail.[3]

## III.    Infringement Of The '806 Patent

Centripetal's Opposition does not contain any citations to the trial record where Centripetal took the position that the '806 Patent could be infringed by reliance on functionality in separate ingress and egress ACLs.  As Cisco established in its opening brief, this was a theory first identified by the Court in its Order.  Centripetal also does not dispute that its expert Dr. Mitzenmacher did not rely on the "egress portion" of a packet's processing and that Centripetal did not cross-examine

---

[3] Regarding invalidity, Centripetal rests its argument on the point that Cisco bears the burden of proof on invalidity.  Opp. at 6, 11.  The record makes clear that Cisco based its invalidity case on showing how the accused functionality that Centripetal accused of infringement was present in its prior art products and accordingly was invalidating.  *See 01 Communique Lab., Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 742-43 (Fed. Cir 2018).  Had Centripetal presented a different infringement theory, Cisco would have reasonably and predictably adjusted its invalidity evidence accordingly. Thus, Centripetal's various protests regarding Mr. Llewallyn's declaration are meritless.  *See* Opp. at 11.

Cisco's expert Dr. Reddy on this point.  *See* Cisco's Motion at 7.  Nor does Centripetal address the fact that the UADP ASIC the Court relies on is *only* used by the Catalyst 9000 switches, not the routers or firewalls that the Court also found to infringe.  *See id.*  That is, Centripetal has not opposed Cisco's demonstration that the Court's supposed rejection of Cisco's non-infringement theory does not apply to routers and firewalls.

In sum, the infringement theory Centripetal presented – the party with the burden of proof – was not based at all on egress ACLs of the accused products.  For this reason, Cisco only developed and presented evidence to rebut the theory Centripetal advanced, i.e., the only infringement theory offered at trial on the '806 Patent.  As the party without the burden of proof at trial, Cisco had no obligation to address hypothetical scenarios that were not alleged as part of Centripetal's infringement theory.

Centripetal attempts to downplay the significance of the Court's findings by arguing that "the Court did not create a new infringement theory, but rather debunked Cisco's non-infringement position…." (Opp. at 14).  That contention is circular.  Centripetal had the burden of proof and came forward with an infringement theory.  Cisco responded to that theory, explaining why it did not satisfy the claim language as properly interpreted.  After trial, the Court's Order explained why it found infringement under its claim interpretation (Order at 110), but then also adopted a brand new theory for why there would be infringement even under a different construction, to which Cisco never had a chance to respond.  *Id.*  Whether or not the Order is considered an infringement theory or a basis for rejecting Cisco's non-infringement position, it is a *different* theory of liability to which Cisco never had an opportunity to respond.

More specifically, one of Cisco's responses to Centripetal's infringement theory was the

legal argument that the '806 Patent claims require that processing must begin on a packet, that the processing on that same packet must cease, and that same packet (which had already begun and then ceased processing under the first (old) rule set) then must be processed with the second (new) rule set. *See*, *e.g.*, Dkt. 424 (Cisco's Proposed Findings of Fact and Conclusions of Law at ¶¶ 525, 534-537; Dkt. 474 (Cisco's Post-Trial Proposed Findings of Facts and Conclusions of Law) at ¶¶ 112, 124; Trial Tr. at 2602:24-25, 2628:2-21, 2629:14-18, 2630:16-2631:1, 2635:3-26:12, 2637:21-2638:19. Centripetal's only answer was that the claims do not have this requirement – i.e., a legal question of claim construction. Faced with this issue, the Court resolved the claim construction issue, finding there was no requirement for processing the same packets with the new rules, and then went on to set forth a new infringement theory, of which Cisco had no notice, under Cisco's proposed claim construction. Order at 110. The theory was based on functionality in separate ingress and egress ACLs, but is a theory that Centripetal never advanced, and Centripetal can point to no place in the record where it actually did so. The Court nonetheless found that "in their operation, the devices are configured to apply one set of rules on ingress while the very same packet would be subject to a second set of rule on egress within the same device. This process would meet the claim language of the '806 Patent…." *Id.* This was the only basis of the Court's finding that Cisco would infringe even under Cisco's proposed construction. Cisco had no notice and no chance to respond.

