**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | | |
|---|---|---|
| **CENTRIPETAL NETWORKS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:18cv00094-HCM-LRL** |
| | ) | |
| **CISCO SYSTEMS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT CISCO SYSTEMS, INC.'S REPLY IN
SUPPORT OF ITS MOTION FOR ADDITIONAL AND AMENDED FINDINGS AND
AMENDED JUDGMENT UNDER RULE 52(b) AND TO CONVERT
THE JUDGMENT TO A PARTIAL FINAL JUDGMENT UNDER RULE 54(b)**

# TABLE OF CONTENTS

**Page**

I.    ARGUMENT ................................................................................................1

    A.    Centripetal's Opposition Invites Legal Error Regarding The Requirements Of Direct Infringement Under 35 U.S.C. § 271(a) ....................................1

    B.    The Court Should Make Findings Of Fact That Centripetal Failed To Prove Any Acts Of Direct Infringement ...........................................................6

        1.    Centripetal Did Not Prove That Cisco Directly Infringed The '856 Patent................................................................................................6

        2.    Centripetal Did Not Prove That Cisco Directly Infringed The '176 Patent................................................................................................8

        3.    Centripetal Did Not Prove That Cisco Directly Infringed The '193 Patent................................................................................................9

        4.    Centripetal Did Not Prove That Cisco Directly Infringed The '806 Patent..............................................................................................12

    C.    The Court Should Amend The Damages Award And Judgment..........................16

        1.    Damages Must Be Commensurate With The Scope Of Direct Infringement........................................................................................16

        2.    The Court Should Limit Damages To Domestic Sales.............................18

    D.    The Court Should Enter An Amended Judgment ................................................19

II.   CONCLUSION.............................................................................................20

i

Cisco's Rule 52(b) memorandum, Dkt. 628 ("Mem."), demonstrated that the Court made no findings regarding acts of direct infringement, and that the record compelled a finding that Centripetal did not prove any such acts.  In its opposition, Dkt. 630 ("Opp."), Centripetal does not identify any act of direct infringement by anyone, and its efforts to salvage the infringement findings and damages award depend on misstating the law governing both issues.  The Court should amend its findings and alter the judgment to hold that Centripetal did not prove any acts of direct infringement and did not limit its damages demand to the scope of any infringement proven. In addition, because Centripetal has now dismissed its remaining stayed claims, Dkt. 633, an amended judgment should enter reflecting that dismissal and finally disposing of all claims.

## I.    ARGUMENT

### A.    Centripetal's Opposition Invites Legal Error Regarding The Requirements Of Direct Infringement Under 35 U.S.C. § 271(a)

Centripetal admits that this case involves no "assertions of contributory or inducing infringement" under 35 U.S.C. § 271(b) or (c) (Opp. 10), such that an infringement finding must rest, if at all, on findings that Cisco itself committed acts of direct infringement.  *See* 35 U.S.C. § 271(a) (direct infringement liability extends to one who "without authority makes, uses, offers to sell, or sells any patented invention, within the United States").  As Cisco explained (Mem. 6-11), the Court has made no findings that Cisco made, used, offered to sell, or sold the specific combinations of products that the Court found infringing, and the record would not support any such findings.  Centripetal's opposition makes a number of legal arguments—often without citing any relevant case law—that are directly contradicted by governing precedent.

**1.   *"Making" and "selling."*   **As Cisco explained, the Supreme Court has long held that the mere manufacture or sale of components that can be combined to make an infringing

combination does not constitute direct infringement.  Mem. 5 (citing *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528 (1972); *Aro Mfg Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 344 (1961)).  Centripetal responds only that the specific facts of those cases differ from this one.  Opp. 4-5.  That is true, but irrelevant, as the ***legal*** rule those cases espouse remains good law, as the Federal Circuit has repeatedly recognized.  *See Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1366 (Fed. Cir. 2001) (reaffirming *Deepsouth*'s holding that a patentee's "monopoly does not cover the manufacture or sale of separate elements capable of being, but never actually, associated to form the invention"); *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 (Fed. Cir. 2000) ("We cannot endorse the view that the 'substantial manufacture of the constituent parts of a machine constitutes infringement' under Section 271(a)" (quoting *Deepsouth*, 406 U.S. at 528)); *id.* at 1252 n.2 ("'[A]s to claims brought under § 271(a), *Deepsouth* remains good law: one may not be held liable under § 271(a) for 'making' or 'selling' less than a complete invention."); *see also, e.g.*, *Centillion Data Systems., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1288 (Fed. Cir. 2011); *Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 995 (Fed. Cir. 2009) (manufacturer did not commit direct infringement where there was no proof that the accused product "was ever placed in the infringing configuration and it [was] clear that the [accused product] does not necessarily have to be placed in the infringing configuration" to function).  Indeed, the facts here are even more favorable to Cisco than those in *Deepsouth*, where the components manufactured and shipped abroad by the defendant had only one purpose:  to be combined into the infringing machine.  *Deepsouth*, 406 U.S. at 523-524.  In contrast, here the accused routers, switches, and firewalls undisputedly can be and are used apart from the accused combinations.  *See, e.g.*, Tr. 2877:5-2878:5 (vast majority of customers for the

