```
1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
2                          NORFOLK DIVISION


3


4  CENTRIPETAL NETWORKS, INC.,    )
                                  )
5            Plaintiff,           )
   v.                             ) Civil Action No.:
6                                 )      2:18cv94
   CISCO SYSTEMS, INC.,           )
7                                 )
             Defendant.           )
8


9


10


11           TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS


12


13                          Norfolk, Virginia
                            September 9, 2020
14


15


16  BEFORE:  THE HONORABLE HENRY C. MORGAN, JR.
              United States District Judge
17


18


19


20


21


22


23


24


25
```

```
 1   Appearances: (Via Zoom)

 2        KRAMER LEVIN NAFTALIS & FRANKEL, LLP
                    By: PAUL ANDRE
 3                      Counsel for Plaintiff

 4        DUANE MORRIS, LLP
                    By: LOUIS NORWOOD JAMESON
 5                      Counsel for Defendant

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

P R O C E E D I N G S

(Proceedings commenced at 2:28 p.m. as follows:)

COURTROOM DEPUTY CLERK:  Civil Action No. 2:18cv94, Plaintiff Centripetal Networks, Inc. v. Defendant Cisco Systems, Inc.

For the plaintiff, Mr. Andre, et al., are you ready to proceed?

MR. ANDRE:  We are, Your Honor.

COURTROOM DEPUTY CLERK:  For defendant, Mr. Jameson, et al., are you ready to proceed?

MR. JAMESON:  Yes, we are, Your Honor.

COURTROOM DEPUTY CLERK:  And the call is connected.

THE COURT:  All right.  I have some additional information which is in the process of being emailed to Mr. Noona and Mr. Carr.  When the Court received the information from my administrative assistant about the Cisco stock, we were in Maine on vacation.  That doesn't mean that the Court's not working; in fact, I did work while I was in Maine and I always do.  But other than dealing with that particular point, I didn't do any other work on this case.

Now, the problem that arose with respect to the case was how to separate or divest the stock, how best to do that, which presented a problem.  On the one hand, we could just sell

1  the stock immediately which would not result in a taxable event

2  for us, or the other alternative that occurred to me was to have

3  it transferred to a blind trust.  Now, the simplest thing would

4  be to sell the stock; however, the problem that that caused is

5  that the Court had already strongly indicated that it might be

6  considering awarding damages in the case, and so I asked for

7  additional evidence on damages, and that might mean that the

8  Court's judgment would have an adverse effect upon Cisco's

9  stock.  So I was concerned about that, because that would defeat

10 the very purpose of the Rules.  It's a bit unusual to have a

11 party which owns the stock be the one objecting to its

12 ownership.  So I was concerned that, to the extent that the

13 Court's ruling might have an adverse effect on the stock

14 price -- I don't know if it will or not -- that that would be

15 defeating the very purpose of the Rules.

16         So I thought about that while I was on vacation and

17 concluded that while that would save us a little money and be a

18 temporary solution, that the better solution was to divest

19 myself of any contact with the stock by having it transferred to

20 a blind trust, which my wife agreed to do, meaning that the

21 property is withdrawn from her account and transferred to the

22 trust.

23         I contacted my attorney as soon as -- or I should say

24 our attorney as soon as I returned from Maine, and he told me he

25 never drawn such a trust before, but that he would undertake it.

1    And he completed it, and my wife and he have signed it, and a

2    copy of the trust is being emailed to Mr. Carr and Mr. Noona,

3    who I assume can pass it on to other counsel.

4              There was one other, probably a non-issue, but I want

5    to bring it to the attention of counsel, the advisory company

6    that I have recently relied on in buying and selling stocks, in

7    addition to recommending Zoom, which I think we talked about at

8    the very beginning of the case, also recommended a stock called

9    Crowd Strike.  And so I bought CrowdStrike.  And my wife called

10   her broker about buying CrowdStrike, and as a result she bought

11   CrowdStrike too.  Then I came to the realization that

12   CrowdStrike was a direct competitor of both parties in this

13   case, and it also indicated on Exhibit PTX-1600 that CrowdStrike

14   shared intelligence feeds with Centripetal.  And so I thought to

15   myself that if the Court's ruling in this case impacted Cisco in

16   an adverse way, that could be construed as benefiting a

17   competitor.  And I didn't really think of CrowdStrike as a

18   competitor initially, but then when I saw it on the list that

19   the plaintiff produced, and the defendant also made reference to

20   in the course of the trial, that I should simply sell it.

21   Because I suppose in theory any competitor could benefit from a

22   judgment which was adverse to one of its competitors.  So I sold

23   it and I recommended to my wife that she sell it, and initially

24   her stock broker didn't want to sell it because even though she

25   had asked him about it initially as opposed to him recommending

1  it, he said he thought it was a good stock and she ought to hold

2  on to it, but she agreed to sell it also.  So she sold it a day

3  or two later after I did.  So that's over with and gone.  But

4  the records of the purchase and sale of CrowdStrike are also

5  being emailed to Mr. Noona and Mr. Carr.

6         Also I thought that I would be retired by now, and so

7  I had signed an agreement with Regent University School of Law

8  to teach two courses beginning this fall, two three-hour

9  courses, one in intellectual property and the other in federal

10  civil procedure.  And the classes began on August 25th, and

11  although all students and professors were given the option by

12  the school to take the course -- to either teach or attend the

13  course online, I did not feel that I should try to do it online

14  from Maine or, as I eventually decided, online from here either.

15  Regent took great precautions to require everyone coming in to

16  the law school, including me and all its professors and

17  students, to be tested for the virus.  And as a result of that

18  I've been teaching in the classroom.  Some of the students had

19  taken it online and some by the Internet.  I say that because it

20  impacts the Court's ability to produce an opinion in the case.

21  We were asked not to publish an opinion by Cisco, and I haven't

22  worked on the case at all since I found out about the Cisco

23  stock.  I haven't done anything on it.  And going forward, I

