**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| CENTRIPETAL NETWORKS, INC.,     ) | |
|                      ) | |
|     Plaintiff,          ) | |
|                      ) | |
| v.                        ) | Case No. 2:18-cv-00094-EWH-LRL |
|                      ) | |
| CISCO SYSTEMS, INC.        ) | |
|                      ) | |
|     Defendant.        ) | |

**REPLY IN SUPPORT OF CISCO SYSTEMS, INC.'S**
**MOTION TO PARTIALLY STAY THE CASE**

Cisco's motion is a straightforward request to pause proceedings on a single patent for a discrete period of time while the PTAB concludes an IPR in which it already found that the arguments for unpatentability "seem particularly strong." Cisco's Motion For Partial Stay of the Case, Dkt. 664 ("Mot.") at 1. Centripetal's brief spends as much time pre-litigating the trial record on the Rule 63 merits issues as it does addressing the question before the Court: whether to stay proceedings on the '856 Patent until the Patent Office issues its Final Written Decision on that patent's validity, due in May 2023. Importantly, Centripetal concedes that *even if* the '856 Patent survives the IPR, the final IPR record can impact the merits of its infringement case. *See* Centripetal's Opposition, Dkt. 666 ("Opp.") at 8. That is why—regardless of the outcome of the IPR—it is more efficient to focus on the infringement and validity issues regarding the '806, '176, and '193 Patents first, while staying proceedings on the '856 Patent until the PTAB issues its Final Written Decision.

Working through the record regarding the issues of infringement and validity on a patent-by-patent basis is a common sense, practical approach under any circumstance. It is the approach the parties and the Court followed in the trial of this matter. Here, if the Court takes up

the '856 Patent last, the PTAB may well have invalidated the '856 Patent or, at a minimum, the arguments Centripetal made to the PTAB to save the '856 Patent may impact the issues the Court would then have to resolve on infringement.  This reply will focus first on the efficiencies created by a partial stay, and then will address Centripetal's various attempts to change the subject.

## I.      A Partial Stay Is The Most Efficient Procedure

The narrow relief that Cisco is seeking—a brief, partial stay as to one of the four patents-at-issue—is the most practical path to avoid inefficiencies.  Given that there is already more than enough for the parties and the Court to do during the next six months—*i.e.*, adjudicating the infringement and validity issues on the other three patents—this partial stay request is akin to a scheduling decision to prioritize the three patents for which there is not an IPR, while the PTAB determines whether the '856 Patent is invalid.[1]

Cisco's request is well within the Court's discretion.  *See* Mot. at 2-3.  Cisco need not make a "clear and convincing" showing, as suggested by Centripetal, for the Court to grant this stay.[2]  Sequencing the work on the '856 Patent, such that it follows the other three patents while

---

[1] The PTAB already has found 7 of the 11 patents Centripetal originally asserted against Cisco to be invalid, and the PTAB already has found that the merits of the '856 IPR "seem particularly strong," so this is not a situation where a defendant is banking on an unlikely outcome from the Patent Office.

[2] Centripetal's brief repeatedly suggests that Cisco must show it is entitled to a stay by a "clear and convincing" showing.  *See* Opp. at 1, 5, 6, 8.  Of the dozen-plus cases cited by both parties from this district addressing stays for IPRs, none requires a "clear and convincing" showing.  Instead, this is purely a discretionary issue for the Court, as confirmed by the Federal Circuit in *Ethicon v. Quigg*, and is evaluated by the 3-part test described in Cisco's Motion.  *See* 849 F.2d 1422, 1426-27 (Fed. Cir. 1988).  In contrast, Centripetal relies on a 1983 case from the Fourth Circuit that was not even a patent case and was issued almost three decades before IPR proceedings even existed.  *See Williford v. Armstrong World Indus., Inc.,* 715 F.2d 124, 127 (4th Cir. 1983) (cited at Opp. at 6).  The other case that Centripetal cites also involves a now-obsolete, pre-IPR proceeding that the district court explained as follows:  "the reexamination process, if it is a typical one, would not conclude for another six years."  *Sunbeam Prod., Inc. v.*

the PTAB finishes the IPR proceedings, eliminates any possible inefficiency created by litigating a patent that either (i) will be found invalid in a Final Written Decision in May of 2023 or (ii) will survive IPR proceedings due to arguments made by Centripetal that could impact its infringement case, as it concedes.  *See* Opp. at 8.

