# EXHIBIT 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - -
                                      )
 5  CENTRIPETAL SYSTEMS, LLC,         )
                                      )
 6          Plaintiff,                )   CIVIL ACTION NO.
                                      )   2:18cv94
 7  v.                                )
                                      )
 8  CISCO NETWORKS, INC.,             )
                                      )
 9          Defendant.                )
                                      )
10  - - - - - - - - - - - - - - - - - -

11

12

13              TRANSCRIPT OF RULE 63 PROCEEDINGS
                        (VOLUME III)
14                    Norfolk, Virginia

15                     June 26, 2023

16        (Courtroom sealed by Order of the Court)
             (Pages: 642-649, 656-668, 694-696)
17

18

19  BEFORE:  THE HONORABLE ELIZABETH W. HANES
                 United States District Judge
20

21

22

23

24

25
```

```
1   APPEARANCES:

2          KRAMER LEVIN NAFTALIS & FRANKEL LLP
           By:  Paul Joseph Andre
3               Lisa Kobialka

4                   AND

5          KAUFMAN & CANOLES, P.C.
           By:  Clark James Belote
6               Counsel for Plaintiff

7

8          DUANE MORRIS LLP
           By:  Louis Norwood Jameson
9               Matthew Christopher Gaudet
                Alice E. Snedeker
10              John R. Gibson

11                  AND

12         TROUTMAN PEPPER HAMILTON SANDERS LLP
           By:  Dabney Jefferson Carr, IV
13
                    AND
14
           O'HAGAN MEYER, PLLC
15         By:  Charles Kalman Seyfarth
                Counsel for Counsel for Defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1              (Hearing commenced at 9:47 a.m.)

 2              THE COURT:  Madam Clerk, can you call our next

 3      matter, please.

 4              THE CLERK:  Civil Action 2:18cv94, Centripetal

 5      Networks, LLC, versus Cisco Systems, Inc.

 6              Mr. Andre, is Centripetal ready to proceed?

 7              MR. ANDRE:  We are, Your Honor.

 8              THE COURT:  Good morning.

 9              THE CLERK:  Mr. Jameson, is the defendant ready to

10      proceed?

11              MR. JAMESON:  We are, Your Honor.  Good morning.

12              THE COURT:  Good morning to you all.  Welcome to

13      everyone.  Nice to see everyone again.  I'm disappointed not

14      to see Mr. Hannah here today, but I heard he has better

15      things to do than to be here.  So was he able to reach the

16      airport on Friday?

17              MR. ANDRE:  He did, Your Honor, and his family and

18      he are safe and sound in Europe somewhere.

19              THE COURT:  Very well.  Very well.

20              So, Mr. Andre, who will be leading the charge for

21      you all today?

22              MR. ANDRE:  Your Honor, I'll be doing the '176

23      patent, and Ms. Kobialka will be doing the damages.

24              I think we have a housekeeping matter to start

25      today.
```

```
 1              THE COURT:  All right.

 2              MS. SNEDEKER:  Thank you, Mr. Andre.

 3              Good morning, Your Honor.  Alice Snedeker for Cisco

 4    Systems, Inc.  As you probably recall, we have admitted a

 5    few exhibits and a couple of pages to exhibits, so just to

 6    perfect the record, we wanted to tender those this morning.

 7              THE COURT:  Go ahead.

 8              MS. SNEDEKER:  So we have DTX-1, which has the

 9    additional pages per your order on Thursday; DTX-369, which

10    has the additional pages per your order on Thursday; we have

11    a new exhibit, DTX-1717, per your order on Thursday --

12    that's the patent owner's preliminary response in connection

13    with the IPR for the '176 patent; and DTX-1718, which is the

14    PTAB's decision on the '176 patent IPR; and then on Friday,

15    Your Honor allowed us to add a page to PTX-1193; and then

16    Centripetal added two pages to PTX-569.

17              So with your permission, Your Honor, I'll tender

18    these to the courtroom deputy.

19              THE COURT:  Thank you, yes.

20              Mr. Andre, when you're ready.

21              MR. ANDRE:  Your Honor, we have some binders we

22    would like to pass up.  Would it be okay, right now?

23              THE COURT:  Go right ahead.

24              MR. ANDRE:  And, Your Honor, in the binders there

25    are two pages that we have slides of the source code.  We
```

1    are -- we don't want to close the courtroom, so we're going

2    to black out the screens, but I'll refer you to the page

3    number on the slides so you can look in your binder, if

4    that's okay.

5           THE COURT:  That's fine.  I think you are, to some

6    degree, at least redacting for purposes of this hearing, and

7    that's the same process that Judge Morgan used.

8           MR. ANDRE:  Yes.

9           THE COURT:  Did he make any findings relating to

10   the source code and the need to close the courtroom or make

11   those redactions during the hearing?

12          MR. ANDRE:  I don't recall if he made any specific

13   orders.  Ms. Kobialka may know.  She has a better memory

14   than I do.

15          THE COURT:  And maybe the different question is, do

16   you want to place on the record your basis for seeking to

17   redact those or effectively seal those for purposes of this

18   hearing?

19          MR. ANDRE:  Yes.  For the purposes of the source

20   code, this is Cisco's source code, and the source code is

21   considered very highly proprietary, and I'll let them make

22   their own record for it, but the general practice in patent

23   cases is the source code is the one last piece of the case.

24   It's usually sealed.

25              We have a -- when we get to the damages phase this

1    afternoon, there will be a lot more issues about

2    confidentiality with financial information.  But we can seal

3    the record.  The way I would describe it, we won't need to

4    seal the actual transcript, I don't believe, but it's just

5    the actual demonstrative exhibit is what we would like to

6    make sure it's not in the public record.

7         THE COURT:  I understand.  And I don't think I need

8    to hear from Cisco.  I think it's appropriate.  I'll deal

9    first just with the source code that, for purposes of your

10   presentation, that the slide which contains that information

11   will not be present to those viewing the trial, but the

12   Court has a copy, and, obviously, both of the parties have a

13   copy.

14        You can go ahead when you're ready.

15        MR. ANDRE:  May it please the Court.  So you have

16   me doing the '176 patent today.  I'm not the engineer that

17   Mr. Hannah is, but I'll do my best to muddle through it.

18        I'm going to start off with the new claim

19   construction issues that Cisco is raising.  We just had

20   admitted some documents related to Centripetal's response to

21   Palo Alto Network's IPRs.

22        I noticed this in our, really, the -- when Cisco

23   filed its trial brief, that they were bringing up claim

24   construction for the very first time all over again, and in

25   their finding of facts and conclusions of law, they also

1    were talking a lot about claim construction and how the
2    patent should be interpreted.
3         And that concerns me because it's like changing the
4    rules after the game is over.  It's like playing football
5    and you get six points for a touchdown and three for a field
6    goal, and the game is over.  Then after the game is over,
7    you say, well, we're going to give you ten points for field
8    goals.  You may have changed the way you played the game if
9    you knew the rules were going to be that way.
10        In this case, we have a situation where there was a
11   claim construction order with Judge Morgan.  We tried our
12   case pursuant to that order.  I put a timeline up here to
13   give you an idea of what I'm talking about.
14        There were two patents -- two IPRs filed for the
15   '176 patent back in 2019, and -- or, actually, it's 2018 we
16   filed.  We put our responses in 2019, and one for the '193.
17        The case was stayed pending those IPRs, and when
18   the stay was lifted, we had the claim construction process.
19   At that point, Cisco could have raised the IPR responses
20   that Centripetal provided.  They chose not to.  So we had a
21   claim construction order and a trial based on that claim
22   construction.
23        And you noted last week that Judge Morgan changed
24   one of his constructions midway through trial.  He did it in
25   a way that Cisco could respond to it.  He actually gave it

1    -- it was a construction that we proposed back in the claim

2    construction hearing in February.  He went with our

3    construction instead of theirs.  He would say he flipped.

4    And that was on the one patent that we lost on.  So me being

5    a little bit cynical, I think he may have threw away our

6    pillage.  He may have already made his mind up.

7            After the trial, there was another round of IPRs

8    filed against these patents, the '176 and '193, and by

9    Palo Alto Networks, and that was done in December of '21.

10           Now, when this case landed back on Your Honor's

11   doorstep in October, we had a case management conference,

12   and you said, What do we need to do?

13           Now, at that point, if Cisco would have said, well,

14   we have got these IPR responses, we would like to revisit

15   claim construction, we could have briefed it properly, let

16   Your Honor have both sides, hear both sides of the story,

17   and consider the claim construction.  And if the claim

18   construction changed, then we could have possibly recalled

19   different witnesses.  We could have recalled Dr. Cole for

20   the '176 patent, for example, and had him give an opinion

21   based on the new claim construction, the new rules of the

22   game, as it were.

23           But because Cisco didn't inform anybody, the Court

24   or us, that they were going to revisit claim construction

25   until their May 26th trial brief, which is -- it's pretty

1    clear what they were doing at that point.  You know, we

2    didn't really have a chance to, you know, decide if we

3    wanted to bring more witnesses, and so forth.

4            So my position is, is that Cisco had two

5    opportunities to raise the claim construction based on

6    Centripetal's response to IPRs.  They didn't bring it up at

7    either time.  That's been waived.  So I wanted to get that

8    on the record.

9            Now, one of the things that I encourage Your Honor

10   and all judges to do is what they call rolling claim

11   construction.  You talked about it, and this is one of the

12   cases on rolling claim construction from 2010, the *Pressure*

13   *Products Med Supplies* case.

14           What I liked in this case is, I've always

15   encouraged Courts to look at -- once you have claim

16   construction, just sometimes you're thrown right in the

17   case, and you don't really know much about the facts, and it

18   can change.  But as this case noted, the discriminated

19   judgment was early enough in trial to give a party the

20   opportunity to consider the new constructions and adjust its

21   arguments to account for the change.  I think that's

22   fairness.  That's a fundamental fairness of how the game is

23   played.

24           Well, this is something that was sprung on us just

25   recently with a trial brief, proposed finding of facts and

```
 1    conclusions of law, and I think at this point Cisco should
 2    not be permitted to change their -- request to change their
 3    claim construction based on their new positions now.
 4            The trial record hasn't changed.  I appreciate what
 5    they're trying to do.  They're trying to change the rule
 6    after the game.  It's a smart tactic, but it is changing the
 7    rules after the game has been played.
 8            THE COURT:  Let me, I guess I have two questions
 9    based on that.  I guess, then, my question would be -- I
10    mean, claim construction, it's a legal issue, right?
11            MR. ANDRE:  It is.
12            THE COURT:  Reviewed de novo?
13            MR. ANDRE:  It is.
14            THE COURT:  So let's say theoretically -- and,
15    look, I mean, the terms that Judge Morgan interpreted, those
16    are not really the arguments that you all have made before
17    me.  You have really made different arguments, it seems to
18    me.
19            So how would you -- let's say that I, to some
20    extent, agree with you but think that there is some claim
21    construction that I need to do at this stage.  How do you
22    propose we proceed, if that's where I landed?
23            MR. ANDRE:  Like I said, this is my first time for
24    a Rule 63 hearing.  We're in uncharted territory.  I would
25    suggest that if there was a claim construction issue that
```

1    Your Honor had, that you would at least give the parties a

2    briefing opportunity to do so, because we have not had the

3    opportunity to brief that issue.  We're trying to address it

4    on the fly here in these closing arguments, but it is

5    something that has not been addressed.

6         Some of the issues -- and I'm not sure which ones

7    you're specifically talking about, in which patents, that

8    would be the issues that were not considered by Judge

9    Morgan.  The standard rule is that, you know, ordinary

10   meaning applies, and no special meaning is necessary.

11        What Cisco is proposing is special meanings based

12   on IPR responses, because it changed in the prosecution

13   history.  But like I say, they had that for months.

14        To the extent Your Honor wants to hear additional

15   information on that and how that might change, I think at

16   the very least you'd have a briefing schedule and allow the

17   parties to present their positions and come in here and

18   argue them, and if you find that there was a change in

19   construction, it would be material and affect one party or

20   the other.

21        I think, you know, I'm going to get shot for saying

22   this, but, you know, if this is going to affect us

23   negatively, we would like to recall some witnesses based

24   upon the claim construction issue.

25        THE COURT:  So you maybe gave the example of the

1   prosecution history, and argument that Cisco made on Friday

2   was the interpretation of the word "the" with, for example,

3   in the '806 patent.  I don't recall reading discussion of

4   that during the Markman hearing, and I don't believe that

5   Judge Morgan's opinion addressed specifically that.  That

6   was raised on Friday.

7        So I just want to understand.  Take that as an

8   example.  Is your point, then, that you would want to -- I

9   don't see that there would be any evidence to be presented

10  or additional -- I mean, so just walk me through how you see

11  that playing out.

12       MR. ANDRE:  So it's interesting because the "a" and

13  "the," you know, with the antecedent basis and the article

14  "a" or "an" is on my very next slide because that is

15  relevant to the '176 patent.  In that particular instance,

16  if it would be -- for the '176, I don't think it would make

17  any difference because we actually gave -- we actually gave

18  proof of either construction.  They were keying that up in

19  their expert report.

20       Now, Judge Morgan's order, which is vacated,

21  obviously, he handled that situation based on the argument

22  that was made at the trial, the "a" and "the" language of

23  the '176 patent.  So in that particular instance, it

24  probably wouldn't have had any material impact.  It's a

25  legal briefing, is all it is, and I've got cases in my next

1     two sides.

2            So that's really what I consider the old claim

3     construction.  It's not the prosecution history.  It's a

4     pure legal issue of what -- we can add the word -- the

5     antecedent words "the" or "the" and said how that affects

6     the articles "a" and "an," A-N.  So I think that is probably

7     a little bit different issue.

8            What I'm more concerned about is the type of broad

9     sweeping, this is what the claim means from a prosecution

10    history perspective, more so than a pure legal finding.

11    And, like I said, with respect to the '176 patent, we

12    understood their argument of what we call artificially

13    narrowing the claim, improperly narrowing the claim, and we

14    addressed it at trial.  And in Judge Morgan's order, like I

15    say, he addressed both of our proposals.

16           THE COURT:  So it sounds like -- and I just want to

17    repeat this so I am sure that I understand your position --

18    that really your suggestion or request, really, is as it

19    relates to the prosecution history, not some of the other

20    arguments that have been made by the parties?

21           MR. ANDRE:  Yeah.  It's when they're trying to go

22    back to the prosecution history, and the specification and

23    say this has this legal implication because the claim should

24    have been limited to this or something that Centripetal

25    said, and the IPR is limited to the claims, something along

 1    that lines, that's what we're concerned about.

 2          The pure legal issues and the antecedent basis, "a"

 3    and "the," I think we're in good shape on that, so I don't

 4    think that's as much of an issue.

 5          THE COURT:  Let me ask just one other question.

 6    The prosecution history, everything but the recently

 7    admitted documents related to the '176 patent, those were

 8    all available to both parties at the first trial, right?

 9          MR. ANDRE:  That's correct.

10          THE COURT:  And so I don't -- while you may -- you

11    know, to me those are two different arguments.  So as it

12    relates to this '176, that's one argument, but I don't see

13    that you could make the same argument regarding anything

14    that was available to you initially.

15          So is it just as to these two new documents that

16    you're making the argument as to?

17          MR. ANDRE:  Yeah.  The stuff that was made

18    available initially, I think it's a straight-up waiver.  I

19    mean, the fact that it was not brought up with Judge Morgan

20    when we had the Markman hearing -- and I think at one time

21    it was actually brought up in the briefing, and they dropped

22    it.  So there is definitely a waiver there that they had

23    a -- they had that issue in front of them actually, and the

24    prosecution history was brought up -- prosecution history of

25    estoppel was brought up in summary judgment, and we opposed

1    it.  So it is something that was addressed previously, and

2    they had that chance.

3          Now, with the new IPRs filed against the '176 and

4    the '193 that Palo Alto Networks filed after the trial,

5    that's what I'm saying, that they should have raised it back

6    in October when Your Honor asked us, what would this enjoin

7    bring?  What issues do we need to bring up?

8          And they had two fact witnesses and one expert

9    witness that they, you know, said they were going to recall

10   in this hearing, and they didn't raise the fact that they

11   wanted to raise the prosecution history or the prosecution

12   history estoppel or the fact that they wanted to revisit

13   claim construction.  That would have been the time to do it.

14   Now --

15         THE COURT:  But wait, just to be clear, the only

16   two documents that I have admitted, which is the DTX-1717

17   and 1718, relate to '176.

18         MR. ANDRE:  Right.

19         THE COURT:  You just mentioned '193 as well.

20         MR. ANDRE:  The only two admitted that is '176,

21   that's correct, Your Honor.

22         THE COURT:  All right.

23         MR. ANDRE:  I'm sorry about that.

24         THE COURT:  So I understand your argument.  I am

25   going to give Mr. Jameson an opportunity to respond.  It may

1   not be something that I decide today, but I understand your

2   argument.

3           MR. ANDRE:  Thank you, Your Honor.

4           And that takes me to the next slide, which I can

5   say is Cisco's old claim construction argument.  This was

6   done during the trial.  This is the -- where they're trying

7   to rewrite the claim.  They said "a" network device means

8   the same network device, it's a single device.  And we

9   argued during the trial the "a," the word, the term "a," the

10  article "a" means one or more network devices.  And the law

11  is very settled on that.

12          Then when you go back to the antecedent word "the,"

13  where it says, "the network device," that means the one or

14  more network devices.  Now, on the next slide, I have the

15  case law that confirms this, and this is in our briefing as

16  well.

17          The article "a" that -- I could give you 50 cases

18  on "a."  "A" means one or more.  But the *Baldwin* case is

19  right on point.  It basically -- you know, when it says,

20  "This record does not contain a clear indication that the

21  applicant departed from the general rule for the article

22  'a.'  Nothing in the claim language, specification, or

23  prosecution history compels an exceptional reading of 'a' in

24  this case."

25          The holding at the end, it says, "As noted above,

1    the use of a definite article ("said" or "the") to refer

2    back to an initial indefinite article does not implicate,

3    let alone mandate the singular."

4            That's what Cisco is trying to say.  They are

5    saying it makes it a single, you know.  It doesn't do so.

6            "Because the initial indefinite article ('a')

7    carries either a singular or plural meaning, any later

8    reference to that same claim element merely reflects the

9    same potential plurality."

10           I think that is dispositive of the whole issue of

11   "a" and "the."  And just to close the loop on that, in our

12   next slide, our patent specification actually says that in

13   Column 15, lines 4 through 8.

14           It says, "The various methods and acts may be

15   operative across one or more computing devices and networks.

16   The functionality may be distributed in any manner or may be

17   located in a single computing device."

18           It can be one or many, and that's what the claim

19   language says.  The specification says this.

20           I want to get the issue of the claim construction

21   out of the way first, and then I can turn to infringement,

22   unless Your Honor has some questions on that.

23           THE COURT:  I guess I do, then.  I understand your

24   argument and the case law.  Could you put the slide where

25   you had the claim language up.  Thank you.

1          And so the red, you're saying, is what you're

2     arguing has been added.  The same does not appear, for

3     example, in the claim, right?

4          MR. ANDRE:  Your Honor, so what we did was we took

5     the original language, "a network device," and put in what

6     they proposed to have the claim to mean, "the same network

7     device."

8          THE COURT:  So I guess my confusion, I can read the

9     case law, and that case law makes -- that can make sense.

10    Where I, then, have some confusion is the purpose of this

11    patent is to correlate something which is received and

12    something which is transmitted.

13         If your argument is -- well, let me ask.  Is your

14    argument, then, that when the claim references "network

15    device," it can be different network devices that are being

16    correlated?  Is that your argument?

17         MR. ANDRE:  Absolutely.

18         THE COURT:  So what's, then, the purpose of

19    differentiating between that which is received and that

20    which is transmitted from different network devices?

21         MR. ANDRE:  So the way -- depending on how you're

22    going to do the correlation, if you're going to do it by

23    ingress or egress or both, because you can do either one,

24    the idea here is that, when you go through a network, the

25    more -- you know, the example that was given about the

1    tunnel, the car that goes in blue and comes out red, there

2    is changes in network addresses, so you want to correlate on

3    both sides of a network device.  You want to get the

4    information, log information on both sides of the network

5    device, and so you can do that either by doing the ingress

6    or egress, which we give evidence of, or you can do that by

7    doing this ingress on one network device here, egress on one

8    network device next to it, because that -- the log

9    information from the second device is actually logging the

10   egress of the first device.  Does that make sense?

11           THE COURT:  It does.  Did Dr. Cole testify to this,

12   what you've just explained to me?

13           MR. ANDRE:  Generally speaking, not specifically.

14   That's why I said we were positioning it so we could --

15   because you can do it with a single device, and that's what

16   Cisco is arguing, and we said if that's the case, it's still

17   infringed.

18           But the claim also allows for multiple devices.  He

19   generally refers to it -- refers to the documents that show

20   it with syslogs, and also it talks about it with the other

21   type of log order that can be done.  And some of the

22   documents talk about, that are in the case, talk about the

23   unidirectional multiple devices, and he actually used a

24   demonstrative that had multiple devices, as well, which

25   comes up in his slide deck.

1          So what we were doing at the time was saying, you

2    know, if you're going to play this game of trying to make it

3    a singular device, then we'll beat you at that game, too,

4    because a singular device can do the correlation as well,

5    because it does both ingress and egress, and the device can

6    do that, and, in fact, that was what the overwhelming

7    evidence showed.

8          As I go through my presentation today, I'll show

9    you that evidence.

10          THE COURT:  All right.  Go ahead, then.

11          MR. ANDRE:  Well, let me turn to the infringement

12    of the '176 patent.  And one of the things I also want to

13    address in infringement and how the '176 is a little bit

14    different than the other two patents is this idea of direct

15    infringement in the integrated systems, the CRM claims.

16          Now, for the '193 patent, the accused products are

17    just the switches and routers.  I think Mr. Hannah handled

18    that fine.  Every claim element goes back to the switch or

19    router.  All you have to do is read the verb in the claim

20    language, and you will see every verb says -- every action

21    is done by the switch or router in that claim.  So the

22    direct infringement and the case law that Cisco keeps going

23    to is not even relevant to the '193.  But to the '806 and

24    the '176, we have the switches and routers and firewalls

25    plus a software component from the cloud; DNA or FMC or

1   Stealthwatch.

2           I wanted to kind of give you our position on this

3   and kind of give you kind of an idea of how I think about

4   it.  I'm not an engineer, but I have a Peloton.  Do you know

5   what Peloton is?  I have a Peloton bike in my garage.

6           THE COURT:  A what?

7           MR. ANDRE:  A Peloton bike.

8           THE COURT:  Oh, yes.

9           MR. ANDRE:  I have a bike in my garage.

10          THE COURT:  Hold on a second.

11          Go ahead.

12          MR. JAMESON:  Your Honor, I hate to do this in

13  closing statements, but if we're going to revisit '193

14  issues and '806 issues, in light of what we've already done,

15  we're never going to get out of here, and I thought we were

16  talking about the '176 patent.

17          MR. ANDRE:  I am drawing the distinction between --

18          THE COURT:  Let me -- I mean, I agree with

19  Mr. Jameson that we can't go backwards, but to the extent

20  that I did ask for a comparison between the two on this

21  specific issue, I'll allow you to address that.

22          MR. ANDRE:  Okay.  So I equate it to a Peloton.  If

23  I buy a Peloton bike, which I have in my garage back home, I

24  can ride the bike, but if I pay a subscription, then I get

25  these very fit young men and women encouraging me to ride

 1   more.  And nothing happens to the bike.  I don't have to go
 2   in and get another piece of equipment.  There is not another
 3   component.  I just pay, say, I want my subscription, and I
 4   am now getting video feeds of people who are trying to
 5   motivate me to get in shape.
 6           So that's kind of what the -- how the Catalyst
 7   switch and the routers, how they interact with Stealthwatch
 8   and, to an extent, DNA as well.  These are not components
 9   you buy.  If you get Stealthwatch or DNA, you don't buy a
10   component.  You pay for a subscription.  And all of the
11   stuff you need to run DNA or Stealthwatch is on that box.
12   It's integrated, and it's foundational to what the switch
13   and router is, or the firewall is.
14           You heard Dr. Medvidovic talk about it.  I asked
15   him what's integrated.  He said it's in the architecture.
16   All you have to do is flip a switch, and your Catalyst
17   switch is now running Stealthwatch, and that's it.  You
18   don't have to download anything.  You just have to start
19   taking the information it gives, just like my Peloton.
20   That's what the record shows.
21           And we give you in all the -- not even all of the
22   exhibits, that shows how these systems are integrated.  And
23   you see all of the trial testimony.  This was the great
24   weight of evidence throughout the case.  So I wanted to give
25   that, you know, understanding that this was what was

1    presented.

2          And we keep hearing about this *Deepsouth* issue,

3    this case law *Deepsouth*, and how it would relate to the

4    '176.

5          Just going back to my Peloton example one more

6    time, there is one more point I want to make.  If I go to

7    the gym in my hotel here, which I have not gone to this

8    week, unfortunately, and they have a Peloton bike, I could

9    log into my account, and it would operate like I am sitting

10   in my garage, because it has all of the hardware, it has all

11   of the chips.

12         The advancement in computing chips and processing

13   power means these things are integrated into these systems,

14   architected into the hardware.  So all you do is just get it

15   from a cloud feed.  And everybody has said that Stealthwatch

16   is a cloud, DNA is a cloud.  They made pictures with boxes,

17   but they're not really -- it was something I couldn't really

18   follow, but some kind of computing power.

19         But when you buy that service, subscribe to that

20   system, is what the evidence showed, all you're doing is

21   just flipping a switch.

22         Now, Cisco keeps bringing up *Deepsouth* and

23   extraterritoriality, not a direct infringement, I'm sure

24   they'll be bringing up again.  And this is a synopsis from

25   the Supreme Court, and it is very specific.

1          It held, "That statute proscribing unauthorized

2     making of any patented invention within United States did

3     not preclude defendant manufacturer, barred by combination

4     of patents," which we'll hear what that is, "from American

5     market for machinery used in deveining shrimp, from

6     exporting its deveiners, in less than fully assembled form,

7     for use aboard."

8          Now, combination patents, that's what they used to

9     call these, you have two pieces that are not patentable,

10    just old prior-art stuff, and you put them together, and you

11    make a new invention.  That's what a combination patent is.

12         And so what this case held was -- it was very, very

13    specific about extraterritoriality, using stuff from

14    overseas, exporting things overseas.

15         The Federal Court has said in the *Paper Converting*

16    *Machine Company* case that, "*Deepsouth* was intended to be

17    narrowly construed as applicable only to the issue of

18    extraterritorial effect of the American patent."  That's

19    what the Federal Circuit says.

20         So *Deepsouth* is completely off base to what we're

21    talking about here.  We're talking about just a subscription

22    to a cloud-based service that you get, like I get with my

23    Peloton bike.  It's the same thing.

24         This is more akin to a case I tried back in 2008,

25    the *Finjan/Secure Computing* case.  In that case -- and this

1    is a reason you start seeing CRM claims in a patent after
2    2010 in every case.  You notice every claim we have, we have
3    an identical CRM system.  The CRM is identical.  Here is my
4    great reveal.  This is the reason you do this, because if
5    the code is on the box, just turning it on doesn't get you
6    out of infringement.
7          So the claims here with the routers and switches,
8    the code is on the box.  The processor is on the box.  In
9    order to get Stealthwatch, DNA, whatever it is, you're not
10   buying another component.  It's not like *Deepsouth* where you
11   buy two different components and put them together.  You
12   just take the subscription, just like they did on *Finjan*,
13   they flip the switch, and you start getting the information
14   you need.
15         And going back to Stealthwatch, I gave you a ton of
16   exhibits that showed how it was integrated with the routers
17   and switches.  And the next slide talks about how by
18   integrating Stealthwatch with other Cisco security
19   solutions, you can gain enhanced segmentation, threat
20   detection, and forensic capabilities.
21         THE COURT:  Let me ask you a question, then, about,
22   in some of the images that were provided, some of the --
23   like Stealthwatch is shown as a separate little computer or
24   device.  Is it not a separate appliance that is also sold?
25         MR. ANDRE:  All computing is done on an appliance

1    up in the cloud somewhere.  You have to have a computer that
2    can access the cloud.  But when you buy -- this is the
3    evidence in the case.  When you buy Stealthwatch, when you
4    buy DNA, you're not buying an appliance.  You don't own the
5    appliance.  You're getting a subscription for something in
6    the cloud.
7         THE COURT:  So let me just, a switch is there is a
8    piece of plastic, a device that you are purchasing, and it
9    has software on it.  So I think the point you're making is
10   Stealthwatch, there is not an associated piece of equipment
11   that it runs on.
12        MR. ANDRE:  The evidence that came in this case was
13   if you get Stealthwatch, you're not going to go get a box
14   and put it in your server rack.  You're going to pay for the
15   service through a Cisco subscription.  And that's an issue
16   that has come up here.  They say you can buy them
17   separately.
18        It's like on my Peloton, I can buy the bicycle for
19   $1,000, and I pay $15 a month for a subscription.  I don't
20   have to have the subscription, but if I want to have the
21   people that motivate me, I do.  I have the bike in my
22   garage.  I don't have the people in London in my garage.  I
23   subscribe to that, and that comes down.
24        I mean, the way you've got to think about it is the
25   code is embedded on the routers and switches, and a

1    subscription paid to Stealthwatch activates that code.

2           THE COURT:  All right.

3           MR. ANDRE:  So the cases that talked about this

4    more recently -- and there is -- I think we've given you a

5    lot of this already.  But if it's designed to be assembled

6    together -- this is the *Hi-Tech* case -- before the

7    operation, the manufacturer may be held liable for

8    infringements, anyway.  I won't read the case law to you.

9    It's in the briefing.  There's been a lot of additional

10   cases, the *Immersion versus Sony* case, in 2005, in the

11   Northern District of California.  And there has been a

12   plethora of case law that says this.

13          By embedding the code on the box -- I mean, and

14   that's a big change in computing.  And you saw that in 2017

15   when they said they had to rewrite entire source code to

16   make this available, to make integrated security on the box.

17   They had to rewrite all of that.  They didn't have that

18   before.

19          A lot of it had to do with this practicality

20   argument.  The computing power got more -- memory got

21   cheaper, and you got more power, more chips, more

22   processors, and now you can put everything you want on the

23   box beforehand, and all they have to do is say I want it,

24   and you unlock the key.

25          So that's the reason the direct infringement case

1    law that Cisco keeps saying with respect to these -- these

2    infringement reads that require, you know, information from

3    the cloud are not the same thing as *Deepsouth* or any of the

4    progeny thereof.

5            Then turning specifically to Stealthwatch, like I

6    said, we gave you a bunch of exhibits.  This is just one of

7    them, where it talks about how Stealthwatch is integrated

8    with other Cisco security products.  We had Dr. Medvidovic

9    talk about what "integrated" means, just on Thursday.  He

10   was not crossed on this.

11           He says integration in the computer world means

12   part of the architecture.  It's part of the architecture.

13   It's baked in, as Mr. Hannah would say.  That's what it's

14   all about.

15           Dr. Cole's trial testimony, when he talked about

16   Stealthwatch -- this is under cross-examination at 1066,

17   lines 14 through 25.  And this is where he was crossed.  You

18   can actually understand this.

19           Stealthwatch is an appliance.  Cognitive Threat

20   Analytics is what Cisco calls a cloud.  And he said, well,

21   there is a Stealthwatch Management Console that's an

22   appliance.  There is also a Stealthwatch that runs in the

23   cloud.

24           And it says:  "Do you believe that Cognitive Threat

25   Analytics is a component of Stealthwatch, or is there

1    another device that's up there in the cloud, if you will?"

2         His answer:  "The way I understand it is that there

3    is a Stealthwatch component in the cloud that contains CTA

4    and Encrypted Traffic Analytics."

5         So -- and all of the evidence says that's what it

6    is; it's a cloud-based product that users subscribe to.

7    That's the evidence in the case.  It's not me saying it.

8    It's not Mr. Jameson, Mr. Gaudet, or Mr. Hannah.  That's

9    what the evidence says in the case.  That's what was

10   presented by the witnesses and the exhibits.

11        And just one last point on the direct infringement

12   claim.  It's about "makes" and "use."

13        As Your Honor is aware, the statute is referring to

14   makes, use, sells, offer to sell.  That's what the statute

15   says.  The code for the accused products is compiled in the

16   United States.  It's made in the United States.  And that's

17   at trial transcript 460, 462 to 464, and on PTX-1932.

18        And Cisco itself uses and tests its products.  They

19   actually use it.  Of course, they use it.  It's their

20   products.  So I have got a bunch of trial testimony.  I

21   won't recite it all because it's in the slide.  But they

22   actually use it as well.  So the direct infringement

23   argument, I think, is a red herring, to say the very least.

24        Unless you have any questions, I'll get to

25   Dr. Cole's evidence that he presented now.

1          THE COURT:  Go ahead.

2          MR. ANDRE:  So Dr. Eric Cole was our expert in this

3    case.  Dr. Cole was the, I think probably the only expert

4    who was an industry guy.  He is not a professor.  He

5    actually lives and breathes and sleeps cybersecurity.  He

6    wrote the book "The Network Security Bible," and he's

7    written over 50 such books.  He writes texts and articles

8    about cybersecurity.

9          He began his career at the CIA, setting up that

10   program, doing break-in scenarios.  He has been the chief

11   technical officer of some of the world's top cybersecurity

12   leaders, like McAfee, Lockheed Martin, et cetera.

13         So he was our expert in this case for the '176

14   patent.  He relied on 14 trial exhibits to prove his case.

15   And to be clear, he could have relied on 50 or 100.  He

16   could have relied on the entire source code.  You have to

17   pick and choose which exhibits you use.

18         I noticed in the findings of fact, they complain at

19   one time that he only uses three documents to prove one

20   element.  But he could have used ten.  There is a time

21   constraint.  You pick the best documents.

22         One of the things Dr. Cole did also, because he's

23   an industry guy that's usually hired by governments or large

24   companies to solve their cybersecurity problems, he likes to

25   test things.  So he had -- when you hire Dr. Cole, you're

1    going to be buying the products, and he's going to put it in
2    his lab, and he's going to test it.  So you'll see some of
3    the evidence of his testing on that.
4            His conclusions were -- next slide -- that the
5    routers and switches identify packets and generate log
6    entries, such as NetFlow or syslog, corresponding to the
7    packets.  The log entries are sent to Stealthwatch where CTA
8    will correlate the log entries from the different networks.
9    And based on the correlation, a rule is generated, and that
10   is sent out to a device in network one.  Those are his
11   conclusions.
12           Now, as we go through the claims -- go to the next
13   slide -- as we've done in the past, we did a system CRM
14   claim, computer-readable media.  They are identical in all
15   respects except for the preamble.  We proved both of the
16   preambles.  And that was not really contested, but let me go
17   through that, nonetheless, using Claim 11 as an example.
18           Next slide.
19           So Claim 11 is a system comprising a processor and
20   memory.  And the way computer claims are written, they're
21   written in -- they have verbs, I like to use.  When you get
22   a mechanical case, they describe plastic lids and bottles of
23   water.
24           Computers are written in a kind of functional
25   language.  So they give you a processor or memory that do

1    things, and you see verbs.  The verbs, when you read these

2    patents, are very important.  They tell you what's doing

3    what.

4            So the preamble was not contested.  We showed three

5    exhibits.  And I won't go through each one of them.  It was

6    not contested, so we got past that element pretty quickly.

7            The second element, we handled these four issues

8    together:  identify a plurality of packets; generate a

9    plurality of logs; identify the next plurality of packets;

10   and generate a plurality of logs.

11           We handled this separately.  This is the

12   transmission and -- receive and transmission languages.  So

13   those elements are very similar.  The first two are like the

14   last two, so we did these all at one time.

15           And as I said, Cisco's primary defense in this was

16   a legal one.  And next slide, please.  I'm sorry.  We

17   referred to this with at least five different exhibits that

18   are listed in slide 23.  That was PTX-408, 1060, 572, 569,

19   and 1849, which is the source code.

20           Cisco's primary defense to this claim was, as I

21   said, a legal one.  They said it had to be a single network

22   device, the same network device, and that that could not be

23   multiple network devices, so we put forward a case that

24   would cover both, a single device or multiple devices.

25           This is important to get the logs on both sides,

1    ones being received and transmitted, because of this idea of

2    the -- what we talked about a little bit last week, the

3    network address translation.

4          And Dr. Cole testified to that when asked about

5    what is Network Address Translation, and he says, I am

6    pausing because I don't want to get too technical.  When you

7    start talking about Network Address Translation, you have a

8    group of computers that are going out, sometimes the

9    addresses, the source, and destination address that you're

10   actually seeing in the initial packet is different than

11   where it actually might get routed to.

12         Now, in simpler times, in public networks, you'd

13   have this, what comes in, you've got to have what's going

14   out.  No one cares because you're describing this public

15   network.  When you get into a private network, you want to

16   protect your private IP addresses from other users.

17         In my office, in my firm, I have a private email

18   address that outside people know, if they send me an email,

19   you know, Paul@Andre.com, it's pretty simple, but how it

20   gets routed in my network is very different, meaning it goes

21   through a New York server, it'll pop up in California, and

22   it's a very private address, because that way people cannot

23   target me without going through my firewall, without going

24   through the process of Network Address Translation.

25         So that's the reason it's important to look at

1    what's happening on both sides, when you start translating

2    packets and packets are changing.  There was a tunnel

3    analogy.  I think it's a nice analogy.

4         So if you don't understand what's happening before

5    and after, you can't stop, what we've talked about, the

6    command-and-control stuff, the exfiltration.  That's the

7    reason you want to look at packets on both sides, because if

8    you don't, hackers can figure out a way they can get into

9    your network, and then they can sneak around in there.  So

10   you've got to understand what's happening.

11        And the whole idea here is if a host computer gets

12   infected by a hacker, you will notice that traffic through

13   the correlation technique, and you can identify it, and you

14   can get a rule out to them and say stop hacking our system.

15        So Dr. Cole talked about that very concept.  And

16   then we relied pretty heavily on Exhibit 1065.  And you've

17   seen this figure on multiple occasions.

18        THE COURT:  Let's just stop there, because I do

19   have some questions.

20        Are you alleging, or why don't you just state --

21   there has been talk about the syslogs, WebFlow, NetFlow,

22   proxy data.  What are you alleging infringes here?

23        MR. ANDRE:  So the Cisco devices can handle certain

24   type of the logs.  The proprietary log is called NetFlow.

25   That's our primary-use case we showed.  But they've also

1    adapted their system to handle what's called syslogs.  So

2    those are the two that we focused on in our proofs.  The

3    trial record shows that both the NetFlow and syslogs would

4    generate the kind of log information that -- the packets

5    being received and packets being transmitted.

6         THE COURT:  So did Dr. Cole -- he certainly

7    testified at length about the infringement related to

8    NetFlow logs.  Did he provide any testimony regarding

9    infringement using the syslogs?

10        MR. ANDRE:  He did.  And I have that in the

11   presentation.  We will get to that.

12        THE COURT:  Okay.

13        MR. ANDRE:  I can jump to it now if you want.

14        THE COURT:  No.  I can wait until you get there.

15        Let me, then, ask about the NetFlow, because as I

16   understood the testimony, the NetFlow logs are a summary of

17   the flow, which could include multiple packets.

18        So how, then, can you -- how does that result in

19   the correlation of packets if it is, to some degree,

20   aggregated?

21        MR. ANDRE:  So if we go back to the -- you go back

22   to the claim language.  You identify a plurality of packets,

23   and you generate a plurality log of entries corresponding to

24   the plurality of packets.  So you're looking at multiple

25   packets, and every time a packet comes through, you will get

some log information, and then they summarize on top.
You're looking at pluralities of packets; you're looking at
flows.

When you're looking at the claim language, it's
talking about identifying -- when you see a plurality of
packets, that's flow.  You identify a flow received by a
network device from the host located in the first network.
You generate the plurality of flow logs, entries
corresponding to the flow.  So plurality of packets is
exactly the flow we're talking about.

We're not talking about -- the way the system
works, based on the record here -- once again, I'm not a
witness here, but based on the information here, the
packets, as they come through, individual packets are being
logged, and then a summary of the flow will go up.  But each
individual packet is being logged as you go through.  Then
you get a summary of that.  So you get a log of the
plurality of packets.

THE COURT:  And so, then, what evidence is there
relating -- I'm sorry, I am skipping ahead a bit -- but
relating to what Stealthwatch actually correlates?  So, I
guess, what's your evidence regarding what and how
Stealthwatch correlates?

MR. ANDRE:  And that's going to be the next claim
element.  I can jump ahead, but there is a lot of evidence

1     on the correlation element.

2          There is no dispute in this case that Stealthwatch

3     correlates these NetFlow telemetry.  There is none.  The

4     dispute in this case was that, are they doing it from the

5     ingress and egress from a single device?  That's that claim

6     language that they rewrote.  That is a major dispute.  There

7     is no testimony that Stealthwatch does not correlate the

8     NetFlow telemetry information.  There is none.  What the

9     testimony is, is that they don't do it the way the claims

10    require.  That's Cisco's position.  That's what the record

11    shows.

12         So when we get to it, I'll show what the record

13    actually does show, what it does correlate, and it

14    correlates the NetFlow logs with NetFlow logs, other NetFlow

15    logs.  That's the very purpose of correlation, especially

16    when you're trying to identify malware, because you're not

17    correlating just, you know, yeah, this is what's happening

18    on the network.

19         Back in the old days, that's what they were.  The

20    old Stealthwatch was just a monitoring tool.  The new one is

21    there to identity using a CTA.  It's there to identify

22    malware, to identify threats.  We have that in spades in

23    evidence.

24         And that's not really -- like I said, it's not

25    really contested.  It's a little bit of a word game that

1    Cisco played that said, yeah, we correlate, we just don't

2    correlate the way the claims require.  So this first set of

3    steps -- the identification of plurality of packets,

4    transmit and receive and then transmit and logging those --

5    that was a big issue, and they did that by, like I said,

6    rewriting the claim language.

7            THE COURT:  Okay.

8            MR. ANDRE:  So, if we go back to slide 26.  This is

9    Dr. Cole under cross-examination.  So this is the evidence

10   that's in the case.  In cross-examination Cisco's counsel

11   says:  "So NetFlow records are being sent to what's called

12   the Stealthwatch Flow Collector, right?"  He's talking about

13   the figure to the left.

14           He says:  "That's correct.  In that box that says

15   NetFlow Exporting Infrastructure, those are the symbols for

16   routers and switches, among other things."

17           Question:  "So this is reflecting what the NetFlow

18   records that you've identified with respect to claim

19   elements B2 and B4, that they're getting sent up to the

20   Stealthwatch Flow Collector, right?"

21           "That's correct."

22           So the first step in the process is you have flow

23   collectors, which are the switches and routers, the

24   collectors, flow collectors -- so that's how Cisco terms

25   them -- with a plurality of packets, and they're sending

1    logs up.  They're sending up the NetFlow logs and other logs

2    as well.

3           Now, one of the things that I talk about in the

4    next slide, Dr. Cole liked doing his own testing.  And if

5    you look at -- this is a -- he has the switch and

6    Stealthwatch, and he's going to configure it himself.  And

7    number 2, it says, "Specify the egress and ingress details

8    for the following."  And he gives you some quality of

9    service things, and then he gives you some flow monitors.

10   He gives you two different report flow monitors.

11          And so that's his, how do you want to do the

12   ingress and egress for the flow monitors?  And this is his

13   testimony, and this was not contested.

14          The question was:  "If you look down towards the

15   bottom of paragraph 2 where it says 'specify the egress and

16   ingress details of the following,' do you see that?  Could

17   you describe what your own testing provided and how it

18   relates to this claim element?"

19          Dr. Cole says:  "When I test the products, I want

20   to make sure I fully understand the products and how they

21   work and operate.  So products often contain help files and

22   resources -- and that's what this is from -- and this

23   resource clearly shows and confirms that what I previously

24   testified to -- testified; that on routers and switches,

25   when you set policies, which can include logging, you can

 1    specify both egress and ingress for the logging or the

 2    policy."

 3            THE COURT:  But your problem is that Dr. Cole

 4    attempted to show that an individual router could be set to

 5    log ingress and egress.  The dispute at trial was whether

 6    Stealthwatch would correlate those two and that -- I think

 7    most of the testimony was that that would return an error.

 8            So this testimony relates to the ingress and egress

 9    of a network device, and what you've argued this morning is

10    that what was really infringed is that it could correlate

11    the ingress and egress from two different devices.

12            MR. ANDRE:  It would actually be the ingress -- may

13    I draw it?

14            THE COURT:  Go ahead.

15            MR. ANDRE:  It would actually be the ingress and

16    ingress, which would be the ingress and ingress of the same

17    device.

18            (Drawing.)

19            So you would have network device 1, the second

20    network device, the flow coming through here to here to

21    here.  And if you are doing logging, let's say at the

22    ingress side, so you have logs going up to Stealthwatch here

23    and logs going up here.  Does that make sense?

24            THE COURT:  It does, but now you're away from your

25    claim language, because doesn't it require what's received

1    and transmitted?

2          MR. ANDRE:  That's exactly what it does.  You're

3    getting a log of what's received here, being a log that's

4    transmitted here.  That log correlates into the system.  So

5    you're getting the transmitted portion right there.  So

6    what's transmitted out of this document, out of this ND1,

7    network device 1, what's transmitted is logged before it

8    goes into network device 2.

9          So that's exactly -- that's if you have one or more

10   network devices, that's specified in the patent itself.  So

11   if you have network device 1, network device 2, this is

12   what's received by network device 1, and this is what's

13   being transmitted by network device 1.

14         THE COURT:  Did Dr. Cole testify relating to what

15   you have just drawn here?

16         MR. ANDRE:  Generally speaking, he testified to it

17   with the syslogs, but the documents themselves actually do

18   state it as well, in the documents we put into evidence and

19   that we've argued in the case.

20         So what we were doing was, we were showing -- what

21   Dr. Cole shows is logged here and here, so you have ingress

22   and egress.  And you are distributing --

23         THE REPORTER:  I'm sorry.  Could you keep your

24   voice up for me.

25         MR. ANDRE:  Sure.  He was talking about the ingress

1    and egress of each device as you go down the system.  So all

2    of these logs are being correlated.  And when we get to the

3    correlation element, I'll explain what I'm talking about.

4           But the actual claim language will permit for a

5    single log going up here to here, multiple logs, both

6    ingress and egress.  But if we were limited to a single

7    device, you would get the logs going up and back, and you

8    would also get bi-directional.  You come back this way, and

9    you get another set of logs.  You get four sets of logs from

10   a single device.

11          Those logs would be correlated.  And we have the

12   evidence that shows that the logs that go up from the

13   NetFlow telemetry are correlated with each other.

14          The only reason you'd want to correlate logs is to

15   understand what's happening in the flow, to understand where

16   the flow -- like, if something is happening here, where you

17   are getting Network Address Translation, and you're coming

18   from, you know, your host here, and this is sending this to

19   some bad actor that's exporting your confidential

20   information, you would want to know that.

21          The only way you can get that is if you know what's

22   coming in and what's going out.  And if it's more than one,

23   it's the same thing.  You're logging all that information.

24   That's what the correlation patent is all about.  And

25   Dr. Cole provided a lot of testimony on that very issue.

1           Now, as we get to the correlation step, I'll

2    show -- the first debate was about whether or not you get

3    ingress or egress logging.  The testimony you talked about,

4    you said that there was an error code.  There was one piece

5    of evidence that was cited for that, and that was source

6    code version of 6.5.4, which was before they had an enhanced

7    NetFlow and before they implemented CTA.  It was old source

8    code.

9           That was the only piece of evidence they show where

10   you get the error log.  There was testimony on it, but -- it

11   was also -- cross-examination was, you can do it, but you

12   might get an error code.  The evidence relied on for the

13   error code was source code that was not accused of

14   infringing.  And that's at trial transcript 2287, 1 through

15   19, and DTX-1610.

16          Cisco is arguing now a lot of lawyer argument with

17   regard to this element, and they're arguing.  It just wasn't

18   at trial.  It's not the trial record.  The trial record is

19   very clear on this.  Ingress and egress -- and I'll go

20   through a few more exhibits -- with the enhanced NetFlow is

21   there.  And then logging, corresponding those logs, I'll

22   show you the evidence of that when we get to the next

23   element.

24          Dr. Cole did his testing.  He also relied on

25   several documents we'll go through very quickly.

1          PTX-1060, he's showed the figure there where you

2    can see the Stealthwatch Flow Collectors and the NetFlow

3    generator and the flow collectors there.  It talks about how

4    you're getting the NetFlow record in key fields and you're

5    getting it going both directions, and you can see Dr. Cole's

6    testimony.

7          So the logs that we're talking about in this case

8    are being generated in actual NetFlow information.  He talks

9    about the proprietary situation, and he talks about the logs

10   can go in and generate and are received by the routers and

11   switches, and when they are sent out by the router or

12   switch.  It shows that NetFlow generators are sending out

13   logs to the collectors.

14         As far as the next slide, this is the Catalyst 9300

15   and 9400 switches.  This is a new -- like I said, brand-new

16   series of switches.  This is something that was not around

17   with the old Stealthwatch.  And with the new Stealthwatch,

18   they configured the Catalyst 9400 switches to support a much

19   enhanced NetFlow, as it were.

20         And if you look at the numbers there, it's pretty

21   astounding.  You can get 384,000 NetFlow entries per switch.

22   That's 192,000 ingress and 192,000 egress.  That's PTX-1060.

23   And when we asked Dr. Cole about this, he says, the second

24   paragraph he is talking about the Catalyst series of

25   switches.

1          If we look at the second line, it talks about the

2     capabilities.

3          THE REPORTER:  I'm sorry.  I'm sorry.

4          MR. ANDRE:  I'm sorry.  I'm sorry.

5          THE REPORTER:  Could you please slow down.

6          MR. ANDRE:  So the second paragraph is talking

7     about the Catalyst series of switches.  If we look at the

8     second line, it talks about the capabilities, the number of

9     entries per switch, and it shows that it logs both on

10    ingress and egress.  So that just further supports his

11    point.

12         Why would you build brand-new switches and split up

13    the capability of the ingress and egress exactly evenly?

14    The world changed in correlation.  The technology, the CTA

15    was not available.  The old Stealthwatch had no interest in

16    trying to figure out where the bad guys are and sending it

17    down.  That was a monitoring tool.  Now you have to find out

18    who the bad guys are, and that's what CTA was all about.

19         The next slide talks about, PTX-572, and Dr. Cole's

20    testimony on that.  The flow record says, "When you

21    configure flow record, you are telling the device to show

22    all of the flow data traffic that enters, ingress, or leaves

23    the device."  And Dr. Cole talked about how that supports

24    his opinion, the ingress and egress.

25         And then finally in Stealthwatch, on the next

1   slide, PTX-569 -- this is the troubleshooting guide -- they

2   talk about how you can set up the ingress/egress in

3   Stealthwatch, where Stealthwatch is going to process both of

4   them.  So I don't think there is really --

5        In the next slide, I'm not going to show you the

6   slide.  We are going to black out the screen.  This is the

7   source code.  This is the source code that Dr. Cole relied

8   on.  This is slide 32.

9        THE COURT:  Okay.

10       MR. ANDRE:  This is Dr. Cole's testimony about

11   that.  "This is showing the actual source code of the

12   devices.  This is showing that it creates a new flow record

13   for the 5-Tuple and copy the metadata info, starting on line

14   54.  Once again, this is what I mentioned earlier, where the

15   5-Tuple is a source IP, the source protocol{sic}, the

16   destination IP," and, et cetera.

17       So this is the actual, the information they're

18   providing.

19       We can go back to the next slide, slide 33.  This

20   was when they introduced the NetFlow configuration guide,

21   Cisco iOS XE, this is that new iOS they talked about.  And

22   this is the new enhanced NetFlow.

23       It says, "The first figure below shows how the flow

24   traffic was tracked before the introduction of the egress

25   NetFlow accounting feature.  The second figure below shows

1  how the flow traffic is tracked after the introduction of
2  the egress NetFlow accounting feature.  The egress NetFlow
3  accounting feature simplifies configuration tasks and makes
4  it's easier for you to collect and track incoming and
5  outgoing flow statistics for the server in this example."
6          This is what the new iOS was about.  This is what
7  the new source code was about, is collecting both types of
8  data.
9          And finally, with respect to the ingress and
10  egress, we also have the testimony of Cisco's engineer,
11  Mr. Llewallyn, saying that you could configure to do both,
12  on the switch and routers, with ingress and egress.
13          So the idea that you cannot do ingress and egress
14  flow collection, I think all of the evidence in this case
15  shows you could.  The only piece of evidence, what Your
16  Honor talked about, was when they said it would create an
17  error code.  That was just the testimony of an expert who
18  relied on source code.  That was not the accused source
19  code, and it did not involve the enhanced NetFlow or the
20  Cognitive Threat Analytics.
21          So based on the evidence that we cited at trial,
22  we've checked the boxes here.  And a lot of the testimony I
23  showed you was actually cross-examination of Dr. Cole
24  confirming that you could actually get this
25  plurality-of-packet logs from these devices.

1            Now we get to the correlation element.  As I said,

2    there is no real debate that Cisco and Stealthwatch

3    correlate NetFlow logs, and they correlate them with each

4    other.  The debate was whether or not the single device is

5    correlated within itself.  That was the whole basis of their

6    expert opinion; it had to be that single device.

7            If you don't have -- if you don't buy the

8    single-device theory, then they have no defense to this

9    element.  And I'll get to that testimony as we go through

10   it.

11           We relied on several exhibits to prove the

12   correlation element.  The one that is prominent is 1065.

13   And I pulled out the relevant pieces of this figure.  This

14   is an internal Cisco document.  And I -- for each piece, I

15   also provided Dr. Cole's testimony regarding this document.

16           It talks about the Stealthwatch will correlate and

17   receive syslogs as it relates to the flow collectors from

18   network devices before and after the proxy.  Dr. Cole

19   provided testimony on that paragraph.  We'll get to that.

20           Perimeter NetFlow brings visibility into outbound

21   traffic of an organization for C&C and emerging threats.

22   C&C is command-and-control.  That's exfiltration.  So

23   they're looking at NetFlow visibility to detect emerging

24   threats.  This was a new capability of Stealthwatch.

25           Then it talks about, "Bringing CTA and Stealthwatch

1    detection together gives us a unique ability to combine our

2    local and global detection capabilities."

3         And then it says, "Customers may use either NetFlow

4    or proxy or both.  The NetFlow data sent into the cloud

5    consists of perimeter traffic, telemetry corresponding to

6    traffic occurring between inside and outside host groups."

7         THE COURT:  You've mentioned the syslogs a couple

8    times, but where are those records coming from?

9         MR. ANDRE:  They're coming from the -- what they

10   call the perimeter device, the network devices.  The

11   switches and routers, can actually pull those.  Stealthwatch

12   can correlate and receive syslogs from the flow collectors

13   from network devices before and after.  So --

14        THE COURT:  When you're talking about perimeter

15   devices, is it clear that those are switches and routers and

16   not some other device, like a firewall?

17        MR. ANDRE:  You might be able to get it from the

18   firewall as well, but they are -- the switches and routers

19   are the primary flow collectors.  So that's the evidence

20   that was in the trial, and I believe Dr. Cole testifies to

21   that paragraph in particular, so you need his word more so

22   than mine.

23        But I'm pretty sure that the syslogs are just

24   another logging form that can be -- you know, you can

25   specify in your device how you want to log it.  You can log

 1  a lot of different ways.

 2       THE COURT:  Right.  My recollection was that

 3  NetFlow is Cisco's flow monitor; whereas, syslogs is just a

 4  different variety of that that may be used by others.  So is

 5  it clear that this Cisco system is using syslogs?

 6       MR. ANDRE:  According to the trial records, yes.

 7       THE COURT:  Okay.

 8       MR. ANDRE:  The evidence in this case shows that it

 9  was.  And, like I said, Dr. Cole testified to this, and

10  there was really no opposition to that testimony.

11       THE COURT:  Okay.

12       MR. ANDRE:  And when it talks about -- you know,

13  when we talk about this document, and there are other

14  documents as well, obviously, but when we get to slide 39 --

15       THE COURT:  Can I ask you one other question about

16  slide 38?

17       MR. ANDRE:  Sure.

18       THE COURT:  So the very last sentence discusses

19  looking at the perimeter traffic, "traffic occurring between

20  inside and outside host groups."  The portion relating to

21  the outside host groups sounds like something different than

22  the internal flows that we've been discussing.  Can you

23  address that?

24       MR. ANDRE:  The flows that we're talking about,

25  they can be from inside to outside.  In fact, that's how you

 1   have the command-and-control, because when you go from

 2   network 1 to network 2, you may go from an internal network

 3   to an external network.  And when you go to the external

 4   network, you want to know what comes back in, in the

 5   bi-directional way.

 6          So the evidence that came into the trial was that

 7   was relevant to -- this is all just not internal -- you

 8   know, internal to internal.  It can be external to internal.

 9   You can come through a firewall right into your first router

10   or switch and then exit.  So I think that's the evidence

11   that was in the case.

12          THE COURT:  All right.

13          MR. ANDRE:  And if we go to the next slide, we talk

14   about -- this is the part that the Cognitive Analytics is

15   going to do analysis.  It says, "Data along with machine

16   learning and threat intelligence."  This is his

17   cross-examination, Dr. Cole's cross-examination.

18          And he says that, "It performs a series of

19   correlations on -- and the important thing for me are the

20   ingress and egress NetFlow data.  There is nothing in the

21   claim that's exclusive to just those two, so there can be

22   other data in there as long as those two NetFlow records are

23   being correlated."

24          And it says, "Just to be crystal clear about the

25   point, is it your opinion that the ingress NetFlow records

1    and the egress NetFlow records are actually correlated in

2    Cognitive?"

3             And he says, "That's correct."

4             THE COURT:  Did he provide similar testimony

5    regarding, for example, syslogs or --

6             MR. ANDRE:  He does.

7             THE COURT:  Okay.

8             MR. ANDRE:  As I walk through this document, if we

9    go to the next slide, on slide 40, there is a section of

10   1065 at Page 5 where there is some other language that was

11   of interest.  This talks about, "Syslog is another form of

12   logging.  So we talked about throughout this trial the

13   different types of logs.  Syslog is that type" -- "is one

14   type.  NetFlow is another type."

15            And the question was:  "What does Stealthwatch do

16   in the next paragraph?  Could you describe what is being

17   referred to there?

18            "Yeah.  So this is talking about the process.  It

19   says, 'Stealthwatch will then correlate to receive syslog

20   and relate it to the flows collected from network devices

21   before and after the proxy, providing deeper visibility into

22   customer web traffic.'  So it's already performing

23   correlation of NetFlow, and then it's using this information

24   to perform some additional analysis."

25            Once again, the weight of the evidence that

1    Dr. Cole testified to was it's doing the correlation of the

2    NetFlow records.  It's also doing additional analysis of

3    syslog.  And I think he also gives further testimony on this

4    a little further down in the testimony.

5         THE COURT:  Is analysis correlation?  I mean, your

6    argument, I think, is that it is but...

7         MR. ANDRE:  If you're doing analysis of logs, yeah,

8    it's correlation because -- the reason you have logs is

9    correlation is comparing the two.  That's the analysis.

10   You're not doing -- through this type of logging

11   information, you're not trying to go in and identify a, you

12   know, signature-based intrusion prevention system, *per se*.

13   You're trying to look at how the traffic flow relates

14   to something that would be in the analysis, would be what

15   CTA does.  It would be akin to this looks like malicious

16   activity, it looks like malicious traffic.

17        THE COURT:  I could analyze the volume of traffic

18   without correlating anything.  So if you're looking at the

19   number of packets that come in and simply counting them,

20   that's an analysis, right?

21        MR. ANDRE:  Only if -- it's an analysis, but it's

22   not an analysis that's going to give you information about

23   bad actions.  This is about security, cybersecurity.  So if

24   you want to do the analysis -- if you're going to look at

25   logs, in terms of cybersecurity analysis on it, you're going

480

1    to do correlation.  That's what the evidence was in this

2    case.

3           The only use of logs for cybersecurity, these

4    different type of logging events and looking at traffic flow

5    and traffic telemetry, the only thing that's useful for, if

6    you want to do the security analysis, you have to do the

7    correlation.  There is no evidence that says otherwise.  And

8    Cisco's documents, all of the testimony in this case, said

9    that's the case.

10          If you're doing cybersecurity analysis, then you're

11   doing logging, you're doing correlation.  I mean, CTA is

12   Cognitive Threat Analysis.  You're using threat intelligence

13   to figure out what this traffic should look like and what it

14   does look like.  If it looks normal, fine.  If you're doing

15   analysis and it looks something different, then you might

16   have a problem.  That's the whole purpose.  That's the whole

17   purpose of the analysis.

18          If it was just a monitoring tool like it used to

19   be -- prior art in Stealthwatch was just a monitoring tool.

20   It didn't do security the way it does today.  It didn't have

21   CTA in it -- then that analysis would have been something

22   different.  They were looking at flow traffic.  Is your

23   network performing properly with traffic flow?  You're not

24   looking for security issues.

25          So that's a big distinction between 2017 and

1   thereafter and pre-2017.  And when you look at documents
2   pre-2017, the analysis there is different than what the
3   analyses are today.
4           If you go to the next slide, this is that one
5   paragraph that talks about using NetFlow or proxy data and
6   talks about the perimeter traffic.  Your Honor asked about
7   this.  And this is Dr. Cole's testimony.
8           He says, "This is referring to the NetFlow data,
9   which is in the switches and routers, and the proxy data
10  that we just referred to, and it says 'Customers may use
11  either...'  Customers can just use NetFlow by itself to do
12  correlation.  It does not need to use the proxy data."
13          "So when you look at this document in its entire
14  context, what does it tell you about the correlation of the
15  '176 patent?"
16          "It shows that correlation can be performed just on
17  the NetFlow data.  So that would be ingress and egress data
18  that we talked about.  It could also perform correlation of
19  just the proxy data, or it could perform correlation of both
20  the proxy and the NetFlow data."
21          THE COURT:  Can you, then, just clarify, because I
22  think when I asked you which logs would infringe, you said
23  it was the syslogs or the NetFlow.  And so here he's talking
24  about proxy data.  So is that different?
25          MR. ANDRE:  To be honest with you, I don't know if