Centripetal's citation to pages 102-103 of the Court's Order confirms the point of Cisco's motion, namely, that the Court's infringement finding is based in part on a theory that Centripetal never advanced and of which Cisco had no notice or opportunity to defend against. As that citation shows, the Court's findings relate to the operation of both the ingress and egress controllers and

how those two components in tandem apply rule sets to packets. *See* Opp. at 14. Citing those findings, Centripetal contends that "even under Cisco's non-infringement argument, the Court found Cisco infringes." *Id.* at 14. That is Cisco's point: Centripetal never presented the ingress/egress theory of infringement at trial, yet now seeks to weaponize it to defend the Court's ruling. The Court created this theory on its own; Cisco was not on notice of such a theory; and it thus did not have an opportunity to defend against the new theory.

Cisco submitted the Jones Declaration as an example of the information Mr. Jones would have testified to had Cisco known the Court was contemplating an infringement theory based on the "egress portion" of packet processing. Centripetal seeks to brush Mr. Jones's declaration aside as generalized testimony "about the processing of packets by the ingress and egress forwarding controller using ACL rules." *Id.* at 14-15. However, the Jones Declaration makes clear that – had Cisco been given notice of the Court's alternative infringement theory – Mr. Jones would have testified, *inter alia*, that the ingress and egress forwarding controllers use different ACLs that are programmed in different memories, and that use of the accused Hitless ACL Update technique to update an ingress ACL does not update an egress ACL, and vice versa. Cisco Motion at Ex. B (Decl. of Peter G. Jones) at ¶¶ 8-11. Mr. Jones did not offer this testimony at trial, and Centripetal cites no place where he did. Indeed, he had no reason to offer this testimony, since Centripetal did not offer evidence of egress ACL functionality (and certainly no evidence based on the Court's new theory) in connection with the '806 Patent. Accordingly, Cisco was not afforded the opportunity to use this evidence to show why the Court's new infringement theory fails, for example, because the theory renders the Hitless ACL Update (and Transaction Commit Model) feature – the foundation of Centripetal's infringement theory – irrelevant.

10

Regarding invalidity, Centripetal argues that Mr. Jones's additional testimony about the ingress and egress ACLs of the prior art Cisco Catalyst switches would have been "irrelevant" because "rule sets are not swapped in the older versions of the products." Opp. at 16. Centripetal misses the point. Cisco and Mr. Jones were not afforded the opportunity to show that, with respect to the relationship between ingress and egress ACLs and the Hitless ACL update technique, the prior art ACLs were updated independently of one another, in the same way as the ingress and egress ACLs of the accused Catalyst 9K series of switches are updated. Thus, to the extent that the updating of ingress and egress ACLs was part of the Court's infringement theory (or its rejection of Cisco's non-infringement position), it relies on something that was fully known in the prior art. This would have created a specific invalidity hurdle under *01 Communique Lab., Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 742-43 (Fed. Cir 2018), which Cisco did not have the opportunity to present.

## IV. Damages

### A. Centripetal Did Not Allege Key Aspects Of The Damages Theory Relied Upon By The Court

Centripetal did not rebut the fundamental point in Cisco's Motion, i.e., that Centripetal never presented a damages model predicated on using June 20, 2017 as a demarcating date for all patents-in-suit, or in which a comparison between pre-June 2017 sales of non-accused products and post-June 2017 sales were relevant to its damages experts' opinions. Centripetal's Opposition identifies no place in the record where Mr. Gunderson or Mr. Malackowski offered an opinion that a comparison of pre-June 2017 sales revenue on non-accused products with post-2017 sales revenue of accused products should influence the royalty rate the Court chose or should impact enhanced damages. The point of Cisco's Motion, unrebutted by Centripetal's Opposition, is that

11

Centripetal (as the burden holder) never alleged the theory on which the Court made use of the pre-2017 sales data. Cisco, therefore, had no opportunity to present evidence and expert opinion on the flaws in the way the Court used that new comparison as upward pressure on the royalty rate and enhanced damages.

None of the record cites in Centripetal's brief point to anything showing that its experts or its counsel offered the theory that the Court adopted in its Order. Centripetal's effort to now string together evidence that might retroactively support such a theory misses the point. It is well established that the Court's function is to decide the case based on the damages theories presented by the parties, not based on theories to which Cisco had no opportunity to develop defenses through factual and expert testimony in the ordinary course of the litigation.

### B.   There Is Nothing In The Record To Support The Use Of June 20, 2017 As A Baseline to Compare Sales

Consistent with Centripetal's failure to allege this theory, there is nothing in the record to support the Court's *sua sponte* decision to use June 20, 2017 as the baseline date and then to compare sales before and after that date for each of the products that make up the accused systems. This is a second and independent basis for a new trial.