2

accused routers/switches do not have Stealthwatch), 1699:19-23 ("[T]here are customers out there who buy Cisco routers and switches who do not buy the Identity Services Engine").

Centripetal tries to avoid this settled law by arguing that manufacture or sale of a component product that would only infringe if combined with another independently-sold product may still trigger direct infringement liability under Section 271(a) because the component is supposedly "capable of infringing." *E.g.*, Opp. 10, 11, 13, 17. Centripetal cites no case reaching such a broad holding, and the authorities cited above foreclose it. The two cases Centripetal does cite—*Silicon Graphics, Inc. v. ATI Techs*, 607 F.3d 784 (Fed. Cir. 2010), and *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010)—do not involve the sale of components at all. Instead, they are directed to a distinct issue not presented here, namely whether a ***single*** product should be considered to satisfy all limitations of the claims when it is merely capable of meeting one or more limitations. The holding of those cases is that the product must be capable of infringing "'*without having to modify the product*.'" *Nazomi Comm'cns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1345-1346 (Fed. Cir. 2014) (emphasis in original) (discussing *Finjan* and *Silicon*); *accord Telemac Cellular v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("That a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement."); *see also ViaTech Techs. Inc. v. Microsoft Corp.*, 2017 WL 2538570, at *5-6 (D. Del. June 12, 2017) (granting summary judgment of no infringement and distinguishing *Finjan* because there "the accused product" standing alone "was capable of operating in a way that met all of the claim limitations"); *Cormack v. United States*, 122 Fed. Cl. 691, 703 (2015) (holding that mail sorting system did not infringe because, in order to perform the claimed steps, "it would have to be physically altered or reprogrammed"; distinguishing *Finjan* as

a case where the claimed feature "was already present in defendants' accused products when sold and required no modification").

Here, because the Court did not find that Cisco's routers, switches, or firewalls infringe the patents-in-suit as sold—but rather, they must be combined with other, separately-sold Cisco products, namely Stealthwatch, Identity Services Engine (ISE), Encrypted Traffic Analytics (ETA), Cognitive Threat Analytics (CTA), Digital Network Architecture (DNA) Center hardware, and/or Firepower Management Center (FMC)—*Silicon Graphics* and *Finjan* are inapposite.

    **2.**  ***"Offering for sale."***   Citing no authority, Centripetal asserts that Cisco directly infringed the patents-in-suit by "offering for sale" the accused products "in its marketing materials and press releases."  Opp. 2-3.  The Court made no such finding, and none would be supported. As the Federal Circuit has explained, "offer to sell liability [is defined] according to the norms of traditional contractual analysis" and thus requires communication of a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  *Rotec*, 215 F.3d at 1254-1255 (quoting Restatement (Second) of Contracts § 24); *see also Group One Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001) (holding, in context of whether an invention was "on sale" for purposes of 35 U.S.C. § 102(b), that "whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law, to be analyzed under the law of contracts as generally understood").

    Mere advertisement of a product is not an offer to sell, because "[i]n general, advertisements are not considered offers for sale, but instead are merely solicitations for offers." *Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028-1029 (Fed. Cir. 2016) (non-precedential);

4

*see also* Restatement (Second) of Contracts § 26, cmt. b ("Advertisements of goods by display, sign, handbill … are not ordinarily intended or understood as offers to sell [and] [t]he same is true of catalogues, price lists and circulars, even though the terms of some suggested bargains may be stated in some detail."); *accord Group One*, 254 F.3d at 1048 ("[C]ontract law recognizes that mere advertising and promoting of a product may be nothing more than an invitation for offers, while responding to such an invitation may itself be an offer.").  Moreover, Centripetal did not offer any damages theory limited to advertisement, much less to actual offers for sale.

    **3.  *"Using."***  Finally, Centripetal attempts to argue that Cisco directly infringes by "using" the combinations of products itself through "tests" and "in its own corporate network."  Opp. 3. As is discussed below, the Court made no finding that Cisco ever used the specific combinations found to infringe in its "corporate network" or indeed anywhere in the United States, and there is no record support for such a finding.  In any event, even a finding that Cisco ***alone*** used the specific combinations in this country would not support a damages award based on ***every unit*** Cisco sold worldwide, given that sales of uncombined components are not themselves acts of direct infringement.  Centripetal did not offer any damages theory limited to Cisco's own supposed use of the claimed inventions for "tests" or "in its own corporate network."