24  can't devote the same amount of time to it as I was devoting

25  before I started teaching.  Obviously takes a lot of time to

1  teach two three-hour courses.  That is considered a full load in

2  many law schools.  So I haven't done any further work at all on

3  the opinion.

4         Now, as Cisco pointed out, I said in my notification

5  that I had virtually completed the opinion.  Now, if both

6  parties want the Court to be more specific, I can be more

7  specific and tell you exactly what I mean I've virtually

8  completed it, but I'm not going to do that if either party

9  objects.  But I can tell you that if it turns out that I'm going

10 to publish the opinion, it's going take some time to finalize

11 it.  We've completed the draft and our draft is currently at

12 130-some pages.  It's a very complex case, and it's going to be

13 the longest opinion I've ever written, by far.  I usually try to

14 write opinions briefly, but this case does not lend itself to

15 writing a brief opinion.  So it's obviously going to take time

16 to edit it and to go from virtually finished to finished.  As I

17 said, most of the issues in the case I've already decided, and

18 I'm not going to change my mind in the course of editing the

19 opinion.  But there are -- I haven't decided 100 percent of it,

20 although I'm very close to that.  If you want, both parties want

21 an explanation of what I mean by virtual, I'll be glad to give

22 it to you, otherwise I won't.

23        MR. JAMESON:  Your Honor, this is Woody Jameson.  On

24 behalf of Cisco, I think in light of what you have already

25 disclosed, we would request that you not provide any further

1  details at this point in time.

2           THE COURT:  All right.  I won't.

3           MR. ANDRE:  And Your Honor, obviously for Centripetal

4  we would like to get more information, because it would be

5  important to the company.  But I know you said if one party

6  objects you won't disclose it.  But we would -- it is something

7  that is very important to our company, and this has been hanging

8  out there for a while for us, and we would like to get it as

9  soon as possible.

10          THE COURT:  Well, other than the time that's elapsed

11 since I first heard about the Cisco stock, I've spent almost all

12 of my time -- I spent almost all my time on going through the

13 record and drafting each portion of the opinion section by

14 section, patent by patent.  But as I said, I didn't do any more

15 after the Cisco stock issue came up.  So I don't, I just don't

16 think it would be the proper thing to do to disclose what the

17 opinion says.  I haven't disclosed anything about what it says

18 other than the fact that I did ask for additional information

19 that was relevant to damages, and a party might draw an

20 inference from my requesting that that I was considering

21 damages.  But beyond that, I haven't disclosed anything in the

22 opinion, and I won't do so until after I resolve this issue.

23          So Cisco having made the motion -- and I would say

24 that the Court did not invite any briefing, the briefing started

25 with Cisco's motion, the only thing I got from Centripetal was

1  the statement that they didn't raise any objection to the stock

2  issue -- so the Court didn't ask for any briefing, but once

3  Cisco filed its motion, the Court did then, I believe, ask

4  Centripetal to respond if it chose to do so, and Cisco filed a

5  rebuttal brief if it chose to do so, and both of you filed

6  briefs.  Since Cisco is the moving party, I'll hear first from

7  them.

8           MR. JAMESON:  Thank you, Your Honor.  Woody Jameson on

9  behalf of Cisco Systems.

10          First let me say on behalf of both outside and

11  in-house counsel for Cisco that the bringing of this motion was

12  a very difficult one to put before the Court.  I want to thank

13  you, the Court, for its candor in informing the parties about

14  the ownership interest by your wife of the Cisco stock, and we

15  really hope that no disrespect is taken by the Court in the

16  bringing of this motion.

17          Second, as you are aware, the basis for the recusal

18  motion is found in the strict requirements of 28 U.S.C. 455,

19  which is implemented by Congress and as interpreted by the

20  courts, it was to create bright-line rules when it came to

21  judicial conflicts to ensure the public's absolute confidence in

22  the judicial system and to avoid any possible appearance by a

23  judicial officer of impropriety.

24          For the reasons that we lay out in our opening brief

25  and in our reply brief, we submit that recusal is required in

1  this case under both 28 U.S.C. 455(b) and under 28 U.S.C. 455(a)

2  and (c), and we believe that recusal is required without the

3  Court issuing a merits decision on the bench trial.  With

4  respect to the facts as known at the time of the briefing, we

5  believe that our opening brief and our reply brief crystallize

6  why recusal is required.  Absent questions from the Court, Cisco

7  will rest on its briefing.

8         I would like to make some brief comments based on new

9  developments as you've laid out today.  First, with respect to

10  transferring the stock into a blind trust, it is not clear to me

11  that that constitutes a proper divestiture under 28 U.S.C.

12  455(f).  And I am doing this, Your Honor, absolutely on the fly,

13  but I would call your attention to Advisory Opinion No. 110

14  which appears to address whether or not issues can be cured by

15  transferring assets into a blind trust.  And based on a review

16  on the fly of that advisory opinion, it appears that it does

17  not.

18         Second, under 28 U.S.C. 455(f), divestiture has to

19  occur immediately or promptly upon learning of the issue, and

20  second, it will not cure a violation of 455(b) if the financial

21  interest is one that could be a substantially affected by the

22  outcome of the case.  And based on Your Honor's comments today,

23  it appears that that is at least a possibility, particularly

24  considering the relief that Centripetal has requested in this

25  case, which is in excess of $500 million in damages, treble

1  damages, and an injunction against a core line of Cisco

2  products.

3         So even if divestiture into a blind trust is possible,

4  I still believe that there is a problem with 28 U.S.C. 455(f)

5  because the interest could substantially be impacted by your

6  decision in this case.  And under those circumstances, 28 U.S.C.

7  455(f) is not available, and that would mean that under 28

8  U.S.C. 455(b), recusal is required.

9         And with that, Your Honor, I have no further comments

10 absent questions for the Court, but I would like the opportunity

11 to respond to any arguments that Centripetal may make.

12         THE COURT:  All right.  Mr. Andre?

13         MR. ANDRE:  Thank you, Your Honor.  May it please the