### A.    The Partial Stay Proposed By Cisco Is Efficient

The efficiencies created by Cisco's proposal are rooted in the proposition that the issues of infringement and validity should be adjudicated on a *patent-by-patent* basis. This is consistent with how the evidence was presented at the trial and how parties' closing presentations were heard,[3] including having different attorneys present the arguments on different patents.[4] Likewise, the parties should submit Rule 63 briefing that is directed to the issues of infringement and validity for each specific patent, consistent with *Mergentime Corp. v. Washington Metro. Area Transit Auth.,* 166 F.3d 1257 (D.C. Cir. 1999).[5]  It is reasonable and practical to conduct this process for the '806, '176, and '193 Patents between now and May 2023.

The only potential inefficiency that Centripetal identified is its assertion that some witnesses might need to testify twice if Cisco seeks to recall witnesses.  First, Cisco has not made such a request, and it is currently evaluating the trial record for this purpose.  While Cisco

---

*Hamilton Beach Brands, Inc.,* No. 3:09CV791, 2010 WL 1946262, at *3 (E.D. Va. May 10, 2010).

[3] *See* Dkt. No. 544 (6/8/2020 Trial Tr.) at 3018 (requesting "argument on the patents one at a time, so it's not going to work out to just have one big chunk of time for the plaintiff" and thus "tak[ing] each patent separately and then tak[ing] damages separately").

[4] *See* Dkt. No. 547 (6/9/2020 Trial Tr.) at 3185 ("Because of the fact that we were dealing with the patents one at a time, I think it only makes sense that the attorneys who handled the patents handle that portion of the closing.")

[5] The briefing could be a series of briefs on each patent or a combined brief with different sections directed to each patent.

has not completed this analysis, it anticipates the need to re-call far fewer witnesses than it suggested at the time of the status conference, and perhaps none at all on the infringement and validity issues on the '856 Patent.  But, no matter the outcome of Cisco's analysis, Centripetal's concerns are greatly overstated.  Specifically, the only potential overlap is that Centripetal had the same experts testify regarding both the '856 Patent (which would be stayed) and the '176 Patent (one of the three patents that would not be stayed).  Dr. Cole testified on the issue of infringement of those two patents, and Dr. Jaeger testified regarding validity of those two patents.  *See* Opp. at 10 n. 4.  For its part, Cisco had different experts testify on each patent, and so no Cisco witness would need to be re-called twice.[6]

Of note, trial testimony was presented in modules, on a patent-by-patent basis, which makes perfect sense in a patent case.  Although the same Centripetal experts handled both the '856 and '176 Patents, there was nothing overlapping about the testimony itself on the issues of infringement or validity.  Instead, each witness clearly demarcated when he finished addressing the issue of infringement (for Dr. Cole) or validity (for Dr. Jaeger) on one patent and moved to the next patent.  *See* Dkt. No. 509 (5/13/2020 Trial Tr.) at 884:22-885:2; Dkt. No. 511 (5/14/2020 Trial Tr.) at 937:4-18; Dkt. No. 545 (6/9/2020 Trial Tr.) at 3099:8-11; Dkt. No. 547 (6/9/2020 Trial Tr.) at 3145:10-20.

---

[6] Even then, the Court had two separate modules of testimony, such that the cross-examination for infringement issues was completed before that same expert witness moved on to invalidity issues.  *See* Dkt. No. 524 (5/27/2020 Trial Tr.) at 1922 ("Counsel, I think it would be helpful to the Court to take these issues one at a time. So I'm going to have cross-examination on the issue of infringement at this point, and then we'll move into the validity and do the same thing then.")