```
 1    he ever answered that question.  I don't know if it was ever
 2    asked of him.  And I'm not an engineer; I don't want to be a
 3    witness here.  And so the evidence in this case showed
 4    overwhelmingly that the NetFlow data is correlated.
 5         THE COURT:  All right.  So you're not trying to
 6    argue that the proxy data is infringing, that the logging of
 7    any proxy data is infringing?
 8         MR. ANDRE:  I'm saying that the evidence shows that
 9    the NetFlow data -- that's what we focused on -- that was
10    infringing.  We think the evidence is very clear on that.
11    So if we had a different claim construction, we might look
12    at the proxy data.  We may have alternative theories.  We
13    may have syslog, and we have other stuff.
14         But in this particular instance, what was very
15    clear was NetFlow -- it was never really any debate about
16    whether or not correlation occurs.  NetFlow data is
17    correlated.  There is just no real question about that.
18    It's just, is it correlated the way Cisco is reading claims?
19         THE COURT:  I am going to take your answer as a no.
20         MR. ANDRE:  Okay.
21         THE COURT:  I mean, because I want to be clear that
22    I understand what you're alleging infringes, and I don't
23    think you've alleged here that it's the proxy data.
24         MR. ANDRE:  I think the evidence shows that the
25    NetFlow data is what we're accusing of infringing.
```

1          THE COURT:  Okay.

2          MR. ANDRE:  I think that's what we've argued in

3   this case, and that's what Dr. Cole testified about.  But,

4   you know, to the extent we had an alternative read, then we

5   would consider that also.

6          We showed you Dr. Cole in the next slide, PTX-591,

7   and it talks about "Cognitive Threat Analytics can now

8   leverage detection from the analysis of WebFlow telemetry to

9   improve the efficiency of analyzing NetFlow telemetry..."

10          So they're using WebFlow to improve the analysis of

11   NetFlow.  So they're using one to make one better; to

12   enhance it.  So it just goes to show that they are using

13   NetFlow telemetry in Stealthwatch.  That's the point.  So

14   they can augment it with other stuff.  Maybe that's what

15   they're doing with the proxy data, and maybe that's what

16   they're doing with the -- like syslog is more akin to

17   NetFlow.  But maybe that's what they're doing with the

18   proxy.

19          But this says, "This is accomplished by the system

20   through correlation of both telemetry types."  It's

21   correlation of both, not correlation together, necessarily.

22   It could be, but they're doing correlation of both telemetry

23   types.

24          So if you have one correlation of NetFlow and you

25   do another correlation of WebFlow, you can take those two

1    correlations and figure out -- enhance it.  And here it says

2    enhanced by approximately 10 percent.

3            Dr. Cole gave testimony on this exact paragraph on

4    cross-examination, and he says:  "Now in this paragraph does

5    it state that NetFlow records are correlated with each other

6    as opposed to NetFlow telemetry and WebFlow telemetry being

7    analyzed at CTA?"  The question that you've logically asked.

8            He says, "Reading this entire document and all the

9    other pieces of evidence... it's my opinion, supports that

10   it not only correlates the WebFlow and the NetFlow, but also

11   the NetFlow data is also correlated among itself."

12           That's in cross-examination, and that was

13   untouched.  That testimony went untouched.

14           If we look to the next slide, PTX-1009.  This is

15   talking about Cognitive Threat Analytics again.  It says it

16   now "can leverage detection from analysis of WebFlow

17   telemetry to improve the efficacy of NetFlow."

18           The same thing, the same paragraph as the previous

19   paragraph, but this is in April 2018.  So this is just --

20   and Dr. Cole testified about that again:  "The analysis of

21   the logs and the NetFlow logs, it can now go in and

22   correlate these types together" --

23           THE REPORTER:  I'm sorry, could you please, when

24   you read...

25           MR. ANDRE:  Yes, I'm sorry.  I get really excited

1    when I read.

2           THE REPORTER:  Thank you.

3           MR. ANDRE:  Anyway, he confirms that you can do the

4    NetFlow individually, you can do them with comparing them

5    with the WebFlow.

6           The next slide.

7           This is a document that's in evidence.  It talks

8    about, "The flow or telemetry represents unidirectional

9    accounting."  This is what I showed you on my picture

10   earlier.  This is a document that would show that "passing

11   through a network device," that you can do logging as it

12   goes from end to end.  "Then the flow will be exported into

13   Stealthwatch that will correlate flows from multiple devices

14   and interfaces and perform stitching and de-duplication

15   action..."

16          So this is the picture I drew up there with the two

17   network devices.  The flow information will go up, and it

18   will be correlated.  It will correlate the flows from

19   multiple devices, and this is in evidence and shows that the

20   claim is met, the claim element is met.

21          And then what did Cisco put in opposition to this

22   correlation element?  Dr. Almeroth testified as follows:

23          "Again, this is based on your requirement" -- it is

24   not an infringement opinion -- that the correlation "be done

25   on the same device; is that correct?"

486

His answer was:  "You have to correlate traffic going into the device with traffic coming out.  You're trying to deal with the obfuscation across that single device.  That's what the '176 patent is about."

So he actually -- the entire basis of his opinion was it's a single device.  And there is evidence to show that:  One, that a single device is not required; and, two, even if it is a single device, the ingress and egress can be correlated.

The testing that was done by Dr. Cole, the documents that were presented of NetFlow correlation by Stealthwatch, the analysis of CTA -- the great weight of the evidence in this case shows that the correlation step was met.  So we checked that box for correlation.

The last element that we looked at was responsive to correlating.  This is where it actually -- if you do the correlation, you generate, based on that correlation, one or more rules configured to identify packets received from the host located in the first network and provision that rule.

So what we had to show there, there was a rule based on the correlation that was generated that was a provision by Stealthwatch to the host.

And in order to do so, we relied on multiple exhibits and source code.  And the very first piece of evidence I'm going to show you -- I'm not going to show it

487

1    to the gallery; it's going to be blacked out -- slide 49.

2            This is the source code Dr. Cole relied on.  So

3    this is the source code from Cognitive Threat Analytics.

4    And he says, "This is the source code for that system, and

5    it's showing how it can identify a suspicious host.  And the

6    way it identifies that suspicious host that's going to

7    require some action, such as sending a rule, is done via

8    correlation."

9            And you can see the actual code itself, it's

10   written in computerese, but you can still understand what

11   it's talking about; "flow host suspicious," and it says,

12   "from correlation."

13           If you go to the next slide, slide 50, Dr. Cole

14   gave you testimony on PTX-1089, and he walks through a

15   flowchart.  It's probably a general flowchart of how rules

16   come from CTA up in the cloud and in Stealthwatch and are

17   provisioned down to the Stealthwatch Management Console

18   where it's then provided to the client or host computer.

19   It's just a flowchart that he presented to show the flow of

20   information.

21           On the next slide, PTX-1018, there was a Cognitive

22   Threat Analytics finding prioritized by risk, and we asked

23   Dr. Cole what this slide was showing, and he said, "If you

24   look at the bottom left-hand corner, based on the analysis

25   that's performed, and if it's escalated and something is

1    critical, then Cognitive Threat Analytics can take action by

2    sending rules that can quarantine a host on that first

3    network."

4              So it's provisioning rules from Stealthwatch.

5              THE COURT:  So there seemed to be some dispute

6    about whether Stealthwatch and/or CTA is providing the

7    analyst with an alert, or it sounds like, based on what

8    you've just read, that it may be your position that the

9    rules actually generate it.  Can you clarify that for me?

10             MR. ANDRE:  Yeah.  They are referred to as ANC, ANC

11   rules.  Adaptive Network Control is the type of rule that is

12   generated.  And based on the analysis that's done up in the

13   cloud, there is CTA about the correlation, and it says

14   something malicious may be happening here.  It can generate

15   a rule, and it can use other resources, but based on that

16   analysis, the rule is generated, and then the rule is

17   provisioned by Stealthwatch to the host, the computer via

18   the Stealthwatch Management Console that Dr. Cole showed

19   earlier.

20             THE COURT:  When you say the rule is provisioned,

21   what does that mean?

22             MR. ANDRE:  That means sent.  It's like I have a

23   boat and a provision.  I'm going to go get food and put it

24   in the boat.  You send something to it.  You supply it.  You

25   supply the rule.  I guess that's probably a better way of

1    putting it, but they use the word "provision" in the claim
2    language.  So the Stealthwatch supplies the rule to the host
3    in the first network.
4         THE COURT:  And does, then, an individual person
5    have to accept or process through, or it happens
6    automatically without an individual being involved?
7         MR. ANDRE:  It would happen automatically.
8         Now, what may happen -- and it's not relevant to
9    the claim language.  What may happen is, based on the
10   analysis done -- all cybersecurity companies hire really
11   smart engineers -- say, hey, something's going on here.
12   They may have to write a new rule.  They may not have the
13   rule in place because it's a new piece of software, right.
14   It doesn't really care where the rule comes from.  The claim
15   is agnostic from that.  It's based on the analysis that was
16   done by CTA.  And then they will provision a new rule.
17        THE COURT:  What about -- I mean, there is some
18   testimony regarding the existence of false positives.  How
19   does the system handle those if the rules are occurring
20   automatically?
21        MR. ANDRE:  False positive.  I mean, the key to
22   cybersecurity is speed.  I mean, you can only imagine.  You
23   can't wait five days for someone to do something to, you
24   know -- for a human being to get involved and put in the
25   middle of this.

1        When you discover malware on your system, you have

2   to act immediately, and it has to be sometimes in the

3   microseconds, because, otherwise, you're not going to stop a

4   breach.  These things happen literally at light speed.  So

5   in order to protect networks, systems are in place that will

6   automatically quarantine people, put rules in place.  It

7   does it very, very quickly.  It has to.

8        Does it make a mistake from time to time?  Does it

9   create a false positive?  Yeah, it does.  But a false

10  positive is better than a false negative.  A false negative

11  means your whole system gets breached.  So that's a debate

12  that all cybersecurity companies have, is how much tolerance

13  do you have for false positive?  Do you quarantine people

14  who don't deserve to be quarantined?  It really can irritate

15  your user sometimes.

16       And so -- but then, again, if you're not catching

17  the malware and you get a false negative and you have your

18  whole system breached, or, you know, there's a highjacking

19  of your entire system and you have some kind of ransomware

20  or something like that, I think that's probably more

21  irritating to users than having a false positive.

22       The false positives are a reality of life in

23  cybersecurity.  You know, you -- you analyze the traffic.

24  It doesn't matter how good your technology is; you analyze

25  it the best you can, and you try to catch the vast majority

1    of it.  And the most important thing is you don't let -- you

2    don't get a false negative.  That's a bigger issue.

3         False positives are a client-relation issue more

4    than anything else, as you could imagine.  If you're the one

5    getting quarantined, you're not going to be really happy

6    about it, if there is no malware there.

7         Talking to the ANC rules, in the next slide,

8    Dr. Cole did talk about how those are applied and how they

9    go through -- go through Stealthwatch.  And he says, "So

10   this is talking about -- the endpoint would be a device on

11   network," you can have rules that action would be taken on

12   device 1.  So this aligns very closely with the claim

13   language.

14        And then in the next slide, PTX-596 is called out.

15   And this is right on point with what I was talking about

16   with Your Honor.

17        "Cisco's Cognitive Analytics," which is CTA,

18   "quickly detects suspicious web traffic and/or Stealthwatch

19   flow records, responds to attempts to establish a presence

20   in your environment to attacks that are already underway."

21        So it quickly detects and responds to attacks

22   already underway, and it does this through the flow records.

23   That's what the flow records are used for in today's world.

24   This is not for analysis of how much traffic you have going

25   through, but it's looking for suspicious activity.