According to Mr. Gunderson's testimony, the only patent for which Centripetal argued a date of first infringement of June 20, 2017 is the '193 Patent, and the only products he included within his royalty base starting on June 20, 2017 are the routers. Trial Tr. at 1515:24-1516:2. For each of the other products and patents, he used a later date of first infringement. *See id.* at 1516:3-10, 1517:8-15; PTX-1629 at Schedule 15. Likewise, Centripetal offered no proof that the routers had any infringing functionality as of June 20, 2017, nor is there evidence in the record to support

12

the later dates of first infringement for the other products.[4]

Centripetal now argues that the Court's choice of the June 2017 date is supported by PTX-1135, a June 20, 2017 press release regarding the release of Cisco's "intent-based networking solutions." *See* Opp. at 18. Centripetal's damages experts did not use this press release as the line of demarcation for any comparison of pre-June 2017 products with post-June 2017 products. Nor could it have been so used, as Centripetal does not point to any evidence in the record that anything in the products changed on that day to make them infringe the '193, '856, '806, and '176 Patents. The only functionality even referenced in the press release that is accused of infringement is ETA, and ETA is not accused of infringing the '193 Patent, i.e., the basis for the use of June 20, 2017 as the date of first infringement. Instead, ETA is first accused of infringement on March 13, 2018 (9 months after the press release), when the '856 Patent issued.

The other record cites to which Centripetal points confirm that the date of June 20, 2017 has no special significance, at least as it relates to the infringement theories Centripetal actually presented at trial. *See*, *e.g.*, PTX-1248 (a 2019 document comparing Catalyst 9300 series to predecessor products and showing that the Catalyst 3650 and 3850 had many of the same features as found on the Catalyst 9300, including the IOS XE operating system); PTX-1507 (a 2019

---

[4] For example, Centripetal now asserts that the '176 Patent was infringed when Cisco updated Stealthwatch in 2019 such that "CTA was improved with the ability to leverage threat detection from the analysis of WebFlow, produced by Syslog, and Netflow telemetry by correlating the data." Opp. at 7. Centripetal's 2019 date is inconsistent with both Mr. Gunderson's use of an August 18, 2017 date of first infringement (*see* PTX-1629, at Schedule 15), and the Court's use of a June 20, 2017 date of comparison.

document showing that Stealthwatch Enterprise worked with the prior Generation 2 ISR routers);[5] *see also* PTX-963 (confirming that ETA was not made available for the ISR and ASR routers until 2018).

Had Mr. Gunderson advanced the theory in his expert report or at trial that the Court created and adopted in its Order – that these documents showed that Cisco's sales before and after June 20, 2017 were influenced by Cisco's alleged incorporation of Centripetal's technology into its products – then Cisco would have rebutted such arguments through the presentation of factual testimony and the development and presentation of rebuttal expert testimony.  As it is, Mr. Gunderson did not offer that opinion, and Cisco did not have the opportunity to rebut it in the context of a theory actually advanced by the burden holder.

Centripetal's citations to other portions of Mr. Gunderson's testimony also fail to support the Court's decision to use a June 2017 date as a baseline for before and after comparisons.  *See* PTX-333 (August 2019 article touting "another consecutive quarter of double-digit growth" in Cisco's security product segment); PTX-515 (merely stating that the Catalyst 9000 product family was launched in June 2017).  The release date of certain of the Catalyst 9000 series switches does not show that any infringing functionality was added as of that date or that June 2017 could be used as a demarcating line for all of the products at issue in the case.  Similarly, PTX-1280 does not support the Court's use of a June 2017 date as a baseline for comparison, and in any event, the page on which Centripetal relies (page 3) was not admitted into evidence.  Tr. at 495-96 (discussing only pages 1 and 21 of PTX-1280).

---

[5] This document references ETA only being available on the ISR 4000 (and not on other, non-accused versions of Cisco's ISRs), but other record evidence confirms that the enhanced NetFlow that ETA requires was not made available for the ISR 4000 until January 2018.  PTX-963.

**C.     Cisco Had No Meaningful Opportunity To Respond To The Court's Decision To Compare Sales Before And After June 2017**

Centripetal argues that "the requested financial information data and use of it was not new and Cisco had every opportunity to address the information presented." Opp. at 19.  But the mere request for the information did not give Cisco any notice of what the Court planned to do with it. Centripetal did not previously request (and Cisco had not previously produced) data going back to June 2016, for either the products that comprised the accused systems or non-accused "predecessor" products.  Tr. at 2971:24-2973:16.  Cisco had no reason to identify every single "predecessor" product during the course of discovery (let alone the trial), given that Centripetal had not alleged that a comparison of sales of these products could be the basis for a damages model.  Likewise, the Court put strict limits on this follow-up testimony from Dr. Becker, instructing Dr. Becker that he was "not to discuss your testimony with anyone between now and the time that you're prepared to deliver the data to the Court," and cautioning Cisco's counsel that it was "to use good faith in limiting themselves to just furnishing the source of the data."  Trial Tr. at 2978:4-25.