    **4.  *Preservation***.  Finally, although Centripetal does not deny that Cisco requested findings of no acts of direct infringement in its Proposed Findings of Fact and Conclusions of Law (*e.g.*, Mem. 2), Centripetal half-heartedly argues that Cisco was somehow required to repeat its requested findings after the trial.  Opp. 5-6.  Centripetal cites nothing supporting its assertion that the parties were required to repeat post-trial all of the proposed findings that they already requested before trial.  On the contrary, the Court expressly stated that post-trial proposed findings were

optional, not mandatory, and nowhere suggested that the parties were required to repeat already-requested findings.  Rather, the post-trial submissions, if filed at all, were merely meant to "supplement" the pretrial proposed findings already submitted.  *See, e.g.*, Tr. 3250:13-15 ("I would think *if you wish to supplement* your findings of fact and conclusions of law, that they should be due at 4:00 tomorrow." (emphasis added)); Tr. 3252:10-12 ("And again, *you don't have to file anything if you don't want to*.  But if you do want to file it, I want it by 4:00 tomorrow."  (emphasis added)).  Cisco's post-trial filing thus accordingly submitted "updated proposed findings of fact and conclusions of law, *in addition to* the points made in Cisco's original Proposed Findings of Fact and Conclusions of Law (Dkt. 420) and Cisco's Motion for Judgment on Partial Findings Pursuant to Fed. R. Civ. P. 52(c) (Dkt. 444, 445)."  Dkt. 474 at 1 (emphasis added).

The Court should not be led astray by Centripetal's mistaken view of the law.  As the following sections show, the Court should find that Centripetal has failed to show that Cisco directly infringed the patents-in-suit under Section 271(a) and should amend the judgment accordingly.

**B.     The Court Should Make Findings Of Fact That Centripetal Failed To Prove Any Acts Of Direct Infringement**

**1.     Centripetal Did Not Prove That Cisco Directly Infringed The '856 Patent**

Centripetal contends that Cisco directly infringed the '856 patent by "making" the claimed invention in the United States and compiling source code in the United States.  Opp. 6-8.  But Centripetal offered no evidence that Cisco ever made the accused combination that this Court found to infringe—a router/switch combined with Stealthwatch, ISE, and ETA (Opp. 6)—in the United States.  Indeed, the record suggests the contrary.  *See, e.g.*, Tr. 2877:5-2878:5 (Dr. Becker

testifying that there were 98,800 customers for the accused routers/switches but only 2,493 customers who had Stealthwatch); Tr. 1699:19-23 ("[T]here are customers out there who buy Cisco routers and switches who do not buy the Identity Services Engine").  Centripetal has not shown that Cisco made the combined system that the Court found practiced the claim limitations. The mere fact that routers and switches *could* be combined with Stealthwatch, ISE, and ETA to produce such a combined system does not amount to direct infringement under Section 271(a). *See supra* pp. 1-4; *Deepsouth*, 406 U.S. at 528.

Centripetal next argues that Cisco "uses" the '856 accused combinations "as part of its corporate network" and in "testing."  Opp. 8-9.  Centripetal cites Mr. Scheck's testimony that "Cisco deploys its own equipment in Cisco's network."  Opp. 8.  But this general statement is not evidence that Cisco used or tested the specific accused combination of products—a router/switch combined with Stealthwatch, ISE, and ETA (Opp. 6)—in the United States.  Centripetal also claims that Cisco deployed "40,000 routers in Cisco's network and uses Stealthwatch," citing a Cisco presentation (DTX-693) and Mr. Scheck's testimony (Tr. 1669:20-1670:10).  Opp. 9. However, the cited document is from 2015—three years before the '856 patent issued (JTX-5)— and thus cannot prove any action by Cisco during the patent's term.  Tr. 1663:1-17, 1664:3-1666:6, 1667:16-21, 1668:15-1669:25.  And the testimony from Mr. Scheck concerns the state of Cisco's network as described in that 2015 document.  *Id.*  Beyond the fact that this evidence does not refer to the accused combination, it does not indicate that Stealthwatch is used with the 40,000 routers; Mr. Scheck merely confirms he is "familiar" with Stealthwatch.  Tr. 1670:8-10.  And the evidence does not even mention ISE or ETA, the two other products in the accused combination.  Centripetal accordingly did not prove that Cisco used the accused combination in the United States during the

patent's term.  And even if it had, Centripetal offered no damages theory to support a reasonable royalty for Cisco's own use in testing or its own corporate network; its damages theory was based on individual units that Cisco *sold* whether in the accused combinations or not, not on the units Cisco used itself.  *See infra* pp. 15-18.