14 Court.

15         Recusal is not warranted in this case.  In fact, it

16 would be improper to recuse yourself on this case given the

17 facts here.  Recusal is very fact-driven.  And the facts as we

18 know it before today and now after today, dictate recusal is not

19 necessary and would be just the opposite.  In fact, every

20 circuit in this country has stated that a judge is as much

21 obligated not to recuse himself when it is not called for as he

22 is obligated to when it is called for.  And in this case, this

23 Court is obligated not to recuse itself given these facts.

24         One fact that cisco has ignored consistently in this

25 proceeding, on this motion, is the last sentence of Your Honor's

1    email to the parties.  The very last sentence stated "Since I
2    did not know that my wife owned the stock until August 11th,
3    2020, it did not and could not have influenced my opinion on any
4    of the issues in this case."  That fact is dispositive of any
5    recusal motion in and by itself.
6              Cisco said they're moving under 455(a), 28 U.S.C.
7    455(a), and the standard for recusal under 455(a) is, recusal is
8    committed to the Court's sound discretion.  This is up to the
9    Court under 455(a).  It is waivable by the parties.  It is not
10   necessarily something that is not waivable.  And nothing in this
11   case has indicated the Court's bias.  In fact, just the
12   opposite.  Your Honor has been extremely forthright when Mr.
13   McKloskey, who I see on the screen, when he made an appearance
14   you were very forthright about your relationship with Mr.
15   MacBride.  We had no objection.  When we decided to use Zoom, as
16   Your Honor mentioned earlier today, you were forthright about
17   your ownership stock in Zoom.  And when you found out about your
18   wife's stock, you notified the parties the day after.
19             So Cisco's attempting to say, they're using a 455(b)
20   argument to raise a 455(a) recusal.  But the standard for that
21   is the reasonable person standard.  And what this case would
22   require is a reasonable person, looking at all of the facts in
23   this case, would believe that the Court actually did know about
24   the stock that his wife had in Cisco at the time you decided to
25   take this case on.  That's what a reasonable person would have

13

1    to believe.  And given the facts here, there is just no possible

2    way a reasonable person would ever believe that.  I think

3    every -- any set of facts you would look at here, you would

4    believe the Court was not aware of the stock until the Court

5    sent us the email on August 11th and August 12th, that time

6    period.  So there's absolutely no basis under the reasonable

7    person standard for recusal under 455(a).

8             Under 455(b), you had to have stock that could be

9    substantially affected.  And in this particular instance, the

10   very first sentence of 455(b) is, at 455(b)(4), is he knows.  As

11   Your Honor said, you did not know when you decided the issues in

12   this case.  So 455(b) doesn't trigger until you actually do know

13   of the stock.

14            And Your Honor's comments today on the divestiture of

15   the stock and even the divestiture of a potential competitor to

16   the two parties -- and just for Your Honor's information, we

17   just found out that CrowdStrike was an old partner of

18   Centripetal, but there's no longer a relationship there at all

19   with Centripetal.  So...

20            THE COURT:  Well, it said that they exchanged

21   intelligence feeds.

22            MR. ANDRE:  They used to.  That time -- they no longer

23   do that.  They did previously.  But just as we sit here today,

24   they do not.

25            But that being said, the fact you went over and beyond

1  what is required to divest of even that stock, a competitor's

2  stock, I think cures any issues on 455(b).

3         The curing provision of 455(f) was brought in in 1988

4  for this very purpose.  The Court has dedicated a lot of

5  resources, a lot of time to this case, and 455(f) was put in

6  place for this exact type of situation.

7         Your Honor has acted exactly as Congress had intended

8  with 455(f), and we don't think there is any basis whatsoever

9  for recusal in this case.

10        Unless Your Honor has any further questions, I will...

11        THE COURT:  All right.

12        Mr. Jameson, do you wish to reply?

13        MR. JAMESON:  Yes, Your Honor, very briefly.

14        With respect to 455(b) -- and our reply makes this

15 point -- but Your Honor absolutely knows now about the Cisco

16 stock and you obviously let the parties know about that.  The

17 Court has made clear today that there is work to be done on the

18 opinion, and therefore 455(b) is absolutely triggered in this

19 situation.

20        With respect to 455(a), I believe that Centripetal is

21 really misstating the law.  Basically what the argument that

22 Centripetal is making is that if this objective person, this

23 reasonable observer was basically sitting in the Court's shoes

24 and knew what the Court knew, that there wouldn't be an issue

25 here.  But the cases address that, and they make it crystal

1    clear that that's not really what a reasonable observer does.

2    And in fact -- and we cite this in our reply brief, and Your

3    Honor I would encourage you, I believe the Chase Manhattan case,

4    it really addresses virtually every issue that's before you

5    right now and it does it in a very methodical fashion.  But in

6    the concurring opinion, Judge Jacobs stated that "The standard

7    that properly governs the panel opinion is what a reasonable

8    person would believe, knowing the salient circumstances, not

9    what a reasonable person would think who had the benefit of

10   inside knowledge about the work of courts, of particular judges,

11   and of judges in general."

12         And Judge Jacobs concluded, and I want to echo this,

13   "I mention them only to emphasize that the panel opinion cannot

14   be fairly read to cast the slightest aspersion on an estimable

15   senior judge."  And Your Honor, that's not what we're here to

16   do.  That's not what Cisco is doing.  This is not about whether

17   you are being impartial or not.  We believe you have every

18   intent of being impartial.  But that's not the test under

19   455(a).  It is what someone outside of these proceedings would

20   possibly believe looking at the record.  And under 455(c), the

21   statute has an affirmative obligation of the Court to keep

22   informed of the stock holdings of both Your Honor and your

23   spouse.  And based on this record, the only thing that we know

24   is that the stock holdings were uncovered as part of an annual

25   disclosure obligation.  We don't know what protocols you had in