The only other witness whom Centripetal identified as potentially being re-called twice is Sean Moore, one of the named inventors on all of the patents.  Cisco will not re-call him, as Federal Circuit precedent makes clear that any patent-specific testimony he could offer—*i.e.*, his understanding about what the claims should cover—is irrelevant.  *Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008) ("As we have explained, 'it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO.' . . . We hold that inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction.") (citations omitted).  But if the potential inefficiencies identified by Centripetal are of concern to the Court, Cisco would accept, as a condition for a partial stay, that it will not seek to re-call any witness twice.

The net result of Cisco's request is that the parties would prioritize the briefing (whether trial briefs or supplemental findings of fact and conclusions of law) and any oral argument or recalled witnesses by focusing first on the infringement and validity of the '806, '176, and '193 Patents.  Then, when the PTAB issues the Final Written Decision in May 2023, the parties and the Court can do the same thing on the '856 Patent if that patent survives.  If the '856 Patent does not survive the IPR, then the Court can move directly to the issues of willfulness and damages, if necessary.

**B.     Proceeding With the '856 Patent Now Would Guarantee Inefficiencies**

There are two possible outcomes to the '856 Patent IPR in May 2023, and proceeding with infringement and validity issues on that patent now, as Centripetal demands, will create inefficiencies under either scenario.

<u>First</u>, if the PTAB invalidates the asserted claims of the '856 Patent, that invalidity ruling would control unless it is reversed by the Federal Circuit.  *See Fresenius USA, Inc. v. Baxter*

*Int'l, Inc.,* 721 F.3d 1330, 1347 (Fed. Cir. 2013) ("In light of the cancellation of Baxter's remaining claims, Baxter no longer has a viable cause of action against Fresenius. Therefore, the pending litigation is moot."); *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1294 (Fed. Cir. 2018) (affirmance of Patent Office invalidation of claims "collaterally estops [the patentee] from asserting the patent in any further proceedings").  As a result, any work regarding the '856 Patent will have been a waste of time for both the parties and the Court.

Cisco explained in its Opening Brief that "Cisco is not aware of any decisions where courts in this district have proceeded to trial on a patent that already stands invalidated in an IPR while that decision is on appeal." Mot. at 5.  In response, Centripetal offered no examples from this district to the contrary.  Even more telling, Centripetal's *nationwide* search came up with a grand total of two cases: one is a microscopic exception that is inapplicable here; and the other does not involve an IPR at all.  In the first case—*Boston Scientific Corporation v. Edwards Lifesciences Corporation*—the parties had each asserted infringement claims against the other in the same case, and the effect of the stay would have been to disarm one of the parties, leading the Court to conclude that "there is merit to maintaining a level playing field if both parties, potentially, pursue injunctive relief in the future, depending on the trial outcome".  No. CV 16-275-JFB-SRF, 2018 WL 1891403, at *3 (D. Del. Apr. 20, 2018).  The second case was not even about an IPR; it was decided years before the enactment of the statute that created IPRs.  *Power Integrations Inc. v. Fairchild Semiconductor Int'l Inc.,* No. CIV. 08-309-JJF-LPS, 2008 WL 5335400 (D. Del. Dec. 19, 2008).  In that case, the claims had been rejected in an *ex parte* reexamination (which is not bound by a statutory deadline), and it had not yet entered the appellate stage of that process before the PTAB, which would ultimately reach a final decision on whether the claims stand rejected.  *Id.* at *1.

Second, and alternatively, if the '856 Patent survives the IPR, then at the very least the statements made by Centripetal in defending the patent would have to be evaluated because they could create new estoppels that would impact the scope of the '856 Patent claims, which then would negatively impact Centripetal's infringement case.  Mot. at 3-4.  This point stems from a fundamental premise of patent law: a patentee cannot convince the Patent Office to give it a patent by distinguishing its invention from certain subject matter, and then turn around in the district court and assert that a defendant is infringing that patent by doing the very thing the patentee had to distinguish to get the patent.  *Aylus Networks, Inc. v. Apple Inc*., 856 F.3d 1353, 1359-50 (Fed. Cir. 2017).  This is an application of the classic maxim that "you can't have your cake and eat it too."  *Id.* at 1360 ("Extending the prosecution disclaimer doctrine to IPR proceedings will ensure that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers.").