```
 1              It says, "Stealthwatch sends flow records to the
 2   Cognitive Analytics cloud for analysis once it's enabled on
 3   the Stealthwatch system.  By default, Cognitive Analytics
 4   processes Stealthwatch flow records for inside/outside host
 5   group traffic and DNS requests, denial-of-service requests."
 6              "You can specify additional host groups to monitor
 7   inside traffic.  Cognitive Analytics also detects malicious
 8   patterns in encrypted traffic using ETA."  Now, ETA is not
 9   in the case anymore, but that's what it was used for.
10              And then the next paragraph talks about how the
11   Cognitive Analytics works with Stealthwatch to analyze flow
12   records and Network Address Translations.
13              The rest of it is more or less about licensing.
14   That was an exhibit that was presented at trial to support
15   how this automatically detects malware and sends out the
16   rules.
17              And the last document I am going to show you, this
18   is a Stealthwatch guide.  It talks about how "Cisco
19   Stealthwatch is a security analytics solution that can
20   leverage enterprise telemetry from the existing network or
21   public cloud infrastructure.  It provides advanced threat
22   detection, accelerated threat response, and simplified
23   network segmentation using multi-layer machine learning and
24   entity modeling."
25              And then it says, "With a single, agentless
```

1    solution" -- that's key, "agentless solution."  You don't

2    have to have an agent there -- "you get visibility across

3    the extended network including endpoints, branch, data."

4    And it says, "It's the only product" -- well, then it talks

5    about encrypted traffic, but that's not relevant to our case

6    right now.

7            But that just goes -- these documents -- these are

8    Cisco internal documents about Stealthwatch that talk about

9    how they are using the telemetry from the network devices.

10   This is the evidence in the case.  There was not really any

11   counterevidence that Stealthwatch doesn't generate these

12   rules and --

13           THE COURT:  Are you relying on Exhibit 54?  Which

14   document establishes that the rules are generated in

15   Stealthwatch or CTA?

16           MR. ANDRE:  The provision by Stealthwatch and CTA,

17   we have -- I think there are several of these.  The ANC

18   rules in Exhibit 1089 -- and there is several documents.  I

19   pulled out select ones.  The ANC rules talk about how they

20   are provisioned by Stealthwatch.

21           THE COURT:  All right.  That's when I asked you

22   about the provisions.  That's what you pointed to?

23           MR. ANDRE:  Yeah.  And also the document, I think,

24   that also talks about provisioning rules is PTX-1089.  There

25   are two figures in that document.  We pulled out one that

1    showed provision rules to the Stealthwatch Management

2    Console, but there is also other -- another image that

3    Dr. Cole testified to regarding the same thing on that

4    exhibit.

5              THE COURT:  All right.

6              MR. ANDRE:  So with that, we check the last box,

7    and that was our infringement of the '176 patent.

8              I do want to talk briefly about, you know,

9    credibility determinations.  Your Honor has a very difficult

10   task trying to determine credibility without seeing people

11   testify because just reading it empirically, you don't get

12   the same flavor, but the parties did agree that you could do

13   so.  But I think the empirical evidence does show

14   inconsistent testimony and what kind of evidence the parties

15   relied upon.

16             In this case, Dr. Cole relied on, as I showed in

17   many exhibits, his own testing, source code.  He provided

18   testimony on every single -- and in cross-examination, there

19   was not a single blemish on his testimony.  The record was

20   very clear that they -- the logs are generated, the

21   correlation is done, and rules are provisioned based on the

22   correlation.

23             On the other hand, when you look at what the other

24   side put forward, Dr. Almeroth, like the other experts --

25   they had PowerPoints.  There was litigation-derived

495

1    documents, not Cisco documents.  Cisco's own documents

2    contradicted his own testimony.  He kept saying there was no

3    ingress and egress, in spite of the documents you've seen,

4    even here today, let alone all the ones we showed at trial.

5          He did provide an opinion based on the wrong

6    version of Stealthwatch, an older source code than before

7    the -- that's not reliable, and he did not interpret the

8    claims consistently for validity and infringement.  This

9    came up last week.  And one thing I can guarantee you that

10   Cisco cannot point to, the case law about inconsistent claim

11   interpretation.

12         Even the case, the *01 Communique* that they talk

13   about, said, "Claims must be construed the same way for both

14   the invalidity and infringement."  I can get you a list of

15   cases longer than my arm of Federal Circuit and other

16   District Courts saying that you have to construe the claims

17   consistently for validity and infringement.

18         The *01 Communique*, I read that case again over the

19   weekend.  It does not say what Cisco says it says, that you

20   can take inconsistent positions.  What *01* says is, if you

21   have a patentee taking a broad construction for

22   infringement, then they have to have that for validity.

23         In this case, Centripetal has not sought to broaden

24   its claim.  We've lived with the claim construction we got

25   from Judge Morgan.  That's the claim construction we used.

1    What Cisco has done is they have rewritten the claims to

2    make them narrower.  In each one of the three patents in

3    this case, I showed you that during my opening statement,

4    how they try and narrow the claim language.  And then they

5    get an obtuse construction for validity, just kind of

6    generally speaking.

7          So the law in this case does not mean that expert

8    witnesses can come in and say, I don't even believe my own

9    testimony.  They have to give sworn testimony that they

10   believe what they're saying is correct.  And you'll see when

11   we get to our validity response, Dr. Almeroth said, "I don't

12   believe my own testimony.  That's not my opinion.  I don't

13   agree with my own opinion."  So that goes to the credibility

14   of these witnesses when they are willing to come to court

15   and give an opinion that is contrary to their own scientific

16   training.  That's what they're here to do, to give their

17   scientific opinion, not be advocates.

18         So when you have knowingly -- a witness knowingly

19   saying, I am giving one interpretation for validity and one

20   interpretation for infringement.  If the courts are having

21   to start deal with that body of law, heaven help us, because

22   that is just moving the goalpost in the middle of the game.

23         May I ask my colleague a question?  I have a note

24   here I don't understand.  I'm sorry.

25         It's just additional cites to the provisioning

```
1    rules from Stealthwatch:  Page 51 of the presentation, trial
2    testimony, 1006-19 through 1007-1; and Page 52 of the
3    presentation, trial testimony, 1005, lines 16 through 19.
4             THE COURT:  All right.
5             MR. ANDRE:  Unless you have any more questions,
6    Your Honor, I'll maybe take a break.
7             THE COURT:  I have no other questions.  Thank you.
8             MR. ANDRE:  Thank you, Your Honor.
9             THE COURT:  So it is 11:30.  Why don't we take a
10   10-minute break until 11:40, and then we will resume with
11   Cisco.  Thank you all.
12            (Recess from 11:30 a.m. to 11:44 a.m.)
13            THE COURT:  Mr. Jameson.
14            MR. JAMESON:  May I proceed, Your Honor?
15            THE COURT:  You may.
16            MR. JAMESON:  Would you like for me to start with
17   the claim construction issues that came up?
18            THE COURT:  Go ahead.
19            MR. JAMESON:  Just some big picture reactions, it
20   actually did feel like a motion of reconsideration of the
21   motion to supplement that you had addressed on Thursday.
22            Claim construction, obviously, it's a legal issue,
23   and in our reply brief on the motion to supplement, we had
24   cited a number of cases that -- particularly in a bench
25   trial, it's often the case that is part of issuing findings
```

1   of fact and conclusions of law, that that's where the judge

2   issues a claim construction.  So that's a fairly routine

3   thing to happen in a bench trial.  Quite frankly, we cited

4   cases that claim constructions can change during the course

5   of a jury trial, because you learn new things as the case

6   proceeds.

7          Centripetal mentioned a waiver argument, and I just

8   wanted to point out that with respect to the '193 patent, in

9   Mr. Gaudet's presentation on the '193 patent at slide 25, we

10  have cites to the trial record where we addressed the

11  prosecution history relating to the '193 patent.  And with

12  respect to the '806 patent, our expert, Dr. Reddy, provided

13  testimony in the trial transcript beginning at 2546 and

14  running to 2600.

15         So the only thing left to say on that is you had

16  admitted into evidence the recent developments with respect

17  to the '176 IPR, and I'm not even really sure what the issue

18  is on that.  I am going to work through my presentation, and

19  I will make the point that what Centripetal did say to the

20  Patent Office, to defeat that IPR, is actually perfectly

21  consistent with what our noninfringement argument is.

22         The other thing that I wanted to briefly address is

23  Centripetal -- I think they tried to distinguish *Deepsouth*

24  under Section 271(a) because it involved issues relating to

25  extraterritoriality.  I want to provide you with two case

1    cites that make clear that the -- the logic of *Deepsouth*

2    applies to 271(a) generally, and it's not just an

3    extraterritoriality issue.

4            The two case cites would be *Waymark versus Porta*

5    *Systems*, 245 F.3rd 1364 at 1366.  That's a Federal Circuit

6    case, 2001.  And then the other case cite would be *Rotec*

7    *Industries*.  It's at 215 F.3d -- excuse me, 1246 at 1252,

8    note 2, footnote 2, Federal Circuit 2000.

9            With that, I would like to turn to our

10   noninfringement position on the '176 patent.  And before I

11   even get started with the presentation, the first really

12   important observation that I want to make -- and this is

13   stating the obvious, but it's really important in light of

14   what I just heard.  Centripetal has got the burden of proof.

15   We don't -- we don't make the case.  They came to us with

16   allegations, and we defend against those allegations, and

17   confusion should not help them in this case.

18           They have to prove to you that whatever their

19   infringement theory was, that they can check the box with

20   respect to every single claim element.  And a number of

21   times I've heard that Cisco, we rewrote the claims to define

22   the fight, and that's obviously not what happens.  The

23   plaintiff tells us what their allegations are, and then we

24   defend against them.

25           We don't get to make their allegations for them and

1    then defeat our version of their allegations.  And I'm going

2    to walk through in excruciating detail what their

3    infringement theory was at trial, because what we heard

4    today was not their infringement theory at trial.

5           With respect to the '176 patent, the first slide

6    shows that they're not accusing proxy servers or network

7    devices that can generate syslog.  They're accusing routers

8    and switches in combination with Stealthwatch when CTA is

9    enabled.

10          And with respect to the commentary that

11   Stealthwatch -- that it isn't sold but it's integrated in

12   some form or fashion into routers or switches, I am

13   confident that Mr. Andre misspoke when he said that.  I

14   mean, if you look at these white boards and you look at the

15   top right-hand corner, there are two Stealthwatch pieces of

16   hardware that you have to buy before you can begin to use

17   Stealthwatch.

18          They are separately sold products, and when we get

19   to damages, you're going to see a huge number associated

20   with the sale of those products.  And I think I heard that

21   we don't sell those products.  And, Your Honor, I mean, I

22   don't know what to say.  That's just not true.

23          And the idea that Stealthwatch is a separate device

24   from the routers and switches, Mr. Llewallyn testified about

25   it, Mr. Scheck testified about it, Dr. Cole even testified

1    about it, Dr. Mitzenmacher testified about it, and so did

2    Dr. Almeroth.

3         And I will give you just a couple of cites:

4    Mr. Llewallyn, at the transcript 2143 to 2144, and again at

5    2168 to 2169; turning to Mr. Scheck, trial transcript 1695

6    to 1696; and then Dr. Almeroth at 2242 to 2244; and then

7    again, even their own experts, Dr. Cole at 1066 and

8    Dr. Mitzenmacher at trial transcript 453.

9         Dr. Almeroth hit on this a little bit on Thursday,

10   but I wanted to start with -- I really want to -- what's the

11   problem of the '176 patent that they were trying to solve?

12   What was the solution?  And that sets up the claims.  And I

13   said in my opening of our closing the other day that the

14   name of the game is the claim.

15        Well, the name of the game is the claim here.  This

16   claim has very, very precise requirements, and no matter

17   what they point at to start the -- the "a network device,"

18   to get this process flowing, the infringement theory breaks

19   down because of the very specific requirements of the claim.

20        But going back to the problem that they were trying

21   to solve, it was that when packets travel through a network

22   device, something can happen in that network device so that

23   that packet changes in some form or fashion and that the

24   packet can become obscure, and so that's the problem.

25        What happens if something to that packet changes

1    going through a network device and so when it comes out the

2    other side, it doesn't look like what it did when it came

3    into the network device?

4            And they had a very specific solution, which was

5    correlating the packets transmitted by the network device

6    with the packets received by the network device to determine

7    whether or not the packets transmitted by the network device

8    are associated with a flow.  So their solution was

9    correlation.

10           And then if we go to figure 1, figure 1, I think it

11   really helps setting up what the problem is.  And to orient

12   you here, in figure 1 of this patent, you have on the

13   right-hand side at the top, you have network B, and then on

14   the left-hand side at the top, you see network A.  And

15   what's going to happen is packets are going to be

16   transmitted from network B to network A, and it's going to

17   happen with the computer that's located at B-H1 on the

18   right-hand side.

19           That computer is going to transmit packets through

20   the network device 112 that's in red and ultimately find its

21   way to a different networking computer, A-H1.  So there we

22   see the packets, they go into the network device, and when

23   they go into that network device, what happens?  And this is

24   the problem.  For whatever reason, the network device does

25   something to those packets, and it changes them, in this

1    animation, into the color green, and those packets proceed

2    to a different network computer, A-H1.

3         Okay.  The packets have changed.  Okay.  That can

4    be a problem for these filtering taps because what went into

5    the first tap at 126, it looks completely different when it

6    goes into the filtering tap 124.  So what do you do?

7         Well, according to the Centripetal '176 patent

8    solution, we're going to correlate those packets.  So the

9    packets come in.  When they come into that tap, at that

10   packet filter, the tap, you create a log.  The packets go

11   through the network device, they get to the tap on the other

12   side, which is another packet filtering device.  You create

13   a log of what came out.  You send the packets up to a packet

14   correlator, and the packet correlator does an analysis to do

15   its best to match up that packet P1 in green is associated

16   with packet P1 in orange, and P2 in green is associated with

17   P2 in orange.

18        And that's generally what this patent was about

19   with respect to the transmitting and receiving packets and

20   correlating the packets.  And the important thing here is,

21   Your Honor, in figure 1, is you've got a tap, you've got a

22   network device, and you've got another tap.  You've got

23   three different pieces of hardware, and that's why you need

24   to do this correlation because these taps may not know

25   what's coming in and out of the network device.  And why is

504

1    that important?  Because with respect to Cisco routers and

2    switches, we don't have this problem.  And let me explain.

3    Let me explain why that's the case.

4           If you go to the patent specification, there is a

5    very important little cheat sheet that I wanted to bring to

6    your attention.  And this is at -- this is at column 5.

7    This is at column 5.  And beginning at line 13, there is a

8    statement:  "Network device(s) 122, however, may include one

9    or more devices that alter one or more" packets -- excuse

10   me -- "one or more aspects of the packets, (e.g., a

11   flow-transforming device) in a way that obfuscates the

12   association of the packets received from host 114 (e.g., P1,

13   P2, and P3) with the corresponding packets generated by

14   network device(s) 122 (e.g., P1', P2', and P3'," and here is

15   the important point, "At least from the perspective of

16   devices other than network device(s) 122."

17          "At least from the perspective of devices other

18   than network device(s) 122."  Your Honor, they're only

19   accusing a router or a switch.  Okay.  A router or switch

20   knows what comes into it and knows what goes out of it, and

21   that's why the router or switch only needs one NetFlow

22   record, because the first NetFlow record that's created on

23   the ingress, it's got the source information, and it's got

24   the destination information.  The record that comes out and

25   is generated on the other side, if a system is configured

1    that way, the egress record, it's got the same source

2    information, and it's got the same destination information.

3           So we just don't have the problem to need to

4    correlate the two NetFlow records.  And so I will get to

5    that when we get to the actual noninfringement issues, but I

6    thought that that provided some context for why this patent

7    ultimately isn't going to read on the accused technology.

8           Okay.  The final piece of figure 1, and what's

9    required by the claims, is the generation of the rule, and I

10   have shown that here, which is in response to the

11   correlation -- let me back that up.

12          Correlation takes place.  Claims are very specific.

13   It's in response to the correlation that the system has to

14   generate rules and provision the rules into the network.

15          Okay.  So that's an introduction to the patent.  I

16   just showed you figure 4, everything I just walked through.

17   It literally -- figure 4 is a great example of the steps

18   that are required in this system.  Starting at the top, you

19   identify the packets, and you generate the log entries.  You

20   identify the packets transmitted.  You again generate log

21   entries, and then you correlate.  That's figure 4 in the

22   specification.  Okay.

23          Two asserted claims.  We've color-coded this

24   because the various color-coding is to reflect kind of how

25   the pieces of the claim work together, and in step 1 -- and

1    this is very important -- you have a system that's got a
2    processor, and it's got a memory, but at the very end of
3    step 1 at A2, the claims make clear the processor calls this
4    the system two.  So everything that follows, it's the system
5    that is implementing what follows.
6            And in step 1, there's the B1 and B2 elements.  We
7    identify a plurality of packets received by a network device
8    from a host.  That host is located in a first network.  You
9    then, in B2, you create the log entries.  Okay.  And then in
10   steps B3 and B4, you identify the packets that come out of
11   the network device, and you generate log entries, and that's
12   B1 through B4.
13           The log entries that were generated at B2 and B4,
14   they're going to be correlated in the C step of this claim.
15   And then once the correlation takes place, elements D, D1,
16   and D2, they're responsive to correlating.  You then
17   generate and provision the rules.  And that's what we show
18   in the next slide, short-form fashion for how the system
19   works.
20           The one thing I want to call out here, it's -- it's
21   this antecedent basis issue that you keep on hearing about.
22   In claim element B1, the claim requires "a network device."
23   Okay.  Nobody is disputing that the indefinite article "a"
24   can mean one or more.  Okay.
25           The case law was crystal clear that when you use

1    the indefinite article "a" and then it's later followed by

2    the article "the," referring back to the same thing, that

3    whatever you identify as the "a network device," it's got to

4    be the exact same thing in the "the network device."  Okay.

5           So there may be -- there may be multiple network

6    devices that can accomplish something, but whatever

7    you're -- whatever you're going to point to identify as

8    satisfying the "a network device" limitation, then we've got

9    to satisfy that thing with the "the network device"

10   limitation.  You're not allowed to start mixing and

11   matching, and the law is crystal clear on that, and I will

12   provide you some more case law later in the presentation.

13          I've already showed you step C, which is the

14   correlation step.

15          And another important point that -- this really

16   started to come up more on Thursday, but this patent, this

17   claim, it's directed at a unidirectional flow through a

18   network device.

19          And the reason that we know that is that in

20   step B1, we have -- we have packets received by a network

21   device from a host located in a first network.  And then in

22   step B3, we have identify a plurality of packets transmitted

23   by the network device to a host located in a second network.

24          So this claim is set up to where you've got a

25   computer in a first network, and it's sending packets

1   through a network device to a computer in a second network.

2   Okay.  It's a unidirectional flow.

3          First independent basis for noninfringement, it is

4   that the accused system does not correlate as required by

5   the claims.  And this is claim limitation C.  And I want to

6   begin with Centripetal's opening statement at trial, because

7   that's where they really defined what we were fighting

8   about.

9          And in Centripetal's opening statement, when we got

10  to the '176 patent, Mr. Andre said, "We call this the

11  correlation patents.  It correlates packets.  As a packet

12  comes into a router or switch, it creates a log of that

13  packet.  When it exits on the other side of the router and

14  switch going into a network, it does another log."

15         It was crystal clear at that point what their

16  infringement theory was going to be.  Now, we disagree with

17  the outcome of it, but we knew what their theory was going

18  to be.  And then he said it again.  "It logs it when it

19  enters the switch, and it logs it when it exits the switch."

20         We then get to their infringement expert, Dr. Cole,

21  and his infringement theory at trial was also, at least I

22  thought it was clear, for the network device, he says it's

23  one router or switch that performs each of the four

24  elements, the B elements of the claim, the receiving and

25  transmitting and the creating of the logs.

1            And we provide you his testimony.  It's the same

2    switch or router that receives the packets, generates the

3    ingress NetFlow records, transmits the packets, and

4    generates the egress NetFlow records.

5            And this was his testimony on direct examination.

6    And he was asked a question by Centripetal's counsel, and

7    this was his answer:

8            "So you have your router or switch, and when this

9    router or switch takes that same packet and sends it out, it

10   is transmitting it.  It is transmitting it out of the

11   device, and then it generates logs again.  So, essentially,

12   it's the same router or switch that receives the packet and

13   generates the logs and takes the packet, transmits it, and

14   generates a second series of logs.  So the activity is

15   performed by the same device."

16           We go on:  "But the activity of receiving and

17   transmitting and generating the logs, it's the same device."

18   He's referring to one router, one switch.

19           My turn came, cross-examination, and there was a

20   colloquy -- actually, I think it was with the '856 patent.

21   I introduced myself to Dr. Cole, and Judge Morgan and me and

22   Dr. Cole, I'm like, Dr. Cole, I doubt I am going to convince

23   you to concede noninfringement on the stand or in trial, and

24   Judge Morgan said he's never seen that happen from an expert

25   in all of his years on the bench.

 1          So my point was, all I want to do is I want to make

 2   sure I understand your infringement theory.  That's all I

 3   want to try to accomplish on cross-examination.

 4          So when it came time for the '176 patent, we put up

 5   a demonstrative, and in this demonstrative, we're now

 6   working left to right.  The host computer that's sending is

 7   on the left-hand side.  It's sending packets through an

 8   accused switch or router to a second host computer in a

 9   different network.

10          And then you'll see we've got Stealthwatch up above

11   it, and then we've got Stealthwatch dotted line up to

12   Cognitive Threat Analytics because Stealthwatch can send

13   information up to the Cognitive for analysis,

14   machine-learning AI, that kind of thing.

15          So using this diagram, I wanted to make sure I

16   understood his infringement theory on claim elements B1, B2,

17   B3, and B4.  So we asked him the question, "And with respect

18   to claim elements B2 and B4, it is the ingress NetFlow

19   record and the egress NetFlow record being created that you

20   say corresponds to those claim elements, right?"

21          His answer, "Yeah, so B1 identifying the plurality

22   of packets received, generating the logs, identifying the

23   packets transmitted, generating the logs?"

24          Question:  "So B2 would be the ingress NetFlow

25   records; is that fair?"

1        "That looks to be correct, yes."

2        "And B4 would be the egress NetFlow record?"

3        "That would also be correct."

4        So we understood the case so far.  We've got a

5   single switch or router.  Logs are generated.  It's ingress

6   and egress NetFlow records.  And to this point, there has

7   been no mention of any other devices or logs.  There has

8   been nothing about proxy devices.  There has been nothing

9   about WebFlow or syslog.  This is the infringement theory.

10        We did the same thing with the correlation step

11  using the same diagram, and I asked the same questions

12  about, now, the ingress and egress NetFlow records that are

13  shown on this demonstrative.

14        "So let's go to claim element C.  In claim element

15  C, we are correlating the two NetFlow records that were

16  created in B2 and B4; is that correct?"

17        "That is my understanding."

18        We then get to the issue where is the correlation

19  actually taking place?  And to be clear, the correlation

20  wasn't taking place in Stealthwatch.  His theory was that

21  correlation is taking place in Cognitive, Cognitive Threat

22  Analytics, and that's -- that's one of the -- that's part of

23  the accused combination; it's Stealthwatch plus CTA enabled.

24        So we asked him the question, "Cognitive Analytics

25  is then going to do analysis on this data along with machine

1    learning and threat intelligence; is that fair?"

2         "Answer:  It performs a series of correlation on --

3    and the important thing for me are the ingress and egress

4    NetFlow data.  There is nothing in the claim that's

5    exclusive to just those two, so there can be other data in

6    there as long as those two NetFlow records are being

7    correlated."

8         So the two NetFlow records being correlated, there

9    could also be threat intelligence from out of the network

10   being correlated as well.  His point is I don't care about

11   that.  That doesn't eliminate infringement as long as the

12   two NetFlow records are being correlated.  That's his

13   theory.

14        So final time, "Just to be clear about that point,

15   it's your opinion that the ingress NetFlow record and the

16   egress NetFlow record are actually correlated in Cognitive;

17   is that fair?"

18        "Answer:  In Cognitive Threat Analytics, correct."

19        Before we turn to why all of that is not correct, I

20   think it's important to provide some -- a little bit of

21   context about NetFlow, because coming into this trial and

22   looking at only the testimony of this trial, there might be

23   a thought that the only use and purpose of NetFlow is to

24   send NetFlow records up to Stealthwatch, and that's not the

25   case.

513

Cisco invented -- I think I said in my opening, I think I said Cisco invented NetFlow in 1996.  That's not in the trial record.  But Cisco invented NetFlow in the 1990s, and they did it for network monitoring and administrative reasons.  It became an industry standard in 2004, okay.  I believe that the first time that NetFlow was used for a security purpose is when Lancope in 2004 launched Stealthwatch.

And so I tell you that only to make the point that NetFlow is used for a lot of things, beyond just sending a NetFlow record up to Stealthwatch.  So I wanted to provide that context.

Now, how does the system really work?  Well, we called Danny Llewallyn to the stand.  He was the software engineer.  He began working with Lancope in 2003.  Cisco acquired Lancope.  He now works for Cisco.  He wrote the source code for Stealthwatch back in 2003.

He testified Stealthwatch only needs the ingress NetFlow record.  The egress NetFlow record is duplicative for purposes of network security because all we're looking for is what's the source and destination.  We get that from the ingress record.

Mr. Llewallyn wrote source code in 2014 to ignore egress NetFlow records.  We then accused, or challenged -- that was the 2014 code.  I've got an answer for that, I

1    hope, in a second.  The first thing is Mr. Llewallyn

2    testified that the code that he wrote in 2014, it's still in

3    the product today.

4          We asked him a specific question:  "Mr. Llewallyn,

5    that egress code, the ignore egress code that we just

6    showed, is that still present in the product today?"

7          The answer, "Yes, it is."

8          And let me stop right there for a second.  They had

9    access to all of our source code.  If somehow or another the

10   source code that he was using from 2014 -- and the reason

11   why we use that source code is, quite frankly, it's prior

12   art.  So we used the prior-art source code to make the point

13   that you ignore egress records, but we still use it today.

14         If he was wrong about that, they would have

15   impeached him with source code that currently exists today

16   that would show where somehow or another the code had

17   changed to where you could now -- you could now assimilate,

18   analyze two NetFlow records.  But they didn't do that

19   because that's not the way it works.  And they had access to

20   all of the code.

21         Another important point.  Stealthwatch does not

22   send ingress or egress NetFlow records at all to Cognitive

23   Threat Analytics, and Dr. Cole's theory is that's where the

24   correlation takes place.

25         The question of Mr. Llewallyn, "Is it ever the case

1    that the Stealthwatch Flow Collector sends both the ingress

2    NetFlow record and the ingress" -- "egress NetFlow record

3    and the ingress NetFlow record up to Cognitive?"

4           "Answer:  There is no concept of that.  Once the

5    statistics are added to the Stealthwatch flow, the NetFlow

6    record is discarded."

7           So the NetFlow records never go to Cognitive.

8           Centripetal has no answer to the Cisco source code.

9    When crossing Mr. Llewallyn, Centripetal did not ask a

10   single question about the source code, not one.  Centripetal

11   did not present source code to rebut the source code that

12   Mr. Llewallyn relied on, and Dr. Cole did not testify about

13   the source code that Mr. Llewallyn relied on to support his

14   opinion on the correlation element, or -- I mean, or on the

15   ignore-the-egress issue.  Dr. Cole didn't take issue with

16   that.

17          And if you look at Centripetal's conclusions of law

18   and findings of fact, they do not challenge Mr. Llewallyn's

19   testimony anywhere.

20          Then we turn to our expert, Dr. Almeroth.  He

21   provided testimony that he reviewed the source code, and he

22   agreed with Mr. Llewallyn's testimony about it, and we've

23   got the cites in the presentation.  He also confirmed

24   Mr. Llewallyn's point that Stealthwatch never passes the

25   ingress and egress NetFlow records to Cognitive for

516

1    correlation.

2         So failures of proof:  Stealthwatch only uses

3    ingress NetFlow records; source code was designed to ignore

4    the egress NetFlow record; and the ingress and egress

5    NetFlow records are not sent to Cognitive Threat Analytics,

6    which was their theory for where the correlation took place.

7         We then turn to the evidence that Dr. Cole relied

8    on, at a high level, to try to support his infringement

9    theory.  And we provide you all of the cites to

10   Dr. Almeroth's testimony, and you actually saw some of it

11   today, and we're going to work our way through it.

12        But the documents that he relied on, they showed

13   generic use of the word "correlation" with other things;

14   proxy logs, global threat intelligence, syslogs.

15        Okay.  We agree that there is correlation that can

16   take place in the system.  I mean, there was correlation

17   that could take place in the system back in 2004, but none

18   of it shows correlation of packets in and out of the router

19   or switch, and none of it shows correlation of the accused

20   ingress with egress NetFlow records, and that's what the

21   claims require, and that's what their infringement theory

22   was.

23        So let's look at the evidence.  You saw this

24   earlier today, PTX-1065.  It's one of the documents that

25   Dr. Cole relied on.  And if you take a look at this, all

1    this document shows is that you've got -- you've got proxy

2    data from a web proxy, and then you've got NetFlow data from

3    a router or switch being sent up to Stealthwatch.  And

4    that's the blue dotted line and the green line.

5           Point 1, they're not accusing proxy data of

6    infringing, and they certainly can't accuse third-party

7    proxy devices of infringement.  They're only accusing

8    routers and switches, okay.  Can a router or switch send

9    NetFlow data to Stealthwatch?  The answer is absolutely.

10   It's just not sending ingress and egress records, or if it

11   were to ever happen because of a misconfiguration, it's

12   going to get ignored.

13          Dr. Cole relied on the statement that, "Correlates

14   threat behavior seen in the enterprise with those seen

15   globally."  Completely agree that can happen, but "with

16   those seen globally" is a reference to global threat

17   intelligence.  That's threat intelligence that's provided to

18   Stealthwatch from a completely different source that's not

19   in the network.

20          The other page, maybe it was lower in the page of

21   PTX-1065, they pointed to some discussion about these other

22   devices, that you'll see in the left here.  We highlight

23   them:  the Cisco WSA, the Bluecoat proxy, the Squid, the

24   McAfee Web Gateway.

25          Again, those are separate devices from routers and

 1    switches.  They didn't accuse the Cisco WSA in this case.
 2    And those other devices are coming from third parties.
 3    Those are a bunch of nonaccused devices.
 4            They relied on this statement, "Stealthwatch will
 5    then correlate the received syslog and relate it to flows
 6    collected from network devices before and after the proxy,
 7    providing deeper visibility into consumer web traffic."
 8            Well, we created this slide saying that it was a
 9    nonaccused log until I heard today that syslog is now being
10    accused of infringement.  You can go through Dr. Cole's
11    testimony from start to finish, and you will not see any
12    analysis of where he went through the claim elements
13    using -- using syslog in some form or fashion.  That's just
14    not his infringement theory.
15            And then the final point that they rely on is that,
16    "Customer may use either NetFlow or proxy data or both."
17    That's absolutely correct, but it doesn't say anything about
18    correlating ingress with egress NetFlow records.  That
19    document was relied on heavily by Dr. Cole.
20            Two other documents he relied on, PTX-1009 and
21    PTX-591.  They say the exact same thing.  So we treat them
22    together.  "CTA can now leverage detections from the
23    analysis of WebFlow telemetry."  Completely agree that CTA
24    can do that.
25            "This is accomplished by the system through

1    correlation of both telemetry types."  We agree with that,

2    but WebFlow telemetry is a nonaccused device, and again,

3    this document doesn't say anything about correlating ingress

4    with egress NetFlow records.

5            So at this point, we have addressed what their

6    affirmative case-in-chief through their infringement expert

7    was all about, and we think it's compelling that we do not

8    infringe.

9            Later in the case, when we get to the invalidity

10   piece of the case, Dr. Jaeger, their invalidity expert --

11   and it was actually unrelated to any validity issue in the

12   case.  He says, "'A network device' could be construed to

13   cover one or more network devices."  Again, that statement,

14   in a vacuum, that's true; that's what the law says.

15           The problems for Centripetal is -- don't know where

16   they were going with it, but it's an untimely theory.  It's

17   coming from their invalidity expert, and the trial theory

18   was unequivocally based on a single router or switch.

19           There is also a complete lack of proof as to

20   whatever they're going to point to as these one or more

21   network devices.  No one went through a

22   claim-element-by-claim-element basis mixing and matching

23   various network devices together because Dr. Cole had one

24   and only one infringement theory.

25           But there is a legal issue here, and we cite two

```
 1   cases, in addition to the cases that you've already seen.
 2   The first is Salazar versus AT&T Mobility.  It's a recent
 3   case out of the Federal Circuit 2023 talking about the,
 4   quote, "a processor."  So the indefinite article "a" being
 5   used with "a processor" followed by "said processor."
 6           So "a" followed by "said" is really the same thing
 7   as "a" followed by "the."  It's just a reference back to the
 8   indefinite article "a."
 9           And what the Federal Circuit said is that there may
10   be multiple processors in your system, but the at least one
11   processor must be able to perform all of the recited
12   functions.
13           And the Federal Circuit in In re Varma -- it's
14   another case -- 816 F.3rd 1352, at 1363 -- and I think it's
15   kind of -- it's just a cool quote.  This is the Federal
16   Circuit 2016.  Here is what the Federal Circuit said:
17           "For a dog owner to have 'a dog that rolls over and
18   fetches sticks,' it does not suffice that he have two dogs,
19   each able to perform just one of the tasks."
20           So whatever it is that you're going to point to
21   that's "the" device or "a" device, it's got to be that same
22   one to meet the remainder of the claim elements.
23           And then, again, regardless of what they're
24   pointing to by way of whatever is going to meet the "one or
25   more network devices," if that's how we're going to now
```

1    construe the term, there is still something that there is

2    just no support for, which is Centripetal's CTA correlation

3    theory is always going to fail because it does not receive

4    NetFlow records, whether created by a single router or

5    switch or multiple routers or switches, because the NetFlow

6    records don't go to CTA.

7         Very briefly.  Some documents were put up, and I

8    don't know whether they're going there or not, but I'm at

9    least going to address it.  There was some conversation

10   about bi-directional flows, and maybe that that's

11   encompassed by these claims in some form or fashion.  I want

12   to go back to the claim language.

13        Bi-directional flow, you've got -- you've got a

14   network device A and a network device B.  Packets go in that

15   direction, packets go to the computer, and then the computer

16   transmits and communicates back in the other direction; a

17   bi-directional flow, okay.

18        That's not what these claims cover.  These claims

19   cover a plurality of packets received by a network device

20   from a host located in a first network, and again, the

21   packets are received and transmitted and sent.  It's a

22   unidirectional -- it's a unidirectional flow.  It does not

23   address a bi-directional flow.

24        For that reason, they can't meet the correlation

25   step in C, and, therefore, Cisco doesn't infringe this claim

1    element.

2         Absent questions, Your Honor, I'm going to go to

3    the next noninfringement argument.

4         THE COURT:  I don't have any questions.

5         MR. JAMESON:  Thank you.

6         The accused system does not generate and provision

7    rules in response to the claimed correlation, limitations D,

8    D1, and D2.

9         Okay.  We're going to start up here in the A

10   elements, because this is really important.  The A elements,

11   it's a computer system, and, again, it's the computer

12   system -- it's the system that causes everything below it to

13   happen.

14        And in claim elements D, D1, and D2, claims are

15   crystal clear.  Responsive to correlating.  So we have to

16   have a correlation.  Responsive to that correlation, it's

17   the system that's going to generate a rule and provision a

18   rule, and that has to be in response to the correlation

19   step, and that's what we show here in 40.  Okay.

20        Important context is when Centripetal first filed

21   for patent protection that led to the '176 patent, they

22   actually sought claim scope that basically said, "Generate

23   data identifying the host, communicate to a device located

24   in the first network, the data identifying the host."

25        Okay.  They don't use the word "alert."  But "data

1    identifying a host," I could see how you could read that on

2    an alert, you know.  You've learned that there might be

3    something out there that's malicious, and so data

4    identifying a host, well, the Patent Office said, you're not

5    getting a patent on that.

6         So they amended the claims.  And they amended the

7    claims to the current claims, which is directly in response

8    to the correlation; we've got to generate these rules and

9    provision the rules down into the network.

10        What happened at trial?  Dr. Cole tries to turn

11   alarms and alerts into rules, and he does that repeatedly.

12   But the punch line is, is that Cognitive Threat Analytics,

13   which is where the correlation has to happen, it doesn't

14   generate rules.  It generates alerts.  And CTA sends the

15   rules -- excuse me, sends the alert, which Dr. Cole is

16   trying to turn into rules -- CTA sends those alerts down to

17   Stealthwatch so that a system administrator can take action.

18        And we went through this with Dr. Almeroth, but the

19   starting point is, is the Court's claim construction.  The

20   Court provided a construction of the word "rule," and the

21   construction is, "A condition or set of conditions that when

22   satisfied cause a specific function to occur."

23        So you think about the rules that Dr. Almeroth

24   showed you on Thursday.  You've got the rule, a set of

25   conditions, and -- and a packet comes in.  If that packet

1    meets that set of -- that set of conditions, then a specific
2    function occurs; drop the packet, allow the packet.  Okay.
3    The Court provided us a definition of the rule, and,
4    obviously, I've showed you D, D1, and D2.
5              THE COURT:  So why is an alert not a specific
6    function to occur?
7              MR. JAMESON:  Well, it's not a specific function to
8    occur, it is a heads-up, you might want to implement a
9    specific function.  It's the precursor to then implementing
10   a function, and that's the important difference.  Okay.
11             The next slide, which we've blacked it out because
12   it's the source code -- actually, Mr. Andre, he actually --
13   he showed you the same thing in his presentation, and the
14   only point that I wanted to make is the source code that
15   Dr. Cole relied on in connection with his infringement
16   theory -- and it's the only source code that he relied on,
17   to the best of my recollection -- it was the source code up
18   in CTA.
19             And it was at line 13 of the source code, and the
20   source code says, "Host suspiciousness from correlation."
21   Okay.  That's all the source code says, which is, we've done
22   the correlation and something seems to be suspicious.  Okay.
23             If CTA generated a rule as a result of that, there
24   would be source code, Your Honor, and they'd be showing it
25   to you.  But that's all it does.  I mean -- I mean, a system

 1    cannot generate a rule without there being source code to do

 2    it, and they don't rely on the source code because it

 3    doesn't exist.

 4          So let's look at the evidence that he relied on to

 5    try to say that Cognitive Threat Analytics sends a rule.

 6    And this is every piece of evidence that -- I thought it was

 7    every piece of evidence that he relied upon, and Mr. Andre

 8    actually showed you this.  And I believe Centripetal's

 9    counsel actually said, you know, this is a flow diagram, and

10    this is the sum and substance of what appears on this page,

11    this page or even before or after pages.

12          This is nothing but a high-level flow diagram as to

13    how information flows through a system, and with respect to

14    CTA, you see a red line going down to the Stealth Management

15    Console.  And completely agree that CTA can send information

16    down to the Stealth Management Console.

17          But what Dr. Cole says is, "Cognitive Threat

18    Analytics, which is Stealthwatch, the cloud, and then it can

19    send a rule back, the red arrow, which is sending it back to

20    the Stealthwatch Management Console."

21          Your Honor, this document doesn't say that.  It

22    doesn't say that.  It doesn't show it.  That's pure

23    extrapolation.  It would be one thing if he had looked at

24    source code, showed source code, and said the source code

25    shows that CTA can send a rule down to Stealthwatch

1    Management Console, and go, and this document is just

2    confirming that.  But his launching-off point is he's

3    creating a rule from a red line in a flow diagram, and

4    that's just not good enough.

5          And we asked Mr. Llewallyn about this.  "Does CTA

6    ever issue a quarantine instruction over that red arrow?"

7          "Answer:  No, it cannot.  The only thing it does is

8    send down information about the flow, and those results

9    would be displayed in what we're calling a widget over there

10   in the Stealthwatch user interface."

11         The document that they relied on with respect to

12   the correlation step, PTX-1065, it actually makes my point.

13   It shows that Cognitive Threat Analytics is sending alert

14   data to the Stealthwatch Management Console.  Otherwise, it

15   would say we send down a rule.  That's not what it shows.

16         THE COURT:  Can you go back to that?  I just want

17   to ask you a question.

18         I think you had argued that Stealthwatch does not

19   pass the ingress or egress NetFlow records to CTA, that it

20   passes, I think you called it Stealthwatch Flow.  Because

21   you see here -- I mean, there is a line, the NetFlow data,

22   the green line to the Stealthwatch Flow Collector, and then

23   obviously there is another line from the Stealthwatch Flow

24   Collector up to Cognitive Analytics and the Stealthwatch

25   Management Console, and it says, "NetFlow and proxy

1    telemetry."

2            So I was somewhat confused by that, and I don't

3    recall having read about the Stealthwatch Flow, so could you

4    clarify that for me?

5            MR. JAMESON:  Yes, Your Honor.  And I believe

6    that -- and I don't have the cites in front of me, but I

7    think you would find that in Mr. Llewallyn's testimony.

8            THE COURT:  All right.

9            MR. JAMESON:  And also a finding of fact at

10   Paragraph 254, we address that issue as well.

11           Your Honor, what happens as -- and if I get this

12   wrong, Mr. Baird is going to run up and tell me that I've

13   gotten this wrong.

14           When NetFlow records or other information is sent

15   up to Stealthwatch, you basically take that information, and

16   you break it apart, you break it down, you assimilate it.

17   You figure out what's useful in it, and the point is

18   whatever you -- whatever Stealthwatch has determined is the

19   useful information that you need, it then can be sent up to

20   Cognitive under certain circumstances for further analysis.

21           And there is so much information in the NetFlow

22   record that if you sent the entire record up to Cognitive,

23   it's getting a bunch of information that it simply does not

24   need, and the information that it really needs, it's the

25   source of the communication and the destination of the

528

1   communication.

2        So pieces of information gleaned from a NetFlow

3   record would then get sent up to Cognitive, along with a

4   whole bunch of other stuff.

5        THE COURT:  All right.  Thank you.

6        MR. JAMESON:  The next piece of evidence, this was

7   PTX-1018.  Dr. Cole looked at this document and provided the

8   testimony on the left:  "Yes.  So this shows, if we look at

9   the bottom left-hand corner, based on the analysis that's

10  performed, and if it's escalated and something is critical,

11  then CTA can take action by sending rules that could

12  quarantine a host on the first network."

13       And once again, Your Honor, all I can do is ask you

14  to look at the document.  There is nothing about this

15  document that says that CTA sends a rule down into a first

16  network.

17       What this document describes is that CTA can send

18  information down to a Stealthwatch console that basically

19  prioritizes what CTA has determined is a potential level of

20  risk.  It's kind of like DEFCON 4, DEFCON 3, all the way

21  down to DEFCON 1.

22       It says, "Based on our analysis, we are looking at

23  something that appears to be critical, high risk.  You might

24  want to implement a quarantine through ISE."  Okay.  That's

25  not a rule.  Somebody is going to have to take action to do

1    that.  And then you work your way down from critical risk to

2    high risk to medium risk to low risk.

3           So it's providing information in the category of

4    the level of risk for someone to then take action, but it's

5    not sending down a rule, and it's certainly not implementing

6    a rule down into the network.

7           The final piece of evidence, and this is PTX-1089,

8    and this is the document that Centripetal relied on to say

9    that a rule is generated by Cognitive.  And, once again,

10   Your Honor, this is -- this document actually shows if ISE

11   is going to implement a quarantine function, the Identity

12   Services Engine that you heard about on Friday, if that

13   device is going to implement a quarantine, what are the

14   steps leading up to that?

15          And what we know is that this isn't happening

16   automatically, this is all about a human taking a bunch of

17   steps in order to decide that something might need to be

18   quarantined in the network.  And how do we know that?

19   Because we go to the very next page of the document, and if

20   you look at the very next page of the document, it shows

21   that we've got all kinds of interactions between a user and

22   Stealthwatch, and then you've got ISE up at the very top.

23          And in the bullets it says, "Stealthwatch triggers

24   alert for host with suspicious behavior."  So it's not

25   really even talking about Cognitive, but let's assume that

1    even something came down from Cognitive and an alert has

2    been triggered.  Well, what happens?

3            "Adam the Analyst" notices the alert, and it

4    investigates the host details.  "Adam the Analyst" then

5    decides to limit access to the network via ISE.  "Adam the

6    Analyst" is going to review, do we already have a rule that

7    exists, or do we need to create a rule to deal with this

8    quarantine issue?  And "Adam the Analyst," he opens up the

9    options and decides, do we need a new rule, or does one

10   already exist?

11           Stealthwatch -- once that decision is made,

12   Stealthwatch then sends the decision to ISE.  ISE may then

13   very well do what it needs to do to go quarantine a

14   computer.  And then the final thing is Adam follows up to

15   make sure that what he wanted, or he or she wanted to

16   happen, actually happened.

17           Okay.  This claim is not reading on that.  This

18   claim is reading on a system automatically generating a

19   rule.  And, Your Honor, your question to Mr. Andre, it

20   was -- it was right on point.

21           The idea that you're just going to have systems

22   automatically generating rules, with the number of false

23   positives in today's world that you could potentially get, I

24   mean, you could be shutting down systems left and right.

25   Now, this isn't in the record, but it's just -- I mean, that

531