The fact that Dr. Becker did identify additional evidence regarding which Catalyst switches were properly considered to be "predecessors" does not alter the analysis.  Had Mr. Gunderson articulated a damages theory based on a comparison of "predecessor" products at any point during the case (or at trial), Cisco would have offered expert testimony addressing the merits of this theory, and Cisco also would have offered factual testimony from the many Cisco technical witnesses that were the original architects of the relevant products.  For example, Cisco would have elicited testimony confirming that – contrary to the Court's findings (Order at 140-141) – the increase in sales was impacted by the addition of numerous non-accused features, and had nothing

15

to do with Centripetal's claimed technology.

**D.    The Court's *Sua Sponte* Comparison Of Sales Played An Outsized Role In Its Damages Analysis**

Centripetal argues that there were additional reasons beyond the alleged increase in sales that supports the Court's damages award.  Opp. at 20.  However, the Court concluded that "the patented functionality added ***very significant value*** to the older technology.  Therefore, this factor supports ***a substantially increased royalty figure.***"  Order at 142 (emphasis added).  The Court did not use such language in its discussion of the other *Georgia-Pacific* factors that it considered to increase the royalty figure.  Centripetal cannot sweep this issue under the rug.

**V.    Willfulness**

A finding of willfulness must be predicated on an underlying finding of infringement.  With respect to the '806 and '176 Patents, in particular, the Court's infringement analysis was new, and Cisco did not have an opportunity to respond to the theories adopted by the Court to find infringement.  None of the evidence the Court cited in its willfulness discussion demonstrates that Cisco knew (or even should have known) that the specific functionality the Court identified as infringing these patents was actually covered by Centripetal's patents.  That even Centripetal did not argue that such functionality was infringing confirms that there was no reason for Cisco to know that it might be accused of infringing, let alone that it was doing so willfully.  The Court should have considered these points in any willfulness analysis.

Finally, as to the fourth *Read* factor in particular, Centripetal does not deny that the Court relied on its comparison of sales – and in particular its conclusion that Cisco earned an additional $5.75 billion in revenues – to support its finding that "this factor weighs strongly in favor of enhanced damages."  Order at 158-59.  The other evidence the Court cited is a reference to profit

margins for individual products, which are not accused of infringement, and for which the negative profit margin of DNA Center was omitted as a "statistical outlier."  Thus, without the Court's independent revenue comparison (which Centripetal never advanced as the burden holder), the only evidence supporting the Court's finding regarding this factor is that Cisco is the "largest provider of network infrastructure and services in the world."  That fact alone cannot support the Court's finding that the fourth *Read* factor "weighs strongly in favor of enhanced damages," particularly since Cisco has been the largest provider of network infrastructure and services for many years before any of the patents issued.

## VI.    Conclusion

For the foregoing reasons, the Court should grant a new trial to permit Cisco to submit additional evidence and argument in response to the new theories raised in the Court's Order.

Dated: November 25, 2020                            Respectfully submitted,

                                                     CISCO SYSTEMS, INC.


                                                     By /s/_____
                                                     Of Counsel


Dabney J. Carr, IV, VSB No. 28679
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutman.com

Louis N. Jameson (admitted pro hac vice)
Matthew C. Gaudet (admitted pro hac vice)
John R. Gibson, VSB No. 72968
Jennifer H. Forte (admitted pro hac vice)
**DUANE MORRIS, LLP**
1075 Peachtree Street, N.E., Suite 2000
Atlanta, Georgia 30309-3929
Telephone: (404) 253-6900
Facsimile: (404) 253-6901
wjameson@duanemorris.com
jrgibson@duanemorris.com
jhforte@duanemorris.com

Joseph A. Powers (admitted pro hac vice)
**DUANE MORRIS, LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Facsimile: (215) 689-3797
japowers@duanemorris.com

Nicole E. Grigg (formerly Johnson) (admitted pro hac vice)
**DUANE MORRIS, LLP**
2475 Hanover Street
Palo Alto, CA 94304-1194
Telephone: (650) 847-4150
Facsimile: (650) 618-2713
NEGrigg@duanemorris.com

*Counsel for Defendant Cisco Systems, Inc.*