Centripetal further argues that Cisco "sells and offers for sale" the accused combination in the United States.  Opp. 9-10.  The only evidence Centripetal cites is Mr. Gunderson's tentative and unsupported statement that "I think they're sold collectively" (Opp. 9; Tr. 1527:15), but that does not prove that Cisco's routers and switches are invariably bought as a combination with Stealthwatch, ISE, and ETA; the Court made no such finding and the evidence shows the opposite. Tr. 1699:19-23, 2877:5-2878:5.  And Centripetal's supposed "offer for sale" evidence (Opp. 9) is limited to marketing documents and advertisements, which do not meet the legal requirements for an offer for sale.  *See supra* pp. 4-5.  Furthermore, Centripetal did not offer any damages theory tied to supposed "offers for sale."  *See infra* pp. 17-18.

Finally, Centripetal argues that the accused routers and switches need not "use Stealthwatch and ISE" in order to infringe because the products are nonetheless "capable of infringing."  Opp. 10.  But Centripetal does not dispute—indeed, its opposition confirms—that the '856 accused combination includes a router/switch, Stealthwatch, ISE, and ETA.  Opp. 6; Order at 32.  As explained above, the "capable of infringing" doctrine does not apply to a product that cannot practice all limitations of the asserted claims unless it is combined with other separately-sold products.  *See supra* pp. 1-4.

### 2. Centripetal Did Not Prove That Cisco Directly Infringed The '176 Patent

Centripetal's opposition confirms that infringement of claims 11 and 21 of the '176 patent

8

requires at least an accused router or switch in combination with Stealthwatch.[1]  Opp. 11.  Because this accused combination is a subset of the '856 accused combination, Centripetal relies entirely on the evidence it cited for the '856 patent in attempting to show direct infringement by Cisco of the '176 patent.  *Id.*  Thus, for the same reasons explained above with respect to the '856 patent, Centripetal did not prove that Cisco directly infringed the '176 patent.  *See supra* pp. 6-8.  In particular, Centripetal failed to prove that Cisco made, used, sold, or offered for sale an accused router or switch in combination with Stealthwatch, much less that the accused routers and switches are only ever used with Stealthwatch.  *Id.*

### 3.   Centripetal Did Not Prove That Cisco Directly Infringed The '193 Patent

As Cisco explained, the Court's findings make clear that infringement turns on not just routers/switches, or even the software on them, but their operation together with the separate ISE device. Mem. 8-9.  Once again, therefore, it does not matter that Cisco "compiles the source code that operates" routers or switches in the United States.  Opp. 12.  Because the routers and switches may be, and frequently are, sold and used separately from ISE, *e.g.*, Tr. 1699:19-23, Centripetal has not shown that Cisco made or sold the combined system that the Court found practiced the claim limitations.  The mere fact that routers and switches ***could*** be combined with ISE to produce such a combined system does not amount to direct infringement under Section 271(a).  *See supra* pp. 1-4; *Deepsouth*, 406 U.S. at 528.

Centripetal asserts (Opp. 12) that switches and routers alone infringe the '193 patent claims

---

[1] The Court's Order and the evidence Centripetal presented make clear that ISE, too, is a required component of the accused combination for the '176 patent.  *See* Order at 71; Tr. 1001:19-1003:1, 1005:4-19, 2184:11-2188:5, 2199:3-16, 2202:1-13, 2266:17-19; PTX-1089; PTX-595; PTX-965.

9

and that ISE is not needed.  The Court's findings are to the contrary: they depend heavily on the involvement of ISE as part of what the Court calls "the Cisco packet-filtering system."  *E.g.*, Order at 90 ('193 infringement analysis depends on switches and routers "aided with Cisco's Identity Services Engine"; "Walking through the operation of the accused products illustrates that the Cisco system operates in a two-stage process that meets the functionality required by the asserted claims. The Cisco packet-filtering system operates by using the Identity Services Engine to assign certain endpoint devices 'roles' that determine what type of packets may be sent and/or received by that specific endpoint computer."), 92 (relying on PTX-1326 at 11, which in turn describes "integration of Cisco security products, technologies from Cisco partners, and the extensive network control of Cisco ISE"), 93 (reprinting image from "Cisco Identity Services Engine Technical Ordering Guide from August 2019," PTX-1326 at 11, which shows "Cisco ISE" directing a "Mitigation Action" to "endpoint devices"), 96 (validity finding: "The prior art does not contain any mention of Secure Group Tags or Identity Services Engine's role-based quarantine functionality."), 97 (validity conclusion: "A review of the asserted prior art shows no mention of the Identity Services Engine packet filtering system that utilizes switches and routers to attach Secure Group Tags, apply operators and then allow certain packets to be transmitted while other packets are subsequently blocked.  It is that system which contains the functionality taught by the claims of the '193 Patent." (footnote omitted)).