```
 1   place to ensure that conflicts like this did not ever come to
 2   this point in a case.  And we cite in our reply brief a number
 3   of cases where judges outline the protocols that they have in
 4   place, and we also cited to the Fourth Circuit's kind of
 5   guidance on issues that courts should do to ensure that
 6   conflicts are readily discovered.  And on this record, all that
 7   Cisco knows is that your wife bought stock in October of 2019 to
 8   a named party in a high-profile case before you, and that
 9   purchase was not discovered until after the trial was complete
10   some nine months later.  And so an issue that is at the heart of
11   this is whether or not reasonable efforts were actually taken
12   under 455(c) to ensure that this type of conflict was discovered
13   as promptly as possible.  And it's our reading of the cases, and
14   particularly Chase Manhattan, and reading the guidance by Shell
15   Oil and the Supreme Court's decision that we cite in Liljeberg,
16   that a reasonable person would believe that the Court would have
17   known about the stock purchase long before this case was tried,
18   and that under those circumstances, under 455(a), there is still
19   a violation under 455(b), and as the Court held in Chase
20   Manhattan, divestiture after the fact does not cure the problem.
21          Absent questions, Your Honor, that's all that I have.
22          THE COURT:  All right.  Well, I think the cases cited
23   by the plaintiff are very different factually than this
24   situation -- I mean by the defendant, excuse me.  This same
25   almost identical situation arose in a case in the Eastern
```