Even Centripetal concedes that the '856 IPR proceeding can create a record that will limit the scope of its infringement case.  Opp. at 8.  While Centripetal dismisses this critical factor as one that is present in any instituted IPR, that ever-presence is a key reason why courts stay most cases when there is an instituted IPR.  *See* Mot. at 3-4.  Likewise, Centripetal's hope that its statements will not constrain its infringement case, *see* Opp. at 8, is a litigant's aspiration.  And it already appears incorrect given that, in the IPR, Centripetal has *distinguished* its claimed invention from the mere filtering of "decrypted data," which is what Centripetal accused Cisco's products of doing to infringe the patent.  *See* Mot. at 4 n.2.

The key point is that the Court will have to take up exactly that question on a full record if the '856 Patent survives the IPR.  This is in addition to the more general guidance that the PTAB's findings can provide to the Court, as the Court noted in recently declining to lift the stay

in the *Centripetal Networks, Inc. v. Palo Alto Networks, Inc.* case.  *See* Civil Action No. 2:21-CV-00137, Dkt. 317 at 3.  ("The PTAB's findings during IPR proceedings of the instituted patents may assist the Court when construing claims in a *Markman* hearing on related non-instituted patents").

### C.      The Original Stay Confirms The Efficiency of Cisco's Proposed Stay

Centripetal spends much of its brief accusing Cisco of trying to endlessly delay proceedings in this case, and characterizing Judge Morgan's Order to lift the original stay as being relevant to the issue currently before the Court.  But it was Judge Morgan, not Cisco, who decided to enter the Order staying the case, and the net result of that decision was to save an enormous amount of judicial and party resources.  The Patent Office invalidated over half (six out of eleven) of the patents Centripetal originally asserted, and Centripetal dismissed its infringement claims against Cisco on those patents.  Dkt. No. 633.

Against that backdrop, Centripetal's reliance on Judge Morgan's decision to lift the stay is curious.  Judge Morgan did *not* lift the stay with respect to the six patents for which IPRs had been instituted (like the '856 Patent here).  Instead, he lifted the stay with respect to five patents that either were never the subject of IPR proceedings or for which the PTAB had denied institution of IPRs.  Dkt. No. 68 at 7 (lifting the stay "as to the patents and claims not currently subject to IPR").  In sum, Judge Morgan did the *opposite* of what Centripetal now seeks, *i.e.*, he did *not* proceed to trial on a patent for which an IPR had been instituted.

Centripetal's real complaint is that it only likes some parts of the Patent Office's procedures, but not others.  But just as a patentee like Centripetal is allowed to keep going back

to the Patent Office to get more and more patents issued from the same original application[7] and then can serially assert them against companies like KeySight, Palo Alto Networks and Cisco, the same laws allow companies to defend themselves by explaining to the Patent Office why those patents should never have issued in the first place.  *See* Mot. at 2.  Centripetal's overarching theme—that somehow it has played by all the rules of the Patent Office and yet the world is still out to get it—is an unjustifiably one-sided view of the governing law and procedures.

## II.   Centripetal's Remaining Points Are Incorrect and Off-Topic

Centripetal fills its brief with charges against Cisco that have little to do with this Motion, but attempt to skew the Court's view of the record before the Rule 63 proceedings begin in earnest.  Cisco will briefly respond to each.

### A.   The Undue Delay Charge

The opening pages of Centripetal's brief read as if Cisco controlled the docket leading up to the last trial.  But Judge Morgan set the schedule, issued the stay, and then lifted that stay only for patents that were not the subject of instituted IPRs.  Lost in Centripetal's list of complaints is that Cisco agreed to a bench trial.  That is an agreement Cisco was not required to make, which allowed the case to proceed to trial rather than being indefinitely stalled due to the pandemic. Dkt. No. 294.