```
 1    doesn't make sense.  But, more importantly, that's just not
 2    the way our technology works.
 3              "Adam the Analyst" is not a computer system.
 4              Centripetal's findings of fact on claim element D,
 5    it's in one paragraph, and one paragraph only, in their
 6    findings of fact and conclusions of law.  It's here at 354.
 7    I show this to you because I've walked through each piece of
 8    evidence that they cited in these findings of fact and
 9    conclusions of law.
10              And then, Your Honor, I am just going to leave you
11    with this:  The very reason that the '176 patent survived
12    PAN's IPR Petition is because Centripetal argued to the
13    Patent Office that the Sutton prior art does not teach
14    taking remedial steps responsive to the correlation.
15    Rather, it takes remedial steps based upon determining that
16    a device is potentially infected.
17              That's what Cisco does.  It takes remedial steps
18    based upon determining that a device is potentially
19    infected.
20              It made the same point in the next quote, and then
21    this was the Board's decision that held that PAN did not
22    establish that the Sutton prior art rules would be based on
23    the correlation and not on the detection of malicious
24    activity.
25              So, anyway, I show you that only to say that that's
```

 1    actually just very consistent with what our noninfringement

 2    position is.

 3            And, Your Honor, absent questions, that's all I

 4    have with respect to noninfringement on the -- absent

 5    questions from you, that's all I have.

 6            THE COURT:  I don't have any questions.  Thank you.

 7            Mr. Andre, I think it would be better if you could

 8    respond before we take our lunch break.

 9            MR. ANDRE:  Your Honor, I'll be very quick.

10            THE COURT:  All right.

11            MR. JAMESON:  Let me get these notes.  I'm sorry.

12            MR. ANDRE:  Your Honor, just a few points I want to

13    touch on.  We talk about the concept of where these boxes

14    are located.

15            And may I approach this, Your Honor?

16            THE COURT:  Go ahead.  But just keep your voice up.

17            MR. ANDRE:  I will.

18            So these are the switches and routers, firewalls.

19    Those are the boxes you buy and you get.  This, the console,

20    the dashboard, this is all in the cloud.  That's what the

21    evidence came in at trial.

22            Now, the '176, we said Stealthwatch is in the

23    cloud.  This is Mr. Llewallyn's testimony.  "Sends it to

24    Stealthwatch Management Console" -- "Sends it to the

25    Stealthwatch Management Console for display to the user, and

1    that is in the cloud."

2          So we've got no testimony that this console -- this

3    is Mr. Llewallyn at Page 2155, lines 11 through 12.  This is

4    what they call the Stealthwatch Management Console.  It's up

5    in the cloud.  You can actually log on to it from your

6    desktop, your own personal desktop, and that's the documents

7    we've shown in this case.  Every bit of evidence shows that

8    it's in the cloud.

9          The other point here at the end was they don't do

10   automatic detection and remediation.  They go to "Adam the

11   Analyst."  They keep showing "Adam the Analyst."  That was

12   the old systems.  When you look at the actual document, it's

13   the old system.  They automated all those systems.  If you

14   look at -- let me get the camera back.

15         THE COURT:  And if the system has been automated,

16   is there a particular document that would show either the

17   change or the new system?

18         MR. ANDRE:  If you look at PTX-584, Page 403, the

19   bottom of the page -- and this is in evidence -- the very

20   last paragraph, "Upon discovery, a malicious encrypted flow

21   can be blocked or quarantined by Stealthwatch --

22   policy-driven remediation actions, via PX grid, using

23   Cisco's Identity Service Engine with Cisco TrustSec.  Upon

24   discovery, a malicious encryption flow can be blocked or

25   quarantined by Stealthwatch."

534

1          It doesn't say by "Adam the Analyst."  It says by

2     Stealthwatch.  That's the very definition of the rule.

3          If you look at the data sheet, PTX-992, also in

4     evidence, you go to the second page of that document, where

5     it says, "Automated detection and response."  And this is

6     the Cisco Stealthwatch, the new Stealthwatch page.  "The

7     combination of this context-driven enterprise" -- I'm going

8     to slow down while I read so I don't get punched again.

9          The last sentence of that paragraph is really the

10    take-home.  "Finally, it integrates with your existing

11    security control in order to respond to threats, without any

12    business shutdown."  It does this automatically; it responds

13    to threats.

14         We'll give you one more from 2020.  It's PTX-482.

15    This is "Cisco's Stealthwatch enterprise provides" -- the

16    very first paragraph, "enterprise provides network

17    visibility and applies advanced security analytics to detect

18    and respond to threats in real time."

19         If you read the trial record, you know the real

20    time was a big issue.  This was the position they had as

21    well.  All we do -- all Cisco does, according to them, is

22    just look around for threats, and if they find them, then

23    they'll figure it out later.

24         They would have no product if that was the case,

25    and we proved that at trial, over and over and over again,

1    that real time -- you need to stop threats in real time.  We

2    had that in spades in numerous documents, and we could keep

3    digging them up.  We just dug up these four on the fly.

4           The source code I showed you on slide 43 -- or 49,

5    and Dr. Cole's testimony about it was the actual source code

6    that he showed you where they identified the host from

7    correlation and his testing, his testimony, his review of

8    the source code, his testimony was unrefuted.  He says it's

9    a way to identify the suspicious host and requires some

10   action, such as sending a rule.

11          And the other document that Cisco's counsel showed

12   you was PTX-1089.  This is the -- at Page 1238.

13          If you look at the -- where it says, "ANC," about

14   the third paragraph down -- third sentence down -- just

15   highlight the third sentence down and pull that out.

16          This is the new Stealthwatch 7.0 release.  That's

17   the new Stealthwatch.  ANC, which are the rules, can be

18   invoked via PX grid 1.0.  Initial ANC integration in

19   Stealthwatch 7.0 will be done by integrating and using PX

20   grid.  It's not "Adam the Analyst."

21          THE COURT:  What is PX grid, and is it accused?

22          MR. ANDRE:  I believe the testimony on that from

23   Dr. Cole was it is a mechanism to send the rules.  I believe

24   that was his testimony.  He did provide testimony on that.

25   He talked about how the ANC is the rule that's being

1    provisioned by Stealthwatch.

2            I think the last point I want to make, Your

3    Honor -- and I think we've covered most of it -- this was in

4    PTX-569, which is in evidence I showed you during my

5    presentation, page ending in Bates number 272.

6            It has the paragraph there, in the first paragraph,

7    "Cisco's iOS flexible NetFlow configuration."  It says,

8    "Mentioned earlier, Stealthwatch can collect NetFlow

9    telemetry."  A NetFlow telemetry, and we've got tons of

10   testimony in this case, that's the logs.  The telemetries

11   are the logging that's going up from network devices to

12   analyze it for anomaly and threat detection.

13           "Stealthwatch is gaining the telemetry from network

14   devices to provide end-to-end visibility."  And how you

15   configure that, down below, you can configure it through the

16   ingress or egress.  You can configure it any way you want.

17   And this document actually talks about how they advise their

18   clients just to do it from one end or the other, ingress or

19   egress, but you can do both.

20           The cardinal rule in cybersecurity is you want to

21   answer three questions:  Did it get in?  Did it get out?

22   Who did it?  The systems we're talking about here, that's

23   what they're identified to do.  They're not just there to

24   analyze randomly these logs, this telemetry information that

25   goes up.  They're there to identify threats and do something

1    about it.

2          Cisco has taken the position over and over again

3    that their systems, they'll give you an alert, but they

4    won't give you a rule to fix it.  That's just not the case.

5    All of the evidence in this case shows they actually stop

6    threats.

7          If you don't have any further questions, we can

8    take a lunch break.

9          THE COURT:  Thank you, Mr. Andre.

10          MR. ANDRE:  Thank you, Your Honor.

11          THE COURT:  So --

12          MR. JAMESON:  Your Honor, very briefly, or have you

13    heard enough?

14          THE COURT:  Go ahead.

15          MR. JAMESON:  Two points.

16          You asked me the question about information going

17    up to CTA.  I told you Mr. Llewallyn had provided testimony

18    on that point.  If you look at our slide 26 in our

19    presentation, his answer is, "There's no concept of that.

20    Once the statistics are added to this Stealthwatch flow, the

21    NetFlow record is discarded."

22          And that was my point about trying to -- there

23    might be some information that's pulled out of it, but the

24    NetFlow record is discarded.  It does not go up to CTA.

25          Can we pull up PTX-992 at 002.  It's what they just

538

1    relied on.  PTX-992 at 002.  Highlight what they were just

2    looking at, if anybody can find it.

3              I would just note right in the middle of the

4    paragraph, it says, "Security teams can see alarms that are

5    prioritized by the threat and the severity," and then the

6    security teams take action as a result of that.  And, you

7    know, Centripetal's counsel about old "Adam the Analyst,"

8    Your Honor, that's the document that they relied on to try

9    to prove infringement, and I just turned to the next page of

10   it.  So I'm confused by that comment, but that's all I have.

11             THE COURT:  Okay.  Thank you.

12             MR. JAMESON:  Thank you.

13             THE COURT:  I just want -- we'll take a one-hour

14   break until 2:00 o'clock.  You all still have validity,

15   willfulness, and then damages.  I think you could get done

16   today so long as -- typically, your arguments on validity

17   have been fairly short.  I think you have well created a

18   record on willfulness and the defenses against that.  I

19   mean, it's in.  That, if anything, has not changed very

20   much.  So if you could do those two things in an hour, that

21   would give us two hours for damages.

22             Do you think that that is achievable today,

23   Mr. Andre?

24             MR. ANDRE:  Your Honor, as far as validity and

25   willfulness, absolutely.  Ms. Kobialka has damages.  I

539

1    don't -- she should be good.  I think we can do it.

2            THE COURT:  That would give you an hour each for

3    damages, which seems like it should be enough.

4            Mr. Jameson, do you want to be heard on that?

5            MR. JAMESON:  Invalidity will be brief, and if I

6    have an hour for damages -- it's damages and injunction

7    relief.  I don't know what they're going to do with that,

8    it's both, but we should be able to work through that in an

9    hour, yes.

10           THE COURT:  All right.  Thank you.  Then we will

11   stand in recess until 2:00 o'clock.

12           (Lunch recess from 1:02 p.m. to 2:05 p.m.)

13           THE COURT:  Mr. Jameson, are you ready to proceed?

14           MR. JAMESON:  I am ready, Your Honor.

15           THE COURT:  All right.  Give me just one moment.

16           Okay.  You can go ahead.

17           MR. JAMESON:  Thank you, Your Honor.  Turning to

18   invalidity with respect to Claims 11 and 21 of the '176

19   patent, there is a lot of Q&A on this slide, but I thought

20   rather than characterizing what the experts have done when

21   it comes to the tension between infringement and invalidity,

22   I would just show what Dr. Almeroth explained that he did.

23           And so we asked him what's your invalidity opinion,

24   and his answer was:  "So my invalidity opinion is based on

25   how Centripetal and Dr. Cole are reading the claims.  I'm

JILL H. TRAIL, Official Court Reporter

1    looking at what Dr. Cole said would meet the claim

2    limitations for purposes of his infringement analysis, and

3    it's my understanding that I can use the scope of Dr. Cole

4    and Centripetal have used for their infringement analysis

5    with respect to forming an invalidity opinion.  It's my

6    understanding that if Centripetal is attempting to read the

7    claims very broadly, and to cover the kinds of things that

8    they're accusing in the Cisco products, that it's only fair

9    for the defendant in this case, Cisco, to be able to use

10   that same very broad scope to the claims to then point out

11   that the functionality would, in fact, exist in the prior

12   art.  So I think it's been referred to a couple of times as

13   what's good for the goose is good for the gander."

14         Your Honor, I would submit that that is exactly

15   what the Federal Circuit said in *01 Communique*.  Mr. Gaudet

16   showed you the case, so I won't go through it again, but the

17   point is, as the Federal Circuit said, is when an accused

18   product and the prior art are closely aligned, it takes

19   exceptional linguistic dexterity to simultaneously establish

20   infringement and evade invalidity.

21         And I would submit to you that that has been

22   Centripetal's problem in this case with respect to every

23   single one of these patents.

24         Our invalidity theory is that if you were to find

25   infringement of Claims 11 and 21, then the claims are

invalid over product combinations, including prior art

Cisco's switches and routers and prior art Stealthwatch.

Now, it's not going to surprise me if Centripetal

stands up in response and say this was all about CTA,

because they had to find something to accuse that was new,

and the one thing that they could find that at least looked

new was Cognitive Threat Analytics.

But under *01 Communique*, we don't have to show that

Cognitive Threat Analytics existed in the prior art.  We

simply have to show that the technology existed in the prior

art, not the identical products, and that's an important

distinction.

We provide this slide just because it shows where

Dr. Almeroth testified at trial.  Our findings of fact and

conclusions of law are at Paragraphs 325 and 338 on

invalidity.  This is the chart that summarizes on a

claim-element-by-claim-element basis the evidence that would

support invalidity under *01 Communique*.  And I just want to

hit on some big-picture topics, and then I'm going to sit

down.

We asked Mr. Llewallyn, going all the way back to

2004, about prior art Stealthwatch, and again, he is the

person that wrote the code back in 2004, and we asked him a

question at the bottom, "Has the functionality that you were

discussing, with respect to raising alarms, when did that

1    functionality first come into the product?"

2         And his answer:  "Well, when I made the

3    Stealthwatch Flow Collector, I started with the original

4    product, which already did all of these, all of this

5    behavioral analysis and alarm and alarming, all of these

6    things.  So the product had been generating alarms and

7    alerts since the original version in 2001.  The 2004 version

8    had the same functionality, it just worked off of NetFlow."

9         So going all the way back to 2004, Stealthwatch is

10   generating alarms and alerts.  It's now working with

11   NetFlow, and I actually -- I found it curious in connection

12   with the noninfringement -- excuse me, infringement

13   presentation by Centripetal's counsel.

14        He made a statement to the effect that Stealthwatch

15   had no interest in finding out who the bad guys are, and

16   that was a curious statement, because that's why the company

17   was founded, and that's why it exists today.  Stealthwatch

18   is all about trying to identify malicious threats out in the

19   network so that you can then send alerts and alarms to

20   people that can then do something about them.

21        This is, again, in summary fashion.  We provide

22   cites to the testimony from the record and the exhibits that

23   show that, like the accused CTA, prior art Stealthwatch was

24   actually processing the NetFlow, it was detecting abnormal

25   behaviors, and it was using global threat intelligence and

1    raised alarms.

2            This is a 2014 prior art Stealthwatch document.

3    Back then the company was Lancope.  That's the company that

4    Cisco purchased.  This is a document that Dr. Almeroth

5    testified to about at trial, and just some points that show

6    what was in the art back in 2014.

7            Here we show the statement, "By collecting,

8    analyzing, and storing large amounts of NetFlow, IPFIX, and

9    other types of flow data for extended periods of time, the

10   Stealthwatch also provides a full audit trail of all network

11   transactions for more effective forensic investigations."

12           So it's receiving all kinds of information from the

13   network back -- really back in 2004, but that's before the

14   priority date of the patent here.

15           With respect to threat intelligence, this is,

16   again, the same document.  "The Stealthwatch Labs

17   Intelligence Center, SLIC, is Lancope's research initiative

18   through which global intelligence on the internet's top

19   threats is delivered to customers and the public.  Through

20   the SLIC threat feed, Lancope correlates real-time

21   intelligence on global threats with suspicious network

22   activity to alert on hosts infected with advanced malware,

23   including botnet activity," the bad guys.

24           That's the whole purpose of what Stealthwatch is

25   trying to accomplish through its technology.

1           And this is a diagram from what I -- the same

2    exhibit, DTX-343, and this is at Page 4, and this actually

3    shows all of the types of information that was being sent to

4    Stealthwatch back in 2014.  And if you look in the orange

5    box, you will see NetFlow, syslog, SNMP.  And to the right

6    of it, you've got NetFlow-enabled routers and switches and

7    firewalls.  And if you go over to the far right in green,

8    you've got SLIC, which is the feeds of emerging threat

9    information, operational threat intelligence that was being

10   sent to Stealthwatch in 2014.

11           And so, you know, if they're now accusing NetFlow

12   and syslog somehow or another being -- and that wasn't their

13   infringement theory at trial, but if that's now what they're

14   saying, that was going on in 2014.

15           And then the final point, and I've already made it,

16   but 2014, alarms for "Adam the Analyst," this is the same

17   document, and it says, "The Stealthwatch system quickly

18   zooms in on any unusual behavior, immediately sending an

19   alarm to the SMC with the contextual information necessary

20   for security personnel to take quick, decisive action to

21   mitigate any potential damage."

22           And, Your Honor, we were doing that in 2014, and

23   that's what we're doing today, and that's our invalidity

24   case in a nutshell.  There is a lot of evidence in that

25   chart, but that's the gist of it.

1          THE COURT:  All right.

2          MR. JAMESON:  Thank you.

3          THE COURT:  Thank you.

4          Mr. Andre.

5          MR. ANDRE:  May it please the Court.

6          Your Honor, the '176 patent has faced down two IPRs

7     from Cisco and one from Palo Alto Networks.  Their lower

8     standard of preponderance of the evidence, institutions have

9     not even occurred with these patents.

10         When Cisco appealed Judge Morgan's order in this

11    case, they didn't even appeal the finding of validity.  The

12    fact that we are here today and still talking about the

13    invalidity of '176 is really an indictment on how our system

14    is currently working for patent law.

15         That being said, the '176 patent is valid.  There

16    is no clear and convincing evidence.  Dr. Almeroth confirmed

17    the claims were valid, to give his honest opinion, he said.

18    We showed you that testimony.

19         Cognitive Threat Analytics, which is a key part of

20    Stealthwatch, was not integrated into Stealthwatch until

21    2017.  Old Stealthwatch did not perform the claimed

22    correlation based on the log entries and the claim

23    responsive to the correlations.

24         The one thing that we find curious is, when we talk

25    about sending the logs up from the flow collector up to

1    Stealthwatch, we are not saying that's a novel feature.

2    They've been doing that for years.  And in order for them to

3    say that the patent is invalid, they have to say that the

4    way Dr. Cole interpreted it, with ingress and egress, has

5    been done for years.

6         They can't have it both ways.  They can't say that

7    Stealthwatch can't handle ingress and egress in one breath

8    and then come here today and say it does, if you use

9    Dr. Cole's interpretation of ingress and egress.  That type

10   of double-talk is what I'm talking about in the invalidity

11   case.

12        Now, on the next slide, this is a slide that we

13   showed in our -- at trial.  And this is an example where you

14   have the "a network device" or "one or more network devices"

15   feeding logs up to the cloud, the Stealthwatch.  You see

16   Stealthwatch is up in the cloud, and all of these logs are

17   going up to these multiple network devices, and those

18   NetFlow logs are being correlated.

19        Now, CTA was integrated with Stealthwatch in June

20   of 2017, and you see CTA is a key component of Stealthwatch.

21   That's what's doing the analysis.  And CTA began correlation

22   of logs from switches and routers in April of 2018.  The key

23   infringing functionality was not even incorporated until

24   2017 and 2018.

25        Mr. Llewallyn confirmed in his testimony that

1    Cognitive Threat Analytics integrated with Stealthwatch, and

2    it was in 2017.  It was in Version 6.10.3.  So them saying

3    that's not important is somewhat missing the whole point of

4    our infringement case, and their invalidity case is not --

5    just doesn't address two of the major elements.

6            If you look at what's new on PTX-591, this is a

7    document you've seen before.  This is in 20 -- in the

8    10.3 -- 6.10.3 release in 2017.  "CTA can now leverage

9    detection from the analysis of WebFlow telemetry to improve

10   the efficiency of analyzing NetFlow telemetry from

11   Stealthwatch."

12           You saw this paragraph earlier.  It shows what was

13   going on with the technology at that time.

14           Dr. Almeroth's trial testimony was quite

15   illuminating.  It said, "If you applied the same

16   interpretation you applied for infringement for validity,

17   the claims would be valid, right?"

18           He says, "That's correct.  I'm not offering

19   opinions under what I believe is a proper claim

20   construction."

21           That should be a checkmate argument right there, an

22   expert coming in and saying I'm not using the proper claim

23   construction, but I'm giving you sworn testimony.  I'm

24   giving you my opinion that it's invalid, and I don't even

25   believe it.

548

1          Dr. Trent Jaeger was our expert in this case.  The

2     trial testimony at 3147, lines 4 through 19, he provided his

3     basis for why he disagreed with Dr. Almeroth's opinion, what

4     I just summarized earlier; that it doesn't correlate based

5     on the claims and does not generate or provision rules in

6     the manner required by the responsive claim limitation.

7          Now, the next slide, Dr. Jaeger was asked about the

8     SLIC feeds, you just heard about.  He says the SLIC feeds

9     are a bunch of humans, that it's a team of humans doing

10    stuff, and it's not computer automated at all.  So it has

11    nothing to do with the claimed invention.  It's clearly not

12    representative of logs.

13         Now, the old Stealthwatch is a monitoring tool.

14    That's what Dr. Jaeger talked about.  It says, "Would you

15    describe the old Stealthwatch system as a visibility tool or

16    something like that?"

17         He said, "The old Stealthwatch system is a tool to

18    gather information and display it to administrators.  So I

19    would say that the notion of a visibility tool would be a

20    reasonable description of the old Stealthwatch system."

21         They're just monitoring it.  And that's at trial

22    testimony 3123, 16 through 21.

23         New Stealthwatch with CTA automatically stops

24    threats.  We saw this earlier today.  "Cognitive Analytics

25    quickly detects suspicious web traffic and/or Stealthwatch

1    flow records and responds to attempts to establish a
2    presence in your network and to attacks that are already
3    underway."

4         It's automatic.  That's what CTA was brought in to
5    do, and it was incorporated in 2017.

6         Go to the next slide.

7         This is just another example how the "Cisco
8    Stealthwatch enterprise provides enterprise-wide network
9    visibility and applies advanced security analytics to detect
10   and respond to threats in real time."

11        "Real time" means it responds as soon as it detects
12   them.

13        If you look at the claim, actual claim language,
14   the correlation element is not there in the prior art; the
15   responsive to correlating, the generated base, and the
16   provisioning.

17        As you see, the identity of the plurality of
18   packets, it sends in the logs up.  They've been doing that
19   for years, and they've had to admit that they did it exactly
20   the way Dr. Cole said they did in order to come here today
21   and say it's invalid for the exact same reasons.  It just
22   doesn't -- once again, it's doublespeak.

23        I want to talk real briefly about secondary
24   considerations of non-obviousness.  This is in the trial
25   record, and I won't spend too much time on it, but it is

1    recognition of a problem; there's a long-felt need in the

2    industry for this technology; the failure of others; praise

3    by others; copying; and licensing.  All of these are met if

4    you read the trial record.

5          In the next slide, we have the Office of Naval

6    Research.  This has come from their document PTX-1113.  This

7    is a time before these inventions were filed.  This was a

8    recognition of a problem.  This was a long-felt need.  The

9    threat is outpacing the capacity in an exponential fashion.

10   This is from a third-party.  This is from the Office of

11   Naval Research.  And Dr. Striegel testified to this, as

12   well, in his trial testimony starting at Page 3198.

13         There's also praise by others in what these patents

14   actually provided to the industry, and they provide

15   proactive, scaleable threat prevention using threat

16   intelligence.

17         And finally, other evidence of non-obviousness is

18   there was not a single comparable license produced in this

19   case by Cisco.  Think about that.  A big company like Cisco,

20   they license a lot of different technology.  They couldn't

21   find a single comparable license to our technology.

22         Keysight is the only comparable license in this

23   case.  We were in this -- not in this courtroom, but in this

24   courthouse when that license occurred.

25         The lack of any comparable license from a company

1    the size of Cisco shows how unique and new Centripetal's

2    patents are, and that's another consideration of

3    non-obviousness.

4            Lastly, they didn't bring it up, but there was

5    somewhat of an issue about written description of the '176

6    patent.  We have cited throughout the specification where

7    there is written-description support for every claim element

8    in the case.

9            Thank you, Your Honor.

10           THE COURT:  Thank you.

11           Mr. Jameson, any response?

12           MR. JAMESON:  Just on what Dr Almeroth did at

13   trial, the very next questions after what he showed you

14   about the Q&A from Dr. Almeroth.

15           The question was:  "In your invalidity analysis,

16   you admitted that you didn't apply what you thought was the

17   correct understanding of the claims, correct?"

18           "Answer:  I applied Dr. Cole's understanding of the

19   claims.  That's what I used."

20           "And you don't agree with Dr. Cole's understanding

21   of the claims? "

22           "Answer:  That's correct.  But I understand it's

23   the goose/gander rule again."

24           Because it was Dr. Almeroth's opinion that we do

25   not infringe this patent, that was his point.

552

```
 1              And absent any questions from you, that's all I
 2     have.
 3              THE COURT:  I don't.  Thank you.
 4              MR. JAMESON:  Thank you.
 5              MR. ANDRE:  Your Honor, I've got the willfulness.
 6              THE COURT:  Well, you've got to hand up the -- hold
 7     on one second.
 8              MR. GAUDET:  If we could just have one moment to
 9     reconfigure our groups here.
10              THE COURT:  Go ahead.
11              MR. ANDRE:  May I proceed, Your Honor?
12              THE COURT:  You may.
13              MR. ANDRE:  Thank you.
14              So willfulness is a tough hill to climb for a
15     patentee.  You've got to show a lot, and you have to show
16     why a big company like Cisco would risk just taking someone
17     else's technology without taking a license or try to acquire
18     it legally.
19              Cisco was facing a significant problem in the
20     market.  They faced an existential threat of commoditization
21     of the core product.  They recognize this in their SEC
22     filing in 2016, where they said that this is a -- they run
23     the risk of the product being commoditized with the
24     hardware, the routers and switches were being commoditized.
25     That's PTX-1450, Page 279, in the SEC filing.
```

JILL H. TRAIL, Official Court Reporter

1          They also recognized it from third parties.

2   JPMorgan put a hold on their stock dealing with switching

3   commoditization.  This was April 6, 2016.  They were having

4   real problems with their business, and the business was

5   declining because of commoditization.  That led to them

6   looking for a solution to this problem and how they take a

7   commoditized product and make something out of it.

8          We used this timeline at trial, and I'll refer to

9   it very quickly, because this showed some of the more

10  significant meetings that Centripetal and Cisco had over a

11  year and a half.

12         The first one I want to talk about is the June 6,

13  2015, meeting with Steven Rogers and Mr. Reddy, Pavan Reddy.

14  And the reason I wanted to mention that is because

15  throughout this case, or this hearing, I've heard that

16  Centripetal was chasing Cisco, that we were chasing them

17  around and asking them to invest in us.  We heard that over

18  and over and over again.

19         But that very first call came in to Mr. Rogers,

20  Mr. Steven Rogers, on the train, and the reason I believe

21  his story, his testimony is -- and it was never disputed --

22  because he got off the train.  He was on a train heading to

23  his home, and he got a call from Pavan Reddy from Cisco, and

24  he said, "Yeah, I'll never forget it.  He called me, and I

25  was on the train in New Jersey coming from a visit -- I was

554

```
1    visiting a customer.  I had to get off the train at a train
2    stop and do the call, walking up and down the train
3    platform."
4          That's credible because that's a fact that you
5    would remember that.  You didn't get off at your own stop.
6    You got off at a different stop and walked the platform to
7    take the call.  Cisco reached out to Centripetal.
8          THE COURT:  What was Mr. Reddy's position at Cisco
9    at the time?
10         MR. ANDRE:  He was -- he worked out of the Research
11   Triangle Park.  He was responsible for putting together
12   special solutions for Cisco's customers.  The people they
13   met with were part of what they called the Cisco security
14   team.  These people specialize in the security aspect of
15   their business.
16         Now, going back to the slide show, the timeline,
17   there were many meetings after that June 6th, 2015.  The two
18   I wanted to highlight were the meetings at R-CISC and Black
19   Hat.
20         The reason those are significant, those were two of
21   the most important cybersecurity conferences there are.  And
22   to meet with a company the size of Centripetal -- they were
23   a third of the size they are today -- a small company
24   getting to meet with Cisco and doing demonstrations to them
25   at these major conferences, to get on their calendar, to get
```

555

1    on their schedule is very difficult.

2            So the testimony went in about those meetings at

3    trial, and their testimony went in, and there were

4    additional meetings besides that.  Once again, it's not

5    disputed.  There was not a single dispute about any of those

6    meetings happening and the substance of them.  Now, they

7    were all public information.  They were given public

8    demonstrations of our product, and for six months

9    Centripetal talked to Cisco, and then Cisco said, "We want

10   to get more from you.  Let's sign the NDA."

11           So on January 26th, 2016, they signed a

12   non-disclosure agreement.  It was a form, Cisco NDA, and it

13   basically said we want to look under the hood, as it were.

14   We want to get confidential information.

15           Because of this NDA, they had a meeting with Cisco

16   that was going to disclose confidential information on

17   February 4th, 2016.  And at trial, we presented the slide

18   deck they gave.  And the slide deck talked about

19   Centripetal's patented filter algorithms eliminate the speed

20   and scalability of the problem.

21           And during the meeting, the people who attended the

22   meeting said they talked about algorithms, patents, and the

23   confidential technology that Centripetal has.

24           If we go to the next slide, you will see this

25   testimony from Steven Rogers, and I won't read all of the

1    testimony to you.

2           It says, "Did you tell the people at Cisco about

3    your patented filter algorithms?"

4           He said, "Well, I didn't.  Jonathan did, of

5    course."  And he says, "We talked about the filter

6    algorithms and all of the other pieces that required speed

7    and scale of the solution."

8           "You mentioned that your solutions were patented?"

9           "Yes, of course."

10          Jonathan Rogers, in his trial testimony, "Can you

11   explain?  What was the purpose of this slide and

12   presentation to Cisco?"

13          So he says, "The purpose of the slide and

14   presentation, we had gone through an overview of the threat

15   intelligence market and the variety of information that's

16   available, the need and motivation to use that, and this

17   slide was to illustrate how we uniquely have developed

18   solutions to these problems and what those solutions are,

19   those technology solutions."

20          We asked him, "Did you describe Centripetal's

21   patented filter algorithms?"

22          "Yes, absolutely.  So where I set out the

23   computational problem, I am describing the function of many

24   of the different algorithmic techniques that we have to use

25   in the product in order to be able to operationalize

1    intelligence."

2            That was the evidence at trial.

3            There also was evidence that there was a

4    demonstration of the technology given at the presentation,

5    as well.  There was a blank slide in the presentation that

6    said "Demo."

7            We asked Mr. Rogers, "Who attended the demo?"  And

8    he talked about the people for Centripetal who attended and

9    the people who came in later, to give the detail of the

10   meetings.

11           What's telling about that meeting is the very next

12   day, February 5th, 2016 -- this is PTX-1046 -- Jonathan

13   Rogers followed up with the individuals at the meeting,

14   three of the individuals at the meeting.

15           And this contemporaneous email, the very next

16   today, said, "The group seemed to hone in on our filter

17   technology and algorithms.  The algorithms are a significant

18   networking technology with broad applications that we

19   productized for security.  There were also a few questions

20   about our patents."

21           That's strong evidence that they talked about the

22   algorithms and the patents because that's contemporaneous,

23   the very next day.

24           Cisco also has some internal communications amongst

25   themselves about the -- following the meeting, on the same

1    day of the meeting.  This is from Mr. T. K. Keanini.

2         And he put in, "It appears that most of their

3    intellectual property lay in the claims that govern an

4    amount of signatures (they call them rules) they are able to

5    instrument them in inline devices."

6         He said he wasn't sure if the market valued that

7    highly.  He wasn't that keen on it.  "What might be work" --

8    he corrected this in his trial testimony.

9         He said, "What might be worth exploration is to

10   look at those algorithms they have and how general purpose

11   they may be for data synthesis -- high performance set

12   theoretical functions.  Again, knowing what patent offices

13   will allow and not allow, I'd be very surprised if they were

14   able to make a claim on the algorithms themselves, but we

15   don't know until we study their claims."

16        That was the same day they had the meeting.

17        Going back to the timeline, after they had this

18   meeting in February of '16, the evidence was in the record

19   that they had several follow-up meetings.  Significant

20   meetings occurred in February 16th with Jonathan Rogers,

21   March 9th, and they had several -- the testimony on the

22   record was they had several phone calls and emails

23   subsequent to -- in between those time periods, and Cisco

24   actually invited Centripetal to a technology party.

25        I want to go back.  I'm sorry.  I skipped one of my

 1    slides here.

 2            Jonathan Rogers, how he described the email, why he

 3    sent the email, and this is the day after.

 4            "So after the email that was sent February 5th,

 5    were there any follow-up between Centripetal and Cisco, in

 6    terms of discussions?"

 7            He says, "Yes, there were a number of points of

 8    follow-up.  There were a couple of calls and emails between

 9    myself and the corporate development team" regarding that.

10            "And at some point, was there a meeting between

11    Mr. Akers, of Cisco, and Centripetal?"

12            "Yes, there was."

13            Then there was a July '16 invitation to be a Cisco

14    Live partner.  "Do you see that?"

15            "I do."

16            "And did Cisco invite Centripetal to be a

17    technology partner at Cisco Live that year?"

18            He said, "Yes, they invited us to be a technology

19    partner and to present in their security pavilion."

20            For a small company, that's a big deal, that Cisco

21    invited you to be a technology partner at one of their Cisco

22    Live events.  And they did.  They went and they presented.

23            And one of their bloggers actually -- a Cisco

24    blogger, on a Cisco publication, actually wrote about

25    Centripetal Solutions.

1          He called it a "Cool Tool:  Centripetal Networks

2    RuleGate - Threat Intelligence Tool."  He says,

3    "Centripetal's RuleGate can be deployed in different ways."

4    He talked about how this is "cool new technology."

5          THE COURT:  And just remind me, what was provided

6    to this individual?

7          MR. ANDRE:  This was a demonstration, and they

8    actually -- because he was with Cisco, they knew he was

9    going to write about it, so they didn't give confidential

10   information.  They didn't want that publicly.

11         It's just a -- the point of all this, to some

12   degree, is to show that we've heard that they were not

13   interested in Centripetal's technology, and the evidence is

14   just absolutely 100 percent or 180 degrees from that.  It's

15   just contrary to everything.  Their bloggers are writing

16   about the cool tools, inviting us to be technology partners.

17         Then they had another follow-up a few months later

18   about getting some more information from Centripetal's

19   technology.  And under the same NDA through Oppenheimer,

20   Centripetal's management presentation was given to them in

21   late 2016.

22         If you go to the next slide.

23         And in this presentation, you can see it was marked

24   "Very Sensitive," "Network Protection System."  It was under

25   the NDA to give their algorithms, they list out their patent

1    portfolio, and they talk about every aspect of their system.

2          When Mr. Rogers was asked about this slide, this

3    was his testimony:

4          "What's contained on this slide is the entire

5    software design of our RuleGate system, so this includes all

6    of the different database types, the language, the

7    components, how those logically interact, the base operation

8    system that we use.  It's a complete design description of

9    our RuleGate product."

10         "Does it show how information flows through the

11   system?"

12         "Yes, it does.  It shows logically how each

13   component has to interact with the data and then what

14   processes are involved for which systems or components."

15         "Was this contained in the part of the presentation

16   regarding intellectual property of Centripetal?"

17         "Yes, intellectual property and our technology."

18         That was at Jonathan Roger's testimony at 1242-19

19   through 1243-10.

20         Now go to the next slide.

21         I mentioned Dr. Cole earlier, and we brought an

22   expert in to talk about this, because we have the testimony

23   of the fact witnesses, the actual participants in the

24   meeting is what was provided.

25         And we asked Dr. Cole -- he had 30-plus years of

 1    industry experience.  Like I say, he was a chief technical

 2    officer at McAfee.  He was a chief tech officer -- or chief

 3    scientific officer at Lockheed Martin.  He worked in the

 4    industry for years and still works in the industry.

 5          So I said, "There was an NDA signed in January.

 6    Did you review this and sign this?"

 7          He said he did.  He understood that it was signed.

 8          I said, "Speaking of someone who has had this type

 9    of experience in the field, you had six months of meetings

10    and then signed a nondisclosure agreement thereafter.  What

11    would that indicate?"

12          This is Dr. Cole's opinion.  "That would indicate

13    to me, based on my experience, that there was a high

14    interest in the technology.  In my experience, I'd want to

15    find out more detailed information.  I know both at McAfee

16    and Lockheed Martin, we took signing NDAs very seriously

17    because it's a binding legal agreement.  So unless there was

18    a lot of interest in the technology, we would not pursue

19    NDAs."

20          That would resonate with me because there's six

21    months of meetings and then you sign an NDA, because that

22    shows the level of interest.

23          He also provided additional testimony.  We talked

24    about what kind of questions to get to a full understanding

25    of how an algorithm and how this technology worked, when we

1    asked him about the algorithms.

2           "Once again, in my experience, that's one of the

3    primary reasons why you would sign a nondisclosure

4    agreement.  If you were going to just look at public

5    features of the product or public screenshots that you could

6    get by buying the product, there would be no reason to have

7    an NDA.  An NDA is so you can open up the hood and look at

8    more details of the algorithms and what's going on with the

9    product."

10          We asked Dr. Cole also about Jonathan Rogers'

11   follow-up email, and he said, "Yes.  In my experience,

12   typically after a meeting with smaller companies when I was

13   at McAfee, a start-up technology we would be interested in,

14   it was very common for one of the key people or owner of the

15   company to follow back up within 24 to 48 hours giving a

16   summary of the meeting, and that's what this looks like."

17          "This is a summary of a meeting from Jonathan where

18   he is giving an overview that the group seemed to be honed

19   in on filter technology and algorithms.  And he continued to

20   talk about how the algorithms are a significant network

21   technology with broad applications that were prioritized for

22   security."

23          "Then he was also asking questions about the

24   patents, so that would indicate that the patents were

25   brought up and discussed during the meeting."

1          Finally, I asked Dr. Cole about, "When you discuss

2     algorithms in the computer sciences context, what exactly

3     are you referring to?"

4          "The algorithms is what we sometimes like to call

5     the secret sauce.  It actually goes in and shows you what

6     you're doing that's unique and different in the marketplace.

7     It's what you're able to do that other people weren't able

8     to do.  So it's typically very highly proprietary

9     information."

10          "Question:  Is that the kind of stuff, in your

11     experience, that people would provide another company under

12     a nondisclosure agreement?"

13          "Answer:  Yes.  That would be one of the primary

14     reasons why you would want to sign a nondisclosure

15     agreement, so this way you could feel comfortable providing

16     a larger company your algorithms, your secret sauce, your

17     special and unique ways of doing things so they can analyze

18     and assess your products, and you're still protected under

19     the NDA."

20          One of the things that we asked about the timeline,

21     in the next slide, was you see a red bar there; 354 website

22     visits and 1,206 pages visited.  And I asked Dr. Cole about

23     that.

24          I said, "What's that referring to?"

25          He said, "That's referring to web-tracking software

1    that tracks the number of times someone visits a website.

2    So it's my understanding that these are visits to

3    Centripetal's website from Cisco's IP addresses."

4            You know, if you type in "centripetal" in a Google

5    search, you get a definition of what "centripetal" means.

6    It's a centripetal force.  You don't get Centripetal

7    Networks.

8            So why were people at Cisco visiting a small

9    company's website 354 times, 1,200 page visits, if they were

10   not interested in the technology?

11           We had Dr. Cole do an exercise, on the next slide,

12   to actually put in when the pages were reviewed and what

13   website they visited.  We put them on a timeline, as shown

14   on slide 102.

15           We asked Dr. Cole, "What does that timeline show

16   you?"

17           And this is what he testified to:

18           "It's typically what I would expect to see.  So

19   prior to a meeting, you would see some website visits to

20   find out information about the organization, and after the

21   meetings, you would expect to see those website visits

22   increase significantly as they try to gather more

23   information from the website.  Then you would typically see

24   the website visits correspond with the meetings.  It's

25   important to point out that websites typically have public

 1    information, just another data point I use as part of my

 2    analysis to correlate with meetings showing additional

 3    interest they want to find out publicly about the product."

 4          As Dr. Cole says, we are not saying looking at

 5    someone's website is a bad thing.  It's just indicative of

 6    the interest when a company the size of Cisco, with tens of

 7    thousands of employees, are hitting a company the size of

 8    Centripetal's at the time, 30 or 40 employees, 300-plus

 9    times, 1,200 web pages, that tells you something.  And they

10    were doing this all starting from the time they first

11    reached out to Centripetal to the time they launched, almost

12    to the year, to the date, two years, and two years after

13    they launched the "network of the future."

14          Next slide.

15          June 2017 they launch this technology that they

16    term is groundbreaking, two years after the first meeting

17    with Centripetal and after meeting with Centripetal for over

18    a year and a half, continuous meetings and information

19    disclosures.

20          Now, one of the things that comes up with this type

21    of allegation of willfulness is the credibility of the

22    witnesses.

23          In our particular instance, every one of our

24    witnesses had contemporaneous documents to support their

25    testimony.  I showed you most of them here today.  In fact,