 The Court's focus on ISE is no surprise, as Centripetal elicited direct testimony from its expert Dr. Mitzenmacher as to the role of ISE in implementing the quarantine function that this Court found to infringe.  *E.g.*, Tr. 471:2-4 ("And this is enabled by the integration with the Cisco Identity Services Engine.  That's the ISE that we've talked about before."), 505:16-506:6

(discussing source code that "relates to the ISE, the Identify Services Engine").  Centripetal tries to brush its expert's discussion of ISE aside as "an introductory section" (Opp. 12), but does not explain why Dr. Mitzenmacher would have mentioned ISE during his direct testimony at all—much less seal the courtroom to discuss source code relating to ISE (Tr. 503:9-17)—if ISE was not part of his infringement theory.  The fact that routers and switches "enforce the quarantine" (Opp. 12) is of no moment; as PTX-1326 and the Court's findings make clear, the routers and switches have no "quarantine" to enforce unless ISE provides them with actual quarantine rules.  Put another way, Centripetal did not prove that the routers and switches, operating by themselves without ISE, would ever "determin[e] that the first portion of packets comprises data corresponding to criteria specified by one or more packet-filtering rules," as the asserted claims require, because the routers and switches do not have "packet-filtering rules" unless they are supplied by ISE.  Order at 84, 92 (discussing "specialized rules, known as SGACLs, that deal specifically with forwarding and dropping packets").

Centripetal's assertion that Cisco directly infringes the '193 patent "as part of its corporate network" or through "testing" (Opp. 12) fails as well.  Centripetal cites only Mr. Scheck's testimony that his team "deploy[s] equipment on Cisco's network, to look for security events."  Tr. 1660:2-5.  He did not state that Cisco employs the quarantine function that the Court found to infringe; on the contrary, he was unequivocal that Cisco does *not* use ISE to quarantine.  Tr. 1698:22-24.  Moreover, Centripetal offered no damages theory to support a reasonable royalty for Cisco's own use in testing or its own corporate network; once again, its damages theory was based on units that Cisco *sold*, not units Cisco supposedly used itself in the accused combination.  *See infra* pp. 15-18.  And as discussed above, Mr. Gunderson's unsupported statement "I think they're

11

sold collectively" (Tr. 1527:15) does not prove that Cisco's routers and switches are invariably bought as a combination with ISE; the Court made no such finding, and Mr. Scheck testified to the opposite.  Tr. 1699:19-23.

Lastly, Centripetal identifies no "offer to sell" the combination of products found to infringe that would remotely satisfy the legal requirements for infringement liability under Section 271(a), *see supra* pp. 4-5; the most it points to are bare advertisements.  Opp. 12.  Besides, Centripetal offered no damages theory tied to supposed "offers for sale."  *See infra* pp. 15-18.

### 4.     Centripetal Did Not Prove That Cisco Directly Infringed The '806 Patent

As with the other patents, the Court found that the accused routers and switches cannot infringe the '806 patent unless combined with another product, namely Cisco's DNA Center product, and that the accused firewalls cannot infringe unless combined with Cisco's FMC product.  Order at 100, 107.  Centripetal urges that Cisco's routers and switches *can* work with the separate DNA Center product and that Cisco's firewall products *can* work with the separate FMC product (Opp. 15-16), but that only confirms that the routers, switches, and firewalls cannot infringe by themselves.  Centripetal presented no evidence that these products are made, used, sold, or offered for sale in combination with DNA Center and FMC.

*First*, Centripetal argues that Cisco "makes and uses the Infringing Routers and Switches" because Centripetal purportedly "proved that these Infringing Routers and Switches work with the Cisco DNA software."  Opp. 14.  Yet the evidence Centripetal cites does not demonstrate that Cisco ***actually combined*** the routers and switches with the DNA Center product—instead, it merely shows that the routers and switches are compatible, or work with, Cisco's DNA Center, and therefore ***could*** be combined.  For instance, PTX-1263, which Centripetal relies on, only states