```
1    District of Virginia.  It's Virginia Central Telephone Company
2    of Virginia v. Sprint Communications, decided by a senior
3    district judge in Richmond.  The citation is 211 Westlaw 6178652
4    with facts almost identical to this where the judge was in the
5    process of making his decision when he discovered that he owned
6    stock in his IRA.  I think it's clear from the fact that the
7    Court did take a number of steps in this case to try to assure
8    its impartiality before this issue even arose that the Court had
9    no knowledge of this, and therefore the defendant is relying
10   strictly on "should have known".
11           As I said, I pointed out my close relationship with
12   one of the attorneys associated by the defendant as soon as I
13   learned of it.  As soon as Zoom came into the issue, I told the
14   attorneys I owned Zoom.  I bought CrowdStrike, and as soon as I
15   learned that they were a competitor and that Centripetal was
16   mentioned as someone with whom they exchanged threat
17   intelligence feeds, I sold the stock, as did my wife.
18           Now, the closing of the defendant's rebuttal brief
19   says that they never should have had to have filed a motion in
20   this case because the judge, me, should have disqualified
21   himself automatically because of the existence of bright-line
22   rules.  Well, people try to write rules as bright-line as they
23   can, but they don't turn out that way in most cases.  And
24   certainly not in this situation.  The existence of so many cases
25   interpreting what the bright-line rule means demonstrates that
```

1   the line can't be but so bright, because the Court not only has

2   a duty to recuse itself when it's appropriate, but has the duty

3   not to recuse itself when it's not appropriate, which is

4   entirely overlooked in the defendant's rebuttal brief.

5           To say that the Court should have automatically

6   recused itself is contrary to the Court's duty to the parties

7   and duty to the concept of judicial economy and Rule 1 calling

8   upon the Court to exercise its best effort to resolve cases

9   fairly, justly and inexpensively.  The expenses that the parties

10  went through to present this case are, I'm sure, enormous, the

11  judicial time that has gone into this case is enormous, and I

12  think all of these points are made in Judge Payne's opinion when

13  he was faced with a similar situation in this Richmond case.

14          MR. JAMESON:  Your Honor, may I comment briefly on

15  Judge Payne's opinion?

16          THE COURT:  No.  You've had your opportunity.  Why do

17  you want to interrupt again?

18          MR. JAMESON:  Because it's the first that the opinion

19  has been raised.  But if you don't want to hear --

20          THE COURT:  Well, if you didn't do your research I

21  can't help you with that, Mr. Jameson.

22          MR. JAMESON:  Your Honor, I actually did do the

23  research and it's actually in our reply brief, both the district

24  court opinion and the Court of Appeals' review of that opinion

25  at the Fourth Circuit.