---

[7] For example, Centripetal originally filed 7 independent patent applications.  The remaining four patents in this case were each "continuation" applications (i.e., later-filed applications that relate back to an earlier application) from a subset of these original 7 applications.  Centripetal has filed 40 more continuation applications so far, all relating back to those original 7 applications.

B.      The IPR Abuse Charge

Centripetal alleges that the "IPR request that PAN filed abus[ed] the IPR process, as PAN has no interest in the '856 Patent and is not accused of infringing the '856 Patent. Indeed, the PTAB is considering dismissing the petition for reasons of harassment."  Opp. at 4.  The PTAB spent 12 pages in the Institution Decision addressing and rejecting Centripetal's accusation.  *See* Mot., Ex. A at 12-23.  The PTAB concluded:

> [Centripetal's] arguments fail to persuade us to exercise our discretion to deny institution based on harassment and gamesmanship.  Under the circumstances here, we do not view [PAN's] challenge to the '856 patent as contrary to the AIA's purposes.

*Id*. at 20.  On this record, Centripetal's statement that the "PTAB is considering dismissing the petition", Opp. at 4, is incomplete (at best), given that the PTAB already had categorically rejected Centripetal's argument.  Although Centripetal has filed motions to reconsider or review that decision, there is no reason to think the PTAB is likely to reverse course.  In the unlikely event that the IPR institution is withdrawn, the Court obviously could lift any stay at that point.

C.      The Underfunded Innovator Charge

Centripetal's portrayal of itself as an under-resourced litigant, Opp. at 1-2, also does not square with the evidence.  Jonathan Rogers, Centripetal's Chief Operating Officer, told Congress earlier this year that Centripetal invested $200 million into research and development. *See* https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=4967 (testimony at 34:50-35:15) (last viewed Nov. 14, 2022).  And those are not the only resources available to it.  Its Chief Financial Officer revealed at his deposition that Centripetal's litigation campaign has benefited from financing from an outside corporate entity, though he refused to identify the entity or the amount or terms of the financing. Ex. A, 12/11/2019 Deposition of Paul Barkworth at 44-46.

**D.      The "Competitors" Charge**

Centripetal's characterization of the parties as "competitors", Opp. at 11, is contrary to the factual record, and does not affect Cisco's request for a partial stay, because Cisco's proposal to proceed on a patent-by-patent basis with the '856 Patent handled last is the most efficient way to resolve the case in any event.

Besides, Centripetal's suggestion that the parties are competitors cannot withstand scrutiny. At trial, Centripetal's VP of Sales, Chris Gibbs, could not identify a single lost sale to Cisco. Trial Tr. at 1330:17-20. This is not surprising, as he also admitted that their products "do not compete" and that they "have different roles". Ex. B (DTX 1689, at 54:9; 56:5). Centripetal's CEO—Steve Rogers—also confirmed that Centripetal's product "worked in conjunction" with products from companies like Cisco. Dkt. No. 499 (5/7/2020 Trial Tr.) at 272. In fact, Centripetal's Director of Information Security, Jess Parnell, acknowledged that Centripetal even buys and uses Cisco's accused switches itself. Ex. C (DTX-1692 at 14:24-25). To be clear, the vast majority of damages that Centripetal seeks is tied to Cisco selling accused routers and switches, which Centripetal does not sell. As to Cisco's firewalls, Centripetal's products were intended to work "in conjunction with" such products, not in lieu of them. Dkt. No. 499 (5/7/2020 Trial Tr.) at 272.

The only other fact witness whose testimony Centripetal cites regarding being a "competitor" of Cisco is Jonathan Rogers, Opp. at 11, whose testimony was short on specifics and long on generalities. Judge Young rejected this type of conclusory testimony from Jonathan Rogers on a different issue in the *Palo Alto Networks* case (before it was reassigned to this Court): "The declarations from [Jonathan] Rogers contain conclusory allegations that are unsupported by relevant details. [H]e provides no details on which patents, what the questions

were, or the nature of his responses." *Centripetal Networks, Inc. v. Palo Alto Networks, Inc.*, No. 2:21-cv-00137, Dkt. No. 285 at 19.  The same will be shown here.