```
 1    I showed you all of them today, contemporaneous documents
 2    that supported their testimony, and in most cases their
 3    testimony was not really contested.
 4            Cisco presented two fact witnesses and no experts
 5    regarding Cisco's willful infringement.  T. K. Keanini, or
 6    Timothy Keanini, the author of the February 4th, 2016, Cisco
 7    email discussing the Centripetal meeting, his testimony
 8    conflicts with his own contemporaneous description.  And
 9    Karthik Subramanian, he's the signatory of the NDA between
10    the parties, did not have any memory if he actually attended
11    the Centripetal meeting, had no memory of it at all.  Those
12    are the only two witnesses at trial that Cisco put forward.
13            Mr. Keanini, in the next slide, we asked him,
14    "During your meeting with Centripetal, did anyone at
15    Centripetal inform you that Centripetal Networks had
16    patents?"
17            "That, I don't recall that coming up in the
18    meeting."
19            "Question:  You have no memory of them talking
20    about their patents at the meeting?"
21            "No.  That wasn't the -- if I remember correctly,
22    the meeting was about what they did, not necessarily their
23    patents."
24            You can see the contemporaneous documents talking
25    about the patented algorithms, and you saw the
```

1    contemporaneous emails.

2            Next slide.

3            When we pushed Mr. Keanini on his email, so the

4    question was, "So when you're talking about intellectual

5    property, you're talking about patents, right?"

6            "Answer:  No.  Again, I may have chosen the wrong

7    word here.  I was just -- in that first paragraph, I was

8    just trying to establish I was paying attention at the

9    meeting and that I understood what they did.  I didn't

10   really mean their intellectual property.  I meant what they

11   said they did in the demo."

12           "Question:  So in this email that you talk about

13   intellectual property, you also talk about algorithms and

14   what the Patent Office will and will not allow, and you're

15   saying you're not talking about the patented technology that

16   Centripetal disclosed at this meeting?"

17           "No, I'm not.  I'm not a -- my focus is to be

18   commercially successful.  I'm not a patent guy.  In fact,

19   even at Cisco, I'm not the person that takes care of

20   patents.  I'm a technologist."

21           He's talking about, in the very email, talking

22   about what the Patent Office will not allow.  He's talking

23   about intellectual property.  He's using the buzz words of

24   our industry, but he would not own up to it in his trial

25   testimony.

569

1        Next slide.

2        And we asked him about the last paragraph.  "What

3   might be worth exploration is to look at their algorithms."

4   We asked him about that.

5        And we said -- he says, "I see that.  And again, I

6   was just trying to express the fact that I wasn't -- I

7   didn't want to come off as arrogant.  I had no interest in

8   their technology.  I used the Steve Jobs thing to show that,

9   you know, I didn't think they were really commercially

10  viable because they were so late.  I wanted to give another

11  example, so I talked about patents, because if you're late

12  on patents, it's a very crowded space to make a claim.  I

13  was just trying to explain where I was coming from in the

14  most polite manner."

15       This is the internal email to his colleagues.  This

16  is not out to the public.  He completely tried to walk away

17  from what he actually said in the email, and to a sense, it

18  made no sense at all.

19       The only other witness Cisco put in to discuss

20  those meetings, as I said, was Mr. Subramanian.  And during

21  his deposition, he couldn't even remember the meeting.

22       And we asked him, "At your deposition, you really

23  didn't remember meeting with Centripetal; is that correct?"

24       He said, "It was one of the hundreds of companies

25  that we met."

1           I said, "But you didn't remember at your

2     deposition, and so you kind of re-created this based on

3     emails that you've been looking at, right?"

4           He said, "I did not remember the specifics of the

5     conversations because it was one amongst hundreds of those

6     meetings that I potentially had when I was at Cisco, yes."

7           Next slide.

8           I said, "If you don't recall going to the meeting,

9     the February 4th meeting, one way or the other.  You may

10    have gone, you may not have; is that correct?"

11          He said, "Yes.  You know, I don't recall the

12    specifics of that.  It was organized by my team.  I think

13    more than likely I was part of the meeting as well.  I just

14    don't remember."

15          He had no testimony to give.  They brought him into

16    trial to try and counter the email.

17          And during this Rule 63 hearing, they tried to

18    make -- they said Mr. DiSabello -- used Mr. DiSabello, who

19    was a former employee, who was not an inventor here, as a

20    witness that said the meeting didn't disclose confidential

21    information.

22          The testimony that we have in the case was he

23    wasn't even at the meeting.  He came at the very end to show

24    a demonstration, and that was it.

25          Willful infringement is a tough road, a tough hill

1    to climb, but if this is not a case of willful infringement,

2    there is no such thing; a year and a half of meetings under

3    an NDA, algorithms disclosed, new technology launched that

4    changed their entire product line, new software.

5            Unless you have any questions, Your Honor, I think

6    I'll sit down.

7            THE COURT:  I don't.  Thank you.

8            MR. ANDRE:  Thank you.

9            MR. GAUDET:  Your Honor, we have a few binders to

10   hand out, as well, a binder for willfulness.

11           THE COURT:  Okay.

12           MR. GAUDET:  It's got about 80 slides in it.

13   Mindful of the Court's desires, I'm going to try to cut out

14   a lot of them.  I have to admit that the more I heard

15   Centripetal talk, the more I found myself putting back in,

16   but I will try to keep this as succinct as I can, Your

17   Honor.

18           THE COURT:  Mr. Andre, your slides are contained in

19   the binder that you had previously put up, right?

20           MR. ANDRE:  That's correct, Your Honor.

21           THE COURT:  So we have them?

22           MR. ANDRE:  You have those.

23           THE COURT:  Very well.  Thank you.

24           MR. GAUDET:  Can I proceed?

25           THE COURT:  You may.

1          MR. GAUDET:  Thank you, Your Honor.

2          This, obviously, is an issue that we hope you never

3     reach, because obviously if we don't infringed the patents,

4     we can't willfully infringe the patents.

5          There is a lot that we have to say in response to

6     that presentation, but I am going to try to organize it

7     around just a few basic points.  The first point -- and I'm

8     jumping to slide 6 here -- is to give you a sense of Cisco's

9     investment group and what they do, because the way that

10    Mr. Andre just presented that timeline, as if we had kept

11    reaching out to them, six months of meetings, this is so --

12    it's utterly incorrect and a highly misleading way of

13    presenting what happened.

14         After showing you what our investment group is, I

15    am going to walk through a timeline, but I'm actually going

16    to show you how each one of these interactions began, and

17    what you will see over and over and over again is a

18    different person at Centripetal or a different bank reaching

19    out again to Cisco after they had already been told no, over

20    and over and over again.  And there was literally one

21    meeting.  I mean, there was a meeting, this February

22    the 4th, 2016, meeting.

23         And the testimony that he did not show you was the

24    testimony from Doug DiSabello, who actually Mr. Rogers

25    confirmed was there the entire meeting, and Mr. DiSabello

1    confirmed he was there the whole meeting, and Haig Colter,

2    their former employees, who have absolutely nothing to gain,

3    and they were unambiguous.  There was literally no

4    confidential, technical information disclosed at that

5    meeting.  It was the level of a marketing meeting, which is

6    exactly what you would expect.

7            So let me start with Cisco investments.  This is

8    from our website, actually.  It's a public document.  It was

9    admitted at trial.

10           Cisco, part of what it does -- I mean, it

11   understands it doesn't have a monopoly on great ideas.  It's

12   got, in effect, like a venture capital group whose job it is

13   to look out and invest in start-up technologies.

14           So this is in 2020.  It describes its portfolio

15   companies in areas including security, where we invest 200-

16   to $300,000,000 per year.  Right.  We've got 120 active

17   portfolio companies, active investments, and this is what

18   leads to things like Cisco acquiring Lancope, which had

19   Stealthwatch; Sourcefire, which you've heard a lot about,

20   Cognitive, which had CTA.  It's this very active investment

21   group, and everybody in this space knows about it.

22           And so when you're a start-up company, one of the

23   things you want to do is get an audience with someone like

24   Cisco to see if you can attract interest, that's just part

25   of what happens.

1          Your Honor, this next slide is slide 10, so I'm

2    jumping a little bit.  This is just to give you a sense of

3    what Centripetal's pitch, as they were trying to get

4    investment, was.  This is a public paper.  No

5    confidentiality investigations on this.  They call it their

6    "Technical White Paper."

7          But Centripetal's basic pitch to the marketplace

8    was that conventional packet filters can only do 10,000

9    rules, and that's still what everybody does, and they've got

10   some really neat technology that can apply 5,000,000 rules

11   in these devices, and you will hear that over and over and

12   over again.

13         They acquired this special software in 2009 from

14   someone named -- it was David Ahn, that allowed you to

15   process a bunch of rules really quickly, and that's what

16   they built, and that's great, but nobody does it.

17         And they are not even suggesting that Cisco does

18   that.  We do not.  We have never increased the number of

19   rules we process.  That's not this case.

20         But that was their investment pitch.  That's what

21   was supposed to make them so unique.

22         So the other thing I want to do before I get into

23   the timelines, I think he just said it again, that he says,

24   "During those meetings" -- even though there was, from what

25   I can tell, really one meeting that involved a PowerPoint or

1   anything like that -- "Cisco sought technological details

2   and the algorithms" -- this is their trial brief -- "that

3   made Centripetal's patented products a novel and unique

4   solution to a complex problem.  Cisco's next move was to

5   steal Centripetal's patented technology."

6          And it may have been the first question that you

7   asked, Your Honor, in this hearing to Dr. Medvidovic.

8   "What's an algorithm?"  It's, for example, source code, or

9   it could be, you know, something more -- you know,

10  something -- or you write it in the source code.  Is it --

11  algorithms, as you can imagine, get much more complex than

12  that.  You can control a switch or a router or a Space

13  Shuttle.

14         Dr. Almeroth said the same thing; very, very

15  complex.

16         And then what is the form of an algorithm?  How

17  could you have disclosed an algorithm?  And he says, well, a

18  graph, typically known as a flowchart, programming language,

19  pseudocode, mathematical formulas.

20         Your Honor, if they had disclosed an algorithm

21  Plaintiff's Exhibit 1 in this case would be the algorithm,

22  but they would have to have expressed it in some form.  It

23  doesn't exist because it never happened.  That is the most

24  sensitive stuff they would have, it was actually one of the

25  things Dr. Cole testified to.

1          They don't disclose it to anybody.  And the
2     evidence is crystal clear they never disclosed any algorithm
3     to us.
4          Instead, what you get is testimony from Jonathan
5     Rogers, who is not even the technical person.  He's the
6     chief operating officer that, frankly, sounds like a word
7     salad with the word "algorithm" repeated in a bunch of
8     different ways; algorithm function and algorithm technique.
9          What's the algorithm?  We have no idea.  There was
10     never an identification of any algorithm that they even
11     disclosed to us, much less an algorithm that we would have
12     used.
13          With that background Your Honor, I'm now going to
14     take you through the timeline, but I set up this timeline
15     different because I want to focus on the people that were
16     making the outreaches and how the outreaches were going, and
17     it tells a very different story than what Mr. Andre just
18     told you.  So this is now slide 16.
19          The first one, this was the one where we had the
20     train, right Steve Rogers, Pavan Reddy on the train.  Okay.
21          Well, to start with, you know:
22          "Question:  Did you disclose any confidential
23     information to Mr. Reddy?"
24          "No."
25          All right.  So this is not where anything

1  confidential happened.  But how did this happen anyway?  How

2  did Mr. Rogers' phone mysteriously ring on the train all of

3  a sudden, right?  There is no real answer to that.

4         Well, this is the answer.  There is an employee

5  named Haig Coulter, there was, right.  He is one of the

6  disinterested employees who Centripetal hired away from

7  Sourcefire.  They hired one of our employees, right, Haig

8  Colter.  Haig Colter knew all kinds of people at Cisco.

9         And so the question to him at his deposition, "Do

10 you know what the purpose of the August 2015 call with

11 Mr. Reddy would have been?

12        Well, "Yes.  When you're a start-up, you're always

13 trying to get the attention of a bigger company who may have

14 interest in licensing technology, reselling your technology.

15 So this was an opportunity to see if we could get somebody

16 at Cisco interested in what we were doing."

17        Mystery solved, right.  That was the first one.

18        The second one.  Someone named Tom Frommack, along

19 with Steve Rogers, reaches out to a different person at

20 Cisco named Greg Akers.  This is also in 2015.  Let's look

21 at how that one went.  This is Mr. Akers.  He testified by

22 deposition.

23        He says, "And how did you first hear about them in

24 2014/2015 time frame?"

25        "A former employee of mine was working for a

```
 1   private equity firm, and he called and asked if he could
 2   introduce them to me."
 3           "And do you recall this gentleman's name?"
 4           "Tom Frommack."
 5           Mystery solved.  Another investment banker, which
 6   is fine.  That is what happens.  When you've got that much
 7   money to invest, you will get, you know, inputs.  But that's
 8   what happens.  Another investment banker introduced Steve
 9   Rogers to a completely different person, to Greg Akers, who
10   had no background that anything else had ever happened.
11           And Mr. Akers -- I took the slide out.  I don't
12   want to belabor every point.  He said absolutely nothing
13   confidential.  This is, again, this high-level pitch.  That
14   was the end of it.
15           And, Your Honor, this is -- there were apparently
16   six months of meetings leading up to the NDA.  I just
17   finished every detail of those six months.  There wasn't a
18   single meeting leading up to this NDA.
19           Then we get to the NDA issue, okay.  And to start
20   with, I'm going to show you the NDA.  That is standard
21   operating practice.  Every time one of these things happens
22   with the Cisco investment group, it's a Cisco form NDA.  We
23   sign the Cisco form NDA, and then you start talking.  And it
24   even says -- I'll show it to you.  It evens says things
25   like, of course, nothing about this suggests that we agree
```

1    what you're saying is confidential or new or whatever else.

2    We just want to have a protected conversation so nobody has

3    to worry, and, you know, that's nature of it.

4           The way that that February 4th, 2016, meeting

5    happened, number one, had absolutely positively nothing to

6    do with anything that came before it.  Instead, this is what

7    happens.  Someone named Sameet Mehta at an investment bank

8    galled Granite Hill, okay, was contacted by Matthew Bennett

9    at Centripetal.

10          So Matthew Bennett/Centripetal reaches out to an

11   investment bank called Granite Hill.  Says, "We're looking

12   to raise 20- to $30 million in our investment."

13          And as a result of that, you can see the bottom

14   here, this is the same email, Mr. Sameet Mehta, on behalf of

15   that investment bank, forwards it to Rob Salvagno, who is

16   the head of Cisco's business development group, or that's

17   Cisco investments, okay, and says, somebody at Granite Hill,

18   which is one of the investment banks, wants us to meet with

19   Centripetal.  He then forwards it to yet another person, who

20   has not ever met with them before.  That leads to the

21   February 2016 meeting.  It has nothing whatsoever to do with

22   anything that came before it.  It was just another one of

23   the hundreds and hundreds of meetings that Cisco's

24   investment group takes that are organized through investment

25   banks.

1             And I want to spend -- I could spend a lot of time

2     talking about the evidence on this meeting.  It's all in the

3     record.  I'm sure you've read it.  There is just a few

4     things I want to point out.

5             Mr. Jonathan Rogers identifies the people that were

6     there.  Right.  And I bolded the ones -- this is on his

7     side.  I bolded the ones that have testified in the record.

8             Steven Rogers says nothing other than, yeah,

9     Jonathan talked about our algorithms, whatever that means,

10    okay.

11            Sean Moore didn't even remember the meeting.  Think

12    about that.  They are saying this is the one time ever they

13    gave away the keys to the kingdom, and their chief

14    technology officer has no recollection, right.

15            But Haig Colter and Doug DiSabello are -- that's

16    it.  It's over.  They are as clear as can be, no

17    confidential information was disclosed at this meeting.

18            And this is a slide where Mr. Rogers confirms that

19    Mr. DiSabello was there.

20            And the testimony that Mr. Andre showed you was on

21    direct.  He said, oh, I'm not sure if he was there.

22            I said, on cross -- or, rather, Mr. Jameson said on

23    cross, at the bottom one, "He may have been there for the

24    entirety of the meeting, you just don't recall.  Is that

25    fair?"

1          He answers, "He may have been there for the
2   entirety of the meeting."
3          Then you'll see Mr. DiSabello says, I was there for
4   the entirety of the meeting.
5          I don't want to take the time to read all this to
6   you, but, you know, slide, 35, 36, and 37 could not be any
7   more blunt than absolutely, positively, no confidential
8   technical information was shared at that meeting.
9          This was the guy.  He was the RuleGate product
10  manager.  He was doing the presentations.  He was answering
11  technical questions, but it's not just him.
12         Mr. Colter was there too, another witness with
13  nothing to get out of this case.  He says he participated in
14  it.  Here it is again.  He says in bold, I remembered very
15  high level demonstrations showing features and
16  functionalities.
17         "Question:  Was the demonstration akin to something
18  you would do in a marketing presentation?"
19         "Yes."
20         "To the best of your knowledge, did Centripetal
21  disclose any technical confidential information to Cisco?  "
22         "I'm not aware of any confidential information
23  being shared."
24         And when you look at the document -- the documents
25  from the meeting, that's consistent with it.

1          Then immediately after that we've got the email

2     internal at Cisco.  Again, just read the email from bottom

3     up.  Everyone is saying I didn't think much of this.  I

4     mean, I kind of get what they're driving at.  I -- what do

5     you think?  I didn't think much of this.  What do you think?

6     And then it ends.  That's the end of it.  Nobody says let's

7     go do something.

8          The PTX-102 from Mr. Rogers, which was his

9     follow-up the next day, look at the last line:  "If it would

10    be helpful, I would be happy to provide some materials or

11    set up a discussion on the filter technology and patents."

12         If their theory was the least bit correct, wouldn't

13    we have said, of course, absolutely.  We literally ignored

14    this email.

15         Instead, he followed up again 11 days later, and

16    that's actually one of the slides I'm skipping over, and

17    that led this between the Cisco group:  "I think it's a pass

18    given the feedback and everything else.  Agree?"  "Yep,

19    agreed."  That's the end of it.  That is the end of it.

20         And so then with respect to Mr. Keanini, he has

21    this -- and this appears to be now the entire basis of their

22    copying case that he says, you know, they talked a lot about

23    algorithms.  I'd be very surprised if the Patent Office

24    would let me have an algorithm.  Who knows?  You wouldn't

25    know unless you went and saw it.  He sort of says that in

1    the context of saying I'm not really interested in this

2    technology.

3            Two more messages come up that say, I'm not

4    interested in it, I'm not interested in it.  That's the

5    email chain, okay, and that's the last thing there is --

6    ever is of anything.

7            So we ask the question, I mean, "Did you yourself

8    study any of Centripetal's algorithms or patents?"

9            "No."

10           To your knowledge...did anyone else?"

11           "No," which is consistent with the fact that it was

12   a pass.  They didn't tell us anything.  No one was

13   interested in it.  That was the end of it.

14           The last point on this.  This is just a copy of

15   that NDA.  It's literally got a Cisco footer on it, "Last

16   modified 6/1/2012."  It's a really old form that we use.

17   This thing gets used in -- it's just a standard thing when

18   you meet with the business development group.  It doesn't

19   mean something was confidential; it doesn't mean something

20   wasn't confidential.  But there is nothing significant about

21   its existence other than that's what happens when you meet

22   with the Cisco business development group.

23           The next one is Cisco Live, and, Your Honor, this

24   one is actually -- this is a particularly remarkable

25   insertion into this story.  Cisco Live is a conference that

584

 1    Cisco has for the industry where developers can come

 2    together, you know.  It's -- and it's a big, huge industry

 3    event.  You have a lot of attendees.  Well, people can pay

 4    sponsorships to be a sponsor there.  Centripetal paid Cisco

 5    money to be a sponsor there, and the people that were

 6    involved in that had nothing to do with these other

 7    meetings.

 8            The people at the Cisco Live event for Centripetal

 9    were Justin Rogers, who is Jonathan Rogers' brother, and

10    Steve Rogers son, who left the company a number of years

11    ago, and Chris Gibbs, who is the marketing person.  Neither

12    of them were even at the February 2016 meeting.  So let's

13    get some testimony about this one.

14            All right.  This is Justin Rogers.  He is a former

15    employee.  He said, I think they hold the conference

16    annually.

17            "Was Centripetal...a sponsor of the event?"

18            "Yes."

19            "And that required Centripetal to pay money?"

20            "Yes."

21            Well, how did this happen?  Well, the reason they

22    were invited again was because they had hired a Cisco

23    employee named Haig Colter, who -- and Haig said

24    basically -- and the other piece of this, Centripetal was

25    also a customer of the ThreatGrid Group, as he referenced a

1    ThreatGrid.  ThreatGrid is a group in Cisco that literally

2    sells threat intelligence.  That's the partnership.  The

3    partnership has nothing to do with the February 4th, 2016,

4    meeting.  Nothing to do with -- it's Haig Colter had a

5    relationship with people in the ThreatGrid team and got an

6    invitation for us to go be a sponsor.  That has nothing to

7    do with the rest of this story, Your Honor, and this is what

8    happened there, right.

9         "Did you ever tell Cisco any confidential

10   information of Centripetal?"

11        "Not to my knowledge."

12        "What was the nature of the presentation that

13   Centripetal made?"

14        "Typical of a marketing presentation, communicating

15   some of the capabilities of our tools..."

16        I like the last one.  "And to whom was that

17   presentation given?"

18        "Passersby, attendees of the conference."  Anyone

19   who would listen.

20        Chris Gibbs said exactly the same thing.  There was

21   absolutely nothing confidential, nothing in any way relevant

22   to the rest of the story that they're telling.

23        This blog that they're talking about that happened,

24   yeah, there are Cisco bloggers that watch all of the

25   gazillions of things that happen by the various sponsors as

1    Cisco Live.

2            And look what he said about it, "Centripetal showed

3    me their approach to these issues" -- public -- "by enabling

4    multiple feeds that provide around 5 million checks when

5    fully enabled."

6            Over and over and over again.  It was this

7    technology that did 5 million rules that was -- they were

8    making a run at it.  Cisco wasn't interested in it, and it

9    appears nobody else in the market was interested in it.

10   That's what the technology was.

11           The next one, all right.  This is now the next

12   outreach.  Now we're back to the Cisco development team, but

13   they -- but Centripetal has switched who is reaching out.

14   This is now a new bank, a different bank, Oppenheimer,

15   reaches out to Cisco.  This is now November of 2016.

16           And Mr. Rogers explained that the point is -- of

17   this one was "identifying potential strategic investors as

18   well as regular financial investors."

19           In other words, they had a broader reach, I guess,

20   than Granite Hill.  And what Oppenheimer did was create this

21   spreadsheet that's got dozens of contacts.  Just look at the

22   one that's highlighted here.  Cisco contacted on 11/08.

23   Sent a teaser on 11/15.  We passed, right.  "Followed up

24   1/5.  They will reach out if there is interest."  That's the

25   grand total of what we know about any communications.  There

1    was no meeting.  There was no -- there was nothing else of

2    the sort.

3              Now, Mr. Andre put up a PowerPoint -- a

4    presentation that he said was the Oppenheimer presentation.

5    It was in slide 96, and he talked about some testimony from

6    Jonathan Rogers about what was in it.

7              Be very careful with that exhibit.  That was not

8    produced by Cisco.  Right.  It doesn't say Cisco on it.

9    That document was produced by Oppenheimer, because when we

10   heard them say that Oppenheimer had sent us something, we

11   didn't have it.  We can't find it.  We don't think

12   Oppenheimer ever sent that document to us.

13             Oppenheimer doesn't have any email, any

14   communication, anything else suggesting that they ever sent

15   that document to us.  The grand total of the testimony is

16   Jonathan Rogers' hearsay testimony that he thinks this is

17   the kind of thing they probably would have sent to us.

18   That's nothing.

19             That's the end of the six months of meetings,

20   right.  It was a grand total of one meeting.  They were

21   orchestrated by investment bankers, and nothing came of any

22   of it.  There was no continuation.

23             They also talk about this October 2017 event.  I

24   just -- you know, there is something big happened before

25   October 2017; namely, the unveiling of the network of the

1    future, and, apparently, they're saying even after we did

2    that, and had already stolen their trade secrets, we

3    apparently time machined back and did it again because we

4    learned something later in October of 2017.  It just -- it

5    doesn't work.

6            And our response, when they reached out was, once

7    again, PTX-1379, it's a pass.

8            The website visit issue -- first of all, if I --

9    for example, when I logged onto ESPN last night to see how

10   some of my favorite teams did, I probably wracked up a

11   couple of dozen web page hits, because every time you click

12   a link, every time you send something else, that's what's

13   happening.

14           Of course, when somebody calls you and asks you to

15   make an investment, you are going to look at their website.

16   There is nothing unusual about that, and that's exactly why

17   we have this just finding of fact, 377, yes.  As part of

18   their reach out to us, you would expect to see website

19   activity, and Dr. Cole said, yeah, that's perfectly normal.

20           The next set of points -- I'm actually getting

21   towards the end, Your Honor.  What I've shown you so far is

22   they didn't tell us a thing.  There is nothing they showed

23   us that even if we had wanted to, we could have used to copy

24   or create something, but there is also no mapping with these

25   patents.

1          I mean, you never heard anything about quarantine

2     rules, right, I mean, nothing ever, that suddenly everything

3     on the previous few days of this trial vanished.  This one I

4     really like, actually, on the '806 patent.  Recall that I

5     showed a slide in the '806 slide patent presentation that

6     had our inventor testimony -- not our inventor testimony,

7     our product testimony.  There is no relationship at all

8     between the buffering and the swap of a rule, and I

9     contrasted that with Sean Moore, their inventor's testimony,

10    about what exactly his invention was.  And the question was,

11    tell me about the patented invention, right.

12         And Centripetal's response was basically, oh, you

13    can't trust what he said.  You shouldn't count what the

14    inventor said because he didn't understand the claim

15    language.  I mean, square that up with the story now that

16    somehow we embraced that, and he was the expert, and he told

17    us -- your head starts spinning.  It doesn't make any sense.

18         The other point on the '176 patent -- and this is

19    slide 73 -- Mr. DiSabello literally said that the type of

20    correlating that he always tells people makes RuleGate so

21    special, their technology so special, is that it correlates

22    every packet, not just a sampling like NetFlow.  What their

23    secret sauce was, was literally distinct.  It was the

24    opposite from what we do.

25         A few more things.  They talked about -- they gave

1    you a lot of testimony from Dr. Cole, and as soon as

2    Mr. Jameson unlocks his computer, I will have something more

3    to say about that.  His punch line was, "It looked very

4    suspicious."

5         Mr. Jameson did a voir dire of Mr. Cole -- of

6    Dr. Cole, and this is at 1011 line 25, he says, "Dr. Cole,

7    in connection with your investigation into copying, you did

8    not interview any Centripetal witnesses about any meetings

9    with Cisco, correct?"

10        And he says, "That's correct."

11        "You did not ask a single Centripetal employee what

12   was disclosed or not disclosed at any meeting with Cisco,

13   correct?"

14        "Answer:  I just relied on the documents provided

15   to me, but I did not interview any witnesses."

16        Your Honor, that testimony is of zero probative

17   value.  He was not there, he didn't even talk to witnesses,

18   and I don't know if he was even provided with all of the

19   things that I just showed to you, Your Honor.

20        Dr. Striegel's testimony was about the most watered

21   down thing you could ever say about something.  "It could be

22   plausible."  That certainly doesn't overcome the hill that

23   Mr. Andre talked about.

24        A couple of other points.  Lost in all of this is

25   that the most fundamental thing that you have to do to even

1    start a copying case, a willfulness case, is to show we had

2    pre-suit knowledge of the patents, that we knew the patents

3    even existed.  They don't even have that.  They're talking

4    about the fact that the RuleGate product itself has patent

5    numbers marked on it, but there is no evidence that we ever

6    had physical possession of a RuleGate product or if we

7    looked at it or anything like that.  They never sent us

8    anything with patent numbers.  There is no patent numbers on

9    the February 4th, 2016.  They literally don't even get out

10   of the gate on this.

11         The last point, and I think this is a great place

12   to end, actually.  These are the witnesses who testified

13   about how the accused products work.  They are the ones who

14   built the accused products.  Every single one of them said,

15   we never heard of Centripetal until they sued us.

16         We'll stop there, Your Honor.

17         THE COURT:  Thank you.

18         Mr. Andre.

19         MR. ANDRE:  Very briefly, Your Honor.

20         What I heard from my opposing counsel here was a

21   lot of lawyer argument and not too many facts.  He

22   criticized Dr. Cole for not talking to witnesses, but

23   Dr. Cole wanted to give an objective analysis based on the

24   actual evidence, the evidence that we put in the record

25   here.  He looked at the documents.  He looked at what

 1   happened in the website hits.  He looked at the emails, the

 2   contemporaneous emails.

 3          Using his experience, he didn't listen to what

 4   Jonathan Rogers or Steven Rogers or anyone else said because

 5   that is subjective information.

 6          For an expert, he wants some kind objective

 7   information.  So he pieced it together based on what was

 8   actually in the contemporaneous documents, which is much

 9   more powerful than someone else's memory or lack thereof.

10          They talked about the follow-up emails.  They said

11   everyone just said they were not interested, not interested.

12          Well, if you go to Exhibit PTX-134, this is the

13   whole email chain.  If you go down to the third page of this

14   document, there is Mr. T. K. Keanini's email that I had in

15   the record, and it talked about what might have been worth

16   exploration, yada-yada-yada.

17          Above that, it spanned over two pages, is a

18   response from Michal -- I'm not even going to try to

19   pronounce his last name.  There were two pages, and what he

20   says, "There is a general agreement that the value they are

21   bringing to the table is scalability of fusing intelligence

22   and doing signature-based detection.  The rest is not that

23   important, I would say.  If you guys suggest we shall

24   continue discussing, we would need to dig deeper into how

25   exactly do they provide high scalability so that we learn

1    whether their approach is really innovative.  It is

2    technologically defensible and the IP is well protected.

3    Given the time available, the answers I was given were all

4    superficial and self-confident.  I can imagine a value being

5    created if they become 'the' place with the most of

6    intelligence (which I do not think they are) and would be

7    able to do some correlation or generalization based

8    analytics on top of their data."

9            The email above that, another attendee, basically

10   echos Michal's emails.  At the very end, it says, "I'm happy

11   to continue investigating the GTM merits of CN's solution if

12   both of you and Bret feel the technology solution is worth

13   further investigation."

14           Very top of the email, says, "Michal indicated the

15   need for deeper dive.  We have not received the feedback

16   from Bret."

17           The top security team at Cisco, some people liked

18   it, some people didn't.  But what we have on the record is a

19   timeline that shows the development following disclosure in

20   every single instance.

21           The information that counsel was talking about, the

22   lot of lawyer argument saying Oppenheimer didn't give the

23   presentation, there is no evidence of that.  In the record,

24   there is.  There is testimony that Oppenheimer did give that

25   information at trial.  Mr. Jonathan Rogers said Oppenheimer

594

1     gave the presentation to Cisco.  The fact that Cisco

2     couldn't find it is neither here nor there.

3          Your Honor, I will save the rest of the time for

4     the damages unless you have any questions.

5          THE COURT:  I don't have any questions.

6          But I did want to circle back to the issue you had

7     raised earlier regarding the exhibits that I had admitted on

8     the '176 patent, and what I had asked you all to meet and

9     confer about is, your concern is related to that, and then

10    there were some additional, at least pages that were

11    admitted into the record and perhaps some limited testimony.

12    And certainly there has been plenty of argument, and so I

13    can see where potentially you both may want to submit

14    amended findings of fact to address those issues.

15         And so my question would be, if given the

16    opportunity to do that, would that not address the concern

17    that you raised with those exhibits?  And so I want you to

18    think about that, talk to Cisco, and then just let me know

19    what your position is based on that.

20         MR. ANDRE:  Will do so, Your Honor.

21         THE COURT:  Why don't we take a ten-minute break,

22    and then we'll resume with damages at 3:35.  Thank you all.

23    We'll stand in recess.

24         (Recess from 3:22 p.m. to 3:37 p.m.)

25         THE COURT:  Ms. Kobialka, it's good to see you.

1          MS. KOBIALKA:  Thank you.  It's good to see you

2     too.

3          THE COURT:  Give me just one moment.

4          MS. KOBIALKA:  Absolutely.

5          THE COURT:  All right.  You can go ahead.

6          MS. KOBIALKA:  Thank you, Your Honor.  May it

7     please the Court.  We do have binders that I believe we need

8     to pass up, if we haven't done that already.  Already done.

9     Wonderful.

10          So, Your Honor, there is lots of evidence that goes

11     into supporting damages, and I could spend a lot of time

12     going through that.  I anticipate that the things that you

13     probably are most interested in will probably be surrounding

14     the Keysight license, the royalty base, the apportionment,

15     those types of things, and what I've tried to do is, I will

16     slim down my presentation, and I'm hopeful that if I miss

17     something, you will go ahead and ask questions.  I've also

18     taken the confidential information and put it at the end so

19     we just close the courtroom at the end.  So it may be a

20     little bit disjointed in the presentation, but I wanted to

21     start with that, and I hope that's helpful.

22          THE COURT:  Let me just, on the confidential

23     information, just for purposes of being clear, specifically

24     what information do you intend to disclose during the sealed

25     portion?

1          MS. KOBIALKA:  So there will be specific terms of

2     the Keysight License Agreement that Keysight has requested

3     be maintained confidential.  Additionally, there are the

4     revenue financial information, the details of those of

5     Cisco.

6          THE COURT:  All right.  And, Cisco, I'm presuming

7     you don't have any objection to sealing the courtroom during

8     the portions of that testimony or that argument?

9          MR. JAMESON:  No, Your Honor.

10         THE COURT:  All right.  And I'll just ask if there

11    is any other objection from the public for sealing during

12    that portion?

13         All right.  Hearing none, I do think it is

14    appropriate, given the way in which this Court has

15    previously handled the terms of the Keysight settlement, as

16    well as the more sensitive information regarding Cisco's

17    financial information, that we seal only during the portion

18    of the argument that relates to that, that argument

19    specifically and disclosing of those numbers, and so we will

20    handle it in that way.

21         Okay.  You can go ahead.

22         MS. KOBIALKA:  Thank you, Your Honor.

23         So we're going to go over the damages methodology

24    that Centripetal's expert, Mr. Gunderson has used.  And what

25    he had done is identified what we call the smallest saleable

1    patent practicing unit, this is referred to as the SSPPU.

2    Patent litigators love to have all kinds of acronyms.

3    That's one that's well used in damages in patent law.

4          Once we've gone through and identified that SSPPU,

5    which formulates the royalty base, we do something called

6    apportion, a reducing that royalty base down to the

7    footprint of the invention.  It doesn't have to be perfect.

8    It can be an estimation.  But that is the step that was

9    taken, and that was done through two steps.  One was done by

10   Dr. Striegel, who did an apportionment based on technical

11   information which then was adopted by Mr. Gunderson, and

12   then he applied it within an economic sense.

13         Then after that, there was -- there is a

14   determination of a royalty rate, and this, in part, was

15   based upon all of these *Georgia-Pacific* factors but also the

16   Keysight license, and then you do the math, which is

17   apportioning the -- you take in the apportioned revenues and

18   multiplying that times the royalty rate to come up with the

19   reasonable royalty.  So that's just a quick overview, and

20   I'm going to try to focus really on the primary points.

21         So if we could turn to slide 4.  The statute

22   addresses and identifies separate, distinct acts of

23   infringement, which are at issue here, and that includes

24   making, using, offering for sale, and selling.  And so those

25   are the various things that have come up throughout the

 1    testimony.  Much of it is undisputed.  So I wanted to

 2    emphasize that because I think there is a huge divide in how

 3    Cisco's expert -- damages expert interpreted the acts of

 4    infringement, only considering what was based on sales and

 5    really didn't pay any attention to the making and using

 6    aspects.

 7           And Mr. Gunderson was very clear that his approach

 8    was to include all of the various acts of infringement that

 9    were at issue and that was in the record here.

10           So the next slide we have is really just

11    hypothetical negotiation framework, which you may have heard

12    of or not.  This largely comes out of the *Georgia-Pacific*

13    case, but what the concept is, is that you'll have to -- in

14    order to come up with a reasonable royalty, you have to kind

15    of re-create this imaginary world at the time the

16    infringement began.  There is an assumption that patents are

17    infringed and valid.  The parties act like reasonable

18    business participants.  There is a willing licensee, willing

19    licensor.  They basically have all of their information out

20    on the table, and they come up with what would be a

21    reasonable royalty, and this would be for past damages.

22           And there is no limitations on the information that

23    you can consider, so you can consider information that comes

24    after the hypothetical negotiation, for example, the

25    Keysight license, revenues, things like that.

1              There is something called the "Book of Wisdom," and

2    this was not disputed amongst the parties.  So this is the

3    framework that the parties agree should be utilized for

4    this.

5              So if I turn to the next slide, this is just

6    briefly -- these are the *Georgia-Pacific* factors from the

7    case, it's a 1970 case, and sometimes people call them

8    factor 1, factor 2.  You might see that referred to at

9    different times, but at least you have that for the

10   reference.  I'm not going to go through all of them, but I'm

11   happy to say that these are largely uncontested in terms of

12   the facts, the evidence, and the application of them.

13             Mr. Gunderson went through all of the

14   *Georgia-Pacific* factors in a lot of detail with a lot of

15   different documents, and all of that's going to be in the

16   record.  I did try in my slides to provide summaries so you

17   can see where he addressed these various factors, and how

18   they came up.  I'm not going to go through each and every

19   bit of evidence that he had had.  And this is actually the

20   14 factors.  There is actually a 15th one on the next slide,

21   and that is really part of this hypothetical negotiation

22   framework, which is what the "willing licensee/willing

23   licensor would have agreed upon (at the time the

24   infringement began)," which the parties agree is June 2017,

25   which is the issuance of the '193 patent, the first patent