12

that "[m]ost" Cisco routers and switches "support Cisco DNA now or with a software update." This general statement does not demonstrate that Cisco actually combined the routers and switches with DNA Center functionality to form the combination the Court found to infringe. And a closer review of PTX-1263 reveals that Cisco's DNA Center capabilities can only be implemented in Cisco's routers and switches when those routers and switches are combined with a separate DNA Center appliance. PTX-1263 at 183 ("To activate Cisco DNA software capabilities on Cisco routers, switches, and wireless products, you will need a Cisco DNA Center appliance and Cisco DNA software subscription licenses for each router, switch, and wireless device."). Centripetal also points to Dr. Mitzenmacher's testimony (Opp. 14), but Dr. Mitzenmacher did nothing more than highlight the basic statement from PTX-1263 that certain routers and switches support DNA Center—without identifying the specific accused routers and switches as compatible with DNA Center, and without demonstrating a single instance in which the necessary combination for infringement of the '806 patent was made or used. *See* Tr. 576:25-577:8.

With respect to Cisco's firewall products, which the Court found do not infringe unless combined with Cisco's FMC products, Centripetal only points to two categories of evidence: (1) Cisco's compiling of source code for the accused firewall products in the United States; and (2) Dr. Mitzenmacher's testimony describing in the abstract what it means to compile source code. Opp. 14. But Dr. Mitzenmacher only testified that compiling source code was "***part of*** making the product." Tr. 463:13-18 (emphasis added). And he described "use" of a product as a distinct act occurring ***after*** compiling the source code. *Id.* ("and then once the code is compiled then you would use it"). Centripetal's assertion that compiling source code alone constitutes "making" or "using" the accused firewalls is thus contradicted by its own expert's testimony. Centripetal

13

further points to Cisco's "admission" that it loads software onto its firewall products—but Cisco only admitted that it loaded software onto *some* of the accused firewalls in the United States, and, in any event, Cisco did not admit to making or using the separate FMC product at all, much less in the accused combination.  PTX-1409 at 6.  Centripetal ignores FMC altogether, despite the fact that FMC is a separate and distinct product that, as the Court found and Dr. Mitzenmacher admitted, must be combined with Cisco's firewalls to practice the '806 patent claims under the Court's findings.  Order at 101, 107; Tr. 843:17-844:16 (Dr. Mitzenmacher's testimony on the role of FMC in generating rule sets).

Centripetal also argues that Cisco uses the accused products in its own corporate network and tests them.  Opp. 15.  But the document Centripetal cites is a software functional specification that does not affirmatively link this testing procedure to the accused products in the combinations found to infringe or point to an instance of Cisco's actual testing (and the document in fact does not even mention the accused product combinations).  PTX-1195.  Centripetal also cites testimony from Dr. Mitzenmacher, but this testimony does not illustrate *Cisco's* use or testing of the accused product combinations—instead, Dr. Mitzenmacher simply discusses how FMC deals with threat intelligence.  Tr. 673:4-21, 675:5, 676:7-15 (cited at Opp. 15).  Centripetal further relies on a brief excerpt of Mr. Scheck's deposition testimony—but this excerpt similarly does not state (or even suggest) that Cisco tested the accused product combinations.  PTX-1918.  Centripetal's remaining citations likewise do not demonstrate Cisco's testing or use of the infringing combinations.  Tr. 572:21-573:7; PTX-1294.  Moreover, Centripetal again offered no damages theory to support a reasonable royalty for Cisco's own use in testing or its own corporate network.  *See infra* pp. 15-18.

14

**Second**, Centripetal asserts that Cisco sells and offers for sale the accused products.  Opp. 15.  Centripetal failed to identify, and the Court did not find, any sale of the accused switches, routers, or firewalls combined with the other devices necessary to infringe the '806 patent.  For the switches and routers, Centripetal and Mr. Gunderson pointed only to documents showing that DNA Center **can** be combined with Cisco's switches and routers and that these products **can** "work together"—neither of which proves that Cisco ever **actually** sold or offered the accused combination.  Tr. 1463:2-1464:9.  For the firewall products, Centripetal points to Mr. Gunderson's testimony that Cisco touted the benefits of FMC and other Cisco marketing materials.  Tr. 1466:6-12; PTX-519.  Mere advertisement of a product is not an offer for sale.  *See supra* pp. 4-5.  And the fact that separately-sold products can "work together" or benefit one another does not indicate whether, or to what extent, Cisco ever combined them.  Centripetal further failed to offer any damages theory tied to supposed "offers for sale."  *See infra* pp. 17-18.