```
1              THE COURT:  Well...

2              MR. JAMESON:  There's a very important distinction I

3    would like to make on the record for you.

4              THE COURT:  Go ahead.

5              MR. JAMESON:  In that case, Judge Payne, he owned

6    stock in a IRA in which he had no control over the purchasing

7    decisions, but instead it was a managed fund.  And there is an

8    express exception for that situation under 455(d)(4)(i),

9    "Ownership in a mutual or common investment fund that holds

10   securities is not a financial interest."  And that is precisely

11   the grounds that the Court of Appeals found was a reason that

12   455 did not apply to the situation that Judge Payne faced.

13             THE COURT:  Right.  In this case, the stock was owned

14   in my wife's account for which I had no control, and I didn't

15   learn about it until I learned about the fact that it had been

16   purchased at the recommendation of her broker.  I had no control

17   over that.  In Judge Payne's case, it was his IRA and he got

18   reports on it.  I didn't get any reports on my wife's accounts.

19   So I think the situations are very much the same.

20             Now, what put the Court in a very difficult position

21   at the beginning was it's unusual in the sense that the party

22   requesting recusal was the party -- was the stock that was owned

23   by my wife.  It wasn't the opposing stock.  And that put the

24   Court in the position of how to resolve the potential problem

25   with the stock.  As I said, I could have immediately just said
```

```
1   sell the stock without any further ado.  But when I thought
2   about the consequences of doing that, it would lead to exactly
3   the opposite of what the rules are designed to prevent, which is
4   using inside information to potentially profit my wife's
5   account.  Because if the case, as you apparently are assuming,
6   will have any kind of impact on the stock, I would have
7   benefited myself, considering my wife owns the stock, it would
8   have benefited us as husband and wife to sell the stock.  So I
9   determined that that was not appropriate.  Because I think it
10  would be a major triumph of form over substance to just go ahead
11  and sell the stock and let come what may.  And that's why I took
12  the additional step of asking my attorney to create the trust so
13  that it would be placed beyond my control and I would not
14  potentially benefit if the Court's decision adversely impacted
15  Cisco.  So it was kind of a reverse conflict which created a
16  situation which is unique.

17           But as I say, I think the cases are very -- the case
18  with Judge Payne is very similar because of the fact that it was
19  in his IRA which he has access to, but it was managed by someone
20  else.  So someone else could take action that he wouldn't know
21  about on a continuous basis.  And that's the same thing here.  I
22  don't know on a continuing basis what stocks my wife buys and
23  sells.  She has more than one account, and what we do is we try
24  to get them all together and put them on our report.  And that's
25  what we did in this case.  So I think that the case is very
```

1   distinguishable factually from the cases that Cisco relies upon,

2   and it is unique in the sense that it is unusual, though

3   certainly permissible, for the party in which she owned the

4   stock to be the one complaining.  You certainly have a right to

5   do that.  But it did create an unusual situation for the Court,

6   and I dealt with it in the best way I thought that I could.

7           So the Court will decline Cisco's motion that it

8   recuse itself and prepare an opinion explaining the reason for

9   its doing so, and thereafter -- and I can't promise how soon it

10  will be, the opinion on the merits of the case.

11          All right.  Is there anything further from counsel?

12          MR. ANDRE:  Nothing from Centripetal, Your Honor.

13  Thank you for your time.

14          MR. JAMESON:  Nothing from Cisco, Your Honor.  Thank

15  you.

16          THE COURT:  All right.  Then I will end the hearing at

17  this point.

18          (Whereupon, proceedings concluded at 3:16 p.m.)

19

20

21

22

23

24

25

22

1                              *CERTIFICATION*

2

3          *I certify that the foregoing is a true, complete and*

4  *correct transcript of the proceedings held in the above-entitled*

5  *matter.*

6

7          _____

8                   Paul L. McManus, RMR, FCRR

9                        _____

10                              Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

          Paul L. McManus, RMR, FCRR Official Court Reporter