Accordingly, nothing in the parties' relationship suggests that a partial and limited stay regarding the '856 Patent only would cause Centripetal any cognizable harm.  On the contrary, it would save judicial and party resources while the PTAB completes its work.

> **E.      The "Technicality" Charge**

Centripetal's contention that the prior verdict was vacated on a "technicality," Opp. at 1, is an interesting characterization of a decision on an issue of such importance that Chief Justice Roberts made this the first topic he addressed in his 2021 Year-End Report on the Federal Judiciary.  *See* https://www.supremecourt.gov/publicinfo/year-end/2021year-endreport.pdf at 3-4 (last visited Nov. 14, 2022).  As the unanimous decision of the Federal Circuit chronicled, Centripetal invited this error by attempting to waive an unwaivable conflict and opposing Cisco's motion for disqualification.  *Centripetal Networks, Inc. v. Cisco Systems, Inc.*, 38 F.4th 1025, 1028-29 (Fed. Cir. 2022).

This Court will now reach its own conclusion about who is right on the merits, as the Federal Circuit ordered that Cisco is entitled to a new adjudication of this record "without regard

for the vacated opinions and orders." *Id.* at 1040.  Centripetal's rhetoric cannot turn that

mandate into a mere formality.[8]

### F.     The Recalcitrant Defendant and Willful Infringer Charges

Centripetal presents a caricature of Cisco as both a recalcitrant defendant and a willful

infringer.  Opp. At 4, 10.  Neither charge can be reconciled with the trial record, but the key

point now is that none of these allegations provides a basis to depart from the efficient path of

focusing on the infringement and validity issues regarding the '806, '176, and '193 Patents while

the PTAB concludes the IPR on the '856 Patent.  Out of an abundance of caution, Cisco briefly

responds to both charges.

Despite the picture Centripetal paints, this is *not* a case where Centripetal sued Cisco

after the two parties could not resolve a disagreement about whether Centripetal's patents cover

Cisco's products.  Instead, Centripetal sued Cisco out of the blue, with no prior notice to Cisco

about *any* allegations of patent infringement on *any* of Centripetal's patents, and Centripetal

accused Cisco of willfully infringing eleven patents.  Dkt. No. 29 at ¶¶ 65-71.

Centripetal's current story that Cisco must have learned about and copied the technology

disclosed in Centripetal's remaining four patents is the same story it told for all eleven patents in

the original version of this case, and the same story it tells about other defendants in other cases,

---

[8] Other jurists looking at the merits of similar infringement issues on two of these patents already have found for Cisco.  There have been foreign proceedings regarding the infringement of foreign counterparts of two of the asserted patents (the '176 and '806 Patents).  While these foreign proceedings are not binding on this Court, their outcome demonstrates that a reasonable jurist can conclude—as Cisco has asserted all along—that Cisco's products do not infringe these patents.  More specifically, the asserted claims of the '176 and '806 Patents have foreign counterpart patents in Germany that are materially identical to the U.S. patents.  A German court in December 2021 found Cisco's accused products (the same products as issue here) do not infringe based on facts undisputed in this case (confirming that a similar resolution is reasonably possible here).

such as KeySight and Palo Alto Networks ("PAN").[9]  The Patent Office has found that the technology disclosed in seven of the eleven patents that Centripetal originally asserted against Cisco was so old and well known by the entire public (not just Cisco)—years before Centripetal met Cisco—that they are invalid.  Centripetal nonetheless contends that its extraordinary "copying" allegation must somehow still be correct as to the remaining four (perhaps soon-to-be three) patents in this case.