```
1    to issue, if they'd been reasonable and voluntary in trying
2    to reach agreement.
3          We've provided some case law here that damages
4    doesn't have to be exactly perfect.  I mean, you do the best
5    you can, and that's the nature of patents and the value of
6    the technology, you know, at some levels it is abstract.
7    And so you do what you can based on what you have.
8          And if you turn to the next slide here, the
9    Carnegie Mellon case really provides a nice overview of
10   really what you need to do, is that these two parties have
11   to be willing to join forces to arrive at a license to the
12   technology, and they recognize that each side is going to
13   have certain benefits from doing so.
14         So I'd like to just go to slide 10, and I'm going
15   to flip through these fairly quickly.  I think you already
16   know who the parties are, you know, in terms of the
17   investment that Centripetal made into the technology.
18         And what we have at issue here is three patents.
19   Two expire in 2033, and one expires in 2035.  It's in the
20   next slide here.  I've listed those patents.  So that's one
21   of the considerations; we have some patents that have some
22   more time on them.
23         Going to the next slide, what Cisco was facing, and
24   we know who Cisco is, but they were facing the
25   commoditization, which you've already heard about.  And so
```

JILL H. TRAIL, Official Court Reporter

1    they needed to have some sort of a change.  And the evidence

2    that we have in the record, which is not disputed, and Cisco

3    didn't even really address it at trial, was what was going

4    on with this commoditization of the routers and switches,

5    and including the fact that the third parties in the

6    marketplace -- there was a Barron's article.  JPMorgan was

7    taking notice of it.  This was occurring in 2016, and so

8    there are citations to the records here.  PTX-1460 is the

9    JPMorgan article, and Mr. Gunderson went through this in

10   some detail.

11          If we could turn to the next slide.  This is

12   Cisco's 2016 10-K.  Now, this was shown at trial.  This is

13   not an exhibit that was admitted, but so I wanted to make

14   sure that you had it.  This was shown at the transcript at

15   1451, and in it Cisco recognized because of the

16   commoditization it was facing and what was important, it

17   needed security.

18          And as part of that, it stated in that security

19   section, "In an evolving dynamic threat landscape, the most

20   effective way to address security challenges is with

21   continuous threat protection that is pervasive and

22   integrated."

23          And it goes on to talk about, we believe that

24   security solutions are really important to us.  It's going

25   to create this competitive advantage.  So we're setting up

1    the hypothetical negotiation of what was going on for Cisco,

2    in particular.

3            And if we go to the next slide, here, one of the

4    things that we know -- and this is not disputed -- is that

5    Cisco had notice of these patents, and we know that because

6    there is constructive notice when a patentee like

7    Centripetal marks its product, its products that practice

8    the patent with its patents, and it did that, and it did so

9    as these patents were issuing.  They're giving the world

10   notice, and so that's sufficient notice for purposes of

11   damages.

12           I don't believe it's really in dispute that the

13   start date of damages is going to be that June 2017 time

14   frame.  I don't believe that that's actually a dispute at

15   all.  Cisco can confirm, but we wanted to let you know that

16   we have unrebutted technical information and technical

17   evidence to show that as well.

18           Dr. Striegel's analysis demonstrating how the

19   RuleGate practices the patents in suit was not disputed all

20   by anybody.  So I don't think this is really going to be an

21   issue.

22           A couple of other points that are to note, is that

23   there were no non-infringing alternatives to Centripetal's

24   patented technology.  Normally in a case like this, if

25   someone is going to assert, I have a non-infringing

1    alternative, you would have an expert present, explain in

2    detail what that non-infringing alterative is, explain why

3    it would be commercially reasonable to use, and we kind of

4    go through and demonstrate, based off of the claims, why

5    it's a non-infringing alternative.  None of that evidence is

6    in the record.  Cisco didn't present any such thing.  So

7    there is no non-infringing alternative available to Cisco

8    based on the record that's here.

9            If we go to the next slide, again, undisputed we've

10   demonstrated time after time how Cisco -- how important this

11   technology was to Cisco for its launch of the network of the

12   future, its new era of networking, and what it had to do.

13           This is PTX-452, which you've seen multiple times.

14   It's the Cisco press release where they announce they have a

15   new family of switches that they've built from the ground

16   up, and they had to innovate, not only at the hardware but

17   also at the software.  So they had to innovate the ASIC --

18   This is directly from their announcement, and we will look

19   at that later -- as well as their software layers, which

20   they note is the iOS XE, which is also accused.

21           And Mr. Gunderson again explained that that's where

22   a lot of the infringement occurs, is in that IOS, that

23   operating software that was identified.

24           And, additional SEC filings that are in the record,

25   they were actually brought in with Dr. Becker on

1    cross-examination, demonstrated how important security was

2    and how foundational it was to this new network that ended

3    up becoming one of the fastest selling products ever for

4    Cisco, and they more than doubled their Catalyst customer

5    base, and that was PTX-550.  This is not in dispute.

6             If we go to the next slide, these are just examples

7    of what was shown at the last trial, of some of the

8    different press releases, and several of these exhibits are

9    already entered into evidence.

10            And the next slide is that PTX-452 that I

11   mentioned, and this was the announcement that they're

12   talking about in terms of how they had to innovate at the

13   hardware and the software, and how they had to build this

14   from the ground up.

15            If we go to the next slide, the results were great

16   for Cisco, right.  They were able to drive another

17   consecutive quarter of double-digit growth.

18            And this is an August 15th, 2019 press release that

19   came out regarding what the CEO of Cisco had to say about

20   how successful this particular launch was.  And, for the

21   record, this is PTX-333, and it's at trial transcript 1454

22   through '56.  And the evidence we had at trial demonstrated,

23   in fact, that's what they saw.

24            If you go to the next slide on Page 20, these are

25   entered into the docket as 479 and 488-7, and this was when

```
 1    we got some additional revenue information, we were able to
 2    show how much better the revenues were doing compared to the
 3    predecessor products, and then this new launch of products.
 4    And I have a number of different slides that I wanted to
 5    show you.
 6           What I should note, the fiscal year is a little bit
 7    different for Cisco.  Cisco's fiscal year ends around
 8    July 29th, and then their fiscal year starts July 31st.  So
 9    when you look at fiscal year 2017, you've got to kind of do
10    a little bit of adjustment in terms of -- it shows here as
11    fiscal 2018, but that's actually part of 2017.
12           THE COURT:  All right.  And there was some
13    discussion about whether which predecessor switches were
14    included, as predecessor switches, and so is there a debate
15    about this slide or not?
16           MS. KOBIALKA:  I don't believe that there is any
17    debate about this slide, and this was really intended to be
18    a summary of what came before versus selling the new.
19           THE COURT:  Okay.
20           MS. KOBIALKA:  Part of the new network, the new
21    switches and routers.
22           The next few slides, if you go to slide 21, this
23    slows the router revenues.
24           And keep in mind that fiscal year 2020 is not
25    complete, so it's partial.  We didn't have it at the time
```

JILL H. TRAIL, Official Court Reporter

1    that we had to do these presentations.  So it may have --

2    you know, it sort of flattens out, but that's because it's

3    just not a complete year.

4              The next one is the ASR router revenues.

5              The next one is slide 23, the DNA revenues.  And

6    DNA was a new product, right, it was new that they launched,

7    and you can see the growth of that particular product.

8              So then that takes me to slide 24, and you've heard

9    a lot about this.  This was actually a very important

10   component of our case and with respect to damages, because

11   Cisco's integrated solutions were being sold and offered for

12   sale, and we had undisputed evidence and significant

13   evidence, which is summarized here in this particular slide,

14   about how these products were operating together, they were

15   sold together, they were integrated.  We showed quote after

16   quote.  This was not disputed at all at trial.  They didn't

17   dispute that, in fact.  This is how they were selling, how

18   it was being offered for sale, and how they worked.

19             Cisco didn't bring a witness to say, no, what

20   Centripetal has stated, or those documents that we showed,

21   that's not really how we do it, but in terms of in the

22   marketplace and what we're doing with our customers.  There

23   wasn't anybody that came and testified to that.

24             And I will go to slide 25, because we've heard a

25   lot about the routers and switches, but this was true also

1    with the firewalls, you know.  This is from PTX-1883.  The

2    FirePower or next-gen firewall is the industry's first fully

3    integrated, threat-focused, next-gen firewall, and it comes

4    with this FirePower Management Center, right.  So again,

5    this was not disputed at all.  This is the evidence that we

6    brought in.

7            So if we go to the next slide, 26, here I've

8    provided a lot of different places where there was testimony

9    regarding how these things were sold, how, you know, the

10   benefits of upgrading these to the new routers and switches

11   because it came with these different features, the different

12   technologies, right.  You want to go to these new switches

13   because of the iOS XE, and as Mr. Gunderson showed, this was

14   where much of the infringement, infringing technology was

15   located.

16           And you want to make sure you're up-to-date,

17   because then with IOS, you will get this DNA Center, right,

18   and you'll get Stealthwatch enterprises that come with it

19   automatically.  Again, these are from Cisco's documents, and

20   this is testimony that Mr. Gunderson provided.

21           And Dr. Becker confirmed that to obtain DNA Center,

22   all you need to do is subscribe for a license.  And so

23   that's what we had talked about a little bit earlier today,

24   is, you say I want a license, and then it will come on

25   because the code is there, right.  It's embedded, you're

1    able to activate.  You don't have to do anything physically.

2    It's not like you're suddenly going to go and get a new box

3    that you now have to install or do anything.  It's there

4    already, and all you have to do is just subscribe, and

5    you'll have access to that.

6            If you go to the next slide, again, the fact that

7    the firewalls with FMC were sold as a package, that delivers

8    a unified management over the firewalls, was another selling

9    point that they had.  And, you know, the testimony kind of

10   goes on and on, so I won't go through all of it.  As I

11   mentioned, no one ever disputed this was the evidence that

12   we had in the record.

13           If we go to the next slide, even Cisco's technical

14   expert said unless you really want to get hacked, you

15   wouldn't buy it this way.  Of course, this is why you would

16   want to buy these solutions.  It's got to be a comprehensive

17   set of products.

18           Then the next slide after that is, it was not

19   disputed in terms of how the source code was handled, right.

20   So we had requests for admissions that Cisco had made that,

21   basically, they are compiling the source code here in the

22   U.S. for their routers and switches, their firewalls.  This

23   wasn't disputed, and there was testimony regarding how this

24   is making and using.

25           And so one of the issues that we presented that

1    really -- that wasn't disputed was that Cisco's accused

2    products made in the U.S. infringe, and it doesn't really

3    matter whether or not they are sold abroad, it impacts the

4    infringement, and this will get to that royalty base, which

5    I imagine you might have some questions about.

6           So if we go to the next set of slides, this is

7    really getting into the *Georgia-Pacific* factors.  There is a

8    number of different licensing factors.  I'm not going to go

9    in detail through all of this.  I would just like to point

10   out a couple of different points, and so one is on slide 33.

11          This was a demonstrative that was shown at trial,

12   and this is at the transcript 1477 through 1479.  And this

13   is the fact that Cisco had no other license, couldn't

14   identify anything that was even relevant, right, that wasn't

15   even in the same ballpark as Centripetal's patents, and this

16   is how we got to there was only one license that was at

17   issue, that was discussed at trial, and that was that

18   Keysight license.  So I wanted to make sure that you had

19   that, because I don't believe the interrogatory was actually

20   moved into evidence, but we did have this slide.

21          And if we go to the next slide.

22          THE COURT:  Let me ask about that.  So the

23   *Georgia-Pacific* factors relating to that specifically, I

24   mean, certainly if there was a license relating to it, the

25   specific patent at issue, that's going to be your best

```
 1    evidence, but there is nothing in the -- I mean, the factor
 2    would allow you -- what does the case law say about how the
 3    Court should consider different -- you know, the fact that
 4    they may be different patents or related patents or
 5    unrelated patents?  I mean, certainly Cisco may have other
 6    relevant information that wasn't presented, so I just want
 7    to make sure I understand how to weigh that.
 8            MS. KOBIALKA:  Certainly.  If we go back to slide
 9    31, this is the Georgia-Pacific factors.  So the first one
10    is, you know, royalties that a patentee may receive for
11    licensing of the patents-in-suit.  So that one is if you've
12    got a license to the patents involved in the case, you want
13    to look at it.
14            The second one gets to what they call comparable
15    patents, right.  So it doesn't have to be exactly the same
16    patents, and there is different thresholds that you're going
17    to have to address and get into.  In general, if you want to
18    use any patent license, you are going to have to address
19    technological comparability and economic comparability.
20            And you go through those different facts.  So that
21    would address specifically your question, right, if there
22    are -- if there is a license involving different patents,
23    how do you equate that?  There should be some sort of
24    analysis.  If there is different terms, how do you address
25    that?
```

611

1          And the case law is pretty specific on what needs

2     to be done for the technical and the economic comparability,

3     and there is a number of cases.

4          One was the *Prism* case, right, which explained, if

5     you're in the middle of a trial, you know, the concerns, for

6     example, on a settlement agreement could be addressed

7     because you've already sunk your litigation costs.  You're

8     now seeing in real time what the merits of your case are,

9     and someone is deciding to settle and pay something, that

10    tells you a lot about -- that's pretty close to the

11    hypothetical negotiation because now you're getting closer

12    to assuming infringement and validity, right.

13          And so there is a number of different cases that we

14    can point to, but *Prism* is actually one of the best ones for

15    utilizing the settlement agreement, and why that would be a

16    good one.

17          But you have to address all of those things, and

18    Mr. Gunderson did.  He went through very carefully, and he

19    was supported by Dr. Striegel with respect to the technical

20    comparability of the two patents.  Granted, they are, you

21    know, related patents and whatnot, but Dr. Striegel

22    presented that information, and Cisco provided no testimony

23    whatsoever, so that's unrebutted, that's undisputed at

24    trial.

25          So the technical comparability, with respect to the

1    patents themselves, we're fine.  Additionally, Mr. Gunderson

2    had evidence of the technical comparability of the various

3    products at issue between Keysight and Cisco, and the

4    testimony related to the fact that they're both networking

5    products.  They both required a license to this patented

6    technology.  They were using the patented technology, and

7    there is some others.  I have them summarized in the slide a

8    little bit later.

9         And then he did the economic comparability, and

10   that's the part I will address that -- that's part of where

11   I would like to close the courtroom to and get into that a

12   little bit more.

13        So if we turn to slide 34, this is the unrebutted

14   evidence that the Keysight license is technologically

15   comparable, and I have citations here.  We are showing

16   just -- this was not actually in dispute, and the Keysight

17   license does, in fact, cover all of the asserted patents.

18   You will be able to see that from the agreement itself.

19        If we skip over to slide 36, this is where we

20   summarize the different patents Dr. Striegel had talked

21   about and explained how they related to the patents that

22   were asserted against Keysight, and why they were

23   technologically comparable.  Again, I don't think this is

24   really at issue because they haven't disputed, they didn't

25   rebut it, but I wanted to provide you with all of the

1    citations to the record.  He started that at 191 and went

2    through all of that for all of the patents through about 193

3    of the trial transcript.

4              Then we get into the economic comparability, and

5    this is where Mr. Gunderson came in, and he went through in

6    pretty great detail as to why he felt the Keysight license

7    -- or his opinion was the Keysight license was an arm's

8    length license, notwithstanding the fact that it was a

9    settlement agreement, how the structure of that agreement

10   demonstrated, in fact, that there was no litigation

11   influence because the way the structure of the agreement was

12   in terms of payment for past damage, to address the

13   settlement, and then a reasonable royalty with different

14   rates going forward.  And there was a -- I have a number of

15   different citations here where he goes through it and

16   addresses it.

17             In terms of Centripetal and Keysight competing, if

18   you look at the actual license agreement there, you have two

19   royalty rates; one for competing products and one for

20   non-competing products.  So it's written right into the

21   agreement, in and of itself, and, likewise, there was

22   evidence that Centripetal is competing with Cisco.

23             And one of the points of evidence that we have,

24   and, again, that wasn't really in dispute, was the fact that

25   Cisco was embedding into its network products, you know,

1    enforcement points within the actual network itself reduced

2    the need for the functionality of the RuleGate that

3    Centripetal was out there trying to go move forward and

4    sell.

5           And so this entry into the marketplace, while it

6    wasn't totally based on just Cisco being in the market, it

7    did, in fact, impact Centripetal sales in the marketplace.

8           And so I have provided all of those different

9    citations here to the record, because this is all based on

10   what's in the record and not disputed.

11          There was also the economic differences between the

12   two agreements Mr. Gunderson had taken into account.  So he

13   explained why the running royalty normalizes the difference

14   in the various company sizes, right.  Keysight was one size

15   versus Cisco.  He considered the impact of the differences

16   in the license scope, the license territory, and the extent

17   of competition, and he also considered apportionment

18   considerations, what -- how the Keysight license was

19   structured versus the hypothetical negotiation that we have

20   here, and that was throughout the record.  I have those

21   citations here starting at 1485, going on through 1523.

22          And he also discussed in detail how to account for

23   the differences between the Keysight license being a

24   settlement in the middle of a litigation and how the

25   negotiation -- how negotiations of any license generally

1    works, which is you don't walk in and say I want to talk
2    about 23 patents that we want to have licensed.  You
3    normally take a handful of patents, and you start with that.
4    And once you've finished your negotiation, you usually end
5    up with a broader portfolio in the license, but really the
6    focus is around several different ones, and he discussed
7    that and provided that testimony.  Again, I don't think any
8    of that is disputed.
9            THE COURT:  So that's the answer to, in the
10   Keysight license, they licensed all patents; whereas here,
11   this hypothetical negotiation would be for fewer than the
12   total, and you think that would be true even now that there
13   are fewer patents than there were at the first trial?
14           MS. KOBIALKA:  It would be.  And Mr. Gunderson
15   explained that the range -- because he didn't just pick one
16   royalty rate.  He actually had a range.  He said that really
17   can account for, too, for the number of patents that we're
18   talking about.  So you can utilize that range.  It gives the
19   fact finder some flexibility as to how to address that
20   particular fact in terms of comparability.
21           Because he recognized that, you know, he was
22   working at the time with five patents.  Now we're down to
23   three, but he actually testified that that can be addressed
24   in that manner.
25           If we go to the next slide, this is where he, you

1    know, explained the timing of the Keysight agreement and why

2    it's akin to a hypothetical negotiation at the transcript at

3    1482 through '83, and it really mirrors actually the law as

4    it stands in the *Prism* case.  And if you have any questions

5    about that case, I'd be happy to answer.  Our team is pretty

6    familiar with that particular decision and what's happened

7    there.

8          THE COURT:  I'm okay.

9          MS. KOBIALKA:  All right.  So the next set of

10   *Georgia-Pacific* factors gets into the technical various

11   factors.  I want to maybe skip through these unless you had

12   any specific...

13         THE COURT:  No.  I think the other things further

14   in would be more important.

15         MS. KOBIALKA:  Okay.  So, Your Honor, I would like

16   to go to, and this was part of those technical factors, but

17   this will be very brief, on slide 44, this really gets into

18   the nature and extent of use.  And this exhibit, which is

19   PTX-242, demonstrates how the iOS XE is used in all of the

20   routers and switches, and we have an excerpt from Cisco's

21   website regarding this new operating system that's built

22   into the switches and routers.  And here it lists all of the

23   various switches and routers that utilize this new operating

24   system, how this is an enhanced platform, and it's built in

25   security.  So the extent of use is pretty substantial across

1     this new product offering.

2          And if we go to next slide, this is yet another

3     exhibit.  This is PTX-1303.  This is a document where they

4     say that the iOS XE is actually a foundational attribute to

5     the switches themselves.

6          The next slide I wanted to go to, this is a 2019

7     10-K of Cisco, and this one is in evidence.  This is

8     PTX-560, and here it -- I'm going to focus on the middle

9     where it says, "Within campus switching are our Catalyst

10    9000 series of switches that include hardware with embedded

11    software" -- we've talked a lot about this embedded software

12    -- "along with a software subscription referred to as Cisco

13    DNA."

14         And so here what you have is Cisco saying, look, if

15    you want a software subscription -- or all you have to do is

16    sign up for our software subscription, you're going to

17    unlock the software, you're going to unlock that code, and

18    you're good to go with respect to DNA.  And this is all part

19    of that integrated embedded offering that they had of these

20    products.  These products were provided together.

21         Likewise, on the next slide, we've already looked

22    at the ones with respect to the firewall and FMC, and so I

23    brought up that one, but also there was some source code

24    citations that I wanted to provide as well in the

25    transcript, 660 through 666, about how the firewalls

1   themselves also are put together with the FMC, which is that
2   FirePower Management Center, so you have that for the
3   record.
4         I won't go into the all of the advantages of the
5   patents, but I have summarized the testimony on the slide in
6   48.
7         And moving to 49, this is the technical advantages.
8   Dr. Medvidovic walked through a number of Cisco documents
9   and tied them specifically to the patents that were at
10  issue, and that was not rebutted.  No Cisco expert came back
11  and said, no, Dr. Medvidovic was wrong.  So we actually had
12  the ability -- or we went through and took the time to
13  really demonstrate where you were seeing the patented
14  technology coming up in Cisco's documentation.
15        And what I have to note is that, you know, Cisco's
16  experts were very conclusory on this.  They really didn't
17  mark any documents, as you've heard.  They cited to very
18  little evidence, and, you know, we've talked a little bit
19  about this.  They had an opinion for noninfringement, then
20  they had an opinion for invalidity, and then they also had
21  an opinion where they had to assume a world where the
22  patents were infringed, invalid, and they came out with the
23  notion that there really wasn't much value to the patents,
24  and that's because I think the invalidity opinions really
25  drove them to the idea that there was no value here.  It is

1    a very difficult thing to do to have that many different

2    opinions in the alternative, but that is, in fact, what

3    Cisco did and what their damages expert had relied upon.

4            And if we go to the next slide, this is some of the

5    exhibits that Dr. Medvidovic had relied upon, where he was

6    looking at Cisco's documents and tying them to the specific

7    patents, and we have testimony on that at the trial

8    transcript cited here, but you can see he actually went

9    through and walked through this document.  This is PTX-199.

10   There is testimony on that particular document, as well as,

11   if you go to slide 52, PTX-202.  He also went through that

12   particular document.

13           And we turn to slide 53, here's an example.  I

14   mean, I could go forever about all of the evidence, but this

15   is another document that was moved into evidence, and here

16   this is an internal Cisco document that was identifying the

17   problems with the technology and then how they solved it,

18   and that was with respect to the '806 patent, you could tie

19   that together about no longer dropping the packets, and we

20   provided that testimony that was located there.

21           So unless you have any questions on that, I'm going

22   to move to sort of a last grouping very quickly of the

23   financial and business factors of the *Georgia-Pacific*

24   factors.

25           THE COURT:  All right.  And this is a portion that

```
 1    you're seeking to close court?
 2              MS. KOBIALKA:  Not quite yet.
 3              THE COURT:  Not yet, okay.
 4              MS. KOBIALKA:  I'm trying to keep as much in as I
 5    can.
 6              THE COURT:  Very well.  Go ahead.
 7              MS. KOBIALKA:  So I won't go through all of these
 8    various factors, but we have summarized them in the next
 9    slide in terms of places in the transcript where this
10    evidence is apparent.
11              I will note that, you know, we had some
12    profitability information that was pretty significant, that
13    was provided, as well as this is where we get into
14    apportioning to the footprint of the inventions the
15    revenues.
16              If we turn to slide 56, this here was actually
17    testified to at 1495 to 1496 of the trial transcript.
18    Mr. Gunderson described how these products were highly
19    profitable and provided the gross profits of the various
20    products based on the information he had at that time.  And
21    as you can recall, he had limited information, and then we
22    subsequently got additional information.
23              THE COURT:  There was some testimony about the fact
24    that Cisco preferred or would have preferred a lump sum
25    payment as opposed to a running royalty.  How did he deal
```

621

1   with that?

2          MS. KOBIALKA:  Yeah, so -- actually, Mr. Gunderson

3   had talked about this, right, and this is something also in

4   the case law, that you want to tie compensation to market

5   success, right, because it minimizes the notion of an

6   underpayment or an overpayment risk, right.

7          And, look, at the time of the hypothetical

8   negotiations, Cisco would have agreed, like this is an

9   important technology that we're releasing to our launch of

10  the new network.  And at the same time Centripetal would not

11  have agreed to a lump sum and just walk away because it

12  wanted to be in the market, and this is a small company

13  fighting for its life to try and be in the market and sell

14  this technology that they invented, that they felt that they

15  coined the term "operationalized," and they got the patents

16  for it.

17         You know, we haven't seen any Cisco patents coming

18  our way.  They got the patents for it, and they're in the

19  marketplace, and they're trying to do this.  And so for them

20  a running royalty makes sense.  And if Cisco really thinks

21  it's of minimal value, it will stop using it, stop using the

22  technology.  So the running royalty is really the better fit

23  for -- given the facts and the factual evidence that we have

24  here.

25         And Mr. Gunderson had provided some testimony with

1    regard to that, right.

2           And keep in mind, there isn't a single Cisco

3    license available.  So this is just some hearsay testimony.

4    The deposition testimony was not put into evidence, that's

5    not there.  It was just Dr. Becker, the talking head,

6    saying, and I understand that they like to have, you know,

7    lump sum agreement.  Now, I'm not disagreeing that the logic

8    would be there; however, there is really no evidence of it.

9           And so at the end of all of the various analysis,

10   and I'm skipping some of the points, but we got to the 8 to

11   10 percent, and this is on slide 57, and here is the

12   testimony of Mr. Gunderson, that the range of rates is to

13   accommodate the number of patents at issue.

14          The range of rates gives the fact finder some

15   flexibility in terms of their various findings, and that's

16   what he tried to do and build into it.

17          So now I wanted to turn to the revenues, and we

18   will be talking about the apportionment.  Now, keep in mind,

19   you hear apportionment.  Apportioning, based on the law, can

20   be in the royalty base, it can be in the royalty rate.  You

21   can have a combination of two.  And what was done here with

22   Dr. Striegel and Mr. Gunderson was first that technical

23   apportionment.

24          And I have a lot of slides, mostly for reference in

25   case you have a lot of questions about this, but I wanted to

1    kind of go over it at a high level.

2           So Dr. Striegel's methodology was to look at public

3    confidential information, deposition testimony, source code,

4    and he had discussions with the other technical experts,

5    Dr. Cole and Dr. Mitzenmacher.  And he testified in the

6    transcript at 1349, he talked with the infringement experts

7    to understand the infringement claims in this case.  He

8    wanted to make sure he understood what was going on, and

9    once he had done that, he identified the features of the

10   products that Cisco -- based off of Cisco's representations

11   to the public, right, these are the data sheets as a guide

12   to figure out what were the top-level functions.

13          And he explained, I took a representation of what

14   Cisco viewed as being important and what they represent to

15   their customers, and he looked at it carefully to go through

16   and determined, after having talked to the infringement

17   experts, after having looked at the other information that

18   was available to him about Cisco products, that these were

19   various top-level functions of each of the accused products,

20   and he labeled the top-level functions with a general name.

21          He just kind of put a general name for each of

22   these various functions for ease of reference.  And what he

23   was doing, and if we go back to slide 61, I have a citation

24   to the record, he explained, I'm identifying and explaining

25   where the patented technology or the infringement lies in

1    each product.  He did it on a product-by-product basis and

2    for each patent.  This is not a situation where he grouped

3    products together.  He didn't group a product with multiple

4    different -- a product that had different types of

5    functionalities.  He took it on a product-by-product basis.

6            And there Judge Morgan asked, so, you know, we have

7    13 functions, are you saying six infringe, seven do not?

8    And he answered, yeah, that's what I was doing in terms of

9    my analysis.

10           So if we go to the next slide, slide 62, this is a

11   summary, ultimately, that he was able to come out with, and

12   you can see, you can determine what -- where he found the

13   footprint of the invention and how much of it.

14           THE COURT:  So he used the term "implicate."

15           MS. KOBIALKA:  Yeah.

16           THE COURT:  Not infringe or, I guess, I'm not --

17   why don't you tell me what you think he was doing and what

18   it means.

19           MS. KOBIALKA:  Yeah.  It was his first time ever

20   testifying.  He had never testified before.  He's not a

21   professional expert, and I think he's, you know, been hired

22   since then, but he did use the word "implicate," but that's

23   why I think Judge Morgan had actually asked him, do you mean

24   this is what infringes or not infringes, and that's why I

25   wanted to provide that citation 1349 through '50, because he

JILL H. TRAIL, Official Court Reporter

1   did say, yes, that's what I mean.

2          THE COURT:  I'm sorry.  You have the quote there?

3   Did you read it before?

4          MS. KOBIALKA:  I didn't read it.  I just cited to

5   it, 1349 through 1350 of the trial transcript.  This was

6   some back and forth between Judge Morgan and Dr. Striegel

7   about what his analysis involved.

8          He also did testify that he mapped the different

9   capabilities to the claims of the patents and excluded the

10  functions that did not infringe, and that's also found at

11  the transcript at 1360.

12         And then 1407 he said, I found the commodity

13  components don't infringe, so I didn't include those.

14         So that's what he meant.  That's really what he

15  did, is he was going through and saying, look, I found this

16  top-level function that's implicated by the patents.  He

17  meant that's what's infringed, right.  That's part of that

18  infringement.  And once again, this was this estimation that

19  you're going to go through and do when you have technology,

20  right.  You're trying to map it to the claims.

21         THE COURT:  And he equally weighed the top

22  functions so that each top function, it wasn't like, well,

23  that's really important, so we're going to give it more

24  weight.  Did he explain why he did that?

25         MS. KOBIALKA:  It is in the record.  I don't have a

1    citation handy, but, yeah, he said that I wanted to go

2    through and be able to identify those things.

3           And when you look at the sheets that he relied upon

4    and how he did that, and I can show you an example, that

5    would be like slide 66, for example, here.  This is how he

6    ended up going through, you know, with the data sheets that

7    Cisco provides, and he walked through and explained in the

8    transcript, for example, how he got to -- you know, the

9    commodity components is one, and, you know, he explained the

10   logic in terms of what he did, and, likewise, for each of

11   these various groupings.

12          So he did walk through all of that, and what we've

13   provided is the slides that he put forward for those

14   top-level functions and the citations to the transcript.  So

15   you can see where he's talking about those specific

16   top-level functions and matched that up to make sure that

17   that was pretty clear.

18          THE COURT:  And how do you suggest -- I mean, the

19   '856 and '205 patent, we're not currently considering those.

20   How is the apportionment testimony or how would you

21   recommend then the Court look at that, given this shift in

22   circumstances?

23          MS. KOBIALKA:  Because he did it patent by patent.

24   So he looked at the routers and switches, for example, for

25   the '193, but he also looked at it separately for the '856.

JILL H. TRAIL, Official Court Reporter

1   And he did it that way, you know, and Mr. Gunderson also

2   took it that way, so that if the '856 falls out, you can

3   still utilize the analysis that was provided.  So it is

4   actually individualized, and this chart that we have at 62

5   provides for you then on a patent-by-patent basis.

6           So, for example, if you found that just the '806

7   patent infringed, right, it would be 4 out of 13 functions.

8   And what Mr. Gunderson ended up doing was actually being the

9   most conservative; he used the smallest apportionment

10  factor, so that would be 4 out of 13 for the damages

11  analysis.

12          THE COURT:  Okay.

13          MS. KOBIALKA:  Okay.  So it should not be impacted

14  at all by the '205 and the '856 falling out and those --

15  because he did it patent by patent, product by product,

16  you're going to be able to crunch the numbers, and I have it

17  summarized, so it will be easy enough to do.

18          So if we can go to the next slide, 63, this

19  apportionment approach is modeled after the *Finjan v. Blue

20  Coat* case, which I'm sure you've read about and heard about

21  quite a bit.  And, you know, damages has been a very complex

22  issue in terms of how to deal with it for a lot of judges,

23  and I think the *Finjan/Blue Coat* case was one of those cases

24  that actually provided some clarity about an approach.  The

25  Federal Circuit says this is the right way to go about doing

1    an apportionment with this top-level functions and features,

2    however you want to call it.

3            So I wanted to talk a little bit about the *Blue*

4    *Coat* case, and there are two holdings in that *Blue Coat*

5    case; one with respect to the, they called it proxy SG, and

6    that was the methodology that Dr. Striegel had used, and the

7    Federal Circuit was fine.  But Cisco had raised in their

8    findings of facts and conclusions of law this DRTR approach,

9    which the Federal Circuit rejected.  And I wanted to explain

10   what happened with respect to those two different ones

11   because they're actually very different scenarios in terms

12   of how damages were calculated.

13           What I can tell you, though, the one that the

14   Federal Circuit has blessed, this was a situation where

15   *Finjan* went in the accused product, they took it, and they

16   identified the top-level functions.  It was actually from a

17   marketing architecture document of the accused product, and

18   they equally weighed each of those functions, and the

19   Federal Circuit said, that's fine, it's fine to go ahead and

20   do that.

21           The other one that the Federal Circuit rejected in

22   the exact same decision was with respect to DRTR, which was

23   a software engine.  And the way that the damages were

24   approached in that case is they didn't start with an SSPPU.

25   They didn't have a product.  They said, oh, this is the

1    product, and these are the revenues that make up the royalty

2    base, like we did here in this case and like they did with

3    the proxy SG, which was the approved methodology.

4         They started -- they had to come up with a royalty

5    base there, and to create that royalty base -- and this is

6    where the Federal Circuit took issue with it and said you

7    didn't apportion out enough.  Right.  You needed to do more

8    apportioning.  So you included some non-patented features

9    and things like that.  So they sent that part of the case

10   back down to the District Court.

11        Turning to, though, the methodology that they

12   approved, which was the 24 functions, those are being equal

13   weighted.  It was disputed as to whether or not one of those

14   functions included multiple different pieces and components,

15   and the Federal Circuit said no, that's okay.  It's fine

16   that that's going to occur in this particular case because

17   of the way the methodology was done, and even though it was

18   disputed, and I have the quote here, it's the second

19   paragraph, to conflict with the testimony of *Blue Coat*'s VP

20   of products saying that each box in the diagram can have

21   many things behind it, right.  So there is really -- just

22   because there is this conflicting testimony doesn't mean

23   that the damages award is unsupported by substantial

24   evidence.

25        And there was, there was conflicting testimony.  It

1    wasn't the right way to go about apportioning.  The Federal

2    Circuit said it was fine, and it had to do with the fact

3    that the methodology was exactly the same as what we had

4    done here.

5            Now, I noted in Cisco's findings of fact, for the

6    first time they tried to suggest and interpret what the

7    Federal Circuit meant in that particular instance, and they

8    claim that, oh, no, the Federal Circuit decision was just

9    about the equal weighting part.  But given that our team had

10   some familiarity with that case as well, that was not even

11   what was actually argued, and what I can tell you, the very

12   first argument they made about the DRTR and the

13   apportionment methodology, was that they failed to properly

14   apportion the value of the infringing and non-infringing

15   features.

16           They included the equal rating component of it,

17   which the Federal Circuit said was fine.  But their main

18   issue, and their first issue they raised was that there was

19   too much in there.  And the Federal Circuit said by going

20   forward and doing these top-level functions, right, if

21   you've got evidence to support it, you're fine, you can go

22   ahead and do that.

23           There is one other important holding I would note

24   in that *Finjan v. Blue Coat* case I think gets overlooked,

25   and that's in footnote 2.  It comes at the end, because this

JILL H. TRAIL, Official Court Reporter

1    was also an issue on appeal.  The jury, based on the factual

2    evidence, actually departed from Finjan's expert's opinion

3    regarding how much damages, and they awarded more based on

4    the factual evidence.  And so that was actually an issue on

5    appeal, and the Federal Circuit said, look, if it's

6    supported by factual evidence, it's fine, we are not going

7    to touch it because the evidence is there.  Even if it's

8    disputed, it's okay, we can move forward with that.

9        So I wanted to raise all of those things for you.

10   Now, there was one other case, another *Finjan* case that was

11   also mentioned in the findings of facts and conclusions of

12   law that Cisco had raised, and this was the District Court

13   case.  This was *Finjan versus SonicWall,* where Dr. Striegel

14   was hired in that case, and the judge said, basically, that

15   that was not the same thing as what happened in *Finjan v*

16   *Blue Coat*.

17       And, like I said, we were not actually involved in

18   the subsequent briefing and things like that.  There was a

19   suggestion that we were.  We had represented *Finjan* for a

20   portion of the time, but not all the way through the

21   briefing on that.  And I'll note that that actual issue is

22   still on appeal, and I think all you really need to look to

23   is the *Finjan/Blue Coat* case and the parallels, because you

24   have a Federal Circuit case and what was done here in this

25   particular case.  I'm not sure if you have any questions on

 1   that because that's a lot.

 2          THE COURT:  Not on that, no.

 3          MS. KOBIALKA:  Okay.  The other thing that I wanted

 4   to note was that -- and we have this in our findings of

 5   facts and conclusions of law that, you know, you can value

 6   conventional elements, right.  This is the *AstraZeneca* case.

 7   You don't have to subtract all of the value of conventional

 8   components in the case.

 9          THE COURT:  Like processing.

10          MS. KOBIALKA:  Uh-huh.  And, you know, Cisco relied

11   on some cases.  It was *Omega* and *Exmark*.  Well, those are

12   cases where they didn't apportion, or they didn't tie the

13   royalty rates to the facts of the case, and that's just not

14   what we have here, as you can see from my very long

15   PowerPoint that I'm trying to push through rather quickly.

16          So I raised that *SonicWall* case and this *Blue Coat*

17   issue that was raised on appeal because they raised that for

18   the first time.

19          So I'd like to turn to slide 65, and this is the

20   case law I was talking about, the *AstraZeneca* case, and it's

21   improper to assume that use of the conventional element

22   can't render something more valuable.

23          So that's some of the various cases there.  And,

24   you know, incremental value gets thrown around a lot.  It

25   doesn't mean it's small necessarily.  Incremental value can

1    be whatever is added, and it could be significant, and

2    that's an important thing to keep in mind when you hear that

3    particular terminology.  In the *AstraZeneca* case, it was all

4    sort of known components, but the value was tremendous when

5    they were able to put that together, and they found that.

6          So if we could skip to slide 83, you know, there

7    were some different attacks on Dr. Striegel's identification

8    of some of the functions, and I'm using again the general

9    name, you put processors on there.  He provided explanations

10   as to why the processors were important in this particular

11   case, how they were different.

12         Likewise, with the ASIC, we've seen evidence how

13   they had to redo the ASIC specifically for this new network

14   that they were launching, and so I have provided some

15   citations here, you know, to Dr. Striegel on the actual

16   exhibits.

17         And the one thing that I do want to note as well

18   is, there was a *Daubert* to Dr. Striegel, which Judge Morgan

19   had denied, and in denying it, he indicated, he said, look,

20   there is evidence that these different things, like dropping

21   packets and firewalls, which they have been around, you

22   know, they are being used in an entirely different way

23   historically, and so this is in line with what we were

24   seeing with the *AstraZeneca* decision.

25         So with that, unless you have any further

1    questions.

2         THE COURT:  If you could address Cisco's argument

3    regarding the combination of components, I'll call them.

4         MS. KOBIALKA:  Yeah.

5         THE COURT:  And just make sure I understand how it

6    was handled, and if you have any response to that argument.

7         MS. KOBIALKA:  Right.  So let me -- it is -- so a

8    couple of points on that, and I'm trying to find it because

9    it's a little bit later in my presentation here.  It has to

10   do with a couple of things, and this is the distinct acts of

11   infringement.

12        One is the making and using.  They make and use all

13   of these component parts, it's undisputed, here in the U.S.,

14   right, and I have citations to the record on that, and that

15   is also in my slides.

16        I think I found it.  Yes, it's on slide 86.  So if

17   you look here, we have undisputed evidence that Cisco itself

18   uses and tests the various products, right, and we have the

19   testimony exhibits here to go with it.  So we have the

20   making and -- well, the using, and then we also have the

21   making, which is Dr. Mitzenmacher's testimony.  And the

22   requests for admissions, it was Cisco's admissions that they

23   compile a code here.

24        And keep in mind, compiling code is different.

25   This is not just like keeping a repository of code.  This is

1    actually when you're going in, you're taking these

2    instructions from English and you're turning it into

3    computer code, right.  You're compiling it into, so you can

4    make a program.  So there is a making where you have an

5    executable program, and then you've got to test it and run

6    it to verify that it's, in fact, going to work.  Now you're

7    using it.

8          So we have, you know, all of this evidence about

9    this making and using and how this was all in the various

10   products.  So that addresses at some level this combination,

11   because all of those things here are made and used.

12         Their theory is, no, you just have to sell it that

13   way.  You only have to sell it that way, you only have to

14   use it that way.

15         And we're saying, no, these are integrated systems.

16   You never disputed this is how you sell, how you make these

17   particular products, right, and they go all together.

18         Obviously, for the '193, this is a non-issue

19   because it was just the routers and switches.  But to

20   address the '806 and the '176, these things were intended to

21   work together.  The code is embedded.  All you do is turn on

22   a license.

23         THE COURT:  Right.  But going to Mr. Andre's

24   example that he provided, if you sell a Peloton, but you

25   never purchase the subscription, I think what he said was

1    that that would not be infringing.

2              MS. KOBIALKA:  No.  No.

3              THE COURT:  I may have misheard him.

4              MS. KOBIALKA:  Yes.  The *Finjan/Secure* case, which

5    is a Federal Circuit decision, said, look, if you just --

6    all you have to do is activate that license, unlock it,

7    right.  Because of the nature of the claims, these are

8    system claims and CRM claims, just like that *Finjan/Secure*

9    decision, if that's all you have to do, wait, you sold it.

10   Whether or not you have that license, it's infringing.

11             So that's going to cover all of these products that

12   they've made here, which we know that they've used here as

13   well.  And once they sold it, they sold it that way.  All

14   you have to do is unlock it.

15             Cisco's contention is, no, you had to use it, you

16   had to prove this is actually used that way, and you know,

17   that's -- that the customers use it that way.

18             And I have to note that, you know, there was a real

19   issue with how they presented their damages case, such that

20   Judge Morgan had asked for additional information, and when

21   he did so, he gave Cisco a second chance to really address

22   anything they wanted to, and we have some quotes in here,

23   specifically what he said, because he offered them -- this

24   is on slide 87, I believe.  Yeah, he gave them a second

25   opportunity.  He said, give me whatever you think is

 1    relevant here, right, because there is this huge divide that
 2    I'm seeing between the two parties, and provide me anything
 3    that you think would be helpful, not just what I've asked
 4    for.  And you know what they did?  They just produced the
 5    same information.
 6          And so, you know, this was after they've heard all
 7    of Centripetal's evidence and testimony about the different
 8    acts of infringement that were at issue, right, which was
 9    the making, the using, the selling, the offering for sale of
10    these products, those integrated systems, how it was
11    embedded, right, and they still produced the information in
12    the same format, you know.
13          The only party, if they're going to say, okay, this
14    is that combination that's sold, that could have provided a
15    list of exactly who it was and how it was used, is Cisco.
16    We couldn't do that based on the information that they had
17    provided because, keep in mind, they have these huge
18    enterprise clients.
19          They may have different names, whatnot, and one
20    client may have purchased seventy or a hundred or a thousand
21    different routers or switches at different times, and to be
22    able to correlate and put all of that information together,
23    that was within's Cisco's purview.  They chose not to
24    provide that information.
25          And based on that, if we can turn to the next

1    slide, you know, there is a law that says there is a

2    reasonable inference at a certain point, which is where we

3    got to, right.  So beyond already all of the proofs that

4    Centripetal had already provided with respect to how these

5    products infringe, and why they should appropriately be

6    considered within the royalty base, right, it was reasonable

7    based on the evidence that they should also be included,

8    given that Cisco was given a second shot at doing this and

9    really didn't do so.

10          And so we had the *Golden Blount* case there, as well

11   as the *Kaufman* case which cites to the Federal Circuit case

12   *Lindemann*, which is that, look, it may be disputed but you

13   can get all reasonable inferences.

14          And I think if there was ever a case to have a

15   reasonable inference, this is it, because they were offered

16   a second opportunity to get into it, and so it was

17   reasonable to infer that all of the accused products were

18   included in the base, the royalty base, based on how Cisco

19   sells these integrated products, these integrated systems,

20   which they didn't dispute, how their product had all the

21   code on them, you could just activate it, it was just a

22   subscription, and how Cisco presented their revenue

23   information.

24          Another thing, too, to note on that is that, you

25   know, the Firewall Management Center or DNA, they're not

1   going to work with some other products.  Like, this is not

2   something that gets sold.  They're going to work

3   specifically with Cisco's FirePower, the ASA, and, likewise,

4   the DNA is to go to the routers and switches.  So I'm hoping

5   that that addresses --

6           THE COURT:  It does.  It does.

7           MS. KOBIALKA:  Okay.  I did want to finish up.

8           THE COURT:  Am I right that, so Dr. Becker excluded

9   revenue from the switches, routers, and firewalls?

10           MS. KOBIALKA:  Yeah, and I believe DNA and the FMC

11   as well.

12           THE COURT:  All right.

13           MS. KOBIALKA:  Yeah.  He didn't include a single

14   dollar.  I mean, he didn't start with the right SSPPU,

15   right.  He didn't start with the smallest saleable patent

16   practicing unit, and that was based, in part, on relying on

17   these experts who thought the patents were invalid and had

18   no value, and he said, so I didn't want to include that.

19           And then I think that's also how we get to the

20   '193, where they had a whole different infringement case.  I

21   mean, they didn't assume that the hypothetical negotiation,

22   the same infringement case that we did, right, which they

23   were required to do.  That isn't what happened.  That was

24   the way that he was able to exclude all of his revenues for

25   the '193 patent.

1              You know, I did want to mention, too, this is not

2      an all-or-nothing type situation that Cisco suggests, right,

3      because you as the fact finder, we're trying to give you all

4      of this evidence so you can make those determinations, and

5      that was the reason why I also cited to the *Blue Coat*

6      footnote to the decision by the Federal Circuit, you know,

7      about that, the fact finder can do that.

8              Okay.  I did want to take a quick look at 85, slide

9      85, because this also provides you with the case law for

10     foreign sales of accused made products, and we did cite to

11     this.  This is in our findings of fact and conclusions of

12     law, but we have the -- our *Railroad Dynamics* case where

13     they admitted infringement, and they said, look, you can

14     base it on units made in U.S. even if they're sold abroad,

15     and that's, you know, what we have here.

16             *Carnegie Mellon* also had a slightly different

17     situation but they were imported into the U.S. for use in

18     the U.S., and they said that was also appropriate.  So there

19     is law there that we can utilize as well.

20             Let's see.  I would like to -- I skipped around

21     just a moment.  Now I think we should probably close the

22     courtroom, and we can get to that part unless you...

23             THE COURT:  This issue about foreign sales, Judge

24     Morgan included them, right?

25             MS. KOBIALKA:  Yes.

1          THE COURT:  Is there an instance where foreign

2     sales have been included in a context more similar to this

3     case?

4          MS. KOBIALKA:  I think the *Railroad Dynamics* case

5     is one to give you an example.

6          THE COURT:  You pointed to that one.

7          MS. KOBIALKA:  Yeah, I did point to that one.

8          There was precedent, you know.  There was a Supreme

9     Court *WesternGeco* case that said, look, if you can tie it to

10    some infringement in the U.S., you're entitled to get

11    damages, even if it's outside, right, so for some of the

12    activities outside, as long as it's tied to the U.S.

13         And that was my point about these distinct acts of

14    infringement, we have making and using here in the United

15    States, right, and then we have the sales.  You take that

16    with the whole inference that we're entitled to get in the

17    circumstances and the specific facts of this case and the

18    opportunities that Cisco had to address it, and that's what

19    makes all of that appropriate to be included.

20         THE COURT:  Okay.

21         MS. KOBIALKA:  Okay.

22         THE COURT:  What we will do now is close the

23    courtroom, and so members of the public are asked to exit,

24    please.

25