**Finally**, Centripetal devotes several paragraphs to summarizing testimony that Cisco's DNA Center can "operate[] with" routers and switches and that FMC can "operate[] with" Cisco's firewalls.  Opp. 15-16.  Again, the mere possibility that products could be combined to practice the claimed invention does not amount to direct infringement.  *See supra* pp. 1-4; *Deepsouth*, 406 U.S. at 528.  And for the reasons stated above, because Centripetal failed to demonstrate that Cisco made, used, sold, or offered for sale those products **in those infringing combinations**, Centripetal has failed to prove Cisco directly infringed the '806 patent.[2]

---

[2] It likewise does not matter that claims 9 and 17 of the '806 patent are "written in functional language."  Opp. 17.  Centripetal has not proven that Cisco made, sold, used, or offered for sale the products in the combinations that the Court found needed to perform the claimed "function."

C.      **The Court Should Amend The Damages Award And Judgment**

1.      **Damages Must Be Commensurate With The Scope Of Direct Infringement**

A patentee is entitled only to damages sufficient ***to compensate for actual infringement***. *See* 35 U.S.C. § 284 ("Upon finding for the claimant the court shall award the claimant damages ***adequate to compensate for the infringement***, but in no event less than a reasonable royalty for ***the use made of the invention by the infringer***[.]" (emphases added)).   "The trial court must carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).  In other words, a patent holder must prove ***the extent*** of infringement, and cannot recover damages for non-infringing uses except in special cases not at issue here.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334-35 (Fed. Cir. 2009); *see also, e.g.*, *Mayor, Aldermen & Commonalty of City of N.Y. v. Ransom*, 64 U.S. 487, 488 (1859) ("If [the patentee] rest his case, after merely proving an infringement of his patent, he may be entitled to nominal damages, but no more.").  While *Lucent* and *Oak Industries* concerned method claims, that is of no moment: those cases simply implement the settled proposition that a patentee cannot recover damages for acts that are not themselves infringing.  The underlying principle from *Lucent* still governs here.  Multiple, separately-sold items do not infringe when made, sold, or used by themselves where infringement requires those separately-sold items to be combined together.  *See supra* pp. 1-4.  Centripetal cites no case to the contrary.

Centripetal further concedes that it has not proven—and did not even attempt to prove—

16

the extent of actual infringement.[3]  Instead, Centripetal asserts that the making, use, or sale of every accused component—every switch, router, or firewall—is an act of direct infringement.  But as explained above, not only can the accused switches, routers, and firewalls be used without infringing, they *are* so used, and they are *incapable* of infringement on their own; they must be combined with additional separately-sold products to infringe.  *See supra* pp. 1-4.  By awarding damages on units that were not shown to have been combined, and thus do not infringe, the damages award "punishes beyond the reach of the statute."  *ResQNet*, 594 F.3d at 869.

Centripetal suggests that the products "work in concert" and are "sold together."  Opp. 2, 20.  But the mere fact that the products *can* be combined, and *may* be sold together, does not mean that they *always* are or that they *actually were* combined as required for infringement.  The Court certainly did not find that they were sold together; it found that "[n]etwork administrators can use *different combinations of these devices and methods* to achieve optimal security personalized for their network."  Order at 17.  And Cisco's marketing documents and informational materials show only that Cisco markets its various products and notes that they can be used together.  They do not prove that Cisco made, used, or sold them together, much less that it did so as to every single unit covered by the damages award.  Centripetal's own damages expert Mr. Gunderson agreed that "a consumer has to buy each" of the accused products separately.  Tr. 1527:12-25, 1538:14-17.  However, he did nothing in his analysis to demonstrate which, if any, customers *actually bought*

---

[3] Centripetal suggests that it "apportioned the revenues . . . to account for the footprint" of the asserted patents.  Opp. 20.  But by his own admission, Mr. Gunderson's "apportionment" merely accounted for the fact that each of the multiple accused components contains parts not accused of infringement, "like the power cords."  Tr. 1565:20-25.  Centripetal does not suggest that Mr. Gunderson limited his damages demand to units actually combined into the arrangements the Court found to infringe.

any of the various accused combinations of products.  Tr. 1540:4-14; 3472:17-20.

And while Centripetal now attempts to rely on other supposed acts of direct infringement that it never proved—such as "testing" by Cisco, use in Cisco's "corporate network," or "offers for sale"—Centripetal tellingly does not point to any damages evidence setting a reasonable royalty for such limited acts of infringement.  Mr. Gunderson's theory sought damages for the units that Cisco *sold*, not for units that Cisco supposedly kept for its own use or for testing, or for the mere act of advertising.  Accordingly, even if Centripetal had proven such acts of infringement—which it did not—the record would not permit a finding of damages for such acts, much less the award reflected in the Court's judgment.

Accordingly, if damages are awarded at all (they should not be), the Court should amend its findings on damages to reflect the only theory supported by the evidence, which is Dr. Becker's. This would reduce the damages award to $3,014,561.  *See* DTX-1693.