Centripetal's reference to its investment meetings with Cisco change the picture.  Cisco has a business unit whose primary responsibility is to consider investment opportunities in start-up companies, Dkt. No. 540 (6/4/2020 Trial Tr.) at 2834:4-7, and it has well over 100 meetings per year.  Id. at 2834:8-11.  Centripetal repeatedly reached out to different Cisco employees to solicit investment, even in different parts of Cisco's organizational structure.  Dkt. 499 (5/7/2020 Trial Tr.) at 256:7-15 and 258:13-15; Dkt. No. 514 (5/18/2020 Trial Tr.) at 1224:23-1225:5; Dkt. No. 516 (5/19/2020 Trial Tr.) at 1234:7-9.  At the same time, Centripetal was pitching many other companies, and it hired Oppenheimer to assist in trying to raise capital for it from over 140 companies.  Dkt. No. 499 (5/7/2020 Trial Tr.) at 294:3-296:3.  None of them chose to invest.  *Id.* And none of the meetings that Centripetal solicited with Cisco impacted Cisco's development of the accused products.  Cisco called the lead product development witnesses for each of the accused products.  None had even heard of Centripetal when they designed the products, much less learned anything from Centripetal.  *See* Dkt. No. 522 (5/26/2020 Trial Tr.) at 1779:2-1780:23; Dkt. No. 529 (5/28/2020 Trial Tr.) at 2196:2-9; Dkt. No. 536 (6/3/2020 Trial Tr.) at

---

[9]  Indeed, in its multi-patent lawsuit against PAN, Centripetal makes the same "willfulness" allegation against PAN, telling almost exactly the same story: that Centripetal met with PAN to discuss a possible investment, and then PAN instead copied and stole Centripetal's patented technology.  *Centripetal Networks, Inc. v. Palo Alto Networks, Inc.*, No. 2:21-cv-00137, Dkt. No. 1 at ¶¶ 50-60; Opp. at 4.

2569:23-2570:12; Dkt. No. 521 (5/21/2020 Trial Tr.) at 1733:22-1734:5; Dkt. No. 535 (6/2/2020 Trial Tr.) at 2530:20-2531:10.  Simply put, this lawsuit was the apparent price for Cisco listening to Centripetal's repeated investment pitches but ultimately passing.

On this record, Centripetal's "copying" case against Cisco relies on generalized allegations from—again—Jonathan Rogers.  Opp. at 10 n.5.  But despite the massive trial record Centripetal touts, it never identified any specific secret that Cisco allegedly learned from Centripetal, nor any specific person at Cisco who allegedly copied anything.  Centripetal instead builds it case on the generalized testimony of Mr. Rogers.  Cisco looks forward to showing that Judge Young's recent conclusion about Mr. Rogers—"he provides no details on which patents, what the questions were, or the nature of his responses"—is equally applicable here.  In the meantime, nothing about this merits preview can undermine the efficacy of a partial stay regarding the '856 Patent.

## CONCLUSION

Cisco respectfully requests that the Court partially stay proceedings, only with respect to the '856 Patent while the PTAB concludes the IPR.

Dated:  November 14, 2022

CISCO SYSTEMS, INC.

By:___*/s/ Dabney J. Carr*_____
      Of Counsel

Dabney J. Carr, IV, VSB No. 28679
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutman.com

Charles K. Seyfarth, VSB No. 44530
**O'HAGAN MEYER**
411 East Franklin Street, Suite 500

Richmond, Virginia 23219
Telephone: (804) 403-7137
Facsimile: (804) 237-0250
cseyfarth@ohaganmeyer.com

Louis N. Jameson (admitted pro hac vice)
Matthew C. Gaudet (admitted pro hac vice)
John R. Gibson, VSB No. 72968
Jennifer H. Forte (admitted pro hac vice)
**DUANE MORRIS, LLP**
1075 Peachtree Street, N.E., Suite 1700
Atlanta, Georgia 30309-3929
Telephone: (404) 253-6900
Facsimile: (404) 253-6901
wjameson@duanemorris.com
mcgaudet@duanemorris.com
jrgibson@duanemorris.com
jhforte@duanemorris.com

Joseph A. Powers (admitted pro hac vice)
**DUANE MORRIS, LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
Facsimile: (215) 689-3797
japowers@duanemorris.com

John M. Baird, VSB No. 77827
Christopher J. Tyson, VSB No. 81553
**DUANE MORRIS, LLP**
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
Telephone: (202) 776 7851
Facsimile: (202) 478 2620
cjtyson@duanemorris.com

*Counsel for Defendant*
*Cisco Systems, Inc.*