```
 1              (The courtroom was sealed per order of the Court.)
 2              THE COURT:  I do have two interns that are present.
 3    Any issue with them remaining?
 4              MS. KOBIALKA:  None from Centripetal, Your Honor.
 5              THE COURT:  All right.  You all can remain, then.
 6              MR. JAMESON:  No issue with that, Your Honor.
 7              THE COURT:  Okay.  Thank you.
 8              MS. KOBIALKA:  I have to admit I don't recognize
 9    most of the people out there.
10              THE COURT:  Frankly, I don't either, so if both
11    sides could ensure that.
12              MS. KOBIALKA:  We have agreed that our corporate
13    reps can be here for that.  We have already separately
14    agreed, but I will trust that the right people are here.
15              THE COURT:  All right.
16              MS. KOBIALKA:  So now on the closed record, I
17    wanted to address the Keysight license, right.  So there
18    was -- and this is on Page 90, we had two different royalty
19    rates.  We had a █ percent rate for competing products,
20    right, and that █ percent rate was on gross revenues of
21    specific products.
22              Then we had the █ percent royalty rate on gross
23    products that did not -- excuse me, on gross revenues for
24    products that did not actually compete.  So we had two
25    different rates to work with, right.
```

1            Separately, there was this whole component for past

2    damages, and Mr. Gunderson explained this and went through

3    this in detail when he talked about the Keysight license,

4    and he explained that the ███████████████████████

5    ████████ was really for the litigation itself, right.  So

6    that took -- you know, that sort of addressed the settlement

7    component of it.

8            And then the █ and █ percent, this was a

9    short-term license, right, because keep in mind Centripetal

10   didn't want to license its products.  It didn't end up doing

11   so in this particular instance, but it wants to compete and

12   be in the marketplace, so it only gave a short-time license.

13   And so he felt that that was really an arm's length

14   negotiation that was between the two parties that was

15   provided.

16           If we go to the next slide, and this is --

17   Mr. Gunderson provided a lot of testimony.  This is really

18   the comparison between the Keysight license and then the

19   Cisco hypothetical negotiation.  This is in the trial

20   transcript that's at 1479 through 1491.  I mean, he walked

21   through each of these different factors, considering where

22   it was similar and where it was different.

23           One thing he did note was that while the territory

24   for the Keysight license was worldwide, and the license in

25   the hypothetical negotiation in the U.S. would only be for

1    the U.S., he said, because Cisco makes and uses the products

2    here in the U.S., because of all of the different acts of

3    infringement that we talked about, that impacts and it

4    implicates the worldwide, and so he actually did address

5    that particular question.

6            And we talked about the number of patents that were

7    at issue there, how the negotiation works in and of itself.

8    And he also noted that because there was no apportionment

9    to -- in the Keysight license, it was just on gross

10   revenues, right, of these specific products, where here

11   we're doing the apportionment, he also noted that it's

12   really like the rate would -- if you were to apportion the

13   rate down, it would be like to 2.7 to 3.3 rate, and that was

14   also in the record as well.  So unless you have any

15   questions, he did kind of walk through all of this.

16           THE COURT:  I think Cisco argues that there was a

17   cap, and can you just explain whether he addressed that

18   specifically.

19           MS. KOBIALKA:  Yeah.  I don't recall offhand if he

20   addressed that specifically, but the cap in and of itself

21   was part of the negotiation, I think, had to do with the

22   term of the license because it wasn't going to continue on

23   forever.  I think if it was a much longer license, there

24   would have been a different discussion, but I'm not a

25   hundred percent sure what's in the record.

COURTROOM SEALED                                                    645

1          THE COURT:  All right.

2          MS. KOBIALKA:  I don't want to get into that, in

3     particular.  I'm not sure that that was really discussed

4     actually at trial, the cap in and of itself.

5          THE COURT:  Okay.

6          MS. KOBIALKA:  The next page, this was the

7     demonstrative shown where he was going through at 1497

8     through 1502, talking about what would have been the

9     considerations of Centripetal versus what would have been

10    the considerations of Cisco, and he really outlined and went

11    through all of these things, which you need to do.  You have

12    to go through that when you're looking at an agreement for

13    comparability, and he met all of those different things.

14         And, you know, you've got to keep in mind that

15    there is just no way that Centripetal is in the marketplace

16    and trying to compete, is going to sit there at the

17    hypothetical negotiations and say, yeah, you can go ahead

18    and use the routers and switches and firewalls with our

19    patented technology, but don't include it in the royalty

20    base.  I mean, that just isn't realistic in terms of what

21    would have happened at the hypothetical negotiation.

22         And keep in mind, I know the numbers are big, but

23    the increase in revenues that Cisco realized, right, that we

24    were able to demonstrate, and this is also part of the

25    record that was submitted, it was about ███████████  in

JILL H. TRAIL, Official Court Reporter

1   revenues that increased between that June 2017 and 2020 time

2   frame, and there was just a small percentage that we were

3   looking for in terms of that.  For that time frame at trial,

4   it was 444 million to 555 million.  It's a small portion.

5           So, of course, that's what Cisco would have

6   negotiated if it was going to realize that kind of increased

7   revenue.  It would make business sense for them to do so.

8           So I wanted to get briefly into the economic

9   apportionment, and this just has some of the various

10  numbers.  And if we turn to slide 95, you know, this is

11  updated to reflect the patents that are involved now, the

12  number of infringing functions, and what the apportionment

13  would be.

14          And this is based off of -- well, yeah.  So I think

15  this is based off of PTX-1931, and we have some information

16  in the trial transcript about this, as well.

17          And if we go to the next slide, which is 96, this

18  provides the PTX-1958.  We had submitted a corrected exhibit

19  and an unopposed motion.  I don't know if that's been

20  addressed yet, but this is the information.  This has the

21  gross revenues, and we provided it both in worldwide and

22  U.S., because, once again, that's intended for the fact

23  finder to be able to look at all of the evidence and make a

24  decision.  We didn't just look at worldwide, we did both, so

25  you would have both sets of numbers in here, and I don't

1    know that I need to read all of this into the record because

2    it is part of that particular exhibit.

3              THE COURT:  I don't think you do.  I mean, it's in

4    the amended exhibit, right?

5              MS. KOBIALKA:  Yeah, yeah.  So this is the total

6    revenue for the SSPPU that we've identified.

7              And if we go to slide 97, here we added -- we did

8    the calculation for you on a worldwide basis with the

9    apportionment number, so you can see the total apportioned

10   revenues.  This is also reflected in that PTX-1958.  These

11   particular numbers are in there, the corrected version that

12   we submitted.  And we also did that for the U.S. royalty

13   base that's slide 98.  All of these numbers will be

14   reflected in there, but we wanted to summarize and point

15   those out.

16             And then, as you know, he did an 8 and 10 percent

17   royalty rate to the base, and that gets us to slide 100.  So

18   this gives us what the reasonable royalty would be for the

19   patents, whether it's on a worldwide basis or separately on

20   a U.S. basis.  And these specific numbers in the breakdown

21   by product actually are not in the PTX-1958, and so I would

22   like to move this into the record just so you have it for

23   reference.  It's really just doing the math at the 8 and 10

24   percent.

25             THE COURT:  And specifically you're referencing

1   Page 100?

2              MS. KOBIALKA:  Yes, exactly.

3              THE COURT:  Slide 100.

4              MS. KOBIALKA:  Slide 100, yes.

5              THE COURT:  Any objection?  I mean, I think it's

6   their position, which is --

7              MR. JAMESON:  Your Honor, actually, at this point,

8   because we've never seen this before, and it's a

9   demonstrative, it's putting me in a very difficult position

10  to agree to this.

11             THE COURT:  All right.  Ms. Kobialka, my

12  understanding is you're saying these numbers are rolled up

13  from the more specific data that was provided to the Court?

14             MS. KOBIALKA:  Yes.

15             THE COURT:  All right.  I'm going to deny your

16  motion because I agree that he hasn't had a chance to look

17  at it, so it's somewhat difficult to agree at this point.

18             MS. KOBIALKA:  Okay.  I don't think they dispute

19  the total number, and that is provided in the other -- all

20  we did was apply the 8 and 10 percent, so, you know, to get

21  to that total number, and we wanted to provide that.  If I

22  need to read that into the record, I can read all of these

23  numbers in terms of what the -- at the 8 percent to

24  10 percent is.

25             THE COURT:  Why don't you just read the total

 1    numbers in because the other, the calculations would be --

 2              MS. KOBIALKA:  Yeah.  The total numbers are in that

 3    PTX-1958.

 4              So on a worldwide basis at the 8 percent, assuming

 5    that all three patents are infringed, the royalty would be

 6    ██████████████████████████████████████████████ at the █

 7    percent.

 8              And then if we were to take just the U.S., and this

 9    is for infringement of the three patents, it would be ████

10    ████████████ at the █ percent.  And at the █ percent, it

11    would be ███████████ I think that's right, ██████████████

12    ██████.

13              And the next slide just provides those numbers.  I

14    think this has been subject to some rounding.

15              I had a couple of quick hits that I wanted to

16    address just regarding Dr. Becker's opinion and his

17    testimony.

18              THE COURT:  All right.  Let me ask you.  Can the

19    courtroom be reopened at this point?

20              MS. KOBIALKA:  Yes.

21              THE COURT:  All right.  So we will do that.

22

23

24

25

```
 1              (The courtroom was opened to the public.)

 2              MS. KOBIALKA:  So the first thing was that, you

 3    know, his opinion really wasn't tied to the facts, and was

 4    inconsistent with the evidence saying, you know, there was

 5    minimal value and not including for the '193 patent, for

 6    example, the routers and switches.

 7              He admitted on the record at the trial transcript

 8    at 2891 and 2936 that the revamped IOS XE software for the

 9    Catalyst switches included the security we're talking about.

10    That's at the trial transcript here, 2933 through '34, but

11    he still called them basic routers and switches.

12              And so that's the reason why I didn't include a

13    single dollar of the revenues.  It just is contrary to the

14    evidence.  He just ignored all of Cicso's disclosures.  And

15    we have time and time again those -- that type of evidence,

16    as well as the growth.  And there was nothing, he didn't

17    present any data about why Cisco's customers were purchasing

18    Cisco's products.  So, you know, he really didn't have

19    anything to support his opinion, you know, what was going on

20    here.  So this was -- it ended up being a lot of attorney

21    argument.

22              His damages opinion for the '806 was not based on

23    any analysis.  He kind of picked a number that was lower

24    than the other numbers, that was really the central, and he

25    said, I had no quantitative evidence for an opinion on the
```

1    '806 patent.  And so if you look at slide 103, we have

2    citations there to the record where he said that.

3            And, you know, we note in the record he was looking

4    at Stealthwatch for the '176.  The number of customers who

5    have a license to Stealthwatch doesn't really reflect the

6    reality because a single customer could have so many

7    different routers and switches, not something he accounted

8    for.

9            And he utilized, for his opinions for the '193 and

10   '176 some usage data that was the subject of a motion *in*

11   *limine* that never got ruled on.  So I just wanted to quickly

12   note that.

13           He limited -- if we go to the next slide -- the

14   infringement remedy to just sales and didn't really consider

15   anything about making or using, and that's at the trial

16   transcript at 2881.  And, you know, he relied on

17   Dr. Crovella who did a back-of-an-envelope estimation,

18   really didn't have any documents to support it, which is

19   very, very questionable.  As I mentioned, they testified

20   that there was no real value.

21           He also relied on Mr. Scheck, and, as you may

22   recall, Mr. Scheck said that there was only so many actual

23   threats that you could look at, and he came up with a small

24   percentage, that he utilized a portion of the revenues of

25   the limited products that they used for the '176 patent.

1          And Mr. Scheck, his statements, and what Dr. Becker

2    relied upon, is also contrary to Cisco's documents because

3    at PTX-591, he was saying -- Mr. Scheck was saying there was

4    something like 3 out of 792 alerts that even get hit, which

5    I won't get into the flawed nature of that particular

6    decision, but it's contrary to PTX-591 where they said,

7    look, with CTA you're going to have confirmed and detected

8    threats, and that should increase by 10 percent.  So it's

9    completely contrary to their own documents that they have.

10          Just a couple of final notes, is that he didn't

11    update his opinion at all.  He had a chance to do so when we

12    did this particular round.  He didn't include anything, so

13    there is no consideration of revenues.  He stuck with the

14    same opinions that he had at trial.

15          And the last point I wanted to make was he did try

16    to do -- subtract some government sales out, but he didn't

17    meet the basic thresholds that you're required to do, and

18    that also is the subject of our motion *in limine* number 4,

19    which is docket number 213, which also didn't get ruled on.

20          So unless you have any further questions, that's

21    everything.

22          THE COURT:  I don't.

23          MS. KOBIALKA:  Thank you.

24          THE COURT:  Thank you.

25          MR. ANDRE:  Your Honor, there is a final section on

 1    injunctive relief.  I don't know if you want to hear that

 2    today or not, but it's in the slide, and it would take about

 3    two minutes to do so.

 4            THE COURT:  You've got two minutes.

 5            MR. ANDRE:  Okay.  So on injunctive relief, on

 6    slide 108, basically what we're trying to say here is that

 7    we are looking for injunctive relief in just in the

 8    firewalls in the '806 patent.  So we're very limited in what

 9    we're asking for.

10            The nexus of the harm is shown throughout the case.

11            The balance of hardships weighs in favor.

12            And the injunction does serve a public policy --

13    public interest.

14            Running royalties for switches and routers would

15    suffice.

16            The irreparable harm is -- basically, what it comes

17    down to is Centripetal is -- you know, we're five years into

18    this case already.  We're competing every day with a much

19    larger company with their own technology.  We cannot be made

20    whole by money alone, not for the firewalls.  The firewalls

21    are something that takes us right out of the market.  So

22    that's what we're talking about with irreparable harm.  I

23    don't want to belabor your time.  I want to out of here

24    today, so --

25            THE COURT:  Thank you.

1          MR. ANDRE:  -- it's in the slides.

2          THE COURT:  Mr. Jameson, are you going to handle

3    this portion?

4          MR. JAMESON:  I was going to handle damages, and

5    then Mr. Gibson was going to handle the response on

6    injunctive relief.

7          THE COURT:  All right.  Go ahead.

8          MR. JAMESON:  Your Honor, I'm going to try to stick

9    to my presentation and try to respond to some of what I've

10   heard along the way because there would be a lot to unpack

11   that would take me a long time in a vacuum.

12         A couple of starting points:  One, we provide

13   detail findings of fact and conclusions of law on damages

14   beginning at Paragraphs 439 and going all the way through

15   600, and I feel like we addressed a good portion of what you

16   just heard in that presentation.  So I just note that for

17   the record.

18         The other thing that I wanted to do, because I

19   think there is really important context for damages, and

20   this is actually the very first slide from their deck, but

21   it's actually looking at the statute, okay.  Now, the test

22   for infringement; make, use, sell, offer for sale.  That's

23   the test for infringement.  That's how you prove up

24   infringement.

25         Okay.  Once you prove up infringement, if you do

 1    prove up infringement, we then have to look at damages

 2    adequate to compensate, and this is what the statute says.

 3    "Upon finding for the claimant, the Court shall award the

 4    claimant damages adequate to compensate for the infringement

 5    but in no event less than a reasonable royalty for the use

 6    made of the invention by the infringer," and that's a key

 7    word.

 8           How much are you using this invention that you have

 9    been found to infringe?  And that's a key part of

10    determining what is adequate damages.  So we can't lose

11    sight of that.

12           Back to the PowerPoint presentation.  I'm going to,

13    unfortunately -- I'm going to get into numbers almost

14    immediately, so I think I need to go ahead and seal the

15    courtroom.

16           THE COURT:  All right.  I almost asked, but it's

17    fine.  We should, if you're going -- you're going to get

18    into it right now?

19           MR. JAMESON:  My very next slide, yes.

20           THE COURT:  All right.  So we'll ask those to leave

21    again.  Sorry for the -- you're getting more steps in than I

22    am today, so.

23

24

25

1              (The courtroom was sealed per order of the Court.)

2              MR. JAMESON:  Are we good?

3              THE COURT:  Go ahead.

4              MR. JAMESON:  Thank you, Your Honor.

5         I got to always say this.  This is for me

6    representing a company like Cisco, who is the defendant

7    here, I hate this portion of the case because we don't

8    believe that we infringe, we believe that the patent is

9    invalid, and we shouldn't -- therefore, there are no

10   damages.  So I'm up here reluctantly, but I understand that

11   that's part of the drill.

12             This is what they're asking for, somewhere between

13   ████████████ and ████████████.  Maybe that number was updated

14   that Ms. Kobialka just read into the record.

15             And we're going to focus on Mr. Gunderson's

16   analysis because we believe that it is flawed in many, many

17   respects, but before we do that, I want to really begin with

18   four big picture credibility issues that hopefully --

19             THE COURT:  Can the courtroom be reopened now?

20             MR. JAMESON:  We're going to be going back and

21   forth.

22             THE COURT:  All right.  As soon as you're close to

23   being done with that portion, let me know so that we can

24   reopen the courtroom.

25             MR. JAMESON:  I am going to be getting back into

```
 1    damages numbers in about seven or eight slides, so the
 2    question is do you want to play ping pong or whatever you'd
 3    like to do.
 4            THE COURT:  Go ahead.  Can we reopen at that point,
 5    then?
 6            MR. JAMESON:  We can for a while, and then we have
 7    to close again.
 8            THE COURT:  All right.
 9            MR. JAMESON:  We're obviously happy after the fact
10    to de-designate, you know, the sealed portions of the
11    courtroom once we see the transcript as well.
12            THE COURT:  All right.
13            MR. JAMESON:  Four big picture credibility issues.
14    The first one is, Your Honor, they're asking for somewhere
15    between 8 and 10 percent of worldwide revenue on our routers
16    and switches, and that is an absolute astronomical number.
17            At the trial in front of Judge Morgan, the Court
18    actually made that point.  "Well, 10 percent of the sales of
19    routers and switches would be an enormous amount of money."
20            And literally on the fly, Centripetal's counsel in
21    response, "We're hoping for the █ percent number, Your
22    Honor.  With Keysight we did █ percent for the non-competing
23    products and █ percent for the competing products.  So
24    we're looking at █ percent for that."
25            Made the point -- as Mr. Jameson made the point,
```

1    they don't sell -- Centripetal doesn't sell routers and

2    switches.

3            Okay.  That was a pretty important concession, I

4    thought, at the last trial, and we're now back in front of

5    you, and they're back to asking for 8 to 10 percent on

6    routers and switches.

7            The other thing that I struggle with is they're

8    still asking for 8 to 10 percent across all of the patents,

9    despite the fact that Mr. Gunderson acknowledged at trial

10   that based on what he heard from Dr. Striegel, the patents,

11   they have equal weight.  Each of them adds an important

12   element to this operationalization of threat intelligence.

13           Well, two of those patents are now gone, so we once

14   had five patents that were of equal weight.  Two patents are

15   now gone, and they're still seeking 8 to 10 percent royalty

16   on all of our accused products.

17           We knocked out the '205 patent, and as a result of

18   that, our damages number actually goes up, not down.  And

19   why is that?

20           Because Dr. Striegel's apportionment percentage on

21   firewalls at trial, for the '205 patent, he had a 46 percent

22   apportionment number for the '205 patent.  So the '806

23   patent, he had a 54 percent apportionment number based on

24   the way he analyzed the top-level features relative to the

25   elements of the claim.

1        Now, under the realm of Mr. Gunderson was being

2   conservative at trial, he used the 46 percent number for all

3   of the firewall products.

4        We defeat the '205 patent at trial, and the result

5   of that is they're back to using a 54 percent number, and

6   the damages on firewalls actually goes up and not down, and

7   that just seems strange to me.

8        Worldwide sales, and this is a big deal.  I think I

9   heard that we're not contesting that the products are made

10  in the United States, and that's just absolutely not true.

11  We are contesting that as much as you ever could.  What

12  Mr. Gunderson said at trial was, since Cisco's products are

13  made here in the United States, it really affects their

14  worldwide sales.  But the license agreement would be only

15  for the United States.

16       So in this so-called hypothetical negotiation,

17  according to Centripetal, we're going to get a license to

18  three patents only for the United States, but they want a

19  reasonable royalty on worldwide sales, and the reason for

20  that is they say that all of these products here on these

21  two boards, all of these products on these two boards, they

22  say they are made in the United States.  Well, they didn't

23  prove that at trial.

24       They made no effort to prove where Cisco actually

25  makes the accused products.  Instead, they relied

```
 1    100 percent on the fact that Cisco compiles source code for
 2    some of the accused products in the United States, and tried
 3    to turn that into a hook for worldwide sales.
 4            Well, we cite the Microsoft versus AT&T Corp. case
 5    here at 550 U.S. 437, 442, 2007.  It addresses this very
 6    issue.
 7            Your Honor, compiling source code, that is a teeny
 8    tiny step of making these products.  I mean, you can look at
 9    them.  I mean, they're hardware, and they made no effort to
10    prove where any of these products were made, and that's
11    their burden of proof, that's not ours.
12            And I heard in Centripetal's presentation a lot of
13    comments about what we could have done, but they're flipping
14    the burden of proof on us here.  I mean, when it comes to
15    damages, Centripetal has the burden to prove up whatever it
16    is they're trying to seek from us, and they didn't make any
17    effort to show that any of these products, the entire
18    product is made in the United States.
19            And having failed to do that, they're not entitled
20    to worldwide sales.  And the reason why they didn't try to
21    prove that up is because these products are made all over
22    the world.  Now, that's not in the record, but they're made
23    all over the world.  But it was, there again, their burden
24    to try to prove this up, and they didn't.
25            This was Mr. Gunderson's analysis.  He had a
```

COURTROOM SEALED                                                  661

```
 1    royalty base.  He used Dr. Striegel's apportionment.  He

 2    applied the Keysight royalty rate, comes up with his

 3    worldwide damages number.  There are multiple problems with

 4    his analysis, and we are going to start -- you asked the

 5    question about -- about the accused combinations, and I want

 6    to start right there.

 7           Well, I tell you what, let me go one slide more.

 8    Using the '176 patent as an example, the accused product

 9    combination is a Catalyst switch, a router or an integrated

10    services router in combination with Stealthwatch plus CTA

11    being enabled.

12           Stealthwatch, despite their protests, is a

13    separately sold product, and the record is crystal clear on

14    that.

15           But what they want to do is they want the revenue

16    from the sale of every switch and router during the damages

17    period that we've ever sold, whether it was ever used with

18    Stealthwatch, use of the invention, and that creates an

19    enormous royalty base.

20           What does that look like?  Well, on the left side

21    you see that with respect to the implicated switch and

22    routers, ████     sales of those products.  With respect to

23    Stealthwatch, ████   customers of Stealthwatch.

24           Giving them every benefit of the doubt, which was

25    not proven at trial, the intersection of those two circles
```

1  would create a much smaller number of the combination of

2  products that were used.

3          Then you have to enable CTA to work with

4  Stealthwatch.  You have to configure it if you want to use

5  CTA to work with Stealthwatch, and when you do that, the

6  number becomes much, much smaller.

7          In contrast, what Mr. Gunderson does, is he says,

8  I'm taking 100 percent credit for every router and switch

9  you've sold.  I'm taking credit for every Stealthwatch

10  you've sold, without any proof of use, and, again, that's

11  their burden.

12          Okay.  I'm going to stop.  Silly example, but I

13  think it's really important, and it's the peanut butter and

14  jelly sandwich.  Somebody has got a patent on a peanut

15  butter and jelly sandwich, and you've got a grocery store

16  here in Norfolk, and Norfolk is telling the world in their

17  advertising that they've got the world's best deli, come in

18  and have your custom-made sandwich made for you.  And at the

19  deli at the grocery story, someone can go in and order a

20  peanut butter and jelly sandwich, okay.

21          Well, that would potentially constitute an act of

22  infringement against the grocery store.  But you're not

23  entitled to get royalties on every loaf of broad the grocery

24  store sold, every jar of peanut butter the grocery store

25  sold, and every jar of jelly that the grocery store sold.

1    And it may be a silly example, but that's what's happening

2    in this case, and that results in this outrageous revenue

3    base; ████████████ of worldwide sales, without drilling

4    down into the combinations that were actually used in the

5    marketplace.

6         And Ms. Kobialka, I think she said that we had the

7    right to demonstrate the number of customers that actually

8    perhaps bought these various combinations of products and

9    put them together, and, Your Honor, that's flipping the

10   burden of proof.  We did not have to do that.

11        They had -- they had megabytes of almost like an

12   entire computer of data we provided them that sliced and

13   diced the switch sales, the router sales, who they were sold

14   to, and they did not undertake the effort to figure out

15   whether or not these various products were sold to some

16   customer that actually implicated -- put that combination

17   together in the marketplace.

18        That's not our burden to prove that, but they're

19   not entitled to just go, we get everything, and that's what

20   they're doing here.

21        The combination example, it applies to all patents.

22   You know, we're fighting about the '193 patent.  They say

23   that they're only accusing Catalyst switches, aggregation

24   service routers, and integrated service routers, and that

25   they're not accusing Stealthwatch, and they're not accusing

1    ISE.

2            But we've got to go back to what the '193 patent is

3    all about.  The '193 patent, it's both.  None of these are

4    patents on our operating systems, and none of these are

5    patents on ASIC.  None of these patents are new and improved

6    to that kind of technology.

7            I mean, the '193 patent it is, literally, it's a

8    patent on a rule, a rule regarding exfiltration, and there

9    is no way to buy a switch, a router out of the box, plug it

10   in, turn it on, and implement this exfiltration rule.  The

11   only way that can happen would be for ISE to send it down to

12   the router or switch, and that's why we say -- I mean, A, we

13   think it's an infringement issue, but the second point is,

14   when it comes to damages, use of the invention, somehow or

15   another that rule has to get into that router or switch

16   because it's not there on day one, and that's a major, major

17   issue, and we're going to talk about that when we get to

18   Dr. Becker's analysis.

19           THE COURT:  But if I disagree with you on that

20   point regarding the '193, then it is the routers and the

21   switches.  I mean, your expert didn't include any revenue

22   from routers and switches, and so especially as it relates

23   to the '193, I mean, to me, that creates a problem for you.

24           MR. JAMESON:  Well, I'll hit that head on.

25           Dr. Becker did an analytical approach, and under

1    the analytical approach, his job was to find the value of

2    the patented improvement, which is exactly what the case law

3    says.  What is the patented improvement?  Where do I find

4    that in the product?  And what's the value of that?

5          Okay.  Your Honor, routers and switches have been

6    running rules, implementing rules going back 20 years.

7    Packet filtering rules, those have been -- I mean, routers

8    and switches, if you -- if you send a switch, a router a

9    rule, it's a computer, it's going to implement that rule,

10   okay.

11         And Dr. Becker's opinion was the '193 patent, it's

12   dealing with a very specific rule, and that rule has to come

13   from ISE, and therefore, the patented improvement is the

14   ability for ISE to send that rule, that specific rule down

15   to the router or switch.

16         Otherwise, I mean, it's the router or switch, it's

17   going to implement any rule you send to it, and it's been

18   doing that forever.  And he goes, there is nothing about the

19   patent that has made the router or the switch any better.

20   That's what routers and switches do.  It's what they've

21   always done.  And so he goes, that's not where the patented

22   improvement is.  The patented improvement is in ISE, where

23   ISE is the device that's sending the rule down to the router

24   or switch.

25         And, again, it's back to the statute.  What's the

1    use of the invention?

2          So that's why he factored out router and switch

3    revenue, and he focused on ISE revenue, and then he

4    apportioned from there, but that's what he did.

5          THE COURT:  I see that you have some financials

6    throughout, but, frankly, I don't think it's appropriate for

7    your entire closing to be sealed.

8          MR. JAMESON:  I've got -- after slide 18, I think

9    we can unseal the courtroom.

10          THE COURT:  All right.  Go ahead, then.

11          MR. JAMESON:  At least for some period of time.

12          Non-accused products.  It's another thing that's in

13    Mr. Gunderson's royalty base that's inappropriate.  He

14    included products like accessories that you can buy, cables

15    that you can buy.  If you wanted to buy additional memory

16    for a product, you can buy that, or if you wanted more power

17    for a product.  None of those have anything to do with these

18    patents.  They're non-accused products, but by the time he

19    did all of the math for what he included, it added up to

20    another ███████████, and so those should be factored out or

21    subtracted out of his royalty base.

22          Worldwide sales, and this is -- again, this is a

23    big one.  The difference between worldwide sales and U.S.

24    sales, you know, it's the difference in ███████ and

25    basically ██████████  It's a huge number.  It's a

1   difference in his damages on the high end of almost

2   ████████   versus   ████████████ .

3         And how did he get to the point of even trying to

4   rely on worldwide sales?  The first thing is he acknowledges

5   it's a legal question.  He goes, "It's largely a legal

6   issue."  But, "It's my understanding that the software was

7   made here in the United States, and under that theory, then

8   worldwide sales would be appropriate.  That's my

9   understanding."  But that's purely a legal issue.

10        Your Honor, this is when we can unseal the

11   courtroom.

12        THE COURT:  All right.  Yes, please.

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The courtroom was open to the public.)

2          THE COURT:  All right.  You can go ahead.

3          MR. JAMESON:  Thank you, Your Honor.

4          An important point.  "It's my understanding that

5    the software was made here in the United States, and under

6    that theory, then worldwide sales would be appropriate...but

7    it's largely a legal question, as I understand it."

8          We provide with you some case law on slide 20.

9    Quite frankly, the most important slide -- or the most

10   important cite on 20 is the third one.  It's the *Microsoft*

11   case.  It's the U.S. Supreme Court from 2007.  "It is the

12   general rule under United States patent law that no

13   infringement occurs when a patented product is made and sold

14   in another country."  Made in another country.

15         And the only thing that Centripetal relied on for

16   saying that these products were made in the United States,

17   it was that we compiled source code for certain of the

18   accused products in the United States.

19         And we show you Dr. Mitzenmacher's testimony here,

20   and he basically says, "Taking the large, high-level source

21   code that humans have developed and turning it into the

22   actual instructions that the machine will run to be put on

23   the machine."

24         Well, the machines that he's talking about, Your

25   Honor, is all of these machines over here that are

```
 1   appliances that are hardware that have to be made also, and
 2   they did not prove that any of these were made in the United
 3   States.  So worldwide sales is entirely inappropriate.
 4          And that's a quote from -- it's actually citing to
 5   the *Microsoft* case.  It's a quote from *Finjan versus*
 6   *SonicWall*, and quoting from the U.S. Supreme Court case,
 7   quote, "The fact that defendant maintains a source code
 8   depository in the United States is insufficient to establish
 9   domestic infringement.  To this end, the Supreme Court has
10   made clear that liability does not extend to computers made
11   in another country when loaded with software copied abroad
12   from a master disk or electronic transmission dispatched by
13   defendant from the United States."
14          So if all of these products are made around the
15   world, and the source code that's compiled in the United
16   States is sent to wherever it's being manufactured, and it's
17   loaded onto the product as it's being made, *Microsoft* says
18   that's not a basis for worldwide sales, and that should
19   really be the end of the worldwide sales analysis, from our
20   perspective in this case.
21          I'm going to click through these very quickly, but
22   at the top of slide 22, this is their finding of fact citing
23   all of the evidence that they relied on that the accused
24   products are made in the United States, and we just provide
25   you with this evidence, because it does not support the
```

1    proposition that these appliances were actually made.

2    They're all talking about compilation of source code.

3            And that was testimony from one of our fact

4    witnesses that they relied on.  In fact, I think it's kind

5    of interesting.  We weren't fighting them, that our source

6    code is compiled here.  We actually -- you know, it's

7    unusual for litigants to actually admit something in an RFA,

8    and we did.  We go, the source code is compiled here, but

9    that doesn't anything for purposes of where the products are

10   made.

11           We got several requests for admission, and slide 26

12   is the same thing.

13           So the other point that I wanted to make is just

14   about the claims.  The claims make clear that you need

15   hardware.  Every -- whether it's the '193 patent, you've got

16   a system comprising at least a processor or a memory.  I

17   mean, a processor is hardware.  You know, the

18   computer-readable media claims say "one or more

19   non-transitory computer-readable media."  That means you've

20   got to at least have a hard drive.

21           So it's not like there is some argument that you

22   can ignore that these are appliances for purposes of the

23   analysis, and that's the case for each of the asserted

24   claims, and that's slide 27, 28, and 29.

25           And so with respect to the royalty base, we think

 1     there is a problem with the combinations.  We think there is

 2     a problem with non-accused products, and we think there is a

 3     problem relying on worldwide sales.

 4          Absent questions about that, I was going to turn to

 5     apportionment.

 6          THE COURT:  I don't have any questions about that.

 7          MR. JAMESON:  Okay.  Dr. Striegel's apportionment

 8     analysis is flawed, and it's flawed because he didn't do any

 9     analysis of the patent's incremental value.  Instead, what

10     he did, and you already asked the question, he did an

11     analysis:  Looking at the claims, can I find, just looking

12     at the claims, can I find that technology or feature in the

13     accused products?  And if I can, I'm taking 100 percent

14     credit for it.  And I'm going to walk you through this, and

15     that's 100 percent contrary to what the law is.

16          But before I do that, you asked -- you asked a

17     question of Centripetal about implicate, and there was a

18     response about -- Dr. Striegel responded to the Court's

19     question about what he did, and I want to pull up that

20     testimony because I think it's telling, and it's at the

21     trial transcript at 1349.

22          And so the Court asked a question, and this was

23     Dr. Striegel's response.

24          "The witness:  No.  What I've done, Your Honor, is

25     I've looked at each of these top-level functions that I've

1   identified, and then, based on my understanding of the

2   infringement, through the discussion with our experts, my

3   understanding of the asserted patents and the asserted

4   claims is I've identified which of these top-level functions

5   that would be implicated by those asserted patents and their

6   asserted claims.  So it's not just network security, it's

7   going through and looking at the claim elements and then

8   determining which of those have a footprint, or in this

9   case, they would be implicated by the patent."

10          The Court asked another question.

11          The witness, Dr. Striegel:  "I would say they're

12   implicated with respect to the infringement arguments."

13          And, Your Honor, this goes back to the point we

14   made in the trial brief.  We had that hypothetical claim

15   about the automobile with the tires, and I think the

16   console, and it had a new and improved tire pressure

17   mechanism.  Okay.  If we were fighting about that patent,

18   your royalty base is not going to include the car and the

19   tire and the console on your car.  It's going to focus on

20   the patented improvement, which was the tire, the new tire

21   pressure gauge that turns on automatically when you turn on

22   your car.  But they're taking credit for the car, and the

23   tires, and I'm going to show you that, and that's just --

24   that's legally flawed.

25          Back to the PowerPoint.  Thank you.

1          So, first point.  Mr. Gunderson made clear that his

2   apportionment is dependent 100 percent on Dr. Striegel.

3          The Court asked a question, and he goes, well, you

4   do an apportionment.

5          The Court asked another question, and his answer

6   was:  "Well, I used the analysis that Dr. Striegel did."

7          So he is relying on Dr. Striegel for the

8   apportionment analysis for his damages number.

9          This is the law, and I tell you why I love this law

10  is because it dates back to 1884.  Apportionment is not a

11  new issue in the law.  *Garretson versus Clark*, and it's

12  cited all of the time in cases.  And, you know, you see the

13  quote, "When a patent is for an improvement, and not for an

14  entirely new machine or contrivance, the patentee must show

15  in what particulars his improvement has added to the

16  usefulness of the machine or contrivance.  He must separate

17  its results distinctly from those other parts, so that the

18  benefits derived from it may be distinctly seen and

19  appreciated...the patentee must in every case give evidence

20  tending to separate or apportion the defendant's profits and

21  the patentee's damages between the patented feature and the

22  unpatented features, and such evidence must be reliable and

23  tangible, and not conjectural or speculative."  And that

24  burden is on Centripetal.  And Dr. Striegel didn't do that.

25          *Exmark* is throughout our PowerPoint presentation.