### 2.      The Court Should Limit Damages To Domestic Sales

If the Court awards damages under Centripetal's theory, it should find that Centripetal did not prove entitlement to a royalty on Cisco's non-U.S. sales, and adjust the award accordingly.

Centripetal argues that it is entitled to damages on foreign sales because source code is "compiled" in the United States.  Opp. 21-22.  But Centripetal does not deny that compiling source code is only one step in the manufacturing process.  To make the accused systems in the United States, all of the requisite elements of the system—including not only processors, memory, and other parts of a router, switch, or firewall, but also the other components of the combinations found to infringe—must be combined in the United States.  *Centillion*, 631 F.3d at 1288 (finding that to "make" a system under § 271(a), a defendant must combine all of the claim elements).  Centripetal

18

has not proven that any infringing combinations outside the United States were ever made, used, or sold in the United States, and thus there is no basis for claiming damages on foreign sales.

The cases Centripetal cites do not suggest otherwise. *WesternGeco* concerned infringement under 35 U.S.C. § 271(f)(2), which Centripetal never asserted in this case, and which turns on ***intentional*** supply of components for combination abroad, where the components are "especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2135, 2137-38 (2018). *Plastronics*—which is not controlling in any event—speculated in dicta that a patent holder ***may*** be able to recover damages for some foreign sales under § 271(a), but only under limited circumstances. *See Plastronics Socket Partners, Ltd. v. Dong Weon Hwang*, C.A. No. 18-14-JRG-RSP, 2019 WL 4392525, at *5 (E.D. Tex. June 11, 2019); *id.* at *4 ("The Supreme Court did *not* hold that a plaintiff could recover foreign damages for *foreign* acts of infringement." (emphasis original)). Centripetal did not prove it was entitled to damages for foreign sales under any valid theory of recovery, and the record would not support such a conclusion.

The Court should thus make additional findings excluding any foreign sales from the royalty base, if it awards damages at all. The Court should also adjust any future damages calculation, enhancement, and prejudgment interest calculation consistent with the revised royalty base and past damages amount.

### D.   The Court Should Enter An Amended Judgment

Centripetal does not deny that the Court's judgment, as entered on October 5, did not decide all claims in this case and accordingly is not final or appealable. Accordingly, Cisco suggested

that the Court enter a partial final judgment under Rule 54(b), and Centripetal does not appear to oppose such a procedure.

Since Cisco filed its motion, the Court has entered an order granting the parties' subsequent motion to dismiss the claims regarding the stayed patents.  Dkt. 633.  That order makes another option possible, namely entry of an amended judgment that disposes of all claims in the case.  *See* Fed. R. Civ. P. 58(a) ("Every judgment and amended judgment must be set out in a separate document[.]").  Cisco respectfully submits that any judgment entered—whether a partial judgment under Rule 54(b) or an amended judgment under Rule 58—should reflect the findings and conclusions Cisco seeks in this motion.

## II.     CONCLUSION

The Court should amend its findings of fact and the resulting judgment to reflect that Centripetal did not prove any act of direct infringement; that Centripetal's damages theory accordingly is unsupported; that the damages award, if any, should be no more than $3,014,561; and separately that, even accepting Centripetal's damages methodology, the royalty base and all related damages calculations should be adjusted to exclude non-U.S. sales.

The Court should also enter an amended judgment that disposes of all claims in the case, or alternatively that is a partial final judgment under Rule 54(b).

Dated: November 25, 2020                    Respectfully submitted,

                                            CISCO SYSTEMS, INC.


                                            By /s/ _____
                                            Of Counsel


Dabney J. Carr, IV, VSB No. 28679
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com

Louis N. Jameson (admitted pro hac vice)
Matthew C. Gaudet (admitted pro hac vice)
John R. Gibson, VSB No. 72968
Jennifer H. Forte (admitted pro hac vice)
**DUANE MORRIS, LLP**
1075 Peachtree Street, N.E., Suite 2000
Atlanta, Georgia 30309-3929
Telephone: (404) 253-6900
Facsimile: (404) 253-6901
wjameson@duanemorris.com
jrgibson@duanemorris.com
jhforte@duanemorris.com

Joseph A. Powers (admitted pro hac vice)
**DUANE MORRIS, LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Facsimile: (215) 689-3797
japowers@duanemorris.com

21

Nicole E. Grigg (formerly Johnson) (admitted pro hac vice)
**DUANE MORRIS, LLP**
2475 Hanover Street
Palo Alto, CA 94304-1194
Telephone: (650) 847-4150
Facsimile: (650) 618-2713
NEGrigg@duanemorris.com

*Counsel for Defendant Cisco Systems, Inc.*