```
1    It's the point I just made about the car, but it says the
2    same thing, "A reasonable royalty must be based on the
3    incremental value that the patented invention adds to the
4    end product."  In that case they were fighting about a flow
5    control baffle in a lawnmower.  The way the claim was set
6    up, the claim, it actually included a lawnmower, it included
7    a mower deck, it included a slide discharge opening, and a
8    power means for operating the mower.
9            And the Federal Circuit said "In these
10   circumstances, the patent owner must apportion or separate
11   the damages between the patented improvement and the
12   conventional components of the multicomponent product."
13           You don't get credit for the lawnmower, the mower
14   deck, the side discharge opening, and the power means for
15   operating it.  That's the law.
16           THE COURT:  But getting back to -- I mean,
17   generally that's what the case law says, but they do attempt
18   to point to your marketing language that references these
19   inherent changes to the switch and the router.  And so I
20   think of like a Tesla, when you give these car examples.
21   And so, I mean, what's your response to kind of their
22   pointing to that evidence in the record?
23           MR. JAMESON:  First of all, I -- and this is the
24   law, and we can give you the cases on it.  In patent cases,
25   marketing documents are really not a good thing to be
```

1    relying on, but, instead, we really need to be looking at

2    the technical operation of the products because marketing

3    documents are intended for a very high-level different

4    audience.

5            But we need to look at the technical operation of

6    the products, and I actually -- I -- to that point -- you

7    know, in Centripetal's presentation, they showed you

8    documents about the fact that we rolled out this new

9    operating system, and that we had new and improved ASIC

10   technology.  And, Your Honor, these patents aren't on --

11   these patents aren't on operating systems.  These patents

12   aren't on new and improved ASICs.

13           These patents are directed at something that's

14   very, very narrow, and so I would respectfully say that

15   that's totally irrelevant, and it's a misdirection, okay.  I

16   mean, if they had a patent -- if they had a patent on a new

17   and improved operating system, then, quite frankly, I get

18   where they're coming from, but that's not what these patents

19   are about.  And they're not entitled to a bigger number

20   because the products that they happen to accuse of

21   infringing happen to have a new and improved operating

22   system in them.

23           I mean -- I mean, stated the other way, routers and

24   switches without the new and improved operating system, they

25   could implement the rule of the '193 patent because that's

1    what they've been doing for years, because it's just another
2    rule, and that's actually -- that's my very slide, which is,
3    what's the focus of the patent improvement here?  And for
4    the '193 patent, it is a rule, a single rule to prevent an
5    exfiltration.
6            There have been rules to deal with exfiltration
7    prior to Centripetal.  They have a very specific rule, and
8    that's the focus of the patented improvement.  The '806
9    patent, it's a different way to swap rules.  The fact that
10   it's happening on a router or switch, that doesn't mean that
11   they get a bunch of credit for the router or switch.
12           What's the patented improvement in the rule
13   swapping technique?  Routers and switches have been swapping
14   out rules forever.  So we got to focus on what's the
15   patented improvement.
16           It's the same for the '176 patent.  It's a very
17   specific correlation technique, and actually that was the
18   focus of Dr. Becker's analysis, was find the patented
19   improvement.
20           I already made this point, none of these patents
21   are directed at an improved router, switch or firewall.
22   It's not about a new processor or a new ASIC or a new memory
23   or a patented improvement on memory.  That's just not what
24   these patents are about, you know.
25           I mean, I will tell you, Cisco has got a lot of

1    patents on routers and switches and firewalls and processors

2    and ASICs and things like that, but you know, you know when

3    a patent is talking about an improvement to a router or a

4    switch because you would see it in the specification of the

5    patent talking about a new and improved router and switch,

6    and telling you what it is, and, again, that's just not what

7    this patent is about.  Quite frankly, these patents talk

8    about network devices.  They don't talk about routers and

9    switches necessarily.

10          This is very important because we believe that both

11   Mr. Gunderson and Dr. Striegel failed the threshold legal

12   test.

13          We asked Mr. Gunderson, "And you, yourself, made no

14   effort to determine the incremental improvement of the

15   patents to the accused products, right?"

16          "Answer:  Well, I certainly relied on what

17   Dr. Striegel did.  When you say made no effort, I don't know

18   that that's true.  I certainly spoke to him and whatnot.

19   But I relied on him for that analysis."

20          So with respect to identifying the incremental

21   value of the patented improvement, Mr. Gunderson is pointing

22   the finger at Dr. Striegel.

23          So we asked Dr. Striegel:  "Okay.  As part of your

24   assignment, you were not asked to identify the incremental

25   value that the patented invention adds to the accused end

1    product; is that fair?"

2         "Answer:  I was not asked to identify the

3    incremental value from an economic perspective."

4         That is the test that he is supposed to apply.  So

5    what did he do?  And you've already picked up on this, but

6    we've got cites to the record.

7         The first thing he did was, he says, "I was asked

8    to determine what was the top-level infringing function of

9    the accused products."

10        Okay.  Well, that's not apportionment.  Okay.

11   That's just -- that's a place to start, okay.

12        "I then went through and identified what particular

13   top-level functions would be implicated then by the asserted

14   patents and their asserted claims."

15        And, Your Honor, that's not the test, but he said

16   it multiple occasions.

17        "As part of my analysis, though, I was looking at

18   was a particular top-level function implicated rather than a

19   particular weight of the implication itself."

20        And so we asked him a question about switching

21   technology as it relates to the '193 patent.

22        "Question:  And the same question with respect to

23   switching capacity is that switching capacity in a switch

24   can perform a bunch of different technical functions other

25   than what's required by claim 18 of the '193 patent?"

1          "Answer:  It can perform additional functions
2      beyond what's identified in the '193 patent."
3          "Question:  And again, you did not apportion down
4      switching capacity because of the fact that it could perform
5      additional functions that are not covered by the claim?"
6          His answer:  "I did not apportion down...I felt
7      that it would be extremely difficult to do given the overall
8      complexity of the products at hand."
9          And I want to pause right there.  Your Honor, the
10     whole purpose of the apportionment analysis is in these
11     products that are incredibly complex, it is to see whether
12     or not the patented improvement can be found in these very
13     complex products and apportion out everything else, and
14     that's why you hire a technical expert to do that.  So he's
15     effectively admitting that I didn't do the job that I was
16     hired to do because these products are so complex.  But
17     that's the whole purpose of the apportionment analysis.
18         So from our perspective, Dr. Striegel has admitted
19     legal error twice.  The first one is merely determining
20     whether a top-level function of Cisco's multicomponent
21     products is implicated by a claim, rather than apportioning
22     out the conventional technology and isolating the patented
23     improvement.
24         The second legal error, refusing to further
25     apportion on the basis that it would be extremely difficult

1    to do given the overall complexity of the products at hand,

2    and we cite you the law again.  It's exactly what *Exmark*

3    says.  That's what you have to do, and he didn't do it.

4           So what did he do?  And I'm going to try to pick it

5    up a little bit through here once I frame the issue for you.

6           He went to Cisco documents for each product.  He

7    found like -- typically, he would find a data sheet, and

8    based on that data sheet, he would take all of the

9    information on the data sheet, and he would put the

10   information into buckets, in the category of top-level

11   functions, which he said each of the top-level functions are

12   of equal value.

13          So for the Catalyst switch 9000, he found 13

14   top-level functions, and then he went to the various

15   patents.  And he goes, for the 13 top-level functions, for

16   the '856, '205, and '193 patent, I found six of the

17   top-level functions infringe.  Okay.  That's not the test,

18   but that's what he did.  Five for the '176, four for the

19   '806.

20          So what do I mean by that?  This is the data sheet

21   that he looked at.  It's got all kinds of information at the

22   highest level about what a Catalyst switch could do.

23          Your Honor, for what it's worth, he could have gone

24   to other types of information, and instead of it being two

25   pages of information, it could have gone on for 30 pages.

1    But, anyway, he used these data sheets because these

2    switches have tons of technology in them, and he looked at

3    all of the information on the data sheets, and he put them

4    into 13 buckets, what he called top-level functions for the

5    Catalyst switch.

6            Then what did he do?

7            Well, he was asked:  "So, Doctor, looking at this

8    slide, can you explain what are the top-level functions for

9    the Catalyst switches that are relevant to the '193 patent?"

10           The question itself, I mean, that's not getting you

11   an apportionment.  It could have been a different question.

12   The fact that these top-level functions might be relevant,

13   that's not isolating the patented improvement, but here is

14   what he said.

15           He identified the ASIC with forwarding ACL, access

16   control list and quality of service, the processor,

17   switching capability, routing capability, SD-Access as well

18   as advanced security.

19           And looking at this diagram, the red boxes, what I

20   just read into the record, that's what he found as being

21   either directly implicated by the claims in some form or

22   fashion or implicated, and he then took 100 percent credit

23   for every single one of those.  And, Your Honor, without

24   going through the evidence, we're talking about a switch, a

25   switch that we've been selling forever.

1          I mean, switches, they have switching capacity, and
2  he took a hundred percent credit for switching capacity in
3  his apportionment analysis.  These patents aren't about a
4  new switch or a switching capacity, and he took a hundred
5  percent credit.  Routing capability, switches have been
6  routing traffic forever.  He took a hundred percent credit
7  for that.  We've had ASICs in our products forever, and he
8  took a hundred percent credit for that.
9          And, in fact, I mean, I remember I got a chuckle
10 last Friday when Mr. Hannah, I think he was talking about
11 the '806 patent, and he got to the analysis of whether or
12 not the very beginning elements are met, the microprocessor
13 and the memory, and his response was, "Of course, they got
14 processors and memories.  They're computers."  But he takes
15 credit for it here, and so we asked him about it at trial.
16         And with respect to the Catalyst switches, asked
17 him a question:  "So, Doctor, looking at this slide, can you
18 explain what are the top-level functions for the switches
19 that are relevant to the '193 patent?"
20         And here was his answer:  "I identified the
21 top-level functions, ASIC processor and switching due to it
22 being directly in the claims with regards to a processor."
23         The fact that something is in the claims, that's
24 not an apportionment analysis.  That's the lawnmower.
25 That's the cover.  You've got to do more than that, but

1     that's all that he did.

2            And a similar question about processors.  "I

3     identified it because it had directly identified usage of a

4     processor in the claims."

5            The fact that a claim recites a processor doesn't

6     mean you get a hundred percent credit for it under the

7     apportionment law.

8            He did the same thing with respect to routing

9     capability, and that's at slide 45.

10           With respect to SD-Access, he took 100 percent

11    credit for SD-Access, despite, when you look at SD-Access,

12    it's got a bunch of sub-bullets about what SD-Access can do.

13    There was no analysis of those sub-bullets as to whether you

14    should get a hundred percent credit for them or not.  He

15    just took a hundred percent credit for all of it.

16           He took credit for a bucket he called advanced

17    security, and the reason why he did it is he said, with

18    respect to the '193 patent, "I then identified advanced

19    security by virtue of its association with network

20    security."

21           And, Your Honor, for the life of me, how isolating

22    the patented improvement and deciding that you get a hundred

23    percent credit for something because there is an association

24    with network security, that's just not a proper

25    apportionment under the law.

1          And then when you look at the sub-bullets under

2     advanced security, the very first one is encrypted traffic

3     analytics.  That's not even an accused product with respect

4     to the '193 patent.

5          MS. KOBIALKA:  Objection, Your Honor.  I don't want

6     to interrupt this, but he is just rearguing the *Daubert*,

7     which was already ruled upon.  I read into the record the

8     portions that Judge Morgan had addressed.  This is all

9     attorney argument.  This is not evidence that's in the

10    record.  He's just arguing about what the testimony is.

11         MR. JAMESON:  Your Honor, we're in closing

12    statements, and I'm drawing the inferences from what's a

13    very document that's in the trial record.

14         THE COURT:  I am going to overrule your objection,

15    but I will tell you, Mr. Jameson, I do understand your

16    argument regarding his apportionment.  I don't think it

17    would benefit me for you to go through each of the patents

18    as to that particular argument.

19         MR. JAMESON:  Thank you, Your Honor.  And I was

20    actually going to skip through a bunch of stuff.

21         THE COURT:  Okay.

22         MR. JAMESON:  I just wanted to -- I wanted to point

23    out the *Omega Patents versus CalAmp Corp.* case, and this is

24    at slide 48, where the Federal Circuit said, "Accordingly,

25    here, even if the LMUs have the same components as those set

1    forth in the asserted claims, *Omega* must still 'adequately

2    and reliably apportion between the improved and conventional

3    features of the accused product when using the LMUs as a

4    royalty base."

5           The point is the fact that you can find a component

6    in a claim, that's not good enough.  You've got to do more

7    than that.

8           In light of your comments, Your Honor, beginning at

9    slides 49, it's just additional testimony from the record

10   that shows what he did, and this goes to each of the accused

11   products with respect to each of the patents.  And so 49 --

12          I will stop at slide 53 in light of her objection

13   that I'm arguing a *Daubert*, with respect to the '806 patent,

14   because he identified advanced security in connection with

15   Catalyst switches for the '806 patent.  I asked him a

16   question at trial.

17          "And encrypted traffic analytics is not an accused

18   feature of the '806 patent, fair?"

19          "It is not."

20          "The next bullet" -- from advanced security -- "is

21   AES-256 with powerful MAC security 256-bit encryption

22   algorithms.  Do you see that?"

23          "I do see that."

24          "That technology is not being accused with respect

25   to the '806 patent, fair?"

1           "That is fair."

2           I asked him the same question about the last

3    bullet, and he goes, that's not being accused.

4           So every sub-bullet under the advanced security is

5    not being accused of infringement in the case but he took a

6    hundred percent credit for that in connection with the '806

7    patent.

8           I will move on.  That's the comments that I have on

9    the apportionment analysis that Mr. Gunderson actually

10   relied on at trial.  So absent questions, I was going to

11   move to a slightly different topic, but it still relates to

12   apportionment.

13          THE COURT:  Go ahead.

14          MR. JAMESON:  This is the topic of what appears to

15   be Centripetal's post-trial pivot to built-in apportionment.

16   And I don't know whether they're relying on built-in

17   apportionment or not, to be honest with you.  It certainly

18   was not their theory at trial.  It shows up in their

19   post-trial findings of fact and conclusions of law.

20          Centripetal hit on it a little bit, but I at

21   least -- I wanted to at least introduce why we think it

22   would be inappropriate to use built-in apportionment.  The

23   first reason would be is that's not what Mr. Gunderson used

24   at trial, that's the first reason.  But even if they were

25   trying to use built-in apportionment -- and I should back

1    up.  If they're using built-in apportionment, they appear to

2    be relying on the Keysight agreement and their rates in the

3    Keysight agreement to be the hook for built-in

4    apportionment.  I think that's what they're trying to do,

5    but, again, you're going to have a difficult time finding

6    that in the trial record.  It shows up in their post-trial

7    findings of fact and conclusions of law.

8            But what built-in apportionment is, and this comes

9    from the case *Vectura versus Glaxosmithkline*.  "Built-in

10   apportionment effectively assumes that the negotiators of a

11   comparable license settled on a royalty rate and royalty

12   base combination embodying the value of the asserted

13   patent."

14           Principles of apportionment were effectively baked

15   into the license.  So they're saying that whatever the

16   combination of rate and base that we came up with, we

17   negotiated apportionment into that.  That's the built-in

18   apportionment theory.

19           We provide you some law on slide 63.  The test to

20   use built in apportionment, it's a difficult one.  You've

21   got to go through a bunch of an analysis to prove that there

22   is some agreement out there that looks so much like yours

23   and that the products are absolutely the same or comparable

24   that you could potentially look at that license agreement as

25   a surrogate for an apportionment analysis.  To be crystal

1    clear, they didn't do that at trial, but that's the concept.

2           And this begins pretrial.  We did file a *Daubert*

3    motion, and in response to the *Daubert* motion there was no

4    reference to Keysight, as if that was their apportionment

5    theory.  There was no reference to built-in apportionment,

6    and they never suggested that what Dr. Striegel did was in

7    any way superfluous or unnecessary for Mr. Gunderson's

8    analysis.

9           And you've already seen this in response to the

10   Court's question about apportionment.  Mr. Gunderson made

11   clear, "I used the analysis that Dr. Striegel did."  That's

12   what we attempted to do with Dr. Striegel's analysis.  He

13   said it multiple occasions at trial.

14          With respect to the math, I asked him the question,

15   "And then you basically took Dr. Striegel's numbers and did

16   the math to come up with the apportioned revenue, right?"

17          Correct...well, I certainly relied on what

18   Dr. Striegel did."

19          That was their apportionment theory at trial.

20          There was one question and answer, and this came on

21   redirect of Mr. Gunderson at trial, that appeared to hint at

22   this issue.  And, Your Honor, it's at slide 67.  I've read

23   the answer, and I've read the Court's question, and I've

24   read Mr. Gunderson's answer, and, honestly, I don't know

25   what he's trying to say here other than he came up with some

1  2.7 to 3.3 percent number that theoretically might apply to

2  Cisco in this case based on something that he took from the

3  Keysight agreement.  That appears to be what he was saying

4  here.

5          I don't know whether that was supposed to be

6  built-in apportionment or not, based on this testimony at

7  trial, but then he said, "Let's be clear.  It's my belief

8  that an apportionment is appropriate, and I think that's the

9  way the case law goes."  And I thought that was a reference

10 back to Dr. Striegel.

11         From a pure math perspective -- let me back up

12 before I get to the pure math.

13         The reason why I'm raising this is because they

14 have a finding of fact and conclusion of law on this.  They

15 have got three of them beginning at 497, and here is what

16 they said, "Mr. Gunderson explained that his reasonable

17 royalty analysis, when compared apples to apples with the

18 Keysight royalty, yields an effective royalty rate of 2.7 to

19 3.3 percent of Cisco's unapportioned revenues.  This rate is

20 roughly a third of the 10 percent rate in the Keysight

21 license."

22         Next finding, "If the base for the hypothetical

23 license is kept the same as in the Keysight license, i.e.,

24 unapportioned, then the reduced 2.7 to 3.3 rate fully

25 accounts for the differences between the agreement and the

1   hypothetical negotiation."

2          The last one, and this is the important one:

3   "Thus, further apportionment, and specifically apportionment

4   of the revenue base, is not required."

5          So I think their argument in the findings of fact

6   is, Your Honor, you can ignore Dr. Striegel's analysis in

7   toto, and it's almost as if they're running from

8   Dr. Striegel's analysis because I think that from a pure

9   legal perspective, they know that they've got problems.

10  And, instead, they're now turning post-trial to this

11  built-in apportionment analysis.

12         But if that's what they're relying on, we drilled

13  into this, and we're like, where did this 2.7 -- let me back

14  up.  Where did this 2.7 to 3.3 percent number come from?

15  Because we couldn't figure it out at first, and then we got

16  someone a lot smarter than me that knows a lot about math,

17  figured it out.

18         So -- oh, this isn't supposed to be up.  How can I

19  do this without --

20         THE COURT:  I'll turn to the slide.

21         I thought I generally understood what he had done.

22  He testified to it at trial.

23         What slide are you on.

24         MR. JAMESON:  I'm on slide 69, so I would like

25  to -- Your Honor, actually we did this as a build, but if

1    you -- if you look at the top line of the slide, that shows
2    the royalty rate that he pulled from the Keysight agreement.
3    It shows the apportioned royalty base that he got from
4    Dr. Striegel to come up with his damages number.  That's the
5    top line, okay.

6              Well, if you go to the next line, and if you work
7    backwards, the number that they're trying to get to is the
8    exact same number that they had at trial.  It's the far
9    right number.  They're using now an unapportioned royalty
10   base in the middle number.  And so the question becomes,
11   what does the rate need to be to get to their damages ask?
12   And so that's just pure math.  And they come up with
13   3.3 percent, okay.  That's just -- that's just algebra that
14   they did.

15             The point is the $555 million number that they're
16   using, by definition it came from Dr. Striegel's
17   apportionment analysis in the first instance.  So this is a
18   little bit like the fruits of the poisonous tree.  If
19   Dr. Striegel's analysis was flawed in the first instance to
20   get to the damages ask, you can't use that damages ask to
21   work backwards to get an effective royalty rate, and that
22   was the point we wanted to make on that, and I think we can
23   now go back to not being dark.

24             THE COURT:  So I think you've been going a little
25   less than an hour, but I see that your slide deck has 130

1    slides on it.  So I can't keep the court staff but so long.

2    So give me a sense of what you think you need to do.

3           MR. JAMESON:  I am going to be finished with my

4    presentation in probably 10 to 15 minutes, and then

5    Mr. Gibson has got about two minutes on injunction, and then

6    other than whatever back and forth is going to happen by way

7    of rebuttal.

8           THE COURT:  All right.  You have ten minutes.

9           MR. JAMESON:  I've got ten minutes, okay.

10          The other thing on built-in apportionment is that

11   you have to show that whatever agreement you're looking at

12   to pull a rate from, you've got to show that the products

13   that were the subject of the license agreement and the

14   products at issue in the case are comparable.

15          They tried to do that through Dr. Striegel at

16   trial, and it's slide 71.  Judge Morgan sustained an

17   objection and said, you cannot do that product comparison

18   because it was not disclosed in your expert report.  So

19   there is no product comparison to be able to get out of the

20   starting box to do a built-in apportionment analysis.

21          The next slide, 72 -- my clicker just died -- 73,

22   74, those next three slides, that was testimony from our

23   experts explaining that the products at issue in Keysight

24   are not comparable to the products that are at issue here.

25   So we believe that the apportionment analysis is flawed.

693

1    Then we get to the Keysight agreement, and Your Honor now

2    the numbers are up.

3         We're going to have to seal the courtroom for the

4    Keysight agreement.

5         THE COURT:  All right.  We'll seal it for this

6    portion.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (The courtroom was sealed per order of the Court.)

2              MR. JAMESON:  With respect to the Keysight

3    agreement, we do not believe that was a reliable agreement

4    to use in this case.  It was incredibly unique

5    circumstances, and it's not going to be comparable to the

6    agreement that would have been negotiated between Cisco and

7    Centripetal.  If you're going to rely on a license

8    agreement, you've got to identify the differences between

9    the two agreements, then you have to explain how the

10   differences do not matter, and then you've got to also show

11   technical comparability and economic comparability.  It's an

12   exacting test.

13             And big picture, it was a trial.  Keysight's lead

14   counsel was hospitalized during trial.  They settled in the

15   middle of trial, and the agreement that we're using for this

16   enormous amount of damages is a two-page term sheet.  They

17   want to make the argument that we are a competitor.  The

18   evidence in the Keysight Centripetal trial was that Keysight

19   was a direct competitor in the threat intelligence gateway

20   market.  75 percent of the product here is routers and

21   switches.

22             Your Honor, the record makes clear, and even

23   Centripetal buys that technology from us.  They don't sell

24   routers and switches.

25             There is no evidence that the products are

 1   technically comparable, and, in fact, there wasn't any

 2   comparison at all of any meaningful value, and, most

 3   importantly, the scope of the rights are incredibly

 4   different.  Keysight got ██████████.  They got worldwide

 5   rights.  They had two different rates, █ percent for

 6   non-competitive, █ percent for competitive.

 7           What is Cisco getting?  We're getting three

 8   patents.  We are getting U.S. only rights, and somehow or

 9   another for that, Mr. Gunderson is adjusting upward from the

10   numbers in the Keysight agreement to where we're now paying

11   8 to 10 percent on all products.

12           I will note, in light of developments in this case,

13   there are no overlapping patents between what was tried in

14   Keysight and what's at issue here.  I think the Keysight

15   trial originally had the '205 patent in it.  We don't have

16   that at issue, so there is no overlapping patents.

17           That's the Keysight issue, and we're getting ready

18   to turn right into Dr. Becker's analysis that has more

19   damages numbers in it, so it may make sense -- so I was just

20   told they're all in the record from the last trial, so we

21   can open the court back up.

22           THE COURT:  All right.  You can reopen it.

23

24

25

1            (The courtroom was open to the public.)

2            MR. JAMESON:  Your Honor, these first slides just

3    provide some credentials on Dr. Becker.  One of the

4    interesting things about Dr. Becker is he actually -- he's

5    got a computer science and electrical engineering background

6    before he turned to the finance world.  So he's -- we just

7    showed some of his credentials in the first few slides.

8            This is what Dr. Becker did, and this is what the

9    law requires.  "Determine the value of the incremental

10   improvement of each patent as alleged to be used by Cisco in

11   the specifically accused combination of products," of

12   course, "assuming infringement and validity."  And if you

13   find not infringed or invalid, then there is no damages.

14           So let me go find the value of the incremental

15   improvement, and he did this through what's called an

16   analytical approach.  He took a completely different

17   approach than Mr. Gunderson.  The first thing he did is he

18   did a quantitative analysis of the incremental value to

19   Cisco of each of the patents-in-suit.

20           At the end of his analysis, he did a

21   *Georgia-Pacific* analysis, just like Mr. Gunderson did.  At

22   the end of his *Georgia-Pacific* analysis, it didn't change

23   his numbers, but he did it, and it's in the record, and I'm

24   not going to go through that.  Then he came up with a

25   reasonable royalty damages for each of the patents-in-suit.

1          I already showed you *Garretson versus Clark*, about

2     isolating the value in the patented improvement.  I showed

3     you *Exmark*.

4          These are the numbers that he came up with, slide

5     89:  The '193 patent, $266,000; the '806, $260,000; the

6     '176, $407,000.  These numbers are not updated from trial.

7     These numbers would go up a little bit if we looked at --

8     well, I'll show you when I show you where he found the value

9     of the patented improvement.  Those numbers would go up

10    based on the supplemental revenue numbers that we've

11    provided.

12         But here is his three-step approach.  First,

13    isolate revenue tied to the patented improvement, step one.

14    Apportion to the footprint of the patented improvement, step

15    two.  And then step three, give Centripetal 100 percent of

16    our profits tied to the alleged infringement.  Give it all

17    to them.

18         How do you isolate the patented improvement?  Well,

19    you look at the accused combination for the '193 patent.

20    You know the accused combination.

21         And this is the analysis he did.  The '193's

22    patented improvement, again, it's in a rule.  Cisco's

23    routers and switches, they've implemented packet filtering

24    rules for 20 years.  There is nothing about the router or

25    switch that is changing in any way by another rule being

 1    sent to it, and the only accused packet filtering rule
 2    was it could not be implemented without the use of ISE.
 3    Unless that rule gets sent down from ISE, then it can't be
 4    used.  The patent statute talks about the use of the
 5    invention.  And he talked about the number of times that
 6    Dr. Mitzenmacher referenced ISE, referenced Stealthwatch in
 7    doing his analysis of the '193 patent.
 8             So the first thing that he did is he said there is
 9    no evidence that the selling price of routers or switches
10    have been in any way related or affected by a claim feature
11    of the '193 patent.
12             The patented improvement must be found either in
13    Stealthwatch or ISE.  So he took the revenues associated
14    with those two products, he used that for his starting base
15    number, if you will.  He combined those together.  He then
16    did the apportionment step, and that's here in the record,
17    and he relied on Dr. Crovella.  And with respect to the '193
18    patent Dr. Crovella said, this is one more rule out of
19    10,000 rules that a router or switch can implement.  So
20    that's the apportionment.  You do the math, you give them
21    the gross profit margin, and that's the analysis that he did
22    on slide 97 for the '193 patent.  Okay.
23             I know I'm out of time, but that's his analysis for
24    each of the three patents, and we provide these slides to
25    you to show how he isolated the revenue, what was the

1    apportionment analysis, and what were the gross profits, and

2    he did that for each of the three patents.  And so in light

3    of the fact that all of these are in the deck, and you

4    understand his methodology, I'll wrap up with that.

5              THE COURT:  Thank you.

6              MR. GIBSON:  Good afternoon, Your Honor.  And I

7    promise to keep this brief.  John Gibson on behalf of

8    defendant Cisco Systems.

9              THE COURT:  Nice to see you.

10             MR. GIBSON:  Just a couple big picture points, Your

11   Honor, with respect to the issue of the injunction.

12   Centripetal only seeks an injunction as to the firewalls,

13   and, again, as we point out, the firewalls are the ASA with

14   FirePower services in combination with the FirePower

15   Management Center and the Cisco FirePower firewalls, again,

16   in combination with the FirePower Management Center.

17             Those products are only at issue with respect to

18   the '806 patent.  So to be entitled to an injunction, they

19   would need to find a causal nexus between the harm

20   associated with our alleged infringement for the '806 patent

21   and their loss of sales as to those specific combinations of

22   products.

23             Now, I would note, Your Honor, that the RuleGate

24   product that they think can supplement our firewalls is not

25   a firewall.  They've said numerous times in their

 1    documentation that their RuleGate product sits behind a
 2    firewall or in front of a firewall.  It provides a first
 3    line defense using threat intelligence data.
 4          The firewall is still necessary for customers'
 5    networks, and, in fact, if you go to slide 128 of our
 6    presentation, we had Centripetal's CEO, Mr. Rogers, talk
 7    about these issues, and he confirmed that, in fact, you
 8    cannot just take out firewalls from customers' networks
 9    because in many cases they are required to have those.
10          So, instead, the RuleGate is an additional product
11    that would be utilized in customers' networks.
12          And just briefly, Your Honor, given the fact that
13    we are in Norfolk, and I've sent my kids about 10,000
14    pictures of the battleships outside, I would further note
15    that Cisco's firewalls are utilized throughout the United
16    States Government, and including many of the Departments of
17    Defense agencies.  And so for that reason we do not believe
18    that it would be in the public's interest to issue an
19    injunction as to the firewalls.
20          Thank you, Your Honor.
21          THE COURT:  Thank you.
22          Ms. Kobialka.
23          MS. KOBIALKA:  Can I have 90 seconds?
24          THE COURT:  You can have 90 seconds.
25          Frankly, when there is a time limit, everyone gets

1    to the point and tells me the most important things.

2         MS. KOBIALKA:  Three points.  There was a

3    discussion about the *Microsoft versus AT&T* case and the

4    *Finjan versus SonicWall*.  Those cases involved no liability

5    for foreign installations of software or use by customers in

6    foreign countries where there is a source code repository in

7    the U.S., and we're talking about compilation.

8         I can tell you there is not a single citation to

9    any evidence that the source code or the software, and this

10   is for the CRM claims, were outside the U.S.  They didn't

11   cite it.  It was just attorney argument.  So the evidence is

12   it's all here in the U.S.

13        The next point:  The challenge to Striegel, that

14   was about a hundred percent attorney argument.  There is not

15   a single Cisco expert that went through the top-level

16   functions or rebutted Striegel's top-level function

17   analysis.  And this is like the *Finjan v Blue Coat* case in

18   that respect, where you might have a dispute as to what's in

19   that top-level function, but that is not enough to overturn

20   the fact finder if it's based on the evidence.

21        The last point I wanted to make is that there is

22   substantial evidence that these routers and switches were

23   transformed due to the patented technology to create this

24   unmatched security, and what Cisco presented at trial, they

25   claim this is all old stuff, they've had it, and all of the

 1    evidence in the record is it was new.  And that's all I

 2    have.

 3            THE COURT:  All right.  Ms. Kobialka, while you are

 4    up there, I had asked Mr. Andre -- I guess, my question is

 5    and now that we've had all of the argument is:  Do you

 6    all -- would that satisfy him, or did you all have a chance

 7    to talk about that?

 8            MR. ANDRE:  We haven't had a chance to talk with

 9    Cisco's counsel about it.  Is it okay if we get back to the

10    Court later this week?

11            THE COURT:  That would be fine.  Why don't you,

12    rather than filing something -- well, if there is an

13    agreement, you can file just a notice that you're in

14    agreement with that.  I think you could file those within

15    14 days.  If there is disagreement, frankly, I'd rather just

16    do a Zoom hearing or a Zoom call so I could address it at

17    that time.

18            MR. ANDRE:  That would be fine, Your Honor, and I

19    was talking to Mr. Jameson.  Both of us are just a little

20    bit unclear as to what you want us to talk about.  I know

21    it's about the new exhibits that came in, and I'm not sure

22    to what --

23            THE COURT:  So you had raised the concern about the

24    new exhibits relating to the '176 patent, and so it seems to

25    me one way to address your concern was simply to say, all

1   right, if there is something that has come in during these

2   proceedings that you needed to address, probably the easiest

3   way to do that would be to file amended findings of fact and

4   conclusions of law, because then that would give you an

5   opportunity to address those specific new items of evidence,

6   if you wished to do so, without new complete briefing.

7          And so there was what I thought was some new

8   arguments or at least a very small amount of new evidence

9   that you may wish to address, and so I'm trying to figure

10  out the most streamlined way of doing that, if you felt the

11  need to.

12         MR. ANDRE:  Okay.

13         THE COURT:  And to address your concern that you

14  raised.

15         MR. ANDRE:  I understand what you're saying now,

16  Your Honor, and would it be like just a supplementation, a

17  findings of fact and conclusion of law, or do you want the

18  whole big 200-page document again?

19         THE COURT:  Frankly, if you could do it through

20  just, these are our extra ten findings of fact, that would

21  be perfectly adequate for the Court.

22         MR. ANDRE:  Okay.  I understand what you're talking

23  about now, Your Honor.

24         THE COURT:  All right.

25         MR. ANDRE:  I think we can get that done very

```
 1   quickly.  I'll talk to Mr. Jameson about it, and if there is
 2   a dispute about it, we'll contact the Court and get on a
 3   Zoom.
 4             THE COURT:  All right.  I appreciate that.
 5             MR. ANDRE:  Thank you very much.  I really
 6   appreciate the Court and the court staff for staying late
 7   tonight.
 8             THE COURT:  Glad we could get it done today.
 9             Mr. Jameson, anything else from you all?
10             MR. JAMESON:  I was just going to say, we'll get
11   back to you in short order, if we reach agreement on the
12   issue, and I do very much share the thank you's and
13   particularly to Ms. Trail's phenomenal job.  Thank you.
14             THE COURT:  Thank you all very much.  I appreciate
15   it.  I hope everyone gets back home safely.
16             We'll stand in recess.
17             (Hearing concluded at 6:14 p.m.)
18
19                        CERTIFICATION
20
21      I certify that the foregoing is a correct transcript
22   from the record of proceedings in the above-entitled matter.
23
24
25        _____/s/_____
```

JILL H. TRAIL, Official Court Reporter

1                        Jill H. Trail

2                     June 28, 2023

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JILL H. TRAIL, Official Court Reporter